1  Keith Beauchamp (012434)
   Shelley Tolman (030945)
2  COPPERSMITH BROCKELMAN PLC
   2800 N. Central Avenue, Suite 1900
3  Phoenix, AZ 85004
   Telephone: (602) 381-5488
4  kbeauchamp@cblawyers.com
   stolman@cblawyers.com
5
   Norma Ventura*
6  Gillian Gillers*
   SOUTHERN POVERTY LAW CENTER
7  P.O. Box 1287
   Decatur, GA 30031
8  Telephone: (404) 521-6700
   norma.ventura@splcenter.org
9  gillian.gillers@splcenter.org

10 Matthew J. Schlesinger*
   Jason A. Carey*
11 Terra White Fulham*
   COVINGTON & BURLING LLP
12 One City Center, 850 Tenth Street, NW
   Washington, DC 20001-4956
13 Telephone: (202) 662-5581
   mschlesinger@cov.com
14 jcarey@cov.com
   tfulham@cov.com
15
   [Additional Counsel Listed on Signature Page]
16
   [*Admitted pro hac vice]
17

18            **UNITED STATES DISTRICT COURT**

19               **DISTRICT OF ARIZONA**

20 | A.P.F. on his own behalf and on behalf of his | No.  CV20-00065-PHX-SRB
   minor child, O.B.; J.V.S. on his own behalf and
21 on behalf of his minor child, H.Y.; J.D.G. on his
   own behalf and on behalf of his minor child,      | **FIRST AMENDED COMPLAINT**
22 M.G.; H.P.M. on his own behalf and on behalf
   of his minor child, A.D.; M.C.L. on his own
23 behalf and on behalf of his minor child, A.J.;
   and R.Z.G. on his own behalf and on behalf of
24 his minor child, B.P.,

25                      Plaintiffs,

26           v.

27 United States of America,

28                      Defendant.

{00505349.1 }

**INTRODUCTION**

1.      This action seeks damages for six asylum-seeking families forcibly separated by the United States government:  A.P.F. and his son, O.B.; J.V.S. and his daughter, H.Y.; J.D.G. and his daughter, M.G.; H.P.M. and his daughter, A.D.; M.C.L. and his son, A.J.; and R.Z.G. and his daughter B.P.[1]

2.      When federal agents came to take Herlinda from her father José, she was just five years old.  She clutched her dad, and screamed, "Papi, don't leave me!  Don't let me go!"

3.      When federal agents came to take Obet from his father Abel, he was just seven years old—a frail child with a serious heart condition.  He clung desperately to his father's neck, and screamed as agents physically tore him from his father's arms.

4.      When federal agents came to take Mariela from her father Joel, she pleaded with Joel that she did not want to go.  Mariela, then eleven years old, cried as Joel hugged her.

5.      When federal agents came to take Alicia away from her father, Heriberto, Alicia tried to stay with her father, but an officer pushed her away.  Alicia, then six years old, threw herself to the floor and began crying and screaming.

6.      When federal agents came to take Antonio from his father, Mario, he was just seven years old.  Antonio cried desperately as he saw two agents grab his father. Other agents then grabbed Antonio and took him away as Mario watched helplessly.

7.      When federal agents called Rolando out of his cell, Bertha—who was then nine years old—ran up behind him.  But before she could reach her father, an agent

---

[1] For ease of reference and to protect Plaintiffs' identities, A.P.F. will be referenced hereafter by the pseudonym Abel; O.B. by the pseudonym Obet; J.V.S. by the pseudonym José; H.Y. by the pseudonym Herlinda; J.D.G. by the pseudonym Joel; M.G by the pseudonym Mariela; H.P.M. by the pseudonym Heriberto; A.D. by the pseudonym Alicia; M.C.L. by the pseudonym Mario; A.J. by the pseudonym Antonio; R.Z.G. by the pseudonym Rolando; and B.P. by the pseudonym Bertha.  Plaintiffs will file a separate motion to proceed with pseudonyms.

closed the door.  Through the door, Rolando heard his daughter screaming in despair "Papá! Papá!"

8.     José, Abel, Joel, Heriberto, Mario, and Rolando ("Plaintiff Fathers") were forced to watch, helplessly, as their children were taken away to an unknown fate.

9.     The United States government tore these families apart pursuant to a cruel and unconstitutional policy:  The government intended to inflict terror and harm on these small children and their fathers, as a means of deterring others from seeking to enter the United States.

10.    The Plaintiff children and their fathers fled persecution in their home countries, only to find it in the very place they sought refuge — the United States of America.

11.    Starting in 2017, the United States government tore thousands of young children away from their parents.  The children and their parents were not told when—or even if—they would ever see each other again.  The children were sent to facilities and foster homes hundreds or thousands of miles away from their parents, and in many cases were subject to abuse and neglect while in the custody of the United States government.

12.    Although the full number of separations is yet unknown, it is estimated that the U.S. government has separated more than 5,000 children from their parents at the southern border since 2017.

13.    After the separations, government officers inflicted additional trauma by refusing to inform parents and children of each other's whereabouts or well-being, failing to facilitate communication between separated parents and children, and failing to implement any tracking system to ensure families could be reunited.

14.    The government did not allow children and their parents to communicate in any way for weeks or months.  Parents did not know where their children were, or even if they were safe—and had no way to comfort or protect them.  Children were terrified and could not understand what had happened to them or why it happened.  Why had their parents abandoned them to strangers?

15.     The government's policy of forcibly taking children from their parents caused extraordinary trauma to thousands of families, including Plaintiffs—six fathers and their six children who were separated for months after being detained at the U.S.-Mexico border in Arizona.

16.     Herlinda, Obet, Mariela, Alicia, Antonio, and Bertha ("Plaintiff Children") were taken away from their fathers and remained separated from them, in the custody of strangers, for periods ranging from eight weeks to eight months.  In addition, Obet, Herlinda, and Bertha suffered abuse while in U.S. government custody.

17.     For days and weeks, the fathers, despite desperate pleas for information, were told nothing about the safety or location of their children—and had no way to communicate with their children.

18.     Later, the government provided only limited information about the children's locations and safety and afforded only minimal opportunities for the families to communicate, often at the fathers' expense.  On those limited occasions when the fathers were able to communicate with their children, the conversations were painful reminders of the trauma the children were suffering.

19.     Heriberto, Mario, and Rolando were deported without their children.  They had no idea what would happen to their children, who remained alone in the custody of the U.S. government while their fathers were sent back to their home countries.

20.     The government understood the harm that it was inflicting on these families.  Indeed, it took children from their parents not despite the harm, but because of it:  The government intended to use the terror inflicted on these families to deter other families from migrating to the United States.

21.     Plaintiffs suffered, and continue to suffer, physical, mental, and emotional harm because of the intentional, reckless, and negligent acts of U.S. government policymakers at the highest levels, whose goal was to inflict harm and instill terror.  Plaintiffs suffered, and continue to suffer, further harm because of the intentional, reckless, and negligent acts and omissions of federal actors who used unreasonable force

and cruelty to separate Plaintiff Fathers from their children and failed to exercise basic care or even simple human decency.

22.     Even after reunification, the effects of the government's inhumane conduct continue to exact a toll on Plaintiffs.  Children, especially those young and vulnerable like the Plaintiff Children, suffer trauma when they are separated from their parents, even temporarily.  Such childhood trauma harms cognitive development and emotional growth and increases the risk of disease and mental health disorders.

23.     As a result of the separation, Obet exhibits symptoms of post-traumatic stress disorder ("PTSD") and suffers from traumatic flashbacks, nightmares, and extreme separation anxiety.  Herlinda also exhibits PTSD symptoms and has nightmares, is quick to anger, and suffers from low self-esteem.  Mariela exhibits symptoms of PTSD and anxiety.  She has nightmares related to the separation and worries constantly about her father.  Alicia, Antonio, and Bertha also exhibit symptoms of PTSD, separation anxiety, and depression.

24.     The fathers also suffered emotional trauma— as would any parent who is deprived of any ability to protect their child, and later learns that their child has suffered and lives with continued pain.  Abel experiences acute headaches, struggles to handle stress, and is overcome with sadness and fear at random times.  José is deeply depressed, constantly sad, and has difficulty concentrating.  Joel experiences reoccurring nightmares and developed stomach pains as a result of the separation.  He also experiences headaches and difficulty concentrating.  As for Heriberto, he experiences sadness, frustration and anger.  He also experiences unrelenting, acute headaches which extend around the back of his ears and down to his jaw causing his jaw to tremble uncontrollably.  Mario wakes up in the middle of night screaming for his son and is frequently overcome with guilt and anxious thoughts.  Rolando experiences loss of appetite, constant worriedness, nightmares, and anxiety. These parents and their children now face an increased risk of developing additional mental health disorders, including severe anxiety, depression, and suicidal ideation.

25.     A report by the U.S. Department of Health and Human Services ("HHS") Office of the Inspector General ("OIG") issued in September 2019 found that "intense trauma" was "common" among children who entered the Office of Refugee Resettlement ("ORR") facilities in 2018, with children who had been "unexpectedly separated from a parent" facing additional trauma.[2]  According to this report, "separated children exhibited more fear, feelings of abandonment, and post-traumatic stress than did children who were not separated.  Separated children experienced heightened feelings of anxiety and loss as a result of their unexpected separation from their parents."[3]  Some children suffered from "acute grief that caused them to cry inconsolably," "believed their parents had abandoned them," experienced "feelings of fear or guilt," and were "concerned for their parents' welfare."[4]

26.     Plaintiffs will endure the trauma of forcible separation for the rest of their lives.  They seek redress for themselves and on behalf of their children for the harm the United States has inflicted.  The government is liable for this conduct under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b)(1), 2671, et seq. ("FTCA").

27.     Plaintiffs, by this action, seek monetary damages for the extensive injuries they suffered because of the conduct of the United States government—conduct that should not be tolerated by any civilized society.

**JURISDICTION AND VENUE**

28.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1346(b), and the FTCA, 28 U.S.C. §§ 2671–2680.

---

[2] OFFICE OF THE INSPECTOR GENERAL, U.S. DEP'T OF HEALTH & HUMAN SERVS., OEI-09-18-00431, CARE PROVIDER FACILITIES DESCRIBED CHALLENGES ADDRESSING MENTAL HEALTH NEEDS OF CHILDREN IN HHS CUSTODY 9 (Sept. 2019), *available at* https://perma.cc/2RPJ-WM5H [hereinafter HHS OIG REPORT II].

[3] *Id.* at 10.

[4] *Id.*

29.     On April 4, 2019, Plaintiffs Abel and José submitted administrative claims to the U.S. Department of Justice ("DOJ"), the U.S. Department of Homeland Security ("DHS"), U.S. Immigration and Customs Enforcement ("ICE"), U.S. Customs and Border Protection ("CBP"), and HHS on their behalf and on behalf of their minor children Obet and Herlinda.  On July 24, 2019, Plaintiffs Heriberto, Mario, and Rolando submitted administrative claims to the same agencies on their behalf and on behalf of Alicia, Antonio, and Bertha.  On August 28, 2019, Plaintiff Joel submitted an administrative claim to the same agencies on his behalf and on behalf of Mariela.  None of the agencies has made a final disposition of any Plaintiff's administrative claim, and, as no less than six months have passed since submission of each of these claims, they are deemed finally denied. 28 U.S.C. § 2675(a).  Accordingly, Plaintiffs have exhausted all available administrative remedies.

30.     Venue is proper in this District pursuant to 28 U.S.C. § 1402(b) because the acts and omissions that give rise to this action took place in this District.

## THE PARTIES

31.     Plaintiffs José and Herlinda are Guatemalan nationals who currently reside in Massachusetts.  José brings this action on behalf of himself and his minor child, Herlinda, age seven.  In 2018, José fled to the United States with Herlinda, his only child, seeking asylum.

32.     José and Herlinda, then five years old, were forcibly separated in a CBP facility in Arizona.  José was then detained by ICE in Arizona, Georgia, and Texas, thousands of miles away from his daughter.  Herlinda was sent away on her own by airplane—the first flight she'd ever taken—and placed in ORR custody at a facility in New York.  They were separated for approximately ten weeks. José and Herlinda are currently seeking asylum in the United States.

33.     Plaintiffs Abel and Obet are Guatemalan nationals who currently reside in California.  Abel brings this action on behalf of himself and his minor child Obet, age nine.  In 2018, Abel fled to the United States with Obet, seeking asylum.

34.     Abel and Obet, then seven years old, were forcibly separated in a CBP facility in Arizona.  Abel was then detained by ICE in Arizona, Georgia, and Texas, while Obet was sent thousands of miles away from his father and placed in ORR custody at a facility in New York.  They were separated for approximately ten weeks.  Abel and Obet are currently seeking asylum in the United States.

35.     Plaintiffs Joel and Mariela are Guatemalan nationals who currently reside in Tennessee.  Joel brings this action on behalf of himself and his minor child Mariela, age 13.  In 2018, Joel fled to the United States with Mariela, seeking asylum.

36.     Joel and Mariela, then 11 years old, were forcibly separated in a CBP facility in Arizona.  Joel was then detained by ICE in Arizona, Georgia, and Texas, while Mariela was placed in ORR custody at a facility in Texas.  They were separated for approximately eight weeks.  Joel and Mariela are currently seeking asylum in the United States.

37.     Plaintiffs Heriberto and Alicia are Guatemalan nationals who currently reside in Guatemala.  Heriberto brings this action on behalf of himself and his minor child, Alicia, age eight.  In 2018, Heriberto fled to the United States with Alicia, seeking asylum.

38.     Heriberto and Alicia, who was then six years old, were forcibly separated in a CBP facility in Arizona.  Heriberto was then detained by ICE in Arizona, thousands of miles away from his daughter.  Alicia was sent away on her own by airplane—the first flight she'd ever taken—and placed in ORR custody at a facility in Michigan.

39.     Heriberto and Alicia were separated for approximately fifteen weeks, during which time Heriberto was deported without Alicia. After Heriberto was deported, Alicia spent an additional twelve weeks in the United States.

40.     Plaintiffs Mario and Antonio are Guatemalan nationals who currently reside in Guatemala.  Mario brings this action on behalf of himself and his minor child, Antonio, age nine.  In late 2017, Mario fled to the United States with Antonio, seeking asylum.

41.     Mario and Antonio, then seven years old, presented themselves at an official port of entry in Nogales, Arizona, and were then forcibly separated in a CBP facility.  Mario was then detained by ICE in Arizona, while Antonio was sent away on his own by airplane—his first flight ever—and placed in ORR custody at a facility in New York, thousands of miles away from his father.  Mario was deported to Guatemala without his son.  They were separated for more than eight months.

42.     Plaintiffs Rolando and Bertha are Guatemalan nationals who currently reside in Guatemala.  Rolando brings this action on behalf of himself and his minor child Bertha, age eleven.  In 2017, Rolando fled to the United States with his daughter, seeking asylum.

43.     Rolando and Bertha, then nine years old, presented themselves at an official port of entry in Nogales, Arizona, and were then forcibly separated in a CBP facility.  Rolando was then detained by ICE in Arizona, while Bertha was sent away on her own by airplane—her first flight ever—and placed in ORR custody at a facility in New York, thousands of miles away from her father.  Rolando was deported to Guatemala without his daughter.  They were separated for more than eight months.

44.     Defendant is the United States of America, acting through DHS, HHS, and DOJ, "federal agencies" of the United States under 28 U.S.C. § 2671, and their employees, officers, and agents, including but not limited to CBP and ICE, subcomponent agencies of DHS that are under the direction, authority, and control of the Secretary of Homeland Security; ORR, a subcomponent agency of HHS that is under the direction, authority, and control of the Secretary of Health and Human Services; and the Office of the Attorney General within the DOJ.

45.     The federal officers referenced in this Complaint were at all relevant times employees of the United States, working within the scope and course of their employment with the federal agencies listed above.

46.     DHS employees were responsible for separating Plaintiff Fathers from their children.  DHS employees were also responsible for supervising and managing detained

individuals at CBP and ICE facilities, including those located in Arizona, Georgia, and Texas where Plaintiff Fathers were detained.

47.     HHS employees are responsible for supervising and managing the detention of children the government classifies as unaccompanied, including at facilities and foster homes in New York, Texas, and Michigan where Plaintiff Children were detained while separated from their fathers.

48.     High-ranking officials from DHS, HHS, and DOJ worked together to design and promulgate the unlawful and unconstitutional family separation policy, pursuant to which Plaintiffs were subject to significant harm.

49.     At all relevant times, all DHS employees referenced in this Complaint who interacted with Plaintiffs were acting as investigative or law enforcement officers.  28 U.S.C. § 2680(h).

## STATEMENT OF FACTS

**A.     The United States Developed and Implemented the Inhumane Separation Policy for the Improper Purpose of Deterring Future Asylum Seekers**

50.     The United States took thousands of children from their parents, intending to cause terror, anguish, and harm.  It deliberately used cruelty to deter future migrants from seeking asylum in the United States.  The policy violated the Constitution, statutory and common law, and basic human decency.

**1.     Beginning in Early 2017, the United States Began Planning a Family Separation Policy with Knowledge of and Intent to Cause Harm**

51.     Beginning in February 2017, DHS officials began considering a policy of separating and holding parents and children arriving at the U.S.-Mexico border as a means of deterring the arrival of asylum seekers at this border.  On March 3, 2017, press reports showed that DHS had been considering this policy, which DHS acknowledged in a statement explaining that "the Department of Homeland Security continually explores

options that may discourage those from even beginning the journey" north from Central America to the U.S. border.[5]

52.     The federal government *knew*—long before it instituted the family separation policy to which Plaintiffs were ultimately subjected—of the harm it would cause by separating children from their parents.  For example, in 2016, the DHS Advisory Committee on Family Residential Centers concluded that "the separation of families for purposes of immigration enforcement or management, or detention is never in the best interest of children," and that "[f]amily separation in these circumstances raises serious concerns and violates the best interests of the child—which requires prioritizing family integrity and the maintenance of emotional ties and relationships among family members."[6]

53.     Nonetheless, in February 2017, a meeting of high-ranking federal officials from ORR, DOJ, CBP and ICE took place at the office of the CBP Commissioner, and a proposal to separate asylum-seeking parents from their children at the border was discussed.[7]  Commander Jonathan White, a high-ranking HHS official and then Deputy Director of ORR's Unaccompanied Children program who attended the meeting, later expressed his concerns about the harms of family separation directly to then-ORR director Scott Lloyd and other top officials.[8]  Commander White has testified before

---

[5] Julia Edwards Ainsley, *Exclusive: Trump Administration Considering Separating Women, Children at Mexico Border*, REUTERS (Mar. 3, 2017), https://perma.cc/P7DE-HX5A.

[6] U.S. IMMIGRATION & CUSTOMS ENF'T, DEP'T OF HOMELAND SEC., REP. OF THE DHS ADVISORY COMMITTEE ON FAMILY RESIDENTIAL CENTERS 2, 10 (2016), *available at* https://perma.cc/TZ9C-CUMC.

[7] House of Representatives, Subcommittee on Oversight and Investigations, Committee on Energy and Commerce Hearing (Feb. 7, 2019), Unofficial transcript, *available at* https://perma.cc/F2EV-ZS9W 1006-1024; 1131-1138 (testimony of Commander Jonathan White, U.S. Public Health Service Commissioned Corps, U.S. Department of Health and Human Services).

[8] *Id.*

Congress that because "'[s]eparating children poses significant risk of traumatic psychological injury to the child,' . . . neither he nor anyone he worked with 'would ever have supported such a policy.'"[9]

54.     The publication of the March 3, 2017 news reports that DHS was considering a deterrence policy of separating migrant parents and children at the border was immediately met with an outcry of warnings from the medical community.  The American Academy of Pediatrics ("AAP"), among others, warned that such a policy would affect "vulnerable, scared children" and urged policymakers to "exercise caution to ensure that the emotional and physical stress children experience as they seek refuge in the United States is not exacerbated by the additional trauma of being separated from their siblings, parents, or other relatives and caregivers."[10]

55.     Nonetheless, the Secretary of Homeland Security, John Kelly, confirmed that DHS was considering this policy "in order to deter more movement" along the route north from Central America taken by many asylum seekers.[11]

56.     When confronted by the growing backlash to the then-proposed family separation policy, Secretary Kelly soon appeared to change course, assuring the Senate Committee on Homeland Security and Governmental Affairs in April 2017 that children would be separated from their parents only "if the child's life is in danger" or if the parent was "an addict,"[12] rather than as a matter of course for families arriving at or crossing the border.

---

[9] Colleen Long, *Official Who Oversaw Migrant Kids: Separation Causes Trauma*, AP NEWS (Feb. 7, 2019), https://perma.cc/BQ3T-U6RJ (quoting testimony of Commander Jonathan White, U.S. Public Health Service Commissioned Corps.).

[10] Fernando Stein & Karen Remley, Am. Acad. of Pediatrics, AAP Statement Opposing Separation of Mothers and Children at the Border (Mar. 4, 2017), https://perma.cc/AZ5Q-TN38.

[11] Daniella Diaz, *Kelly: DHS is considering separating undocumented children from their parents at the border*, CNN (Mar. 7, 2017), https://perma.cc/L4Q9-KVAW.

[12] Brooke Singman, *Kelly Says Full-scale Border Wall 'Unlikely,' Clarifies Position on Family Detentions*, FOX NEWS (Apr. 5, 2017), https://perma.cc/RAE5-7N85.

57.     The Administration's own comments and the government's response to the many public warnings of the dire effects of a family separation policy show that the Administration was well aware of the harms family separation would cause before it implemented its family separation policy.

58.     In response to the concerns raised by Commander White that a family separation policy would "expose children to unnecessary risk of harm," and "exceed the capacity of the [ORR Unaccompanied Alien Children, or UAC] program," White was repeatedly assured by the then-Director of ORR, among others, that "there was no policy that would result in the separation of children and parent," and that, accordingly, the UAC program need not plan for continued increases in children classified as unaccompanied as a result of being separated from their parents.[13]

**2.     After Piloting Family Separation in 2017, the United States Launches a Full-Scale Policy of Separating Parents from Their Minor Children in April 2018**

59.     Despite Secretary Kelly's public assurance to Congress in April 2017 that families crossing the border would be separated only in specific circumstances for the welfare of the child, the government covertly began instituting a general policy of widespread separation of families who crossed the southern border.  It did so knowing the separations would cause harm and intending to leverage that harm to deter future immigrants from seeking to enter the United States.

60.     Between July and November 2017, a pilot program of family separation began in CBP's El Paso sector.[14]  Under the program, the government prioritized the

---

[13] House of Representatives, Subcommittee on Oversight and Investigations, Committee on Energy and Commerce Hearing (Feb. 7, 2019), Unofficial transcript, *available at* https://perma.cc/F2EV-ZS9W 1012-1024; 1131-1138; 2058-2064 (testimony of Commander Jonathan White, U.S. Public Health Service Commissioned Corps, U.S. Department of Health and Human Services).

[14] OFFICE OF THE INSPECTOR GENERAL, U.S. DEP'T OF HEALTH & HUMAN SERVS., OEI-BL-18-00511, SEPARATED CHILDREN PLACED IN OFFICE OF REFUGEE RESETTLEMENT CARE 3 (Jan. 17, 2019), *available at* https://perma.cc/2XX7-GBYR  [hereinafter HHS OIG REPORT I] ("From July through

prosecution of the misdemeanor charge of improper entry, including the prosecution of parents who crossed the border into the United States with young children.  It detained parents as criminals, and forcibly took their children away.  DHS re-classified the children as unaccompanied minors and placed them in the custody of ORR.[15]  The government did not reunify the parents following the completion of any misdemeanor criminal sentence.  CBP separated approximately 280 families during the El Paso program.

61.     Because the unaccompanied minors who typically arrived at ORR prior to 2017 had arrived at the border genuinely unaccompanied by a parent or guardian, ORR did not have any formal means of noting that children artificially classified as unaccompanied by CBP in fact had parents in DHS custody, nor of tracking the whereabouts of those parents.  As a result, some staff began to informally track such relationships upon learning of them during a child's intake interview.[16]

62.     By late 2017, the government was separating families along the length of the U.S.-Mexico border, including families arriving through official ports of entry.  Notwithstanding the alarm bells raised by many within ORR that it lacked the systems needed to handle the steady increase in children who had been separated from their parents and re-classified as unaccompanied, DHS discouraged HHS from taking steps to formalize and better prepare for continued increases.[17]

---

November 2017, the El Paso sector of Customs and Border Protection (CBP), an agency within DHS, implemented new policies that resulted in 281 individuals in families being separated.").

[15] *See, e.g.*, *United States v. Dominguez-Portillo*, No. 17-MJ-4409, 2018 WL 315759, at *1 (W.D. Tex. Jan. 5, 2018), *aff'd sub nom. United States v. Vasquez-Hernandez*, 314 F. Supp. 3d 744 (W.D. Tex. 2018), *aff'd*, 924 F.3d 164 (5th Cir. 2019).

[16] HHS OIG REPORT I at 6.

[17] See House of Representatives, Subcommittee on Oversight and Investigations, Committee on Energy and Commerce Hearing (Feb. 7, 2019), Unofficial transcript, *available at* https://perma.cc/F2EV-ZS9W 1012-1024; 1131-1138; 2058-2064 (testimony of Commander Jonathan White, U.S. Public Health Service Commissioned Corps, U.S. Department of Health and Human Services).

63.     On December 16, 2017, senior DOJ and DHS officials jointly prepared and reviewed a memorandum titled "Policy Options to Respond to Border Surge of Illegal Immigration."[18]  The first section of this memorandum, titled "Increase Prosecution of Family Unit Parents," suggests action to "[i]nstruct CBP and ICE to work with DOJ to significantly increase the prosecution of family unit parents when they are encountered at the border," nothing that "[t]he parents would be prosecuted for illegal entry (misdemeanor) or illegal reentry (felony) and the minors present with them would be placed in HHS custody as UACs."

64.     The memorandum's second section, titled "Separate Family Units," suggests "[a]nnounc[ing] that DHS is considering separating family units, placing the adults in adult detention, and placing the minors under the age of 18 in the custody of HHS as unaccompanied alien children (UACs)," and concludes, "[o]nce legal coordination between DHS, HHS, and DOJ is complete, begin separating family units, as stated above."

65.     On April 6, 2018, the U.S. Attorney General announced a "Zero Tolerance Policy," extending the practices of criminal prosecution and family separation tested in the El Paso pilot program to the entirety of the southern border.  The Zero Tolerance Policy "fundamentally changed DHS' approach to immigration enforcement," which, until 2017, did not separate a child from an accompanying adult except in very limited circumstances, such as where CBP determined that the adult was not the child's parent or guardian or the adult posed a danger to the child.[19]

---

[18] Policy Options to Respond to Border Surge of Illegal Immigration, https://perma.cc/7KRZ-PXW7; *see* Anne Flaherty & Quinn Owen, *Leaked Memo Shows Trump Administration Weighed Separating Families at Border, Sen. Merkley Wants Nielsen Investigated for Perjury*, ABC NEWS (Jan. 18, 2019), https://perma.cc/6SVC-9Q3D.

[19] *See, e.g.*, OFF. OF INSPECTOR GEN., U.S. DEP'T OF HOMELAND SEC., OIG-18-84, SPECIAL REVIEW - INITIAL OBSERVATIONS REGARDING FAMILY SEPARATION ISSUES UNDER THE ZERO TOLERANCE POLICY 2 (2018), *available at* https://perma.cc/4E35-DQR5 [hereinafter DHS OIG REPORT I].

66.     In early May 2018, CBP estimated to the Office of Management and Budget ("OMB") that it would separate *more than 26,000 children* from May through September 2018 because of the Zero Tolerance Policy.[20]

67.     Several aspects of the Zero Tolerance Policy and officials' comments on it confirm that the Policy's goal was to harm families through forcible separation in an effort to deter future immigrants from seeking entry to the United States, and that prosecution of underlying criminal offenses of improper entry was pretextual.

68.     For example, the December 2017 joint DOJ and DHS memorandum noted that the "prosecution of family units" and "separat[ion] [of] family units" "would be reported by media and . . . have substantial deterrent effect" on future migration.[21]

69.     On May 11, 2018, John Kelly, President Trump's then Chief of Staff, stated on NPR that "a big name of the game is deterrence . . . .  It could be a tough deterrent — would be a tough deterrent."[22]  He added, "[t]he children will be taken care of — put into foster care *or whatever*."[23]

70.     On June 19, 2018, Steve Wagner, Assistant Secretary of HHS said, "[w]e expect that the new policy will result in a deterrence effect . . . ."[24]

---

[20] OFFICE OF THE INSPECTOR GENERAL, U.S. DEP'T OF HOMELAND SEC., OEI-09-18-00431, DHS LACKED TECHNOLOGY NEEDED TO SUCCESSFULLY ACCOUNT FOR SEPARATED MIGRANT FAMILIES 17 (Nov. 2019), *available at* https://perma.cc/GY3G-F8TG [hereinafter DHS OIG REPORT II].

[21] Policy Options to Respond to Border Surge of Illegal Immigration, https://perma.cc/7KRZ-PXW7; *see* Anne Flaherty & Quinn Owen, *Leaked Memo Shows Trump Administration Weighed Separating Families at Border, Sen. Merkley Wants Nielsen Investigated for Perjury*, ABC NEWS (Jan. 18, 2019), https://perma.cc/6SVC-9Q3D.

[22] Transcript: *White House Chief of Staff John Kelly's Interview with NPR*, NPR (May 11, 2018), https://perma.cc/ZN5N-VN5R.

[23] *Id.* (emphasis added).

[24] Philip Bump, *Here Are the Administration Officials Who Have Said that Family Separation Is Meant as a Deterrent*, WASH. POST, June 19, 2018, https://perma.cc/LTB8-878Y.

71.     While the government claimed that it separated families only when the parents were referred for improper entry prosecution, it also separated many families who presented at official ports of entry seeking asylum and were not subject to prosecution.[25]

72.     The government also separated families who crossed the border between ports of entry when the parents were not criminally charged.

73.     When the government prosecuted parents for misdemeanor improper entry, the typical sentence was 48 hours or less of "time served."  Rather than reunifying the parents with their children after the completion of the misdemeanor sentence, the government sent their children to far-flung ORR facilities, sometimes thousands of miles away.

74.     Although the government claimed that it applied the "Zero Tolerance" prosecutions evenhandedly, CBP targeted parents arriving with their children over single adults when making criminal referrals to DOJ.[26]

75.     During six weeks at the height of the Zero Tolerance period, between May 7, 2018 and June 20, 2018, the government separated at least 2,231 children from their parents.[27]

76.     A DHS directive, issued on June 23, 2018, suggested that once families were separated, only parents who were subject to removal would be reunited with their children, and only "for the purposes of removal."[28]  This directive imposed an impossible choice on parents:  They had to choose between seeing their children again or continuing

---

[25] *See Ms. L. v. U.S. Immigration & Customs Enforcement*, 310 F. Supp. 3d 1133, 1143 (S.D. Cal. 2018) ("[T]he practice of family separation was occurring before the zero tolerance policy was announced, and that practice has resulted in the casual, if not deliberate, separation of families that lawfully present at the port of entry, not just those who cross into the country illegally.").

[26] *See* TRAC Immigration, Syracuse University, "Zero Tolerance" at the Border: Rhetoric vs. Reality, *available at* https://perma.cc/EK2Q-CJ7G  (July 24, 2018).

[27] House Oversight Staff Report (Jul. 2019), *available at* https://perma.cc/ZE5H-9FJZ.

[28] *Fact Sheet: Zero-Tolerance Prosecution and Family Reunification*, U.S. DEP'T OF HOMELAND SEC. (June 23, 2018), https://perma.cc/4X33-8C8D.

to seek asylum in the United States.  The Administration would not allow them to do both.

77.     In response to intense public backlash against the policy, on June 20, 2018, President Trump issued an executive order purporting to end the policy of family separation. Exec. Order No. 13841, Affording Congress an Opportunity to Address Family Separations (Fed. Register at 83 FR 29,435, June 25, 2018).

78.     On June 26, 2018, Judge Sabraw of the U.S. District Court for the Southern District of California issued a preliminary injunction prohibiting the government from separating parents from their children absent a finding of parental unfitness or danger to the child.  He ordered the government to reunify children under age five within fourteen days and children age five and older with their parents within thirty days of the order. [29]

79.     The President of the United States continued to openly discuss the deterrence rationale for pursuing the family separation policy well after the Zero Tolerance aspect of the policy was officially ended, declaring in December 2018 that "[I]f you don't separate, FAR more people will come."[30]

**B.     The United States Forcibly Separated Abel and Obet**

**1.     Abel and Obet Seek Asylum in the United States**

80.     Abel and Obet came to the United States fleeing persecution in Guatemala and seeking medical care for Obet's heart and chest conditions.

81.     Abel and Obet are of the indigenous Q'anjob'al tribe.  While in Guatemala, the family faced violent persecution, including attempted murder because of their indigenous background and Abel's environmental advocacy.

---

[29] *Ms. L.*, 310 F. Supp. 3d at 1146, 1149.

[30] *See* Donald J. Trump (@realDonaldTrump), TWITTER (Dec. 16, 2018, 8:25 AM), https://perma.cc/4EMP-JC34; *see also* Fox News, Interview: Maria Bartiromo Interviews Donald Trump on Fox Sunday Morning Futures (Apr. 28, 2019), https://www.youtube.com/watch?v=hvUc7ONNTp4 at 1:32-2:21; Kimberly Kindy et al., *Trump says ending family separation practice was a 'disaster' that led to surge in border crossings*, WASH. POST (Apr. 28, 2019), 2019 WLNR 13234400.

82.     When Obet was six, his family learned he had only a year to live unless he underwent major heart surgery.  With the support of a charitable organization, Obet had the surgery in Guatemala City, which involved cutting through his back to place a metal clip in one of his heart valves.  The surgeons told Abel that Obet needed regular check-ups with a cardiologist to ensure his survival—something Abel knew was nearly impossible given their income and the lack of access to cardiologists in Guatemala.

83.     Facing persecution in their village and Obet's health condition, Abel made the difficult decision to flee to the United States.

84.     The two-week journey from Guatemala to northern Mexico taxed Obet's body.  After the surgery, Obet had developed a chest condition.  His lungs and throat would sometimes become blocked by thick mucus, and he would choke and wheeze.  Coughing also caused Obet great pain because of his wounds from the surgery.  Obet's surgeon had said Obet could choke on his mucus and instructed Abel on the Heimlich maneuver.  Sometimes, Obet was too weak to cough and clear his congestion.  Abel worried Obet could choke to death.

85.     On the journey, Abel realized Obet's condition worsened when he was cold, so Abel covered him with his sweater and a small blanket and held him close.

86.     Abel and then seven-year-old Obet reached Arizona around May 15, 2018.

87.     Abel reached and crossed the U.S. border.  He walked for hours carrying Obet, who was wheezing and choking.  Around 2:00 A.M., it was too cold to continue. Abel stopped and built a small fire to warm Obet and to signal Border Patrol so that he could ask for asylum.

### 2.     Abel and Obet Are Taken into Custody by CBP

88.     A single Border Patrol agent soon found them.  Abel felt relieved but was soon terrified.  Whereas Abel is 5 feet 3 inches tall, the agent was much taller, had a gun,

and seemed enraged.  He screamed, calling the father and small child *pendejos, jodidos animales* ("stupid, fucking animals").[31]

89.    With his hand on his gun, the agent demanded Abel explain "why you came to my country."  Terrified, Abel kept his head down, held Obet, and did not speak. Eventually Abel tried to explain that he was fleeing his home country and that his son had a severe medical condition.  Though the agent spoke Spanish, he did not acknowledge anything Abel said.

90.    The agent put them in the back of a covered truck with the air conditioning on.  Abel held Obet, but they could not get warm.  They were in the truck for about three hours.

91.    At the Border Patrol station, several agents worked in a single office.  The agents made Abel and Obet sit on the floor with several other families.

92.    With urgency, Abel asked for help for Obet, but the agents told him he was not allowed to speak.  He tried to stand up but was ordered to sit back down and stay still.

93.    Afterward, an officer sat Abel and Obet down to ask Abel questions.  This agent spoke Spanish proficiently.  Abel gave the agent paperwork verifying his identity and relationship to his son, as well as evidence of Obet's medical condition, but the agent would not listen to his pleas for medical care for Obet.  The agent aggressively asked Abel "what you came to do in this country."  Abel told him they were seeking asylum. He also told the agent, "my son had a heart surgery a few months ago, is very sick, and can barely breathe."

94.    The agent told Abel he "did not care," and that he and Obet should not have come to "my country" because "you do not belong here."  Abel tried to show the agent Obet's surgery scars and insisted that Obet needed medical help.  Abel began to cry.  Obet started crying too.  The agent continued to ignore both of them, staring at his computer.

---

[31] This exchange, and any other exchange described herein unless otherwise noted, took place in Spanish.

95.     The agent put Abel and Obet into a small cell with more than twenty parents and children.  Abel again asked for medical attention for Obet, but the agent ignored him.

96.     The cell had concrete floors and walls and a single bench.  Cold air blasted from vents.  It was so cold that Abel and others called it the "hielera," meaning "icebox." There was no space to lie down, so Abel sat with Obet in his lap.  They were both freezing.

97.     After a few hours, Obet complained of chest pain.  Abel went to the cell door to seek attention.  When an agent walked by, Abel knocked on the door and asked for help.

98.     The agent opened the door, and Abel again explained his son needed medical attention.  The agent's response was to take Obet's sweater because it was contraband.

99.     Abel asked several more times for medical attention for Obet to no avail. The agents ignored his pleas, and their only reaction was to order him to sit down.

100.    The agents began threatening not to give Abel his "next Maruchan" if Abel kept talking to them.  Every twelve hours, agents provided the families with a single Maruchan Ramen soup for adults and one cookie and small juice box for each child. Abel and Obet remained hungry after eating these meager rations.  Because they were so hungry, Abel stopped asking for medical help as frequently.  He feared losing what little food they were given.

101.    Abel and Obet spent more time in the cell, crammed in with many other people, freezing, hungry, and exhausted.  There were several kids who appeared sick and were consistently coughing.  Abel worried the children were contagious and spreading germs.

102.    The hielera was so full that there was no space to sleep and barely any to sit.  It was difficult to tell how many days passed; there were no windows and the lights were kept on at all times.

103.   Abel and Obet were freezing and had no blankets.  Some families had thin foil sheets, but Abel and Obet were not provided any.  After the first day in the hielera, Abel found a small piece of foil another family had left.  He tried to cover Obet with it, but the sheet disintegrated and fell off, and the pieces of foil got into Obet's mouth and eyes, exacerbating his condition.

104.   Obet's health got progressively worse.  He was cold, hungry, afraid, and crying constantly.  Abel told stories about dragons to distract him.  If Abel expressed any discomfort, Obet became inconsolable.  And so Abel, despite his own feelings, tried to appear calm.

105.   After some time without medical care, Obet developed a greenish hue to his skin.  Despite the agents' threats to withhold food, Abel again asked for medical attention and was ignored.

106.   At one point, Obet began severely choking, and Abel gave him the Heimlich maneuver, dislodging mucus blocking his airway.  Only then did agents bring them to a hospital.

107.   The doctor who saw Obet did not speak Spanish, so Abel did not follow much of what happened.  He later learned Obet was diagnosed with an acute respiratory infection.

108.   After the hospital, Abel and Obet were placed back in the same freezing cell, despite Abel's attempts to explain that the cold made Obet's condition worse.

**3.      The United States Takes Obet from Abel**

109.   On or around their second day in the cell, Abel and Obet witnessed a horrifying scene.  An agent much larger than anyone in the cell, with a gun in his holster, called a father and son to the door and told the father to give up his son.  When the father refused, the agent grabbed the man by his neck and shoved him back into the cell, forcibly grabbing and taking his small son.  The child was led away desperately crying and screaming, "Daddy, I do not want him to take me!"

110.     Seeing this, Obet started screaming and crying.  Other children also began to cry in fear.  Panicked, Obet asked his father, "Are they going to do that to us?"  Abel tried to calm his son and said no, but Obet wailed, "Do not lie to me, they are going to take me!"

111.     Abel and Obet then witnessed other children being taken by force from their parents.  Abel became terrified that if Obet were taken by force, he could hurt his surgery wounds.  Abel explained this to Obet and coached him not to struggle.  Obet refused to agree to be taken willingly.  Despite feeling a sense of dread he had never before experienced, Abel tried to be calm and told Obet that everything was going to be okay.

112.     When the moment came, Abel had Obet in his arms.  Three armed agents came into the cell and told Abel to put his son down.  Abel asked to speak with an officer about Obet's health.  The agent said no.  Abel then requested a few seconds to hug Obet, but the officer demanded he give up his son.  They trembled with fear and clutched each other.

113.     The agents yelled threateningly that Abel needed to obey and put Obet down.  More agents approached, and they forcibly wrenched Obet out of Abel's arms.  Abel and Obet kept holding hands.  The agents ripped their hands apart and took Obet away.

114.     Obet looked back at Abel, screaming, almost fainting, as he was taken away.  Abel saw a fear on his son's face that he will never forget, and he knows his son saw that same fear on Abel's face.  His son screamed and cried, "Daddy, why are you letting them take me?"

115.     Abel tried to follow the agents out of the cell to comfort Obet, but the agents forced him to stay in the cell.  Abel cried for his son, feeling "totally destroyed."

### 4.     Abel and Obet Are Lost to Each Other for Weeks

116.     Agents took Abel out of the hielera and led him to a different room.  This room had approximately seventy adults.  It was so crowded that Abel felt he could not breathe.  There was no bathroom, and the room stank of urine and bodies.  The smell was nauseating.  There was no space to lie down or even sit.  People often fainted and an agent would take them away.

117.   Abel was held here for approximately 10 days.  He stood in a corner most of this time.  He received just one Maruchan Ramen every twelve hours and felt constant hunger.  But Abel's extreme physical discomfort paled in comparison to the terror of losing his young, frail son.

118.   Abel was distraught.  He thought his son had been taken away permanently, and he was terrified that the officers did not know of or did not care about Obet's medical condition.  If his son started choking, who would help?  Would he get to see a cardiologist?  He felt he would never see his son again.  Abel had suicidal thoughts during this time.

119.   The agents provided no explanation for why they had taken Obet or what would happen to him.  Not knowing any information—or even if his son was alive— tortured Abel.  Over nearly three months, Abel would never receive any explanation from any government agent.

120.   About ten days after taking Obet away, agents put chains on Abel's wrists, waist, and ankles.  They boarded him on a bus and then a plane to a different detention center.

121.   Upon information and belief, Abel was never charged with any criminal offense.

122.   Abel was transferred like this multiple times to detention facilities in Arizona, Georgia, and Texas, with no explanation or notice.  Based on ICE records and on information and belief, it appears that Abel was held for various amounts of time in at least the following facilities: a CBP facility near San Luis, Arizona; Folkston ICE Processing Center in Folkston, Georgia; Stewart Detention Center in Lumpkin, Georgia; and Port Isabel Detention Center in Los Fresnos, Texas.  At each new facility, Abel was initially held in a hielera for many hours and then transferred to a cell.  Every time, Abel tried to ask about Obet he was either ignored or told he did not have the right to speak to the agents.

123.   During his time in CBP and ICE detention, other detained parents who had been separated from their children told Abel about a phone number he could call to try to

speak with Obet.  He tried calling it collect almost daily, but the calls did not go through.  During all of this time, Abel's pain, hunger, and discomfort remained in the background.  His fear for Obet's safety and well-being dominated his mind.

124.    Abel was consistently ignored by ICE agents.  He begged one officer to be put in touch with his son, and told the officer that his son was very sick.  The officer responded, "We know nothing about your case, much less your family."

125.    Later, other officers told Abel and other fathers that the government had taken away their kids for good and that they would be deported without their children.  Being told that he had lost his son forever caused Abel grave terror and anguish.  Abel again had suicidal thoughts.

126.    Other parents suffered as Abel did, and many eventually "drove themselves mad with sadness, regret, and fear."  There was a desperation that permeated the detainees.  Abel succumbed to constant agony and "feeling dead."  He lost hope of ever being with his son again.

127.    Approximately a month and a half after Obet was taken, Abel and several other detainees were brought to a large room to "sign some papers."  The ICE agents in the room gave the detainees papers in English and refused to explain what they meant.

128.    Abel walked up to an ICE officer to ask what happened to his son and what the paper was.  The ICE officer yelled at Abel, refused to answer, and told him to go sit down.  Demoralized, Abel did not say another word.  ICE officers told the detainees that if they did not sign these forms, there would be "problems with ICE."  Abel felt obligated to sign and did so.

129.    The English language form that ICE coerced Abel into signing was titled "Separated Parent's Removal Form."  It had his information and that of Obet pre-populated at the top and referenced the *Ms. L.* litigation.  The form provided only two options: reunification with children for purposes of joint removal, or removal without one's children, where the children would remain in the United States alone to pursue their

independent immigration cases.  The form did not allow parents to choose reunification with their children in the United States to pursue their immigration cases together.

130.   Around two weeks later, ICE agents brought Abel another paper, this time with a Spanish translation, that included the option of being deported with Obet or relinquishing his son and being deported alone.  Abel recalls signing this form to indicate that he wanted to be with his son.

### 5.   After About Fifty Days Apart, Abel and Obet Are Finally Allowed to Speak—Once

131.   About fifty days after Obet was taken, in or around early July 2018, advocates visited Abel's detention center.  Abel met with them and explained that his ill son had been taken away and that he desperately wanted more information.  The advocates talked to ICE, and later ICE let Abel call Obet.

132.   On or about July 7, 2018, Abel and several others were put in a line and given approximately ten minutes each to talk to their children in front of everyone else. While waiting, one father did not stand in line correctly, and an ICE officer yelled and threatened to hurt him.

133.   Eventually it was Abel's turn.  When Obet answered, Abel had no words. He could only cry.  He says of that moment, "My life returned to me when I heard his voice."

134.   Abel and Obet cried, neither able to speak.  But, knowing their time was limited, they tried to catch up quickly.  Obet told Abel he had talked with his mother in Guatemala.  He told Abel he rode on a train, had gotten lost on the train, and went on a plane.  Obet told his father that his heart hurt and that he felt pain at night.  Then their time was up.  Abel had to say goodbye.  He told Obet to be strong and that they would see each other soon.

135.   After the call, Abel became even more worried about Obet's health.

136.   This was the only time, in approximately seventy days of detention, that the government allowed father and son to speak to each other.

137.   Although Abel asked, he was unable to place any other calls to his son because he could not pay for them.

**6.   Abel Learns Obet Was Sexually Abused While in the Custody of the United States**

138.   Advocates who visited the Folkston, Georgia ICE detention center helped Abel contact his wife in Guatemala and his brother in California.  Abel had no money to place calls, but his wife and brother set up accounts so that they could receive collect calls from Abel.

139.   Thereafter, Abel spoke with his wife, who had been able to speak with Obet on the phone.  Abel learned something that broke him all over again: after Obet had been taken away from Abel, Obet had been sexually abused in a foster home in New York.

140.   When Abel learned this, he felt hysterical and powerless.  His mind raced with questions: "Why couldn't the government protect my son?  Why couldn't the government tell me what was going on and help?  The laws of the United States were supposed to protect us, but why did everything turn out the reverse?"  Abel had self-destructive thoughts.  Knowing that his son had been victimized, he felt terrorized by guilt and pain.  He felt like a bad father.

141.   After learning about his son's sexual abuse, Abel increased his efforts to ask ICE for information about his son.  Still, no officers paid attention to Abel's requests.

142.   In early July, Abel saw on television a Univision report on a policy called "Zero Tolerance."  A court had ordered the government to reunite children and parents it had separated.  Abel and other detainees crowded around the television.  As soon as the ICE officer noticed this, he changed the channel.  This was the first time Abel understood why his son had been taken from him.

143.    On June 26, 2018, Judge Sabraw issued the preliminary injunction in the *Ms. L.* case and ordered the government to reunite the families like Abel and Obet, within thirty days.[32]

### 7.    After Approximately Seventy Days, Father and Son Are Reunited

144.    Several weeks later, on or about July 25, 2018, Abel and several other fathers were put in chains and transferred to Port Isabel, Texas, again with no explanation.  When Abel arrived, he noticed a mother walking with a child.  He felt a glimmer of hope but tried to temper his optimism.  He was scared to even hope to see his son again.

145.    As time passed, he watched as other fathers were reunited with their children and released, but he was passed over and given no explanation why.

146.    A few days later, officers returned Abel's clothes to him, brought him and about thirty other fathers to a room, and took off their chains.  The fathers waited. Sometime later, the door opened, and children walked in, disoriented, crying, and frantic. Abel finally let himself have hope and was overcome with emotion.  Abel then spotted Obet, fearful and crying.

147.    Obet looked at Abel but did not recognize him.

148.    Crying, Abel called his son's name.  Obet looked at him again, still unrecognizing, but walked slowly toward him.  Obet then jumped into his father's embrace.  They both sobbed and hugged each other for several minutes.  Overcome with grief, they were at first unable to speak.  Abel felt deep sorrow that his son had endured terrible suffering.

149.    Obet began to say over and over, "Daddy, don't let them take me away again.  Daddy, we have to leave right now so they don't take us again."  Clutching his son, Abel told Obet that everything had only been a bad dream, and that they would not be separated again.

---

[32] *Ms. L.*, 310 F. Supp. 3d at 1149.

150.    Abel and Obet were detained for two more days together.  During those days, Obet clung to Abel and reacted in panic whenever an ICE agent approached.  Obet asked repeatedly when they could leave and whether the agents were going to take him away again, and Abel reassured Obet each time that they were not going to be separated again.

151.    Around July 27, 2018, approximately ten weeks after Abel and Obet were forcibly separated from each other, they were released together.

152.    The release occurred with no notice to Abel, Abel's and Obet's counsel, or Abel's brother in California, who was Abel and Obet's sponsor.  As a result, they had no money and nowhere to go when released.  They sought refuge in a Catholic Charities shelter in Texas until Abel's brother could arrange for their travel to California.

153.    After being reunited, Abel learned some of what his son suffered through, but he laments that he will "never know everything that happened," both because his son is too young to explain everything, and because it upsets Obet to talk about the subject, so Abel avoids it.

154.    Abel learned most of what happened to Obet through paperwork from ORR, but that paperwork was often inaccurate and incomplete.

### 8.    Obet Suffered Clinical Trauma from the Separation from His Father and Sexual Abuse in U.S. Government Custody

155.    After he was taken from his father, Obet was sent to New York and placed in an institution operated by a government contractor, Cayuga Centers.  Obet spent the days at the Center and spent nights at a foster home with several other children.

156.    ORR records reflect that, on various nights, children climbed into Obet's bed and touched his penis, buttocks, and chest.  In reality, the sexual abuse went beyond external touching and was much more severe.

157.    Obet told the foster adult what happened each time, and the adult told the kids to go back to their beds each time.  Still, the sexual abuse persisted.

158.    When Obet reported the abuse to a counselor, who reported it to the foster adults and the New York Police Department ("NYPD"), the foster parent claimed no knowledge.

159.    Obet's mental health deteriorated in the face of the emotional harm the government inflicted upon him by forcibly separating him from his father and exposing him to sexual abuse.  His suffering was registered in several assessments of his mental health, even if the individuals evaluating him all but ignored the government-inflicted sources of trauma.

160.    On June 13, 2018, ORR evaluated Obet for trauma using an analytical form for children and adolescents.  Fifteen points or higher on the evaluation is defined as "clinical" trauma.  Obet registered thirty-six points.  Obet indicated on the form that someone close to him had suddenly or violently passed away.  The evaluation stated that Obet "almost always" had nightmares and disturbing thoughts or images in his mind about "what happened."  It also stated that Obet had negative thoughts about himself or others, thoughts like "I will not have a good life," "I can't trust anyone," and "the world is unsafe."

161.    A Cayuga Centers counselor in New York also found Obet was exhibiting symptoms of PTSD.  Obet told the counselor that he prayed for his father, whom he missed very much.  Obet described almost always feeling hyper-vigilant and suffering from flashbacks and nightmares.  He reported feelings of guilt, isolation, and disinterest.

162.    On June 28, 2018, Obet disclosed to a Cayuga worker that he was being sexually abused in his foster home.  Obet was placed in a new foster home the same day.  The next day, June 29, 2018, NYPD officers visited the new home to interview him.  However, Obet was asleep.  The NYPD scheduled a date for the interview with Obet, on or about July 26, 2018, and instructed that Obet was not to leave the state before then.

163.    But the day before the scheduled NYPD interview, on or about July 25, 2018, the government transported Obet to Port Isabel Detention Facility in Texas.  The transfer occurred without notifying NYPD or allowing them to conduct Obet's interview.

164.    One week later, the NYPD Special Victims Unit recommended closing the investigation into the sexual abuse of Obet.  A police report indicates "all leads [were]

1    exhausted" because Obet had left New York before the scheduled interview, and Cayuga

2    Centers "does not have any forwarding information to contact the child or his father."

3        165.    Obet was unable to talk to his mother about the sexual abuse for over two

4    weeks and was not able to tell his father until they were reunited.

5                **9.    Abel and Obet Continue to Suffer After Being Reunited**

6        166.    In the weeks after their reunification, Obet blamed Abel for the separation,

7    asking why Abel let the officers take Obet away.  He asked, "If you are my Daddy, why

8    didn't you do anything?  Why didn't you defend me?"  Abel explained it was the law and

9    there was nothing he could do.  Eventually Obet stopped asking.  It caused Abel deep

10   pain that his son felt this way.

11       167.    Abel could not leave Obet's side without Obet becoming terrified, crying,

12   and begging his father not to leave him.

13       168.    Obet told his father that every night he had been alone, he thought about his

14   father and asked God to let him have his father back.  He also said he asked every day

15   "where his Daddy is," and "when is he coming," but the adults just told Obet he had to

16   wait.

17       169.    Obet said that he felt sick throughout the separation and went to a doctor

18   once.

19       170.    Abel has noticed that Obet is traumatized and his behavior has changed.

20       171.    Whereas before he was a happy and adjusted child, outgoing, friendly, and

21   trusting of adults, he is now hyper-vigilant, withdrawn, and often sad.

22       172.    Obet's emotions sometimes change quickly and without warning; he can go

23   from being happy to deeply sad, or from being sad to angry.  Obet has tantrums for no

24   apparent reason and one time became aggressive with Abel and tried to hit him.

25       173.    Obet has nightmares and wakes up crying, calling, and reaching for his

26   father.

27       174.    Obet often expresses fear that Abel will be taken and deported without

28   Obet.

175.    Obet sometimes says that he feels that he has no family.  Abel tries to explain that he has his father and mother, but Obet seems stuck on the thought that he has no one.

176.    Obet is terrified of any adult that appears to be a law enforcement officer, including security guards, and grabs onto his father's hand in fear if he sees someone in uniform.  For fear of triggering Obet if they see someone in uniform, Abel rarely takes him out in public except when they go to and from Obet's cardiologist appointments and Obet's elementary school, where he is in the third grade.

177.    Obet avoids discussing what occurred during his separation from his father, including his time at Cayuga and the abuse incidents in foster care, and Abel tries to only talk about happy subjects with Obet to avoid upsetting him.

178.    Abel continues to suffer physical and emotional harm from the separation. He tries to forget everything that happened but he cannot.  Abel often feels sadness and fear at random times.  Sometimes Abel does not want to get out of bed in the morning when he thinks of everything that happened.

179.    Since being reunified with his son, Abel has experienced unrelenting, acute headaches behind his eyes and along his temples when he becomes stressed, especially when he thinks about his ever-present fear that immigration will separate him from his son again and deport him without his son.  Before the separation from his son, he never had headaches as a response to stressful thoughts.

180.    Abel and Obet resettled in Southern California, where they are pursuing their immigration cases.

**C.    The United States Forcibly Separated José and Herlinda**

**1.    José and Herlinda Seek Asylum in the United States and Are Taken into CBP Custody**

181.    In late April 2018, José and Herlinda fled violence and extortion in their home in Guatemala to seek asylum in the United States.  Every night of their journey to

the United States, José held Herlinda — his only child — as they slept.  Though the trip was challenging, Herlinda remained in good spirits throughout and laughed often.

182.   José and Herlinda reached the United States, near Yuma, Arizona, on or about May 8, 2018.  They encountered immigration officials shortly after crossing the border.  The agents placed José and Herlinda, along with a group of other migrants that included several children, in a pickup truck, and then a van with benches, and transported them to a CBP facility.

183.   At the facility, immigration agents processed José and Herlinda.  One agent asked José if he had been watching the news and said, "You know what's going to happen, don't you?  We're going to take the girl away and send her to a detention center for minors and you're going to be imprisoned."  José was alarmed.  He hoped that what the official had told him was not true, but he remained very anxious about what they were going to do with him and Herlinda.

184.   José and Herlinda spent their first approximately two days and nights in the United States shivering on the concrete floor of the CBP facility crowded with other migrant families.  At this hielera, José and Herlinda were crowded into a "cage" — a concrete space surrounded by fencing — with about thirty other people.

185.   The facility had several more cages that held scores of additional migrants, including many children.  Each cage had just one bathroom for use by all those detained, and the bathrooms had only half-doors.  To use the bathroom, they had to walk over people lying on the floor.

186.   The agents denied the detainees showers, soap, and toothpaste.  A trash can in the cage was overflowing, and a foul smell emitted from the bathroom into the areas where José, Herlinda, and the other migrants spent all day and all night.  The lights were always on, and there were no windows, making it difficult for José to know whether it was day or night.

187.   When they arrived at the facility, José and Herlinda had to hand over their belongings to CBP agents.  Although José had a few changes of clothes for Herlinda in a

backpack, he was not allowed to bring any of them into the cage, nor was he allowed to take the sheet that he had packed for her to use on cold nights.  Instead, the agents issued José and Herlinda only thin aluminum sheets to shield themselves from the bitter temperatures.

188.    The sheets were flimsy and ripped after one night, so José collected pieces of sheets left behind by others to try to keep Herlinda warm.  In the cage where José and Herlinda were held, there were no beds.  The migrants, including children, were pressed together on the floor.  But the space was so cramped there was not enough room for every person to lie down, so José sat up on the concrete bench.  He mainly stayed awake, watching over Herlinda, who slept on the floor, with only the thin aluminum sheet to protect her against the freezing concrete.

189.    The agents gave the families nothing to eat but undercooked instant ramen noodle soup, and, for the children, some crackers and juice.  The agents brought the noodles in tepid water, and there was no hot water available to warm up the soup or cook the noodles.  It broke José's heart that he could only feed his daughter these undercooked noodles.  Herlinda told her father that she was hungry, but she was reluctant to eat the undercooked noodle soup.  She ate it three times during their first day in the hielera, but by the second day, she would only take a bite and then refuse to eat the rest.  Herlinda asked why they could only eat the undercooked soup.  José told her to be patient and tried to reassure her that they would not be eating soup forever.

190.    The water that came out of the sink at the hielera was foul-smelling and foul-tasting.  They spent twenty-four hours a day in the cage and were not permitted to go outside.

## 2.    The United States Takes Herlinda from José

191.    After about two days, agents called the name of one of the other detained migrants and escorted him, along with his daughter, out of the cage.  Only the father returned to the cage.  The father cried and explained that the agents had taken his

1   daughter away.  Several others asked the father where they had taken his daughter.  The

2   man could not answer.

3       192.   At that moment, José realized that the threat the agent had made when José

4   and Herlinda first arrived was true—they really were taking children from their parents.

5   Still, José held out hope that they would not take very young children like Herlinda, who

6   was just five years old.  But his hope was short-lived.  An agent called José and Herlinda

7   out of the cage next.

8       193.   José was filled with dread.  After briefly questioning José, the official said,

9   echoing the threats that had been made when José first arrived, "We're going to take the

10  girl away and send her to a detention center for minors.  You're going to be imprisoned."

11      194.   José was horrified at the thought of separation.  He pleaded to the official

12  that his five-year-old daughter was too small to be taken from him and that he could not

13  leave her.  The official only told him, "She can't stay here longer; we're going to send her

14  away."

15      195.   A different official, who José believed was a social worker, told José to

16  bathe Herlinda and change her clothes before she was taken.  This official handed José

17  clothes and a pair of sandals that were far too big for Herlinda, and directed them to an

18  area with showers.

19      196.   José bathed Herlinda and put her belongings (a few clothes and some

20  orthotic inserts from Guatemala) into a bag.  José had about ten minutes to bathe Herlinda

21  and dress her.

22      197.   Although José treasured the few remaining minutes that he had with

23  Herlinda, they were also intensely painful—he was in anguish about the impending

24  separation.

25      198.   Through tears, José struggled to explain to his daughter what was

26  happening.  He told her that the officials would take her somewhere else.  He told her to

27  behave herself, to be strong, and to have patience—that he didn't know exactly when

28  they would see each other again, but that he would never leave her.  José reminded

Herlinda that God would protect them.  While he attempted to maintain a strong face for his daughter, José wondered if this was the last time he would see her.  Herlinda did not say anything, but José could tell she seemed worried.

199.    After José bathed Herlinda, the officials told José, along with the parents of about eight other children, to say goodbye to their children.

200.    José thought of how innocent his daughter was and describes the moment as one of the most painful in his life.  He felt as if the officials were "taking half of [his] life from [him]."

201.    When the social worker approached Herlinda, she latched onto her dad, screaming, "Papi, don't leave me!  Don't let me go!"  Herlinda, who had been upbeat and smiled often on the journey from Guatemala, began crying uncontrollably.  José attempted to comfort her, telling her not to be sad because they would "only be apart for a few moments."

202.    Agents ordered the children to line up on one side of the room, with the parents across from them.  The crying children lined up, wearing their government-issued clothes.

203.    José—standing with the other parents apart from their children—felt powerless to stop the separation.  The moment was excruciating for José and Herlinda. Although Herlinda kept crying, José said with "all the pain in [his] heart [he] had to let them take her."  The agents then led the children in a line out the door, while José and the other parents stood there watching, not knowing when—or even if—they would ever see their children again.

204.    The officials took José and other parents back to the cages.  José describes the scene as being "like a funeral," with grown men and women openly and uncontrollably weeping.  As soon as Herlinda was gone, José began crying.  In anguish, his mind went to the thought of being deported without his daughter.  He did not know whether he would see his daughter again.

### 3.    José Is Kept in Detention After Separation and Has Limited Contact with Herlinda

205.    José wept every day of the next week that he was kept in the hielera after Herlinda was taken.  Left with no information about his daughter, José could not sleep.

206.    The agents refused to tell him what would happen to him and his daughter.  Were they going to be deported?  Would U.S. officials deport only José, leaving Herlinda alone in the United States?  What would happen to Herlinda?  Overcome with confusion and fear, José and the other separated parents in the hielera cried for their children.

207.    José recalls comforting another father who could not stop thinking about what could happen to his child.  Although José reassured him that they would someday be reunited with their children, privately he was deep in despair.

208.    José and other parents constantly asked officials about their children but were denied any information.  Often, the officers would shut the door to silence the parents' pleas.

209.    The detainees continued to eat nothing but the undercooked instant noodle soup.  Each time, José was painfully reminded that Herlinda was only able to eat the undercooked soup for their last meals together.  Whenever he ate he wondered if Herlinda was eating properly.  He hoped that wherever she was, she at least had better food.

210.    After approximately a week in the hielera, José and several other detainees were taken to a courthouse.  Officials told José was told he had been sentenced to "time served" for having entered the United States without authorization, but he has no recollection of going before a judge, making any kind of plea, or actually being charged or sentenced.  Upon information and belief, José was never charged with or sentenced for any criminal offense.  He was transferred to ICE custody and placed in a detention center in Florence, Arizona.

211.    In ICE detention, José continued to ask officers about his daughter, with no response.  José had not heard anything about his daughter since their separation.  The lack of information or even response put José in a state of hopelessness.  He cried most nights.

212.    In late May 2018, José was transferred to the Folkston ICE Processing Center in Folkston, Georgia, again shackled at the hands, waist, and feet during the flight.

213.    Again, José asked about his daughter, but agents at Folkston ignored him.

214.    José was soon transferred again, shackled, this time to Stewart ICE Detention Center in Lumpkin, Georgia.

215.    After arriving at Stewart Detention Center he contacted the Guatemalan consulate to seek information about Herlinda.  The consulate tracked down a number for a worker at Lutheran Social Services ("Lutheran Services") in New York, where Herlinda was being held.  José could not call Herlinda right away because he could not afford the expensive calling card PINs needed for detainees to make calls from within the detention center.

216.    José began work as a janitor at the detention center, earning about two dollars a day, to talk to his daughter.  All of the money went toward purchasing PIN-based calling cards.

217.    After saving enough, José called the Lutheran Services case manager from detention on or about May 26, 2018, expressing his desperation to know his daughter's whereabouts and to speak with her.  Throughout the entire process of attempting to locate and speak with his daughter, José received no help from anyone working for the U.S. government.

218.    José and Herlinda talked for the first time on or about May 31, 2018—three weeks after their separation in Arizona.  When they finally connected by phone, it was nearly impossible for them to speak because they were overcome with emotion and both crying uncontrollably.  They only had time to greet each other and weep for a few minutes before the time on José's calling card expired and the call disconnected.

219.    Hearing Herlinda's voice after so long apart, but still being unable to see her or know when they would be reunited, was agony for José.  Herlinda's crying so distressed José that he began to doubt whether he should have even called her.  He

1    worried the call made things worse for Herlinda because he could not tell his daughter

2    whether they would see each other again.

3          220.   Deeply concerned for his daughter, José confirmed to the worker at

4    Lutheran Services that if he were to be deported, he wanted Herlinda to return to

5    Guatemala with him.  The case worker was able to reach José's wife (Herlinda's mother)

6    in Guatemala who agreed with this decision.  Although José feared the persecution and

7    danger that awaited them in Guatemala, he also feared what would happen to Herlinda if

8    she were left alone in a foreign land.

9          221.   During the next seven weeks of their separation, José and Herlinda were

10   able to speak only about five more times for short periods of a few minutes.

11         222.   José's detention in Stewart was deeply discouraging and degrading.  He

12   cried every night thinking about what was happening to Herlinda.  For a month, José sat

13   in his small cell and wondered if he would ever see his daughter again.

14         223.   Although José wanted to pursue his immigration case in the United States,

15   he was increasingly desperate to see Herlinda again.  Seeing the other asylum-seekers

16   languishing in ICE detention for months and even years, José began to believe that the

17   only way to be reunited with his daughter was if he chose not to pursue his asylum claim

18   and agreed to be deported.

19         224.   On June 18, 2018, José appeared before an immigration judge at Stewart

20   Detention Center.  Desperate to see his daughter and believing deportation to be the only

21   way to be reunited with her, José relinquished his asylum claim before the immigration

22   judge, who then ordered José removed.

23         225.   Eight days after José appeared before the immigration judge, Judge Sabraw

24   in the *Ms. L.* case ordered the government to reunite the families like José and Herlinda

25   within 30 days and prohibited the government from deporting any parent who had been

26   separated from his child at the border before they could be reunified.

27         226.   In late June, José was sent back to Folkston ICE Processing Center, again in

28   shackles.

227.    There, ICE and/or HHS officials presented him with a form in English that they instructed José to sign.  Because the forms were in English, José did not fully understand them.  However, officials explained in Spanish that the form had two options: 1) he could be deported with Herlinda, or 2) he could be deported alone and he could leave Herlinda in the United States.  He recalls additional language on the form, but he does not know what it said.

228.    Unable to read or understand the forms, José refused to sign them.  On or about July 16, 2018, José's legal representatives attempted to meet with him at Folkston but were told that they could not see him.  On July 18, 2018, an immigration judge re-opened José's case in light of the "totality of the circumstances" surrounding the previous removal order.

### 4.    Herlinda Is Placed in ORR Custody More than 1,000 Miles Away from Her Father and Faces Abuse There

229.    After Herlinda was separated from her father, she spent a night or two at an unknown location before being put on a flight across the country—her first time ever on an airplane, without any family by her side.

230.    She arrived in New York City on or about May 11, 2018.  She was placed at Lutheran Social Services of New York, Safe Haven for Children Program run under the auspices of ORR, where she spent some of her daytime hours.  Herlinda spent her nights in a foster home associated with Lutheran Services.

231.    Herlinda's ORR records reflect that about a day after her arrival in New York, she cried when discussing the separation with the case manager.  On May 17, Herlinda, who "presented sad and timid," told her case manager that she missed her parents and wanted to talk to her dad.

232.    While in ORR custody, Herlinda suffered multiple instances of harm.  On or about May 21, Herlinda was watching television at her foster home when a male minor residing at the same home inappropriately touched her chest.  In one of her weekly meetings with her clinician, Herlinda reported that this made her feel uncomfortable.

Child Protective Services was informed and law enforcement officers came to the home to investigate the incident.  According to an ORR Counseling Progress report, Herlinda was scared when she saw the law enforcement officers and "did not understand why they were in the home."

233.    Following the inappropriate touching at the first foster home, Herlinda was moved to another foster home.  However, the same boy remained in her "class" at Lutheran Services, and on May 24, staff noted that he attempted to grab Herlinda's face and kiss her. Their teacher separated them and explained to both that the behavior was wrong.

234.    Herlinda and the minor were "monitored," but ORR records do not indicate they were placed in separate classes.  Herlinda had difficulty focusing in school after these incidents.

235.    Herlinda reported to a case worker that the grandmother in the foster home where Herlinda resided had spoken to Herlinda harshly, using offensive words that made her uncomfortable.  The words were "pendeja*"* ("stupid," "dumbass," or "asshole") and "carajo" ("fuck," "shit," or "damn it"). The grandmother claimed that she had only said "pendejada" ("foolishness" or "stupid thing").  A caseworker told the grandmother that such words were offensive to people from Guatemala, like five-year-old Herlinda.

236.    In several instances, Herlinda was locked alone in a room as "punishment."

### 5.    Herlinda and José Are Reunited and Face the Effects of Separation

237.    Around July 16, 2018, ICE transferred José, shackled again by the wrists, waist, and feet, by plane to another detention center in Port Isabel, Texas.

238.    Before he left Folkston for Port Isabel, José was given a DNA test.

239.    José was unsure what would happen once he arrived in Port Isabel but believed he was getting closer to finally reuniting with Herlinda.

240.    At Port Isabel, officials told him that he was going to be reunited with his daughter and released on parole.

241.     ORR records reflect that Herlinda left her foster home in New York and boarded a plane for Texas around 2:00 A.M. on July 21, 2018.

242.     Later that day, an official called José to speak with his attorney on the phone.  Before José could take the call, another official told him to go back to his cell to gather his belongings.

243.     Although José was never told he was going to meet his daughter, he followed the officers, hoping to see her.  They then stopped and entered an office where José saw Herlinda watching television.  José immediately began crying tears of joy.  He realized that at times during the separation he had lost hope that he would ever see her again.

244.     José also felt immediate anxiety when he saw Herlinda.  He was concerned about how the separation had affected her emotionally and was unsure how she would react now.

245.     When José stepped into the room Herlinda looked over at him with uncertainty.  For a brief moment, it seemed that she did not recognize him.  But then — realizing that her father was finally standing in front of her — she ran over to him and cried as she embraced him.  José describes this as a "beautiful moment" that "brought [him] to life again."

246.     Because they had nowhere to go, the two spent a few days at a Catholic Church in Texas before they were released together.

247.     During that time, as joyous as he felt at having his beloved daughter back with him, José was also deeply troubled at the thought of the harm Herlinda experienced in foster care and of his inability to protect her from those harms.

248.     José and Herlinda resettled in Massachusetts, where they are pursuing their immigration cases.

249.     The two and a half months of separation "emotionally destroyed both" José and Herlinda.  In the eight months since the reunification with his daughter, José has noticed the ongoing and lasting effects that the trauma of separation has had on Herlinda.

250.    Herlinda is far more sensitive than she was before the separation and cries frequently for no apparent reason.

251.    Since the separation, Herlinda exhibits symptoms of PTSD.

252.    José notices that she is now impatient and quick to anger, on occasion hitting him.

253.    In calls with her mother, Herlinda suddenly and inexplicably becomes angry and hangs up.  She was not like this before the separation.

254.    After reunifying with her father, Herlinda did not want to go to school.

255.    José perceived that Herlinda's self-esteem has suffered.

256.    Even now, Herlinda has nightmares about the separation and her detention that wake her at night and make it difficult for her to sleep.  José finds it difficult and shocking to see his previously happy daughter act this way, but tells himself he must "remember what she went through."

257.    The prolonged separation has also impacted José deeply.

258.    While José was separated from Herlinda, he wept constantly and had trouble sleeping.  The insomnia persisted for months even after he and Herlinda were reunited and continues to the present.

259.    José did not learn of all the incidents of harm that Herlinda endured in ORR custody until after their reunification. When he learned of this additional harm to Herlinda, it caused José further distress.

260.    At night José still remembers the "pain of it all."

261.    José has had difficulty concentrating on tasks and finds that these events have left him with constant sadness.

262.    José often does not feel like speaking with anyone, including family members in Guatemala.

263.    José feels deeply depressed and at times is unable to enjoy life.

264.    The separation deeply damaged José and Herlinda, and José attempts to seek solace in his faith.

**D.     The United States Forcibly Separated Joel and Mariela**

   **1.     Joel and Mariela Seek Asylum in the United States and Are Taken into CBP Custody**

265.   Joel and Mariela arrived at the U.S.-Mexico border around May 19, 2018 after fleeing violence in their home in Guatemala.

266.   Soon after Joel and Mariela entered the United States near San Luis, Arizona, they encountered several immigration officers.  The officers questioned them and reviewed Joel's Guatemalan identification card and Mariela's birth certificate.

267.   An officer then put Joel, Mariela and other families in the back of a truck. Despite their detention, Mariela told Joel, "As long as I'm with you, I'm protected."

268.   Joel and Mariela were taken to a detention facility nearby and put in a hielera with about 15 other adults and their children.  Through the window in the door, Joel could see other cells containing more children and their parents.

269.   In an initial interview by an immigration officer, Joel claimed fear of persecution or torture if he was returned to Guatemala.

270.   The hielera where Joel and Mariela were detained was freezing cold, and there was no space to lie down, bathe, or use the bathroom privately for approximately six days.  They received only instant ramen to eat, and they had no pillows or mats for sleeping or additional clothes or blankets for warmth.  The lights were always on.

271.   While detained in the hielera, Joel and Mariela witnessed officers forcibly separate families.  Joel felt distraught at this sight, and Mariela also became upset and worried that the same thing would happen to her and her father.

272.   Mariela began declining physically and emotionally in the hielera.  She became pale, lethargic and despondent.  Joel worried that she was becoming dehydrated. She was not sleeping and was constantly cold, and sat in a corner crying to herself.  Joel felt helpless and overwhelmed.  He held Mariela close while they both cried.  Seeing his child cry because she was suffering broke Joel's heart.  He feared that Mariela would become seriously sick.

## 2.   The United States Takes Mariela From Joel

273.   After Joel and Mariela had been in the hielera for almost a week, officers came to take Mariela.  The officers told Joel that they were going to take Mariela to a shelter.  Mariela pleaded with Joel that she did not want to go and that she wanted to stay with him.  Mariela cried as Joel hugged her.  He did not want to let her go but felt he had no choice.  At this point, Mariela was pale, weak, and very sick.  Joel worried that if Mariela stayed in the hielera longer, her health would continue to deteriorate. Joel told Mariela they would see each other soon.  Crying, Mariela walked out with the officers.

274.   At this time, Joel believed that he would see his daughter soon.  An officer had told him that the separation was temporary and that as soon as Joel resolved his "situation," they would be reunited.  He assured Joel that Mariela would be okay.

275.   Joel asked the officers where Mariela was being taken and how to contact her, but no one gave him any information.  Joel felt destroyed by the separation.

## 3.   Joel Is Kept in Detention After Separation as His Health Declines

276.   While Joel was still in the hielera, he asked several officers where his daughter had been taken.  The officers said they did not have any information about Mariela and did not know where she was.

277.   A few days after the separation, Joel was transferred to a detention center in Florence, Arizona.  He was detained there for several days.

278.   Joel was never charged with any criminal offense.

279.   At the detention center in Florence, Joel became severely ill with a fever and body ache.  His pleas for medical attention were repeatedly denied.

280.   Joel was sad and in despair over his daughter.  He inquired repeatedly about Mariela, but he was told that no information was available, and that he had to wait.  Joel was in such deep despair that he considered taking his own life.

281.   With his wrists and ankles shackled, Joel was placed on an airplane with other detainees and sent to Stewart ICE Detention Center in Lumpkin, Georgia ("Stewart").  His health worsened.  Throughout the flight, Joel coughed up blood.

282.    Joel was chained for many hours during the journey by plane and bus.  The only food that Joel and the other detained immigrants were given during this trip was bread, cheese, and one small cup of water.

283.    As soon as Joel arrived at Stewart, he was placed in quarantine because medical staff there thought that he had rotavirus.  He continued to cough up blood. Debilitated by his illness and in deep distress over having been separated from his daughter, Joel felt that he did not want to live anymore.  Medical staff gave him pills for his condition, which he considered saving and then taking all at once to end his life.

284.    Before the separation from his daughter, Joel had never experienced suicidal thoughts.

**4.    Joel and Mariela Speak for the First Time in One Month**

285.    An officer told Joel that the asylum process could take several months, during which time he would be detained.  Joel could not imagine being separated from Mariela for that long.

286.    While Joel was at Stewart, an officer conducted a credible fear interview for Joel over the phone.  Believing it was the only way he could be reunited with his daughter, Joel decided not to proceed with an asylum claim.  He asked to be sent back to Guatemala with Mariela.  The officer promised to tell ICE that Joel wanted to know where his daughter was, and that he wanted to return to Guatemala with her.

287.    An officer presented Joel with a paper to sign titled "Request for Dissolution of Credible Fear Process," which stated: "I . . . have decided to stop pursuing protection from removal through the credible fear process."  Wanting to be with Mariela again, Joel signed the form.

288.    Joel was still unable to locate Mariela, and he worried about her health.  An officer told Joel that he needed Mariela's identification number to locate her.  Joel had never been told this number or how to obtain it.

289.    Joel called his wife.  She had been able to speak with Mariela.  Joel felt relieved that Mariela was alive, but he also felt anger and frustration that the United

States government had done nothing to help him communicate with—or even locate—his daughter.

290.    Joel and Mariela were separated for approximately one month before Joel was able to speak with Mariela.

291.    On or about June 25, 2018, an officer told Joel that he could speak with his daughter.  The officer gave him only a few minutes to speak to Mariela on the phone.  During this short phone call, Mariela and Joel cried.

292.    Mariela asked Joel when they would be leaving and when Joel would see her.  He did not know the answers but tried to comfort her by saying he would see her soon.  Mariela told her father that she did not want to be at the shelter.  She said that other children were bothering her.  Joel told her that she needed to report it to staff.  Joel felt distraught upon hearing Mariela's pleas and recognizing his own powerlessness to end her suffering.

293.    Shortly after Judge Sabraw issued the Preliminary Injunction in the *Ms. L.* case, which promised relief for Joel and Mariela, Joel was again shackled and taken to a different ICE detention center in Folkston, Georgia.

294.    Officers at the Folkston detention center asked Joel to provide a DNA sample to prove that he was Mariela's father.  He explained that he had provided other officers with Mariela's birth certificate and his government identification card.  The officers responded that they needed DNA confirmation and that without the test, Joel would not be reunited with Mariela.  Joel agreed to a cheek swab.

295.    Joel tried to call his daughter on multiple occasions, but no one answered at the Southwest Key facility where she was being held.  Joel and Mariela spoke infrequently.  When they did speak, he could not get a full sense of how Mariela was doing because the calls were so short.

296.    Joel came to believe that he would never again see Mariela and that the government might put her up for adoption.  He felt desperate.

297.    When Joel was in Folkston, he and other separated fathers were given a document in English to sign.  Upon information and belief, the document related to Joel's deportation.  Joel told the officers that he did not want to sign it and only wanted to see his daughter.  The officers told him that if he did not sign the document, he would never see his daughter again.  Fearing that this threat was true, Joel signed the document even though it was in a language he could not understand.

298.    From Folkston, officers transferred Joel to two additional detention centers in Texas.  During the duration of those transfers, which on one occasion lasted approximately 16 hours, he was shackled and received very little food and water.

**5.    After Approximately Two Months Apart, Joel and Mariela Are Reunited**

299.    Late in the night on or about July 21, 2018, an officer at the detention center in Port Isabel, Texas, where Joel was then detained, ordered Joel to gather his belongings.

300.    The officer told Joel to sign several documents and said that they were going to return his daughter to him.  Because he longed to see his daughter again, he hastily signed several documents in English and Spanish, not fully understanding their contents.

301.    Joel was escorted to a different section of the detention center where Mariela was waiting.  When Joel and Mariela saw each other, they were overjoyed. Mariela ran toward Joel, and they hugged and cried together.

302.    Joel was released from detention with Mariela.  They settled in Tennessee, where they are pursuing their immigration cases.

**6.    Joel and Mariela Remain Traumatized After Being Reunited**

303.    Mariela had been held at the Southwest Key Nueva Esperanza facility in Brownsville, Texas, a privately contracted facility for children in ORR custody.  In late July 2018, Mariela reported to shelter staff that another minor was bullying and harassing her. ORR records show that staff removed a minor from Mariela's dorm room after this report.

304.    After their reunification, Joel noticed changes in Mariela.  She was not the same child as before the separation.  She insisted on being with Joel at all times.  She

worried constantly about her father.  Since the reunification, she has seemed sad, distracted, and unable to focus.  She has avoided interactions with others and kept to herself.  She has also experienced stomach pains and nightmares related to the separation.  She has had a poor appetite.  Since the reunification, Mariela has also exhibited combative and even rebellious behavior, which was a change from her previous demeanor.

305.  Mariela has symptoms of PTSD and anxiety stemming from the separation.

306.  The separation has had a significant impact on Joel's mental and physical well-being.  He developed stomach pains after the separation.  He has struggled with feelings of guilt and sadness.  Recounting the details of the separation has made him feel depressed and experience extreme headaches.  He has also had trouble concentrating.  His self-esteem has plummeted due to the powerlessness he felt.  He has had repeated nightmares of his daughter being taken away.  He has been haunted by memories of officers yanking crying babies from their parents.  He fears that the government will separate him from his daughter again.

307.  Joel demonstrates symptoms of PTSD, depression, and anxiety resulting from the separation.

**E.  The United States Forcibly Separated Heriberto and Alicia**

**1.  Heriberto and Alicia Seek Asylum in the United States and Are Taken into CBP Custody**

308.  Heriberto and Alicia reached Arizona on or around May 12, 2018, after fleeing violence in their hometown in Guatemala.

309.  Immediately after they crossed the U.S. border near San Luis, Arizona, a CBP agent approached them.  The officer asked Heriberto if he was Guatemalan, and Heriberto responded yes.  The officer ordered Heriberto and Alicia to get into a CBP vehicle with other migrants, and drove them to another location.

310.    Alicia, then six years old, became very nervous and asked where they were going.  Heriberto reassured her that everything was going to be all right, but he did not know where the officer was taking them.

311.    The CBP agent asked Heriberto if Alicia was his daughter.  Heriberto responded that Alicia was his daughter and that he had Alicia's birth certificate.  The officer stated that parents would be separated from their children if they tried to cross into the United States together.  The officer said: "You can't use children as tickets to enter anymore."  Heriberto did not understand what the agent meant.  He felt despair and feared he would be separated from Alicia.

312.    Heriberto and Alicia were driven to a detention center, and escorted into a building where agents told them to remove their outer garments, belts, backpacks, and shoelaces.  The agents then gave Heriberto and Alicia one aluminum blanket each and escorted them to a hielera where approximately 40 other adults and children were being held.  Both Heriberto and Alicia wore only sleeveless shirts because their outer garments had been taken from them.

313.    The hielera had vents that blasted freezing air, and Alicia struggled to withstand the frigid temperature.  The lights were always on.  There was nowhere to sit or lie down except on the floor.  There were no windows.

314.    On the first day in the hielera, the agents brought pieces of bread and juice.  The bread was hard, and Alicia could not eat it even though she was hungry.  On approximately their second day in the hielera, agents gave Heriberto and Alicia each a cookie and juice.  Alicia was very hungry, so Heriberto gave her his cookie.

315.    Soon after, Alicia told Heriberto that she felt bad, that her head hurt, and that she was sleepy.  Heriberto could tell that she was losing her strength.

316.    Alicia fell asleep and did not wake up for hours.  She was almost non-responsive.  Seeing his daughter in that condition, Heriberto began to cry.  Heriberto tried to get an officer's attention through the glass in the door, but the officers who walked by ignored him.  He felt desperate to help Alicia but did not know what to do.  He held her closely.

## 2.   The United States Takes Alicia from Heriberto

317.   On approximately their third day in detention, an officer opened the door to the hielera and called Heriberto to him.  The officer gave Heriberto soap and clothes and told him to give Alicia a bath.  The officer also asked Heriberto to confirm Alicia's name and date of birth.  While he bathed Alicia, Heriberto noticed that she was very weak and sad.  She could barely stand up.

318.   As Heriberto exited the bathroom with Alicia, officers instructed Heriberto to move to one side of the hallway and instructed Alicia to go to the opposite side with other children.  Heriberto immediately objected, saying: "But this is my daughter!"  An officer told Heriberto that they had to take Alicia.  The officer said that she would be cared for and that she and Heriberto would be reunited later.

319.   Heriberto told Alicia to go with the other children and that he would see her soon.  He did not want to make the moment any harder for her.  Alicia tried to stay with Heriberto, but an officer pushed her back.  Alicia threw herself to the floor and began crying and screaming.  Heriberto was devastated.

320.   As the officers led Heriberto away in a different direction, Alicia got up from the floor and again attempted to run towards Heriberto.  This time an officer grabbed Alicia and threw her onto his shoulder.

321.   Heriberto was brought to a different hielera.  He felt despair and frustration at not knowing what to do.  He cried, and constantly thought about Alicia.

## 3.   Heriberto Is Told Nothing About Alicia's Whereabouts or Well-Being for Two Weeks

322.   After Heriberto was separated from Alicia, officers shackled Heriberto and transported him first to one detention center, and then to another detention center, both in Arizona.  Heriberto asked every officer he encountered about Alicia's location.  Some of the officers ignored Heriberto's questions.  Others responded that they did not know anything about his daughter.  Some officers told Heriberto that Alicia would be brought to him soon.  But days passed and Alicia never arrived.

323.    Heriberto was never charged with any criminal offense.

324.    While he was detained without Alicia, Heriberto met with an ICE officer who asked him if he wanted to be deported.  Heriberto said no and told the officer that he was waiting for his daughter, who had been separated from him.  The officer appeared confused and asked Heriberto for his daughter's name.  Heriberto provided Alicia's name and showed the officer her birth certificate.

325.    The officer said Alicia was in the country but that she was an unaccompanied minor who had arrived in the United States alone, without a mother or father.  The officer told Heriberto that Alicia would be put up for adoption.  Heriberto told the officer that the officer's information was incorrect and explained that he and Alicia arrived together, but that Alicia had been separated from him and taken by officers.  The officer said he did not believe that Alicia was Heriberto's daughter.

326.    Heriberto constantly thought about Alicia and worried about her.  At nights Heriberto cried and was unable to sleep from the stress.  He began to suffer from constant headaches.  Sometimes the headaches were so severe that they lasted three or four days.  Not knowing where his daughter was and how she was doing tortured Heriberto.  Heriberto began to think that he might never see Alicia again.

327.    Approximately two weeks after he was separated from Alicia, Heriberto was able to call his sister-in-law in Florida.  His sister-in-law told Heriberto that she had received a call from a social worker stating that Alicia was in Michigan.  Heriberto understood that the social worker told Heriberto's sister-in-law that Alicia had arrived in the United States alone.

328.    Heriberto did not know where Michigan was or why the social worker told his sister-in-law that Alicia arrived alone, but he felt immense relief at learning Alicia's location.

### 4.    Heriberto Is Finally Able to Speak with Alicia

329.    Around May 29, 2018, an officer took Heriberto to a phone and gave him a phone number.  When Heriberto dialed the number, he spoke with a case manager for

1   Alicia, who put Alicia on the phone.  This was the first time Heriberto was able to speak

2   with Alicia since being separated approximately two weeks earlier.

3       330.   Alicia began to cry.  She asked Heriberto, "Why did you leave me?  Where

4   are you?"  Heriberto felt heartbroken.  The phone call lasted only a couple of minutes.

5   Heriberto was relieved that he was able to speak to his daughter, but he also felt hopeless

6   and anxious not knowing when or how he could reunite with her.

7       331.   Heriberto spoke with the case manager and Alicia only two more times

8   before he was deported in early June 2018.  Often when he tried to call the case manager,

9   no one answered.  When the case manager answered and put Alicia on the phone, Alicia

10   cried and seemed inconsolable.  Alicia told Heriberto that she wanted to be with him.

11   Heriberto also heard Alicia tell the case manager to go get her dad because she wanted to

12   leave with him.

13               **5.      Heriberto Is Deported to Guatemala Without Alicia**

14       332.   Heriberto was transferred to another detention center where he could not

15   call Alicia.

16       333.   In early June, several officers approached Heriberto and told him to sign

17   some papers.  An officer said that if he signed the papers, he and his daughter would be

18   deported together to Guatemala.  The officer said that if he did not sign, Heriberto would

19   never get his daughter back.

20       334.   A second officer told Heriberto that after he signed, Heriberto would be

21   taken to the airport, where his daughter would be waiting for him.  Heriberto asked to see

22   the papers in Spanish.  The officers told Heriberto to just sign the documents to facilitate

23   the process of reuniting him with his daughter and returning to Guatemala.

24       335.   Heriberto signed the papers because he wanted desperately to see Alicia and

25   felt that he had no choice.  According to ORR records, on or about June 5, 2018,

26   Heriberto "was informed that if he signed his order of deportation he would be sent back

27   with the minor [Alicia] to Guatemala, so he signed."

28

336.    The day after he signed the papers, Heriberto was shackled and escorted with other detainees outside the detention facility, where they were forced to wait for more than 12 hours without food or water.  Heriberto and the other detainees were then escorted onto large buses.  Heriberto felt a sense of relief at leaving the detention center, thinking he would soon be reunited with Alicia.

337.    When the buses pulled into the airport, Heriberto scanned the parking lot, looking for his daughter.  He asked an officer where he could pick up his daughter.  He told the officer that he had signed papers saying he would be deported with his daughter. The officer responded, "You should not have signed those papers; those were just lies." Heriberto could not believe what he heard.  He felt like he was straining to breathe and could think of nothing other than Alicia being left behind.

338.    Heriberto was deported to Guatemala without Alicia.  His flight landed in Guatemala City on or around June 7, 2018.

### 6.    Alicia Suffers Trauma Due to the Separation from Her Father

339.    After the separation, Alicia was placed in ORR custody.  On or about May 15, 2018, Alicia was transferred from the Yuma Border Patrol Station and arrived at Bethany Christian Services ("BCS") shelter in Kalamazoo, Michigan.  The next day, Alicia was placed in a transitional foster care program.  During the day, Alicia attended school with other children in ORR custody.  Alicia spent nights at a foster home.

340.    A case manager at BCS contacted Alicia's maternal aunt and informed her that Alicia would remain in the care of BCS until a decision could be made about her case.  Alicia's aunt was confused.  She did not understand why Alicia was now in Michigan without Heriberto.

341.    The case manager also contacted Alicia's mother and Heriberto's wife, Anna,[33] in Guatemala, and explained the same information to her.

---

[33] To protect Plaintiffs H.P.M.'s and A.D.'s identities, a pseudonym has been adopted for H.P.M.'s wife.

342.   The case manager searched for Heriberto in the ICE Online Detainee Locator System but did not find him.  As of May 28, 2018, the case manager still had not located Heriberto.

343.   ORR's initial intake form notes that upon arrival, Alicia appeared confused and exhausted.  At her first meeting with the case manager on May 15, 2018, Alicia cried and would barely speak.  All she said was that she had been separated from her father and that she wanted to be reunited.

344.   Two days later, the case manager conducted an Unaccompanied Minor Risk Assessment.  The assessment indicated that Alicia was "greatly missing her father" and "wanting to be with her father to help her feel more comfortable and safe."

345.   During the more than three months that Alicia remained in the care of BCS, case reports and assessments note that Alicia cried easily, was distracted and unfocused, and continued to ask for her father.

346.   On June 4, 2018, Alicia's primary care physicians approved Alicia to take melatonin at night because Alicia had so much trouble sleeping.

347.   On June 26, 2018, educational staff reported Alicia was "punched and kicked . . . in the chest and face" by another child during recess.

348.   Reports from BCS also suggest that Alicia had difficulty learning and sitting still at school.  A BCS Educational Coordinator recommended occupational therapy for Alicia given certain behaviors that she developed while in ORR care.

349.   After Heriberto was deported, he and Anna were only able to have facilitated calls approximately once a week with Alicia.  Whenever Alicia's parents spoke to her, she cried and was mostly unable to speak.  She told her parents that she wanted to be with them, and that she missed them.  She also told them she was scared of being in her foster home because the family had a large dog.

350.   On one occasion, Anna was informed that Alicia had cut her own hair using a pair of scissors found at her foster home.  Heriberto became intensely worried that Alicia was not being carefully watched or cared for.

351.   Alicia was referred to a psychologist "[d]ue to trauma and educational concerns."  Further, a Clinical Closing report by BCS dated August 30, 2018, notes that Alicia exhibited an "Acute Stress Reaction that caused neurological difficulties" and became "emotionally dysregulated" in school and during phone calls with family, during which she always became anxious and cried.

352.   On or about June 11, 2018, Heriberto spoke with the case manager about the possibility of obtaining an order for voluntary departure so that Alicia could return to Guatemala.  The case manager obtained pro bono counsel for Alicia at the Michigan Immigrant Rights Center.

353.   On June 14, 2018, a clinical supervisor at BCS told Alicia that because Heriberto was now in Guatemala, Alicia would remain in BCS's care for a few months. Alicia broke down in tears.

354. On June 26, 2018, Judge Sabraw issued the preliminary injunction in the *Ms. L.* case and ordered the government to reunite families like Heriberto and Alicia within thirty days.

355.   On July 28, 2018, Alicia was transferred to another foster family that had some experience in "trauma informed" care after the case manager expressed concern for Alicia's well-being and her need to be in a more stable environment.  Alicia remained with the new foster family until her return to Guatemala.

### 7.   After Approximately 108 Days of Separation, Heriberto and Alicia Are Reunited

356.   After being deported, Heriberto felt depressed and anxious without his daughter.  He was desperate to learn more about Alicia's return.  The case manager initially said Alicia would not be able to return to her family for about a year.

357.   On or about August 1, 2018, Alicia's attorney and an ICE attorney submitted a joint motion in immigration court, seeking an order of voluntary departure for Alicia to return to Guatemala.  The motion stated that Alicia "cries for much of the day ever since her arrival in Michigan, and she is extremely anxious and has even begun

1    expressing desires to self-harm." On or around August 7, 2018, an immigration judge

2    granted Alicia's motion.

3        358.   On August 30, 2018, after approximately 108 days of separation, Alicia was

4    discharged from BCS and placed on a flight to Guatemala City. Heriberto and Anna

5    traveled five hours to the capital to meet her.

6        359.   Heriberto felt an enormous sense of relief when he saw Alicia. But Alicia

7    stood before him and Anna with a blank stare. Alicia then recognized Heriberto and went

8    over to give him a hug, saying nothing. Alicia initially appeared not to recognize Anna,

9    her own mother. Alicia also did not recognize her brother, and she did not want to talk to

10   her aunts who had traveled to Guatemala City with the family to meet her.

11           **8.     Heriberto and Alicia Continue to Suffer After Being Reunited**

12       360.   After Heriberto and Alicia were reunited, Alicia remained distressed. When

13   she first returned home, Alicia stayed in her room in bed.

14       361.   For almost a week, Alicia refused to eat more than a few bites at a time.

15   Alicia cried for hours, both during the day and at night. Heriberto and Anna were unable

16   to console her.

17       362.   As time went on, it became clear to Heriberto and Anna that Alicia had

18   changed. Before the separation, she was a happy and well-adjusted child, who was

19   outgoing, friendly, and trusting of adults. After the separation, she is quiet, distant, and

20   cries easily.

21       363.   Alicia was scared to go back to school. While in school, she did not

22   interact with the other children. Alicia stared blankly at walls or other things, and she did

23   not respond when called or when spoken to.

24       364.   Heriberto took Alicia to a doctor, who prescribed medicine because she was

25   anemic. The doctor also explained to Heriberto that Alicia showed signs of trauma and

26   needed regular therapy. Heriberto inquired about therapy but was unable to afford it.

27       365.   Alicia experiences symptoms of PTSD, separation anxiety, and depression

28   stemming from the separation.

366.    Heriberto also continues to suffer physical and emotional harm from the separation.  He tries to forget everything that happened but cannot.  He often feels sadness, frustration, anger, guilt, and remorse about what happened.

367.    Heriberto experiences symptoms of PTSD resulting from the separation.

368.    Even after being reunified with Alicia, Heriberto continues to experience acute headaches.  The headaches extend around the back of his ears and down to his jaw, causing his jaw to tremble uncontrollably.  Before the separation from his daughter, he never had such headaches.

**F.    The United States Forcibly Separated Mario and Antonio**

**1.    Mario and Antonio Seek Asylum in the United States and Are Taken into CBP Custody**

369.    On or about November 19, 2017, Mario and his son Antonio presented themselves at the DeConcini Port of Entry in Nogales, Arizona, seeking asylum.

370.    Mario and Antonio had left their village located in the San Marcos Department of Guatemala due to increasingly violent land disputes.

371.    At the port of entry, Mario provided an officer his name, Guatemalan identification card, and Antonio's birth certificate, demonstrating he was Antonio's father. The officer said he was going to take Antonio.  Mario was shocked and told the officer that the government could not take his son away.

372.    Presenting oneself at a port of entry is not a crime, and Mario was not charged with any criminal offense.

373.    For the next two days, Mario and Antonio were detained in hieleras within the CBP facility.  For bedding, they had a single mattress pad to share and a thin foil sheet, which did little to shield them from the facility's extremely cold temperatures.  The lights were always kept on.  Mario and Antonio were not able to bathe or shower, and they received no hygiene products such as soap or toothpaste.  They were given only burritos to eat.  They also had to ask permission to use the restroom.

## 2.   The United States Takes Antonio from Mario

374.   After about two days, an officer told Mario that the officers would take Antonio in two hours and that Mario should tell Antonio to behave.

375.   Mario was in a state of disbelief, and he started to cry.  He refused to be separated from his son, but the officer told Mario, "It doesn't matter what you want. It's going to happen."  Feeling helpless and in pain, Mario told Antonio that they were going to be separated.  Antonio started to cry.  Back in the cell, Mario and Antonio held each other and cried themselves to sleep.  After about two hours, officers returned with chains and handcuffs.  They ordered Mario and Antonio to follow them.

376.   Mario asked the officers if they were sending Antonio back to Guatemala and pleaded that he needed to go with his son.  An officer stood on each side of Mario, grabbed his arms, and forced him down onto a bench.  Antonio cried.

377.   The officers grabbed Antonio and took him away.  Mario could not bear to watch.  He hunched over, feeling powerless.  Antonio's cries became distant, and then Mario could not hear his son anymore.

## 3.   Mario Tries to Locate His Son

378.   On or about November 21, 2017, Mario was shackled and taken on a bus with other detainees to a detention center in Eloy, Arizona.

379.   Over the course of the next two weeks, Mario submitted numerous written requests to ICE for assistance in locating and contacting his son.  Because he did not speak or write English, he relied on the assistance of other detainees.

380.   ICE officers repeatedly told Mario that Antonio was not in ICE custody, and that he should contact his family or consulate to locate him.  Mario's calls to the consulate went unanswered.  His wife also did not know Antonio's whereabouts.

381.   On or around December 8, 2017, Mario made his sixth request to ICE with the assistance of a translator, stating: "Please I need the right directions and contacts to get ahold [sic] of my son [Antonio]," providing his son's full name.

382.   Finally, an ICE officer gave Mario a phone number to the facility where

Antonio was being held in New York.  Because Mario did not have any personal funds, he had to request ICE officers' permission to call the facility.

383.    On or around December 8, 2017, with the assistance of an ICE officer, Mario spoke with Antonio's case manager.  He learned that Antonio had been placed at Cayuga Centers in New York City.  The case manager told Mario that Antonio had been crying most of the time.

384.    Antonio then picked up the phone.  This was the first time Mario spoke to Antonio since they had been separated more than two weeks earlier.  Antonio cried and was generally was unable to speak to Mario.  Although Mario felt some relief upon speaking with his son, he was pained by Antonio's obvious distress.

385.    Mario wanted to talk to his son as often as possible, but he did not have the personal funds required by the government to place calls from ICE detention.  Mario pleaded with officers to allow him to call his son, but they often refused.  When calls were allowed, they were short, lasting about five minutes at most.  Antonio usually cried throughout the calls.

**4.    Believing It Would Expedite Reunification with His Son, Mario Agrees to Deportation**

386.    Mario appeared before an immigration judge in Eloy on or about December 6, 2017.  Mario told the judge that he wanted to find out where his son was and that he did not have any information about him.  The judge told Mario that he did not know anything about Mario's son.

387.    Soon afterward, an ICE officer presented Mario with papers that the officer said were related to Mario's deportation. The officer told Mario that his son would be returned to him immediately after he was deported.  Mario signed the documents believing the official's assurances that he would be reunited with Antonio in Guatemala.

388.    Mario was deported to Guatemala in January 2018.  He was very distressed about leaving his son alone in a foreign country.

389.    When Mario landed in Guatemala City, he called his wife, Margarita.[34] He told her that he had been deported and that Antonio was not with him.  His wife was devastated and cried inconsolably.  At that moment, Mario felt worthless and ashamed.

**5.    Despite the Government's Promises, Antonio Is Not Returned to His Family**

390.    Antonio was not returned to Guatemala until approximately six months after Mario's deportation.  During these six months, communication with Antonio and Cayuga Centers was infrequent.  When Mario and Margarita were able to talk to Antonio's case manager, they asked for their son to be returned to Guatemala as soon as possible.

391.    Months passed without a call from the case manager, and Mario and his wife feared that they had lost Antonio forever.  Desperate, Mario and Margarita borrowed money to travel to Guatemala City in June 2018 to seek assistance from the Guatemalan government.  The trip took over seven hours and cost 1,500 Quetzales (approximately $196).

392.    When Mario and Margarita arrived in the capital, they received a call from Antonio's case manager.  She told them that Antonio would be returned to Guatemala on July 9, 2018.  Ecstatic, Mario and Margarita returned to their village.

393.    On June 26, 2018, Judge Sabraw issued the preliminary injunction in the *Ms. L.* case and ordered the government to reunite families like Mario and Antonio within thirty days.

394.    On July 9, 2018, Mario and Margarita again traveled to Guatemala City using borrowed funds. They travelled by car with Rolando, who lived in the same village. Rolando was going to meet Bertha, who was also scheduled to return to her family after being taken from her father in Arizona.

395.     Antonio's case manager had told Mario and Margarita to go to the office of Casa del Migrante.  But when they arrived at that office, they were told that Antonio's flight had been canceled for unknown reasons.

---

[34] To protect the Plaintiffs' identities, Mario's wife will be referred to by the pseudonym Margarita.

396.    Mario and his wife were devastated.  They felt as if they had been lied to. They were afraid that Antonio had been hurt, or that the United States government no longer had custody of him.  They called Antonio's case manager several times, but she did not return any of their calls.

      **6.**      **After Eight Months of Separation, Antonio Is Finally Reunited with His Father**

397.    On or about July 24, 2018, a Casa del Migrante employee called Mario and his wife to tell them that Antonio would be returned to Guatemala on July 26, 2018.  It had been about eight months since Mario had seen his son.

398.    Mario again borrowed money and traveled to Guatemala City with his family and Rolando's family.  They all waited nervously at Casa del Migrante with other parents who were hoping to be reunited with their children.

399.    When Antonio was brought into the room where his family was waiting, Mario and his wife rushed to hug him.  Antonio held his mother's hand tightly, refusing to let go.  The family was overjoyed.

      **7.**      **Antonio and Mario Continue to Suffer After Being Reunited**

400.    Soon after the reunification, Mario and his wife noticed that the Antonio who had returned to them was very different from the child who had traveled to the United States with Mario.

401.    Since his return to Guatemala, Antonio has repeatedly woken up in the middle of the night sobbing.  He sometimes walks to the front door and tries to leave his family's home in the middle of the night.  When this happens, Mario or his wife carry Antonio back to bed and comfort him until he falls asleep.  In the morning, Antonio cannot remember waking up the previous night.

402.    Since returning to Guatemala, Antonio has experienced anxiety around people who look and dress differently from most of the people in his village.  The community in Antonio's village is formed largely of indigenous Mam-speaking people. The women traditionally wear handwoven dresses and blouses.  On his first day of school

after his return, Antonio refused to enter his classroom because his teacher did not wear the traditional clothing of the women in his village.  Antonio told Mario that he was afraid of his teacher because she dressed like the nurses in the United States.  He remembered the nurses giving him many shots, and the memories filled him with fear.

403.    In the months since his return to Guatemala, Antonio has continued to express reluctance to go to school.

404.    Antonio also becomes upset very easily.  He has cried in desperation and fear when taken to the local health clinic.  He has also expressed fear of police officers, often hiding when he sees one.  When other children have asked Antonio if he has been to the United States, he has broken down in tears.  He has cried when asked what he would like to eat.

405.    Mario and Margarita worry because Antonio's crying episodes are not like typical temper tantrums.  Sometimes he cries for no apparent reason.

406.    Since returning to Guatemala, Antonio has spent a lot of time by himself and has often refused to play with his sister or cousins who are close in age and live in the same house.

407.    Since returning to Guatemala, Antonio—an otherwise healthy boy—has fainted at least seven times.

408.    Antonio's behavior since returning to Guatemala is a stark difference from the child Antonio was before he was separated from his father.  Before the separation, Antonio was a normal, happy child.  He did not experience faintness.  He did not fear people from outside his community.  He attended school with little protest.  Trips to the health clinic did not overwhelm him with fear.  He ate well and slept well.  He played with his cousins at all hours of the day and was curious and expressive.  Mario and Margarita worry that Antonio will never overcome the lasting effects of the separation.

409.    Antonio has refused to talk about his time in the United States and has told his parents that he does not want to remember it.

410.    Antonio has been diagnosed with PTSD, separation anxiety, and depression resulting from the separation.

411.    Mario also suffers from lasting effects of the separation.  He is tormented by memories and recurring nightmares of the separation.  He cannot forget Antonio's cries as immigration officers took him away.  Mario is tormented by the fact that he does not, and may never, know exactly what happened to Antonio during the eight-month separation. Margarita has often found him sitting alone, lost in thought.  Mario has trouble remembering basic information and often forgets what he was doing or was supposed to do.  He feels guilt, shame, and sadness that his son is not the same happy boy anymore.

412.    Mario has been diagnosed with PTSD and depression resulting from the separation.

**G.    The United States Forcibly Separated Rolando and Bertha**

**1.    Rolando and Bertha Seek Asylum in the United States and Are Taken into CBP Custody**

413.    Rolando and his daughter Bertha, then nine years old, presented themselves to immigration officials at the DeConcini Port of Entry in Nogales, Arizona, on November 13, 2017, seeking asylum.

414.    Rolando and Bertha had left their rural community in Guatemala due to increasing violence over land disputes.

415.    At the port of entry, Rolando showed an official his Guatemalan identification card and his and Bertha's birth certificates.  Rolando told officials about his fear of returning to Guatemala, including the violence in his community.

416.    Presenting oneself at a port of entry is not a crime, and Rolando was not charged with any criminal offense.

417.    Officials forced Rolando and Bertha to turn over their personal belongings, including extra clothing and toiletries.

418.    Rolando and Bertha were kept in a room with about 20 other fathers and children at the Nogales facility.  This hielera was made almost entirely of cement and

contained a cement bench that only accommodated a few people.  There were no windows or fresh air.  The room was at times very cold, and Rolando and Bertha could not keep warm because government officials confiscated their sweaters. They had only a thin plastic mat for sleeping and a foil sheet to cover themselves.  They were not permitted to bathe or change clothes, and they received no hygiene products.  The room had one foul-smelling toilet, which was exposed to everyone's view.  For food, they were given only burritos, which were sometimes still frozen.

419.    On the afternoon of the second day, they were moved to another detention facility.  Rolando and Bertha were put in a small room. They slept on the same thin, plastic mats on the floor and had only a foil sheet for cover.  Bertha repeatedly told Rolando that she was very hungry.  Eventually, they were given frozen burritos and Bertha was given milk.

### 2.    The United States Forcibly Separates Rolando and Bertha

420.    On or around November 15, 2017, Rolando was again interviewed by immigration officials, and he again explained that he had come because of the violent conflict in his town.

421.    Later that evening, Rolando and Bertha heard chains rattling.  Rolando is still haunted by the sound of the chains.  Officials opened the door and told Rolando that he needed to go with them because he had court.  As soon as Rolando walked out of the room, an official closed the door behind him before Bertha could follow her father.

422.    Rolando saw Bertha through the window of the door and heard her screaming "Papá, Papá!"  Flailing and crying inside the room, Bertha begged to go with her father.

423.    Two officials grabbed Rolando and cuffed his hands and feet.  Rolando asked the officials, "Why are you taking me away?  Why are you separating us?" but he was not given any information.  The officials did not permit Rolando to hug Bertha or say goodbye before he was forced to leave her.

424.   Two officials, each holding one of Rolando's arms, led him down the hallway.  A third official waited outside the door of the room where Bertha was locked inside alone, crying hysterically.  Rolando heard Bertha screaming and crying uncontrollably.  It was the most painful moment of Rolando's life.

425.   Rolando began to cry and wondered what the officials would do to Bertha and whether they would take care of her.  Rolando told the officials, "She's a young girl. She is only nine. You can't take her from me."

426.   Rolando did not go to court.  He was put on a bus with other men and taken to a detention center.

427.   After arriving at the detention center, Rolando asked an official about Bertha.  The official replied that he had no information.

428.   Rolando was placed in a large room crowded with other detainees.  He could not sleep because he was thinking about Bertha.  He cried all night, not knowing how or when he would see his daughter again.

**3.    After a Week Without Any Information, Rolando Speaks to Bertha for the First Time**

429.   The next evening, Rolando was shackled and taken by bus to another detention center.  Upon information and belief, this detention center was in Eloy, Arizona.

430.   Rolando was placed in a small prison-like cell made entirely of cement. The cell had only two beds, a toilet, and a small window.  Rolando was constantly freezing.

431.    Each day, Rolando asked officials at the detention center for information about Bertha's whereabouts and well-being.  He asked repeatedly how he could communicate with her.  Officials gave him no information.

432.   After several days, officials met with Rolando and told him to sign some documents written in English.  Rolando did not understand the contents of these documents but signed the paperwork as instructed.

433.     Rolando finally learned from an official that Bertha was in New York. Rolando was relieved to know where Bertha was but desperately wanted to speak with her.

434.     About a week after the separation, an official facilitated a call between Rolando and the case manager in charge of Bertha's case at a facility in New York City.

435.     Rolando then spoke with Bertha for the first time since the separation. Both Rolando and Bertha cried.  Rolando asked Bertha how she was, and Bertha replied that she wanted to be with Rolando.  Bertha told Rolando that she had been taken to New York and had been scared to travel by airplane for the first time.  They were only able to speak for a few minutes before the official who facilitated the call told Rolando that his time was up.

436.     After the first call with Bertha, Rolando could not stop worrying about Bertha.  He was miserable and could not sleep or eat.  Rolando worried that Bertha would not be able to express her needs to strangers because she was just a little girl.

**4.      Rolando Learns that Bertha Was Beaten and Abused in Custody**

437.     In total, Rolando spoke with Bertha about three times while he was in detention in Arizona.  After his first conversation with Bertha, Rolando tried every two or three days to call the facility, but most calls went unanswered.

438.     During one of his calls with Bertha, Rolando learned that Bertha had been physically abused by an immigration official after he and Bertha were separated.

439.     Bertha told him that she had watched through the glass window in the door as he was handcuffed, shackled, and taken away from her.  She felt alone and terrified. She had no idea what would happen next, and she screamed and cried uncontrollably to be able to go with her father.

440.     Then an immigration official wearing a uniform threatened to hit her if she did not stop crying.  When Bertha did not stop crying, the official removed her belt and beat Bertha on the arm and leg several times.  Bertha told Rolando that she was injured from the beating and had purple bruises after being hit.

441.   The case manager spoke briefly with Rolando about the incident and told him that she was sorry for what happened to Bertha.

442.   After hearing what had happened to his daughter, Rolando went back to his cell and cried.  He felt sad and angry with himself.  He regretted that he was far away and unable to protect Bertha from the abuse.

### 5.   Rolando Is Deported to Guatemala Without Bertha

443.   On or around December 4, 2017, Rolando was brought before an immigration judge in Eloy.  He was ordered deported to Guatemala.

444.   A few days after his court appearance, Rolando spoke with a Guatemalan consular official who informed him of his removal date.  The official told Rolando that he would be going back to Guatemala without his daughter and that Bertha would be deported later.

445.   Rolando was terrified by the prospect of leaving his daughter behind and overwhelmed with worry about what would happen to her.  Rolando felt hopeless.

446.   Rolando was deported to Guatemala, arriving in Guatemala City on or around December 13, 2017.

447.   When Rolando arrived home, his wife Carmen[35] was crying and refused to speak to him.  She was angry and wanted an explanation, asking Rolando, "Where is Bertha?  How could you leave her?"  Rolando cried and tried to explain what happened, and that he had done everything possible to get his daughter back.

448.   Every one to two weeks after Rolando was deported to Guatemala, Rolando and Carmen received brief calls from Bertha.  Bertha often told her father that she did not understand why he had not come to get her in New York.

449.   In mid-April 2018, Rolando and Carmen hired an attorney in Guatemala to formalize their request that Bertha's return to Guatemala be expedited, and they faxed

---

[35] To protect the Plaintiffs' privacy, Rolando's wife will be referred to by the pseudonym Carmen.

this document to Bertha's caseworker.  A final determination to allow Bertha to return to Guatemala to reunite with her family was not made until her immigration court hearing on May 31, 2018.

### 6.      Bertha Suffers During Her Time in ORR Custody

450.    The day after Bertha was separated from her father—after being physically abused by an immigration official, and still crying and in pain—Bertha was shoved into a car with other children.

451.    Bertha was put on two flights and transported across the country.  This was the first time Bertha had been on an airplane, and she felt scared and alone.

452.    Bertha arrived in New York City on or about November 17, 2017, and was placed in ORR custody at Cayuga Centers.  She received services at Cayuga Centers during the day and lived in a foster home with several other children.

453.    During her time at Cayuga, Bertha was not able to communicate with anyone in Mam, her native language.  Bertha also was not able to wear her traditional dress that includes a huipil (blouse) and corte (woven skirt), adding to the disorientation of being separated from her father in a strange country.

454.    Additionally, other minors inflicted harm on Bertha on two occasions, with both instances documented in Bertha's ORR file as "Significant Incident Reports."  A minor in Bertha's foster family bit her on the back when she was trying to go outside and play.  Another minor pushed Bertha at the "Learning Center."

### 7.      Bertha is Reunited with Her Family After More Than Eight Months Apart

455.    In June and early July 2018, Rolando and Carmen awaited news about plans for Bertha's return to Guatemala, and they stayed in touch with Bertha through calls and texts from her case manager.  Bertha sometimes cried on the phone and told Rolando and Carmen that she missed them and wanted to come home.  Bertha was also very worried about her mom, who she knew was sick and unwell.    When Bertha would call, Carmen would cry inconsolably and could not get out of bed.

456.    On June 26, 2018, Judge Sabraw issued the preliminary injunction in the *Ms. L.* case and ordered the government to reunite families like Rolando and Bertha within thirty days.

457.    In June 2018, Rolando received a call from the case manager, who notified him that Bertha would be returning to Guatemala on July 9, 2018.

458.    Rolando spoke with an employee at Casa del Migrante in Guatemala City who told him he could pick up Bertha there.  Rolando was elated that Bertha would finally be coming home.

459.    Rolando and Carmen borrowed money and traveled with Mario and Margarita, who were also traveling to Casa del Migrante to meet their son Antonio.

460.    After a journey lasting several hours, they arrived at Casa del Migrante and waited for several hours before they were notified that Bertha's flight had been canceled. Rolando contacted the case manager, but she did not know when the flight would be rescheduled.

461.    Rolando returned to his village for the second time without his daughter. He began to worry that Bertha was never coming home.

462.    About a week later, the case manager called Rolando and told him that Bertha would be scheduled for another flight sometime later in July.  It was not until July 23, 2018, that Rolando learned that Bertha was scheduled to arrive in three days.

463.    Rolando and Carmen made hurried arrangements to again travel to the capital to pick up Bertha, again with Mario and Margarita.  They arrived at Casa del Migrante and anxiously waited with other parents who had also been separated from their children.

464.    On July 26, 2018, Rolando, Carmen, and Bertha's younger brother were taken to the room where the children were arriving.  Rolando and Bertha cried as they hugged and Bertha whispered, "I love you a lot, Papá."  Rolando saw the look of relief on Bertha's face, but he also noticed that she was not able to say much.

### 8. Rolando and Bertha Continue to Suffer After Being Reunited

465.   Bertha was separated from Rolando for over eight months.  She continues to suffer from the effects of the separation.

466.   Since her return to Guatemala, Bertha has had a poor appetite.  A month after her return, Rolando was so concerned about Bertha not eating that he decided to take her to a doctor.  The doctor told Rolando that Bertha was still very frightened and prescribed some medicine for her to take.

467.   Since her return to Guatemala, Bertha has expressed fear of traveling or leaving her community.  She has expressed fear of being separated from her father again and has not wanted to let him out of her sight.

468.   Several months after Bertha's return, officials from a Guatemalan governmental agency called Rolando and asked him to return to the capital with Bertha for an interview.  Bertha told Rolando that she was afraid that officials would take her away again.

469.   Bertha has experienced frequent nightmares—sometimes as often as several times per week—that involve being separated from her parents and being abused by the immigration official who struck her in the United States.  She has refused to go to sleep without being near her parents and has insisted on sleeping with the light on.  She has experienced fear and anxiety around yelling or loud noises.

470.   It is difficult for Bertha to talk to Rolando about the separation or the abuse she suffered in detention.

471.   Bertha has been diagnosed with PTSD, depression and separation anxiety resulting from the separation.

472.   The prolonged separation has also deeply impacted Rolando.  Rolando has felt easily startled and has suffered from anxiety, constantly worrying that something bad could happen.  Rolando has lost weight and has experienced loss of appetite.  He has experienced frequent headaches and gastric issues.  He has had trouble concentrating and has had nightmares about the separation.

473.   Rolando has been diagnosed with PTSD resulting from the separation.

**H.      The Government's Forcible Separation of Parents and Children Caused Irreparable Harm**

474.   Forcible parent-child separations have long been known to cause significant short- and long-term damage to mental, physical, and emotional health.

475.   Keeping parents separated from their children with "little or no direct access to basic information about their health or general well-being, *plainly causes irreparable harm*."[36]   Children attach to their caregiver from the time they are born, and the children's sense of safety "depends on that relationship."[37]   Disrupting that relationship causes "the parts of the brain that deal with attachment and fear" to "develop differently."[38]   It is not surprising, then, that "[s]eparation irreparably harms [families] every minute it persists."[39]

476.   The AAP explained the effects of separation on children: "[H]ighly stressful experiences, like family separation, can . . . disrupt[] a child's brain architecture and affect[] his or her short- and long-term health. This type of prolonged exposure to serious stress—known as toxic stress—can carry lifelong consequences for children."[40]   Children who experience trauma like forced separation from a parent "are at a much greater risk of

---

[36] *Jacinto-Castanon de Nolasco v. U.S. Immigration & Customs Enf't*, 319 F. Supp. 3d 491, 502 (D.D.C. 2018) (emphasis added).

[37] William Wan, *What Separation from Parents Does to Children: 'The Effect is Catastrophic'*, WASH. POST (Jun. 18, 2018), https://perma.cc/7MA6-X7MB.

[38] *Id.*

[39] *Jacinto-Castanon de Nolasco,* 319 F. Supp. 3d at 503.

[40] *Jacinto-Castanon de Nolasco,* 319 F. Supp. 3d at 503 (quoting Colleen Kraft, Am. Acad. of Pediatrics, AAP Statement Opposing Separation of Children and Parents at the Border (May 8, 2018), https://perma.cc/23ET-GN7S); *see also* Allison Abrams, LCSW-R, *Damage of Separating Families: The Psychological Effects on Children*, PSYCHOL. TODAY (Jun. 22, 2018), https://perma.cc/H967-BBWV (Because a child's "secure attachment comes from the child's perceptions of his or her caregiver's availability (physical accessibility) . . . separations as brief as one week in duration could negatively impact the quality of attachments.").

developing mental health disorders such as depression, anxiety, addiction, Attention Deficit Hyperactivity Disorder ('ADHD') and PTSD.  Their physical health is also negatively affected."[41]  The materials cited here barely scratch the surface of the wealth of expert material describing the harms caused by family separation.  Given the "extensive evidence," the irreparable harm caused by forcibly separating parents and children is indisputable.

477.    All of these circumstances show that the government intentionally inflicted the severe harm caused by forcible separation on families, like Plaintiffs, who crossed the U.S. border.  The government did so to deter future immigrants from coming to the United States.

## I.    The Government's Policy of Forcible Separation Was Unconstitutional and Illegal

478.    In addition to the harm it caused, the separation policy intentionally violated the constitutional rights of those separated, including the right to family integrity and to equal protection.

479.    For decades, this nation's highest court has recognized the fundamental right to family integrity protected by the Constitution:  "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder."[42]  These constitutional protections extend to citizens and non-citizens alike, even when confined by the government.[43]

480.    Through its family separation policy, in the name of deterrence, the United States tore immigrant children from their parents, sent the children thousands of miles

---

[41] Abrams, *supra* note 40.

[42] *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944).

[43] *Jacinto-Castanon de Nolasco*, 319 F. Supp. 3d at 500 ("The fact that [families are] lawfully detained in immigration custody does not eliminate [their] due process right to family integrity.").

away, refused to inform parents and children of each other's whereabouts or well-being, refused to provide adequate means for parents and children to talk with each other, and failed to have any system for tracking the children or ensuring that families could ever be reunited.

481.    As Judge Sabraw concluded in *Ms. L. v. U.S. Immigration and Customs Enforcement*, the government's actions "shock[] the conscience."[44]  "[N]othing in federal law suggests that deterring immigration by indefinitely separating families once the parents have been transferred to immigration custody is a compelling or legitimate government objective."[45]

482.    The United States' family separation policy was also motivated by discriminatory animus against arriving Latino immigrants of Central American origin, who were targeted for deprivation of their fundamental right to family integrity.

483.    The United States' discriminatory purpose is evidenced by the pretextual nature of the stated justification for separating only those families (the vast majority of whom are Latino and Central American) arriving at the southern United States border, the unusual sequence of events leading to the promulgation of the policy, and contemporaneous statements by policymakers showing a marked animus toward Latino immigrants from Central America.[46]

---

[44] *Ms. L.,* 310 F. Supp. 3d at 1142.

[45] *Jacinto-Castanon de Nolasco*, 319 F. Supp. 3d at 502.

[46] *See, e.g.*, Josh Dawsey, *Trump Derides Protections for Immigrants from 'Shithole' Countries*, WASH. POST (Jan. 12, 2018), https://perma.cc/2HP4-PFYK  (including El Salvador as a "shithole" country from which  immigration to the United States should not be welcomed, and expressing a preference for immigrants "from countries such as Norway"); Donald J. Trump (@realDonaldTrump), TWITTER (Jun. 19, 2018, 6:52 AM), https://perma.cc/MLC6-8VX5 (characterizing "illegal immigrants" as "pour[ing] into and infest[ing] our Country").

484.    The family separation policy disproportionately impacted individuals from Central America: more than 95 percent of the members in the *Ms. L.* certified class are from Central American countries.

485.    As with the fundamental right to family integrity, the Constitutional right to equal protection under the law, and to freedom from invidious discrimination by the government on the basis of race or national origin has also long been recognized as "extend[ing] to anyone, citizen or stranger, who is subject to the laws of a State," even those not lawfully present. *Plyler v. Doe*, 457 U.S. 202, 215 (1982) (emphasis removed).

**J.    The United States Applied the Already Cruel Separation Policy in a Deliberately Inhumane Manner to Further Harm Families**

486.    Defendants made the harm suffered by Plaintiffs and others subject to its family separation policy far worse by implementing its policy with carelessness and callous disregard for the physical safety and emotional well-being of Plaintiffs.

487.    The Administration then multiplied the harm it intended to cause by the shocking and intentional carelessness with which it implemented its policy.  The Attorney General announced the Zero Tolerance Policy without any prior notice to certain DHS and HHS (including ORR) officials,[47] purposely giving those employees no time to plan for or coordinate implementation.[48]

488.    ORR was aware as of at least November 2017 of an increase in the number of children in ORR custody separated from their parents, many of whom were very

---

[47] U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-19-163, UNACCOMPANIED CHILDREN: AGENCY EFFORTS TO REUNIFY CHILDREN SEPARATED FROM PARENTS AT THE BORDER 12 (2018), *available at* https://perma.cc/UYZ9-UBYQ [hereinafter GAO REPORT] ("DHS and HHS officials told us that the agencies did not take specific planning steps because they did not have advance notice of the Attorney General's April 2018 memo.").

[48] A high-ranking HHS official testified before Congress that ORR considered planning for the increase but was specifically told not to.  *Id.*; *see also id.* at 14 ("DHS officials told [HHS leadership] that DHS did not have an official policy of separating parents and children.").

young children.[49]  Yet the government failed to adequately prepare for the increased number of children separated from parents in its custody.

489.    Among other things, this deliberate lack of planning resulted in the government failing to provide adequate detention facilities, failing to track separated families, failing to communicate with parents about their children's welfare, and failing to take basic care to comply with child welfare standards, all of which compounded the harms already inflicted on families who had been forcibly separated.

490.    The government's family separation policy and deliberate lack of planning and coordination among agencies also caused children to be detained in CBP facilities beyond the 72-hour legal limit. During the Zero Tolerance period, thirty-nine percent of separated children were detained by CBP for more than seventy-two hours.[50]

### 1.    Defendant Subjected Plaintiffs to Dangerous Detention Facilities Unsuited for Families with Children

491.    As a direct result of the indiscriminate and reckless apprehension, under the pretext of intending to prosecute, thousands of families like Plaintiffs seeking entry into the United States,[51] the CBP-run hieleras in which Plaintiffs were initially detained were dangerously overcrowded and in egregious violation of federal health and safety requirements.

492.    Defendant failed to provide Plaintiffs with basic hygiene items, failed to provide access to safe and sanitary restrooms, and failed to provide proper food and clean drinking water, proper clothing, bedding, hygiene products, and appropriate meals.

---

[49] *See id.* at 12-13; DHS OIG REPORT I at 15, 24.

[50] DHS OIG REPORT I at 36.

[51] The U.S. government has separated more than 5,000 families at the southern border since 2017.  Joint Status Report at 1, 12, *Ms. L. v. U.S. Immigration and Customs Enf't*, No. 18-cv-00428 DMS MDD (S.D. Cal. November 6, 2019), ECF No. 495 (the government acknowledged that, for the original class, as many as 2,814 children were separated from their parents, and has thus far recognized an additional 1,556 children as part of the expanded class); ECF 439-1 (Pls.' Mem. in Support of Mot. to Enf. Prelim. Inj.) at 7 (noting that government reported 911 child separations between June 26, 2018 and June 29, 2019, after the preliminary injunction was entered); *see also* HHS OIG REPORT I at 11.

493.     Defendant detained Plaintiffs in conditions that were so overcrowded—with adults and children alike—that in some cases the detainees did not have enough room to sit or lie down to rest.  The overcrowding, lack of mattress and blankets, and constant lighting in the hieleras deprived Plaintiffs of sleep.

494.     Defendant placed Plaintiffs in freezing cold cages and in some cases deprived Plaintiffs of warmth by taking away their clothing and belongings.

495.     In subjecting Plaintiff Children to inhumane and unsafe conditions in CBP detention, Defendant violated federal law and policy requiring that minors who are detained by CBP or other DHS agencies, or who are held in HHS custody, be held in "facilities that are safe and sanitary," and that account for "the particular vulnerability of minors."[52]  Defendant violated requirements that minors detained by CBP be provided access to toilets and sinks, adequate temperature control and ventilation, drinking water and food, as well as "medical assistance if the minor is in need of emergency services."[53]

496.     Defendant failed to provide Obet with medical assistance once it became apparent that he was likely in need of emergency services, in violation of the mandatory *Flores* consent decree.[54]

**2.     Defendant Failed to Track Parent and Child Relationships and to Communicate with Parents About Children's Whereabouts and Safety, and Interfered with Plaintiffs' Asylum Claims**

497.     Despite the fact that tracking separated children was as simple as adding a checkbox to an ORR / DHS referral page,[55] these two agencies primarily responsible for

---

[52] *Flores v. Reno*, Stipulated Settlement Agreement ¶ 12.A, No. 85-CV-4544 (C.D. Cal. Jan. 17, 1997); *see also* U.S. Customs & Border Prot., *U.S. Border Patrol Policy: Hold Rooms and Short Term Custody* (2008); *Flores v. Barr*, 934 F.3d 910, 916 (9th Cir. 2019).

[53] *Flores v. Reno*, Stipulated Settlement Agreement ¶ 12.A, No. 85-CV-4544 (C.D. Cal. Jan. 17, 1997). *See also Flores*, 913 F.3d at 916.

[54] *Flores v. Reno*, Stipulated Settlement Agreement ¶ 12.A, No. 85-CV-4544 (C.D. Cal. Jan. 17, 1997).

[55] *Oversight of the Trump Administration's Family Separation Policy: Hearing Before the H. Comm. on the Judiciary* (Feb. 26, 2019) (statement of Scott Lloyd, Senior Advisor,

implementing the policy instituted no "consistent way to indicate in their data systems children and parents separated at the border" until the summer of 2018 at the earliest.[56]

498.    The El Paso pilot program in place from July through November 2017 revealed that DHS was woefully underprepared to track separated families through its information technology systems. According to the DHS Office of the Inspector General (OIG), CBP personnel "relied on local spreadsheets to document family separations," which led to data errors and "prevented ICE and CBP personnel in other locations from seeing where El Paso Sector Border Patrol agents had separated family members."[57]

499.    El Paso sector CBP officials raised concerns to CBP headquarters about the lack of functionality to track family separations in their computer systems but headquarters failed to make any changes in response to those concerns.[58]

500.    The U.S. government thus was on notice at least as of November 2017 that government databases could not properly track families once the child was separated from the parent.  It was also aware that DHS component agencies needed to better coordinate with each other and with ORR before a vast expansion of family separation across the length of the southern border.  But the government plowed ahead with its policy of mass family separation despite these identified defects and without making any improvements to its IT systems.

501.    When the government ramped up family separations during the Zero Tolerance Policy, these deficiencies were predictably multiplied on a mass scale, and with devastating results.

502.    CBP entered inaccurate and incomplete information in its systems, including failing to link parents and children as separated families.  These initial errors

Center for Faith and Opportunity Initiatives, U.S. Department of Health and Human Services, at 4), *available at* https://perma.cc/P97Q-JB58.

[56] GAO REPORT, *supra* note 47, *Highlights*; *see also id.* at 16-19.

[57] DHS OIG REPORT II at 14–15.

[58] *Id.*

had a ripple effect through other government tracking systems:  ICE could not readily identify parents in its custody who were separated from their children and HHS/ORR systems lacked even a field to indicate that a child had been separated from her parents until July 2018—after a federal court halted the practice of family separation.[59]

503.    The most staggering result of this failure was that the Administration had no ready records of where thousands of parents' children were located, and could not promptly reunite parents and children,[60] even when ordered to do so by a U.S. District Court.[61]

504.    After separation, parents and children often did not know each other's whereabouts for days, weeks or months, as was the case with Plaintiffs.  When the children were taken, "officers often failed to fully explain to parents what was happening and how the adults could get in touch with their kids."[62]

505.    The government failed to provide parents with any "paperwork" documenting the location or well-being of their children, or to enable communication between parents and their separated children.[63]  One Texas federal district court magistrate judge observed in January 2018, when addressing the government's failure to track families separated during the 2017 pilot of the family separation policy, that "[t]he

---

[59] *Id.* at 13, 21.

[60] *Id.* at 9–11; *see* Kevin Sieff, *The Chaotic Effort to Reunite Immigrant Parents with their Separated Kids*, WASH. POST (June 21, 2018), https://perma.cc/HQ6W-HLBK; Miriam Jordan, *Torn Apart by Zero Tolerance, Kept Apart by Red Tape*, N.Y. TIMES (June 24, 2018), https://perma.cc/EY2J-XYPT.

[61] *See* Evan Halper, *Federal Investigators Find Many Failures in Trump's Family Separation Policy*, L.A. TIMES (Oct. 2, 2018), https://perma.cc/ZP4B-HQVE.  These circumstances led the court to conclude that the "unfortunate reality" of the family separation policy was that "migrant children [were] not accounted for with the same efficiency and accuracy as *property*." *Ms. L.*, 310 F. Supp. 3d at 1144.

[62] Halper, *supra* note 61.

[63] *See United States v. Dominguez-Portillo*, No. EP-17-MJ-4409-MAT, 2018 WL 315759, at *1–*2, *9 (W.D. Tex. Jan. 5, 2018).

practical effect" of this failure was "to create a 'blackout' period where parent and child are wholly incommunicado from each other."[64]

506.   Plaintiffs here experienced the devastating effects of the government's failure to link the parents' cases with those of their children and to provide information to the parents about the children's whereabouts.

507.   The anguish of Plaintiff Fathers' separations from their children was exacerbated by the government's failure to provide information about their children's whereabouts, well-being, and plan for custody.  Plaintiff Children suffered further harm from not knowing where their fathers were and being unable to communicate with them.

508.   Even after Plaintiff Fathers were finally able to obtain contact information for their children as the result of their own efforts, phone calls were logistically difficult and expensive to make, severely limiting their communication.[65]

509.   Defendant's failure to link the cases of Heriberto, Mario and Rolando with those of their children as "family units" also resulted in the devastation of being deported without their children, while the children remained alone in government custody with no plan for reunification.

510.   Defendant also violated federal law and policy requiring children held in ORR custody be provided with "contact with family members."[66]

511.   Furthermore, Defendant used separation as a means to pressure Plaintiff Fathers to relinquish their asylum claims.  Defendant leveraged the Plaintiff Fathers' separation from their children to compel them to abandon their asylum cases, including by causing extreme duress through the prolonged separations themselves, pressuring the

---

[64] *Id.* at *9.

[65] *See* Halper, *supra* note 61; Jordan, *supra* note 60; Jack Herrera, *A New Report Reveals How Family Separation Led Border Officials to Break the Law*, PACIFIC STANDARD (Oct. 4, 2018), https://perma.cc/9BGJ-LT8Q .

[66] *Flores v. Lynch*, 828 F.3d 898, 903 (9th Cir. 2016) (citing *Flores v. Reno*, Stipulated Settlement Agreement, No. 85-CV-4544 (C.D. Cal. Jan. 17, 1997)); *see also* ORR Policy Guide § 3.3.10.

Plaintiff Fathers to sign forms they could not understand, and/or deliberately misrepresenting to them that they had to agree to deportation to see their children again.

512.   Defendant's actions in coercing Plaintiff Fathers to abandon their asylum claims violated its mandatory, nondiscretionary duties under federal statutes and regulations.  *See* 8 U.S.C. § 1225(b)(1)(A)(ii); 8 C.F.R. §§ 235.4; 235.3(b)(4); 241.8(e). Defendants' misrepresentations to Plaintiffs Abel, José, Joel, Heriberto, and Mario that they could only reunify with their children if they agreed to accept deportation also violated the constitutional guarantee of procedural due process.

### 3.   Defendants' Actions Created Conditions Ripe for Alarming Instances of Child Abuse

513.   Defendants ignored applicable child welfare standards in the rush to expand detention capacity to accommodate the influx of families affected by the Policy.  In so doing, Defendants violated mandatory, non-discretionary duties.

514.   The family separation policy caused a sudden increase in the number of children, including very young children, in ORR custody.  Despite indicators by mid-2017 that larger numbers of very young children were entering ORR custody, ORR was unprepared to adequately care for these children.[67]

515.   Children age twelve and under are considered "tender aged."  When those children enter ORR custody, they must be placed in special facilities that are licensed to care for younger children.

516.   The family separation policy caused the number of tender-aged children in ORR custody to increase substantially and exceeded ORR's capacity to house them in congregate care facilities.  Upon information and belief, facilities like Cayuga, Lutheran Services, and Bethany Christian Services had to quickly recruit additional foster families and place larger numbers of children in individual foster homes than had been previously lived in those homes.

---

[67] HHS OIG REPORT II at 6.

517.   These foster homes were ill-prepared to house the number of children that came into their care.  The resulting abuses suffered by children, including Obet and Herlinda, were compounded by ORR's failure to properly plan for a large number of young children in its custody and to monitor the children in these foster homes.

518.   Defendant's failure to ensure that children placed in ORR custody were in "facilities that are safe . . . and that are consistent with the [government's] concern for the particular vulnerability of minors" violated its duties under the Flores consent decree.[68]

519.   The Administration's intent to inflict the trauma of family separation as a deterrent — followed by its failures to provide children with appropriate care and protection from abuse, track separated children, and tell their parents anything about their whereabouts and well-being — evinces an intent to increase their suffering to maximize the deterrent effect of the family separation policy.

## CONSEQUENCES OF DEFENDANT'S WRONGFUL ACTS

520.   The federal government deliberately violated Plaintiffs' constitutional rights, including their right to family integrity, and failed in its basic duties not to harm those in its custody.

521.   The government's actions and failures were designed to and did cause Plaintiffs severe trauma and emotional distress.

522.   The government knew that forcibly taking Plaintiffs would fill them with terror, desperation, and anguish.

523.   The government purposefully inflicted that trauma on Plaintiffs to instill fear in others.

524.   The government then compounded that trauma by keeping Plaintiffs apart from their children for periods ranging from around eight weeks to around eight months, without telling them anything about the other's whereabouts or well-being, without

---

[68] *Flores v. Reno*, Stipulation Settlement Agreement § V ¶ 12.A; *see Flores v. Lynch*, 828 F.3d 898 (9th Cir. 2016) (holding that *Flores* consent decree "unambiguously applies to accompanied minors").

allowing them even to speak to one another for days or weeks, and without any plan for reuniting them.

525.    And, as a result of the government's actions and failures, Herlinda and Obet were exposed to abuse in a foster care system overburdened with unaccompanied children, and Bertha was exposed to abuse in a detention facility.

526.    Plaintiffs will carry the harm done to them for the rest of their lives.  The government's conduct here is unconscionable, and it cannot be excused in a civilized society.

**CLAIMS FOR RELIEF**

**COUNT ONE**

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

527.    Plaintiffs re-allege each allegation in the preceding paragraphs 1 through 526 as though fully set forth here.

528.    Defendant, federal officials, and federal employees referenced above engaged in extreme and outrageous conduct with an intent to cause, or at least a reckless disregard of the probability of causing, Plaintiffs to suffer severe emotional distress.

529.    Defendant, federal officials, and federal employees referenced above intended to cause, and did cause, Plaintiffs to suffer severe emotional distress by forcibly separating Plaintiffs father and child from each other without their consent and despite the obvious terror caused by the separation, flying Obet, Herlinda, Alicia, Antonio and Bertha thousands of miles across the country, and deporting Heriberto, Mario and Rolando without their children.

530.    Defendant, federal officials, and federal employees referenced above intended to cause, and did cause, Plaintiffs to suffer severe emotional distress by, *inter alia*, failing to develop and use a system for tracking the existence of the parent-child relationship, exposing Herlinda, Obet and Bertha to the risk and reality of abuse while in ORR or CBP custody, withholding from the parents any information about their child's location or welfare for days, weeks or months at a time, not allowing families to

communicate with each other or severely limiting such opportunities, not giving any indication that the parents and children would ever be reunited, and interfering with Plaintiffs' rights to seek asylum in the United States by using Plaintiffs' distress at their separation to coerce Plaintiffs to sign documents authorizing their removal from the United States.

531.    Defendant, federal officials, and federal employees referenced above further intended to cause, and did cause, Plaintiffs to suffer severe emotional distress by subjecting Plaintiffs to inhumane detention conditions prior to their separation.  This includes (among other acts mentioned above and such acts that may become apparent during discovery) denying Plaintiffs proper food, clean drinking water, hygiene products, clothing, and appropriate restroom facilities during their time in CBP detention, subjecting Bertha to physical abuse, holding Plaintiffs in the freezing cold hieleras that lacked ventilation, and subjecting Plaintiffs to mental anguish through verbal cruelty.

532.    Defendant, federal officials, and federal employees referenced above confirmed their intent to cause severe emotional distress by failing to plan for or secure resources to accommodate the increase in children designated as UACs as a result of the family separation policy, failing to provide a child welfare or child safety justification for forcibly separating children from their parents, failing to track families, failing to account for all the children separated from their parents, and failing to craft any type of reunification plan until receiving a court order from a federal judge.

533.    The behavior of Defendant, federal officials, and federal employees referenced above was extreme and outrageous under the circumstances, particularly in light of Plaintiffs' recent flight from abuse and persecution.

534.    As a direct and proximate result of that conduct, Plaintiffs suffered severe emotional distress throughout their time in Defendant's custody and continue to suffer the lasting effects of that distress today.

535.    Under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-2680, the United States is liable to Plaintiffs for intentional infliction of emotional distress.

**COUNT TWO**

**NEGLIGENCE**

536.     Plaintiffs re-allege each allegation in the preceding paragraphs 1 through 535 as though fully set forth here.

537.     Defendant, federal officials, and federal employees referenced above had a legal duty to Plaintiffs to act with ordinary care and prudence so as not to cause harm or injury to Plaintiffs.  They also had mandatory, non-discretionary duties including but not limited to, those imposed by the United States constitution, the *Flores* consent decree, federal statute, and federal regulations.

538.     Defendant, federal officials, and federal employees referenced above acted unreasonably by violating their duties while Plaintiffs were in Defendant's custody.

539.     Defendant, federal officials, and federal employees referenced above violated those duties by *inter alia* forcibly separating Plaintiffs from their children without their consent, flying Herlinda, Obet, Alicia, Antonio and Bertha thousands of miles across the country, and deporting Plaintiffs Heriberto, Mario and Rolando without their children.

540.     Defendant, federal officials, and federal employees referenced above violated those duties by *inter alia* failing to develop and use a system for tracking the existence of the parent-child relationship, exposing Herlinda, Obet and Bertha to the risk and reality of abuse while under ORR or CBP custody, withholding from the parents any information about their child's location or welfare for days, weeks or months at a time, not allowing families to communicate with each other or severely limiting such opportunities, not giving any indication that the parents and children would ever be reunited, and interfering with Plaintiffs' rights to seek asylum in the United States by using Plaintiffs' distress at their separation to coerce Plaintiffs to sign documents authorizing their removal from the United States.

541.     Defendant, federal officials, and federal employees referenced above violated those duties by subjecting Plaintiffs to inhumane detention conditions prior to

their separation.  This includes (among other acts mentioned above and such acts that may become apparent during discovery) denying Plaintiffs proper food, clean drinking water, hygiene products, clothing, and appropriate restroom facilities during their time in CBP detention, subjecting Plaintiff Bertha to physical abuse, holding Plaintiffs in the freezing cold hieleras that lacked ventilation, and subjecting Plaintiffs to mental anguish through verbal cruelty.

542.    Defendant, federal officials, and federal employees referenced above further violated those duties by failing to plan for or secure resources to accommodate the increase in children designates as UACs as a result of the family separated policy, failing to provide a child welfare or safety justification for forcibly separating children from their parents, failing to track families, failing to account for all children separated from their parents, and failing to craft any type of reunification plan until receiving a court order from a federal judge.

543.    Defendant, federal officials, and federal employees referenced above violated their duties to Plaintiffs by unreasonably ignoring Abel's pleas for medical attention for his son, despite their knowledge Obet was suffering from a severe heart condition and developing an acute respiratory infection.

544.    Defendant, federal officials, and federal employees referenced above violated their duties to Plaintiffs by allowing Obet and Herlinda to be held in locations that did not adequately protect them from sexual assault, and as a result, both children experienced numerous incidences of sexual assault.

545.    Defendant, federal officials, and federal employees referenced above violated their duties to Plaintiffs by failing to properly supervise other federal employees and federal contractors responsible for the care of Plaintiffs while they were in Defendant's custody.

546.    By engaging in the acts alleged herein, the federal officers referenced above failed to act with ordinary care and breached their duty of care owed to Plaintiffs.

547.    As a direct and proximate result of the referenced conduct, Plaintiffs suffered substantial damages.

548.    Under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-2680, the United States is liable to Plaintiffs for negligence.

### COUNT THREE

### LOSS OF CHILD'S CONSORTIUM

549.    Plaintiffs re-allege each allegation in the preceding paragraphs 1 through 548 as though fully set forth here.

550.    Plaintiff Children suffered severe, permanent, and disabling injuries.

551.    Plaintiff Children must now cope with the long-term mental health effects and trauma caused by Defendant, federal officials, and federal employees referenced above.

552.    Those injuries substantially interfere with the capacities of Plaintiff Children to interact with their fathers in a normally gratifying way.

553.    Plaintiff Children continue to struggle to communicate with their fathers, especially about the separation and, in the case of Obet, Herlinda, and Bertha, the abuse they suffered.

554.    Under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-2680, the United States is liable to Plaintiff Fathers for loss of consortium.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully demand as follows:

A.      Compensatory damages;

B.      Attorneys' fees and costs pursuant to, among other provisions, the Equal Access to Justice Act, 28 U.S.C. § 2412; and

C.      Such other and further relief as the Court may deem just and appropriate.

1    Respectfully submitted this 16th day of July, 2020.

2                                    COPPERSMITH BROCKELMAN PLC

3                                    By  s/ Keith Beauchamp
4                                        Keith Beauchamp
                                         Shelley Tolman
5
                                     SOUTHERN POVERTY LAW CENTER
6                                        Norma Ventura*
7                                        Gillian Gillers*

8                                    SOUTHERN POVERTY LAW CENTER
9                                        Paul R. Chavez*
                                         P.O. Box 370037
10                                       Miami, FL 33137
                                         Telephone: (786) 347-2056
11                                       paul.chavez@splcenter.org

12                                   COVINGTON & BURLING LLP
13                                       Matthew Schlesinger*
                                         Jason Carey*
14                                       Terra White Fulham*

15                                   COVINGTON & BURLING LLP
16                                       Swati R. Prakash*
                                         The New York Times Building
17                                       620 Eighth Avenue
18                                       New York, NY 10018-1405
                                         Telephone: (212) 841-1174
19                                       sprakash@cov.com

20                                   COVINGTON & BURLING LLP
21                                       Jessica R. Hanson*
                                         1999 Avenue of the Stars, Suite 3500
22                                       Los Angeles, CA 90067-4643
                                         Telephone: (424) 332-4800
23                                       jhanson@cov.com

24                                   *Attorneys for Plaintiffs*
25

26

27

28