Keith Beauchamp (012434)
Shelley Tolman (030945)
COPPERSMITH BROCKELMAN PLC
2800 N. Central Avenue, Suite 1900
Phoenix, AZ 85004
Telephone: (602) 381-5493
kbeauchamp@cblawyers.com
stolman@cblawyers.com

*Counsel for Plaintiffs (Additional Counsel for Plaintiffs Listed on Signature Page)*

Philip D. MacWilliams
Theodore W. Atkinson
U.S. Department of Justice
Civil Division, Torts Branch
Benjamin Franklin Station
P.O. Box 888
Washington, D.C. 20044
Telephone: (202) 616-4285
phil.macwilliams@usdoj.gov
theodore.atkinson@usdoj.gov

*Counsel for Defendant*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| A.P.F. on his own behalf and on behalf of his minor child, O.B.; J.V.S., on his own behalf and on behalf of his minor child H.Y.; J.D.G. on his own behalf and on behalf of his minor child, M.G.; H.P.M. on his own behalf and on behalf of his minor child, A.D.; M.C.L. on his own behalf and on behalf of his minor child, A.J.; and R.Z.G. on his own half and on behalf of his minor child, B.P., <br><br> Plaintiffs, <br><br> v. <br><br> United States of America, <br><br> Defendant. | No. CV-20-00065-PHX-SRB <br><br> **JOINT CASE MANAGEMENT REPORT** |

Pursuant to the Court's Order of July 27, 2020 (Dkt. 37) and Federal Rule of Civil Procedure 26(f), on August 19, 2020, the parties met and conferred via telephone concerning the items listed in the Court's Order and Rule 26(f).  The parties respectfully submit this Joint Proposed Case Management Report.

**1.     Parties who attended the Rule 26(f) meeting and assisted in developing the Case Management Report**

The following counsel attended the Rule 26(f) meeting on behalf of Plaintiffs:

> Keith Beauchamp
>
> Jason Carey
>
> Paul Chavez
>
> Terra White Fulham
>
> Gillian Gillers
>
> Sam Greeley
>
> Shelley Tolman
>
> Norma Ventura

The following counsel attended the Rule 26(f) meeting on behalf of Defendant:

> Theodore W. Atkinson
>
> Philip D. MacWilliams
>
> James M. McConnon
>
> Walter E. Parker
>
> Martin St. Aubin

**2.     List of parties in the case**

Plaintiffs (identified by pseudonym, as permitted by the Court's Orders dated April 16, 2020 (Dkt. 27) and August 6, 2020 (Dkt. 38)):

> Abel (A.P.F.) on his own behalf and on behalf of his minor child, Obet (O.B.);
>
> José (J.V.S.), on his own behalf and on behalf of his minor child, Herlinda (H.Y.);

Joel (J.D.G.), on his own behalf and on behalf of his minor child, Mariela (M.G.);

Heriberto (H.P.M.), on his own behalf and on behalf of his minor child, Alicia (A.D.);

Mario (M.C.L.), on his own behalf and on behalf of his minor child, Antonio (A.J.); and

Rolando (R.Z.G.) on his own behalf and on behalf of his minor child, Bertha (B.P.)

Defendant:

United States of America

**3.     Statement of the nature of the case**

<u>Plaintiffs' statement</u>

This action seeks damages for six families forcibly separated by the United States. The separations were made pursuant to an unconstitutional policy developed by high-ranking government officials to inflict harm and instill terror on migrant families, in an effort to deter others from seeking asylum in the United States.

Plaintiffs are six fathers and their children who came to the United States seeking asylum between November 2017 and May 2018.  The Plaintiff Fathers were forcibly separated from their respective children by federal officials while detained at federal immigration detention facilities in Arizona.

Following the separations, the government sent the Plaintiff Children, who ranged between five and eleven years old at the time, to facilities and foster homes hundreds or thousands of miles away from their parents.  The families remained separated for periods ranging between eight weeks and eight months.  During the time the families were separated, the government provided only limited information about the children's locations and safety, and afforded limited opportunities for the families to communicate.  Some of the Plaintiff

Children were subject to abuse while in the custody of the United States.  Three of the Plaintiff Fathers were deported to Guatemala without their children.

The significant public record concerning the family separation policy demonstrates that this policy was intentionally created and developed by high-ranking government officials, including senior White House officials, cabinet-level government officials, and heads of federal agencies.  *See generally* Am. Compl. (ECF No. 34) ¶¶ 44-79.  Numerous government officers from myriad offices within at least three federal agencies and four subcomponent agencies were involved in the policy's implementation. *Id.*

Plaintiffs suffered, and will continue to suffer, substantial physical, mental, and emotional harm as a result of the government's actions.  They assert three causes of action under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b)(1), 2671-2680: (1) intentional infliction of emotional distress ("IIED"); (2) negligence; and (3) loss of child's consortium.

Defendant's statement

Plaintiffs consist of six adult male aliens suing on behalf of themselves and their respective alien children.  Four Plaintiffs illegally crossed the border into the United States in Arizona with their children in May 2018.  They did so at a time when the Department of Homeland Security ("DHS") had been directed by the President of the United States to exercise its federal statutory authority to detain aliens during the pendency of their immigration proceedings, and after the Attorney General had directed federal prosecutors to adopt a "zero-tolerance" policy for immigration offenses referred for prosecution under 8 U.S.C. § 1325(a) as well as other criminal immigration statutes.  Plaintiffs were amenable to prosecution under 8 U.S.C. § 1325(a) and were detained pending decisions regarding criminal prosecutions and were detained by U.S. Immigration and Customs Enforcement ("ICE") in secure adult detention facilities pending removal proceedings.  Two Plaintiffs and their children allegedly presented themselves at ports of entry, and were detained by ICE in secure adult detention facilities pending removal proceedings. Plaintiffs' minor

children were determined to be "unaccompanied alien children" ("UACs") pursuant to 6 U.S.C. § 279(g)(2), and were placed in the care and custody of the Office of Refugee Resettlement ("ORR"), a component of the U.S. Department of Health and Human Services ("HHS") pursuant to the Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), 8 U.S.C. § 1232(b)(3).  Certain Plaintiffs and their children were reunified and released, while others were reunified following repatriation to their home countries.  The United States maintains that it is immune from suit under the FTCA on several grounds, including that the separations of Plaintiffs from their children were pursuant to the execution of federal criminal and immigration laws, and their claims are based upon discretionary, policy-based conduct.  The United States further maintains that Plaintiffs have not pleaded actionable claims under applicable state law.

**4.      Jurisdictional basis for the case**

Plaintiffs assert that the Court has jurisdiction over this case under 28 U.S.C. §§ 1331, 1346(b).  The United States maintains that the Court lacks subject matter jurisdiction over Plaintiffs' claims for the reasons asserted in its motion to dismiss (ECF No. 21, 32).

**5.      Parties which have not been served**

All parties have been served.

**6.      Statement of whether any party expects to add additional parties or amend pleadings**

The parties do not expect to add parties or amend the pleadings at this time.  Any necessary amendments will be made before the deadline provided in the Court's scheduling order, after seeking leave of Court as necessary. A deadline for amending the pleadings is proposed below. *See infra* ¶ 16(a).

**7.     Listing of contemplated motions**

The parties do not contemplate any motions at this time.

**8.     Whether the case is suitable to reference to a Magistrate Judge**

The parties do not consent to reference to a Magistrate Judge for trial.  The parties agree that the case may be suitable for reference to a Magistrate Judge for a settlement conference at a later date.  *See infra* ¶¶ 16(d), 18.

**9.     Status of related cases**

The matter of *C.M. et al. v. United States*, No. 2:19-cv-05217-SRB ("*C.M.*") is pending before this Court.  The Court denied Defendant's motion to dismiss in *C.M.* on March 30, 2020, and Defendant filed its Answer on May 13, 2020.  This Court entered a Case Management Order in *C.M.* on June 18, 2020, and the parties in *C.M.* filed their initial MIDP responses on June 12, 2020.  The United States filed a supplemental MIDP response on June 29, 2020.  On August 17, 2020, the parties in *C.M.* submitted a Joint Discovery Plan and the *C.M.* parties' agreement regarding the format for the production of documents and related matters ("ESI protocols") (ECF No. 60).

On August 26, 2020, this Court entered an Order approving parts of the *C.M.* parties' Joint Discovery Plan for which there was agreement, and resolving the remaining initial discovery disputes among the parties concerning the number of depositions allowed by each party, the extent of policy-related discovery, and the schedule for written discovery and document production (ECF No. 61).

**10.     Discussion of issues related to electronically stored information**

The parties in this action are in the process of discussing the ESI protocols and ESI search terms and custodians.  The parties will be prepared to update the Court on the status of those discussions at the case management conference.  The Parties' respective statements concerning issues related to ESI are below.

1

2   <u>Plaintiffs' statement</u>:

3       Plaintiffs disagree with Defendant's position that Plaintiffs should accept the ESI

4   protocols entered in the *C.M.* case without any modification. Plaintiffs were not included in

5   the negotiations over the ESI protocol in that case. While Plaintiffs are prepared to accept

6   most of the provisions in that protocol, Plaintiffs have proposed reasonable changes that are

7   not unduly burdensome.

8       Plaintiffs disagree with Defendant's position that Plaintiffs should accept, without

9   any additions, the draft ESI search terms and custodians for policy-level discovery being

10  negotiated by the parties in *C.M.* Plaintiffs were not included in the negotiations of search

11  terms and custodians in *C.M.*, and were provided this list for the first time on August 19.[1]

12  Plaintiffs are reviewing the list of search terms and custodians negotiated in *C.M.* and agree

13  that these terms and custodians should result in production of relevant information.

14  However, these lists do not include certain terms and custodians that Plaintiffs believe to be

15  important to their case. For instance, the *C.M.* custodians list does not include officers from

16  the Office of Refugee Resettlement, which engaged in significant communications about

17  the development and implementation of the family separation policy, the failure to track

18  separated families, the breakdown in inter-agency communication about separated families,

19  the capacity issues at ORR resulting from the family separation policy, and the harm

20  suffered by separated children.[2] Plaintiffs have identified other omissions as well, and still

21  others may become apparent upon receipt of Defendant's MIDP response.

22

23

24  [1] Plaintiffs disagree with Defendant's position that it was Plaintiffs' burden to ask to be

25  included in discovery negotiations in *C.M.*, a separate case that has not been consolidated
    with *A.P.F.*

26  [2] Plaintiffs have received no information from Defendant about the "alternative" for ORR

27  discovery discussed in *C.M.* beyond that included in Defendant's statement below. Although
    Plaintiffs are open to discussion, Plaintiffs cannot say without more information whether

28  such an approach would be satisfactory. Moreover, the omission of ORR-related terms is
    just one example of the issues Plaintiffs plan to raise with Defendant.

Plaintiffs expect to propose additional search terms and custodians tailored to Plaintiffs' legal strategy and responsive to the ways in which the Plaintiffs' case varies from *C.M.* The additional terms and custodians will be reasonable and proportional to the needs of the case, and will not be unduly burdensome. Defendant may minimize any burden by conducting a single search for both cases, including both the search terms and custodians agreed upon in *C.M.*, and any additional ones negotiated with Plaintiffs.

Defendant's statement:

Defendant has provided Plaintiffs with a copy of the above-mentioned ESI protocols in *C.M.* that was filed with the Court with the parties' Joint Discovery Plan, ECF No. 60 (Exhibit 1), and entered by the Court on August 25, 2020, ECF No. 61.  It is Defendant's position that to promote efficiency, and because of the need for a consistent approach relating to document discovery, the ESI protocols for *C.M.* should also be adopted in this case.  The parties are discussing proposed changes by Plaintiffs and will update the Court on the status of those discussions at the case management conference.

The parties also are in the process of discussing search terms and custodians for ESI searches.  As noted in the Joint Discovery Plan submitted in *C.M.*, the parties in *C.M.* are in agreement with respect to the majority of ESI search terms and government custodians for electronic discovery, subject to the government performing testing and sampling of said search terms.  ECF No. 60 at 5. As a result of this Court's discovery order in *C.M.* (ECF No. 61), the issues regarding the search parameters for ESI searches are resolved.   The policy-level *C.M.* search terms and government custodians have been provided to Plaintiffs in this lawsuit.  It is Defendant's position that given the uniformity of policy-level discovery between this case and *C.M.*, and a need to promote efficiency and not unduly burden the government, the date range, search terms and government custodians for policy-level discovery should be the same for both cases.[3]  It will be unduly burdensome for Defendant

---

[3] The uniformity in "policy-level" discovery is discussed further below in Defendant's statement regarding discovery (¶14(a)).

to search a vast amount of data possessed by multiple agencies for relevant ESI, and then perform the necessary reviews of such information before production, in *C.M.*, and then perform another such search for ESI and review in this case. Plaintiffs' position that they should develop their own set of search parameters for this case would require Defendant to twice perform this resource-intensive exercise for the same policy-level ESI. Such a requirement on Defendant is unnecessary, overly burdensome, and would make meeting the discovery deadlines in this case and *C.M.* nearly impossible.

Defendant is willing to engage in joint discussions with the plaintiffs' counsel in *C.M.* and *A.P.F.* regarding the ESI search parameters. But it is imperative that a single approach be adopted. To the extent the parties do not agree, intervention by the Court will be sought. In the meantime, however, performing the agreed-upon ESI searches in *C.M.* will have to be delayed until this issue is resolved.

Defendant further notes that additional search terms and custodians are not warranted here simply because Plaintiffs did not participate in discussions or negotiations with the plaintiffs in *C.M.* regarding search terms and custodians, as those search parameters are sufficient to meet the needs of this case as well. In specific response to Plaintiffs' point regarding the lack of custodians and search terms for HHS/ORR, Defendant and the plaintiffs in *C.M.* have discussed ESI discovery for HHS/ORR that involves an alternative to using search terms and custodians. The same approach would be satisfactory here and Defendant is amenable to further discussion with Plaintiffs on this matter.

Defendant engaged in discovery-related discussions with Plaintiffs in *C.M.* and *A.P.F.* in accordance with the posture of the cases and the time-frames set by order of the Court. Despite being aware of the discovery matters under discussion between the parties in *C.M.* and despite Plaintiffs' own statements regarding the overlap of issues and discovery needs, Plaintiffs did not seek to be included in those discussions. In light of the position they are taking now regarding ESI searches, and knowing full-well how that position would dramatically increase the burdens on Defendant, Plaintiffs should have done so.

**11.     Discussion of issues related to claims of privilege or work product**

The parties agree that a Fed. R. Evid. 502 claw back order is warranted in this case.  Plaintiffs have proposed edits to the Rule 502(d) Order issued by the Court in *C.M.* The parties are conferring on the terms of the order and will be prepared to update the Court on the status of those discussions at the case management conference.

**12.     Discussion of an order under Fed. R. Evid. 502(d)**

*See supra* ¶ 11.

**13.     Discussion of the parties' compliance with the MIDP**

Plaintiffs will serve their MIDP responses by September 9, 2020.  Defendant will serve its MIDP responses by September 9, 2020.

Plaintiffs' statement

To assist in Defendant's MIDP production, Plaintiffs will submit a letter to Defendant identifying specific relevant documents and ESI that Plaintiffs believe are in Defendant's possession, custody, or control based on Plaintiffs' investigation to date, and which Plaintiffs expect to be produced by the October 19, 2020 deadline for ESI under MIDP.

Under the MIDP, as the Court is aware, parties must list documents and ESI that are "relevant to the claims and defenses in the case, whether favorable or unfavorable, and regardless of whether they intend to use the information in presenting their claims or defenses."[4] Relevant ESI must be produced within 90 days of the MIDP deadline, which in this case is September 9, 2020.[5] The MIDP replaces initial disclosures under Fed. R. Civ. P. 26(a)(1), and does not supplant Rule 34's process for serving requests for production.[6]

---

[4] General Order 17-08 at A(4), B(3), In the matter of Mandatory Initial Discovery Pilot Project in the District of Arizona (July 29, 2020).
[5] *Id.* at C(2)(c).
[6] *See generally id.*

As required by the MIDP, Plaintiffs will seek to confer with Defendant and attempt to agree on matters relating to the disclosure and production of the ESI. However, the specific documents that Plaintiffs plan to identify should be readily available, and their production should not be overly burdensome. Some of these documents were already processed or produced in response to FOIA requests; some were produced to members of Congress or congressional committees; some were already gathered by the government in the course of conducting investigations or authoring reports; and the remaining documents are highly specific and have been the subject of significant media attention.

Defendant's statement

Defendant agrees that if Plaintiffs have information regarding specifically identifiable and relevant information in the government's possession, it would be helpful to share that information with Defendant to assist it in its discovery efforts throughout this case. However, Plaintiffs' apparent demand that certain information be part of Defendant's MIDP response, and that it be produced by a certain date regardless of the volume and without assessing whether it is relevant, is an improper expansion of the scope of Defendant's MIDP obligations. Rather, Plaintiffs' approach is more akin to a request for production of documents pursuant to Fed. R. of Civ. P. 34, which is premature at this point and the response to which should be subject to the discovery protocols being discussed by the parties and any discovery plan developed by the parties.

**14.   Discussion of necessary discovery**

**a)   Extent, nature, and location of anticipated discovery**

Plaintiffs' statement

Plaintiffs require documentary discovery and deposition testimony concerning the areas identified below:

Policy-Level Information

- The creation, development, and implementation of the government's policy or practice of separating adults and minors at the Southern border of the United States since 2017 (the "Family Separation Policy"), including any pilot program related to the separation of families, and including the separation of families who crossed the border between ports of entry and families who lawfully presented at a port of entry.

- The purpose or intent of the Family Separation Policy, and the reasons underlying government officials' decision to implement the Family Separation Policy.

- Government officials' knowledge of potential or actual effects of the Family Separation Policy on individuals subject to the policy, including but not limited to government officials' knowledge that separating children from parents would cause emotional and psychological harm to separated parents and children; and concerns raised by government officials and others about the Family Separation Policy before and during implementation.

- The creation, development, and implementation of the government's so-called "zero-tolerance" policy implemented in 2018, and the relationship, if any, between the Family Separation Policy and the "zero-tolerance" policy.

- Government policies and practices concerning the care of individuals in immigration detention.

- The policies, directives, processes, procedures, and decision-making related to the referral of parents to the U.S. Department of Justice for prosecution pursuant to 18 U.S.C. § 1325.

- Government policies and practices concerning the care of children in the custody of the U.S. Office of Refugee Resettlement ("ORR"), including

policies related to the government's determination of where to place children separated from their parents pursuant to the Family Separation Policy, and policies and practices of facilities and organizations that contracted with ORR and provided care for the Plaintiff Children.

- ORR's response to the implementation of the Family Separation Policy, including information regarding the number of children in ORR custody for the period of 2016 to 2019, and concerns raised by ORR officials and others concerning ORR's capacity to house children separated from their parents.

- Government policies and practices, if any, regarding communication between parents and children separated under the Family Separation Policy.

- Government policies and practices, if any, regarding the tracking of parents and children separated under the Family Separation Policy, including any inter-agency communication regarding separated families.

- Government policies and practices, if any, regarding the reunification of families separated under the Family Separation Policy.

- Government officials' response to the court order to reunify children age five and older with their parents within thirty days entered in *Ms. L v. U.S. Immigration & Customs Enforcement*, 310 F. Supp. 3d 1133 (S.D. Cal. 2018).

- Government officials' actions and decisions, if any, to end the Family Separation Policy.

Plaintiff-Specific Information

- The circumstances of each Plaintiff's entry into the United States.

- The circumstances of each Plaintiff's detention in government or government-contracted facilities, including the conditions of such facilities.

- Government officials' decisions concerning whether to prosecute each of the Plaintiffs under 8 U.S.C. § 1325 or any other statute.

- Government officials' decisions to separate each of the Plaintiff Fathers from his child, and the circumstances of the separations of Plaintiff Fathers from their respective children, including the manner in which government officials separated each of the Plaintiff Fathers from his child.

- Government officials' decisions of where to place each of the Plaintiff Children following separation from the Plaintiff Fathers, including decisions to place them in shelters or foster homes far from their fathers.

- The manner in which government officials transferred each of the six Plaintiff Children to ORR shelters and/or foster homes.

- Government officials' treatment of each of the Plaintiff Fathers and Plaintiff Children during the course of their respective detentions.

- Government officials' knowledge of abuse suffered by any of the Plaintiff Fathers and Plaintiff Children while in U.S. government custody.

- Government officials' actions, if any, to track each of the Plaintiff Children after they were separated from their fathers.

- Government officials' actions, if any, to provide or prevent means of communication between each of the Plaintiff Fathers and their respective children after separation of the families.

- Government officials' statements or actions to encourage or pressure Plaintiffs to abandon their asylum claims, including any statements or actions suggesting or indicating that a Plaintiff Father must abandon his asylum claim in order to be reunified with his child.

- Government officials' actions, if any, to ensure that Plaintiff Fathers were or were not deported without their children.

- Government officials' actions, if any, regarding the reunification of the Plaintiff Fathers with their children.

- Information concerning the physical, medical, psychological, and emotional harms suffered by each of the Plaintiff Fathers and Plaintiff Children as a result of their separation, including any reports or assessments of the physical, mental, emotional, or psychological state of Plaintiff Fathers and Children while in the custody of the United States.

- Information concerning the retention, storage, and organization of Government records concerning each of the Plaintiffs.

These subject areas are proportional to the needs of the case, as provided in Fed. R. Civ. P. 26(b)(1).  The issues at stake in the action are significant.  The case concerns a policy enacted by high-level federal government officials that received significant public attention. Potential damages are significant, as Plaintiffs allege that they have suffered and will continue to suffer severe and long-lasting physical, emotional, and psychological effects of the government's cruel and tortious actions.  Much of the information relevant to Plaintiffs' claims resides solely with government officials and in records maintained by the government.  Plaintiffs have limited access to this relevant information without the use of discovery permitted under the Federal Rules of Civil Procedure.[7]  In light of these factors, the proposed discovery is proportional to the needs of the case, and the burden and expense of the proposed discovery does not outweigh its benefit to efficiently resolve the Plaintiffs

---

[7] Although there is a significant public record on family separations, the publicly-available documents that have been produced under the FOIA are heavily redacted, and journalistic pieces on the subject are secondary sources, based on documents and interviews that have largely not been made available to the public.

claims. Plaintiffs believe that several of the privileges Defendant intends to invoke may not apply in many circumstances given the nature of the case and the claims at issue.[8]

Plaintiffs disagree with Defendant's position that policy-level discovery should be "uniform" between *C.M.* and *A.P.F.* Defendant first communicated its position that discovery should be "uniform" to Plaintiffs on August 24, five days *after* the Parties' case management conference, during which Plaintiffs had directly inquired about Defendant's position concerning potential coordination of discovery between the *A.P.F.* and *C.M.* cases.[9] As noted above, Plaintiffs were neither invited to nor involved in negotiations over the joint discovery plan entered in *C.M.* The joint discovery plan submitted, and the Court's resulting discovery order, include no mention of the *A.P.F.* Plaintiffs or potential coordination of discovery between the cases. Moreover, Plaintiffs understand that Defendant never raised consolidation of discovery with the *C.M.* plaintiffs despite engaging in negotiations over the discovery plan in that case.

It is Plaintiffs' position that to the extent there is any coordination of discovery in the two cases, the discovery plan must include, at a minimum, Plaintiffs' participation and representation of the issues relevant to this litigation, and would benefit from negotiations among all three parties, who could then bring any disagreements to the Court. This approach will ensure fairness to all parties. The *A.P.F.* Plaintiffs should not be bound by a discovery plan entered in *C.M.* which failed to include representation of Plaintiffs' interests, and which we understand was negotiated by the *C.M.* plaintiffs without contemplation of consolidation.

---

[8] Although the parties plan to confer in good faith to resolve any discovery disputes, Plaintiffs may need to seek intervention from the Court to resolve disputes concerning the government's invocation of governmental privileges and/or the "apex doctrine" to oppose production of documents or witnesses.

[9] At that conference and during a previous call, defense counsel stated a preference for coordination of some discovery, but did not share or propose details, and did not disclose Defendant's current position that all policy-level discovery and even some Plaintiff-specific depositions should be "uniform."

Defendant's statement

Defendant asserts that the scope of discovery described by Plaintiffs is overbroad and unduly burdensome.  Defendant notes that any such discovery may be subject to attorney-client privilege, work production protection as defined by Fed. R. Civ. P. 26(b), governmental privileges, including, but not limited to, deliberative process privilege, law enforcement privilege, executive privilege, and other privileges the United States may invoke, or any other applicable privileges or protection.  Furthermore, insofar as Plaintiffs intend to seek discovery from current or former cabinet-level government officials, heads of any federal agencies, advisors to the President, or the President, such discovery should not proceed unless and until Plaintiffs demonstrate the requisite heightened need for such discovery, and that such discovery cannot be obtained through some other source that is more convenient and less burdensome.

Defendant further states that with respect to policy-level discovery, there is uniformity between this case and *C.M.*  Plaintiffs moved to transfer this case in light of common factual and legal issues and discovery needs, stating, among other things, "[t]his case arises from substantially the same events, involves the same defendant, and calls for determination of substantially the same questions of law as [*C.M.*]," and that there is "significant overlap in factual issues between the two cases."  ECF No. 10 at 2, 5.  Further, Plaintiffs stated, "[t]here will likely be overlap in discovery sought against the United States in these cases relating to the development and implementation of the family separation policy, specifically as it was carried out by government officials in Arizona.  For the same reason, consolidation or coordination of the two cases for limited pretrial purposes may also be appropriate following the Court's resolution of any motions to dismiss."  *Id.* at 6.  Plaintiffs' motion to transfer was granted.  ECF No. 26 at 2 (stating "[b]oth cases also involve the enforcement of the same policy of family separation by federal employees in Arizona in May 2018.").  Accordingly, Plaintiffs' policy-level discovery should be closely coordinated with that in *C.M.* so as to be uniform between the cases. *See infra*, ¶ 14(b).

Defendant further disagrees with Plaintiffs that the need for coordination of discovery was not raised until after the case management conference.  Rather, it was discussed at the case management conference and during a previous call between the parties.

The United States requires documentary discovery and deposition testimony concerning the following subject areas:

- Information regarding the entry of Plaintiffs and their respective children into the United States and the apprehensions of Plaintiffs and their children.

- Information regarding the circumstances experienced by Plaintiffs and their children in their home country that allegedly led to their decision to enter the United States, and the extent to which said circumstances contribute to the alleged physical, medical, emotional, and/or psychological harms experienced by Plaintiffs and their children.

- Information regarding communications and other contacts between Plaintiffs and their children during their separations.

- Information regarding the alleged physical, medical, emotional, and/or psychological harms suffered by each of the Plaintiffs and their respective children as a result of their separations

This discovery is proportional to the needs of the case as provided in Fed. R. Civ. P. 26(b)(1).  Plaintiffs have brought claims arising out of the separations from their children following their entry into the United States, and it is imperative that the United States seek discovery from Plaintiffs regarding the circumstances of their entry, apprehension, detentions, and separations, as well as the alleged harms resulting from those separations. This information is within the knowledge of Plaintiffs and their children, and the United States does not have access to it without the use of discovery permitted under the Federal Rules of Civil Procedure. The burden and expense of the proposed discovery does not outweigh its likely benefit in permitting the parties to efficiently resolve the case through settlement discussions or trial.

**b)** **Suggested changes to the discovery limitations imposed by the Federal Rules of Civil Procedure**

The parties request that the limit on depositions set forth in Fed. R. Civ. P. 30(a)(2)(A)(i) be increased.  In addition, Plaintiffs request that the limit on interrogatories set forth in Fed. R. Civ. P. 33(a)(1) be enlarged.  The parties have outlined their views on these issues below.

Plaintiffs' statement:

A.  Written Discovery:

Plaintiffs request that the limit on the number of interrogatories set forth in Fed. R. Civ. P. 33(a)(1) be increased to 35.   Although the Federal Rules of Civil Procedure set no numerical limits on requests for production, Plaintiffs would agree to a limit of 40 requests for production per side under Fed. R. Civ. P. 34.

These numbers are appropriate given the number of Plaintiffs (twelve individuals) in this action, and the number of federal agencies and subagencies involved in separating the Plaintiff families and inflicting harm on Plaintiffs, as well as the number of agencies and subagencies involved in the creation, development, and implementation of the family separation policy which caused harm to Plaintiffs.  As noted above, publicly available documents indicate that at least three federal agencies and four subcomponent agencies, including numerous sub-agencies and directorates, as well as White House officials, were involved in the creation, development, and implementation of the family separation policy over the course of nearly 17 months prior to issuance of the preliminary injunction in *Ms. L v. ICE*, with reunifications of separated families, including Plaintiffs, occurring in the months after that ruling. 310 F. Supp. 3d 1133 (S.D. Cal. 2018).  In addition, officials from numerous federal agencies across five states interacted with Plaintiffs and may possess relevant information specific to the Plaintiff families' apprehension, detention, separation, and reunification, and the harm suffered by Plaintiffs.

Plaintiffs disagree with Defendant's position that they should serve the same discovery requests related to policy-level information as the *C.M.* plaintiffs. For the reasons articulated above, Plaintiffs believe that Defendant's position is inequitable and deprives Plaintiffs of representation and participation in policy-level discovery.  Defendant raised its position on policy-level discovery with Plaintiffs for the first time on August 24, five days after the Parties' Rule 26(f) conference, and after the *C.M.* parties had already submitted their joint discovery plan to the Court. That plan proposed a limit on requests for production to which Plaintiffs would not have consented. Moreover, pursuant to the *C.M.* discovery plan, written discovery in the *C.M.* case will begin September 1, foreclosing Plaintiffs from involvement in drafting joint discovery requests.  Plaintiffs cannot agree to be bound by discovery requests that they have not seen, or by a discovery plan that they did not negotiate. Moreover, factual differences between the two cases may require different discovery requests even on policy-level information. For example, unlike the plaintiffs in *C.M.*, some Plaintiff fathers were separated at ports of entry, some Plaintiff fathers were deported without their children, and some Plaintiff children were abused in government custody. Am. Compl. ¶¶ 369, 413, 509, 513–519.

After reviewing the discovery requests submitted in *C.M.* and receiving MIDP responses from Defendant, Plaintiffs may agree to serve some of the same discovery requests as *C.M.* counsel to promote efficiency, but Plaintiffs cannot agree to do so at this stage.

B.  Depositions:

Plaintiffs anticipate that they may require a total of approximately 50 depositions, in the categories discussed below.

- **Plaintiff-Specific Depositions.** Five depositions for each Plaintiff family (for a total of 30) concerning the circumstances of each Plaintiff family's entry into and detention in the United States; the decision to separate each Plaintiff family and the details surrounding the physical separation;  the determinations of whether to refer each Plaintiff Father to the U.S. Department of Justice for

prosecution; the placement of each Plaintiff Child in ORR foster homes and/or shelters; the treatment of Plaintiff Children while in ORR custody; each Plaintiff Father's ability to communicate with his child during their separation; the withholding of information from each Plaintiff father and child about one another; the physical, medical, psychological, and emotional harms suffered by Plaintiffs; where applicable, the circumstances of Plaintiff Fathers' deportations; and each Plaintiff Father's reunification with his child.[10]

- **Policy-Level Depositions.**  Twenty depositions collectively for all Plaintiffs concerning the creation, development, and implementation of the Family Separation Policy, including any pilot program related to the separation of families at the Southern border; the purpose or intent of the Family Separation Policy; the government's knowledge of the harm caused by the Family Separation Policy; the connection, if any, between the Family Separation Policy and the "zero-tolerance" policy; policies and procedures governing when and how government officials would separate individual families, including both families who crossed the border between ports of entry and families who presented at ports of entry; the government's procedures (or lack thereof) to track separated families or facilitate communication between separated parents and children; the extent to which agencies implementing the Family Separation Policy engaged or did not engage in planning or coordination; the connection between the Family Separation Policy and the dangerous and/or abusive conditions to which separated families were subject

---

[10] Even if the Court were inclined to follow the *CM* case regarding the number of Plaintiff-specific depositions, Plaintiffs should be permitted at least 18 Plaintiff-specific depositions at this time because there are six Plaintiff families in *A.P.F.*, compared to five Plaintiff families in *C.M.* The Court ruled in *C.M.* that the plaintiffs would, at the present time, be permitted 15 Plaintiff-specific depositions, which averages to three depositions per Plaintiff family. (ECF No. 61 at 2.)

in government detention or ORR facilities, and other Policy-Level topics listed *supra* at ¶ 14(a).

These numbers are appropriate in light of the high number of individuals who, according to publicly available documents, worked closely on the development and implementation of the family separation policy. Based on publicly available documents— including documents requested under the Freedom of Information Act,[11] a recently-published book,[12] government hearings and reports, and numerous news articles—at least 50 individuals across at least three federal agencies and four subcomponent agencies (including myriad subagencies, offices and directorates, all with different functions) possess Policy-Level Information relating to the family separation policy. *See supra* ¶ 14(a). This figure does not include the numerous additional individuals who interacted with Plaintiffs and contain Plaintiff-Specific Information. *See id.* Witnesses possessing Plaintiff-Specific Information include, but are not limited to, Border Patrol agents and agents at ports of entry who encountered Plaintiffs; officers who made the decision to separate Plaintiffs; agents who physically separated Plaintiffs; officers at the multiple ICE facilities where Plaintiffs were detained and unable to communicate with their children (three of the Plaintiffs were apparently detained in 4-5 different ICE facilities); and field specialists, case managers, program managers, teachers, medical providers, and therapists assigned to the ORR facilities where Plaintiff Children were housed.

Plaintiffs are willing to confer with Defendant and *C.M.* plaintiffs regarding the coordination of depositions of certain government officials who possess Policy-Level Information (*see supra* ¶ 14). However, Plaintiffs request that this discussion occur after they receive written and document discovery and are better positioned to identify a more comprehensive list of the individuals whom they wish to depose. Plaintiffs understand that

---

[11] *See, e.g.,* American Oversight, *A Timeline of the Trump Administration's Family-Separation Policy*, https://www.americanoversight.org/a-timeline-of-the-trump-administrations-family-separation-policy.

[12] JACOB SOBOROFF, SEPARATED: INSIDE AN AMERICAN TRAGEDY (2020).

the *C.M.* plaintiffs may also want to defer discussion on coordination until after receipt of such discovery. At that point, the parties in both actions are likely to have a better appreciation as to the logistics and workability of coordinated discovery.

Plaintiffs disagree with Defendant's position that the number of policy-level depositions should be capped at the number permitted in *C.M.*  Plaintiffs believe that a limit of ten depositions for Policy-Level Information is significantly lower than needed considering the quantity of relevant information and the number of federal offices involved. Consolidation would make that limit even more difficult, given that the parties may disagree about which witnesses to prioritize among the many witnesses with significant relevant information.  In the event that any policy-level depositions are consolidated, the total number of such depositions and the length of each should be the subject of discussion among the three parties after receipt of written and document discovery. Plaintiffs understand that Defendant did not raise consolidation of depositions in negotiations with the *C.M.* plaintiffs over the joint discovery plan in that case. If Defendant had proposed consolidation, the *C.M.* plaintiffs may have negotiated different limits on depositions in the various stages of that discovery plan.

After receiving written discovery, Plaintiffs are also willing to discuss with Defendant whether coordination of any depositions of Plaintiff-specific witnesses may be appropriate. However, Plaintiffs note that these witnesses will have different information relevant to each case, based on their separate interactions with the plaintiffs in each case.

Defendant's statement regarding depositions:

It is Defendant's position that, as with *C.M.*, the number of interrogatories set forth in Fed. R. Civ. P. 33(a)(1) should be limited to 25, and the number of requests for production pursuant to Fed. R. Civ. P. 34 should be limited to 25.  Regarding policy-level discovery relating to the creation, development, and implementation of policies resulting in the separation of Plaintiffs in this action and *C.M.*, Plaintiffs in both actions should coordinate their written discovery and serve uniform discovery requests.  The discovery plan in *C.M.*

sets forth a time-frame for such discovery that provides ample time for the Plaintiffs in this case and *C.M.* to coordinate policy-related written discovery.

It is Defendant's position that, in accordance with the Court's recent discovery order in *C.M.* (Dkt. # 61), the same number of depositions permitted in *C.M.* should be permitted in this action – specifically, no more than fifteen (15) depositions of fact witnesses regarding Plaintiff-specific claims, and no more than ten (10) policy-level witnesses. Defendant's position is, however, contingent upon there being uniformity in policy-level witnesses, as described below. Further, the policy-level depositions should not include government witnesses who are or were Cabinet level officials, heads of any federal agency, or White House officials or advisors. As in *C.M.*, the parties can confer on such depositions later in discovery. Defendant should be permitted the same number of depositions that Plaintiffs are permitted.

In light of the uniformity in issues in this case and *C.M.* relating to the alleged family separation policy, the number of policy-level depositions permitted by the Court in *C.M.* should serve as the total number of policy-level depositions permitted in *C.M.* and this case together. Moreover, Plaintiffs in this action and *C.M.* should confer on the identity of policy-level fact witnesses to be deposed and the subject matter for any Rule 30(b)(6) depositions, and serve joint deposition notices for such policy-level depositions. This approach will avoid duplication of efforts, prevent the same witness from being noticed for depositions in both cases, and prevent the total number of depositions between both cases being more than necessary to address the uniform policy-level issues raised in both cases.

Regarding Plaintiff-specific depositions, given that the apprehension, detentions, and separations of Plaintiffs in this action and *C.M.* occurred primarily in the same location and time-frame, *see* ECF No. 26 at 2 ("Both cases also involve the enforcement of the same policy of family separation by federal employees in Arizona in May 2018."), there is likely considerable overlap with respect to the persons who Plaintiffs in this action and *C.M.* will seek to depose. Thus, Plaintiffs in this action and *C.M.* should confer and coordinate the Plaintiff-specific depositions so that the same witness is not deposed more than once. To

the extent Plaintiffs in this action and *C.M.* wish to depose the same Plaintiff-specific witness, they should do so jointly.

### c)   Number of hours permitted for each deposition

The parties agree that each deposition of an adult witness shall be subject to the presumptive limit of one day of seven hours as provided in Fed. R. Civ. P. 30(d)(1).  To the extent that there is coordination of depositions with the *C.M.* case, Plaintiffs may seek to extend the time limit for any coordinated depositions. To the extent that Defendant seeks to depose any of the Plaintiff Children, the parties will confer regarding appropriate limitations for such depositions.

## 15.   Statement of when the parties served their MIDP discovery responses

The parties will serve their MIDP discovery responses by September 9, 2020.

## 16.   Proposed deadlines

The parties propose the following deadlines.  Defendant's agreement to the proposed dates below is subject to the policy-level ESI searches being uniform with the *C.M.* case and other discovery being coordinated as described above in Defendant's position.  Otherwise, this case will require significantly more time for discovery, and Defendant would therefore propose an additional four (4) months to each proposed date.

Plaintiffs believe that the below timeline is realistic even if the parties negotiate some additional search terms and custodians, and even if written discovery and depositions proceed as requested by Plaintiffs.

### a)   Deadline for amendments to the complaint

February 26, 2021

### b)   Completion of fact discovery and supplementation of MIDP discovery responses

August 27, 2021

**c)      Expert disclosures under Fed. R. Civ. P. 26(a)(2)(A)‑(C)**

Plaintiffs' expert disclosures:  October 15, 2021

Defendant's expert disclosures:  November 19, 2021

Rebuttal expert disclosures:  December 23, 2021

**d)      Completion of expert depositions**

February 25, 2022

**e)      Face-to-face good faith settlement talks**

August 27, 2021 (by the completion of fact discovery)

**f)      Filing of dispositive motions**

April 8, 2022

**17.      Whether a jury trial is requested**

Plaintiffs have not requested a jury trial as the FTCA provides that all actions shall be tried by the Court without a jury.  28 U.S.C. § 2402.

**18.      Prospects for settlement**

The parties believe that they will be able to assess prospects for settlement of the case after the completion of fact discovery.

**19.      Any other matters that will aid the Court in resolving the case**

None at this time.

RESPECTFULLY SUBMITTED this 27th day of August, 2020.

COPPERSMITH BROCKELMAN PLC

By: s/ Keith Beauchamp
    Keith Beauchamp
    Shelley Tolman

SOUTHERN POVERTY LAW CENTER
Norma Ventura*
Gillian Gillers*

SOUTHERN POVERTY LAW CENTER
Paul R. Chavez*
P.O. Box 370037
Miami, FL 33137
Telephone: (786) 347-2056
paul.chavez@splcenter.org

COVINGTON & BURLING LLP
Matthew J. Schlesinger*
Jason A. Carey*
Terra White Fulham*

COVINGTON & BURLING LLP
Swati R. Prakash*
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Telephone: (212) 841-1174
sprakash@cov.com

COVINGTON & BURLING LLP
Jessica R. Hanson*
1999 Avenue of the Stars, Suite 3500
Los Angeles, CA 90067-4643
Telephone: (424) 332-4800
jhanson@cov.com

*Attorneys for Plaintiffs*

[*Admitted pro hac vice]


s/ Philip D. MacWilliams *(w/permission)*
Philip D. MacWilliams
Theodore W. Atkinson

*Attorneys for the United States of America*