EXHIBIT J



# The Atlantic

Subscribe

| CHAPTERS | TIMELINE | KEY PLAYERS |
| --- | --- | --- |

"They ripped her out of my arms while she clung on to me."

"I didn't know if he was alive, dead, anything."



"CBP officers told me that I was never going to see my child again."

*The secret history of the U.S. government's family-separation policy*

"We need to
take away

# take away
# children."

*An investigation by*
*Caitlin Dickerson*

AUGUST 7, 2022                                              SHARE ⌄

As a therapist for children who are being processed
through the American immigration system, Cynthia
Quintana has a routine that she repeats each time she
meets a new patient in her office in Grand Rapids,
Michigan: She calls the parents or closest relatives to let
them know the child is safe and well cared for, and
provides 24-hour contact information.

*Leer este artículo en español.*

This process usually plays out within hours of when the children arrive. Most are teens
who have memorized or written down their relatives' phone numbers in notebooks

they carried with them across the border. By the time of that initial call, their families are typically worried, waiting anxiously for news after having—in an act of desperation—sent their children into another country alone in pursuit of safety and the hope of a future.

But in the summer of 2017, Quintana encountered a curious case. A 3-year-old Guatemalan boy with a toothy smile and bowl-cut black hair sat down at her desk. He was far too little to have made the journey on his own. He had no phone numbers with him, and when she asked where he was headed or whom he'd been with, the boy stared back blankly. Quintana scoured his file for more information but found nothing. She asked for help from an Immigration and Customs Enforcement officer, who came back several days later with something unusual: information indicating that the boy's father was in federal custody.



▶                                                                    0:00 / 3:13:51

**Audio:** Listen to this article. To hear more, download Audm for iPhone or Android.

At their next session, the boy squirmed in his chair as Quintana dialed the detention center, getting his father on the line. At first the dad was quiet, she told me. "Finally we said, 'Your child is here. He can hear you. You can speak now.' And you could just tell that his voice was breaking—he couldn't."

The boy cried out for his father. Suddenly, both of them were screaming and sobbing so loudly that several of Quintana's colleagues ran to her office.

Eventually, the man calmed down enough to address Quintana directly. "I'm so sorry, who are you? Where is my child? They came in the middle of the night and took him," he said. "What do I tell his mother?"

THAT SAME SUMMER, Quintana was also assigned to work with a 3-year-old Honduran girl who gave no indication of how she'd gotten to the United States or where she was supposed to be going. During their first several sessions, the girl refused to speak at all. The muscles on her face were slack and expressionless. Quintana surmised that the girl had severe detachment disorder, often the result of a sudden and recent trauma.

---

## Explore the September 2022 Issue

Check out more from this issue and find your next story to read.

View More

---

Across her organization—Bethany Christian Services, one of several companies contracted by the American government to care for newly arrived immigrant children —Quintana's colleagues were having similar experiences. Jennifer Leon, a teacher at Bethany, was at the office one day when the private company that transports children from the border delivered a baby girl "like an Amazon package." The baby was wearing a dirty diaper; her face was crusted with mucus. "They gave the baby to the case manager with a diaper bag, we signed, that was it," Leon recalled. (Leon rushed the baby to the hospital for an evaluation.)

Mateo Salazar, a Bethany therapist, went to his office in the middle of the night to meet a newly arrived 5-year-old Honduran girl. At first, the girl was stoic, but when the transportation-company employees started to leave, the girl ran after them, banging on the glass doors and crying as she fell to the ground. Salazar sat with her for two hours until she was calm enough to explain that her mother had made her

promise—as Border Patrol agents were pulling them apart—to stay with the adults who took her no matter what, because they would keep her safe.

For more than a year, Quintana and her colleagues encountered cases like this repeatedly. To track down the parents of children in their care, they would scour American prisons and immigration detention centers, using clues from social media or tips from friends inside the government. They would struggle to explain to parents why their kids had been taken away or how to get them back. The therapists, teachers, and caseworkers would try to maintain their composure at work, but they would later break down in their cars and in front of their families. Many debated quitting their job. Though they were experts in caring for severely traumatized children, this was a challenge to which they did not know how to respond.

"I started questioning myself," Quintana said. "Am I doing the correct thing by serving these kids, or am I contributing to the harm that's being done?"

"It just seemed unreal to me," she said of the moment she understood that these were not one-off cases. "Something that was not humane."

DURING THE YEAR AND A HALF in which the U.S. government separated thousands of children from their parents, the Trump administration's explanations for what was happening were deeply confusing, and on many occasions—it was clear even then—

patently untrue. I'm one of the many reporters who covered this story in real time. Despite the flurry of work that we produced to fill the void of information, we knew that the full truth about how our government had reached this point still eluded us.

Trump-administration officials insisted for a whole year that family separations weren't happening. Finally, in the spring of 2018, they announced the implementation of a separation policy with great fanfare—as if one had not already been under way for months. Then they declared that separating families was not the goal of the policy, but an unfortunate result of prosecuting parents who crossed the border illegally with their children. Yet a mountain of evidence shows that this is explicitly false: Separating children was not just a side effect, but the intent. Instead of working to reunify families after parents were prosecuted, officials worked to keep them apart for longer.

Over the past year and a half, I have conducted more than 150 interviews and reviewed thousands of pages of internal government documents, some of which were turned over to me only after a multiyear lawsuit. These records show that as officials were developing the policy that would ultimately tear thousands of families apart, they minimized its implications so as to obscure what they were doing. Many of these officials now insist that there had been no way to foresee all that would go wrong. But this is not true. The policy's worst outcomes were all anticipated, and repeated internal and external warnings were ignored. Indeed, the records show that almost no logistical planning took place before the policy was initiated.

It's been said of other Trump-era projects that the administration's incompetence mitigated its malevolence; here, the opposite happened. A flagrant failure to prepare meant that courts, detention centers, and children's shelters became dangerously overwhelmed; that parents and children were lost to each other, sometimes many states apart; that four years later, some families are still separated—and that even many of those who have been reunited have suffered irreparable harm.



A migrant child looks out the window of a bus leaving a U.S. Customs and Border Protection detention center in McAllen, Texas, in June 2018. (Spencer Platt / Getty)

It is easy to pin culpability for family separations on the anti-immigration officials for which the Trump administration is known. But these separations were also endorsed and enabled by dozens of members of the government's middle and upper management: Cabinet secretaries, commissioners, chiefs, and deputies who, for various reasons, didn't voice concern even when they should have seen catastrophe looming; who trusted "the system" to stop the worst from happening; who reasoned that it would not be strategic to speak up in an administration where being labeled a RINO or a "squish"—nicknames for those deemed insufficiently conservative—could end their career; who assumed that someone else, in some other department, must be on top of the problem; who were so many layers of abstraction away from the reality of screaming children being pulled out of their parent's arms that they could hide from the human consequences of what they were doing.

Congress, too, deserves blame, because it failed for decades to fill a legislative vacuum that anti-immigration officials moved to exploit. For too long, an overworked and underequipped border-police force has been left to determine crucial social, economic, and humanitarian policy. It should be no surprise that this police force reached for the most ready tool at its disposal: harsher punishments.

What happened in the months that led up to the implementation of Zero Tolerance —the Trump administration's initiative that separated thousands of families—should be studied by future generations of organizational psychologists and moral philosophers. It raises questions that have resonance far beyond this one policy: What happens when personal ambition and moral qualm clash in the gray anonymity of a

bureaucracy? When rationalizations become denial or outright delusion? When one's understanding of the line between right and wrong gets overridden by a boss's screaming insistence?

From the May 2021 issue: Caitlin Dickerson on how America never wanted the tired, poor, huddled masses

In reporting this story, I talked with scores of Trump-administration officials whose work was in some way connected to the policy. Very few were willing to speak on the record, for fear that it would affect their employment prospects. A number of them told me they were particularly nervous because they had children to think about and college tuitions to pay. During interviews, they asked to call me back so that they could run and pick their children up from school; they sat their children down in front of homework or toys so that we could speak privately in their homes. "Can you hold on? My daughter is about to get in her car to leave and I need to kiss her goodbye," one government official said as she was in the middle of describing a spreadsheet of hundreds of complaints from parents searching for their children. I listened as the mother and daughter said "I love you" back and forth to each other at least five times before the official returned and our conversation continued.

Recently, I called Nazario Jacinto-Carrillo, a 36-year-old farmer from the western highlands of Guatemala whom I first wrote about in 2018. Back then, with his field barren and the price of crops stagnant, his family had been straining to survive on the $4 a week he brought home during harvest season. Most days, he and his wife went hungry; some days, his two young children did too. They were destitute and felt unsafe in their community. So that spring, he and his 5-year-old daughter, Filomena,

set off for the United States. A "coyote" guided them to the American border near San Diego. All they had to do was walk across.

Things didn't go as planned. As six Border Patrol agents surrounded them, Filomena grabbed onto one of Nazario's legs, as did another girl her age with whom they were traveling. The girls screamed as the agents pulled the three apart, one of them holding Nazario by the neck. Nazario eventually agreed to be deported back to Guatemala because, he said, a federal agent told him that if he did so, Filomena would be returned to him within two weeks. This false promise was made to many separated parents, who were later portrayed by the administration as having heartlessly chosen to leave their children alone in the United States. "I would never abandon my daughter," Nazario told me when we first spoke. More than a month had passed since Nazario's deportation, and Filomena still wasn't home.

Nazario's voice cracked as he interrupted my questions with his own. When will Filomena be returned to Guatemala? How many weeks? What number of days? When is the United States government going to give back the children it kidnapped? What does it want with them? *They're children.*



"It was about 4 a.m. when they took her away from my arms. She was crying and saying she wanted to be with her father."

These illustrations were created by *The Atlantic* using direct quotes from parents who were separated from their children. Interviews were conducted by the <u>Asylum Seeker Advocacy Project</u>, a legal-advocacy organization that has helped separated families build and file lawsuits against the U.S. government. In a statement, U.S. Customs and Border Protection told *The Atlantic*, "We take all allegations seriously, provide multiple avenues to report allegations of misconduct, and investigate all formal complaints." (Photo-illustrations by Oliver Munday)

It would take nearly three months, a team of lawyers, the sustained attention of journalists, and a federal court order for Filomena to be reunited with her family. By then she was 6; she'd celebrated a birthday in U.S. government custody.

<u>Read: How the Trump family-separation policy traumatizes children</u>

When I called Nazario again recently, his children were still hungry and his family still felt unsafe. I told him that four years later, some parents still don't have their children back. "I honestly don't know what to say," he said. When I asked him if Filomena, now 9 years old, thinks back <u>on what she experienced in the U.S.,</u> he handed her the phone so she could answer herself. She eked out a few words that I couldn't understand and then went silent and handed the phone back to her father.

"Sorry," he told me. "She's crying."

CHAPTER 1
# The Dawn of Zero Tolerance

To understand how the American government took children away from their parents with no plan to return them, you have to go back to 9/11. Following the deadliest attack in U.S. history, the Bush administration created a new federal department. Comprising 22 offices and agencies, the Department of Homeland Security became the largest federal law-enforcement agency in the country. Its hundreds of thousands of employees were charged with vetting foreigners as they entered the U.S., any of whom could be carrying out the next plot to take American lives.

Among the agencies folded into DHS was the Border Patrol. A federal police force established in 1924, the Border Patrol resembled something out of an old Western. The agency drew thousands of young men and women who wanted to fight crime and carry weapons—and because for decades it did not require a high-school degree, it attracted many who might not have qualified to work for their local police department. For every one person the Border Patrol caught, chasing after them on foot, horseback, or ATV, 100 others seemed to slip through. Even the agents themselves knew that their work was mostly ineffectual.

But after 9/11, the agency took on a national-security mission, and the way that it viewed border crossers evolved. Though a denigrating posture toward migrants was nothing new—agents referred to people they apprehended as "bodies," and categorized them with terms like *guats* and *hondus*—suddenly the agency's leadership began describing these day laborers as hardened criminals and grave threats to the homeland. The Border Patrol Academy transformed from a classroom-like setting, with courses on immigration law and Spanish, into a paramilitary-style boot camp.

No longer content to police the national boundary by focusing on the highest-priority offenses, the Border Patrol now sought to secure it completely. A single illegal border crossing was one too many. The new goal was zero tolerance.

IN 2005, DURING George W. Bush's second term, an enterprising Border Patrol chief in Del Rio, Texas, named Randy Hill came up with an idea for how to eliminate unauthorized border crossings for good: He would make the process so unpleasant that no one would want to do it. He looked to a legal provision added into federal immigration law in the 1950s that had only rarely been enforced; it made any unauthorized border crossing a misdemeanor crime, and any repeat offense a felony. Before 2005, federal judges and prosecutors had tacitly agreed to leave migrants alone, except in high-profile cases. People picking crops for under-the-table wages were not a principal concern for most Americans; overworked U.S. attorneys preoccupied with major drug- and weapons-smuggling cases viewed border crossing as a minor infraction not worth their time. (Hill could not be reached for comment.)

But the Del Rio chief persuaded his counterparts in local law enforcement to participate in an experiment in which every adult who was caught crossing the border illegally, no matter the reason, would be prosecuted. This would subject the migrants to formal deportation proceedings, and trigger even harsher penalties if they were caught trying to cross again in the future, all but cutting off their route to citizenship.

This initiative, named Operation Streamline, would form the basis of a school of thought that has made "prevention by deterrence" a centerpiece of the United States' immigration enforcement today. Parents traveling with children were generally exempt from prosecution under Operation Streamline, but this approach to securing the border would eventually culminate in family separation.

The experiment started out promisingly enough. <u>Within four years</u>, apprehensions at the border in Del Rio dropped by 75 percent, and in Yuma, Arizona, by 95 percent. Border Patrol headquarters was so impressed that it moved to implement the plan nationwide. But the effort may have been less successful than those numbers suggested.

In regions that didn't adopt Streamline, border crossings increased, indicating that the program was pushing people to cross in different areas. "I call it 'squeezing the balloon,'" Anthony Porvaznik, who served as the Border Patrol chief in Yuma during the Obama and Trump administrations, told me. While the first half decade of Streamline coincided with an overall decline in nationwide crossings, <u>academic research indicates</u> that this was largely attributable to economics. (Declining births in Mexico had resulted in far fewer adults who needed work, while demand for labor in the United States plummeted in 2008, during the recession.) Those who did appear to be deterred by Streamline were migrant workers who had never been to jail before, Porvaznik said. People carrying drugs or weapons across the border didn't seem to care.

In many ways, the implementation of Streamline was a mess. Courthouses along the border became so overwhelmed that they had to close to the public. Judges began <u>holding mass hearings</u>, with groups of up to 100 shackled defendants being tried at the same time. <u>Arizona declared a judicial emergency</u> in early 2011, temporarily suspending the right to a speedy trial for all federal defendants, including American citizens. Law-enforcement officers argued that the onslaught of misdemeanor prosecutions required by Streamline took resources away from serious felony cases.

"I had been asking the officers where HM was and no one would tell me anything. I asked many officers, and they would say, 'Why would you bring her here? Why would you put her in danger? You are bad mothers.'"

Yet criminal prosecutions against border crossers became more and more politically popular. Under the Bush and Obama administrations, DHS officials who were eager to show that they were keeping the nation safe testified before Congress that Operation Streamline was an industry "best practice." Border Patrol agents embraced the model too, finally feeling empowered after decades of impotence.

Caitlin Dickerson: America's immigration amnesia

By the mid-2010s, deepening poverty and an explosion of gang and domestic violence in Guatemala, Honduras, and El Salvador were driving children and families to the border in larger numbers. (Today, the State Department discourages Americans from traveling to those countries, because of rampant kidnapping and murder.) Jonathan White, a longtime Health and Human Services social worker, was sent to assess the situation. He saw children crammed into tiny, concrete Border Patrol holding cells or sleeping under bridges while they waited to be processed into the United States. In one facility, "the fire-marshal sign over the door said MAX OCCUPANCY 35 PEOPLE," White told me. More than 80 teenage boys were passing around water in paper cups

and climbing over one another to access a single toilet. He saw a baby lying alone on a flattened cardboard box. "We were horrified from a public-health, child-health perspective."



### Jonathan White

The head of the HHS program that houses detained migrant children. White tried to prevent family separations after learning of a proposal to carry them out and later helped lead HHS efforts to reunify separated families.

In 2014, Jeh Johnson, President Barack Obama's secretary of Homeland Security, called John Kelly, a Marine Corps general who was serving as the highest-ranking U.S.-military official in Central and South America, for advice. "I said, 'Come down here,'" Kelly recalled telling Johnson at the time. "'You have to come down here and look north and see what the other side of the problem is all about.'"



### John Kelly

Considered but ultimately rejected the idea to separate migrant families as a deterrent while serving as Trump's first DHS secretary. Kelly went on to serve as Trump's chief of staff during Zero Tolerance.

During Johnson's July 2014 visit to Guatemala City, Kelly explained that the mass migration of children and families seeking asylum in the U.S. was not a threat to national security, but said that the crush at the border would continue to build unless jobs became more plentiful, and violence less rife, across Central America. No amount of "deterrence," Kelly told Johnson, would outweigh all of the factors driving Central Americans to the United States. Johnson left Guatemala City with a better understanding of the dynamics he faced but no solution for his overwhelmed agents or his boss, President Obama.

So Johnson convened a meeting in Washington with his top border-enforcement officials to discuss ideas. Among those present were Kevin McAleenan, who was then the deputy commissioner of Customs and Border Protection; Ron Vitiello, the deputy chief of the Border Patrol; and Tom Homan, the executive associate director of enforcement and removal for Immigration and Customs Enforcement. All three would subsequently be promoted, and become integral to implementing family separations four years later.



### Kevin McAleenan

Commissioner of Customs and Border Protection, which oversees the Border Patrol. In May 2018, McAleenan recommended that the Border Patrol start referring migrant parents for prosecution and separating them from their children.

Of those in the room, Homan was the most strident. He had spent decades in immigration enforcement, beginning in his early 20s as a Border Patrol agent. Homan said he wanted to apply the perceived lessons of Operation Streamline to migrant families, by prosecuting parents who crossed the border illegally with their children. Though many of these families came to the U.S. seeking asylum, under this new model they would be treated as criminals. Homan explained that the parents would be taken into federal criminal custody, just like with Operation Streamline—only this time the process would trigger an automatic family separation.



### Tom Homan

The intellectual "father" of the idea to separate migrant families as a deterrent, who went on to serve as acting ICE director through the end of Zero Tolerance

This is the earliest instance I've discovered of family separation being proposed as a way to deter migration to the United States. This makes Tom Homan the father of what might be the Trump administration's most controversial policy. "Most parents don't want to be separated," Homan told me recently. "I'd be lying to you if I didn't think that would have an effect."

Homan acknowledged that many people would think him evil for proposing the idea, but he said it was intended to help families, not hurt them. He explained himself by way of an experience that, he said, still troubles him today. One day in the spring of 2003, he said, he got a call from ICE headquarters asking him to rush to a crime scene near Victoria, a city in Southeast Texas. He flew to the border, where more than 70 migrants had been discovered packed into the back of an overheated semitruck. When the authorities found them, 17 of the passengers were already dead; two more died soon after. Lifeless bodies spilled out of the truck. Most of the passengers had stripped down to their underwear for relief from the heat.

As Homan surveyed the trailer, he noticed a boy who turned out to be 5 years old— the same age as Homan's youngest son—lying in his father's lap, both of them dead. "I got down on my knees, put my hand on the child's head, and said a prayer, because I could only imagine what his last hour of life must have been like, how scared he must have been. Couldn't breathe, pitch black, begging his father to help him. His father couldn't help. What was his father thinking? He'd put him in that position, right? His father was probably saying, 'I can't believe I did this.'" He said the experience had driven him to therapy. "That one instance made me who I am today, because it's preventable. We could stop this."

Homan said he had families like this in mind when he pitched Secretary Johnson on the idea of prosecuting parents and taking their children away. Yes, the separated families would suffer, he acknowledged, but at least "they're not dead."

"The goal wasn't to traumatize," he added. "The goal was to stop the madness, stop the death, stop the rape, stop the children dying, stop the cartels doing what they're doing."

When the official Zero Tolerance policy went into effect, in the spring of 2018, the Trump administration made frequent use of this defense. I heard it again and again while I was conducting interviews for this story: Families were separated not to harm them but to keep others like them safe. What I never heard anyone acknowledge was that "deterrence" methods such as family separation have been shown to increase the likelihood of these terrible outcomes—because harsher enforcement induces children and families to try to sneak across the border using more dangerous methods, such as hiding in the back of a tractor trailer.

Johnson eventually rejected Homan's proposal. Though he professed belief in the value of deterrence, he said that, as a father, he couldn't stomach separating children from their parents.

"Family separation was raised and rejected for two reasons," Johnson told me recently. First, "I already had in my mind the vivid visual image of a mother clinging to a child in a Border Patrol holding station—and I was not going to ask somebody from the Border Patrol or ICE to take that child away." Second, "it would have overrun" government shelters for children. "So it was heartless *and* impractical."

CHAPTER 2

# The C-Team Assembles

*(November 2016–January 2017)*

In the executive branch of the American government, policy ideas are traditionally vetted first by subject-matter experts—lower-level staffers whose knowledge is specific and deep. The ideas that pass muster are elevated to managers who are familiar with multiple areas of study and, therefore, a potential policy's broader implications. Finally, proposals are handed to political appointees who ensure that they meet the objectives of the administration. Only those policies that survive these layers of vetting are presented to principals—the Cabinet secretaries or agency heads who decide, based on exhaustive briefings, whether or not to authorize them.

The system serves multiple purposes: It protects those at the top from getting so entangled in the specifics of one part of their portfolio that they neglect another. And given the little firsthand knowledge they have, it's supposed to prevent those in authority from making uninformed decisions. "It's a very poorly kept secret in

Washington that principals never have any idea what they are talking about," one Trump White House official told me. Keep that in mind as we move forward in this timeline.

As Donald Trump prepared to fill the political positions that sit atop the bureaucracy in January 2017, he had a thin bench from which to draw. During Trump's campaign, many prominent Republicans had sworn publicly never to support him. The list shrank further when Chris Christie, Trump's transition head, was fired. When Christie left, so did many establishment Republicans he'd lined up. It was time to bring in the C-team.

The political appointees who came to work on immigration issues in the new administration can be sorted into two groups.

In the first group were establishment Republicans—I'll refer to them as the Careerists —who were compelled not by the president but by the call to serve their country, as well as by personal ambition: With so few qualified candidates eager to work for Trump, those willing to do so got installed a few rungs higher in the bureaucracy than they likely would have in a traditional administration. Like other moderate Republicans, they still hoped that Trump would be less erratic and extreme as president than he had been as a candidate. And if not, they told themselves, the bureaucracy would save them: Trump's most outlandish ideas would never survive the layers of expert review.

Some members of this group came from a tight-knit community of national-security wonks who had occupied the lower rungs of leadership in the Department of Homeland Security when it was first established. Now mid-career and entering middle age, they had stayed in close touch; at Bush-alumni events, they could usually

be found huddling about cybersecurity or anti-terrorism issues. They were not particularly hawkish on immigration by the standards of Trump's GOP. Among this group was Kirstjen Nielsen, a senior policy director at the Transportation Security Administration upon its founding, who was selected to "sherpa" John Kelly, the president's nominee for DHS secretary, through his confirmation process. She would later become the face of family separations.



### Kirstjen Nielsen
After serving as chief of staff to John Kelly at DHS, Nielsen became the administration's second confirmed DHS secretary and the face of family separations carried out under Zero Tolerance.

For the second group—I'll refer to them as the Hawks—Trump was a vehicle for the implementation of ideas they had been honing for years. He doubled down on their plans to slash immigration after seeing how popular they were at campaign rallies. Credit for that success went to Stephen Miller, the Hawks' leader, who had already achieved minor infamy while working as the communications director for Senator Jeff Sessions of Alabama. He signed on as chief speechwriter and senior adviser to the president. Sessions, who had previously been ostracized by his own party for his almost fundamentalist stance on immigration, became Trump's first attorney general.



### Stephen Miller
President Trump's senior adviser on immigration

Lesser known than Miller was Gene Hamilton, a lawyer who had worked for ICE in Atlanta before going to Capitol Hill as then-Senator Sessions's general counsel. He became senior counselor to Secretary Kelly. Hamilton's reputation is complex; he stood out to colleagues as exceptionally kind and, indeed, family oriented, and

frequently asked colleagues about their children and personal lives. But he believed that immigration laws should be applied with draconian rigor. Though Atlanta had the country's harshest immigration courts, where more than 90 percent of immigrant defendants lost their cases, he had left that job angry, according to a longtime colleague, because he felt that too many undocumented immigrants were given a "free pass." (Miller declined to comment for this story. Hamilton did not respond to requests for comment.)



### Gene Hamilton

Served as senior counsel at DHS under President Donald Trump. When Nielsen was chosen to take over as DHS secretary, Hamilton left to work on immigration enforcement with his former boss Jeff Sessions, who was then Trump's attorney general.

To staff his team in the White House, Stephen Miller hired a variety of people from the anti-immigrant fringes of official Washington. Many had personally helped thwart bipartisan reform efforts in the past. Now they planned to bypass Congress altogether, using every possible presidential authority to shape the nation's immigration policies without any input from legislators.

The Hawks knew that their plans were going to be controversial, but they didn't care. New colleagues were viewed as closeted liberals until proved otherwise. "There's this worship of process," John Zadrozny, who joined Miller's team as a member of the White House Domestic Policy Council, told me. "Process, process, process. *Process* is code for 'We can slow down the quick impulses of a fiery political administration with no experts.' Well, that's not what was voted for."

"Our posture was 'If you don't want to make these tough decisions, go,'" Zadrozny said. "'There are plenty of us here who will do these things and sleep at night … We know we'll take a few arrows. That's okay. That's why we're here.'"

Prone to paranoia and insularity, the Hawks signed nondisclosure agreements and met during the transition in secret war-room sessions, unencumbered by general-counsel staff who might say their ideas were illegal, or by bureaucrats who might call them unrealistic. They composed a raft of executive orders, many of which read more like press releases, though Miller would later use them to strong-arm Cabinet secretaries into fulfilling his wishes.

In any other presidential administration, Miller's disregard for the chain of command would have been grounds for his dismissal. But he possessed a kind of mystique that insulated him from consequences. Almost no one, including Cabinet secretaries, dared challenge him, even as he drove them to distraction. (At least one Cabinet secretary negotiated an effective ban on ever having to deal directly with Miller, and another demanded that Miller never speak to his subordinates without permission— an order that Miller did not heed.)

Miller was better than other advisers at managing his relationship with the president. He avoided the limelight and never pushed back, as others did, against the president's more ill-considered ideas. But when I asked his colleagues why he was afforded such protection, they reminded me that this was an administration plagued by insecurity and imposter syndrome: The president and his family had not expected to win the 2016 election. When they did, a narrative formed that gave Miller, and his immigration speeches, the credit. Miller's messaging came to be seen as crucial to securing a second term.

At meetings about immigration policy during the transition, Miller and Gene Hamilton displayed how little they understood about border enforcement. According to people who attended the meetings, they proposed ideas that were outlandishly impractical—such as sending National Guard troops to the border to block migrants from setting foot on American soil, or building barriers across private land, including through waterways where such structures would not be able to withstand seasonal weather patterns. "They were talking like people who'd never been down on the border," one official said.

But instead of pushing back against bad ideas in those early meetings, the Careerists just rolled their eyes and commiserated afterward. I asked a number of them why they hadn't explained the obvious reasons such policies should not be pursued. These were "speak when spoken to" environments, they told me. And precisely because the proposals being batted around were so terrifically bad, they felt confident that the bureaucracy would neutralize them. In the end, these officials assumed—incorrectly—that the only harm done by those meetings would be the time they wasted.

One idea that surfaced multiple times in early 2017 was Tom Homan's Obama-era proposal to prosecute parents coming across the border with their children and separate them. John Kelly, who did not hide his distaste for the Hawks, told me that Stephen Miller pitched the idea to him directly, with support from Hamilton. Kelly came into his position at a disadvantage, as did Kirstjen Nielsen, whom he'd appointed as his chief of staff. Though they understood, at a high level, the push-and-pull factors influencing immigration trends, they had little knowledge of the actual federal immigration code or the mechanisms through which it was enforced. This made Kelly reliant on Hamilton's knowledge of the system, despite his disdain for Hamilton's politics. "There would be this unusual dynamic where Kelly would kind of

rib Gene," a senior DHS official told me about the daily morning staff meetings. "He would say, 'Oh, Gene-O, has your buddy Stephen been calling you up lately?' That was Kelly's way of saying, 'I know that you've got friends in all these places and there's this right-wingy immigration network here, but I'm the boss, so make sure everything comes through me.'"

Kelly told me he immediately opposed separating families, not just on moral grounds but also for pragmatic reasons: Based on his own experiences in Central America, he didn't think it would work. Kelly knew the moral argument wouldn't sway Trump, so he focused on the logistical challenges. He asked for a cursory review of the policy, after which he came to the same conclusion as Jeh Johnson: Though the idea was likely legal, it was wildly impractical—executing it successfully would require hundreds of millions of dollars to build new detention facilities and months to train staff within both Homeland Security and Health and Human Services, the latter of which would be charged with caring for the separated children. (In March 2017, Kelly told CNN that the idea was under consideration, fueling rumors and confusion that would linger for the next year.)

Based on this review, Kelly told me, he decided definitively not to authorize a separation program. He shared his decision publicly, first in a meeting with Senate Democrats on March 29, 2017, and subsequently with the press.

After that, Kelly told me, every time the idea was proposed in a Cabinet or other meeting, he would refer back to the results of the review, as if reading from a script: Separating families was simply impossible. He told Trump that the president would have to ask Congress for the funds for it, knowing that he would never agree to do that, "because that then links him to the policy, and he loses deniability," Kelly said.

But the idea to separate families was proceeding anyway, on numerous tracks at once, including some that were out of Kelly's sight. On Valentine's Day 2017, Kevin McAleenan, now the acting head of Customs and Border Protection, hosted a large meeting with representatives of CBP, ICE, HHS, and a smattering of White House Hawks.

On the other side of the table from the Hawks, both literally and figuratively, was Jonathan White, the social worker. A former academic, White had become a commander in the U.S. Public Health Service Commissioned Corps, and risen quickly within HHS: Weeks before Trump was elected president, White had been tapped to head the program that houses immigrant children in U.S.-government custody, a division of the Office of Refugee Resettlement (ORR). Along with most of that office's employees, he is an expert in childhood trauma. He views the children in the office's care as the most vulnerable in the Western Hemisphere, not merely because they are alone in a foreign country but because they are "off the charts when it comes to ACEs," or adverse childhood experiences, such as exposure to violence, food insecurity, and the feeling that their life is at risk. Even before Trump took office, ORR had often been left out of meetings because it was viewed as an impediment to border enforcement.



Exhibit J, Page 28 of 117



Homeland Security Secretary John Kelly and Kirstjen Nielsen, then Kelly's chief of staff, meet with Tom Homan, Gene Hamilton, Matt Albence, and other senior DHS leaders in March 2017. (U.S. Department of Homeland Security)

White says the environment was like a pep rally, with two deputies of Tom Homan's —Matt Albence and Tim Robbins—announcing their plans for securing the border, which included separating migrant families. (Robbins did not respond to requests for comment.) As the initiative was described, White says, he turned pale and began strategizing about how to stop it. He requested a white paper articulating the idea, knowing that having such documentation would allow him to lobby against family separation directly to the Health and Human Services secretary, Tom Price, and to share it with other parts of the HHS bureaucracy that could begin to outline its many ethical and logistical flaws. (Documents show that White would continue to request the white paper from CBP and ICE officials, who promised it was coming, though it never materialized.)

Meanwhile, Kelly learned that Miller was contacting various DHS officials to push forward the idea of separating families, and he was furious. Kelly stormed into one of his daily morning staff meetings and declared that anyone contacted by Miller needed to refer him directly to Kelly—and that, in any case, DHS would not be moving forward with the idea, no matter how many times it was raised. He told Reince Priebus, Trump's chief of staff, to keep Miller away from his subordinates at DHS.

By the time Kelly replaced Priebus as Trump's chief of staff, he thought he had shut down the discussion of separating families for good. But a local initiative was already under way that would soon be used to justify separations on a nationwide scale.

CHAPTER 3

# The Pilot

*(March–November 2017)*

In the spring of 2017, as illegal border crossings were undergoing their typical seasonal spike, Jeff Self, the Border Patrol chief in El Paso, Texas, acted on a general message that he and other sector chiefs had received after Trump's election—to work with their local counterparts at the Department of Justice to crack down on border crossings in service of the new president's agenda. Self decided that the best way to do that would be for his agents to start referring parents traveling with children for prosecution. Though he likely didn't realize it at the time, Self was laying the groundwork for a national policy that called for separating families. Federal officials would later call his local initiative a "pilot" and use it as a

model for expanding the practice nationwide. (Self declined to comment for this story.)

A Border Patrol agent working under Self emailed an assistant U.S. attorney for the Western District of Texas about the departure from prior practice. Though phrased in such a way as to suggest an insignificant administrative change, the email was in fact describing a revival of the idea Tom Homan had proposed to Jeh Johnson in 2014—using prosecution and family separations as a means of deterring would-be migrants.

At the time, the Western District of Texas was being run by Richard Durbin, who was keeping the U.S. attorney's seat warm until a Trump appointee could be nominated and confirmed. Durbin, who had been with the office for decades, responded to the policy change with skepticism. "History would not judge that kindly," he wrote to his colleagues. Though Durbin agreed that exempting *all* parents from prosecution seemed unwise, he said he had "no confidence" in the Border Patrol's ability to determine which ones deserved to face prosecution. "We don't want small children separated from parents and placed into some bureaucratic child services or foster agency in limbo."



**Richard Durbin**
U.S. attorney for the Western District of Texas in the early months of the Trump administration. Durbin supervised the assistant U.S. attorneys who prosecuted separated migrant parents as part of a Border Patrol pilot program.

Durbin eventually consented to prosecuting some parents, but he wanted to focus on those who were also being accused of much more serious crimes. "If culpability is very low and they have their own children we don't need to prosecute," he wrote in an email. "If they are a *sicario* [cartel hit man] we should prosecute and figure out how to deal humanely with children."

But the instructions sent to Border Patrol agents, which I obtained through a Freedom of Information Act request, contain none of the limitations Durbin requested, instead emphasizing that "the US Attorney's office will be contacted to seek prosecution for the adults of <u>every</u> family unit arrested." The document is dedicated mostly to warning agents against contacting assistant U.S. attorneys about the cases late at night or on weekends. It does not contain any guidance on how to separate parents and children or what each should be told about what was happening.

A person familiar with Durbin's thinking told me he was incensed when he discovered that the Border Patrol's change in policy was not intended to punish hard-core criminals who might have been using children to gain entry to the United States, but was instead a strategy to deter families seeking asylum. "I was bamboozled," Durbin reportedly said. "They didn't care about our prosecutions. They wanted a reason for separating children from parents."

Wesley Farris, a Border Patrol agent in El Paso, was asked to handle some of the separation cases. In one instance, a boy who was about 2 years old grabbed onto him in confusion, refusing to let go. "The world was upside down to that kid," <u>Farris told PBS's *Frontline*</u>. "That one got me." Farris told his supervisor afterward not to assign him to separation cases anymore. "That was the most horrible thing I've ever done," he recalled. "You can't help but see your own kids."

Meanwhile, the El Paso Border Patrol immediately started looking to expand Jeff Self's initiative to New Mexico. "Although it is always a difficult decision to separate these families," an agent wrote to the acting U.S. attorney there, "it is the hope that this separation will act as a deterrent to parents bringing their children into the harsh circumstances that are present when trying to enter the United States illegally." Some separations also occurred in Yuma, Arizona, under a separate initiative.

With the anticipation that the duty attorney may receive an increased number of phone calls from the NM Border Patrol Stations, we ask the stations that they limit after hours calls for these types of cases whenever possible.

This guidance impacts only adults that are claiming to be part of a family group/unit. Current prosecutorial guidance on single adults remains in place.

Fro          (b) (6), (b) (7)(C)
Sent: Monday, July 10, 2017 2:16 PM
To: EPT-PAI            (b) (7)(E)
Subject: Field Guidance on FMUA

Good Afternoon,

Texas Stations, we are now clear to begin the process below.

Effective immediately, the following steps must be followed when family groups are encountered in Western District of Texas.

• The US Attorney's office will be contacted to seek prosecution for the adults of every family unit arrested.
• There is no longer a requirement for the adult to have an immigration or criminal history.
• The name of the attorney, and the disposition will remain a requirement for all narratives. If prosecution is declined, the reason for the declination must also be documented.
• If prosecution of the parent/s is approved, the family separation request will be sent to (A)ACP (b) (6), (b) (7)(C) for final approval.
• Please have your agents conduct their due diligence when verifying the documentation provided by the adults of the family units
•                          (b) (7)(E)

With the probable increase in calls to the AUSA, it was requested that discretion be used when deciding to call the duty attorney. Every effort should be made to call the attorneys during or

close to normal business hours.

- The best practice for subjects arrested during the day should be to immediately collect the information needed to present the case and call the duty attorney as soon as the information is available.
- For those subjects arrested in the late evening or very early morning, it is not unreasonable to wait until business hours to contact the attorney.
- It should not be common practice for the processing agents to contact the attorney in the middle of the night for a disposition request that could wait a matter of a few hours.

We all understand that we operate 24/7; however, there are several agencies contacting these attorneys for a variety of cases that need immediate attention.  It is also understood that should

The instructions sent to Border Patrol agents that launched the family-separation pilot in El Paso, Texas, did not contain any guidance on how to separate parents and children or what each should be told about what was happening.

In the spring of 2017, Nora Núñez, a public defender in Yuma, noticed that the cellblocks at the federal courthouse were overflowing with detainees, many of them hysterical parents. The system was already under strain from other prosecutions, so Núñez had to move briskly to keep it from breaking down. "Having to get really firm with someone who was crying and upset because they didn't know where their kid was was heartbreaking," she told me.

Though Núñez had never seen misdemeanor charges filed against parents migrating with their children, she assumed that the families would be reunited as soon as their cases were completed, so she rushed them through the process even quicker than usual. Núñez only realized months later that by the time her clients were returned to immigration custody, many of their children had been sent to shelters in different states.

Alma Acevedo, who was then working at Bethany Christian Services in Michigan, said the organization was inundated with children so inconsolable that teaching them was impossible. "It wasn't just tears," Acevedo told me, as I reported at the time. "It was screams."

When Acevedo managed to reach separated parents by phone, they asked for her advice about whether they should sign paperwork that immigration officers had given them. Acevedo feared that the parents were being asked to consent to their own deportations. "Parents are saying, 'The immigration officer told me if I signed this document, they would give me my child back,'" she said. "The parents would sign in desperation and then, the next thing you know, they would call me from their home country and say, 'I'm here, where's my child? Give me my child back.' It was really sad and really depressing hearing the parents cry all the time."

Explaining the situation to separated children was even harder. "The therapists and I would do a meeting with the child and use pictures or puppets. We would say, 'Your daddy is really far,' and kind of show them—'this is Guatemala and this is the U.S., and you guys are far away.'" She learned not to give separated children any specific timeline for when they might see their parent again, because the children would latch on to those promises, however vague, and then ask about them constantly. "We would have to say, 'In many, many days you will be reunited with your parent, but we have to do a lot of paperwork.'"

Supervisors at Bethany and other organizations that operate shelters repeatedly called Health and Human Services headquarters in Washington, pressing for details about what was going on, but they were given none. Don't speak with the media, some were told.

## 868

Minimum number of separated children as of November 30, 2017, according to government records

CHAPTER 4

# Ignoring the Warnings

*(July–December 2017)*

When John Kelly left the Department of Homeland Security to become President Trump's chief of staff in July 2017, Stephen Miller and Gene Hamilton moved in tandem to fill the power vacuum that Kelly's departure created. They appeared determined to institute family separations nationwide.

Elaine Duke, Kelly's deputy, became the acting Homeland Security secretary. Duke had only joined the Trump administration after being coaxed out of retirement by former colleagues desperate to fill the open positions at DHS. Within weeks of her taking over the department, she confronted two natural disasters—Hurricane Harvey and Hurricane Maria—and Miller and Hamilton saw an opportunity in her distraction.



**Elaine Duke**
Served as acting Homeland Security secretary after John Kelly moved to the White House and before Kirstjen Nielsen took over DHS. She declined to approve proposals to separate migrant families.

Miller phoned DHS staff day and night, barraging them with demands and bullying career bureaucrats into a putative consensus on his ideas. At a meeting that fall, Hamilton distributed a document listing more than a dozen immigration policies that

he said the White House wanted implemented, according to several people who were present. At the top were two proposed methods of achieving family separations: either administratively—by placing children and parents in separate detention centers—or via criminal prosecutions, which would place parents in the Department of Justice's custody instead of the Department of Homeland Security's. In both cases, the children would be given to a division of the Department of Health and Human Services. (The El Paso pilot was still under way, unbeknownst to most people at DHS headquarters, including Duke.)

Duke declined to move forward with administrative separations, and sought advice about the prosecution initiative from John Kelly, who assured her that if the president wanted her to do something, he would have told her himself. Duke agreed and proceeded accordingly. "There was a disconnect between those that had strong feelings about the issues and those that could sign things," Duke told me. "And I was the one with the authority to sign things."

The majority of Duke's staff were moderates. At this point, many of them told me, they still believed that Hamilton's idea for separating families nationally was so outlandish that they didn't take it seriously. "What I remember saying is 'This is the most ridiculous proposal, so this doesn't even require all that much work,'" a senior DHS official said. But Miller, recognizing Duke's resistance, started going around her, to her chief of staff, Chad Wolf, who asked that the DHS policy office produce documentation supporting Hamilton's proposals. Soon after, this official said, he "started getting phone calls from Chad Wolf, and you could tell he was under tremendous pressure, saying, 'I gotta have that paperwork—where are we on the paperwork?' And I said, 'Chad, you know and I know this isn't how government

works. We've gotta get a lot of eyeballs on it. We have to find out if this is legal, moral, ethical, good policy, geared toward success, etc.'



**Chad Wolf**
Chief of staff to Acting DHS Secretary Elaine Duke and Secretary Nielsen. Under Duke, Wolf pressed the DHS policy office to produce paperwork supporting proposals to separate families.

"What followed was a lot of bad government," the senior official continued. "Bad draft memos were put together. They went up the chain but were bad because they weren't fully vetted policies."

Several of the DHS officials who were present at the meeting with Hamilton told me that after a few weeks, talk about separating families petered out, so they assumed the idea had been abandoned, or at least put on hold. It hadn't been—those who were perceived to be doubters were just excluded from subsequent meetings. "I think what I recall most is that I wasn't in the discussions," Duke said, adding that perhaps because she was viewed as a moderate, "I wasn't in the inner circle."

Inside and outside the government, people were beginning to notice that separations were already under way. Immigration lawyers who practiced in Texas and Arizona started reporting individual separation cases to national networks of advocates, who began drafting an official complaint to file with the DHS inspector general. Those advocates also began to share cases with reporters, who prepared stories about them. But the DHS press office insisted that no policies had changed.

Throughout the summer and fall, problems cropped up in the pilot regions. Under the guidelines imposed by Richard Durbin, who was still the acting U.S. attorney in El Paso, DOJ lawyers in the sector rejected two-thirds of the cases referred to them by Border Patrol. Despite that, some of the worst outcomes Durbin had anticipated and tried to prevent were indeed happening. "We have now heard of us taking breast feeding defendant moms away from their infants, I did not believe this until I looked at the duty log and saw the fact we had accepted prosecution on moms with one and two year olds," Durbin's deputy criminal chief wrote to him in August. "The next issue is that these parents are asking for the whereabouts of their children and they can't get a response."



"When she was sick, the officials took her to go bathe alone and wouldn't let me go with her, but then I didn't see her again. I didn't know what had happened to her."

FOIA records show that in the summer of 2017, the DHS's Office for Civil Rights and Civil Liberties, which serves as an internal watchdog for civil-rights violations by the agency, noted a dramatic uptick in complaints involving separations, but remained in the dark about what was driving them. The increase in separations was also being tracked by HHS. Shortly after the meeting on Valentine's Day 2017 when the idea to separate families was presented, Jonathan White and several colleagues had begun an internal campaign to try to stop separations from happening.

<u>Documents I obtained show</u> that White took his concerns about the family-separation proposal to his superiors dozens of times, and asked them to inquire about it with DHS. He underscored that the HHS shelter system was not prepared to take a large number of separated children, who tend to be younger than those who cross the border alone, and require specialized housing that was in short supply. Hoping to catch the attention of others in the bureaucracy who might mobilize against the policy, White repeatedly inserted subtle references to looming family separations in internal and external reports that he wrote, even ones mostly unrelated to the subject. Meanwhile, his colleague James De La Cruz, an HHS administrator, began an effort to track every possible instance of separation, and to strategize about how to help reunite as many families as possible.

But White's concerns were intercepted by his politically appointed boss, Scott <u>Lloyd</u>, who was not inclined to help him. Lloyd told me he has many relatives in policing and corrections; he was predisposed to support the views of law enforcement over those of his own department. "I had an affinity for DHS and just tended to take them at their word, and got annoyed when people didn't," he said.



**Scott Lloyd**
Director of the Office of Refugee Resettlement, the HHS division that houses detained "unaccompanied children." For months, Lloyd declined to look into reports of family separations, even when presented with overwhelming evidence that they were occurring.

Finally, in mid-November 2017, White managed to get Lloyd's attention with an alarming email. "We had a shortage last night of beds for babies," White wrote. "Overall, infant placements seem to be climbing over recent weeks, and we think that's due to more separations from mothers by CBP." Lloyd requested a phone call with Kevin <u>McAleenan</u>, so that White could ask the acting Customs and Border Protection commissioner directly about what he was seeing. During the call, on November 16, McAleenan repeated Kelly's statement that a separation policy had been considered but ultimately rejected. Lloyd would cling to this assurance for

months—even when evidence seemed to call for action on his part. (Today, Lloyd says he believes the facts show that he acted appropriately.)



Jonathan White, who ran HHS's shelter system for unaccompanied immigrant children, appealed to his bosses dozens of times to try to stop family separations from happening. (J. Scott Applewhite / AP)

White's warning prompted McAleenan to ask his acting chief of the U.S. Border Patrol, Carla Provost, what was happening. Provost learned about the El Paso initiative from Gloria Chavez, one of her deputies, and immediately shut the program down. "It has not blown up in the media as of yet but of course has the potential to," Provost wrote to McAleenan. After this clear indication that the pilot could be controversial, McAleenan and others at CBP did not disclose the fact that it had ever existed, even to other government agencies that were dealing with its consequences.



**Carla Provost**
Acting Border Patrol chief during Zero Tolerance

At the end of November, a Border Patrol employee emailed several colleagues, including Chavez, asking how to respond to questions from a reporter from the *Houston Chronicle*, Lomi Kriel, who had been tipped off about the initiative. By this point, Chavez not only knew about the pilot; she had been chastised for not alerting her superiors about it earlier. Yet the Border Patrol spokesperson who ultimately responded to Kriel cited an old policy manual stating that agency protocol required maintaining family unity "to the greatest extent operationally feasible." (Provost and Chavez both declined to comment for this story.)

Kriel's article foreshadowed what would go wrong under a nationwide program the following year—problems that DHS officials who served under Trump now claim they never could have anticipated. "There aren't mechanisms in place to systematically allow a parent or child to locate one another once they have been separated," an NGO told Kriel. "Family members lose track of each other."

In December, immigration advocates filed their complaint with the DHS inspector general's office <u>detailing the experiences of more than a dozen separated families</u>, which prompted CBP officials to meet with the agency's chief counsel, according to records obtained through a FOIA request. The complaint, which was shared with Congress and the media, noted that separated children were ending up in shelters in different states, as far away as New York.

For months afterward, in response to questions from reporters, representatives of DHS <u>would continue to say</u> that there had been no change in the agency's treatment of parents traveling with children, not acknowledging that the pilot program had already separated hundreds of children from their parents.

In January 2018, warning of potential "permanent family separation" and "new populations of U.S. Orphans," documents I obtained show that the DHS Office for Civil Rights and Civil Liberties recommended that criteria be established to prevent the separation of very young or especially vulnerable children. They also recommended that an online database be created that family members could use to find one another in the detention system. This tool, if it had been created, would have proved immeasurably valuable the following year, when thousands of parents were searching for their children.

The <u>Border Patrol's internal summary of the pilot program</u>, which has not been reported on until now, also highlights potential issues such as children getting lost or ending up in long-term foster care. The document repeats versions of the phrase *family separation* more than 10 times. Despite that, CBP leaders said they were not made aware of any problems that came up during the program.

<span style="color:red">1,141</span>  Minimum number of separated children as of January 24, 2018, according to government records

CHAPTER 5

# Ambient Ignorance

*(December 2017–May 2018)*

By the end of 2017, DHS and White House officials say, Stephen Miller appeared to be losing patience with Elaine Duke, who had refused to sign off on any of his major plans. Rather than continue to argue with the acting DHS secretary, the White House Hawks started looking for a replacement.

Discussion centered on Kansas Secretary of State Kris Kobach, who had made a career out of pushing controversial anti-immigrant policies. John Kelly worried about someone like Kobach overseeing DHS. So he floated Kirstjen Nielsen, who had worked with him at the agency and come with him to the White House as his No. 2. Trump accepted Kelly's recommendation, perhaps thinking that Nielsen would be pliable. According to colleagues, Gene Hamilton was so upset when the president chose a moderate to run DHS that he went to work for his former boss Jeff Sessions at the Justice Department, thinking he could have more of an impact on aggressive immigration restrictions from there.



### Jeff Sessions

A longtime immigration hard-liner who served as Trump's first attorney general. Sessions's preliminary Zero Tolerance memo was used to pressure DHS Secretary Nielsen to sign off on separating migrant families.

It is somewhat ironic that the person most associated with the Trump administration's harshest immigration policy turned out to be Nielsen. She signed the memo allowing Border Patrol agents to take children away from their parents so that the adults could be prosecuted. But Nielsen had not wanted to sign off on Zero Tolerance; for months, she refused to do so. In fact, throughout her tenure as secretary, Nielsen would be accused by administration colleagues of being a "squish" over and over again. Each time, she would go a little further in order to appease her critics. Eventually, she followed them off a cliff.

Compared with many of her hard-line colleagues at DHS, Nielsen was technocratic and restrained. After graduating from Georgetown and the University of Virginia School of Law, she had worked at a private law firm in Texas, until September 11 motivated her to take a position with the newly established Transportation Security Administration (soon to become part of DHS); she also worked in the Bush White House and over time became one of the country's foremost experts on cybersecurity policy.

Nielsen's own employees noted that she had considerably less leadership experience than any previous DHS secretary, and some took issue with that. Before joining the Trump administration, she had run a consulting company that had a handful of employees. Now she was leading an agency that employed a quarter of a million people. She was exceptionally hardworking, but in a way that didn't always endear her to colleagues. "She read 80-page briefs for breakfast, lunch, and dinner," one high-ranking DHS official told me, adding that in meetings, Nielsen "asked questions that embarrassed you because she knew more than you did about what you were supposed to be doing."

Nielsen was defensive about any criticism of the department. Unlike Kelly, who had let staffers sift through the pile of news clips published about DHS and only share with him the ones they deemed important, Nielsen devoured them on her way to work each morning, pillorying staff because she hadn't been alerted beforehand about negative stories. But in the eyes of key advisers and staff, anything the press wrote was inherently suspect—likely liberal hysteria. Because of this, they viewed Nielsen's demands for inquiries into allegations of wrongdoing by DHS staff as an annoying waste of time. By the time family separations were being described in the national media, much of her staff didn't believe what was being reported, even when clear evidence supported it.

The DHS that Nielsen took control of was virtually unrecognizable compared with the one that she had worked for when it was started under President Bush. Its energy was now directed toward the southwestern border, with much less attention focused on other matters, including the issue that had sparked its creation: global terrorism. Nielsen was being summoned to the White House so often to talk about immigration that she started working out of a makeshift office at the nearby CBP headquarters on Pennsylvania Avenue, which put her in close proximity with her immigration-enforcement chiefs, Tom Homan and Kevin McAleenan.

From the moment she was confirmed, Nielsen fielded a barrage of immigration-policy proposals from Stephen Miller, which he conveyed through incessant phone calls, day and night. When John Kelly was secretary, he would ignore Miller's late-night calls. But Nielsen frequently found herself listening to him rant after midnight.

Nielsen would hear Miller out, knowing that his approval was crucial to her success in the job. "I would say, 'Okay, Stephen, we'll have a meeting on it; we'll get the lawyers and we'll figure out what's possible and we'll talk it through,'" she told me. "Or I'd say

to him, 'Have you talked to anyone at CBP? Did you talk to anybody at HHS? Did you talk to the lawyers? What does [White House Counsel] Don McGahn say?' It would just be him saying stuff and me being like, 'Okay, Stephen, let's find a process here. I don't just make policy on phone calls with you. We have a whole department that I run.'"



Elaine Duke served as acting Homeland Security secretary after John Kelly became White House chief of staff. She declined to sign off on family separation and was soon sidelined. (Justin Sullivan / AFP / Getty)

By this point, Miller had insinuated himself deep into DHS, identifying allies at its lower rungs who either agreed with him or were open to persuasion. Under the traditional chain of command, only a department's senior leadership has direct contact with the White House, to prevent miscommunications and decisions being made by people lacking authority. Now random employees throughout DHS were speaking directly with Miller and his team, who would then claim to have buy-in for their ideas "from DHS."

Miller's incursions extended to the communications department. For example, he requested photos of detained immigrants with tattoos, presumably to suggest that most of those crossing the border were hardened criminals. When he faced pushback, Lauren Tomlinson, a senior DHS communications aide, told me, "a phone call would go to someone else further down the chain, and the next thing you know, they've got the photos. They would just keep calling until they got to yeses."

Adam Serwer: The cruelty is the point

Miller blocked numerous candidates to replace Gene Hamilton as senior counselor to the DHS secretary, apparently intent on assuming the role informally himself. Nielsen's staff learned not to bring Miller any job candidates who had served in the Bush administration, because they would be automatically rejected. A handful of people cycled through the position over the next several months, but none lasted long, because "no one could pass the Miller smell test," a senior DHS official recalled.

Soon after Nielsen's confirmation in December, colleagues of Kevin McAleenan say that he began to agitate for a meeting about rising border crossings, which the White House was pressuring him to contain. Like Nielsen, he'd pursued work in Homeland Security after 9/11, leaving behind a career in corporate law. In the Trump era, he was also under pressure to prove that he wasn't a squish. He had leapfrogged over those in CBP leadership who'd worked their way up from the front lines of the Border Patrol and who tended to view leadership recruits with posh résumés as "street hires." Brandon Judd, the head of the Border Patrol union, may have been McAleenan's most influential skeptic. Judd maintained close access to Trump after winning his affection with an early endorsement in 2016, and occasionally attended private Oval Office

meetings where he lobbied for McAleenan to be fired for being too weak on enforcement.

But McAleenan navigated this terrain deftly. He could pass as a Hawk, professing an adherence to the gospel of deterrence, but moderates and progressives on Capitol Hill appreciated that he was more polished than his brasher colleagues during congressional briefings. He made abundant use of Latin phrases (*sui generis*, *ex ante*, *ex post facto*) and words like *confirmatory*, even during small talk. In meetings, he rattled off facts and statistics with such facility that people were reluctant to challenge him. During his frequent media appearances, he outlined harsh enforcement policies, coming off not as someone who felt strongly about them one way or the other, but as the coolheaded adult in the room who was making sure they were implemented smoothly. Over time, more than 15 of McAleenan's colleagues told me, he became one of the most vocal advocates for Zero Tolerance.

Chad Wolf, who was now Nielsen's acting chief of staff, told McAleenan that if he wanted a meeting with Nielsen about the rising number of border crossings, he first needed to put together a proposal with possible solutions for her to study. Nielsen liked to be well prepared ahead of meetings, to avoid being put on the spot about issues she hadn't fully considered. This ended up being a primary way that extreme immigration policies were delayed under Nielsen: She would ask questions in meetings that her staff was not prepared to answer, then send them off to look for more information.



As secretary of Homeland Security, Kirstjen Nielsen signed the memo that authorized Border Patrol agents to take children from their parents. (U.S. Department of Homeland Security)

"There was a joke we all had, because everything needed sign-off from the secretary," John Zadrozny, of the White House Domestic Policy Council, told me. "So we'd get

something up to the secretary's desk, and weeks would go by where we hadn't gotten something back, and we're like, 'Where is this?' 'Oh, it's on the secretary's desk, hahaha.' Meaning it sat there because she didn't want to deal with it … We were basically always pushing Jell-O up a hill."

When McAleenan and Homan ultimately presented a set of ideas to Nielsen, she and others who were there say, they started by proposing separating families administratively. (Homan says he doesn't recall this.) This would have allowed the agency to separate not only families that crossed the border illegally but also those who presented themselves at legal ports of entry, requesting asylum. Nielsen rejected the idea out of hand, invoking John Kelly's prior decision, which she told the men she viewed as standing DHS policy. Homan and McAleenan shot back that border crossings had increased since Kelly's tenure as secretary and that other strategies to quell them weren't working. "My response was more or less 'I agree we need to do something big,'" Nielsen told me. "'Let's talk about realistic options.'"

McAleenan and Homan then began to describe an initiative to prosecute all adults—including those traveling with children—who crossed the border illegally, telling Nielsen that a pilot program along these lines had already been successfully implemented in El Paso and that the prosecutions could serve as a deterrent on a larger scale.

Nielsen was upset that a pilot had been implemented, seemingly in defiance of Kelly's orders. She asked how the border-enforcement apparatus would absorb the burden of so many additional prosecutions. McAleenan and Homan, who was now the head of ICE, testily assured her that the agencies involved "had a process"—without specifying what it was. Unsatisfied with their responses, Nielsen ended the meeting by telling them to run down answers to her questions and report back.

Elizabeth Neumann, Nielsen's deputy chief of staff, told me she was shaken by the nonchalance with which McAleenan and Homan had proposed taking vast numbers of children away from their parents. "They were not grasping the humanity of the situation; they were just all about 'I need Stephen [Miller] off my back. I need the president off my back,'" she said. (McAleenan denies this account.)

After the meeting, Neumann, who had spent more than a decade working with Nielsen in and out of government, said she approached another top adviser to ask whether taking children from their parents was truly being considered. If the answer was yes, she was planning to lobby against it. The colleague told Neumann that Nielsen was holding firm against separating families. "I was really relieved because I didn't feel I had to have the next conversation," Neumann said.

What she didn't realize was that the second proposal—to refer for prosecution every adult coming across the border illegally—would have the same result, and was still on the table.

Across Washington, a new immigration-prosecution initiative that was being considered by the White House came up in various meetings. But the blandness with which it was described—as a way to crack down on lawbreakers—served as a sleight of hand. Because fluency on immigration policy is so rare in Washington, few people grasped the full implications of what was being suggested until it was already happening.

As Nielsen debated these proposals, my sources at DHS alerted me to their existence. Once I'd confirmed the details, _The New York Times_ published my report in December 2017, which included the story of a father and his 1-year-old son who had already been separated. _The Washington Post_ published a story about the proposals the

same day. The response both papers got from the DHS press office not only failed to acknowledge that separations were already taking place; it also characterized families seeking asylum in the United States as abusive to their own children: "It's cruel for parents to place the lives of their children in the hands of transnational criminal organizations and smugglers who have zero respect for human life and often abuse or abandon children. The dangerous illegal journey north is no place for young children and we need to explore all possible measures to protect them." The statement alluded to "procedural, policy, regulatory and legislative changes" that would be implemented "in the near future."

UNLIKE KIRSTJEN NIELSEN, Jeff Sessions is exactly the sort of person one might expect to be responsible for a policy that would result in widespread family separations. Throughout his career, his approach to both criminal justice and immigration enforcement could be defined by the phrase *zero tolerance*, a law-enforcement term of art that is almost always used euphemistically, because snuffing out all crime is impossible. But for Sessions, the phrase is literal. He supported enforcing all laws—or at least the ones that he deemed important—to the fullest extent possible, with no room for nuance or humanitarian exception.

In interviews, DHS officials blamed Sessions for ordering the separation of thousands of families. Some of Sessions's own staff at the Justice Department blamed him as well. Gene Hamilton and Rod Rosenstein, the deputy attorney general, who are revealed to have pushed persistently for Zero Tolerance in a report published by the DOJ inspector general, told the IG's office that they did so solely at the behest of Sessions. (Sessions says that the report appeared to be politically biased, pointing to the fact that it had been leaked prior to the 2020 election. He says President Trump

had clearly ordered the executive branch "to reduce the immigration lawlessness at the border." Rosenstein declined to comment for this article.)



**Rod Rosenstein**
Deputy attorney general who urged U.S. attorneys to enforce Zero Tolerance to the fullest extent possible

Though it is true that Sessions pushed hard for aggressive immigration-enforcement policies, including Zero Tolerance, nothing I found in my reporting suggests that prosecuting parents traveling with children was his idea, and nothing that he did as attorney general, from a legal perspective, caused the policy to come into being.

Exactly how much Sessions even understood about Zero Tolerance is unclear. He is not, former colleagues say, one to get entangled in details, or to let facts get in the way of what he thinks is a good idea. Sessions was distracted during his tenure as attorney general, battling constant rumors that he had had untoward interactions with Russian operatives. He was also <u>trying to salvage his relationship with President Trump</u>, who never forgave Sessions for recusing himself from the congressional inquiry into Trump's own ties to Russia.





On May 7, 2018, Attorney General Jeff Sessions held a press conference in San Diego to publicize the Zero Tolerance policy. (Ariana Drehsler / Bloomberg / Getty)

In a functioning bureaucracy, none of this should have presented any great impediment to Sessions's understanding of Zero Tolerance: A Cabinet secretary generally makes decisions based on the recommendations presented by advisers, which in turn are based on expert analysis. But Sessions's principal immigration adviser was Gene Hamilton. As one of the only DOJ staff members fully dedicated to the subject, Hamilton worked in relative isolation, with few colleagues to challenge his positions. And Hamilton showed an unwillingness to take seriously any of the policy's pitfalls that he was alerted to before and during its execution.

As Hamilton prepared to formally propose Zero Tolerance to Sessions, Rosenstein's office asked John Bash, the newly confirmed U.S. attorney in El Paso, for a briefing on the separation pilot program there. Bash had previously served as a White House legal adviser and was considered a trusted Trump ally. Bash asked his new colleagues in El Paso to bring him up to speed on the pilot, according to email excerpts that were published by the DOJ inspector general. He then briefed Hamilton and others at DOJ. His notes indicate that the initiative had faced "significant 'pushback'" from

local stakeholders; they also reference pending litigation in the Western District of Texas filed on behalf of five people whose children (and in one case a grandchild) had been taken away from them. The magistrate judge in that case complained that the defendants before him were "completely incommunicado" with their children "while being prosecuted for a very minor offense" and that parents and children had no apparent way to find each other after being separated.



**John Bash**
Took over as U.S. attorney for the Western District of Texas in December 2017. Under Bash, separated parents were prosecuted in West Texas courts during Zero Tolerance.

Hamilton later told the inspector general that he didn't remember the meeting. This is the first of many documented instances—all of which he would later tell the inspector general he could not recall—when Hamilton was warned directly about the problems that would take place if the pilot was expanded nationwide. He forged ahead anyway.

A few weeks later, Bash received a memo from his colleagues explaining in even greater detail problems that had arisen during the prosecution pilot. But headquarters hadn't followed up with him about expanding it, so he didn't share the memo with anyone, and he later told the inspector general that he'd assumed the idea had died. No one at headquarters ever contacted Richard Durbin—the acting U.S. attorney in El Paso during the pilot program who had been told that infants were being separated from their mothers—for his input.

Meanwhile, immigration advocates were still learning of families that had been separated during the pilot but had not yet been reunited. They were also hearing reports of families that had been separated after presenting themselves at a port, where it is perfectly legal to request entry to the United States. The advocates prepared to file a lawsuit, which they hoped would result in a nationwide injunction against separations and a court order to reunify the families that had already been torn apart. Lee Gelernt, a lawyer with the ACLU's Immigrants' Rights Project, would lead the

case. "It's not just that the parents and children are separated for months and months," Gelernt told me at the time. "It's that the parents have no idea where their children are, what's happening to their children, or whether they are even going to see their children again."

Gelernt was gathering tips from advocates with connections to shelter workers in the Department of Health and Human Services, who defied orders not to speak publicly about what was happening, out of concern over what they were seeing. The shelter workers "don't even know where the kids are coming from, who the parent is, where the parent is," Gelernt told me. "They are 2, 3, 4, 5 years old."

During this period, each time I asked Trump-administration officials about a specific case, they would say that the separation had taken place only because the child was thought to be caught in a trafficking scheme or otherwise in danger, which would have been in keeping with past policies. But in many of these cases, lawyers representing the families said none of those circumstances held true.

In February 2018, Gelernt met a woman from the Democratic Republic of Congo who had been separated from her 6-year-old daughter. The girl had spent several months in an HHS shelter in Chicago; her mother was being held in an immigration detention center in the desert on the outskirts of San Diego. When she walked into a cinder-block room to meet Gelernt, she appeared gaunt and confused—"almost catatonic from what had happened to her," Gelernt told me. The woman explained that when she and her daughter had crossed the border, agents had taken them to a motel for questioning—a common practice when border facilities run out of space— and put them in adjacent rooms. Because the mother and daughter, who became known in court as Ms. L and S.S., respectively, had been living in South America before requesting asylum in the United States, S.S. had picked up Spanish. When the

agents began to discuss separating the girl from her mother, perhaps thinking that they were being discreet by speaking in Spanish, Ms. L heard her daughter's screams through the wall between them.

Though Gelernt had been planning to build a case for a class-action suit, he was so disturbed by the meeting that he began drafting a complaint on Ms. L's behalf as soon as he returned from the detention center. "Her child's been gone for nearly four months," he told me at the time, "and I just could not justify delaying going into court any longer to get her and her child reunited. Hearing her talk about her child screaming 'Don't take me away from my mommy.'"



"When I got to the border, the officials separated me from my daughter and put her in a separate room—I could hear her screaming and crying that she wanted to be with me. The officials said no one had forced me to come to the U.S. and this is what I came looking for—I didn't have any rights."

While they waited for a ruling on the Ms. L case, Gelernt and his colleagues scrambled to prepare filings for other plaintiffs, quickly adding another mother,

known as Ms. C, who had been separated from her 14-year-old son during the El
Paso pilot six months earlier. (Ms. C had ended up in West Texas; her son had landed
in a shelter in Chicago.) At this point, the ACLU asked the judge to certify the case as
a class action, estimating, based on accounts it had collected—some from concerned
government sources—that at least 400 to 500 separations had occurred by then.

The government responded to Gelernt's suit in a legal briefing with the same message
that reporters kept hearing—that the Department of Homeland Security did not have
a separation policy and that nothing had changed in its treatment of migrant families.
The response did not acknowledge the existence of any pilot program. "Such a policy,"
the government's brief stated, "would be antithetical to the child welfare values of the
Office of Refugee Resettlement."

The government argued that agents had separated Ms. L from her daughter because
they were skeptical that the pair were truly related; Ms. L had not provided
documents proving she was the child's mother. Gelernt thought this was merely a
pretense to justify the separation. "She spent three months walking here," Gelernt told
me. "She was robbed. So of course she didn't have documents." A judge called for a
DNA test, which proved that Ms. L was in fact S.S.'s mother. Soon after, the
government released Ms. L onto the street outside the desert detention center. Several
days later, with the help of lawyers, Ms. L was reunited with her daughter.

IN THE SPRING OF 2018, I learned about the list of separated children that James
De La Cruz, Jonathan White's colleague at the Office of Refugee Resettlement, was
compiling. De La Cruz and a handful of others at ORR were using the list to seek
help from ICE in tracking down the parents of those children and trying to reunify
them, or at least connect them by phone—many of the separated parents were still
detained or had been deported. De La Cruz and the small group of his colleagues who

had access to the list were keeping its existence quiet, knowing that the document would be controversial because the administration was still publicly denying that children were being separated from their parents at the border with any greater frequency than under previous administrations.

Most of those with access to the list initially told me they worried that a news article about it could be traced back to them—or worse, that it might somehow jeopardize what, at the time, was the only known effort to track family-separation cases. But by early April, the list grew to include more than 700 names—enough that my sources began to conclude that the situation was too dire to go unreported any longer. And they knew that the total number of separations was even higher: The list contained only the names of children whose cases had been reported to HHS headquarters by shelter staff.

At that point, I contacted the HHS and DHS public-affairs offices at the same time, letting them know that I was preparing to publish a story about the list of separated children, and asking them to confirm its authenticity. Mark Weber, an HHS spokesperson, says he called Katie Waldman, a DHS spokesperson who later married Stephen Miller. Waldman yelled at him, telling him that DHS was not separating children from their parents. (Waldman told me the same, saying that I would be misleading the American public if I published my story as planned.) But Weber's own colleagues at HHS eventually acknowledged, according to emails that were made public later as part of a congressional inquiry, that De La Cruz was keeping track of separations. When Weber went back to Waldman, telling her that he planned to corroborate my story, he says that Waldman and her boss, Tyler Houlton, insisted that he officially deny that DHS was separating families any more than in the past. "They made me lie," Weber told me recently. (Waldman said Weber's memory of the conversation is not accurate; Houlton did not respond to a request for comment.) Waldman and Houlton provided a statement for my *Times* story, insisting that families were not being separated for the purposes of prosecution and deterrence. All the while, separations were still increasing. By April 23, three days after the story was published, documents show that De La Cruz had tracked 856 separations, more than a quarter of which involved children younger than 5.



**Katie Waldman**
DHS deputy press secretary, who went on to marry Stephen Miller

When my *Times* story came out, Scott Lloyd, De La Cruz's boss, was distressed. "I was just like, 'Why do we have a list?'" Lloyd told me recently. "It looked like ORR keeping tabs on DHS. And possibly leaking it to *The New York Times*." Lloyd asked ORR staff to stop adding to the list, because the document made "it look like something that isn't happening is happening, because I didn't know there to be any sort of a zero-tolerance policy." But De La Cruz told Lloyd he felt the list was necessary to ensure that the children would be reunited with their families. He continued adding to it.

THROUGH THE EARLY SPRING OF 2018, border crossings continued to rise. Fox News commentators took note of the trend and blamed Kirstjen Nielsen. Stephen Miller prompted the president to chastise her. Knowing that Trump did not like to read official reports, Miller would instead print out articles by a few choice immigration reporters at right-wing outlets and leave them on the president's desk, saying they were evidence that Nielsen was a bad leader. Soon, Nielsen was being summoned to the West Wing for even more frequent—sometimes daily—meetings about what to do. The discussions consisted mostly of Miller ranting about how the ideas he'd been pitching for months had needlessly stalled. Jeff Sessions would sometimes pile on, telling the president that Nielsen was being gutless, allowing him —if only temporarily—to escape Trump's ire himself. Once, Sessions told Trump that

Nielsen could simply choose not to let people cross the border, but was refusing to do so. Trump screamed at Nielsen, making her Cabinet colleagues deeply uncomfortable. Kelly stepped in and tried to adjourn the meeting, but he stayed quiet about the specific policies.

Indeed, the limitation of Kelly's approach to opposing Zero Tolerance may have been that, in front of the Hawks, he focused on his logistical concerns. Kelly felt that approach was the most likely to stop the policy from being implemented, but the Hawks now say they didn't register Kelly's general opposition to it, only that he thought it would require additional resources. (Kelly says his opposition to separating families was plainly clear throughout his tenure in the administration.)

According to colleagues, Tom Homan and Kevin McAleenan continued to minimize the significance of Zero Tolerance, saying that they merely wanted to increase enforcement of laws already on the books. "Under what authority do you tell the police 'Don't enforce law'?" Nielsen told me McAleenan said to her. "He was basically like, 'Look, you're not allowing me to do my job. We need to stop having the conversation and just move forward and do this.'" (McAleenan says he never suggested that the policy was uncontroversial and that he raised logistical concerns with Nielsen repeatedly. Homan says he never pressured Nielsen.)





Children are led through a detention center in Tornillo, Texas, in June 2018. (Mike Blake / Reuters / Alamy)

Nielsen still didn't feel she had enough information to make a decision: Did Border Patrol stations have the capacity to house additional migrants waiting to be sent to court? Did the Justice Department have enough lawyers to take on extra cases? Did the U.S. Marshals have enough vehicles to transport separated parents? What would happen to the children while the prosecutions were carried out? Nielsen and her colleagues say that McAleenan and Homan were dismissive, the implication being that it was not her job as secretary to get mired in enforcement details; she was micromanaging.

Every key member of the Trump administration's DHS leadership team whom I interviewed told me that separations were never meant to play out as they did. But when I asked them to explain how separations, prosecutions, and reunifications were supposed to have worked, every one of them gave me a different version of the plan. Some said they thought that parents and children were going to be reunited on an airport tarmac and deported together. Others said they thought that after being prosecuted, parents would go back to Border Patrol stations, where their children would be waiting. Others thought that kids would be sent to HHS facilities for only a few days. But it doesn't really matter which plan was supposed to have prevailed: None of them was feasible or had any precedent. This points to how little knowledge

of the system most of these people had and how unclear communication was throughout what passed for the planning process.

In early April 2018, Stephen Miller, Gene Hamilton, and Kevin McAleenan (who had recently been confirmed as the CBP commissioner) began citing various documents to insist that Nielsen was violating a lawful order by delaying the implementation of Zero Tolerance, according to colleagues. One was an executive order, "Enhancing Public Safety in the Interior of the United States," crafted by Miller and his faction during the transition and issued in January 2017. It was clearly directed toward ICE, which operates in the interior of the country, unlike the Border Patrol. But by refusing to command Border Patrol agents to refer parents for prosecution, the Hawks said, Nielsen was violating a clause in the order that stated, "We cannot faithfully execute the immigration laws of the United States if we exempt classes or categories of removable aliens from potential enforcement."

Two new documents were issued on the same day, April 6, 2018, perhaps to increase the pressure on Nielsen. In one, Jeff Sessions officially announced a new "zero-tolerance policy," under which U.S. attorneys would, "to the extent practicable," accept 100 percent of the illegal-entry cases referred to them by the Border Patrol. (Sessions had also issued a similar memo the year before.) The second, a presidential memorandum, called generally for the end of "catch and release" immigration enforcement. Materially, the documents did not mean much for the Border Patrol, which Nielsen, a lawyer, theoretically should have known: Sessions had no authority over that agency, including over which cases its agents referred for prosecution. And Trump's memo didn't contain any specific directives regarding parents traveling with children.

The Border Patrol could have continued processing families the same way it always had without violating any law or order. Records show that <u>Border Patrol sectors even received guidance</u> indicating that Sessions's initiative applied only to adults traveling without children. But colleagues say that McAleenan, Hamilton, and Miller again told Nielsen that by declining to refer parents traveling with children for prosecution, she was defying orders.

As the Zero Tolerance announcement was hyped to Nielsen for its alleged importance, it was played down to the U.S. attorneys whom it would ultimately affect. Originally, they were told that Sessions's memo was no big deal. According to the DOJ inspector general's report, Sessions had asked Hamilton to "ensure it was workable, and there were no red flags," before writing it. But Hamilton didn't do that. Instead DOJ asked for feedback on the document from the five U.S. attorneys stationed along the southwestern border—without making clear to them that it would change the department's treatment of migrant families. The attorneys later told the inspector general that they assumed parents would continue to be exempt from prosecutions for illegal entry, as they had been for the entirety of DHS's history. Ryan <u>Patrick</u>, the U.S. attorney in South Texas, told me that each time "zero tolerance" messaging came up, DOJ officials told him explicitly that his district was already doing plenty to combat illegal immigration and that he could disregard the initiative.



### Ryan Patrick
U.S. attorney for the Southern District of Texas, where some of the separated parents were prosecuted during Zero Tolerance

Again and again, Gene Hamilton ignored or rejected anything suggesting that the execution of a policy that separated children from their parents would create moral, legal, or logistical problems. When I asked a close colleague of Hamilton's at the Justice Department why Hamilton was so persistent about moving the policy forward, she took a guess based on her own experience: "Stephen Miller told him to." She added, "Stephen Miller often told people that if they tried to work through the system that they would get pushback … so it was really important for that person to just go around the system and do it themselves and circumvent the chain."

"For Stephen and Gene," she told me, "anything that got stalled was evidence of the failure of the system," not of any weakness in their policy ideas.

Beyond actual experts, official Washington has very little knowledge of how the immigration system works. (Immigration "is a career killer," Lauren Tomlinson, the senior DHS communications aide, told me. "You can't solve it. All you're gonna do is piss everyone off.") Still, in retrospect, it is astonishing how many people throughout the federal government were engaged in conversations about a policy that would result in prolonged family separations apparently without realizing it.

This ambient ignorance enabled the Hawks to hoodwink the Careerists, and to make certain facts appear more benign than they were. Kirstjen Nielsen and members of her inner circle all told me they recalled constantly hearing the line "We've done this before" in reference to prosecuting parents and separating them from their children; Kevin McAleenan and Tom Homan and their respective staffs repeated that line incessantly. Nielsen, Scott Lloyd, and others said they understood this to mean that Border Patrol agents under previous administrations had done the same thing.

When I first heard this argument from one of Nielsen's advisers, I assumed that he had misspoken or that I had misheard. It seemed preposterous that he didn't know separating children from their parents was not something that had been done on any significant scale. But then I heard it again from Nielsen and her senior staff. Some of them told me they remembered hearing certain statistics—that 10 or 15 percent of parents had been referred for prosecution in the past. Others said that the details were never clear, or that the White House or Justice Department would claim it didn't keep data on that. These officials said they believed that the idea Nielsen was debating was nothing new. "It just seemed like a nonissue that I shouldn't spend any time on," May Davis, who held various roles in the Trump White House, recalled.

When I would tell these officials, including Nielsen, that parents traveling with a child had rarely been prosecuted in the past, they sounded shocked. Those who reportedly gave these assurances about the policy, including Homan, McAleenan, and Ron Vitiello, the acting deputy commissioner of CBP, all denied doing so; some suggested that the DHS secretary and her advisers must simply be confused.





Kevin McAleenan, one of Kirstjen Nielsen's top deputies, pushed her to sign off on family separation. He was later named acting secretary of Homeland Security. (Mark Wilson / Getty)

THE RELENTLESS PRESSURE from the White House Hawks seemed to be wearing on Kevin McAleenan. Caravans of asylum seekers from Central America had formed, headed for the United States, and 24-hour coverage of them incited a new level of panic in the administration about border crossings. After debating the idea for months, McAleenan took his most direct step to push for prosecuting parents, knowing that they would be separated from their children by the Border Patrol. In an email dated April 19, 2018, to Tom Homan and Francis Cissna, the director of U.S. Citizenship and Immigration Services, he stated his intent to formally recommend the idea to Nielsen.

"Please see a draft decision memorandum proposing increased prosecution (toward 100%) of all adults who cross illegally, whether they present as single adults or in family units," McAleenan wrote. "I do believe that this approach would have the greatest impact on the rising numbers, which continue to be of great concern." He said he planned to send the memo to Nielsen by close of business the next day, adding that even without their support, "I am prepared to submit solo."

Homan and Cissna decided to sign on. McAleenan now says the email was only a "small snapshot" of a larger bureaucratic process in which he was just following directions.

Nielsen received the memo with annoyance, feeling squeezed by her own subordinates. Attached was a legal analysis by John Mitnick, the top lawyer at DHS, who found that "although it would be legally permissible to separate adults and

minors as outlined above, any such decisions will face legal challenges." He warned that a court could find family separations on a large scale, without any proven mechanism for swift reunification after prosecutions, in violation of "various laws or the Fifth Amendment due process clause." (Though Mitnick's analysis is written with lawyerly detachment, a White House staffer who attended a meeting about Zero Tolerance with him in April said that he was "freaking out" about the litigation risks associated with the policy.)

Nielsen told me she supported the idea of prosecuting all those who crossed the border illegally, including parents traveling with their children, but she feared that DHS was not logistically prepared to implement the policy without causing chaos in courts and detention centers, and losing track of parents and children. She asked the White House to allow her to defer her decision on the program for six months so she could travel to Central America herself and announce that the policy was imminent, in hopes that doing so would encourage families that needed to seek asylum to use legal ports of entry. Stephen Miller was unwilling to wait. Nielsen told me he claimed to be in contact with Border Patrol officials who were eager to get started. With him, Nielsen said, "the tone is always frantic. 'The sky is falling, the world is ending, it's going to be all your fault. The president promised this, and we have to deliver on the promise.'"

"The White House was growing frustrated" with the delays, an adviser to Nielsen told me. "They basically said, 'Look, the attorney general gave you a lawful order. You need to execute it.'" This was not true. "And we kept pushing back. Eventually the pressure got to be just overwhelming." McAleenan and Homan were saying, "We're ready to go. We're ready to go. We're ready to go. We've got it in place. We've got a good battle rhythm with DOJ. We can do this."

None of the other agencies that would be affected by Zero Tolerance had been alerted to what was looming. That included the Department of Health and Human Services. "I don't know how to say this delicately, so I'll just say it: It's really not like HHS's opinion mattered here," John Zadrozny told me, explaining that because HHS did not have any authority over immigration policy, it was not uncommon for the department to be left out of such discussions. Zadrozny said that although he did not recall a specific decision to keep the Zero Tolerance policy secret from HHS, it wouldn't surprise him if there was one. "There were times when we were having meetings where we would specifically say, 'Keep HHS out of it; they're just going to babble and cause problems. They're not actually going to be helpful.'"

Astonishing as this sounds, it seems that no one at the department that would be charged with taking care of thousands of separated children was given any official warning that the Zero Tolerance program was in the offing. "We did not find evidence that DOJ leadership had discussions about the zero tolerance policy or family separations with HHS prior to the announcement," the inspector general's report later concluded.

At the end of April, several developments took place almost at once. Gene Hamilton's office asked the five U.S. attorneys who were stationed in southwestern border districts if their staffs had seen an increase in prosecution referrals for parents traveling with children based on Sessions's April memo, and if not, when they expected to. The email was written as if the attorneys should have known that a change was coming, but their response made clear that this was, in fact, the first notice they had received that the treatment of families would change. The attorneys issued a joint response stating that none of the five districts had the resources to handle the increased volume of cases that prosecuting parents would create. "This change in policy would result in

new referrals of 20 to 400 cases per day, depending on the district," the U.S. attorneys wrote. Furthermore, Homeland Security and Border Patrol would not be able to process these cases fast enough. "The medical screening for TB, chicken pox, measles; much less the processing of these individuals in establishing identity, alienage, criminal and/or immigration history, etc. would be practically impossible to accomplish within the constitutionally mandated time constraints." Hamilton would later tell the inspector general that he'd "missed" the response from the U.S. attorneys —which was one he'd requested—and that he was not aware that the U.S. attorneys had raised these specific concerns about prosecuting parents.

Rich Hunter, the second-highest-ranking official in the U.S. Marshals Service in South Texas, heard about what was coming from a colleague who had been tipped off by a friend at the Justice Department. The Marshals are responsible for housing pretrial detainees facing federal criminal charges, including border crossers, and transporting them to court for their hearings. Even in normal circumstances, their facilities along the border are constantly at capacity. Under the influx of new detainees that a zero-tolerance policy would bring, Hunter anticipated that the system would break down.



"I would ask about my son and no one would give me any information—just gave me a phone number, but I didn't

**have any money
to make the call and
the only phones there
had to be paid for."**

"The more and more information we got, it just painted a bleaker and bleaker picture for us," Hunter told me. "I could see the impact headed down the tracks straight at us, and no one had talked to us. No one had prepared us for this. No one had asked us, 'Do you have space for this? Do you have resources, manpower?'" Hunter helped produce a report that was delivered to the Justice Department on April 27. It stated that the Marshals—like the U.S. attorneys—did not have the resources to implement Zero Tolerance. The Marshals sent copies of the report to Jeff Sessions's office and to Rod Rosenstein, who would later push DOJ attorneys to apply the policy as aggressively as possible. Both Hamilton and Rosenstein would tell the DOJ inspector general that they were unaware of any problems with Zero Tolerance raised by the Marshals—yet another warning they claim to have missed.

That same week, McAleenan's memo pressing Nielsen to activate Zero Tolerance was leaked to *The Washington Post*, which published an article about it on April 26. To this day, it is not clear whether the memo was leaked by those who supported Zero Tolerance or those who opposed it. Many speculated that opponents of the program had leaked it in order to generate popular blowback and make the policy's implementation less likely. But if that's the case, the scheme backfired. After the *Post*

article appeared, the pressure on Nielsen to authorize Zero Tolerance only increased. "It seemed like Kirstjen was sitting on all these memos and wouldn't do anything," Lauren Tomlinson recalled.

In early May, Miller convened yet another meeting about Zero Tolerance, in the Situation Room. Nielsen says she started listing all the reasons the department was not ready to move forward. "First Stephen said, 'We've had this meeting a million times—who thinks despite all of that we need more time?'" Nielsen told me. She raised her hand—the only person in the room to do so. "The follow-up from Stephen was 'Okay, who thinks we just need to go forward? We're done talking about this.' And at that point, I remember what felt like a sea of hands."

According to notes that he prepared, Hamilton acknowledged that separated children would be sent to HHS. To anyone familiar with HHS's operations, this would have immediately indicated that the government would face significant barriers in trying to bring parents and children back together—among them, children and parents would be separated by hundreds of miles because of the way HHS placements typically work, and many parents would not qualify to regain custody of their own children under the requirements for sponsoring a child officially deemed an unaccompanied minor. But no one with such knowledge was in the room.

On May 1, McAleenan emailed Hamilton, saying, "Looking at next week, likely," for the Border Patrol to begin referring parents for prosecution. Three days later, McAleenan went to see Nielsen, his draft memorandum in hand for her to sign. A heated conversation ensued, according to Nielsen and several people who overheard it.

Nielsen told me that McAleenan made the usual arguments—you can't tell Customs and Border Protection not to enforce the law; you can't exempt parents from

prosecution; the president wants this. "But I had been telling Kevin, 'You cannot implement Zero Tolerance until I'm convinced that we have the resources.'" Nielsen said she thought that "in Kevin's mind, I was holding up what they had been told to do, basically under law. And I'm sure Stephen was calling all of them five times a day, like, 'Why aren't you doing this?' And the [Border Patrol and ICE] unions were freaking out because they wanted it to happen."

Nielsen told me she wanted to be "the type of leader who deferred to the experts and the careers," using shorthand to refer to those, like McAleenan and Homan, who had spent years working at their agencies and insisted that they had the resources necessary to implement the policy smoothly. She also could not afford to be seen as the sole moderate who was stalling for time. "DHS is a department of 250,000 people, so for me to pretend that I know better than everyone else, to me, seemed to be the opposite of the type of leader that I wanted to be," Nielsen told me. "So, yeah, ultimately, I took Kevin at his word," she said, adding that McAleenan demanded, "Why don't you believe me and why don't you believe the careers? They know what they're doing!" (McAleenan denied ever pressuring Nielsen on his own behalf. He said he did convey directives that he was receiving from the White House and others.)

The argument would have continued but, Nielsen told me, she had to leave for another meeting. "I was like, 'Okay, I believe you.'" She signed Zero Tolerance into being. "Frankly," she told me, "I wish I hadn't."

ON THE AFTERNOON of May 7, standing at the border in San Diego, overlooking the Pacific, Jeff Sessions held a press conference. With Tom Homan standing at his side, he announced that Zero Tolerance was going into effect as a national policy. Kirstjen Nielsen and other DHS staff say they weren't informed about the press conference until a few hours beforehand, when a Justice Department spokesperson shared a draft

of Sessions's remarks. When they read it, Nielsen's staff asked for the removal of one line, hoping that they could ask Border Patrol to hold off on applying the policy to families until they could prepare: "If you are smuggling a child, then we will prosecute you and that child will be separated from you as required by law." Sessions's staff declined; that's our "money line," they said, according to *Border Wars*, a book by Julie Hirschfeld Davis and Michael D. Shear.

John Kelly told me that during the televised press conference, Nielsen burst into his office in the West Wing, incensed. She was worried that a sudden and dramatic increase in prosecutions was going to cause chaos at the border. "Nielsen was saying, 'We're not ready to do this. We don't have any facilities. We don't have any training.'"

She was right, Kelly told me. "It was a disaster as predicted."

After months of unheeded warnings and unread reports, the mass separation of families was about to begin. Though many have argued that the policy was born out of malice, those who watched it unfold up close say they saw something subtler but no less insidious among Homan and McAleenan and others who pushed the policy forward.

"They were trying to do their jobs," Elizabeth Neumann, Nielsen's deputy chief of staff, told me. "And they were absolutely flummoxed about how to stem the tide" of migrants flowing across the border. "And I think they lacked a really important filter to say 'There is a line that we can't cross.'"

She paused, then put this another way: "If the president suggested, 'We should have moats with alligators in them, and maybe shoot people from the border, and that would be a deterrent,' I think most every Border Patrol agent would be like, 'Hey, that's a red line we will never cross.' We all know the bright-red lines.

"They just were up against this wall, and they couldn't see the red line anymore."

# 1,780

Minimum number of separated children as of May 7, 2018, according to government records

CHAPTER 6

# Implementation

*(May–June 2018)*

The implementation of Zero Tolerance was a disaster. For 48 days, catastrophes cascaded. After two and a half weeks, the Border Patrol leadership finally told agents to write down which children belonged to which parents. Internal emails show that when a magistrate judge in South Texas demanded that the Border Patrol there provide the court with weekly lists of separated children and their locations, threatening to hold the agency in contempt for failing to do so, <u>agents panicked</u> at their inability to fulfill such a basic request. "I might be spending some time in the slammer," one supervisor wrote to a colleague, who replied, "I ain't going to jail!!!!!!!!!!!!!!!"

Some of those dealing with the fallout of Zero Tolerance—the bureaucrats, judges, social workers, U.S. attorneys, and law-enforcement officials—registered warnings or complaints with their supervisors. They received different versions of the same response: Push harder.

After Jeff <u>Sessions</u>'s announcement, the five U.S. attorneys stationed on the southwestern border requested a meeting with Gene <u>Hamilton</u>. Four days later, on

May 11, as the attorneys sat on the line waiting for a conference call to begin, they received an email informing them that Hamilton would no longer be able to attend. The attorneys decided to talk among themselves, while a liaison from the Justice Department listened in and took notes. Afterward, the liaison wrote a summary of the call that concluded, "BIG CONCERN: What is happening with these children when they are being separated from the parent? It appears that once DHS turns the child over to HHS, DHS is out of the picture and cannot give information. What are the safeguards to the children?"

His attention apparently piqued, Sessions agreed to speak with the attorneys by phone later that day. His responses seemed out of touch with reality. He had promised to assign 35 additional attorneys to southwestern border districts to help with the implementation, but they wouldn't be able to start those jobs for months. Several of the attorneys' notes about the call record that Sessions articulated a central goal: "We need to take away children."

Soon after, the U.S. attorneys were assured that parents and children would be swiftly reunified after prosecution. With that, they forged ahead.

Internal emails show that some assistant U.S. attorneys who resisted prosecuting parents under Zero Tolerance faced reassignment—and the parents whose cases they declined were separated from their children anyway. In early May, for example, DHS officials heard that attorneys in Yuma, Arizona, were declining to prosecute Zero Tolerance cases except in those instances where children had crossed the border with both parents, so that at least one parent could remain with them. As Border Patrol officials scrambled to confirm that this "problem" was not occurring elsewhere, one warned that "there will be repercussions" for prosecutors who turned down cases. Another added that "the AG's office"—presumably a reference to Hamilton—had

assured them that any attorneys refusing to break up family units "will find themselves working in another district, away from the Southwest Border."

Hamilton made several attempts in early May, after Zero Tolerance began, to convene meetings between the Departments of Health and Human Services, Justice, and Homeland Security, in hopes of getting all three agencies, with their tens of thousands of employees, on the same page—but it was far too late. His emails betray such naivete about the system that it's unclear if they were sincere or feigned. For example, in one email, he proposed that perhaps the U.S. Marshals could use abandoned jails to house separated parents—an idea that went nowhere because it would have taken millions of dollars and months of contract negotiations to bring such facilities up to federal code. At the same time, Hamilton was bragging internally about how much prosecutions had increased, writing to a colleague on May 21 that, although 2,700 monthly prosecutions had been typical in the months before Zero Tolerance, "we're now on track to do at least that many each *week*."

> "When I got to Honduras, it was very difficult and I don't even want to remember, because it is so difficult to think about. I was in so much pain."

The brutality of Zero Tolerance was immediately evident. The father of a 3-year-old "lost his s—," one Border Patrol agent told *The Washington Post*. "They had to use physical force to take the child out of his hands." The man was so upset that he was taken to a local jail; he "yelled and kicked at the windows on the ride," the agent said.

The next morning, the father was found dead in his cell; he'd strangled himself with his own clothing.

The influx of anguished parents into government detention centers across the country turned the facilities into pressure cookers, where detainees and correctional workers alike were on edge. Even during the busiest season at the border, an individual U.S. Marshals facility would typically deal with only a few dozen daily intakes. Now the facilities were suddenly being asked to find housing for hundreds of new detainees every day.

Marshal supervisors ordered that temporary, stackable overflow beds be crammed into dorms so that the separated parents had a place to sleep. "Our manpower has been completely depleted," a Marshal in the Southern District of California <u>wrote in an email to staff</u> in mid-May. "We are in 'crisis mode,' 'critical mass' 'DEFCON 1' or however you want to phrase it."

On top of this, the Marshals were fielding urgent calls from shelter staff working under the Office of Refugee Resettlement who were improvising any method they could to track down the parents of separated children, to satisfy requirements that children in federal custody be given the chance to speak with their family members or sponsors twice a week. According to the DOJ's inspector general, some of the Marshals <u>had never heard of ORR</u> and had to research it on the internet. Many Marshals declined to make parents available for the calls, because the Marshals were too busy or said they were not required to do so.

Rich Hunter, the high-ranking Marshals official in Texas who had anticipated such chaos, traveled from his office in Houston to the federal court in McAllen to try to troubleshoot problems. He arrived to find the street outside the courthouse lined with

charter buses that had been procured at the last minute to transport the surge of separated parents to court. Because the court didn't have enough cellblocks, parents had to sit for hours inside the parked buses until it was their turn to be called before the judge. The courtroom itself resembled a packed concert venue; the court reporter "was crammed in the corner," Hunter told me. "The prosecutors are standing up over by the jury box that had additional defendants in it. It was just not a picture of a federal courtroom that I had ever seen before."

As a 30-year veteran of the agency, Hunter said his first concern was safety. But he also found the scene emotionally disturbing. "I remember their faces," Hunter said. "You deal with this issue long enough, you realize that the overwhelming majority of people are not cartel members … You would hear them asking their defense attorneys, asking anybody, for information [about their kids]. As a dad, as a person, it would take a toll on you, because you can imagine what that was like."

He recalled parents struggling to use the court's interpretation headphones. "A lot of them had not seen technology like that before ever in their life, so they're put on wrong," he said. "And then the look on their faces of *What am I going through?*"

Neris González, a Salvadoran consular employee charged with protecting the rights of migrants from her country in U.S. custody, was stationed at a CBP processing center in McAllen when she read about Zero Tolerance. "In my little mind," she told me, "I thought they were going to separate the families" by putting parents in one cell and children in another. "I never thought they would actually take away the children."

But when she walked into the processing center for the first time after Zero Tolerance was implemented, she saw a sea of children and parents, screaming, reaching for each other, and fighting the Border Patrol agents who were pulling them apart. Children were clinging to whatever part of their parents they could hold on to—arms, shirts, pant legs. "Finally the agent would pull hard and take away the child," she said. "It was horrible. These weren't some little animals that they were wrestling over; they were human children."

Other than Wesley Farris, the Border Patrol officer who spoke to *Frontline*, González appears to be the only official to have gone on the record to describe the separations themselves. (I asked members of the Biden administration to provide Border Patrol officials who'd participated in Zero Tolerance for an interview. I was told that no one would agree to speak with me.) González said the facility was effectively locked down during Zero Tolerance; almost no one outside Border Patrol and ICE was allowed in, whereas in the past, journalists, representatives from faith-based organizations, and human-rights lawyers had sometimes been given access. "It wasn't right," she said. "They didn't want anyone to expose what they were doing."

González asked a Border Patrol agent what was going on. "He said that ICE and BP were under orders from Trump, and he said to separate the kids from their parents—as in, completely separate." Desperate scenes played out everywhere. Border Patrol agents who were yanking children away asked González to help them prevent fights. In several instances, she placed herself between parents and agents, trying to calm the families down. González said that at the height of Zero Tolerance, about 300 children were separated each day at her facility and crammed into caged enclosures. She spent most of her time inside the enclosures, helping children call their relatives. Sometimes the younger children didn't seem to fully understand what was going on.

González says the sound in the facility was chilling—the children's cries formed an ear-piercing, whistling wind. The sound worsened when it came time for her to leave at the end of the day. "They grabbed me, squeezed me, hugged me so that I couldn't leave."

For her, the scene triggered flashbacks to the war in El Salvador, where thousands of children were disappeared and the sound of their wailing mothers was hard to escape.

WHILE ZERO TOLERANCE was in effect, Kirstjen Nielsen <u>defended it before Congress</u> and <u>in the media</u> using the same clinical language that had been deployed to convince her that the policy was reasonable. She and her team argued that some of the separated families were actually part of trafficking schemes in which children were either kidnapped or paired with random adults in order to give both parties free passage into the United States. (Several Trump-administration officials stipulated that they would talk to me for this article only if I agreed to mention "false families" in my story. Instances of such false families do exist, but subsequent investigations into family separation have not yielded many examples. In the federal class-action lawsuit over family separation, the government indicated that it suspected only a small number of false families existed, and Michelle Brané, who is heading up the Biden administration's Family Reunification Task Force, recently told me the group had not found a single false-family trafficking case.)



Another argument Nielsen made is still popular today among veterans of the Trump administration: that separating migrant children from their parents for the purposes of prosecution was no different from what happens in American criminal proceedings every day. "If an American parent is pulled over for a DUI and their child is in the back seat," this argument goes, "the child doesn't go to jail with them."

But as U.S. attorneys—who are arguably the highest authorities on this subject—came to understand what was happening to families after separated parents left the courtroom, they wholly disagreed with this assessment. American parents who are arrested in the United States typically have access to a system for getting their children back when they are released from custody. According to a source, John Bash, the Trump-appointed U.S. attorney in El Paso, recently testified in federal court that he was horrified to discover in June 2018 that in the few days it took his office to finish prosecuting parents, their children were already being shipped as far away as New York, with no system in place for reuniting them. "It was like, 'You're telling me the kid is nowhere to be found and they're in some other state?!'" Bash reportedly said.

Bash and other U.S. attorneys were flabbergasted by the ineptitude of those who had created the policy. "I remember thinking, *Why doesn't someone just have an Excel file?*" Bash reportedly said. "I mean, it's a large population in human cost and human terms, but it's not a large population in terms of data management. We're talking about a few thousand families. You can have all that on one spreadsheet with the names of the people, where the kid's going. It was just insane. I remember being told that there was going to be a phone number parents could call and know where their kids were. And I told a public defender that and she was like, 'This phone number doesn't work, one. And two, most parents don't have access to phones where they're being held, or they have to pay for the use of the pay phone. So that doesn't work.'"

Bash asked the Justice Department to launch an investigation into why parents and children were not being reunited expeditiously, still not fully understanding his agency's role in the scheme. He created a list of questions that he wanted answered, which were shared with Gene Hamilton, Rod Rosenstein, and others at DOJ: "What technology could be used to ensure that parents don't lose track of children?"; "Is it true that they are often pulled apart physically?"; "Why doesn't HHS return the child to the parent as soon as the parent is out of the criminal-justice system, on the view that at that point the child is no longer an 'unaccompanied minor'?" Rosenstein responded that the U.S. attorneys should try to find out what was going on themselves. The attorneys sent the questions to their Border Patrol counterparts, but their inquiries were ignored. "DHS just sort of shut down their communication channels to us," Ryan Patrick, the U.S. attorney in South Texas, told me. "Emails would go either unanswered, calls would go unreturned, or 'We're not answering that question right now.'"

Recently disclosed internal emails from that time help explain what Bash, Patrick, and the other U.S. attorneys couldn't figure out—why the plan for reunifying families was faulty to the point of negligence. Inside DHS, officials were working to *prevent* reunifications from happening.

Within days of the start of Zero Tolerance, Matt Albence, one of Tom Homan's deputies at ICE, expressed concern that if the parents' prosecutions happened too swiftly, their children would still be waiting to be picked up by HHS in Border Patrol stations, making family reunification possible. He saw this as a bad thing. When Albence received reports that reunifications had occurred in several Border Patrol sectors, he immediately sought to block the practice from continuing, contacting at least one sector directly while also asking his superiors—Tom Homan, Ron Vitiello,

and Kevin McAleenan—for help. "We can't have this," he wrote to colleagues, underscoring in a second note that reunification "obviously undermines the entire effort" behind Zero Tolerance and would make DHS "look completely ridiculous." Albence and others proposed "solutions" such as placing parents whose prosecutions were especially speedy into ICE custody or in "an alternate temporary holding facility" other than the Border Patrol station where their children were being held. This appears to have happened in some cases.



**Matt Albence**
Head of enforcement and removal operations, the division of Immigration and Customs Enforcement that carries out deportations

Albence also suggested that the Border Patrol deliver separated children to HHS "at an accelerated pace," instead of waiting for federal contractors to pick them up, to minimize the chance that they would be returned to their parents. "Confirm that the expectation is that we are NOT to reunite the families and release" them, Albence wrote. (Albence declined to comment for this article.)

DHS headquarters sent out an email on May 25 saying that—when it was possible—the agency had no choice but to reunify children with parents whose criminal sentences were complete. The responses made clear that this was new information and not part of the original plan. Mere prosecution was "not exactly a consequence we had in mind," wrote Sandi Goldhamer, a longtime agent and the partner of Carla Provost, the head of the Border Patrol at the time.

Still unaware that DHS officials were working to keep parents and children apart, both Bash and Patrick started to devise strategies wherein parents could be prosecuted on misdemeanor charges, satisfying their orders from Sessions, but still get their children back quickly: Patrick developed a plan to transfer some detainees to less burdened courts in his district, farther away from the border, so that they could be prosecuted faster. Bash hashed out another plan to conduct prosecutions via video

teleconference, so families would not have to be separated in the first place. Neither idea ever got off the ground.

Bash recently reviewed the exchanges between Albence and others at DHS, which were made public this past June as part of the court case for which Bash was deposed. He was outraged. In no place in the American criminal-justice system, he reportedly testified, would it be considered either ethically or legally permissible to keep children from their parents for punitive purposes after their legal process is completed. "We wouldn't do that to a murderer," much less a parent facing misdemeanor charges as a result of their attempt to claim asylum, Bash reportedly said.

In federal court cases, several parents whose children were taken away allege being taunted by agents who said "Happy Mother's Day!" And parents say they were told that their children would be put up for adoption or that they would never see them again. Others recount being threatened or ignored when they asked where their children were. Perhaps to avoid physical altercations, some agents began deceiving families in order to lure them apart, or pulling children out of holding cells while they and their parents were asleep. Bash reported to DOJ headquarters that two plaintiffs in his district said they had been told their children were being taken to have baths and then never saw them again.

HHS child-care facilities evolved rapidly to meet the new demands of their work. Bethany Christian Services, which had previously cared mostly for children 12 and older, had to open a makeshift preschool to accommodate the influx of separated children who were not yet potty-trained and who needed to take naps. Bethany's teachers stopped trying to give traditional lessons, resorting instead to playing soothing movies throughout the day, in hopes of preventing a domino effect where one child's emotional outburst could quickly lead to an entire wailing classroom.

"What it demonstrated was that we do not, in fact, want your tired and poor and huddled masses," Hannah Orozco, a supervisor at Bethany, told me. "We want to deter you from coming here, and we were the face to the children of that message."

When the entire HHS shelter system reached capacity, Bethany resisted pleas to expand its program, which consists mostly of foster homes and a few small shelters housing only up to 36 kids at a time, to ensure that each child still received individualized care. But other companies eagerly accepted multimillion-dollar government contracts, housing children in huge facilities such as a former Walmart, which was at one point used to detain more than 1,000 children.

Large-scale institutions had long since been eliminated from the domestic child-welfare system because they were found to be traumatizing and unsafe. Indeed, many such facilities for immigrant children have faced significant allegations of physical and sexual abuse, and some have bypassed federal background-check requirements to weed out predators. But they are where most separated children ended up, in part because the lack of advance planning left no other option.

Some of the social workers under contract with HHS wrestled with the ethical dilemma presented by Zero Tolerance, unsure if they were helping separated children by continuing to go to work each day or if they were enabling the system that had taken them away from their parents in the first place. In mid-June, Antar Davidson quit his job at a large shelter in Arizona, calling himself a "conscientious objector" to Zero Tolerance. Children at the shelter had been "running up and down the halls, screaming, crying for their mom, throwing chairs," he told MSNBC, which led to a "harder, more authoritarian approach by the staff in attempting to deal with it."

The public did not know what to make of HHS's role in the situation either. Reporters and protesters showed up outside HHS child-care facilities, whose addresses are typically tightly guarded because of the vulnerability of their clients. Staff put Halloween masks on the children or shielded their faces when they were outside to protect them from being photographed. A Bethany caseworker in Michigan was spit on at a gas station and accused of kidnapping.

Even high-ranking Trump-administration officials were deeply confused. For weeks, the White House communications team asked the Justice Department to put forward lawyers who could explain the policy to the media, but no one at DOJ headquarters wanted to do it. May Davis, then the deputy White House policy coordinator, tried to explain the situation to a group of senior staff, including Sarah Huckabee Sanders, the press secretary, who was being questioned by reporters about the policy. But Davis inadvertently added confusion by suggesting that parents and children were being swiftly reunited. "I did a few diagrams of what I thought was happening," Davis told me. "Of course, what I thought was happening was 'separate for two to three days while they go get time served from a judge and then come back.'"

At one point, Claire Grady, Nielsen's deputy, emailed Rod Rosenstein at the Justice Department to ask for help: HHS had run out of space, so more than 100 young children had been stuck for several days in Border Patrol holding cells. Rosenstein, who had previously admonished John Bash's office for declining to prosecute parents of very young children (a charge Rosenstein disputed to the DOJ inspector general, though it was explicitly documented), responded by asking if the 72-hour time limit on when children must be transferred over to HHS for their safety could simply be changed. Grady and Gene Hamilton had to explain to Rosenstein that the limit was nonnegotiable; it had long been enshrined in law. The email chain eventually made it to Jeff Sessions, who replied unhelpfully: "If things are not moving at any DOJ agency don't hesitate to report it to me, and Rod or I may need to call them. We are in post 9/11 mode. All is asap."



June 2018: A person in Tornillo, Texas, protests against the Trump administration's Zero Tolerance policy, which separated families attempting to cross the border into the U.S. without authorization. (Mike Blake / Reuters / Alamy)

Meanwhile, the DHS Office for Civil Rights and Civil Liberties was being overrun with pleas for help from separated parents looking for their children. The requests tended to be fielded by entry-level contract employees. Each time an employee started processing a new complaint, a mug shot of the child taken by the Border Patrol appeared on their computer screen. In some photos, a very young child appeared unaware of what was about to happen—smiling as if on school-picture day. Photographs of older children, who seemed to have a better understanding of what was going on, showed some in tears or still screaming. Young staffers in the office started breaking down at their desks.

Government records indicate that, just like with Operation Streamline, Zero Tolerance began <u>preventing Border Patrol agents and federal prosecutors from focusing on higher-stakes work</u>. The Border Patrol "is missing actual worthy felony defendants, including sex offenders," the DOJ liaison for the U.S. attorneys wrote in an email to colleagues in Washington.

Ron <u>Vitiello</u> told me the main goal at CBP during Zero Tolerance was to encourage agents, whose morale was eroding. "This was supposed to be short-term pain for long-term gain," Vitiello said. "I was trying to communicate with the workforce, telling them, 'Hopefully we'll see a dip in the numbers. This is going to work.'"



**Ron Vitiello**
Acting deputy commissioner of CBP, who was second in command to Kevin McAleenan during Zero Tolerance and the preceding pilots

But as individual parts of the immigration enforcement system each wrestled with their own logistical crises, a gruesome larger picture began to come into view. The policy was so broken—perhaps intentionally—that it could not be fixed.

Vitiello and others at CBP and DHS headquarters said they were not aware of the wrenching separations being reported by the media. "I would feel bad if someone went to the shower and their kid was gone when they got back. I'm a human being," Vitiello told me. He and others said they did recall the mood beginning to sour when it seemed as if the department had "lost the narrative" on Zero Tolerance in the press. McAleenan has since said that he felt the policy needed to end because CBP was losing the public's trust—though he and others have also expressed a belief that journalists exaggerated their reporting on separations to make them seem more egregious than they were.

Some at DHS, however, did believe the well-documented reports that they were reading in the press—many of which involved leaks by government workers.

Elizabeth Neumann, Nielsen's deputy chief of staff, recalls a career civil servant walking into her office around this time and saying, "I can't believe they're doing it. This is evil."

ON JUNE 18, the fog of denial abruptly dissipated when ProPublica published leaked audio of separated children crying for their parents inside a government facility. It called into question the official assurances that separations were happening smoothly and humanely. More than that, it made clear that the targets of the Zero Tolerance policy were not criminals, but children.

Throughout the seven-minute recording, a little boy speaking through a low, wobbly sob repeats "Papá, papá," over and over. "I want to go with my aunt," one little girl tells agents. Over their cries, a detention official can be heard joking with the children. "*Tenemos una orquesta*," he said. "We have an orchestra—what we're missing is a conductor."



By that point, the U.S. government had separated from their parents more than 4,000 children under Zero Tolerance and the preceding local initiatives.

The audio clip was picked up by news outlets around the world. Comments posted on the YouTube version of the ProPublica audio show the news of family separation finally penetrating the public's consciousness.

As I listened to this I cried till my stomach hurt so much.

My heart breaks hearing these innocent children crying. I hope that they will be reunited soon. God help us.

Never have I ever been more ashamed with America.

FACING AN OVERWHELMING OUTCRY, even the staunchest Republican allies of Trump's immigration agenda began condemning Zero Tolerance, some of them sincere and others motivated by politics. "All of us who are seeing images of these children being pulled away from moms and dads in tears are horrified," Senator Ted Cruz told reporters. "We should keep children with their parents. Kids need their moms. They need their dads."

One high-level HHS official told me it took weeks for her to accept what she was reading in the news, including that immigration officers were pressuring parents to agree to be deported without their children. "It was something so horrible that it wouldn't occur to any normal person that this was happening," the official said.

When denial was no longer viable, the administration wasted no time looking for someone to scapegoat.

"It was very apparent that they wanted a fall guy," Lauren Tomlinson, the senior DHS communications aide, told me. When ProPublica published the recording, Kirstjen Nielsen was in Louisiana for a speech. At that point, she had already declined several requests from Sarah Huckabee Sanders to address the press from the White House podium.

While still on the plane back to Washington, Nielsen was summoned to the White House by Sanders, who told her when she arrived that she was the administration's best person to address the policy, and that Jeff Sessions's attempts to do so had only made things worse. (Days earlier, the attorney general had invoked scripture to justify the separation of families.) Nielsen and her inner circle huddled in the West Wing with John Kelly, who strongly urged her against doing the press conference. "I said, 'Look, whoever goes out there is going to own this,'" Kelly told me. Nielsen told me she felt she had no choice. Her agents were being attacked, and it was her job to defend them.

Nielsen sat down in the makeup chair off the White House pressroom, while an aide, Jonathan Hoffman, peppered her with mock questions. Minutes later, she walked to the podium. Kevin McAleenan, who had urged Nielsen to approve the policy and was officially responsible for the actions of the Border Patrol, stood off to the side, outside of most of the news cameras' frames, silent and unnoticed.



**Jonathan Hoffman**
A close adviser and assistant secretary for public affairs to DHS Secretary Kirstjen Nielsen

At DHS headquarters, staff huddled around televisions. "I think in that moment it became very clear to everyone just how bad everything was," a senior DHS official told me. "For some people, that was their first time really understanding how much of a crisis this was."

At the podium, Nielsen was defensive, causing reporters to bear down. She tried to distinguish between separating families and prosecuting parents—ignoring the fact that in practice this had amounted to the same thing. She emphasized that the parents being separated were committing the crime of crossing the border illegally, even if to exercise their legal right to claim asylum. She did not acknowledge that DHS had been limiting access to official ports of entry through a process called "metering," effectively blocking people from requesting asylum without breaking the law to do it. Nor did she acknowledge that substantial numbers of families that had been able to cross at official ports of entry, or who had crossed elsewhere but were not being prosecuted, had also been separated. And she repeatedly blamed Congress for Zero Tolerance, suggesting that she'd had no choice but to enforce the statutes that made unauthorized border crossing a crime, which was a lie—outside Operation Streamline, few people were prosecuted in the decades prior to Donald Trump taking office.

To viewers watching the press conference, for whom the pleading cries of separated children were still fresh in mind, Nielsen's focus on technical details seemed astonishingly tone-deaf.





Cindy Madrid located her then-6-year-old daughter, Ximena, only after recognizing her voice in audio released by ProPublica of separated children crying in a government facility. (Christopher Lee for *The Atlantic*)

Nielsen told me that at the time of the press conference, she was unfamiliar with news reports indicating that babies had been taken from their parents, or that family members were getting lost in the maze of federal detention, or that parents had been deported without their children, which happened more than 1,000 times, according to federal records. This is almost impossible to believe given her reputation as someone who was obsessively well prepared and consumed with following media coverage of her department's operations.

"The last thing I would ever support or defend is some sort of tragic scene where someone is grabbing a baby out of someone's arms," Nielsen told me. "That's just so the opposite of every bone, every cell in my body."

After the press conference, Nielsen made her way out of the White House. As she left, people patted her on the shoulder as if they were touching a casket at a funeral one last time.

# 4,335   Minimum number of separated children as of June 18, 2018, according to government records

# Reunification

Across the federal government, futile attempts at damage control began the next morning. It was "a minute-to-minute disaster," a Justice Department official told me, recalling a meeting that day. "We were taking on water from all sides." DOJ's congressional-affairs team reported being inundated with official requests for information from Capitol Hill, while Rod Rosenstein finally conceded that he did not see any way of solving Zero Tolerance's logistical problems. In the meeting, Sarah Isgur, the chief spokesperson for DOJ, said that the narrative around the policy had become so bad, there was no way to recover from it. As district-level reports—

initially tightly controlled—circulated more widely at headquarters, it became clear that "there were some unfair stories out there," the official told me, "but even the fairest ones were bad. And with some of the ones that the reporter had gotten wrong, the facts were actually worse than the reporter realized."

Congressional Republicans began asking not only for an end to family separations, but for a bill outlawing them in the future. Paul Ryan, the speaker of the House, told John Kelly at a breakfast meeting that if Congress didn't outlaw family separations, "we will lose the House [in the 2018 midterms]. It will kill the Republican Party." Kelly recounted the meeting in a discussion with Stephen Miller and some DHS officials, according to the contemporaneous notes of a Nielsen staffer who was present. Miller argued that the program should continue.

The White House scrambled to issue an executive order—one that is among the most confusing and nonsensical of all those produced by the Trump administration. It called for the Justice Department to continue exercising "zero tolerance" toward illegal border crossings—but at the same time for the Department of Homeland Security to maintain the family unity of those who were prosecuted. This was executive order as oxymoron: Zero Tolerance had meant separating families.

"It didn't make a damn bit of sense," May Davis recalled.

Nevertheless, the next day, June 20, Trump signed it. "He just kind of caved," one Hawk told me. The administration indicated that families that crossed the border

would be detained together in DHS's family-detention centers for the duration of their criminal and immigration cases. This also made no sense. For one thing, DHS had about 3,000 family-detention beds. Based on the number of people crossing the border, those beds would have filled in less than two weeks. For another, asylum cases take more than a year to complete, on average, and <u>a long-standing federal consent decree</u> held that families could be detained for a maximum of only 20 days, because of the harm that long-term detention does to children.

<u>Read: Immigration-law changes will expand family separation</u>

During a conference call that same day, Gene <u>Hamilton</u> told reporters that the administration planned to challenge the consent decree, and that if the judge did not agree to lift it, family separations would begin again. "It's on Judge [Dolly] Gee," he said, referring to the Central District of California judge who would rule on their challenge. "Are we going to be able to detain alien families together or are we not?" The consent decree, Hamilton said, "put this executive branch into an untenable position"—as if the 20-day limit had not already been in place for several years and as if it were the judge, not the Trump administration, that had changed things with Zero Tolerance.

BY LATE JUNE, new separations had stopped. But it was still not at all clear what would happen to the estimated 3,000 separated children who remained in government custody, not to mention those who had been released to a sponsor in the United States but still had not been reunited with their parents. Soon after the executive order came down, an HHS spokesperson told reporters that the separated families would not immediately be reunited, because their parents were being detained on criminal or immigration charges. A second HHS spokesperson from the same agency followed up later in the day to say that the first one had misspoken, explaining that "it is still very early, and we are awaiting further guidance on the matter," but that "reunification is always the ultimate goal."

Only at the height of Zero Tolerance did Alex <u>Azar</u>, who was the secretary of Health

and Human Services and therefore the overseer of the system tasked with sheltering the separated children, begin to understand his agency's role in what was happening, according to his staff. (Azar declined to comment for this story.) A former corporate lawyer and pharmaceutical executive, Azar was appointed after the administration's first HHS secretary, Tom Price, was ousted in scandal. He was given a mission of overhauling federal regulations on prescription-drug pricing, and he had pursued his target with exacting focus. Azar was so obsessed with efficiency that HHS employees were not allowed to contact him directly, lest he be distracted; his email address was a tightly kept secret. Azar's chief of staff and deputy chief of staff fielded all internal inquiries to his office; anything that was not of utmost importance to Azar, they delegated. This included all matters related to immigration.



**Alex Azar**
Secretary of Health and Human Services, the agency that housed separated children during Zero Tolerance and earlier local initiatives

Azar didn't know or care much about immigration policy when he joined the administration. He didn't view this as a problem, because it seemed to him to be a fraction of HHS's work. The entire immigration portfolio was given to Azar's deputy secretary, Eric Hargan. Colleagues say that Hargan was not taken seriously—that he was frequently out of the office, appeared less than fully engaged in meetings, and lacked mastery of the policy details for his areas of responsibility, including immigration. Hargan declined to comment, so I was not able to confirm whether he had any knowledge of Zero Tolerance prior to it being announced, but Azar and others close to him insisted repeatedly that they had been wholly blindsided. Although Nielsen and others at DHS said that Azar was warned that the policy was coming, they conceded that perhaps no one "shook him by the shoulders" to explain exactly what it meant. Those close to Azar say that if he had been involved in any discussion of an innocuous-sounding prosecution policy, it would have flown over his head. He would have had no idea that prosecution would entail taking the parents'

children away, much less making them his responsibility as part of the larger pool of unaccompanied minors in the U.S. whom HHS was tasked with caring for.





Lucinda and her son Gabriel, photographed in July. They were separated for almost three months when he was 5, after they came to the U.S. from Honduras. (Juan Diego Reyes for *The Atlantic*; U.S. Government)

Once he fully understood Zero Tolerance, some of his employees told me, Azar was furious. But at no time, it appears, did he or other Health and Human Services officials argue against separating children before the policy was implemented nationwide. Yes, HHS officials had been cut out of the conversation by the Hawks in the White House—but they hadn't noticed, they freely admit, because they hadn't been paying attention. This is especially noteworthy in Azar's case. He had a close

relationship with Ivanka Trump and Jared Kushner, which Azar leveraged to keep Miller from ever contacting him directly. If Azar had been attuned to what Zero Tolerance would mean, he may have been able to head it off or reshape it.

News coverage now made his agency's connection to the crisis undeniable. Azar's office heard from Rachel Maddow's producers that her MSNBC show <u>was getting ready to report</u> that during Zero Tolerance—while his agency was erecting a tent city in the Texas desert to house the overflow of separated children in its custody—Azar had attended his Dartmouth College reunion. Azar demanded that Scott Lloyd, at the Office of Refugee Resettlement, immediately locate the parents of the separated children whom HHS was sheltering. When Lloyd went to Azar's office the next morning to say that the parents were in ICE custody, Azar started yelling: He wanted precise locations for all of the parents. He didn't yet understand that such information did not exist.

Casting Lloyd aside as useless, Azar deputized Bob Kadlec, the agency's assistant secretary of preparedness and response, to take over the effort to put parents and children back in touch with each other. Kadlec, a physician, had spent two decades in Air Force Special Operations and the CIA, serving five deployments, before moving over to HHS. Though he had done stints advising Republicans in Congress and the George W. Bush White House, he identifies as an independent.



**Bob Kadlec**
HHS assistant secretary of preparedness and response, who led the agency's family-reunification task force and recruited Jonathan White to help

Recognizing immediately that he knew next to nothing about immigration law or the shelter system that HHS oversaw, he did something that those in charge of Zero Tolerance had yet to do: He turned to the bureaucracy for help. He asked his staff to identify experts in the agency who could brief him. Soon after that, Jonathan White was in his office. (White had eventually become so infuriated with Scott Lloyd that he'd left ORR and moved to a different department in HHS. In addition to rebuffing White's pleas for an intervention on family separation, Lloyd had also been trying to stop unaccompanied girls in ORR care from getting abortions, using a spreadsheet with data including their last menstrual cycle. "We were in a human-rights free fall," White recalled.) After a half-hour conversation, Kadlec announced that White would take charge of the entire operation.

For White, the appointment felt like an opportunity to redeem himself from his failure to stop family separations from happening. A week later, Lloyd still had not satisfied another one of Azar's requests—to produce a list of potentially separated children. Azar told his staff to brew coffee and order pizzas; no one was going home. About a dozen members of Azar's inner circle sat down in the secretary's command center in front of computers, while Jallyn Sualog, a longtime civil servant at HHS who had been working with White to oppose separating families, taught them how to use an online portal to review every available detail about every child in their care.

At the time, Health and Human Services was housing roughly 12,000 children, the majority of whom had come to the United States alone—the population the HHS shelter system was created to serve. They would have to sift through those records in order to figure out which children—nearly a quarter of the total—had arrived at the border with a parent and then been separated.

Photos taken at the ORR shelters, similar to the mug shots that had brought employees in the DHS Office for Civil Rights and Civil Liberties to tears at their desks, now filled the computer screens of Kadlec and his colleagues. When I met with Kadlec recently, he teared up when he told me that the pictures he saw that night still haunt him. "The first one was a little girl kind of smiling. Another was a little boy crying. Another was a teenage girl who looked fearful," he said. "You could just see that what was happening was devastating to these kids ... Some of the children were infants. Some were 1 and 2 years old, 5 years old, 10 years old."

He recalled the "stupefying silence" that came over the room where he and the rest of the task force were working. "People afterwards had a hard time. I had to put some on extended leaves of absence because of emotional trauma."

That night was the first time officials running HHS had to confront the faces of separated children—something many of those responsible for the policy have never had to do.







Federal employees took mug shots of children who were separated from their families. These photos are reprinted with permission from the children's parents and legal representatives. (U.S. Federal Government)

INTERNAL EMAILS REVEAL that officials at Immigration and Customs Enforcement, which was assuming custody of separated parents after the completion of their criminal proceedings, were still determined to block the HHS task force from reuniting any families unless it was for the purposes of deportation. "They will want to know what can be done to facilitate immediate reunification," Matt Albence, who was soon to become the deputy director of ICE, told colleagues in an email. "I told them that wasn't going to happen unless we are directed by the Dept to do so."

Sensing that reunification was nowhere in sight, the ACLU's Lee Gelernt asked the judge in his case against the government to intervene. Most of the separated children, except for those who had been released to other relatives in the United States, were still in HHS custody. For the most part, separated parents who had not yet been deported were either serving time for their illegal-entry convictions in the custody of the Bureau of Prisons or being detained by ICE. Many parents still didn't know where their children were, and vice versa. (One woman, Cindy Madrid, only located her 6-year-old daughter, Ximena, after recognizing Ximena's voice in the audio released by ProPublica, which was played during a news broadcast shown in the South Texas detention center where Madrid was being detained.)

On June 26, Judge Dana Sabraw of the Southern District of California responded to Gelernt's request, ordering that the government return children younger than 5 to their parents within two weeks, and that the rest of the separated children be reunited with their families within 30 days. Alex Azar's general counsel warned him that he could be held in contempt of court if the government did not successfully comply, which theoretically meant that Azar could be put in jail.

Kadlec and White, who were leading the HHS task force, sought out a few select representatives of ICE and CBP to help with their efforts. "We had to pick those people carefully so that they would be willing to share," Kadlec told me, anticipating that not everyone at the law-enforcement agencies would try to be helpful.

"The ICE leadership didn't want us to succeed," White said. "They wanted to sabotage the reunification effort." According to White, Tom Homan's initial position as the head of ICE was that families should be reunified only "at the flight line in Phoenix"—meaning he didn't want to return any children to their parents unless their immediate deportation was guaranteed. But there was no way to adjudicate everyone's asylum claims (many of which were eventually successful) before Judge Sabraw's deadline, so White requested that four DHS processing facilities be designated to serve as reunification sites. Even then, White says, ICE leaders started coming up with excuses for why they needed more time. Emails show that some children were told that they were going to be reunited with their parents and then were driven or flown to reunification sites hours away, only to learn upon arrival that ICE still wanted to interview their parents before they could be released, or that their parents were not even there yet. (Homan denies trying to delay family reunifications.)

"They were trying to run out the clock," White said. He addressed HHS staff: "If we miss the judge's deadline, there is nothing that we can use to hold the administration's feet to the fire to make this happen. Do you understand? Then those kids will wait, their parents will be deported, and they will be separated potentially for the rest of their lives."

White told his colleagues to marshal vehicles and flights they needed to move thousands of children across the country in a matter of days. "Here's what we are going to do: You push those kids, once they're green-lighted, to ICE's door. You park

them outside the door. We will move the kids to them and force them to do the reunifications, or the whole world will see kids surrounding them … Take snacks, take blankets. I am besieging ICE with children until they reunify them as they're required to do."

As officials in the Departments of Homeland Security, Justice, and Health and Human Services prepped for congressional hearings, the DHS communications aides Jonathan Hoffman and Katie Waldman showed up at HHS for a "murder board" session to prepare Jonathan White and others to answer questions. Quickly, arguments broke out, as White and Judy Stecker, a public-affairs official at HHS, felt that White was being pressured to suggest, inaccurately, on the witness stand that HHS had been given advance notice of Zero Tolerance. Stecker asked Brian Stimson, the lead HHS lawyer working on litigation over family separations, to provide backup. According to those present, Stimson told Hoffman to "fuck off" and called him a "moron." (Hoffman disputes this.)

Afterward, Waldman pulled White aside and called him a bleeding-heart liberal. White unloaded on her, shaking and turning red. "It is difficult to maintain my emotional equilibrium where family separation is concerned," he told me. "I do not accept that any immigration outcome, however important it might be to people, can be bought at the price" of separating families. "Like, you do understand these aren't theoretical children? They're all real children … They're as real as my kids."

# 4,371

Minimum number of separated children as of August 1, 2018, according to government records

# The Aftermath

On August 1, a week after the court deadline, more than 500 separated children remained in federal custody; many others had been released to sponsors in the U.S. but still had not been reunited with the parent with whom they'd crossed the border. The government still had made no effort to contact parents who had been deported without their children. Judge Sabraw called the government's progress "just unacceptable," adding that "for every parent who is not located there will be a permanently orphaned child. And that is 100 percent the responsibility of the administration."

Additional separated children were later added to Lee Gelernt's class-action lawsuit; as of now, the total number of known separations between January 2017 and June 2018 is more than 4,000. After entering the White House, President Joe Biden signed an executive order forming the Family Reunification Task Force, headed by Michelle Brané, to continue tracking down and reuniting the 1,500 families that remained separated when his administration took office. At least 360 parents have been reunited with their children. Those who had been deported after they were separated were allowed to return to the United States and given a three-year temporary-parole status. But approximately 700 families still have not been officially reunited, according to the task force's most recent estimate. Some families are presumed to have found each other independently without reporting it, fearing any further interactions with the U.S. government.

Though prominent child-welfare organizations have labeled the family separations carried out by the Trump administration "child abuse" and "torture," Gelernt avoids such language, because he believes it risks causing people to tune out even more. But he struggles with the reality that so many people seem to have moved on. "The average American parent, when they leave their child the first time for one night with a babysitter, is worried every minute of it, or when they drop their kid off for the first time in preschool and worry what the child is going through or the first time a teacher treats them unfairly," he said. "Do they really not think these families suffer the same way they would from losing their child?"

His main goal at this point is to push for the separated families to receive permanent legal status in the United States—"something Congress could do tomorrow," he said. Others are still advocating for the law that Paul Ryan requested, making it illegal to separate children from their parents for the purposes of deterrence. Both efforts have stalled.

The lasting effect of family separation is undeniable. Cheryl Aguilar, a therapist in Washington, D.C., who has treated more than 40 formerly separated families, said the children are still experiencing regressive behaviors such as bed-wetting and pronounced immaturity, as well as nightmares, flashbacks, and severe withdrawal and detachment from loved ones. Healing "takes a very long time when that kind of trauma takes place at such an important developmental stage," she told me. "It impacted the wiring of their brain so that they have been primed to expect scary experiences like that in the future. They are hyperaware and hypervigilant of dangers—some of which are real and some perceived." Aguilar hosts a support group for separated parents, who also struggle with severe depression and anxiety; some feel rejected by their children, many of whom believe their parents abandoned them or gave them up willingly. "We're trying to give children and families basic tools to reconnect and start processing," she said.

Various studies have looked at the effect of separation on migrant families. In April, Physicians for Human Rights published a report based on clinical evaluations of 13

separated parents. All of them had some form of mental illness linked to the separation; 11 had PTSD. Anne Elizabeth Sidamon-Eristoff, now a medical student at Yale, who led another study, pointed out that in animal research used to assess risk for mental illness, separation of mice from their mothers is used as a kind of gold-standard strategy for modeling stress in humans. "My first thought was, *That's what our government is doing to children*," she told me.

"These studies reaffirm what science has been saying all along" about what the impact of a program like Zero Tolerance would be, Sidamon-Eristoff told me. "And it's honestly quite frustrating to me that we even have to collect this data to try to prove a point that we've always known: Family separation is bad for children."

The frontline workers who were pulled into Zero Tolerance against their will have also struggled. Last summer, I visited Nora Núñez, who no longer works as a public defender. She invited me into her living room, where the lights were off. She was in low spirits. A *Washington Post* reporter had recently contacted her for a story about a separated mother whom Núñez had represented in court. He'd shown Núñez a picture of the mother and daughter being reunified four years after they were separated. The girl's arms were limp at her sides while her mother embraced her through tears. "You could tell that little girl was traumatized. Her mother was hugging her, and you could see her face and her eyes looked kind of vacant," she told me, her mouth quivering. "You didn't see any normal emotion of happiness of being reunited."

Núñez said she felt sick as she recalled rushing parents through their prosecutions because she thought that it would get them back to their children more quickly—not realizing that the government had other plans.

"I'm not sure if I can do this much more right now," she said after a while, eventually asking me to leave.



Mirian and her son, originally from Honduras, were separated in U.S. custody in 2018, when he was 18 months old, not long after presenting themselves for asylum. In a sworn declaration in federal court, Mirian said that because her son was so young, Border Patrol agents made her carry him to a car herself, strap him into a car seat, and watch as they closed the door and drove off. (Christopher Lee for *The Atlantic*)

AS THE TRUMP ADMINISTRATION sought to defuse the anger over Zero Tolerance, White House officials proposed blaming separated families for what had happened to them. A damage-control working group developed fact sheets suggesting, without evidence, that most of the separated children were trafficking victims, according to two people who were present. At one meeting, one of these officials told me, "they were like, 'Why don't we just show these women throwing their children over the wall, and then people will think, *How could they do this?*'"

Throughout the remainder of his presidency, Trump pushed to relaunch family separations. "The conversation never died," Kirstjen Nielsen told me, recalling a series of discussions that took place at the White House and on Marine One. "I started saying, 'Sir, we really can't reinstate it. Nothing has changed. We still do not have the resources. It will result the same way. The system didn't get fixed.'" She says she threatened to resign, and appealed for support to the first lady, Melania Trump, who would place a discouraging hand on her husband's shoulder when Trump ranted about "turning it back on," generally while watching Fox News.

Nielsen had been persuaded to sign off on Zero Tolerance by people who either minimized its implications or cloaked its goals, but the president himself didn't bother speaking in euphemism. Trump would "literally say 'family separation,'" a senior DHS official recalled. "Stephen Miller was always very cautious and would frame it as 'reinstituting Zero Tolerance.' But Trump himself just blurted it out." (Trump could not be reached for comment.)

The official continued, "The level of visceral description that the president gave would freak Nielsen out because she was like, 'I'm out here trying to explain that this isn't what the administration intended to do,' and the president's talking like it totally was."

Nielsen said she tried framing separation as something that would harm the president's reelection prospects, but the strategy didn't work, because Miller would counter that he believed the opposite was true. She told Trump he would have to write yet another executive order to reinstate Zero Tolerance, knowing he would never agree to backtracking publicly, because it would make him look weak. A few times, Nielsen called Alex Azar to ask him to back her up. Azar also indicated that he would resign if the policy were to be reinstated.

As time went on, Trump became further incensed about the number of people crossing the border, proposing more and more outlandish ideas to stop it from happening, many of them preserved in the senior DHS official's notes: The president once "ordered Kelly to tell Nielsen to, 'Round them all up and push them back into Mexico. Who cares about the law,'" one entry says. "Silence followed."

NIELSEN'S RELATIONSHIP WITH the president never recovered; she was asked to resign in the spring of 2019. Trump elevated Kevin McAleenan to replace her temporarily. During his tenure, DHS and its subagencies pursued other controversial tactics targeting families, such as conducting raids in homes with children and detaining them along with their parents for the purposes of deporting them, something ICE had historically tried hard to avoid. Trump refused to officially nominate him for the position. He eventually resigned as well.

"To me, the person who did not get enough scrutiny or enough blame or enough attention was Kevin McAleenan," a lawyer working for one of the congressional committees that investigated family separations told me. This idea was repeated by many of those closest to Zero Tolerance, who criticized McAleenan for insisting— publicly and privately—that he was merely a bystander. In an interview with MSNBC's Chuck Todd at the height of the policy, when asked who had ordered Zero

Tolerance, McAleenan invoked <u>Sessions</u>'s Zero Tolerance memo, not mentioning that his own memo had been the catalyst that activated the policy, or that he had repeatedly urged Nielsen to sign off on it. "Kevin knew everything that was going on, he pushed it, he supported it, and he was the key to implementing it," the lawyer said. After Zero Tolerance ended, McAleenan said publicly that he felt it was a mistake. "The policy was wrong, period, from the outset," he told me. "It should never have been undertaken by a law-enforcement department, even while facing the stark challenges we faced at the border."



"He was so traumatized when we first were reunited, he didn't want to speak. He just wanted to be alone, and he was very sad."

Ron <u>Vitiello</u>, who became the acting director of ICE in June 2018, also owned up to the policy's shortcomings, becoming emotional in some of our interviews. "We could have done the logistics better," Vitiello told me. "It wasn't messaged right. We rushed into this failure, basically … It's definitely one you wish you could get back, but it wasn't cruel and heartless to be cruel and heartless. We surmised it was a way to get us out from under this crush at the border, but we sort of lost it."

Nielsen said she decided to speak to me for this story "because the border and immigration situation in this country is heartbreaking and is only getting worse." She said that it is up to Congress to reform our immigration laws in a way that allows people who need to come to the United States to do so legally, and for the laws to be

fully enforced in a way that is humane. With regard to Zero Tolerance, Nielsen said she wouldn't apologize for enforcing the policy. She echoed an argument I heard frequently from people I interviewed for this story: that they, or their agency, had been unfairly blamed. "HHS had the children, DOJ had the parent, we had neither," Nielsen told me.

But she wished she hadn't approved the policy, because of its deep flaws. "I made the decision based on what turned out to be faulty information," she told me. She insisted that she had prevented the worst from happening, because she never signed off on the administrative-separation proposal, which could have led to thousands more children being taken from their parents.

People who know Miller say he believes that Zero Tolerance saved lives, and that immigration enforcement was Trump's most popular accomplishment among his base. Miller has told them that the administration laid the groundwork necessary for a future president to implement harsh enforcement even more quickly and with greater reach than under Trump.

In my interviews, the Hawks argued that Zero Tolerance had been effective—or that it would have been, if only it had been left in place a little longer—suggesting that if Trump or someone who shares his views on immigration were to be elected in 2024, family separations would almost definitely recommence.

RECENTLY, I SPOKE WITH Alejandro Mayorkas, President Biden's Homeland Security secretary, who has been dealing with yet another influx of border crossers, most of whom are now coming from places outside Latin America. Biden campaigned on a promise to tackle the root causes of migration to the United States from Central America—poverty and violence—but little progress has been made on that front. In

June, 53 migrants died trying to sneak into the interior of the country in the back of a tractor trailer, a deadlier incident than the one Tom Homan witnessed in 2003.

Despite the fact that such incidents tend to result from harsh enforcement at the border, Mayorkas has faced criticism from Republicans for being too soft on immigration, in particular for the Biden administration's move to scale back Title 42, a Trump-era policy linked to the coronavirus pandemic that effectively sealed the border. In response, Mayorkas has started reaching for the same solutions that led to Zero Tolerance—using the Border Patrol to ramp up prosecutions and generate other forms of "consequence delivery," though he says those tools should be deployed only "in concert with ample humanitarian protections for people seeking asylum." Congressional action on border issues continues to stall, leaving immigration policy squarely in the hands of the executive branch.

Caitlin Dickerson: Democrats' free pass on immigration is over

Mayorkas said he hoped the media would help hold those responsible for family separation to account. While some deterrent strategies "arguably fall within the parameters of our value system," Mayorkas said, family separation was "way outside the bounds of what we as a civilized and humane country would ever countenance."

When I asked Mayorkas about any official government accountability for those who were responsible for separating families, he said that was outside his purview at DHS and was up to the Justice Department. But DOJ has been defending Zero Tolerance —and the individuals responsible for it—in court, insisting in a recent hearing that a family-separation policy "never really existed. What existed was the Zero Tolerance

policy which started in April of 2018 … We have testimony from the CBP and ICE witnesses and from Hamilton, who was at DHS at the time, that these separation policies, as plaintiffs put it, never existed, and they were never enacted."

But the judge was unconvinced. "This is a continuing argument that the government's been making," she said, pointing out that the plaintiffs in that particular case, migrants who were all separated from their children, were never even prosecuted. (The Justice Department declined to comment for this story but has said previously that it is devoted to "bringing justice to victims of this abhorrent policy.")

A comprehensive accounting of what happened during Zero Tolerance would require the government to look not only ahead toward reunifying families, but backwards as well—to be fully transparent about the past. This seems unlikely to happen. "DHS was lying to us and not giving us documents," the lawyer who investigated Zero Tolerance for a congressional committee while Trump was still in office told me. "They very much withheld stuff from us, and I would catch them red-handed and flag it for them, and they're like, 'Oh well, we'll go back and look,' and it was a constant BS battle."

Many of those who were involved in the development of Zero Tolerance are still working at DHS or its subagencies. But Mayorkas said it would be too hard for him to determine "what they knew, what they didn't know, what they understood, what they didn't understand." That lack of accountability for those who participated in separating families has some in the government worried that the practice could restart under another administration. "There is no cautionary tale to prevent this from happening again," Jonathan White said. Without that, he told me, "I fear that it will."

If anyone is likely to lead another push for the American government to separate families, it's Stephen Miller. For a year and a half, I tried to reach him so that I could ask him directly, among other things, why he had lobbied so forcefully for this to occur in the first place, and whether he would do so again in the future. A close friend of Miller and his wife explained that ever since the couple became parents, they had been consumed by child care and were hard to reach.

<span style="color:red">5,569</span> Minimum number of separated children as of January 20, 2021, according to government records

As my deadline approached, Miller repeatedly ducked or delayed speaking with me. Once, when I got Miller on the phone, he quickly told me that he had to go, and hung up. He soon sent a follow-up text to explain why he had been so abrupt. "With the extended family." he said. "And our little one."

---

The running count of separated children throughout this article comes from government data provided to the ACLU as part of the federal Ms. L litigation.

*Additional image credits*: Albence: Scott Heins / Getty; Azar: U.S. Department of Health and Human Services; Bash: William Luther / San Antonio Express-News / AP; Duke: U.S. Department of Homeland Security; Durbin: John Davenport / San Antonio Express-News / AP; Hamilton: U.S. Department of Homeland Security; Hoffman: Yasin Ozturk / Anadolu Agency / Getty; Homan: U.S. Department of Homeland Security; Kadlec: U.S. Department of Health and Human Services; Kelly: U.S. Department of Homeland Security; Lloyd: Administration for Children and Families; McAleenan: James Tourtellotte / U.S. Customs and Border Protection; Miller: Chip Somodevilla / Getty; Nielsen: U.S. Department of Homeland Security; Patrick: David J. Phillip / AP; Provost: U.S. Customs and Border Protection; Rosenstein: Matthew T. Nichols / U.S. Department of Justice; Sessions: U.S. Department of Justice; Vitiello: U.S. Department of Homeland Security; Waldman: Office of the Vice President; White: Andrew Harrer / Bloomberg / Getty; Wolf: Glenn Fawcett / U.S. Customs and Border Protection

Development and production by Frankie Dintino, Aithne Feay, Elizabeth Hart, Gerald Rich, and Yuri Victor

*This article appears in the <u>September 2022</u> print edition with the headline "'We Need to Take Away Children.'"*