Keith Beauchamp (012434)
D. Andrew Gaona (028414)
COPPERSMITH BROCKELMAN PLC
2800 N. Central Avenue, Suite 1900
Phoenix, AZ 85004
Telephone: (602) 381-5490
kbeauchamp@cblawyers.com
agaona@cblawyers.com
*Counsel for A.P.F. Plaintiffs*

*(Additional Counsel for Plaintiffs Listed on the Signature Page)*

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| A.P.F., on his own behalf and on behalf of his minor child, O.B.; et al.,<br><br>                    Plaintiffs,<br><br>          v.<br><br>United States of America,<br><br>                    Defendant. | No. 2:20-cv-00065-SRB<br><br>**MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>**ORAL ARGUMENT REQUESTED** |

# TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT ..................................................................... 1

II.     STATEMENT OF FACTS ............................................................................ 2

    A.    The Government Knew in 2017 that Separating Families Would Cause Severe Emotional Distress, But It Did So Anyway to Deter Migration. ........................................................................................... 2

    B.    After Experimenting with Family Separations, the Government was Again Informed that Separating Families Would Cause Severe Emotional Distress. ...................................................................... 4

    C.    DHS Secretary Nielsen Approved the DHS Referral Policy, which Required Separating Adults Traveling with Children and Expanded Family Separation. ................................................................ 6

    D.    The Government Implemented the DHS Referral Policy Without the Planning and Care that Government Officials Knew to Be Necessary. ........... 7

    E.    The Government Separated Thousands of Parents and Children Under the DHS Referral Policy, Even if Parents Were Not Referred For Prosecution and Despite the Harm Caused By Separations. ..................... 8

    F.    The Government Separated Plaintiffs, Inflicting Distress. .......................... 10

        1.    José and Herlinda ................................................................... 10

        2.    Heriberto and Alicia ............................................................... 12

        3.    Abel and Obet ......................................................................... 12

        4.    Joel and Mariela ..................................................................... 13

        5.    Rolando and Bertha ................................................................ 14

        6.    Mario and Antonio ................................................................. 15

    G.    The Government Did Not Reunite Separated Family Members, Including Plaintiffs, Until Ordered to Do So by a Federal Court. .................. 16

III.    LEGAL STANDARD .................................................................................. 17

IV.     ARGUMENT ............................................................................................... 18

    A.    Partial Summary Judgment Should Be Entered on Plaintiffs' Claim of Intentional Infliction of Emotional Distress. ...................................... 18

        1.    The Government's Conduct in Connection with Separating Plaintiff Families Was Extreme and Outrageous. ................................. 18

        2.    The Government Recklessly Disregarded That Its Extreme and Outrageous Conduct in Separating Families Would Cause Emotional Distress. .................................................................... 22

B.   Partial Summary Judgment Should Be Entered on Plaintiffs' Claim of Negligence. ..........................................................................26

1.   The Government Owed a Duty Of Care to Plaintiffs. ............27

2.   The Government Breached Its Duty Of Care to Plaintiffs. ....28

V.   CONCLUSION.............................................................................29

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aguchak v. United States*,
    747 F. App'x 503 (9th Cir. 2018) .......................................................................... 22, 26

*Am. Title Ins. Co. v. Lacelaw Corp.*,
    861 F.2d 224 (9th Cir. 1988) .................................................................................... 1

*In re Barker*,
    839 F.3d 1189 (9th Cir. 2016) .................................................................................. 1

*C.M. v. United States*,
    2020 WL 1698191 (D. Ariz. Mar. 30, 2020) ...................................................... 27, 28

*Carranza v. United States*,
    2013 WL 3333104 (D. Or. July 1, 2013) ................................................................. 19

*Certain Underwriters at Lloyds v. Dowdy*,
    2015 WL 12592103 (D. Ariz. Apr. 6, 2015) ........................................................... 26

*Cobler v. United States*,
    2022 WL 625710 (D. Ariz. Jan. 12, 2022) .............................................................. 28

*D.J.C.V. v. United States*,
    605 F. Supp. 3d 571 (S.D.N.Y. 2022) ................................................................ 21, 29

*DeMontiney v. Desert Manor Convalescent Ctr. Inc.*,
    695 P.2d 255 (Ariz. 1985) ....................................................................................... 27

*Doe v. Oesterblad*,
    2015 WL 12940181 (D. Ariz. Jun. 9, 2015) ....................................................... 18, 19

*Dominguez v. City of Scottsdale*,
    587 F. Supp. 3d 914 (D. Ariz. 2022) ....................................................................... 17

*Fleming v. State Dep't of Pub. Safety*,
    352 P.3d 446 (Ariz. 2015) ....................................................................................... 27

*Flores v. Barr*,
    934 F.3d 910 (9th Cir. 2019) ................................................................................... 28

*Kajtazi v. Kajtazi*,
    488 F. Supp. 15 (E.D.N.Y. 1978) ............................................................................ 19

*Kawaahau v. Geiger*,
  523 U.S. 57 (1998) ............................................................... 23

*Markowitz v. Ariz. Parks Bd.*,
  706 P.2d 364 (Ariz. 1985) .................................................. 28

*Melvin v. United States*,
  2010 WL 11628796 (D. Ariz. Jun. 18, 2010)) ..................... 17

*Ms. L. v. ICE*,
  310 F. Supp. 3d 1133 (S.D. Cal. 2018) ............... 16, 17, 21, 26

*Pankratz v. Willis*,
  744 P.2d 1182 (Ariz. Ct. App. 1987) ..................... 19, 22, 26

*Pierre-Canel v. Am. Airlines*,
  375 F. Supp. 3d 1044 (D. Ariz. 2019) ................................ 22

*In re Plyam*,
  530 B.R. 456 (B.A.P. 9th Cir. 2015) ................................... 22

*Quiroz v. ALCOA Inc.*,
  416 P.3d 824 (Ariz. 2018) .......................................... 27, 28

*Research Corp. Tech. Inc. v. Eli Lilly & Co.*,
  2021 WL 4861403 (D. Ariz. Oct. 19, 2021) ........................ 17

*Shields v. Frontier Tech., LLC*,
  2012 WL 12538963 (D. Ariz. Jan. 30, 2012) ...................... 18

*Estate of Smith v. Shartle*,
  2020 WL 1158552 (D. Ariz. Mar. 10, 2020) ....................... 27

*W.S.R. v. Sessions*,
  318 F. Supp. 3d 1116 (N.D. Ill. 2018) ............................... 21

*Watson v. United States*,
  133 F. Supp. 3d 502 (E.D.N.Y. 2015) ................................ 29

*Zhou v. Villa de Paz Apartments, LLC*,
  339 F. Supp. 3d 910 (D. Ariz. 2018) .................................. 17

**Statutes**

8 U.S.C. § 1325 ......................................................................... 6

**Other Authorities**

Fed. R. Civ. P. 56 ................................................................................................ 17

Restatement (Second) of Torts § 46 .................................................................. 22

Restatement (Second) of Torts § 500 ........................................................ 22, 26

## I.       PRELIMINARY STATEMENT

In statements to the American public, the government has admitted that its former "practice of intentionally separating families at the border to deter others from migrating to the United States" resulted in "immense trauma" to those separated.  Statement of Facts ("SOF") ¶ 84.  This practice was, according to Department of Homeland Security ("DHS") Secretary Alejandro Mayorkas, "unconscionable."  *Id.*  President Biden has "condemn[ed] the human tragedy that occurred when our immigration laws were used to intentionally separate children from their parents or legal guardians."  Def.'s Opp'n to Pls.' Mot. to Compel at 2 (Dkt. No. 96) (quoting Exec. Order No. 14011, 86 Fed. Reg. 8273 (Feb. 2, 2021) at § 1).[1]  The government's admissions of intent and acknowledgment of the harms rendered by the government's actions are supported by contemporaneous documents and testimony, and they provide more than a sufficient basis for the Court to enter partial summary judgment as to the liability elements of Counts I (Intentional Infliction of Emotional Distress) and II (Negligence) of Plaintiffs' Amended Complaint (Dkt. No. 34).[2]

Plaintiffs A.P.F. ("Abel") and his son, O.B. ("Obet"); J.V.S. ("José") and his daughter, H.Y. ("Herlinda"); J.D.G. ("Joel") and his daughter, M.G. ("Mariela"); H.P.M. ("Heriberto") and his daughter, A.D. ("Alicia"); M.C.L. ("Mario") and his son, A.J. ("Antonio"); and R.Z.G. ("Rolando") and his daughter B.P. ("Bertha") are six asylum-seeking families who were victims of the "human tragedy" of the United States' separation of parents and children.

With respect to Plaintiffs' Intentional Infliction of Emotional Distress ("IIED") claim, the undisputed facts establish that the government's decision to separate families and its conduct in separating families, including Plaintiffs, was extreme and outrageous.  The government forcibly and cruelly separated Plaintiff families, refused to provide Plaintiff

---

[1] This statement is a judicial admission that is "conclusively binding" on the government.  *In re Barker*, 839 F.3d 1189, 1195 (9th Cir. 2016) ("Judicial admissions are formal admissions in the pleadings which have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact." (quotation omitted)); *see also Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 227 (9th Cir. 1988) ("[S]tatements of fact contained in a brief *may* be considered admissions of the party in the discretion of the district court.").

[2] Plaintiffs do not move for summary judgment on the causation or damages elements of Counts I and II or for summary judgment on their claim for loss of child's consortium (Count III).

fathers with information about where their children were being taken, did not allow Plaintiffs to communicate with one another for days or weeks, and failed to reunite Plaintiffs until months after they were separated.  This extreme and outrageous conduct was carried out with an intent to cause—or a reckless disregard of the probability of causing—severe emotional distress, as the undisputed facts make clear that the government knew or should have known separating families would cause emotional distress.

As to Plaintiffs' negligence claim, the undisputed facts establish that the government (a) owed Plaintiffs a duty of care and (b) the government breached its duty of care. Accordingly, the Court should enter partial summary judgment as to the liability elements of Plaintiffs' IIED and negligence claims.

## II.   STATEMENT OF FACTS

### A.   The Government Knew in 2017 that Separating Families Would Cause Severe Emotional Distress, But IT Did So Anyway to Deter Migration.

Prior to 2017, it was "very rare" for the government to separate parents and children who allegedly unlawfully entered the United States.  SOF ¶ 5.  As early as February 2017, senior-level DHS officials, including CBP Commissioner Kevin McAleenan, prepared to ██████████████████████████████████████████████████████ ████████.  SOF ¶¶ 6–7.  In March 2017, when asked by a reporter if DHS was planning to separate parents and children attempting to enter the U.S. unlawfully, DHS Secretary John Kelly confirmed: "Yes, I am considering, in order to deter more movement along this terribly dangerous network, I am considering exactly that."  SOF ¶ 9.  Kelly also stated, "I would do almost anything to deter the people from Central America [] to getting on this very, very dangerous network that brings them up through Mexico into the United States."  SOF ¶ 10. Kelly's handwritten notes from March 2017 further demonstrate that the purpose of "███████████████████████████████" was "███████████████████████████."  SOF ¶ 8.

In response to reports of DHS officials' discussions of plans to separate families, on March 8, 2017, eighty members of Congress wrote to Kelly to express their "deep concerns and opposition to an immigration enforcement proposal . . . to separate families and put

children into the U.S. foster care system." SOF ¶ 11. The members of Congress asked that DHS "reconsider the implementation of this harmful immigration policy which will only serve to further traumatize families, overwhelm our child welfare system and roll back years of humanitarian progress." *Id.* Similarly, in a March 22, 2017 letter to Kelly, which was shared with Acting ICE Director Thomas Homan, "184 organizations who serve or work on behalf of immigrants, refugees, asylum seekers, and children" warned the government of the same thing: that separating children from parents would "further traumatize those already fleeing harm." SOF ¶¶ 12–13. The 184 organizations also warned that "DHS components and the Office of Refugee Resettlement [("ORR")] lack the mechanisms to ensure . . . that communication between separated family members is coordinated," and that the policy would render "thousands of children unaccompanied . . . and overwhelm the system and cause a crisis in care." *Id.*

With full knowledge of the harms it would cause, the government proceeded to separate families. For example, in 2017, El Paso Sector Customs and Border Protection ("CBP") agents began considering an effort to refer all adults who entered the country illegally for prosecution, including adults traveling with children (the "El Paso Initiative" or the "Initiative"), which would result in family separations. *See* SOF ¶¶ 14–27. Prior to implementing the Initiative, "Border Patrol did not refer parents in family units who were apprehended at the border for illegal entry prosecution if the referral would result in children being separated from their parents." SOF ¶ 15. Under the Initiative, "the Border Patrol's El Paso Sector began referring family unit adults for criminal prosecution, and the WDTX USAO developed guidelines to prosecute family unit adults in certain circumstances even if this resulted in the separation of children from those prosecuted adults." SOF ¶ 17. Once an adult was referred for prosecution, Border Patrol separated the parent from his or her child, designated the child as an Unaccompanied Alien Child ("UAC"), and sent the child to the custody of ORR. SOF ¶¶ 12, 15, 17. The purpose of the El Paso Initiative was to provide " ██████████████████████████████████████████████████████████ ██████████████████████████████████████████████████." SOF ¶ 18. Richard Durbin, then-

U.S. Attorney for the Western District of Texas, wrote to other federal prosecutors and expressed concern about the change in policy: "I am very reluctant to start prosecuting family units.  History would not judge that kindly."  SOF ¶ 16.

Between July and November of 2017, approximately 280 families were separated under the El Paso Initiative.  SOF ¶ 21.  On November 2, 2017, U.S. Magistrate Judge Miguel Torres expressed concern regarding the separation of children from parents as a result of the El Paso Initiative, noting that "[i]n a number of recent illegal entry cases over the last several months, the Court has repeatedly been apprised of concerns voiced by defense counsel and by defendants regarding their limited and often non-existent [ ] information about the well-being and whereabouts of their minor children from whom they were separated at the time of their arrest."  SOF ¶ 20.

On November 18, 2017, the El Paso Sector ended the Initiative "until USBP-HQ leadership has had an opportunity to review all aspects of this program and brief up the chain at the appropriate level."  SOF ¶ 24.  Federal prosecutors noted that, during the Initiative, "██████████████████████████████████████████."  SOF ¶ 27.  The El Paso Sector subsequently submitted a memo recommending that the Initiative be reinstated, but acknowledging that "███████████████████████████████████████ ████████████████████████" was needed so that "████████████████████ █████████████████████."  SOF ¶ 25.  During the Initiative, "CBP headquarters personnel had been aware of the various system deficiencies related to tracking family separations."  SOF ¶ 23.  Also during the Initiative, "El Paso Sector agents requested assistance from CBP headquarters, but the necessary system changes were not made" because the requested changes to help "track family separations was not a high enough priority to warrant the time and resources required for system modifications."  *Id.*

**B.    After Experimenting with Family Separations, the Government was Again Informed that Separating Families Would Cause Severe Emotional Distress.**

On December 11, 2017, a group of immigration advocates sent a complaint to the DHS Office of Civil Rights and Civil Liberties ("CRCL") and to the DHS Acting Inspector

General "on behalf of numerous family members who have been separated while in federal custody at the U.S. border." SOF ¶ 26. The complaint documents facts showing that the separations "deprive[] family members the ability, given their detention, to locate each other and be reunited," and that "family members are given little to no information on what happens to those from whom they are separated, including how to locate, contact, or reunite with them." *Id.* Concerns were raised within DHS as well. In a December 16, 2017 email regarding "Policy Edits to UAC Options," DHS Assistant Secretary for International Affairs James Nealon wrote, "████████████████████████████," but given "████████████████," the Secretary should "███████████████████████████████████." SOF ¶ 28. Nealon warned that family separations "███████████████████████████████████." *Id.*

Similarly, on January 11, 2018, the American Academy of Pediatrics ("AAP") urged DHS Secretary Kirstjen Nielsen "in the strongest possible terms to reject" instituting "a policy that would separate children from their parents at the border" and asked to meet with Nielsen at her "earliest convenience" to explain why such a policy "would be detrimental to the health, safety and well-being of children." SOF ¶ 29. The AAP noted that separating families seeking asylum in the United States would cause "additional trauma" to children seeking refuge in the country, and specifically highlighted how the separations could significantly harm brain development through the onset of "toxic stress." *Id.* On March 2, 2018, Senators Dick Durbin and Tammy Duckworth wrote to Nielsen—copying CBP and ICE—that "it is cruel and inhumane to separate a parent from her child." SOF ¶ 30.

Around this same time in "early 2018," CBP and ICE informed Nielsen of concerns raised by non-governmental organizations that a policy resulting in the separation of families "would be detrimental to the health, safety, and well-being of children." SOF ¶ 31. In these conversations, DHS also discussed "the effect [separating] would have not only on children but the parents." *Id.*

**C.      DHS Secretary Nielsen Approved the DHS Referral Policy, which Required Separating Adults Traveling with Children and Expanded Family Separation.**

On April 6, 2018, Attorney General Jeff Sessions "direct[ed] each United States Attorney's Office along the Southwest Border—to the extent practicable, and in consultation with DHS—to adopt immediately a zero-tolerance policy for all offenses referred for prosecution under [8 U.S.C. §] 1325(a)," the statute that makes improper entry into the United States a misdemeanor offense (the "Zero Tolerance Policy").  SOF ¶ 32.  On April 23, 2018, McAleenan, Homan, and Francis Cissna, Director of U.S. Citizenship and Immigration Services ("USCIS"), sent Nielsen a memorandum titled "Increasing Prosecutions of Immigration Violations" (the "DHS Referral Memorandum"), which proposed three options for implementing the Zero Tolerance Policy, ranging in "feasibility," "legal risk," and predicted deterrent "impact."  SOF ¶ 33.  Options 1 and 2 would have increased the referral of single adults who crossed the border between ports of entry to DOJ for prosecution for misdemeanor illegal entry, either "in accordance with USAO capacity" or to "100%."  SOF ¶¶ 34–35.  Option 3 proposed that DHS "[w]ork with DOJ, [HHS], and other interagency partners to develop a quickly scalable approach to achieve 100% immigration violation prosecution referral for all amenable adults, including those initially arriving or apprehended with minors," meaning that DHS "would pursue prosecution of all amenable adults who cross our border illegally, including those presenting with a family unit, between ports of entry in coordination with DOJ."  SOF ¶ 36–37.

The government understood that adopting Option 3 would mean "███████████ ████████████████."  SOF ¶ 44.  But the DHS Referral Memorandum contained no plan for ensuring separated family members could communicate with one another, nor did it include any plan for reuniting families.  *See* SOF ¶¶ 39–42.  The memorandum also did not address ICE's concern—raised in prior drafts of the memo—that  separating families "███ █████████████████████████████████████████████████████████████ ██████████████████."  SOF ¶ 43.

McAleenan, Homan, and Cissna recommended Option 3 despite acknowledging that it would "requir[ee] significant resources and present[] increased legal risk." SOF ¶ 36. They made this recommendation based, in part, on the purported "effectiveness" of the El Paso Initiative, noting that, under the Initiative, "the number of illegal crossings between ports of entry of FMUAs dropped by 64 percent." SOF ¶ 38. The DHS Referral Memorandum did not reference any of the tracking, communication, or reunification failures encountered during the El Paso Initiative. *See id.*; *see also supra* § II.A.

On May 4, 2018, less than two weeks after being presented with the DHS Referral Memorandum, Secretary Nielsen approved Option 3 (the "DHS Referral Policy"). SOF ¶ 45. In a memorandum dated May 11, 2018, Nielsen "direct[ed] all DHS law enforcement officers at the border to refer all illegal border crossers to the Department of Justice for criminal prosecution to the extent practicable," and stated that "[i]f adopting such a policy requires additional resources, each office shall identify and request such additional resources." SOF ¶ 46. Nielsen's directive did not provide guidance to ensure that parents were told of their children's whereabouts, or to ensure that parents and children could be reunited.

### D.    The Government Implemented the DHS Referral Policy Without the Planning and Care that Government Officials Knew to Be Necessary.

The government implemented the DHS Referral Policy without ensuring that key government officials were prepared to carry it out. ICE officials responsible for detaining parents after the separations were not told about the Policy in advance. The ICE Enforcement and Removal Operations ("ERO") Acting Deputy Assistant Director did not learn of the Policy until "everyone else found out" and testified that "[t]here was no proactive like email to my knowledge or memo or a heads-up that this was going to be occurring." SOF ¶ 51. The ICE Unit Chief of the Juvenile & Family Residential Management Unit, which "advise[s] on policy; operational issues for everything related to unaccompanied children, and family units," testified that she did not "remember any specific meetings or emails" that gave her "a heads up that there was going to be an increase in UAC under this Zero Tolerance and separation initiative." SOF ¶ 52. Likewise, the Associate

Deputy Directory of ORR, the agency responsible for the care of the children after the separations, testified that she did not recall any planning discussions about how the Policy would impact ORR's operations.  SOF ¶ 53.  CBP officers did not "receive any training concerning how to carry out a separation of a child from his or her parent," SOF ¶ 48, and Border Patrol agents did not receive "any training on how to care for children" or how to "explain to children the consequences of . . . an ORR placement."  SOF ¶¶ 49–50.  CRCL personnel, meanwhile, were "inappropriately frozen out" of "operational planning" regarding family separations.  SOF ¶ 54.

The government further implemented the DHS Referral Policy without "establish[ing] a plan for how CBP, ICE, and HHS would successfully reunify separated family members.  As a result, ICE ERO personnel were not prepared to deal with the myriad nuanced circumstances surrounding family separations."  SOF ¶ 47.

### E. The Government Separated Thousands of Parents and Children Under the DHS Referral Policy, Even if Parents Were Not Referred For Prosecution and Despite the Harm Caused By Separations.

The DHS Referral Policy was in effect from May 4 through June 20, 2018.  *See* SOF ¶¶ 45, 73.  By May 12, 2018, CRCL officials had raised "███████████████████████" regarding the Policy.  SOF ¶ 61.  During this approximately six-week period, Border Patrol agents separated an estimated 3,014 children from their parents.  SOF ¶ 55.  The DHS OIG "could not confirm the total number of families DHS separated during the Zero Tolerance period."  *Id.*

While the DHS Referral Policy was in effect, Nielsen publicly claimed that the government was separating families because the parents were being prosecuted and the children could not accompany their parents into criminal custody.  *See* SOF ¶ 60.  But in practice, the government separated parents and children regardless of whether the parents were prosecuted or placed in criminal custody.  According to the U.S. Attorney's Office for the District of Arizona, for example, Border Patrol separated families before the Office had any input on whether there would be a prosecution.  SOF ¶ 56.  In Yuma, Border Patrol agents were directed to refer for prosecution all parents who crossed the border without

inspection, even if Border Patrol agents knew the referrals were flawed and would not be accepted by the U.S. Attorney's Office.  *See* SOF ¶ 57.  ICE ERO was advised that Border Patrol agents at Yuma "will not try to reunite [parents and children] if prosecution [wa]s denied for [the] parent."  SOF ¶ 58.  Similarly, if a parent returned from criminal custody while their child was still detained at Yuma, "the adult and the [child] [we]re not reunited.  The [child] [wa]s placed at the juvenile facility and the adult continue[d] through removal proceedings."  SOF ¶ 63.

In fact, government officials took steps to ensure that parents and children would be separated, and remain separated, regardless of whether the parent was in criminal custody.  In a May 10, 2018 email, ICE Executive Associate Director Matthew Albence expressed "concern . . . that the adults that were separated from their children due to prosecution will be returned to USBP immediately after the guilty plea is accepted by the Court, as the local District Court generally only imposes time-served.  This will result in a situation in which the parents are back in the exact same facility as their children - possibly in a matter of hours - who have yet to be placed into ORR custody."  SOF ¶ 59.  In other words, Albence was concerned that because courts were imposing short, time-served sentences for the parents' misdemeanor convictions, parents would return to the Border Patrol facility while their children were still there, allowing them to be reunified promptly after the parent completed their sentence—thus undermining the government's objective.  Albence then proposed ways to *prevent* parents who had completed the criminal process from being reunited with their children, and he wrote that ICE should confirm with DHS "that the expectation is that we are NOT to reunite the families and release."  *Id.*

Two weeks later, on May 25, 2018, ICE ERO Assistant Director Tae Johnson told Albence, "CBP is [r]euniting adults with kids after prosecution in McAllen.  My guess is there is no place to house the adult, so they are bringing them back to the station and since the child is still there, they are joining them.  These kids have already been designated and are awaiting transportation to HHS. . . .  What a fiasco."  SOF ¶ 62.  Albence escalated the issue to McAleenan, Homan, and others, writing, "[i]t sounds like ORR is refusing to take

the children as UAC if the parent arrives back [at] the processing site and the child is still there.  This is happening at the CPC as indicated below and have also heard in AZ."  SOF ¶ 64.  Albence emphasized that "[t]his obviously undermines the entire effort and the Dept is going to look completely ridiculous if we go through the effort of prosecuting only to send them to a [Family Residential Center] and out the door."  *Id*.  In response, a CBP official recommended that "we cease the reunification process when a family member is given time served and sent back to the [Centralized Processing Center]," and suggested placing the parent at a temporary location in order to allow the separation to occur.  SOF ¶ 65.

In its rush to implement the DHS Referral Policy, the government failed to develop a system to track separated families and allow them to communicate with one another—or even just allow parents to know the location of their children.  ORR care provider facilities "commonly indicated that they encountered difficulties when trying to locate parents in DHS or DOJ custody, a necessary first step to establishing communication and eventually reunifying the family."  SOF ¶ 72.  One ORR program director "estimated that overall, it took an average of 2 weeks to locate parents and then an additional 3 to 7 days to arrange a phone call between the parent and child, a necessary first step before reunification could be pursued."  *Id*.  On June 16, 2018, Homan and Albence were informed by the ORR Director that ORR had "790 kids in our shelters who are not able to contact their parents."  SOF ¶ 67.

## F.    The Government Separated Plaintiffs, Inflicting Distress.

### 1.    José and Herlinda

Plaintiff José traveled to the United States with his five-year old daughter Herlinda to seek asylum.  On May 8, 2018, José and Herlinda were apprehended in Arizona by Border Patrol agents.  SOF ¶ 85.  The agents drove José and Herlinda to a CBP facility and placed them into a "hielera"—a "cold room[]."  *Id*.  The agents refused to allow José to keep a sheet from his backpack to keep Herlinda warm.  *Id*.  An agent approached José and Herlinda "in an aggressive way," had José and Herlinda line up against a wall, and told them: "You guys don't read the news. You guys don't know what's going to happen with you."  SOF ¶ 86.  The agent said, "[Y]ou're all going to be locked up, and we're going to take your children

away, and they're going to go to a place for minors." *Id.*  While José and Herlinda were in the *hielera*, José saw "families that were being separated," and he was afraid "that they might separate me, as well, from my daughter." SOF ¶ 87.  José described the scene in the *hieleras* as "like a funeral." *Id.*

The next day, José, Herlinda, and other immigrant families were called out of the *hielera*.  SOF ¶ 88.  José was told to bathe and dress Herlinda.  *Id.*  After Herlinda was bathed and clothed, José was told "to say goodbye" to her because she was "going to be transferred to New York." *Id.*  José was told by an ICE agent that he "was going to be in custody and that [Herlinda] was going to be going to a place for minors." *Id.*  Herlinda was "sad" and "inconsolable." *Id.*  José, Herlinda, and other families then formed a line, and José was told "to say goodbye" to Herlinda because she was "going to be traveling." *Id.*  When Herlinda heard she would be taken away, she grabbed José by the neck, and said, crying, "[P]api, don't let them take me." SOF ¶ 89.  Herlinda "stuck herself" to José, "and she wouldn't let go," so agents "c[a]me and pull[ed] her off [José] because she wouldn't let go." *Id.*  Herlinda was crying as she was walked away from José.  *Id.*

At the time of the separation, José was not given a phone number or any other way to communicate with Herlinda.  SOF ¶ 90.  José was never given information about a hotline he could call to locate Herlinda.  *Id.*  On May 11, 2018, Herlinda was admitted to Lutheran Social Services of New York ("LSS").  SOF ¶ 91.

José was referred by CBP to the U.S. Attorney for the District of Arizona for prosecution on May 11, 2018—approximately two days after he was separated from Herlinda.  SOF ¶ 92.  The prosecutors' office declined to prosecute José's case the same afternoon, "███████████████████████████████████████████████████████ ███████." *Id.*

José was not able to speak with Herlinda until May 31, 2018.  SOF ¶ 93.  As late as June 28, 2018, however, LSS did not know where José was located or how to contact him. SOF ¶ 94.  On July 21, 2018, approximately 74 days after their initial separation, José and Herlinda were reunited.  SOF ¶ 95.

### 2.     Heriberto and Alicia

Plaintiff Heriberto traveled to the United States with his six-year-old daughter Alicia, seeking refuge and prosperity.  On May 12, 2018, Heriberto and Alicia were apprehended by CBP agents and transported to the Yuma Border Patrol Station.  SOF ¶ 96.  The government separated Heriberto and Alicia the next day.  SOF ¶ 97.  When agents physically separated Alicia from Heriberto, she "started running after [Heriberto], and she fell."  SOF ¶ 98.  An officer then "lifted [Alicia] up, put her on his shoulder," and carried her away.  *Id.*  The officer did not tell Heriberto "what was going to happen to [Alicia]."  SOF ¶ 99.  Heriberto and Alicia were unable to contact each other until May 29, 2018.  SOF ¶ 102.

On May 15, 2018, two days after the forced separation from her father, ORR placed Alicia in the custody of Bethany Christian Services ("BCS") in Kalamazoo, Michigan.  SOF ¶ 100.  When BCS tried to search for records of Heriberto after it assumed custody of Alicia, it "obtained no results."  SOF ¶ 100.  That same day, the U.S. Border Patrol's Prosecutions Unit declined to refer Heriberto for prosecution.  SOF ¶ 101.

On June 5, 2018, Heriberto signed a deportation order "███████████████████████████████████████████."  SOF ¶ 103.  Heriberto was deported on June 6, 2018 without Alicia.  SOF ¶ 104.

On August 13, 2018, Alicia received a psychological evaluation, which concluded that she was experiencing an "████████████████," and that the "████████████████████████████████████████████████████████."  SOF ¶ 105.  Alicia remained in ORR custody until August 30, 2018, when she was deported to Guatemala and reunited with Heriberto.  SOF ¶ 106.  At that time, Heriberto and Alicia had been separated for approximately 110 days.

### 3.     Abel and Obet

Plaintiff Abel traveled to the United States with his seven-year-old son Obet to seek asylum.  Abel and Obet were apprehended by Border Patrol on May 18, 2018.  SOF ¶ 107.  The government separated Abel and Obet and placed Obet in ORR custody on May 19, 2018.  SOF ¶ 110.  On that day, "[a]bout five people . . . gather[ed] around" Abel and Obet's

cell door.  SOF ¶ 111.  Armed officers opened the door and "took [Obet] by force without any notice of where he was being taken."  *Id.*  Abel "wanted to protect and defend [his] son," but he "didn't say anything because [he] didn't want them to take [Obet] by force."  *Id.*  Abel described seeing government agents separating children—some younger than Obet—from their parents as "something we've never seen before.  It was like a horror movie."  SOF ¶ 109.

Abel was then taken "to a cell where there were about 70 parents and other people," and he was held there "approximately for seven days."  SOF ¶ 112.  Federal prosecutors never accepted CBP's referral for Abel's prosecution.  SOF ¶ 113.

Abel did not receive any information about Obet until 50 days after the initial separation.  SOF ¶ 114.  At that time, Abel "received a piece of paper saying that [Obet] was at a place called Cayuga, and that I had a one-minute credit to call."  *Id.*  Abel called the number, but "there was no answer."  *Id.*  Abel was not reunified with Obet until July 25, 2018, approximately 67 days after the initial separation.  SOF ¶ 115.

### 4.   Joel and Mariela

Plaintiff Joel traveled to the United States with his eleven-year-old daughter Mariela to seek asylum.  On May 19, 2018, Joel and Mariela were apprehended by CBP and transported to the Yuma Border Patrol Station.  SOF ¶ 116.  The next day, CBP referred Joel for prosecution and placed Joel and Mariela in separate cells in the Yuma Border Patrol Station.  SOF ¶ 117.  Joel was told that Mariela was going to a place where "she could eat well and where she would be all right."  SOF ¶ 118.  Joel was also told that he would be able to speak to Mariela.  *Id.*  Mariela "didn't go peacefully," and Joel "began to cry like a child, not having her near me."  SOF ¶¶ 119–120.

On May 22, 2018, approximately two days after Joel and Mariela were separated, the U.S. Attorney's office in Arizona notified Border Patrol that it would not accept Joel's case for prosecution for any violations of U.S. immigration laws.  SOF ¶ 121.  Despite knowing that Joel was not going to be prosecuted, CBP kept Joel and Mariela in separate cells at the Yuma Border Patrol Station.  SOF ¶ 122.  On or about May 24, 2018, approximately two

days after the U.S. Attorney's office declined Joel's prosecution referral, Mariela was placed in ORR's custody and transferred to the Southwest Key facility in Brownsville, Texas.  SOF ¶ 123.  Joel was not told about Mariela's transfer or told about her location.  SOF ¶ 125.  Nor was Joel listed on the approved call list for Mariela at Southwest Key.  SOF ¶ 124.  Joel and Mariela were separated for approximately one month before they were able to speak by phone.  SOF ¶ 126.

Mariela remained in ORR custody until she was reunited with Joel on July 22, 2018, approximately 64 days after she was initially separated from her father.  SOF ¶ 127.

### 5.    Rolando and Bertha

On November 13, 2017, Plaintiff Rolando and his nine-year-old daughter Bertha sought asylum in the United States at the Nogales, Arizona port of entry.  SOF ¶ 128.  On November 15, 2017, a Field Officer Juvenile Coordinator ("FOJC") in Phoenix interviewed Rolando and Bertha and verified their parent-child relationship, but requested they be separated anyway on the purported basis of Rolando's immigration and criminal history.  SOF ¶¶ 129–130.  The request was approved within minutes, and officers were instructed to "███████████████████████████████" and to "██████████████████████████████ ███████."  SOF ¶ 130.

Later that day, officers came with chains to Rolando and Bertha's room.  SOF ¶ 131.  The officers grabbed Rolando and took him outside the room.  *Id.*  The officers "shut the door quickly" and left Bertha crying inside.  *Id.*  Bertha later reported that during the separation, an "officer hit [Bertha] with a belt buckle," bruising her.  *Id.*  "The officer told her 'If you don't stop crying, I'm going to hit you more times with the belt.'"  *Id.*  The officers did not let Rolando "say goodbye to [his] daughter."  SOF ¶ 132.  Rolando "wanted to speak with her," but the officers "didn't let [him] speak with her."  *Id.*  The officers did not tell Rolando where they were going to take him or what was happening to him.  *Id.*  After the separation, Rolando was not told "what was going to happen to [Bertha]."  *Id.*

Despite the instruction to "████████████████████████," Bertha was transferred to Cayuga Centers in New York.  SOF ¶¶ 130, 133.  Rolando was not able to

speak with Bertha for six days, when he was able to speak with Bertha for approximately five minutes.  SOF ¶ 134.  When Rolando spoke with Bertha, he did not know "where she was at that time."  SOF ¶ 135.

Rolando was deported to Guatemala without his nine-year-old daughter.  SOF ¶ 136. Over eight months after Rolando was separated from his daughter, they were reunited in Guatemala on July 26, 2018.  SOF ¶ 137.

### 6.   Mario and Antonio

On November 19, 2017, Plaintiff Mario and his seven-year-old son Antonio presented themselves at the Port of Entry in Nogales, Arizona seeking asylum.  SOF ¶ 138.  On November 20, 2017, an FOJC officer requested that Mario and Antonio be separated on the purported basis of Mario's immigration and criminal history.  SOF ¶ 139.  The FOJC officer was instructed to "███████████████████████████████████████████

████████████████████████████████████████."  SOF ¶ 140.  That afternoon, the officer instructed CBP officers at the Nogales Port of Entry to "███████████████

███████████████████████████████████████████████████████████████████████████

███."  SOF ¶ 141.

An officer then informed Mario that he would be separated from his son "whether [Mario] want[ed] it or not."  SOF ¶ 142.  The officer told Mario to "ask [his] son to behave well."  *Id.*  Antonio "screamed" and "cr[ied]" when officers took him from Mario.  SOF ¶ 143.  The officers were not able to take him away during the first attempt.  *Id.*  Two more officers came and grabbed Mario's hands, while a third officer took Antonio away from him. *Id.*  Mario was not told where his son was going or how long he would be separated from his son.  SOF ¶ 144.

Antonio was admitted at Cayuga Centers, an ORR contracted facility in New York City, on November 22, 2017.  SOF ¶ 145.  Mario sent six written requests for information about Antonio's location and how to contact him.  SOF ¶ 146.  He was informed by ICE officers "that they didn't know anything" about Antonio's location.  *Id.*  After approximately his "third request," ICE told Mario that Antonio "was in New York."  *Id.*  The first time

Mario was able to speak with Antonio was on December 8, 2017, over two weeks after their separation.  SOF ¶ 147.

Mario was deported to Guatemala two months later, on January 17, 2018, without his son.  SOF ¶ 148.  About eight months after being separated, Mario and Antonio were finally reunited when Antonio returned to Guatemala on July 26, 2018.  SOF ¶ 150.

**G.  The Government Did Not Reunite Separated Family Members, Including Plaintiffs, Until Ordered to Do So by a Federal Court.**

On June 20, 2018, then-President Trump signed an executive order directing DHS to keep families together and revoking the DHS Referral Policy.  SOF ¶ 73.  But even after the executive order, the government did not direct that separated parents in ICE custody and children in ORR custody be reunited.  Instead, on June 22, 2018, an ICE official wrote to Johnson and Albence that "███████████████████████████████████████████████████████████████████████████████████████████████████████████████████."  SOF ¶ 75.  Similarly, on June 23, 2018, Albence wrote that reunification "wasn't going to happen unless we are directed by the Dept to do so.  We are moving forward w [sic] reunification only for the purposes of removal."  SOF ¶ 77.

On June 22, 2018, HHS created an "unaccompanied children reunification task force" to take the "first step toward reunifying thousands of migrant children in the agency's custody with their families."  SOF ¶ 76.  As of at least June 23, 2018, ORR did not have the information that "was necessary in order to associate children with parents," which meant that reunifying children with parents was "effectively impossible."  SOF ¶ 68.

The government began reunifying families only after the Southern District of California issued a preliminary injunction on June 26, 2018 in the *Ms. L. v. ICE* litigation. *See Ms. L. v. ICE*, 310 F. Supp. 3d 1133 (S.D. Cal. 2018), *modified*, 330 F.R.D. 284 (S.D. Cal. 2019), *enforcement granted in part, denied in part*, 415 F. Supp. 3d 980 (S.D. Cal. 2020).  SOF ¶ 78.  The order preliminarily enjoined the government "from detaining Class Members in DHS custody without and apart from their minor children, absent a determination that the parent is unfit or presents a danger to the child, unless the parent affirmatively, knowingly, and voluntarily declines to be reunited with the child in DHS

custody," ordered the government to "reunify all Class Members with their minor children who are under the age of five (5) within fourteen (14) days of the entry of this Order," and ordered the government to "reunify all Class Members with their minor children age five (5) and over within thirty (30) days after the entry of this order." *Id.*

The same day, ICE ERO Assistant Director Johnson signed a funding request stating that "[d]etained parents that have been separated from their children may experience acute trauma or crisis.  As a result, these detainees may exhibit concerning behaviors or symptoms (e.g. harm to self or others)."  SOF ¶ 79.  As of July 6, 2018, the government still did not have a plan to reunify separated families.  SOF ¶ 80.

## III.   LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial."  *Dominguez v. City of Scottsdale*, 587 F. Supp. 3d 914, 921 (D. Ariz. 2022) (Bolton, J.).  "A fact is 'material' when, under the governing substantive law, it could affect the outcome of the case.  A 'genuine issue' of material fact arises if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Melvin v. United States*, 2010 WL 11628796, at *2 (D. Ariz. Jun. 18, 2010) (Bolton, J.) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Plaintiffs need only "produce sufficient evidence to persuade the court that there is no genuine issue of material fact" to prevail on summary judgment.  *Zhou v. Villa de Paz Apartments, LLC*, 339 F. Supp. 3d 910, 912 (D. Ariz. 2018).  Pursuant to Rule 56(a), a party need not move for summary judgment on the entirety of a claim, but may identify a part of each claim upon which summary judgment is sought.  Fed. R. Civ. P. 56(a); *see Research Corp. Tech. Inc. v. Eli Lilly & Co.*, 2021 WL 4861403, at *16 (D. Ariz. Oct. 19, 2021) (granting summary judgment as to liability on certain counts, and ordering a trial solely on damages for those counts).

## IV.   ARGUMENT

### A.   Partial Summary Judgment Should Be Entered on Plaintiffs' Claim of Intentional Infliction of Emotional Distress.

"The required elements of the tort of intentional infliction of emotional distress are '*first*, the conduct by the defendant must be extreme and outrageous; *second*, the defendant must either intend to cause emotional distress or recklessly disregard the near certainty that such distress will result from his conduct; and *third*, severe emotional distress must indeed occur as a result of defendant's conduct."  *Shields v. Frontier Tech., LLC*, 2012 WL 12538963, at *2 (D. Ariz. Jan. 30, 2012) (Bolton, J.) (quoting *Ford v. Revlon, Inc.*, 734 P.2d 580, 585 (Ariz. 1987)).  Plaintiffs seek summary judgment as to the liability aspects—the first and second elements—of their IIED claim.  Here, the undisputed facts show that (1) the government's separation of families was extreme and outrageous because, as the government admits, separation inflicted harm, SOF ¶¶ 81–84, and because the government separated Plaintiffs in an inhumane manner, *see* SOF ¶¶ 81–84, 92, 101, 113, 121, 86, 88, 98, 111, 121–122, 131, 132, 143, failed to facilitate regular communication among Plaintiff families, *see* SOF ¶¶ 90, 93, 94, 102, 114, 124–126, 134, 146–147, and lacked a plan for reunifying Plaintiff families, *see* SOF ¶¶ 42, 75–80, 88, 95, 97, 103, 106, 110, 115, 117, 127, 129, 137, 139, 150; and (2) the government either intended or had a reckless disregard of the near certainty that such extreme and outrageous conduct would cause severe emotional distress, *see* SOF ¶¶ 59, 64, 11–27, 29–31, 42–44, 47–54, 59, 64, 67–69, 70, 72, 76, 80, 128–150.

### 1.   The Government's Conduct in Connection with Separating Plaintiff Families Was Extreme and Outrageous.

Conduct is extreme and outrageous when it is "'atrocious and beyond all possible bounds of decency so that an average member of the community would regard it as outrageous.'"  *Doe v. Oesterblad*, 2015 WL 12940181, at *5 (D. Ariz. Jun. 9, 2015) (Bolton, J.) (quoting *Lucchesi v. Frederic N. Stimmell, M.D., Ltd.*, 716 P.2d 1013, 1015 (Ariz. 1986)).  Courts have long held that there are "few acts more calculated to engender a sense of outrage in both the victim and the average member of the community" than the government's act of

separating children from parents.  *Pankratz v. Willis*, 744 P.2d 1182, 1189 (Ariz. Ct. App. 1987) (affirming jury verdict finding intentional infliction of emotional distress where a child's grandparents aided the mother in separating the child from her father, and compiling cases finding that "unilateral separation of a child from a parent can be extreme and outrageous conduct"); *see also Carranza v. United States*, 2013 WL 3333104, at *8 (D. Or. July 1, 2013) (holding that a mother sufficiently stated an IIED claim where ICE officers threatened to send her to Mexico and place her daughters in a foster home where they would not know who their family was and she would not see them again); *Kajtazi v. Kajtazi*, 488 F. Supp. 15, 20 (E.D.N.Y. 1978) (finding it "difficult to conceive of intentional conduct more calculated to cause severe emotional distress than the outrageous conduct of the defendant" in separating child from mother).  Here, there is no dispute that the government's conduct in separating Plaintiffs—even going so far as to deport parents without their minor children—fell beyond all possible bounds of decency.

*First*, the government's decision to separate the Plaintiff families, in and of itself, was extreme and outrageous.  The undisputed evidence demonstrates that separating families inflicts harm and "immense trauma."  SOF ¶ 84.  Government officials have *admitted* as much, describing the government's conduct in separating families as atrocious and beyond all possible bounds of decency, using terms like "human tragedy," "unconscionable," "cruel," and "shameful."  SOF ¶¶ 81–84; *see Oesterblad*, 2015 WL 12940181, at *5.  Moreover, for Plaintiffs separated in 2018 pursuant to the DHS Referral Policy, the government's stated justification for separation was pretextual at best—the government separated families regardless of whether prosecution of the father would occur.  Not one of them was prosecuted despite the government's position that they were "amenable" for prosecution.  SOF ¶¶ 92, 101, 113, 121.

*Second*, the government cruelly separated all Plaintiffs, often by force, without warning, and with little to no opportunity to say goodbye.  José and Herlinda were threatened by an agent who told them "you're all going to be locked up, and we're going to take your children away, and they're going to go to a place for minors."  SOF ¶ 86.  José was then

instructed to bathe and dress Herlinda and told to "say goodbye" to her before agents pulled Herlinda off of José and carried her away.  SOF ¶ 88.  Alicia was separated from Heriberto by an officer who, after Alicia tried to run back to Heriberto and fell down, picked Alicia up and carried her away on his shoulder.  SOF ¶ 98.  Five armed officers separated Abel and Obet by force.  SOF ¶ 111.  CBP kept Joel and Mariela in separate cells *at the same Border Patrol station* "for approximately a day-and-a-half or more *after the prosecution declination happened*."  SOF ¶¶ 121–122 (emphasis added).  Rolando and Bertha were separated by officers carrying chains, one of whom hit Bertha with a belt buckle.  SOF ¶ 131.  Rolando was not allowed to "say goodbye to [his] daughter."  SOF ¶ 132.  And after officers were unable to take away his screaming and crying son in their first attempt, two officers restrained Mario while a third took seven-year-old Antonio away.  SOF ¶ 143.

*Third*, the government failed to inform Plaintiff fathers of the whereabouts of their separated children—who had been flown hundreds of miles away to ORR facilities—or allow Plaintiffs to communicate with one another.  José was never provided information about how to communicate with five-year-old Herlinda, and he did not speak with her until over three weeks after their separation.  SOF ¶¶ 90, 93.  LSS, where Herlinda was placed, did not know where José was located or how to contact him for approximately two months.  SOF ¶ 94.  Heriberto was unable to contact Alicia for 17 days.  SOF ¶ 102.  Abel did not receive any information about Obet until 50 days after they were separated, at which point he "received a piece of paper saying that [Obet] was at a place called Cayuga, and that I had a one-minute credit to call."  SOF ¶ 114.  Abel called the number, but "there was no answer." *Id.*  Joel, meanwhile, did not know Mariela's location and was not able to speak with her for approximately one month.  SOF ¶¶ 124–126.  Rolando was not told where Bertha was taken or what would happen to her, and he was not able to speak with her until his five-minute phone call with her six days after their separation.  SOF ¶ 134.  Mario was not able to speak with Antonio until over two weeks after their initial separation, and only after he submitted multiple written requests for Antonio's location and contact information.  SOF ¶¶ 146–147.

*Fourth*, Plaintiffs remained separated for months, and the government took no steps to reunite Plaintiffs until after a court order forced the government to do so.  José and Herlinda were separated for approximately 74 days, Heriberto and Alicia for 110 days, Abel and Obet for 67 days, and Joel and Mariela for 64 days.  *See* SOF ¶¶ 88, 95, 97, 106, 110, 115, 117, 127, 129, 137, 139, 150.  The government also deported Heriberto on the false pretenses that "█████████████████████████████"; instead, Alicia remained in ORR custody for nearly three months after Heriberto signed his deportation order.  SOF ¶¶ 103, 106.  Rolando and Bertha, as well as Mario and Antonio, were not reunited until more than *eight months* after they were separated.  SOF ¶¶ 129, 137, 139, 150.

Such facts are sufficient to conclude that the government's conduct in separating Plaintiffs was extreme and outrageous.  As courts addressing the government's implementation of family separation have consistently concluded, separating parents from their children and failing to reunify them, "combined with the manner in which that practice [was] implemented, e.g., the lack of any effective procedures or protocols for notifying the parents about their children's whereabouts or ensuring communication between parents and children," shocks the conscience.  *Ms. L.*, 310 F. Supp. 3d at 1145–46 ("A practice of this sort implemented in this way is likely to be 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience,' interferes with rights 'implicit in the concept of ordered liberty[,] and is so 'brutal' and 'offensive' that it [does] not comport with traditional ideas of fair play and decency." (citations omitted)); *W.S.R. v. Sessions*, 318 F. Supp. 3d 1116, 1126 (N.D. Ill. 2018) ("[T]he government's insistence on keeping these boys from their father can only be deemed arbitrary and conscience shocking."); *cf. D.J.C.V. v. United States*, 605 F. Supp. 3d 571, 601 (S.D.N.Y. 2022) (denying motion to dismiss and holding that allegations that the government separated plaintiffs to deter migration and failed to give parents information about where their children were or to facilitate communication with them "easily" satisfied the extreme and outrageous conduct element).

1
2
3

The government's admissions and the undisputed facts of Plaintiffs' separations leave no doubt that the government's conduct in separating Plaintiffs was extreme and outrageous.  Summary judgment should be entered for Plaintiffs on this element.

4
5

> **2.    The Government Recklessly Disregarded That Its Extreme and Outrageous Conduct in Separating Families Would Cause Emotional Distress.**

6
7
8
9
10
11
12
13

The evidence makes clear that the government knew family separations would cause distress, and the government separated families intending to cause distress.  That is why government officials expressed "that the expectation is that we are NOT to reunite the families and release," and they believed that CBP reunifying families would "undermine[] the entire effort."  SOF ¶¶ 59, 64.  But the Court need not probe the government's intent to enter summary judgment for Plaintiffs.  For the purposes of IIED, it is enough that the government acted "with reckless disregard of the near-certainty that . . . distress would result."  *Pierre-Canel v. Am. Airlines*, 375 F. Supp. 3d 1044, 1055 (D. Ariz. 2019).

14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

"The critical difference between intentional and reckless misconduct is the necessary state of mind; for conduct to be reckless, the person must intend the reckless act but need not intend to cause the resulting harm.  To establish recklessness, it is sufficient that the person realizes (or should realize) the 'strong probability that harm may result, even though he hopes or even expects that his conduct will prove harmless.'"  *In re Plyam*, 530 B.R. 456, 467 (B.A.P. 9th Cir. 2015) (citing Restatement (Second) of Torts § 500 cmt. f); *see also* Restatement (Second) of Torts § 46 cmt. i (defining "reckless" in the context of infliction of emotional distress with reference to Restatement (Second) of Torts § 500). Thus, if the government knew or should have known that by engaging in the extreme and outrageous conduct there was a near certainty or strong probability it would cause severe emotional distress, the element is satisfied.  *See Aguchak v. United States*, 747 F. App'x 503, 505 (9th Cir. 2018) (citing Restatement (Second) of Torts § 500 in affirming that the evidence established the government was reckless because it "knew, or should have known" the "risk and severity of harm"); *Pankratz*, 744 P.2d at 1187; *see also* Restatement (Second) of Torts § 46 cmt. i (recklessness requires "a deliberate disregard of the high degree of probability

that the emotional distress will follow"); *Kawaahau v. Geiger*, 523 U.S. 57, 61-62 (1998) ("Intentional torts generally require that the actor intend 'the *consequences* of an act,' not simply 'the act itself.'").  Here, the undisputed evidence establishes that the government's decision to separate Plaintiffs was with reckless disregard for the distress that would result and that the government admitted *did* result.

*First*, the government acted with reckless disregard when it separated Rolando and Bertha as well as Mario and Antonio (hereinafter "2017 Plaintiffs") in November 2017.  SOF ¶¶ 128–150.  It is undisputed that by March 2017, the government knew that separating families would inflict harm on migrants because 184 immigration advocacy organizations, the AAP, and eighty Members of Congress all informed the government that separating children from parents would "only further traumatize those already fleeing harm," and that the government was not prepared to handle an influx of separated children.  SOF ¶¶ 11–13. But even more, the government also knew firsthand of the near certainty and substantial probability of harm that family separations would cause based on its own experiences separating families during the El Paso Initiative starting in March 2017.  SOF ¶¶ 14–27.

There is no dispute that on November 2, 2017—before Plaintiffs Rolando and Bertha or Mario and Antonio were separated, SOF ¶¶ 128, 138—U.S. Magistrate Judge Miguel Torres "expressed concern" as he had "repeatedly been apprised of concerns voiced by defense counsel and by defendants regarding their limited and often non-existent . . . information about the well-being and whereabouts of their minor children from whom they were separated at the time of their arrest."  SOF ¶ 20.  It is also undisputed that federal prosecutors believed that "█████████████████████████████████████ █████" SOF ¶ 27, and the El Paso Sector acknowledged that "███████████████████ ██████████████████████████████" was needed so that "██████████████████████ █████████████████████████," SOF ¶ 25.  "CBP headquarters personnel" were also "aware of the various system deficiencies related to tracking family separations" during the Initiative and that "necessary system changes were not made" by CBP

headquarters to help "track family separations was not a high enough priority to warrant the time and resources required for system modifications."  SOF ¶ 23.

Despite having multiple sources of information, including its own firsthand experiences, confirming that separating families would cause harm, the government still chose to separate Plaintiffs Rolando and Bertha as well as Mario and Antonio.  SOF ¶¶ 128–150.  Summary judgment should therefore be entered for 2017 Plaintiffs as to the element that the government acted with reckless disregard when it separated each Plaintiff family and did not reunite them for months.

*Second*, the government similarly acted with reckless disregard when it adopted the DHS Referral Policy, which resulted in the separations of Plaintiffs José and Herlinda, Heriberto and Alicia, Abel and Obet, and Joel and Mariela (hereinafter "2018 Plaintiffs").  Before the government enacted the DHS Referral Policy in May 2018, there is no dispute that (in addition to the facts just recited):

- The government knew family separations "deprive[] family members the ability, given their detention, to locate each other and be reunited," and that "family members are given little to no information on what happens to those from whom they are separated, including how to locate, contact, or reunite with them."  SOF ¶ 26.

- Doctors and immigration advocates informed the government that separating families would harm parents and children.  SOF ¶ 29.  Indeed, DHS Chief of Staff Chad Wolf testified that, as of at least "early 2018," DHS Secretary Nielsen had been informed "about the possibility that separation of families would be detrimental to the health, safety and well-being of children."  SOF ¶ 31.

- The government knew separating families would "███████████████████████████████████████████████████████████████████████"  SOF ¶ 43.

- The government knew separating families would require "██████████████" between government agencies.  SOF ¶ 25.

Yet, when the government enacted the DHS Referral Policy, it is undisputed that:

- The government failed to inform key personnel that the DHS Referral policy would be enacted before these officials were directed to implement it.  ICE, ORR, CRCL officials, and Border Patrol agents—the officials responsible for separating, prosecuting, caring for, and/or housing separated families—testified they were not informed about the DHS Referral Policy before it was enacted or trained on how to implement it.  *See* SOF ¶¶ 47–54.

- The government did not have a plan that would allow families, including Plaintiffs, to regularly communicate while separated.  Senior government officials were aware of the communication issues prior to and during the implementation of the DHS Referral Policy.  *See, e.g.*, SOF ¶¶ 23, 26, 67, 70, 72.

- With respect to reunification of families, the DHS Referral Policy did not even mention reunifications, let alone set forth or direct anyone to develop a reunification plan.  SOF ¶ 42.  And no prior reunification plan existed.  SOF ¶¶ 68–69, 72, 80.

Such undisputed facts show that the government recklessly disregarded the near certainty and substantial probability that the family separations that would result from adopting the DHS Referral Policy, including of 2018 Plaintiffs, would cause distress.  The recklessness of the government's conduct is further underscored by what took place *after* the DHS Referral Policy was enacted.  For instance, it is undisputed that *three months* after the DHS Referral Policy was implemented, the government was *still* attempting to create a system that would allow for regular communication between separated families.  *See* SOF ¶ 80.  Commander White testified that this failure to ensure communication "create[d] profound barriers to the case management of the child to find an appropriate sponsor, and pose[d] significant psychological risk to the child, because it interrupts the caring relationship."  SOF ¶ 70.  Furthermore, because DHS "did not establish a plan for . . . reunify[ing] separated family members . . . . ICE ERO personnel were not prepared to deal

1   with the myriad nuanced circumstances surrounding family separations." SOF ¶ 47.  As a

2   result, most families separated under the DHS Referral Policy, including Plaintiffs, were not

3   reunited until a federal court ordered the government to do so.  *See Ms. L.*, 310 F. Supp. at

4   1149.  Last, because the government failed to track all separated families, *see* SOF ¶¶ 42,

5   68–69, 72, the government was forced to create an emergency response team to reunify

6   separated families, *see* SOF ¶ 76, 80.  Accordingly, summary judgment should be entered

7   for the 2018 Plaintiffs as to their claim that the government acted with reckless disregard in

8   enacting the DHS Referral Policy that resulted in their separations.

9   *** 

10   In sum, there is no dispute that the government was informed repeatedly about the

11   significant emotional distress that would be inflicted on migrant parents and children if it

12   separated families.  SOF ¶¶ 11–13, 20, 26, 29–31.  There is no dispute that the government

13   had no plan to allow separated families to communicate with one another regularly or to

14   track separated families, let alone to reunify separated parents and children.  SOF ¶¶ 23, 26,

15   42, 47, 67–70, 72, 80.  The government separated families anyways in 2017 and 2018, and

16   it has since admitted that separating families was extreme and outrageous, SOF ¶¶ 79, 81–

17   84.  As the government's actions in separating Plaintiffs, by its own admission, were extreme

18   and outrageous, and the undisputed evidence shows that, at a minimum, the government

19   decision to separate Plaintiffs was with reckless disregard of the harm that may (and did)

20   result, *see Aguchak*, 747 F. App'x at 505; *Pankratz*, 744 P.2d at 1189; Restatement (Second)

21   of Torts § 500 cmt. f., the Court should enter partial summary judgment for Plaintiffs on

22   their IIED claim.

23   **B.**   **Partial Summary Judgment Should Be Entered on Plaintiffs' Claim of Negligence.**

24

25   "To establish a claim for negligence, a plaintiff must prove four elements: (1) a duty

26   requiring the defendant to conform to a certain standard of care; (2) a breach by the

27   defendant of that standard; (3) a causal connection between the defendant's conduct and the

28   resulting injury; and (4) actual damages."  *Certain Underwriters at Lloyds v. Dowdy*, 2015

   WL 12592103, at *4 (D. Ariz. Apr. 6, 2015) (Bolton, J.) (quoting *Gibson v. Kasey*, 150 P.3d

228, 230 (Ariz. 2007)).  The government owed a duty of care to the migrant families it took into custody, and it breached that duty when it forcefully separated parents from their children, SOF ¶¶ 86, 88, 98, 111, 117–123, 131–132, 143, sent them separately to facilities far away from each other, SOF ¶¶ 91, 100, 114, 123, 133, 145, failed to provide contact between them for weeks at a time, SOF ¶¶ 90, 93, 102, 114, 124–126, 134, 146–147, and failed to devise any plans for reuniting those families until their hand was forced by judicial intervention, SOF ¶¶ 75–80.  Summary judgment should therefore be entered for Plaintiffs' claim that (1) the government owed Plaintiffs a duty of care while Plaintiffs were in its custody, and (2) the government breached that duty.

### 1.    The Government Owed a Duty Of Care to Plaintiffs.

Determining whether a duty exists "is a legal matter to be determined before the case-specific facts are considered," *Quiroz v. ALCOA Inc.*, 416 P.3d 824, 828 (Ariz. 2018), and thus appropriate for summary judgment.  "[D]uty in Arizona is based on either recognized common law special relationships or relationships created by public policy."  *Id*. at 829.  A special relationship can arise from common law, from "conduct undertaken by the defendant," or can be "created by statute."  *Id*.  A special relationship can also exist when "[o]ne who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection." *DeMontiney v. Desert Manor Convalescent Ctr. Inc.*, 695 P.2d 255, 260 (Ariz. 1985) (quoting Restatement (Second) of Torts § 314A (1965)); *see also Fleming v. State Dep't of Pub. Safety*, 352 P.3d 446, 448 (Ariz. 2015) ("[U]nder our common law, when DPS takes custody of someone . . . it assumes a duty to protect that person against unreasonable risk of physical harm."); *Estate of Smith v. Shartle*, 2020 WL 1158552, at *2 (D. Ariz. Mar. 10, 2020) ("BOP has a duty to ensure the safety of the persons who reside at the facility.").

As this Court previously held, "[f]ederal immigration officials too, are tasked with the care and custody of those they detain, and owe detainees at least a minimal level of care." *See* Dkt. No. 36 (citing *C.M. v. United States*, 2020 WL 1698191, at *2 (D. Ariz. Mar. 30, 2020)).  There is no dispute that Plaintiffs were detained by the government after crossing

the border seeking asylum or presenting at a port of entry to seek asylum.  SOF ¶¶ 85, 96, 107, 116, 128, 138.  As such, the government was "tasked with the care and custody" of Plaintiffs, and it owed Plaintiffs "at least a minimal level of care."  *See C.M.*, 2020 WL 1698191, at *2.

### 2.     The Government Breached Its Duty Of Care to Plaintiffs.

In assessing whether a duty of care is breached "[i]n negligence cases," the question is whether there was "reasonable care under the circumstances."  *Markowitz v. Ariz. Parks Bd.*, 706 P.2d 364, 368 (Ariz. 1985).  The standard for reasonable care can be based on standard government manuals.  *See Cobler v. United States*, 2022 WL 625710, at *9 (D. Ariz. Jan. 12, 2022).  Furthermore, "[f]oreseeability can also . . . determine whether the defendant breached the relevant standard of care."  *Quiroz*, 416 P.3d at 828.

Here, the undisputed facts show that the government failed to exercise even a minimal level of care to Plaintiffs.  As discussed above, the government's undisputed conduct— including forcibly separating Plaintiffs, transporting Plaintiff parents and children to facilities far away from each other, failing to provide contact between them for weeks at a time, and failing to devise any plans for reuniting those families—was extreme and outrageous.  *Supra* Section IV.A.1.  In addition to supporting Plaintiffs' IIED claim, these undisputed facts also demonstrate that the government breached its duty of care to Plaintiffs.

The government also violated its own standards for the treatment of detained migrants and the standards set forth in a Court-ordered settlement agreement.  The government's standards require that "CBP [ ] maintain family unity to the greatest extent operationally feasible, absent a legal requirement or an articulable safety or security concern that requires separation."  SOF ¶ 2; *see also* SOF ¶ 3.  Yet the government failed to reunify Plaintiffs for months.  *See* SOF ¶¶ 75–80, 88, 95, 97, 106, 110, 115, 117, 127, 130, 137, 139, 150.  The government's standards also allow detainees to "request to call immediate family or others in personal or family emergencies on an as-needed basis."  SOF ¶ 4.  Likewise, under the *Flores* settlement, the government is required to provide "contact with family members who were arrested with the minor."  *Flores v. Barr*, 934 F.3d 910, 913 (9th Cir.

2019) (quotation omitted).  But the government failed to provide contact between Plaintiff fathers and children, in some cases for as long as fifty days, after it separated them from each other.  SOF ¶¶ 90, 93, 102, 114, 124–126, 134, 146–147; *see generally D.J.C.V.*, 605 F. Supp. 3d at 601–02 (denying motion to dismiss FTCA claim in part because plaintiffs adequately "alleged that Government agents violated their duty to act with ordinary care towards them by separating parent and child and preventing them from communicating"). Furthermore, the government was explicitly warned that it was not prepared to separate parents and children, and it failed to reunite families even as those warnings came to fruition. *See supra* Section IV.A.2; *Watson v. United States*, 133 F. Supp. 3d 502, 526 (E.D.N.Y. 2015) ("If the USCIS were a private entity and had knowledge of a condition which it could eliminate and which would foreseeably cause harm to a specific individual, then its failure to avoid the harm by reasonable means would be actionable negligence.").

## V.    CONCLUSION

Based on the foregoing, the Court should grant partial summary judgment to Plaintiffs and find that, with respect to Count I (IIED), the government (a) engaged in extreme and outrageous conduct (b) with an intent to cause, or a reckless disregard of causing, severe emotional distress; and with respect to Count II (Negligence), the government (a) owed Plaintiffs a duty of care and (b) the government breached its duty.

Respectfully submitted this 9th day of March, 2023.

By */Keith Beauchamp/*
COPPERSMITH BROCKELMAN PLC
Keith Beauchamp
D. Andrew Gaona

COVINGTON & BURLING LLP
Matthew J. Schlesinger*
Jason A. Carey*
Jennifer L. Saulino*
Terra White Fulham*
Teresa S. Park*
Kathleen E. Paley*
Kavita R. Pillai*
Emily R. Woods*
Kristin M. Cobb*
Shadman Zaman*
Stephen Rees*†
Paulina Slagter*
Samuel Greeley*
Joshua Silver*
Patrick Lee*
One City Center, 850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: (202) 662-5581
mschlesinger@cov.com
jcarey@cov.com
jsaulino@cov.com
tfulham@cov.com
tpark@cov.com
kpaley@cov.com
kpillai@cov.com
rwoods@cov.com
kcobb@cov.com
szaman@cov.com
srees@cov.com
pslagter@cov.com
sgreeley@cov.com
jsilver@cov.com
plee@cov.com

SOUTHERN POVERTY LAW CENTER
Norma Ventura*
James Knoepp*
Sharada Jambulapati*
150 E. Ponce de Leon, Suite 340
Decatur, GA 30030
Telephone: (404) 521-6700
norma.ventura@splcenter.org
jim.knoepp@splcenter.org
sharada.jambulapati@splcenter.org

SOUTHERN POVERTY LAW CENTER
Paul R. Chavez*
2 S. Biscayne Boulevard, Suite 3750
Miami, FL 33137
Telephone: (786) 347-2056
paul.chavez@splcenter.org

*Attorneys for Plaintiffs A.P.F. et al.*
*\* Admitted pro hac vice*
*† Admitted only in Illinois, not admitted in the District of Columbia, and supervised by principals of the firm.*