BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division
JAMES G. TOUHEY, JR.
Director, Torts Branch
PHILIP D. MACWILLIAMS
Trial Attorney
D.C. Bar No. 482883
E-mail: phil.macwilliams@usdoj.gov
U.S. Department of Justice
Civil Division, Torts Branch
Benjamin Franklin Station, P.O. Box 888
Washington, DC 20044
Telephone: (202) 616-4285
Attorneys for the United States of America

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| A.P.F. on his own behalf and on behalf of his minor child, O.B.; J.V.S., on his own behalf and on behalf of his minor child H.Y.; J.D.G. on his own behalf and on behalf of his minor child, M.G.; H.P.M. on his own behalf and on behalf of his minor child, A.D.; M.C.L. on his own behalf and on behalf of his minor child, A.J.; and R.Z.G. on his own half and on behalf of his minor child, B.P., <br><br> Plaintiffs, <br><br> v. <br><br> United States of America, <br><br> Defendant. | No. 2:20-CV-00065-SRB <br><br> **MOTION FOR SUMMARY JUDGMENT** |

**TABLE OF AUTHORITIES**

**Statutes:**

6 U.S.C. § 202 ................................................................................................ 11

6 U.S.C. § 251 ................................................................................................ 18

6 U.S.C. § 279(a) .............................................................................................. 3

6 U.S.C. § 279(b)(1)(A) .................................................................................... 3

6 U.S.C. § 279(b)(1)(C) .................................................................................... 3

6 U.S.C. § 279(g)(2) .......................................................................................... 3

6 U.S.C. § 552(d) .............................................................................................. 3

8 C.F.R. § 235.3(b)(2)(iii) ................................................................................ 3

8 C.F.R. § 235.3(b)(4)(ii) ................................................................................. 3

8 U.S.C. § 1103 ......................................................................................... 11, 12

8 U.S.C. § 1182(d)(5) .................................................................................. 3, 22

8 U.S.C § 1225(b) ............................................................................................. 3

8 U.S.C § 1226 ................................................................................................. 3

8 U.S.C § 1226 (a)(2) ....................................................................................... 3

8 U.S.C. § 1231 ........................................................................................... 3, 18

8 U.S.C. § 1232 ................................................................................................. 3

8 U.S.C § 1325 ......................................................................................... 2, 3, 10

8 U.S.C § 1326 ................................................................................................. 2

8 U.S.C § 1357 ................................................................................................. 2

28 U.S.C. § 1346 ......................................................................................... 6, 29

28 U.S.C. § 1346(b)(1) ..................................................................................... 5

28 U.S.C. § 2671 .............................................................................................. 5

28 U.S.C. § 2680 ............................................................. 1, 5, 9, 10, 17, 23

42 U.S.C. § 1983 ......................................................................................... 7, 8

**Cases:**

*A.P.F. v. United States,*
   492 F. Supp. 3d 989 (D. Ariz. 2020) .................................................. 18, 23

*Aguilar v. United States Immigr. & Customs Enf't,*
   510 F.3d 1 (1st Cir. 2007) ................................................................. 27-28

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986) ................................................................................ 6

*Bodett v. CoxCom, Inc.,*
   366 F.3d 736 (9th Cir. 2004) .............................................................. 29

*B.A.D.J. v. United States,*
   No. CV-21-00215, 2022 WL 11631016 (D. Ariz. Sept. 30, 2022) ............................ 7

*Baie v. Sec'y of Def.,*
   784 F.2d 1375 (9th Cir. 1986) ............................................................ 15

*Barton v. Barr,*
   140 S. Ct. 1442 (2020) ........................................................................ 2

*Berkovitz v. United States,*
   486 U.S. 531 (1988) ......................................................................... 9, 23

*Bivens v. Six Unknown Fed. Narcotics Agents,*
   403 U.S. 388 (1971) .............................................................................. 8

*Blanco Ayala v. United States,*
   386 F. Supp. 3d 635 (E.D. Va. 2019) .................................................. 22

*Blanco Ayala v. United States*,
   982 F.3d 209 (4th Cir. 2020) ................................................................... 15

*Bryan v. United States*,
   913 F.3d 356 (3d Cir. 2019) ................................................................... 24

*Butz v. Economou*,
   438 U.S. 478 (1978) ................................................................................ 24

*Caban v. United States*
   728 F.2d 68 (2d Cir. 1984) ..................................................................... 30

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) .................................................................................. 5

*Chadd v. United States*,
   794 F.3d 1104 (9th Cir. 2015) ................................................................... 9

*City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*,
   538 U.S. 188 (2003) ................................................................................ 27

*Clark v. Suarez Martinez*,
   543 U.S. 371 (2005) ................................................................................ 18

*Comm. of Cent. Am. Refugees v. I.N.S.*,
   795 F.2d 1434 (9th Cir. 1986) ................................................................. 18

*County of Sacramento v. Lewis*,
   523 U.S. 833 (1998) ............................................................................ 25-26

*Correction Servs. Corp. v Malesko*,
   534 U.S. 61 (2001) ................................................................................... 8

*D.B. v. Poston*,
   119 F. Supp. 3d 472 (E.D. Va. 2015) ...................................................... 15

*Daigle v. United States*,

    972 F.2d 1527 (10th Cir. 1992) ................................................................ 13

*Delgado Immigr. & Naturalization Servs.*,

    637 F.2d 762 (10th Cir. 1980) .................................................................. 25

*Demetrulias v. Wal-Mart Stores Inc.*,

    917 F. Supp. 2d 993 (D. Ariz. 2013) ....................................................... 29

*Demore v. Kim*,

    538 U.S. 510 (2003) ................................................................................. 18

*Dep't of Commerce v. New York*,

    139 S. Ct. 2551 (2019) ............................................................................. 27

*DHS v. Regents of Univ. Of Cal.*,

    140 S. Ct. 1891 (2020) ............................................................................. 27

*F.R. v. United States*,

    No. CV-21-00339, 2022 WL 2905040 at (D. Ariz. July 22, 2022) ............................. 7

*Fang v. United States*,

    140 F.3d 1238 (9th Cir. 1998) ................................................................. 13

*Fazaga v. Fed. Bureau of Investigation*,

    916 F.3d 1202 (9th Cir. 2019) ................................................................. 24

*FDIC v. Meyer*,

    510 U.S. 471 (1994) ....................................................................... 6, 8, 24

*Fisher Bros. Sales, Inc. v. United States*,

    46 F.3d 279 (3d Cir. 1995) ...................................................................... 17

*Ford v. Revlon, Inc.*,

    734 P.2d 580 (Ariz. 1987) ....................................................................... 29

*Franklin Sav. Corp. v. United States*,

    180 F.3d 1124 (10th Cir. 1999) ...................................................................... 26

*Freeman v. United States*,

    556 F.3d 326 (5th Cir. 2009) ................................................................... 13, 14

*Galicia v. United States*,

    No. CV 13-0105, 2015 WL 12696086 (D.N.M. Feb. 24, 2015) ................................. 30

*Gandarillas-Zambrana v. BIA*,

    44 F.3d 1251 (4th Cir. 1995) ...................................................................... 18

*Gasho v. United States*,

    39 F.3d 1420 (9th Cir. 1994) ...................................................................... 14

*GATX/Airlog Co. v. United States*,

    286 F.3d 1168 (9th Cir. 2002) ...................................................................... 9

*Gen. Dynamics Corp. v. United States*,

    139 F.3d 1280 (9th Cir. 1998) ..................................................................... 11

*Gonzalez v. United States*,

    814 F.3d 1022 (9th Cir. 2016) ............................................................. 9, 10, 22

*Harlow v. Fitzgerald*,

    457 U.S. 800 (1982) ............................................................................... 23

*In re Sealed Case*,

    829 F.2d 50 (D.C. Cir. 1987) ..................................................................... 10

*J.F.G. v. Hott*,

    921 F.3d 204 (4th Cir. 2019) ...................................................................... 25

*Johnson v. McDonald*,

    3 P.3d 1075 (Ariz. Ct. App. 1995) ................................................................. 29

*K.W. Thompson Tool Co. v. United States*,
836 F.2d 721 (1st Cir. 1988) ..................................................... 14

*Kelly v. United States*,
241 F.3d 755 (9th Cir. 2001) ..................................................... 9

*Kennewick Irr. Dist. v. United States*,
880 F.2d 1018 (9th Cir. 1989) ..................................................... 10

*Laird v. Nelms*,
406 U.S. 797 (1972) ..................................................... 6

*Lee v. United States*,
No. CV 19-08051, 2020 WL 6573258 (D. Ariz. Sept. 18, 2020) ............................ 6-7

*Lerner v. John Hancock Life Ins.*,
No. CV-09-01933, 2011 WL 13185713 (D. Ariz. Mar. 21, 2011) ........................... 30

*Lewis v. Dirt Sports LLC*,
259 F. Supp. 3d 1039 (D. Ariz. 2017) ..................................................... 28

*Marin-Garcia Holder v. Holder*,
647 F.3d 666 (7th Cir. 2011) ..................................................... 25

*Meier v. United States*,
No. C 05-04404, 2006 WL 3798160 (N.D. Cal. Dec. 22, 2006) ............................ 7

*Mejia-Mejia v. ICE*,
No. 18-1445, 2019 WL 4707150 (D.D.C. Sept. 26, 2019) ........................ 12

*Milan-Rodriguez v. Sessions*,
No. 16-cv-1578, 2018 WL 400317 (E.D. Cal. June 6, 2018) ................ 27-28

*Mintz v. Bell Atl. Sys. Leasing Intern., Inc.*,

905 P.2d 559 (Ariz. Ct. App. 1995) ............................................................ 29, 30

*Mirmehdi v. United States*,

662 F.3d 1073 (9th Cir. 2011) ................................................................... 19

*Monell v. New York City Dept. of Social Servs*,

436 U.S. 658 (1978) ................................................................................ 7

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*,

210 F.3d 1099 (9th Cir. 2000) ................................................................... 5

*Nurse v. United States*,

226 F.3d 996 (9th Cir. 2000) ............................................................ 9, 10, 24

*Ouellette v. Beaupre*,

977 F.3d 127 (1st Cir. 2020) ................................................................. 7-8

*Payne-Barahana v. Gonzales*,

474 F.3d 1 (1st Cir. 2007) ....................................................................... 25

*Peña Arita v. United States*,

470 F. Supp. 3d 663 (S.D. Tex. 2020) ................................................... 12, 19

*Redmond v. Shilosky, Dillard Dep't Stores v. Silva*,

106 S.W.3d 789 (Tex. App.—Texarkana 2003, pet. granted), 148 S.W.3d 370 (Tex.

2004) ................................................................................................. 30

*Reno v. Am.-Arab Anti-Discrimination Comm.*,

525 U.S. 471 (1999) ............................................................................... 10

*Reynolds v. United States*,

549 F.3d 1108 (7th Cir. 2008) ................................................................. 10

*Richards v. United States*,

369 U.S. 1 (1962) ................................................................................. 29

*S.E.B.M. v. United States*,

    No. 1:21-cv-0, 2023 WL 2383784 (D.N.M. Mar. 6, 2023)................ 11,  17, 26, 28, 30

*Savage v. Boise*,

    272 P.2d 349 (Ariz. 1954) ................................................................. 30

*Sloan v. H.U.D.*,

    236 F.3d 756 (D.C. Cir. 2001) ......................................................... 14

*Smith v. United States*,

    375 F.2d 243 (5th Cir. 1967) ........................................................... 10

*Tsolmon v. United States*,

    841 F.3d 378 (5th Cir. 2016) ........................................................... 14

*United States v. Dominguez-Portillo*,

    2018 WL 315759 (W.D. Tex. Jan. 5, 2018)..................................... 25

*United States v. Flores-Montano*,

    541 U.S. 149 (2004) ......................................................................... 11

*United States v. Gaubert*,

    499 U.S. 315 (1991) ................................................................ 9, 10, 26

*United States v. Varig Airlines*,

    467 U.S. 797 (1984) ......................................................................... 10

*Van Dinh v. Reno*,

    197 F.3d 427 (10th Cir. 1999) ......................................................... 18

*Vill. of Arlington Heights v. Metropolitan Housing Dev. Corp.*,

    429 U.S. 252 (1977) ..................................................................... 26-27

*Walding v. United States*,

    955 F. Supp. 2d 759 (W.D. Tex. 2013) ........................................... 18

*Waldon v. Covington*,

415 A.2d 1070 (D.C. 1980) ......................................................... 29

*Weissich v. United States*,

4 F.3d 810 (9th Cir. 1993) ......................................................... 22

*Wilson v. Layne*,

526 U.S. 603 (1999) ......................................................... 23

*Xue Lu v. Powell*

621 F.3d 944 (9th Cir. 2010) ......................................................... 24

*Ziglar v. Abbasi*,

137 S. Ct. 1843 (2017) ......................................................... 8

**Federal Rules of Civil Procedure:**

Fed. R. Civ. P. 56 ......................................................... 5

**Restatements:**

Restatement (Second) of Torts

§ 46, comment g ......................................................... 30

In May of 2018, Plaintiffs A.P.F., J.V.S., J.D.G., and H.P.M. and their children, O.B., H.Y., M.G., and A.D., respectively, were apprehended for unlawfully crossing the Southwest Border of the United States between ports of entry.  Pursuant to a policy issued that month by the then-Secretary of Homeland Security, U.S. Border Patrol initiated the process of referring the adult Plaintiffs for prosecution and designated their children for separate placement by the Department of Health and Human Services' Office of Refugee and Resettlement ("ORR").  The parents and children were separated following the decision to initiate the prosecution referral process and—although the adult Plaintiffs were ultimately not prosecuted—the families remained separated while the adults were detained by U.S. Immigration and Customs Enforcement ("ICE") pending removal proceedings.

The Department of Homeland Security ("DHS") referral policy was one of the prior Administration's responses to high rates of illegal migration across the Southwest Border.  Under the policy, U.S. Border Patrol Sectors along the Southwest Border were directed to refer for prosecution all amenable adults—regardless of family unit status—and those adults could then be detained through their removal proceedings pursuant to ICE's existing statutory authority.  The policy of referring all border-crossers for prosecution, regardless of family unit status, was terminated in June of 2018 following the separation of thousands of children and intense public scrutiny.  After taking office, President Biden denounced the prior practice of separating children from their families at the United States-Mexico border, condemned the human tragedy that occurred, and established a task force to continue efforts to reunify families who had been separated.

The U.S. government does not defend the policy choices that led to family separations.  But those policy decisions do not give rise to tort liability for three reasons: (1) Plaintiffs' claims for institutional or systematic torts are not cognizable under the Federal Tort Claims Act ("FTCA"); (2) Plaintiffs' claims are barred by the FTCA's discretionary function exception, 28 U.S.C. § 2680(a); and (3) Plaintiffs have not established a claim for intentional infliction of emotional distress ("IIED") under state law. Therefore, the United States is entitled to judgment as a matter of law.

1

In addition to the Plaintiffs described above, Plaintiffs M.C.L. and R.Z.G. and their children, A.J. and B.P., respectively, (hereinafter "the port of entry Plaintiffs") attempted to enter the United States in November 2017 at the port of entry in Nogales, Arizona.  Both adults already had criminal records in the United States—including convictions for operating a vehicle while impaired and multiple unlawful entries—and were subject to bars prohibiting them from entering the United States.   Based on these histories, the adults were transferred to adult detention in ICE custody and their children were transferred to ORR custody.  The separations of the port of entry Plaintiffs were unrelated to the DHS Referral Policy and were based on the criminal and immigration history of the adults. Their claims are likewise barred by the FTCA's discretionary function exception, and they cannot establish a claim for IIED under state law.

## BACKGROUND

### A.     Statutory Background

When a noncitizen enters the United States between official ports of entry, he or she may be prosecuted for criminal immigration violations, including entering the United States "at any time or place other than as designated by immigration officers" and eluding "examination or inspection by immigration officers."[1] 8 U.S.C § 1325(a).  Section 1325(a) is a misdemeanor that is punishable by a fine and "imprison[ment] not more than 6 months" for a first infraction.  A subsequent violation may result in imprisonment of not more than two years.  *Id*.  Additionally, a noncitizen who has previously been removed and unlawfully re-enters the United States can be prosecuted for a violation of 8 U.S.C § 1326, which is a felony and carries a potential term of imprisonment of up to two years. Violations of these federal criminal immigration statutes are prosecuted by the U.S. Attorneys' Offices, which are offices within the U.S. Department of Justice.

Noncitizens arriving in or present in the United States who, following inspection, are deemed inadmissible are subject to removal from the United States and subject to

---

[1] This brief uses the term "noncitizen" as equivalent to the statutory term "alien."  *See Barton v. Barr*, 140 S. Ct. 1442, 1446 n.2 (2020) (*quoting* 8 U.S.C. § 1101(a)(3)).

2

detention during the pendency of their removal proceedings.  *See id*. §§ 1225(b); 1226; 1357.  Further, noncitizens with final orders of removal are subject to detention pursuant to 8 U.S.C. § 1231(a).  DHS possesses statutory authority to "arrange for appropriate places of detention for aliens detained pending removal or a decision on removal."  8 U.S.C. § 1231(g)(1).  In some cases, DHS may exercise its discretion to release a noncitizen from custody.  *See, e.g.*, *id.* §§ 1182(d)(5), 1226(a)(2).  Those determinations are made on a "case-by-case basis" pursuant to federal statutory and regulatory authorities.  *Id.* § 1182(d)(5); 8 C.F.R. §§ 235.3(b)(2)(iii), (b)(4)(ii).

When an agency takes custody of a noncitizen child for whom "there is no parent or legal guardian in the United States [or] no parent or legal guardian in the United States is available to provide care and physical custody," 6 U.S.C. § 279(g)(2), the agency must designate that child as an "unaccompanied alien child" ("UAC") pursuant to the Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), and transfer custody of the child to ORR.  *Id.*[2]

### B.    The Policies Challenged in this Case

On April 6, 2018, Attorney General Jefferson Sessions issued a memorandum that directed "each United States Attorney's Office along the Southwest Border—to the extent practicable, and in consultation with DHS—to adopt immediately a zero tolerance policy for all offenses referred for prosecution under" 8 U.S.C. § 1325(a), which prohibits

---

[2] ORR has responsibility for "the care and placement of unaccompanied alien children who are in federal custody by reason of their immigration status."  6 U.S.C. §§ 279(a), (b)(1)(A), (b)(1)(C); *see also* 8 U.S.C. § 1232(b)(1).  The term "UAC" is defined as a child who: (1) "has no lawful immigration status in the United States"; (2) "has not attained 18 years of age"; and (3) "with respect to whom…there is no parent or legal guardian in the United States [or] no parent or legal guardian in the United States is available to provide care and physical custody."  6 U.S.C. § 279(g)(2).  Under the TVPRA, any federal agency shall "transfer the custody of such child to [ORR] not later than 72 hours after determining that such child is" a UAC except in the case of exceptional circumstances.  8 U.S.C. § 1232(b)(3).  ORR seeks to place UACs "in the least restrictive setting that is in the best interest of the child."  *Id.* § 1232(c)(2)(A).  ORR "shall not release such children upon their own recognizance."  6 U.S.C. § 279(b)(2).  Once a minor is in ORR custody, statutory and regulatory provisions govern release of the minor to an approved sponsor.  *See* 8 U.S.C. § 1232(c)(3).

unlawful entry into the United States.  SOF 5.  About two weeks later, in a memorandum titled "Increasing Prosecutions of Immigration Violations," senior officials at DHS proposed three prosecution referral policy options to the Secretary of Homeland Security (the "DHS Referral Memorandum").  SOF 6.  On May 4, 2018, Secretary Kirstjen Nielsen approved Option 3 in the DHS Referral Memorandum, initiating a policy of referring for prosecution, to the extent practicable, all adults who unlawfully crossed the Southwest border of the United States, "including those initially arriving with minors" ("the DHS Referral Policy").  SOF 15.

### C.    Plaintiffs' Detention and Separation

The non-port of entry Plaintiffs—four male adult non-citizens and their respective children—were apprehended in the U.S. Border Patrol's Yuma Sector in Arizona in May 2018 and transported to the Yuma Border Patrol Station.[3]  SOF 44, 63, 84, 101.  Pursuant to the DHS Referral Policy in effect at the time, Border Patrol agents identified the adult Plaintiffs as amenable to prosecution because they had entered the United States unlawfully and initiated the prosecution referral process for the adult Plaintiffs for violations of § 1325.  SOF 45, 64, 85, 102.  Based on Border Patrol's decision to initiate the prosecution referral process for the adult Plaintiffs, the minor Plaintiffs were designated as UACs, and accordingly, Border Patrol agents requested placement of these minors with ORR.  *Id.*  After Border Patrol agents completed processing of the adult Plaintiffs and the criminal referral processes concluded, the adult Plaintiffs were transferred to the custody of ICE as single adults for a custody determination pending removal proceedings.[4]  SOF 55, 75, 95, 109.  The adult Plaintiffs were not prosecuted and

---

[3] U.S. Border Patrol is a component of U.S. Customs and Border Protection ("CBP"), which is an agency within DHS.  Border Patrol possesses responsibility for apprehending individuals who enter the United States between ports of entry.  Its geographic areas of responsibility along the Southwest Border are divided into several sectors.  Border Patrol's Yuma Sector encompasses parts of Arizona and California.

[4] ICE also is an agency within DHS.  ICE's Enforcement & Removal Operations, among other things, is authorized to take custody of non-citizens following their apprehension by Border Patrol and to make a determination as to whether to detain or release the noncitizen during the pendency of his or her removal proceeding.

remained in ICE custody when they were reunified with their children.  SOF 55, 56, 74, 79, 94, 96, 108, 133.

The port of entry Plaintiffs sought entry into the United States in November 2017 at the port of entry in Nogales, Arizona.  The adult port of entry Plaintiffs had criminal histories, including for operating vehicles while intoxicated and multiple unlawful entries and removals, and thus both were barred from seeking entry into the United States.  SOF 116-119;138-146.  Accordingly, the adult port of entry Plaintiffs were detained in secure ICE detention pending their removal proceedings and consequently their children were transferred to the custody of ORR.  SOF 122,148.  The port of entry Plaintiffs subsequently were ordered removed and lawfully removed from the United States.  SOF 130-133, 156, 159-160.

**D.      Procedural History**

On January 10, 2020, Plaintiffs filed this action under the FTCA, 28 U.S.C. §§ 1346(b)(1), 2671-2680, for alleged injuries arising out of their separations following their unlawful entries into the United States.  The government moved to dismiss, which the Court denied on July 27, 2020.  The parties conducted extensive fact discovery, which was completed in 2022.

**STANDARD OF REVIEW**

Summary judgment must be granted when "the movant shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment under Rule 56 "bears the initial responsibility of informing the [Court] of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000)).  The non-moving party may not rest on mere denials of the movant's pleadings but must respond by asserting specific facts showing a genuine issue exists precluding a grant of summary judgment.  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Nissan Fire*,

210 F.3d at 1102-03.  The disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## ARGUMENT

### I.   Sovereign Immunity Has Not Been Waived For Plaintiffs' Claims Challenging Policy Decisions.

The current Administration has denounced the policy decisions made by DHS and DOJ during the last Administration that led to the separation of families at the United States-Mexico border.  Nonetheless, the FTCA does not permit recovery in tort for harms asserted to arise from policy decisions.  Any other outcome would contravene the text and purpose of the FTCA and threaten to expose the federal government to tort litigation over myriad policies that adversely affect certain individuals.

### A.   Plaintiffs' Claims Are Impermissible Institutional or Systemic Tort Claims

Absent a specific, express waiver, sovereign immunity bars a suit against the government for lack of subject matter jurisdiction.  *See FDIC v. Meyer*, 510 U.S. 471, 475-76 (1994).  The FTCA's limited waiver of sovereign immunity makes the United States liable only under principles of *respondeat superior* for the negligent or wrongful acts or omissions of "employee[s] of the Government" while acting within the scope of their employment.  *See* 28 U.S.C. § 1346(b)(1); *see also Laird v. Nelms*, 406 U.S. 797, 801 (1972) (FTCA's legislative history "indicates that Congress intended to permit liability essentially based on the intentionally wrongful or careless conduct of Government employees, for which the Government was to be made liable according to state law under the doctrine of *respondeat superior*").

Thus, a plaintiff suing under the FTCA cannot assert "institutional" or "systemic" claims to hold the United States liable based on the conduct of an agency or the government as a whole.  Rather, a plaintiff must allege tortious acts or omissions *by individual federal employees*, acting within the scope of their employment, for whom the United States has assumed *respondeat superior* liability under the FTCA.  *See, e.g., Meier*

6

*v. United States*, 2006 WL 3798160, at *3-4 (N.D. Cal. Dec, 22, 2006) (dismissing claim based on corporate negligence theory), *aff'd*, 310 F. App'x 976 (9th Cir. 2009); *Lee v. United States*, 2020 WL 6573258 at *6 (D. Ariz. Sept. 18, 2020) (dismissing claims of "generalized theories of negligence asserted against the staff and employees of federal institutions as a whole" for lack of jurisdiction); *F.R. v. United States*, No. CV-21-00339, 2022 WL 2905040 at *3 (D. Ariz. July 22, 2022) ("[A] cognizable FTCA claim must be predicated on the tortious misconduct of individual government employees, rather than on alleged wrongdoing by the United States or its agencies writ large."); *B.A.D.J. v. United States*, No. CV-21-00215, 2022 WL 11631016 *5 (D. Ariz. Sept. 30, 2022) ("To the extent Plaintiffs allege harms resulting from policymaking or agency-wide misconduct, the Court lacks subject matter jurisdiction over those claims.").

Plaintiffs' challenges to the DHS Referral Policy are quintessential claims based on "policymaking or agency-wide misconduct" that are not cognizable under the FTCA. Plaintiffs' complaint indicates that they are challenging what was, at the time, the official policy of DHS. *See* Am. Compl. ¶ 15. The FTCA cannot be used as a vehicle to challenge that policymaking.

Congress has elected not to subject the federal government to monetary damages for policies that cause systemic harm. In 42 U.S.C. § 1983, Congress subjected municipalities to money damages for unconstitutional policies. But §1983 is the mirror image of the FTCA's waiver of immunity, in that municipalities can be held liable only for unconstitutional actions taken "pursuant to official municipal policy" and not based upon *respondeat superior* principles for the acts or omissions of individual employees. *See Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 691 (1978); *Ouellette v. Beaupre*, 977 F.3d 127, 141 (1st Cir. 2020) ("The FTCA, unlike § 1983, '[i]n substance . . . adopts respondeat superior liability for the United States.'" (quoting *Solis- Alarcón v. United States*, 662 F.3d 577, 583 (1st Cir. 2011)). "The 'official policy' requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the

municipality is actually responsible. *Monell* reasoned that recovery from a municipality is limited to acts that are, properly speaking, acts 'of the municipality' – that is, acts which the municipality has officially sanctioned or ordered." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986) (emphasis in original); *see also Owen v. City of Independence*, 455 U.S. 622, 657 (1980) ("[T]he public will be forced to bear only the costs of injury inflicted by the 'execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts and acts may fairly be said to represent official policy.'" (quoting *Monell*, 436 U.S. at 694)). In contrast to the liability of municipal entities under §1983, the federal government cannot be held institutionally liable under the FTCA for official policies, regardless of whether such a policy violates the Constitution.[5] We are aware of no cases finding the federal government liable under the FTCA for high-level policy decisions.

Accordingly, Plaintiffs' claims challenging official agency policymaking cannot be a basis to impose FTCA liability based on principles of *respondeat superior*. Regardless of how Plaintiffs characterize or label their claims, they indisputably arise out of separations resulting from enforcement action taken pursuant to the DHS Referral Policy. Therefore, Plaintiffs' claims in their entirety are not cognizable under the FTCA.[6]

**B.      Plaintiffs' Claims Are Barred by the Discretionary Function Exception**

---

[5] Although individual federal officers may be subject to liability in their personal capacities for violating the Constitution under certain circumstances, *see Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971), "a *Bivens* action is not a 'proper vehicle for altering an entity's policy.'" *Ziglar v. Abbasi*, 137 S.Ct. 1843, 1860 (2017) (quoting *Correction Services Corp. v. Malesko*, 534 U.S. 61, 74 (2001)); *see also FDIC v. Meyer*, 510 U.S. at 485 ("The purpose of *Bivens* is to deter *the officer*."). For this very reason, in *Meyer* the Supreme Court held that constitutional torts were not cognizable under the FTCA and declined to imply a *Bivens* cause of action directly against federal agencies. *See* 510 U.S. at 478, 485; *see also Malesko*, 534 U.S. at 71 ("If deterring the conduct of a policymaking entity was the purpose of *Bivens,* then *Meyer* would have implied a damages remedy against the [FDIC]; it was after all an agency policy that led to Meyer's constitutional deprivation.").

[6] As discussed *infra*, the port of entry Plaintiffs were separated not pursuant to the DHS Referral Policy, but because of the adult Plaintiffs' criminal and immigration histories. However, to the extent the port of entry Plaintiffs nonetheless suggest that their claims arise from a purported policy of separating families, *see* Am. Compl. ¶ 15, those claims similarly would be not cognizable under the FTCA.

8

The FTCA's discretionary function exception ("DFE") also bars Plaintiffs' claims because they challenge discretionary policy determinations by the federal government. Although the consequences that flowed from the DHS Referral Policy are deeply regrettable and have been denounced by the current Administration, the FTCA does not provide for monetary damages based on such determinations.

### 1. Overview of the DFE

The FTCA's waiver of sovereign immunity is subject to statutory exceptions. *See* 28 U.S.C. § 2680. When an exception applies, the United States retains its sovereign immunity and the court lacks jurisdiction. *Nurse v. United States*, 226 F.3d 996, 1000 (9th Cir. 2000). These exceptions include "[a]ny claim" "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a).

The Supreme Court has established a two-part test to determine when the DFE bars a claim. *United States v. Gaubert*, 499 U.S. 315, 328-32 (1991). First, a court must ask whether the challenged conduct was in fact "discretionary in nature"—that is, whether the conduct involved "'an element of judgment or choice.'" *Id.* at 322 (*quoting Berkovitz v. United States*, 486 U.S. 531, 536 (1988)); *see also Chadd v. United States*, 794 F.3d 1104, 1109 (9th Cir. 2015). The first prong is met unless "a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." *Berkovitz*, 486 U.S. at 536); *see also Kelly v. United States*, 241 F.3d 755, 761 (9th Cir. 2001) ("[A] general regulation or policy…does not remove discretion unless it specifically prescribes a course of conduct."). Even if a statute, regulation, or policy contains a mandate to do something, if the implementation of that mandate involves judgment or choice, the discretion element is satisfied. *See GATX/Airlog Co. v. United States,* 286 F.3d 1168, 1174-75 (9th Cir. 2002); *see also Gonzalez v. United States*, 814 F.3d at 1022,1030 (9th Cir. 2016) ("The presence of a few, isolated provisions cast in mandatory language does not transform an otherwise suggestive set of guidelines into binding agency regulations."). When a statute, regulation, or policy at issue allows for the exercise of discretion, "it must be presumed

9

that the agent's acts are grounded in policy when exercising that discretion." *GATX/Airlog Co.*, 286 F.3d at 1174 (quoting *Gaubert*, 499 U.S. at 324).

Second, if the challenged conduct involves judgment or choice, a court must next determine if it was "of the kind that the discretionary function exception was designed to shield." *Gaubert*, 499 U.S. at 322-23.  Congress intended for the DFE to "prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy" through a tort action.  *United States v. Varig Airlines*, 467 U.S. 797, 814 (1984).  "[T]he focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation" but rather "on the nature of the actions taken and on whether they are *susceptible* to policy analysis."  *Gonzalez*, 814 F.3d at 1027-28 (quoting *Gaubert*, 499 U.S. at 325) (emphasis added); *see also Nurse*, 226 F.3d at 1001 (the decision "'need not actually be grounded in policy considerations' so long as it is, 'by its nature, susceptible to a policy analysis'").

Concerns about subjecting policy-based decisionmaking "to outside inquiry" are magnified in the immigration context.  *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 490 (1999).  Further, "negligence is simply irrelevant to the discretionary function inquiry," *Kennewick Irr. Dist. v. United States*, 880 F.2d 1018, 1029 (9th Cir. 1989), and the exception applies "whether or not the discretion involved [was] abused," 28 U.S.C. § 2680(a); *see also Reynolds v. United States*, 549 F.3d 1108, 1112 (7th Cir. 2008) (DFE applies where there are allegations of "malicious and bad faith conduct" because "subjective intent is irrelevant to our analysis").

### 2. Issuance of the DHS Referral Policy Was an Exercise of Policy Discretion

The former Secretary of Homeland Security's issuance of the DHS Referral Policy—that is, approval of referring for prosecution all adults amenable to prosecution for violation of 8 U.S.C. § 1325(a)—was a discretionary policy decision shielded from challenge by the DFE.  "The Supreme Court has long recognized that 'the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case.'"  *In re Sealed Case*, 829 F.2d 50, 63 (D.C. Cir. 1987) (quoting *United States v.*

*Nixon*, 418 U.S. 683, 693 (1974)); *Smith v. United States*, 375 F.2d 243, 247 (5th Cir. 1967) ("decisions concerning enforcement" are matter of "discretion").  As the Ninth Circuit has recognized, "[t]he decision whether or not to prosecute a given individual is a discretionary function for which the United States is immune from liability" under the FTCA.  *Gen. Dynamics Corp. v. United States*, 139 F.3d 1280, 1283 (9th Cir. 1998); *see also United States v. Flores-Montano*, 541 U.S. 149, 153 (2004) ("It is axiomatic that the United States, as sovereign, has the inherent authority to protect, and a paramount interest in protecting, its territorial integrity."); *S.E.B.M. v. United States*, No. 1:21-cv-00095 --- F.Supp.3d --- 2023 WL 2383784 *15 (D.N.M. Mar. 6, 2023) (FTCA suit based on family separation was shielded by DFE because the decision to prosecute the father "was a discretionary decision that violated no federal law," and the decision to prosecute, detain, and deport the father did not violate the child's constitutional rights) (*citing Delgado v. Immigr. & Naturalization Servs.*, 637 F.2d 762, 764 (10th Cir. 1980)).[7]

The DHS Referral Policy plainly was susceptible to policy considerations.  The DHS Referral Memorandum sets forth the policy objective of addressing illegal migration and the specific reasons for not exempting adult members of family units from prosecution referrals.  The DHS Referral Memorandum states, "Illegal migration toward the Southwest Border (SWB) continues to rise" and inadmissible family units "encountered at and between the ports of entry during the period of April 18-19, 2018, reached the highest level since 2016 – at almost 700 per day."  Ex. C Att. 3.  The memorandum further states, "Family groups are one of the most challenging populations to the integrity of the immigration enforcement system both because of the strictures placed by the *Flores* Settlement Agreement, but also because of the costly and challenging nature of

---

[7] The Secretary of Homeland Security is charged with the broad statutory responsibilities of "[s]ecuring the borders [and] ports," "[c]arrying out the immigration enforcement functions vested by statute[,]" and "[e]stablishing national immigration enforcement policies and priorities."  6 U.S.C. § 202.  Further, the Secretary is charged with the "administration and enforcement of [chapter 8 of the U.S. Code] and all other laws relating to the immigration and naturalization of aliens," unless expressly committed to another agency.  8 U.S.C. § 1103(a)(1).

operationally addressing their needs and requirements." *Id*.  The option in the DHS Referral Memorandum that Secretary Nielsen ultimately selected was stated to be the prosecution policy option that "would increase the consequences for illegally entering the United States by enforcing existing law, protect children from being smuggled by adults through transnational criminal organizations, and have the greatest impact on current flows." *Id*.; SOF 15, 19.  The memorandum further states, "If [family units] are excluded from this initiative, the potential for an increase in fraudulent/fictious [family units] could be an unintended consequence." *Id*.[8]

Secretary Nielsen was made aware in "dozens of conversations" of various policy considerations then-DHS officials articulated related to the policy.  Ex. A Att. 1 (McAleenan 264-65); SOF 19, 21.  Those considerations included the deterrent effect of prosecutions and the diversion of DHS resources from other priorities.  SOF 11, 19; Ex. A. Att. 1 (McAleenan 94, 96-97,138, 198-199, 243); Ex. A. Att. 3 (Hastings 295, 298, 300-01); Ex. A. Att. 4 (Vitiello 220-221); Ex. A At. 2 (Homan 43).[9]  Secretary Nielsen was "aware, generally, of both prosecution affecting flow as well as detention through removal in an immigration proceeding reducing the number of people attempting to cross."  Ex. A

---

[8] Although Plaintiffs also challenge the Zero Tolerance memorandum issued by Attorney General Sessions on April 6, 2018, Plaintiffs were separated due to determinations made by Border Patrol agents pursuant to DHS Referral Policy.  Accordingly, the application of the DFE turns on the DHS Referral Policy, not the Zero Tolerance Memorandum. Nevertheless, courts have likewise recognized that the prosecution policy set forth in Attorney General Sessions' Zero Tolerance Memorandum "amounts to exercise of the prosecutorial discretion that Congress and the Constitution confer on the Attorney General."  *Mejia-Mejia v. ICE*, No. 18-1445, 2019 WL 4707150 at *5 (D.D.C. Sept. 26, 2019); *see Peña Arita v. United States*, 470 F. Supp. 3d 663, 691-92 (S.D. Tex. 2020).

[9] Ex. A Att. 1 (McAleenan 96-97) ("[O]ur agents were so involved in transportation, processing and care of families and children that they weren't doing their security job of preventing narcotics, preventing criminals, preventing gang members, potential terrorists from coming into the country."); *id*. at 243 ("The drug cartels . . . control access to the border between ports of entry . . . [and] migrants approaching the border have to pay significant fees to be allowed to cross through the territory controlled by drug cartels."); *see also* Ex. A Att. 3 (Hastings 300-01) (testifying that cartels often "cross large groups of migrants, usually families and children together in a specific location, which causes Border Patrol to send a large amount of their manpower . . . to that location to take care of the family and kids," while the cartels will "cross[] narcotics, gang members, criminal migrants or even cartel members in other locations because they know we're tied up").

Att. 1 (McAleenan 264-65); SOF 12, 13, 19.  The law enforcement, national security interests, resource considerations, and asserted humanitarian concerns set forth in the DHS Referral Memorandum, were described as the "underlying operational backdrop" "that led to a year and a half of policy process and consideration of every potential option for addressing the flow of families."  Ex. A Att. 1 (McAleenan 345-361); SOF 19.

Secretary Nielsen testified before Congress that "the [DHS Referral Memorandum] from my component heads came April 23.  I then issued after many consultations with them the direction to increase prosecution between ports of entry . . . for all adults coming across the border illegally."  Ex. B Att. 1 at 31.  Secretary Nielsen also issued a memorandum on May 11, 2018, restating her decision to issue the DHS Referral Policy.  The May 11 memorandum states: "There is no more basic responsibility of a sovereign nation than defending its borders[,]" and "[i]n response to the on-going challenges presented by the flow of illegal crossings between ports of entry" "I direct all DHS law enforcement officers at the border to refer all illegal border crossers to the Department of Justice for prosecution to the extent practicable."  Ex. C Att. 4; SOF 15.  Thus, the decision set forth in the DHS Referral Policy to increase prosecutions of all amenable adults, and not exempt those adults traveling in family units, was susceptible to myriad policy concerns.

### 3. Planning and Implementation of the DHS Referral Policy Was an Exercise of Discretionary Conduct Susceptible to Policy Analysis.

The DFE also bars any claims by Plaintiffs based upon inadequacies in planning for increased enforcement actions pursuant to the DHS Referral Policy, including decisions regarding resources and staffing and assessments of the sufficiency of existing processes and systems.  These kinds of decisions are policy-based discretionary determinations that are shielded by the DFE.  *See Fang v. United States*, 140 F.3d 1238, 1242 (9th Cir. 1998) ("[D]ecisions involving the allocation and deployment of limited governmental resources

are the type of administrative judgment that the discretionary function exception was designed to immunize from suit.").[10]

In particular, the DFE bars claims based on the Yuma Sector's implementation of the DHS Referral Policy. A Concept of Operations ("ConOp") issued by Border Patrol Headquarters on May 4, 2018 directed the Southwest Border sectors to begin increasing referrals for prosecution of amenable adults, including those traveling in family units. Ex. C Att. 5; SOF 23. The ConOp did not, however, prescribe a specific course of action to achieve the DHS Referral Policy's objective of prosecution of amenable adults, including the operational processes for initiating prosecution. *Id*.; *see also* Ex. A Att. 4 (Vitiello 182) (testifying that "the final decisions, and [the] implementation on the ground" of DHS policies are made by "first-line supervisors, [and] actual line agents" in the field, because CBP headquarters "can't script it so well that we can configure for every contingency that would happen in a place like Yuma or the Rio Grande Valley").

Among the discretionary decisions Border Patrol agents were required to make in operationalizing the DHS Referral Policy in individual cases was whether and when to pursue referral for prosecution of an amenable adult, and, relatedly, whether and when to deem a child traveling with an amenable adult as "unaccompanied" within the meaning of the TVPRA. These discretionary decisions thus are intertwined with and susceptible to the same policy considerations underlying the DHS Referral Policy.

Such decisions are of the kind the DFE was intended to protect. A decision by law enforcement officers to seek prosecution of unlawful acts is protected by the DFE, *see*

---

[10] *See also Daigle v. United States*, 972 F.2d 1527, 1541-42 (10th Cir. 1992) (decisions balancing readiness and available resources with need to address public health crisis were protected by the DFE, which cannot be defeated by allegations that the agency "rushed into [its efforts] without proper planning" or "allegations of deficient planning and execution"); *Freeman v. United States*, 556 F.3d 326, 340 (5th Cir. 2009) ("[T]he government's decisions about when, where, and how to allocate limited resources within the exigencies of an emergency are the types of decisions that the discretionary function exception was designed to shelter from suit.").

*Gasho v. United States*, 39 F.3d 1420, 1435-36 (9th Cir. 1994),[11] including in the immigration enforcement context, *see Blanco Ayala v. United States*, 982 F.3d 209, 217 (4th Cir. 2020) ("DHS officers' decisions in investigating and responding to potential violations of immigration law are infused with public policy considerations.").  A decision by one law enforcement agency—here, Border Patrol—to initiate prosecution for a criminal offense is a discretionary act, regardless of whether the U.S Attorney's Office ultimately chooses to pursue that prosecution.

Similarly, the determination of whether and when a parent is "available to provide care and physical custody," and thus whether a child is a UAC, is a determination susceptible to policy analysis.  *See D.B. v. Poston*, 119 F. Supp. 3d 472, 482-83 (E.D. Va. 2015) ("Federal agencies are afforded discretion under the statutory scheme when classifying juveniles as unaccompanied alien children."), *aff'd in part and vacated in part*, 826 F.3d 721 (4th Cir. 2016).[12]  Designating a child a UAC because of the decision to pursue prosecution of the parent, whom the child cannot accompany during the criminal proceedings, is integrally related to the decision to initiate prosecution itself.  *See Ayala*, 982 F.3d at 215 ("[P]laintiff's attempt to slice up the process is unfounded. The law enforcement function is a continuum where the products of the investigation are integrally related to the decision on whether to proceed further with detention and removal.").

---

[11] *See also Sloan v. H.U.D.*, 236 F.3d 756, 760 (D.C. Cir. 2001) ("The decision to initiate a prosecution has long been regarded as a classic discretionary function."); *Tsolmon v. United States*, 841 F.3d 378, 383 (5th Cir. 2016) ("[D]ecisions on when, where, and how to investigate and whether to prosecute have long been found to be core examples of discretionary conduct for which the United States maintains its immunity.") (citations and quotation marks omitted); *K.W. Thompson Tool Co. v. United States*, 836 F.2d 721, 729 (1st Cir. 1988) ("Decisions concerning when, whether and whom to prosecute have traditionally been considered discretionary and have been held to fall within the discretionary function exception of 28 U.S.C. § 2680(a). . .  All the components of the final determination—whether, when, whom and how—reflect the decision-maker's judgment of how best to enforce compliance and to deter misconduct in others.").

[12] *See also Baie v. Sec'y of Def.*, 784 F.2d 1375, 1377 (9th Cir. 1986) ("[I]nterpretation of [a] statute is a plainly discretionary administrative act the 'nature and quality' of which Congress intended to shield from liability under the FTCA.").

Further, the timing of when to designate a child "unaccompanied" was also a discretionary determination susceptible to policy analysis. *See* Ex. A Att. 1(McAleenan at 72 ("the timing and manner of the request for placement of a UAC with HHS was not prescribed at the national policy level"); *see also* Ex. A Att. 5 (DHS 30(b)(6) 140) ("DHS didn't give direction on that, at what point a child would become unaccompanied, as a DHS-level policy or direction."); SOF 26-27.[13]  "[T]he expectation . . . is that [B]order [P]atrol would operate with their discretion, consistent with their logistics and operational and pragmatic considerations," when making decisions regarding the timing and processes for designating a minor a UAC when his or her parent was to be referred for prosecution. Ex. A Att. 1 (McAleenan 92-93).  And, as a matter of operational practice, Border Patrol agents would designate a child as a UAC and seek placement with ORR as soon as possible once a parent was identified as amenable to prosecution and was to be processed for a referral for prosecution. SOF 26-27; Ex. D.

The Yuma Border Patrol Sector was thus exercising policy discretion when Plaintiffs were apprehended in May 2018: Border Patrol agents determined whether an adult would be processed for a referral for prosecution shortly after arrival at the Yuma Station, and consequently, once they made that determination, they sought to place the child with ORR as soon as possible.  SOF 26-27; Ex. D.   This operational approach reflected discretionary choices related to the constraints and exigencies associated with noncitizens, particularly minors, in custody.  Border Patrol stations are intended for short-term custody of

---

[13] Nor was there any mandatory and specific directive regarding whether, when, or how a previous designation of a minor as a UAC should be revisited.  Ex. A Att. 1 (McAleenan 94-95) ("It was not directed in national policy.  Such decision by Border Patrol was affected by the operational contingencies and the specifics of the situation."); *id.* at 222 ("[T]here's no way to nationally prescribe how this works in all circumstances.  It's based on the reality of the operations on the border and the discretion and judgment of the agents involved in the processing."); *id.* at 293 ("[Y]ou can't, by national policy, prescribe all the operational and pragmatic permutations you're going to face in a complex logistical environment, with a number of permutations on the ground, that's the function of the agents to make those determinations.").  Moreover, there was no mandatory and specific directive that Border Patrol sectors were prohibited from designating a minor a UAC, and must delay a placement request to ORR, unless or until the U.S. Attorney's Office accepted prosecution of a parent.  Ex. A Att. 3 (Hastings 306-307); SOF 26-27.

apprehended noncitizens, which requires Border Patrol agents to process and transfer noncitizens from Border Patrol custody as quickly as possible.[14]  Specifically with respect to minors, the determination of when to make a UAC designation and a placement request with ORR is further guided by the statutory requirements of the TVPRA, the *Flores* Settlement Agreement, and the operational guidelines provided in TEDS.   Ex. A Att. 1 (McAleenan 291) ("The imperative, once a decision is made to refer for prosecution, is that the child get a placement to be in a better custodial situation than in a border patrol station."); SOF 26-27.[15]

The decisions to initiate prosecution of the adult Plaintiffs, designate minors as UACs, and promptly place them with ORR, in some cases prior to a final prosecution decision by the U.S. Attorney's Office, were thus susceptible to policy analysis.  Those decisions were exercises of policy-based discretion and are shielded by the DFE.  *See Fisher Bros. Sales, Inc. v. United States*, 46 F.3d 279, 287 (3d Cir. 1995) (decision protected by the DFE when it "necessarily reflects the decisionmaker's judgment that it is more desirable to make a decision based on the currently available information than to wait for more complete [information] or more confirmation of the existing [information].").[16]

---

[14] CBP's National Standards on Transportation, Escort, Detention, and Search ("TEDS") states: (1) "Every effort must be made to hold detainees for the least amount of time required for their processing, transfer, release, or repatriation as appropriate and as operationally feasible." (TEDS ¶ 4.1.l); and (2) "Every effort must be made to promptly transfer, transport, process, release, or repatriate detainees as appropriate according to each operational office's policies and procedures, and as operationally feasible."  (TEDS ¶ 1.8). Ex. C. Att. 6; SOF 25.

[15] The TVPRA requires that a UAC be transferred to ORR custody within 72 hours, which for operational reasons is treated as running from the time the child determined to be a UAC is apprehended.  Ex. A Att. 1 (McAleenan 67).  CBP's operational practice in that regard was consistent with the *Flores* Settlement Agreement, which provides DHS transfer a minor "as expeditiously as possible."  *Flores* Settlement Agreement ¶ 12A.  The TEDS also provides, "Every effort must be made to transfer UAC from CBP to ORR custody *as soon as possible*, but no later than 72 hours after determining that a child is a UAC." (TEDS ¶ 5.6) (emphasis added).  The TEDS further states, "Whenever operationally feasible, at-risk individuals will be expeditiously processed to minimize the length of time in CBP custody[,]"; "at-risk individuals" is defined as including juveniles. (TEDS ¶ 5.68, ¶ 5.1); Ex. C. Att. 6; SOF 25.

[16] Further, the FTCA does not waive sovereign immunity for "[a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of

1          Further, because the designation of the children as UACs and the transfer of the

2    children to ORR custody is protected by 28 U.S.C. § 2680(a), Plaintiffs cannot

3    characterize any mistreatment or abuse of their children while in ORR custody simply as

4    damages arising out of an allegedly wrongful transfer to ORR custody.  *See A.P.F. v.*

5    *United States*, No. CV-20-65-SRB, 492 F. Supp. 3d 989, 998 (D. Ariz. 2020).  Rather,

6    because the children were properly and lawfully in ORR custody and placed in the care

7    of an ORR grantee facility, any claim arising out of abuse or mistreatment while in such a

8    facility could only be based upon alleged negligence in the supervision of that facility and

9    its employees.  However, the supervision and oversight of such facilities is protected by

10   the DFE.  *See Walding v. United States*, 955 F. Supp. 2d 759, 771-72 & 783 (W.D. Tex.

11   2013) (holding that DFE barred plaintiff's claims based upon failure of ORR to properly

12   supervise facility employees accused of abusing UACs).

13                    **4.    Detention of the Adult Plaintiffs Pending Immigration
                             Proceedings Was an Exercise of Policy Discretion**

14          The decisions regarding detention also fall within the DFE.  When an adult's

15   criminal proceeding was complete, including cases where the U.S. Attorney's Office

16   declined to prosecute, ICE retained the discretion to determine whether and where to

17   continue the adult's detention pending removal proceedings. SOF 16; Ex. C Att. 3. The

18   federal government has the express statutory authority to "arrange for appropriate places of

19   detention for aliens detained pending removal or a decision on removal." 8 U.S.C. §

20   1231(g)(1).  The Supreme Court has recognized "detention during deportation proceedings

21   as a constitutionally valid aspect of the deportation process."  *Demore v. Kim*, 538 U.S.

22   510, 523 (2003).

23

24   a statute or regulation, whether or not such statute or regulation be valid."  28 U.S.C.
     § 2680(a).  Here, once Border Patrol agents designated the minor Plaintiffs UACs, the
25   TVPRA required they be transferred to ORR custody.  The enforcement of that statutory
     command cannot form the basis of an FTCA claim.  *See S.E.B.M.*, 2023 WL 2383784,*16
26   (FTCA claim not actionable where "the separation itself was mandated by [the TVPRA]
     and [the child] alleges no other facts to suggest that she was treated unreasonably" during
27   separation).

28

In particular, the decision whether and where to detain an individual during removal proceedings is a classic discretionary exercise: "Congress has placed the responsibility of determining where aliens are detained within the discretion of the [Secretary of Homeland Security]." *Comm. of Cent. Am. Refugees v. I.N.S.*, 795 F.2d 1434, 1440 (9th Cir. 1986) (emphasis added).[17]   As the Ninth Circuit has explained, "[b]ecause the decision to detain an alien pending resolution of immigration proceedings is explicitly committed to the discretion of the [Secretary] and implicates issues of foreign policy, it falls within this [FTCA] exception." *Mirmehdi v. United States*, 662 F.3d 1073, 1081-82 (9th Cir. 2011). This discretion necessarily applies to decisions regarding with whom noncitizens are detained, whether adults and minors can be detained in the same facility, and whether to detain family members together. *See Peña Arita v. United States*, 470 F. Supp. 3d 663, 691-92 (S.D. Tex. 2020) (decisions by DHS to separate family members protected by the DFE).

Here, former DHS officials discussed policy rationales for the detention of adult noncitizens, notwithstanding the impact on families. Prior to the *Flores* orders, family units could be detained by ICE in family residential centers for their entire immigration proceedings, and then removed if so ordered. SOF 1-3. However, the *Flores* orders limited ICE's ability to hold children, even in family units, in an unlicensed facility generally for longer than 20 days. *Id*. Because immigration proceedings usually took longer than 20 days, this restriction effectively required ICE to release family units directly into the United States following their entry or after a brief stay at a family residential center rather than housing families during the pendency of their immigration

---

[17] Following the Homeland Security Act of 2002, many references in the Immigration and Nationality Act to the "Attorney General" are read to mean the Secretary of the Department of Homeland Security. *See Clark v. Suarez Martinez*, 543 U.S. 371, 374 n.1 (2005). *See also Gandarillas-Zambrana v. BIA*, 44 F.3d 1251, 1256 (4th Cir. 1995) ("The [DHS] necessarily has the authority to determine the location of detention of an alien in deportation proceedings…and therefore, to transfer aliens from one detention center to another."); *Van Dinh v. Reno*, 197 F.3d 427, 433 (10th Cir. 1999) (the "[DHS's] discretionary power to transfer aliens from one locale to another, as she deems appropriate, arises from" statute); *see also* 6 U.S.C. §§ 251, 552(d).

proceedings. *Id*. In testimony before Congress, Secretary Nielsen identified the challenges of not being able to detain family units together: "If migrants arrive with children, we can only detain them for days and then we have to release them.  Even when they have no legal right to stay [in the United States], we cannot keep them together as a family." Ex. B Att. 1 at 17; *id*. at 10 ("We are often forced to release [family units] into the United States and we have virtually no hope of removing them in the future").  The DHS Referral Memorandum indicated that it addressed the effect of the *Flores* decision on ICE's ability to effectuate removals of adults in family units: "Given challenges presented by the *Flores* decisions, backlogs in overall protection systems and immigration court processes, and other considerations, it is very difficult to complete immigration enforcement proceedings and remove adults who are present as part of FMUAs at the border.  In fact, only 2.3 percent of non-Mexican FMUA apprehended during the Fiscal Year (FY) 2014 surge have been repatriated in the three-plus years after their illegal crossings." Ex. C Att. 3.

Former DHS officials testified that they believed that effectuating removal upon entry of a final order of removal is an important law enforcement mechanism because removals, like criminal prosecutions, reduce recidivism and deter others from attempting to enter the United States illegally.  SOF 12-13.[18]  In particular, DHS officials indicated that a criminal prosecution coupled with execution of a final order of removal would have an increased deterrent effect on illegal entries into the United States, because removal results in a ban on reentry and a re-entrant could be subject to potential felony prosecution.  Ex. A Att. 2 (Homan 47, 160).  And those officials stated that ICE's ability to effectuate removal orders is enhanced through the exercise of its statutory detention authorities.  First, the vast majority of noncitizens removed from the United States are removed from an ICE detention facility.  Ex. A Att. 2 (Homan 79) ("About 95 percent of everybody that ICE

---

[18] Ex. A Att. 1 (McAleenan 118) ("If you can effectuate a removal, that's what's likely to affect people's perception that they will be successful in being allowed to stay in the United States."); Ex. A Att. 2 (Homan 69) ("[B]ased on my experience . . . deportation has a consequence.  Deportation affects recidivism.").

removes from the country are removed from a [detention facility].  If you are released, the chance of being found and deported are very low."); Ex. A Att. 1 (McAleenan 103-104) (citing studies that only 1.5 percent of family units had been removed despite orders of removal, often in absentia, being issued for over 80 percent of the family units).  Second, noncitizens in detention would be placed on the "detained docket," which "is a priority for immigration courts," meaning that immigration proceedings would generally conclude in a matter of weeks, while proceedings on the non-detained docket could take substantially longer.  Ex. A Att. 2 (Homan 178-79) (testifying that "the average length in detention is between 30 and 38 days," while proceedings on the non-detained docket could take "three to five years to get a decision").[19]  Thus, officials testified that they believed that detention would help ensure the prompt completion of immigration proceedings, including, where applicable, removal.

After the criminal prosecution referral process and immigration processing of the adult Plaintiffs was complete, the adult Plaintiffs were transferred from Border Patrol to the custody of ICE.  SOF 55, 75, 95, 109.  Once ICE received custody, it "proceed[ed] with . . . ERO's normal adult processes when they would take an adult into custody."  Ex. A Att. 6 (Albence 64-65); SOF 28.[20]  The DHS Referral Policy did not constrain ICE's statutory discretion to detain the adult Plaintiffs pending immigration proceedings or its processes for making discretionary determinations regarding detention.  SOF 16; Ex. C Att. 3.  Nor did the DHS Referral Policy mandate a specific course of action for reunification of a parent and child separated as a result of Border Patrol's initiation of the prosecution

---

[19] Ex. A Att. 1 (McAleenan 335) ("families were essentially being released very soon after arrival at the US border, and put into immigration proceedings out of custody, non-detained immigration proceedings, that often were scheduled years from their arrival at the US border.").

[20] Not all family units that crossed between the ports of entry were separated when the DHS Referral Policy was in effect.  SOF 29, 41.  If a parent and child were transferred by Border Patrol to ICE as a family unit, then-existing processes for custody determinations of family units were followed.  SOF 29; Ex. A. Att. 6 (Albence 69-70) ("Even during zero tolerance, if ICE was presented with an intact family unit, ICE would handle that case generally in accordance with the way that it would handle family units before, whether they go to the family residential center for a short period of time, whether they are released from, from custody at that point.").

process.  SOF 17; Ex. C Att. 3.  Generally, unless an adult was earlier released by ICE, ICE and HHS coordinated for reunification and removal of parent and child together upon entry of an order of removal for the adult.  SOF 30.  In many cases, that approach resulted in lengthy separations of families, and as a policy matter, the DHS Referral Policy was abandoned, even by the Administration that adopted it.  But this approach was an exercise of discretion susceptible to policy analysis.

Accordingly, any challenge by Plaintiffs to ICE's exercise of its statutory authority to detain parents such as the adult Plaintiffs for the pendency of their immigration proceedings is barred by the discretionary function exception.

Nor can the port of entry Plaintiffs overcome the DFE with respect to their detention by ICE pending their removal.  Both of the adult port of entry Plaintiffs, M.C.L. and R.Z.G., were detained by ICE because they had prior criminal convictions and removals. SOF 122, 148.   Criminal convictions are among the considerations ICE takes into account when making detention decisions, including determining whether a family unit can or should be placed at a family residential center, Ex. A Att. 10 (Lee 43); Ex. A Att. 11 (Lucero 107, 113), as well as whether the adult should be detained rather than released based on considerations of child welfare and public safety.  Ex. A Att. 11 (Lucero 125-129, 174-175, 201-202); SOF 42.  Here, the discretionary determinations were made based on the totality of the circumstances to detain, rather than release, the adult port of entry Plaintiffs.  SOF 122, 148; Ex. A Att. 11 (Lucero 313-22).

The decisions to detain the adult port of entry Plaintiffs in secure detention were pursuant to ICE's express statutory authorities relating to detention and grounded in the policy objectives underlying those statutory schemes, *see supra* at 18-21.  Moreover, those decisions reflected considerations of public safety and child welfare.  *Gonzalez*, 814 F.3d at 36 (DFE shields officer's decision not to disclose information, which required consideration of public safety); *Weissich v. United States*, 4 F.3d 810, 814 (9th Cir. 1993).  Finally, the DFE also bars any challenge to the removals of the adult port of entry Plaintiffs, which were pursuant to the statutory authority in 8 U.S.C. § 1182 and

court-issued removal orders.  *See, e.g., Blanco Ayala v. United States*, 386 F.Supp.3d 635, (E.D. Va. 2019), *aff'd,* ("decisions concerning the detention and removal of aliens directly implicates issues of foreign policy that are committed to the discretion of the executive branch") (citing *Mirmehdi*, 689 F.3d at 984), *aff'd*, 982 F.3d 209 (4th Cir. 2020).

### 5.    Plaintiffs Cannot Overcome the Discretionary Function Exception By Alleging a Constitutional Violation

Plaintiffs' allegation that the government violated the Constitution does not preclude application of the discretionary function exception.  At the motion to dismiss stage, this Court held that Plaintiffs "have plausibly alleged that the government's separation of their families violated their constitutional rights."  *A.P.F. v. United States*, 492 F. Supp. 3d 989, 996 (D. Ariz. 2020) (citing *Ms. L.*, 310 F. Supp. 3d 1133, 1144–46 (S.D. Cal. 2018)).  However, to prevail in their claims, Plaintiffs must do more than make a plausible allegation: They must prove that the government violated a constitutional right that was clearly established and specifically prescribed at the time of the alleged violation.[21]  They cannot do so here.

#### a.    A clearly established and specific constitutional directive is required to overcome the discretionary function exception

The Supreme Court has long recognized that official conduct may be discretionary even if it is later determined to have violated the Constitution.  The common law doctrine of official immunity applies to the exercise of "discretionary functions" even when that conduct violates the Constitution, as long as the constitutional right is not defined with sufficient specificity at the time.  *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (explaining that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have

---

[21] Indeed, the discretionary function exception applies to "[a]ny claim" based on the exercise of a discretionary function, "whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). The word "[a]ny" indicates that the exception applies regardless of the nature of the claim; it leaves no room for an exception for constitutional claims.

known"); *Wilson v. Layne*, 526 U.S. 603, 614-615 (1999) (using the "discretionary function" formulation and holding that officers were entitled to immunity because the constitutional violation was not clearly established with sufficient specificity). The Court in *Berkovitz* likewise analogized the DFE to official immunity and held that discretion is removed under the FTCA only when a provision of federal law "*specifically prescribes* a course of action for an employee to follow." 486 U.S. at 536 (emphasis added).

Moreover, Congress enacted the FTCA (as the law's title suggests) to address violations of state tort law committed by federal employees—not to address constitutional violations. *See, e.g., Meyer*, 510 U.S. at 477 (recognizing that the FTCA "does not provide a cause of action" for a "constitutional tort claim"). If the DFE included an unwritten carveout for cases in which plaintiffs allege any kind of constitutional violation, it would effectively create a back door for constitutional claims under the FTCA.

Accordingly, the DFE is not made inapplicable by every instance of unlawful or unconstitutional conduct. At a minimum, overcoming the DFE requires a showing that the government official's discretion was constrained by a specific, clearly established directive, along with proof that the specific directive was violated. *See, e.g.*, *Bryan v. United States*, 913 F.3d 356, 364 (3d Cir. 2019) ("Because…the CBP officers did not violate clearly established constitutional rights, the FTCA claims also fail" under the DFE); *see also Butz v. Economou,* 438 U.S. 478 (1978) (recognizing that DFE would apply even if alleged conduct might later be held unconstitutional).

The law of this Circuit is consistent with requiring that any constitutional directive be clearly established and specific before it can render an official's actions nondiscretionary. The Ninth Circuit in *Nurse* held that a constitutional violation "may" remove an official's discretion and left open "the level of specificity with which a constitutional proscription must be articulated in order to remove the discretion of a federal actor.*" Nurse*, 226 F.3d at 1002 n.2. And subsequently, in *Xue Lu v. Powell*, the Ninth Circuit held that the DFE applied when the plaintiffs had not "pointed to any

24

*specific duty* under the Fifth Amendment or any specific policy to support a claim of unconstitutional policymaking." 621 F.3d 944, 950 (9th Cir. 2010) (emphasis added).[22]

Accordingly, to overcome the DFE, a plaintiff must show that the government official's discretion was cabined by a specific, clearly established directive and that the specific directive was violated.

### b. <u>There is no evidence that the government violated a clearly established and specific constitutional directive</u>

No clearly established and specific constitutional directive constrained the government's actions here at the time they took place.  The Fourth Circuit observed a year *after* Plaintiffs' separations: "We…have been unable to find a substantive due process right to family unity in the context of immigration detention pending removal." *Reyna as next friend of J.F.G. v. Hott*, 921 F.3d 204, 210-11 (4th Cir. 2019); *see also Delgado*, 637 F.2d at 763-64 ("incidental impact visited upon the children" resulting from family separation due to parent's removal "does not raise constitutional problems").[23]  Thus, a right to family integrity during immigration proceedings was not "clearly established" at the time of Plaintiffs' separations.

The Due Process Clause, on which Plaintiffs relied in opposing the government's Motion to Dismiss, fails to supply a sufficiently specific directive.  Only official conduct that "shocks the conscience" can give rise to a Due Process Clause violation, *County of*

---

[22] *See also Fazaga v. Fed. Bureau of Investigation*, 916 F.3d 1202, 1251 (9th Cir. 2019) ("[I]f the district court instead determines that Defendants did violate a *nondiscretionary federal constitutional …directive*, the FTCA claims may be able to proceed to that degree." (emphasis added)).

[23] *Accord Marin-Garcia Holder v. Holder*, 647 F.3d 666, 674 (7th Cir. 2011) ("nothing in the Constitution prohibits" separation of citizen children from their parents when the parents are deported); *Payne-Barahana v. Gonzales*, 474 F.3d 1, 2 & n.1 (1st Cir. 2007) ("The circuits that have addressed the constitutional issue  . . . have uniformly held that a parent's otherwise valid deportation does not violate a child's constitutional right."); *Dominguez-Portillo*, 2018 WL 315759 at *6 (W.D. Tex. Jan. 5, 2018) ("[T]he case law provides little guidance on how such parental rights are actually manifested when a parent charged with a petty misdemeanor illegal entry offense is separated from their child who allegedly accompanied them across the border."); *see also id.* (noting "lack of clearly established parental rights in these circumstances and under case law"), *aff'd sub nom Vasquez- Hernandez*, 924 F.3d at 164.

1    *Sacramento v. Lewis*, 523 U.S. 833, 836 (1998), and the "shock the conscience" standard

2    does not have clear and specific elements but involves an assessment of the totality of the

3    circumstances.  At no point in this litigation have Plaintiffs cited any contemporaneous

4    binding authority prohibiting family separations in the course of immigration

5    enforcement under the circumstances like those resulting from the issuance and

6    implementation of the DHS Referral Policy.  *See S.E.B.M.*, 2023 WL 2383784*15

7    (dismissing FTCA claim based on family separation and holding that "[a]lthough [the

8    child's] right to associate with her father is constitutionally protected, it does not

9    outweigh the government's interest in enforcing its immigration policy").  Nor were

10   federal officials on notice of any such specific constitutional directives at the time.

11         Moreover, insofar as establishing a Due Process Clause violation necessitates

12   delving into the subjective intent of the individual whose action is at issue, doing so is

13   inconsistent with well-established discretionary function exception precedent that

14   precludes inquiry into the subjective mindset of the decisionmaker.  *See Gaubert*, 499

15   U.S. at 325 (in determining whether the DFE applies, "[t]he focus of the inquiry is not on

16   the agent's subjective intent in exercising the discretion conferred by statute or

17   regulation, but on the nature of the actions taken and on whether they are susceptible to

18   policy analysis"); *Franklin Sav. Corp. v. United States*, 180 F.3d 1124, 1127 (10th Cir.

19   1999) ("the exception's purpose compels dismissal of any claim whose ultimate

20   resolution would require judicial scrutiny of an official's good faith or subjective

21   decisionmaking"); *id. at* 1140 ("[I]t is sensible to allow judicial inquiry into bad faith and

22   subjective decisionmaking in a few exceptional cases under the APA, but to ban all

23   FTCA suits that necessitate that peculiarly disruptive inquiry … The exception must bar

24   all suits dependent on allegations of subjective bad faith if it is to serve its

25   purposes[.]"). [24]

26   _____

27   [24] Further, a substantive Due Process Clause violation cannot be established by conduct
     that is negligent.  *Lewis*, 523 U.S. at 849 ("[T]he Constitution does not guarantee due care
     on the part of state officials; liability for negligently inflicted harm is categorically beneath
     the threshold of constitutional due process."). Therefore, even if a substantive Due Process

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

To the extent the intent of the decisionmaker is relevant, Plaintiffs have not adduced evidence of an unconstitutional motive on the part of Secretary Nielsen.  *Supra* at 11-13; SOF 18-20.  It was Secretary Nielsen's decision to approve the DHS Referral Policy, and so only her intent is relevant in assessing the purpose of the policy.  *See, e.g., Vill. of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252 (1977) (focusing on the "*decisionmaker's* purposes" in determining whether a policy was motivated by discriminatory intent (emphasis added)); *City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 196-97 (2003) ("statements made *by decisionmakers* or referendum sponsors during deliberation over a referendum may constitute relevant evidence of discriminatory intent" (emphasis added)).  The evidence does not establish that Secretary Nielsen's purpose in approving the DHS Referral Policy was to cause harm in order to deter unlawful entry into the United States; rather, she testified that her purpose was to increase prosecutions for immigration offenses.  SOF 18-19.[25]

That other officials may have made statements touching on their purposes in supporting the DHS Referral Policy or other border policies is immaterial to determining Secretary Nielsen's intent in approving the DHS Referral Policy.  *See, e.g., Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2574-75 (2019) (in an APA challenge to a Census question, focusing on the motives of the "agency head" rather than other individuals in determining whether there was evidence of "bad faith or improper behavior"); *DHS v. Regents of Univ. Of Cal.*, 140 S. Ct. 1891, 1916 (2020) (where "relevant actors were most directly Acting [DHS] Secretary Duke and the Attorney General," statements by President "remote in time and made in unrelated contexts . . . fail[ed] to raise a plausible inference that [policy] was motivated by animus").

---

Clause violation could defeat application of the discretionary function exception, it could not do so with respect to any conduct forming the basis of Plaintiffs' negligence claim.

[25] Ex. B Att. 1 at 46-47 (when asked whether she issued the DHS Referral Policy with the purpose of using separations to deter families from coming to the United States, testifying "No.  I did not.  Again, the whole purpose of that was to increase consequences for those who choose to break the law"); Ex. B Att. 2 at 19 ("[M]y decision has been that anyone who breaks the law will be prosecuted.  If you are a parent or you are a single person or you happen to have a family, if you cross between the ports of entry we will refer you for prosecution. You have broken U.S. law.").

In any event, "the evenhanded enforcement of the immigration laws, in and of itself, cannot conceivably be held to violate substantive due process." *Aguilar v. United States Immigr. & Customs Enf't*, 510 F.3d 1, 22 (1st Cir. 2007) (citations omitted); *Milan-Rodriguez v. Sessions*, No. 16-cv-1578, 2018 WL 400317 at *9-10 (E.D. Cal. June 6, 2018). The DHS Referral Policy did not single out adult members of family units for enforcement purposes. On its face and as implemented, the policy applied to *all* adults who unlawfully crossed the Southwest Border and reflected a decision not to exempt those adults traveling in a family unit. Ex. C. Att. 3 & 4; SOF 15. Moreover, when adults, like the adult Plaintiffs, were transferred to ICE custody following the criminal prosecution process, ICE applied its statutory detention authority to them as it did for all single adults transferred to ICE custody. SOF 28. Further, as demonstrated *supra,* the DHS Referral Policy, on its face, indicated that it sought to advance legitimate government interests in immigration enforcement at the U.S.-Mexico border, including border security, allocation of personnel and resources, and humanitarian considerations. *Supra* at 11-21; SOF 19.

Nor could a Substantive Due Process violation be based on any deficiencies in the tracking of family units as part of a deliberate effort to delay or prevent reunification. The record evidence demonstrates that Plaintiffs' family relationships were well-documented and available to the federal agencies (and their contractors) with custody of the adult Plaintiffs and their children, and that the adult and minor Plaintiffs communicated during their separations.[26] *See Aguilar*, 510 F.3d at 22 ("[A]ny claim of an intentional deprivation is belied by the petitioners' concession that ICE took at least some measures to alleviate any resultant harm."); *S.E.B.M.*, 2023 WL 2383784,*16 (dismissing claim based on limited contact between parent and child for lack of jurisdiction).[27]

## II.    Plaintiffs Cannot Establish Claims for IIED under Applicable State Law

---

[26] SOF 46-48, 53, 59; 65-68, 80; 86-88, 99; 103-105, 111, 115; 123-125, 129, 134-135; 149-151, 155, 161.

[27] Because the decision to detain the port of entry adult Plaintiffs in adult ICE detention was based on their specific criminal and immigration histories, any argument by Plaintiffs that separations resulting from enforcement action taken pursuant to the DHS Referral Policy were unconstitutional does not apply to those Plaintiffs.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

The crux of Plaintiffs' IIED claim is that their alleged damages were the result of intentional malfeasance of high-level government officials.[28]  But Plaintiffs cannot show that the government's exercise of its law enforcement authority meets the "extremely high burden of proof for demonstrating intentional infliction of emotional distress in Arizona." *Bodett v. CoxCom, Inc.*, 366 F.3d 736, 747 (9th Cir. 2004).[29]

Arizona courts have set forth the elements required for a *prima facie* case for IIED by relying on the language of the Restatement (Second) of Torts.  *See Ford v. Revlon, Inc.*, 153 Ariz. 38, 44, 734 P.2d 580, 586 (Ariz.1987) (citation omitted).[30]  Plaintiffs must establish the following elements for an IIED claim: "(1) the conduct of the defendant was extreme and outrageous; (2) the defendant either intended to cause emotional distress or recklessly disregarded the near certainty that such distress would result from his conduct; and (3) severe emotional distress occurred as a result of the defendant's conduct." *Johnson v. McDonald*, 197 Ariz. 155, 160, 3 P.3d 1075, 1080 (1995).  "The adjectives 'extreme' and 'outrageous' are not just for show; evidence of callousness or insensitivity will not suffice." *Demetrulias v. Wal-Mart Stores Inc.*, 917 F. Supp. 2d 993, 1012 (D. Ariz. 2013).  To satisfy the first element of an IIED claim, the defendant's conduct must be "so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized

---

[28] Insofar as Plaintiffs claim that they were intentionally harmed, they cannot also maintain claims for negligence based on the same challenged acts or omissions. *Lewis v. Dirt Sports LLC*, 259 F. Supp. 3d 1039, 1046 (D. Ariz. 2017) ("Any given act may be intentional or it may be negligent, but it cannot be both. Intent and negligence are regarded as mutually exclusive grounds for liability.").

[29] The arguments in this section apply with equal force to the port of entry Plaintiffs, whose detention and removal were pursuant to statutory authority and court-issued removal orders.

[30] Under the FTCA, liability is determined in accordance with the law of the place where the act or omission occurred." 28 U.S.C. §1346(b)(1).  Courts must apply the "whole law" of the state, including its choice of law rules. *Richards v. United States*, 369 U.S. 1, 10-11 (1962).  While Plaintiffs were separated in Arizona, their claims are based upon the DHS Referral Policy, which was issued in the District of Columbia.  For IIED claims, the District of Columbia, like Arizona, also applies the Restatement (Second) of Torts. *See, e.g., Waldon v. Covington*, 415 A.2d 1070, 1076 (D.C. 1980).  Because Plaintiffs' claims for IIED would fail under the laws of either Arizona or the District of Columbia, this Court need not rule now which jurisdiction's substantive tort law applies.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

community." *Mintz v. Bell Atl. Sys. Leasing Intern., Inc*., 905 P.2d 559, 563 (Ariz. Ct. App. 1995).

There is no basis in Arizona law for IIED claims arising out of a lawful arrest and detention. *See Savage v. Boise*, 272 P.2d 349, 352 (Ariz. 1954) (lawful arrest and detention cannot form the basis for a tort claim under Arizona law). Plaintiffs do not contest that they were lawfully arrested for unlawful entry into the United States and detained pursuant to federal statutory authorities. Accordingly, their IIED claims arising out of their lawful arrests and detentions fail as a matter of law. Further, an IIED claim cannot lie if the challenged conduct is privileged, as were Border Patrol's and ICE's law enforcement actions to enforce existing federal criminal and immigration statutory authorities. *See* Restatement (Second) of Torts § 46, comment g (conduct is privileged when the actor "insist[s] upon his legal rights in a permissible way, even though he is well aware that such insistence is certain to cause emotional distress."); *see also Caban v. United States* 728 F.2d 68 (2d Cir. 1984) (false imprisonment claim was not actionable because INS's detention of plaintiff pursuant to federal statutory authority was privileged). Here, the challenged conduct—the separations of Plaintiffs—was a direct result of the initiation of the criminal process for the adult Plaintiffs and the adult Plaintiffs' subsequent detention by ICE for immigration proceedings. This law enforcement conduct was authorized by federal law. Accordingly, the conduct was privileged, and the United States cannot be held liable. *See Mintz*, 905 P.2d at 563 (holding that, although employer engaged in conduct that could be viewed as extreme and outrageous, the conduct was not actionable because it was accompanied by a "legitimate" purpose); *accord Lerner v. John Hancock Life Ins.*, 2011 WL 13185713, at *3 (D. Ariz. Mar. 21, 2011); *see also S.E.B.M.*, 2023 WL 2383784 *8 (IIED claim not actionable under New Mexico law where government's actions in separation parent and child "were protected by its privilege to prosecute").[31]

---

[31] *Accord Galicia v. United States*, No. CV 13-0105, 2015 WL 12696086 at *2 (D.N.M. Feb. 24, 2015) (pursuant to Restatement, a Border Patrol agent's actions "in arresting and detaining Plaintiff" and "removing Plaintiff to Mexico" did not constitute

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### **CONCLUSION**

For all the foregoing reasons, the motion for summary judgment must be granted.

Dated: March 9, 2023                    Respectfully Submitted,


BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

JAMES G. TOUHEY, JR.
Director, Torts Branch

*s/ Phil MacWilliams*
PHILIP D. MACWILLIAMS
Trial Attorney
D.C. Bar No. 482883
E-mail: phil.macwilliams@usdoj.gov
U.S. Department of Justice
Civil Division, Torts Branch
Benjamin Franklin Station, P.O. Box 888
Washington, DC 20044
Telephone: (202) 616-4285
Attorneys for the United States of America

---

IIED under New Mexico law because these actions "were authorized by law"); *Redmond v. Shilosky, Dillard Dep't Stores v. Silva*, 106 S.W.3d 789, 797 (Tex. App.—Texarkana 2003, pet. granted) (where probable cause exists for an arrest, the decision to initiate criminal proceedings "cannot constitute outrageous behavior"), *aff'd in part, mod. in part on other grounds*, 148 S.W.3d 370 (Tex. 2004)).

31

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on March 9, 2023, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants.

*s/ Phil MacWilliams*
PHILIP D. MACWILLIAMS
Attorney for United States of America