1  Keith Beauchamp (012434)
2  D. Andrew Gaona (028414)
   COPPERSMITH BROCKELMAN PLC
3  2800 N. Central Avenue, Suite 1900
   Telephone: (602) 381-5490
4  Phoenix, AZ 85004
5  kbeauchamp@cblawyers.com
   agaona@cblawyers.com
6  *Counsel for A.P.F. Plaintiffs*
7  (*Additional Counsel Listed on Signature Page*)

## UNITED STATES DISTRICT COURT

8

## DISTRICT OF ARIZONA

9

| | |
|---|---|
| A.P.F. on his own behalf and on behalf of his minor child, O.B.; J.V.S. on his own behalf and on behalf of his minor child, H.Y.; J.D.G. on his own behalf and on behalf of his minor child, M.G.; H.P.M. on his own behalf and on behalf of his minor child, A.D.; M.C.L. on his own behalf and on behalf of his minor child, A.J.; and R.Z.G. on his own behalf and on behalf of his minor child, B.P., <br><br> Plaintiffs, <br><br> v. <br><br> United States of America, <br><br> Defendant. | No. 2:20-cv-00065-SRB <br><br> **SEPARATE STATEMENT OF FACTS IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT** |

10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Pursuant to LRCiv 56.1(a), the above-captioned Plaintiffs submit the following separate statement of facts in support of their Motion for Partial Summary Judgment:

## I.     Standards Regarding Migrant Families

1.     The Department of Homeland Security's ("DHS") Customs and Border Protection ("CBP") agency issued National Standards on Transport, Escort, Detention, and Search ("TEDS"), "an agency-wide policy that sets forth the first nationwide standards which govern CBP's interaction with detained individuals," in October 2015. Ex. 1, at 3.

2.     TEDS General Standard § 1.9 states that "CBP will maintain family unity to the greatest extent operationally feasible, absent a legal requirement or an articulable safety or security concern that requires separation." *Id.* at 4.

3.     TEDS General Standard § 5.6 states that "[g]enerally, family units with juveniles should not be separated.  When it is necessary to separate juveniles from the parent(s) and/or legal guardian(s), officers/agents must follow legal requirements and their operational office's policies and procedures. In circumstances where family units must be separated due to different immigration dispositions, such separation must be documented in the appropriate electronic system(s) of record." *Id.* at 22.

4.     DHS's Immigration and Customs Enforcement's ("ICE") Performance-Based National Detention Standard, Section 5.6(V)(E)(3), states that indigent detainees "may request a call to immediate family or others in personal or family emergencies or on an as-needed basis." Ex. 2.

## II.     2017 Policy and Practice Changes

5.     At his deposition, former Office of Refugee Resettlement ("ORR") Deputy Director for Children's Programs Jonathan White was asked, "Do you know why procedures regarding reunification of a child separated from their parent by DHS were implemented in September of 2016?" Ex. 3, White Dep. 46:25–47:3. White testified, in part, "[T]here had been a number of cases for a long period of time of children who were separated from a parent for what we then -- the term of art we then used was 'separations

for cause' related to the . . . safety and well-being of the child.  These were very rare events, but they did occur." *Id.* at 47:6–48:9.

6.     Former CBP Commissioner Kevin McAleenan testified about "█████████ ████████████████" that occurred on February 14, 2017.  Ex. 4, McAleenan Dep. 106:8–14.  McAleenan testified that "████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████" *Id.* at 106:15–108:8.

7.     Former Associate Deputy Director of ORR Tricia Swartz, when asked to "████████████████████████████████," testified that participants "██████████ ███████████████████████████████████████████████████." Ex. 5, Swartz 9/7/2022 Dep. 11:15–12:7.

8.     In notes dated March 2017, Secretary Kelly wrote "██████████████ █████████████████" under the heading "█████████████████████████." Ex. 6, at CD-US-0219621.

9.     On or about March 6, 2017, Secretary Kelly was asked in an interview, "If you get some young kids who manage to sneak into the United States with their parents, are [DHS] personnel going to separate the children from their moms and dads?"  Ex. 7. Kelly responded, in part: "Yes, I am considering, in order to deter more movement along this terribly dangerous network, I am considering exactly that."  *Id.*

10.     During the same interview on or about March 6, 2017, Secretary Kelly was asked, "Are you, [DHS,] considering a new initiative that would separate children from

their parents if they try to enter the United States illegally?"  Ex. 8.  Secretary Kelly responded, in part, "I would do almost anything to deter the people from Central America [] to getting on this very, very dangerous network that brings them up through Mexico into the United States."  *Id.*

11.     Eighty members of Congress wrote a letter to Secretary Kelly, dated March 8, 2017, regarding their "deep concerns and opposition to an immigration enforcement proposal . . . to separate families and put children into the U.S. foster care system" and asking that DHS "reconsider the implementation of this harmful immigration policy which will only serve to further traumatize families, overwhelm our child welfare system and roll back years of humanitarian progress."  Ex. 9, at CD-US-00016642.

12.     In a letter to Secretary Kelly dated March 22, 2017, "184 organizations who serve or work on behalf of immigrants, refugees, asylum seekers, and children" stated that "[f]amily separation will only further traumatize those already fleeing harm."  Ex. 10, at CD-US-0047010.  The letter stated that "DHS components and the Office of Refugee Resettlement lack the mechanisms to ensure . . . that communication between separated family members is coordinated," that the policy would render "thousands of children unaccompanied," and that sending these children "to ORR custody will overwhelm the system and cause a crisis in care."  *Id.* at CD-US-0047011.

13.     The March 22, 2017 letter to Secretary Kelly was forwarded on March 23, 2017 to, among others, ICE Acting Director Thomas Homan.  *Id.* at CD-US-0047007.

## III.   El Paso Initiative

14.     The Department of Justice's ("DOJ") Office of the Inspector General ("OIG") issued a report titled "Review of the Department of Justice's Planning and Implementation of Its Zero Tolerance Policy and Its Coordination with the Department of Homeland Security and Health and Human Services" ("DOJ OIG Report") on January 14, 2021 (revised April 13, 2022).  Ex. 11.

15.     The DOJ OIG Report states, "In early March 2017, the Border Patrol's El Paso Sector suspended what local WDTX USAO and Border Patrol officials referred to

as the sector's 'family unit policy,'" under which "the Border Patrol did not refer parents in family units who were apprehended at the border for illegal entry prosecution if the referral would result in children being separated from their parents." *Id.* at 14.

16.    In an email dated March 8, 2017, U.S. Attorney for the Western District of Texas Richard Durbin wrote to other federal prosecutors:  "I am very reluctant to start prosecuting family units.  History would not judge that kindly." Ex. 12.

17.    The DOJ OIG Report states that the "El Paso Initiative or the Initiative[]" was "when the Border Patrol's El Paso Sector began referring family unit adults for criminal prosecution, and the WDTX USAO developed guidelines to prosecute family unit adults in certain circumstances even if this resulted in the separation of children from those prosecuted adults."  Ex. 11, at 13.

18.    In an email dated July 28, 2017, Victor Acosta, Border Patrol ("USBP" or "BP") Assistant Chief Patrol Agent in El Paso, stated, "███████████████████ ███████████████████████████████████████████████████ ██████████████████████████████."  Ex. 13, at CD-US-00017119.

19.    In an email dated December 21, 2017, Western District of Texas Assistant U.S. Attorney ████████████ wrote to the U.S. Attorney for the Western District of Texas, John Bash, that, as of August 10, 2017, "████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ██████."  Ex. 14, at CD-US-0049390.

20.    The DOJ OIG Report quotes U.S. Magistrate Judge Miguel Torres as saying in November 2017 that "[i]n a number of recent illegal entry cases over the last several months, the Court has repeatedly been apprised of concerns voiced by defense counsel and by defendants regarding their limited and often non-existent . . . information about the well-being and whereabouts of their minor children from whom they were separated at the time of their arrest."  Ex. 11, at 17.

21.    The DOJ OIG report states that "the El Paso Initiative resulted in the separation of approximately 280 families in the Border Patrol's El Paso Sector (covering DNM and part of WDTX) from July to November 2017." *Id.* at 16.

22.    The DHS OIG issued a report titled "DHS Lacked Technology Needed to Successfully Account for Separated Migrant Families" ("DHS OIG Report") on November 25, 2019.  Ex. 15.

23.    The DHS OIG Report states that "CBP headquarters personnel had been aware of the various system deficiencies related to tracking family separations since at least the El Paso [I]nitiative." *Id.* at 14.  The DHS OIG Report further states that, during the Initiative, "El Paso Sector agents requested assistance from CBP headquarters, but the necessary system changes were not made" because the requested changes to "track family separations was not a high enough priority to warrant the time and resources required for system modifications." *Id.* at 14–15.

24.    In an email dated November 18, 2017, with the subject line "FW: DHS Separating Families," USBP Deputy Chief Gloria Chavez wrote to CBP personnel, "Effective immediately, please stand down on the continuation of this EPT prosecutions program until USBP-HQ leadership has had an opportunity to review all aspects of this program and brief up the chain at the appropriate level.  This is one that USBP HQ should have been consulted with prior to implementation so that Headquarters could have had the opportunity to review and comment." Ex. 16, at CD-US-0024332.

25.    On November 29, 2017, the El Paso Sector recommended the Initiative be reinstated with "███████████████████████████████████████████" so that "████████████████████████████████████████." Ex. 17, at CD-US-0054286.

26.    On December 11, 2017, immigration advocacy organizations sent a complaint to the DHS Office of Civil Rights and Civil Liberties ("CRCL") and to the DHS Acting Inspector General "on behalf of numerous family members who have been separated while in federal custody at the U.S. border." Ex. 18,  at CD-US-0094465.  The

complaint states that separations "deprive[] family members the ability, given their detention, to locate each other and be reunited," *id*. at CD-US-0094466, and that "[f]amily members are given little to no information on what happens to those from whom they are separated, including how to locate, contact, or reunite with them," *id.* at CD-US-0094470.

27.    On or about December 21, 2017, federal prosecutors in the Western District of Texas noted that, during the Initiative, "███████████████████████████████ ███████████" Ex. 19, at CD-US-0049398.

## IV.    DHS Referral Policy

28.    In an email dated December 16, 2017, with the subject line "Policy Edits to UAC Options," DHS Assistant Secretary for International Affairs James Nealon wrote that "████████████████████████████," but that, given "████ ████████████," DHS Secretary Kirstjen Nielsen should "██████████ ██████████████████████████████." Ex. 20.  Nealon also wrote that family separations "██████████████████████████ ████████████████████████████." *Id.*

29.    On January 11, 2018, the American Academy of Pediatrics ("AAP") wrote to Secretary Nielsen to "urge [her] in the strongest possible terms to reject" a "policy that would separate children from their parents at the border." Ex. 21, at CD-US-00016509A. The AAP "request[ed] to meet with [Nielsen] at [her] earliest convenience to discuss why it would be detrimental to the health, safety and well-being of children." *Id.*  The AAP also wrote that "Proposals to separate children from their families as a tool of law enforcement to deter immigration are inhumane and counterproductive.   Federal authorities must exercise caution to ensure that the emotional and physical stress children experience as they seek refuge in the United States is not exacerbated by the additional trauma of being separated from their parents. . . .  Fear and stress, particularly prolonged exposure to serious stress without the buffering protection afforded by stable, responsive relationships—known as toxic stress—can harm the developing brain and harm short- and long-term health." *Id.*

30.     On March 2, 2018, Senators Dick Durbin and Tammy Duckworth wrote to Secretary Nielsen that "it is cruel and inhumane to separate a parent from her child."  Ex. 22, at CD-US-0217934.  Senators Durbin and Duckworth wrote that "[s]tudies of detained immigrants have shown that children and parents may suffer negative physical and emotional symptoms from detention, including anxiety, depression and posttraumatic stress disorder.  When children live in fear for prolonged periods of time, they may develop toxic stress, which causes harm to the developing brain and can result in short and long-term health consequences."  *Id.* at CD-US-0217933–34.  Senators Durbin and Duckworth sent a copy of their letter to CBP and ICE.  *Id.* at CD-US-0217934.

31.     Former DHS Chief of Staff Chad Wolf testified that, in "early 2018 . . . February, March, April time frame, 2018," CBP and ICE informed Secretary Nielsen "about the possibility that separation of families would be detrimental to the health, safety and well-being of children."  Ex. 23, Wolf Dep. 196:3–16.  When asked "generally what do you recall" about Nielsen's discussions on this topic, Wolf testified, "Generally they brought up some of the same concerns, which is the . . . effect it would have not only on the children but the parents."  *Id.* at 198:3–10.

32.     On April 6, 2018, Attorney General Jeff Sessions issued a "Memorandum for Federal Prosecutors Along the Southwest Border" regarding "Zero-Tolerance for Offenses Under 8 U.S.C. § 1325(a)" (the "Zero Tolerance Policy").  Ex. 24.  The Policy "direct[ed] each United States Attorney's Office along the Southwest Border—to the extent practicable, and in consultation with DHS—to adopt immediately a zero-tolerance policy for all offenses referred for prosecution under section 1325(a)."  *Id.*

33.     On April 23, 2018, McAleenan, Homan, and USCIS Director Francis Cissna sent Secretary Nielsen a decision memorandum titled "Increasing Prosecutions of Immigration Violations" (the "DHS Referral Memorandum").  Ex. 25.  The DHS Referral Memorandum proposed three options "for how to pursue this increased prosecution, 'Zero-Tolerance' Initiative" and stated that "[t]hese options have different characteristics

in terms of feasibility and legal risk, as well as potential impact on the reduction of current illegal crossings." *Id.* at CD-US-0024045.

34.     Option 1 was a "Scalable Approach," in which DHS would "[w]ork with DOJ and other interagency partners to develop a quickly scalable approach to increase prosecution in accordance with USAO capacity.  This would have modest initial impact, increasing over time as USAOs add capacity." *Id.*  The DHS Referral Memorandum stated this option was "unlikely to have a deterrent impact in the immediate term." *Id.*

35.     Option 2 proposed, "Refer All Amenable Single Adults: Work with DOJ and other interagency partners to develop a quickly scalable approach to achieve 100% immigration violation prosecution referral for all amenable single adults." *Id.*

36.     Option 3 proposed, "Refer All Amenable Adults, including those presenting as part of a FMUA: Work with DOJ, [HHS], and other interagency partners to develop a quickly scalable approach to achieve 100% immigration violation prosecution referral for all amenable adults, including those initially arriving or apprehended with minors." *Id.* The DHS Referral Memorandum stated Option 3 "would likely have the most effective impact, while requiring significant resources and presenting increased legal risk." *Id.*

37.     The DHS Referral Memorandum stated that Option 3 "would pursue prosecution of all amenable adults who cross our border illegally, including those presenting with a family unit, between ports of entry in coordination with DOJ." *Id.* at CD-US-0024047.

38.     Regarding Option 3, the DHS Referral Memorandum provided "context on the effectiveness of this approach" by citing the El Paso Initiative, which the Memorandum described as "the local USAOs in New Mexico and the Western District of Texas committ[ing] to accepting all cases amenable for prosecution to include prosecutions under 8 U.S.C. § 1325." *Id.* at CD-US-0024046.  The DHS Referral Memorandum states that, "[a]mong the results of this initiative, the number of illegal crossings between ports of entry of FMUAs dropped by 64 percent.  This decrease was

attributed to the prosecution of adults amenable to prosecution for illegal entry while risking the lives of their children." *Id.*

39. The DHS Referral Memorandum did not reference any issues with tracking separated families during the El Paso Initiative. *Id.*

40. The DHS Referral Memorandum did not reference any issues with facilitating communication between separated families during the El Paso Initiative. *Id.*

41. The DHS Referral Memorandum did not reference any issues with reunifying separated families during the El Paso Initiative. *Id.*

42. The DHS Referral Memorandum did not contain a plan for allowing families to communicate while separated, nor did it contain a plan for reuniting separated families. *Id.*

43. On April 20, 2018, an individual at ICE commented on a draft version of the DHS Referral Memorandum that Option 3 "███████████████████████████ ███████████████████████████████████████████████████." Ex. 26, at CD-US-0102696TAA.

44. On April 24, 2018, Wolf transmitted the DHS Referral Memorandum to Secretary Nielsen.   Ex. 27.   Wolf wrote that "████████████████████████ ████████████████████████████████████████." *Id.*

45. On May 4, 2018, Secretary Nielsen approved Option 3 (the "DHS Referral Policy"). Ex. 25, at CD-US-0024047.

46. On May 11, 2018, Secretary Nielsen "direct[ed] all DHS law enforcement officers at the border to refer all illegal border crossers to the Department of Justice for criminal prosecution to the extent practicable," and stated that "[i]f adopting such a policy requires additional resources, each office shall identify and request such additional resources." Ex. 28, at CD-US-0050304.

## V.   Implementation of the DHS Referral Policy

47. The DHS OIG Report states that, "[p]rior to Zero Tolerance implementation, the Department did not establish a plan for how CBP, ICE, and HHS would successfully

reunify separated family members.  As a result, ICE ERO [Enforcement and Removal Operations] personnel were not prepared to deal with the myriad of nuanced circumstances surrounding family separations." Ex. 15, at 23.

48.    The Rule 30(b)(6) witness for CBP testified that officers do not "receive any training concerning how to carry out a separation of a child from his or her parent." Ex. 29, Arellano (CBP OFO 30(b)(6)) Dep. 222:18–22.

49.    USBP Agent ███████████ testified that he did not believe he received "any training on how to care for children."  Ex. 30, ██████ Dep. 34:6–17.

50.    USBP Agent ████████████ testified that "border patrol agents [did not] have any training about how to . . . explain to children the consequences of . . . an ORR placement." Ex. 31, ██████ Dep. 221:14–18.

51.    ICE ERO Acting Deputy Assistant Director Robert Guadian testified, in response to the question "How did you learn about the Zero Tolerance Policy," that, "I don't recall how I learned about it.  I think . . . at least my division found out about it the same time the media found out about it.  There was no proactive like email to my knowledge or memo or a heads-up that this was going to be occurring.  I think we found out at the same time that everyone else found out." Ex. 32, Guadian Dep. 61:2–11.

52.    The former Unit Chief of the ICE Juvenile & Family Residential Management Unit, which "advise[s] on policy; operational issues for everything related to unaccompanied children, and family units," Mellissa Harper, testified that she did not "remember any specific meetings or emails" that gave her "a heads up that there was going to be an increase in UAC under this Zero Tolerance and separation initiative."  Ex. 33, Harper Dep. 30:14–24, 110:4–9.

53.    Former Associate Deputy Director of ORR Swartz testified that she did not recall "hear[ing] of any planning discussions with anyone at ORR about how DHS's policy change might impact ORR." Ex. 34, Swartz 5/24/2022 Dep. 194:21–24.

54.    On May 31, 2018, CRCL advisor Scott Shuchart wrote to CRCL Officer Cameron Quinn regarding "Family Separation" that "there is a large volume of

operational planning going on right now from which we are inappropriately frozen out - a point you know I've made before and was just trying to reiterate here."  Ex. 35.

## VI.    Separation of Families Pursuant to the DHS Referral Policy

55.     The DHS OIG Report states that it "could not confirm the total number of families DHS separated during the Zero Tolerance period," but "DHS estimated that Border Patrol agents separated 3,014 children from their families while the policy was in place."  Ex. 15, at 8.

56.     The Rule 30(b)(6) witness for the U.S. Attorney's Office for the District of Arizona, in response to the question "U.S. Attorney's Office would have no input whatsoever as to whether the separation occurs; is that correct?" testified, "Yeah, I believe in these cases that was the -- that was the situation. They were asking us whenever family units came up about what we would do from the prosecution perspective if it was a family and it being separated."  Ex. 36, Lokey (USAO D. Ariz. 30(b)(6)) Dep. 110:15–111:9.

57.     USBP Agent ███████ testified that "back in May 2018," if he "noticed a problem with a criminal case," his "instructions were to . . . still refer th[e] case to the U.S. Attorney's Office but to highlight the areas of concern for the U.S. Attorney's Office to review."  Ex. 30, ███████ Dep. 181:13–22.

58.     On May 10, 2018, the Yuma Sector USBP Adjutant to the Chief attached a document, titled, "YUM Zero Tolerance Initiative LIMFACs," which stated that "Local ERO has been advised that once a child has been separated YUM will not try to reunite if prosecution is denied for parent."  Ex. 37, at CD-US-0080522.

59.     On May 10, 2018, ICE Executive Associate Director Matthew Albence emailed Homan and others, writing, "Bottom line, our concern is that the adults that were separated from their children due to the prosecution will be returned to the USBP immediately after the guilty plea is accepted by the Court, as the local District Court generally only imposes time-served.  This will result in a situation in which the parents are back in the exact same facility as their children—possibly in a matter of hours—who have yet to be placed into ORR custody."  Ex. 38, at CD-US-0167960.  Albence also

wrote that the "asks" for CBP were that "[t]hey need to remain flexible and work with the FOD [Field Office Directors] to prevent this from happening.   This may mean transporting the UACs to an ORR facility themselves, at an accelerated pace, bringing the adults to ERO after the prosecution is completed, as opposed to back to the USBP station, or any other number of new processes that may need to be established."  *Id.*  Albence further wrote that the "asks" for DHS were that it was "[p]robably a good idea just to give them visibility that this issue exists, and confirm that the expectation is that we are NOT to reunite the families and release (either pre or post FRC [Family Residential Center])."  *Id.*

60.    On May 10, 2018, in response to the question "Will families be separated, who cross the border illegally, or may families be separated if they cross the border illegally," Secretary Nielsen claimed, "Our policy has not changed in that if you break the law, we will refer you for prosecution. What that means, however, is if you are single adult, if you are part of a family, if you are pregnant, if you have any other condition, you're an adult and you break the law, we will refer you. Operationally what that means is we will have to separate your family. That's no different than what we do every day in every part of the United States when an adult of a family commits a crime. If you as a parent break into a house, you will be incarcerated by police and thereby separated from your family. We're doing the same thing at the border." Ex. 39.

61.    On May 12, 2018, "Senior CRCL Staff with Immigration-Related Responsibilities" submitted a memorandum to CRCL Officer Quinn titled "Family Separation Policy – Serious Constitutional, U.S. Law, and Treaty Concerns."  Ex. 40. CRCL staff wrote: "█████████████████████████████████████ ████████████████████████."  *Id.* at CD-US-0063242A.

62.    In an email dated May 25, 2018, with the subject line "CBP is Reuniting adults with kids," ICE ERO Assistant Director Tae Johnson wrote to Albence that "CBP is Reuniting adults with kids after prosecution in McAllen.  My guess is there is no place to house the adult, so they are bringing them back to the station and since the child is still

there, they are joining them.  These kids have already been designated and are awaiting transportation to HHS.  Transportation arrangements are now being cancelled and presumably the males HoHs are being released…..  What a fiasco." Ex. 41, at CD-US-0030039.

63.     On May 25, 2018, USBP Acting Patrol Agent in Charge of Yuma Station Desi DeLeon wrote, "YUS [Yuma Station] has not reunited any UACs with the adult.  It is a rarity for the UAC to still be in our custody after the adult returns.  When and/if this does occur, the adult and the UAC are not reunited.  The UAC is placed at the juvenile facility and the adult continues through removal proceedings."  Ex. 42, at CD-US-0028320.

64.     On May 26, 2018, Albence forwarded Johnson's May 25, 2018 email to McAleenan, Homan, and others, writing, "It sounds like ORR is refusing to take the children as UAC if the parent arrives back that [sic] the processing site and the child is still there.  This is happening at the CPC as indicated below and have also heard in AZ.  This obviously undermines the entire effort and the Dept is going to look completely ridiculous if we go through the effort of prosecuting only to send them to a FRC and out the door." Ex. 41, at CD-US-0030039.

65.     CBP official Sandi Goldhamer responded to this email exchange, writing, "I recommend we cease the reunification process when a family member is given time served and sent back to the CPC." *Id.* at CD-US-0030038.  Goldhamer wrote, "If you are concerned with appearances than do not return the family unit adult back to the CPC.  Take them to an alternate temporary holding facility and have ERO pick them up from that designated location.  Additionally, continue providing the separated adult with the tear sheet which provides information on locating their child." *Id.*

66.     On June 12, 2018, in a memorandum to McAleenan, Homan, and ICE and CBP's legal counsel, CRCL wrote: "CRCL concludes that CBP and ICE lack updated, clear, cohesive, comprehensive, and readily accessible policy and procedure covering family separation." Ex. 43, at CD-US-0045423.

67.     In an email dated June 16, 2018, with the subject line "Connecting parents and kids," ORR Director Scott Lloyd wrote to Homan and Albence that "[w]e have 790 kids in our shelters who are not able to contact their parents."  Ex. 44, at CD-US-0190277.

68.     At his deposition, former ORR Deputy Director for Children's Programs White was asked, regarding an email dated June 23, 2018, "[s]o this information, such as the alien number that you just described, was needed in order to link parents and children?"  Ex. 3, White Dep. 304:23–25.  White responded, in part, that "[i]n most cases, we did not have alien numbers or even names for parents," and that "[t]his was necessary in order to associate children with parents."  *Id.* at 305:3–19.

69.     At his deposition, White was also asked, "What did the absence of this information mean for your reunification efforts?"  *Id.* at 307:10–11.  White responded, "It meant that . . . ICE would not be able to locate the parent. Without the A number, locating a parent in ICE custody is effectively impossible. . . . In the immigration space, the A number is the dispositive information, and absent the A number, you would not find the parents. . . . So the information about the A number of the parent for each child that we identified as separated was operationally essential."  *Id.* at 307:12–308:3.  White was then asked, "But you didn't have it?"  *Id.* at 308:5.  He responded, "We did not have it."  *Id.* at 308:6.

70.     At his deposition, White further testified he was "concern[ed]" that "parents and children were having difficulty communicating," because "that creates profound barriers to the case management of the child to find an appropriate sponsor, and poses significant psychological risk to the child, because it interrupts the caring relationship."  *Id.* at 281:11–17.

71.     The HHS OIG issued a report titled "Communication and Management Challenges Impeded HHS's Response to the Zero-Tolerance Policy" in March 2020 ("HHS OIG Report").  Ex. 45.

72.     The HHS OIG Report states that ORR care provider facilities "commonly indicated that they encountered difficulties when trying to locate parents in DHS or DOJ

custody, a necessary first step to establishing communication and eventually reunifying the family." *Id.* at 25.  The HHS OIG Report further states that "[a] program director estimated that overall, it took an average of 2 weeks to locate parents and then an additional 3 to 7 days to arrange a phone call between the parent and child, a necessary first step before reunification could be pursued." *Id.*

**VII.    Revocation of the DHS Referral Policy and Reunification of Families**

73.    On June 20, 2018, President Trump issued Executive Order 13841.  Ex. 46. The Order states that "[i]t is also the policy of this Administration to maintain family unity, including by detaining alien families together where appropriate and consistent with law and available resources." *Id.* at 29435.

74.    The DHS OIG Report states that EO 13841 "end[ed] the practice of family separations." Ex. 15, at 2.

75.    On June 22, 2018, ICE official ████████ wrote to ICE ERO Assistant Director Johnson and ICE Executive Associate Director Albence: "████████ ████████████████████████████████████████ ████████████." Ex. 47, at CD-US-0194647.

76.    On June 22, 2018, POLITICO reported HHS created an "unaccompanied children reunification task force" to take the "first step toward reunifying thousands of migrant children in the agency's custody with their families." Ex. 48.

77.    On June 23, 2018, Albence wrote to ICE ERO Acting Deputy Assistant Director Guadian: "In talking to HHS, I don't think they really have any idea as to what they are doing.  Their immediate goal is to meet their S1's directive to ensure that communication is established and regular between the UACs and their parent." Ex. 49, at CD-US-0169163.  Albence also wrote, "while I made it abundantly clear to them, they will want to know what can be done to facilitate immediate reunification.  I told them that wasn't going to happen unless we are directed by the Dept to do so.  We are moving forward w reunification only for the purposes of removal.  If a judge bonds the parent out, then of course the parent is free to sponsor the child from HHS.  Absent that, we aren't

releasing and we aren't going to put them in a FRC for the sole purpose of releasing 20 days later." *Id.* at CD-US-0169164.

78.     On June 26, 2018, the government was preliminary enjoined "from detaining Class Members in DHS custody without and apart from their minor children, absent a determination that the parent is unfit or presents a danger to the child, unless the parent affirmatively, knowingly, and voluntarily declines to be reunited with the child in DHS custody," ordered to "reunify all Class Members with their minor children who are under the age of five (5) within fourteen (14) days of the entry of this Order," and ordered to "reunify all Class Members with their minor children age five (5) and over within thirty (30) days after the entry of this order." *Ms. L. v. ICE*, 310 F. Supp. 3d 1133, 1149 (S.D. Cal. 2018), *modified*, 330 F.R.D. 284 (S.D. Cal. 2019), *enforcement granted in part, denied in part*, 415 F. Supp. 3d 980 (S.D. Cal. 2020).

79.     In a June 26, 2018 memorandum titled "Request Funding for Additional Resources to Support Effective Family Reunification in Response to the Zero Tolerance Initiative," Johnson wrote that "[d]etained parents that have been separated from their children may experience acute trauma or crisis.  As a result, these detainees may exhibit concerning behaviors or symptoms (e.g. harm to self or others)."  Ex. 50, at CD-US-0068355–56.

80.     At his deposition, ICE ERO Acting Deputy Assistant Director Robert Guadian was asked about a declaration he gave, dated July 6, 2018, which stated that "one of the labor intensive steps was to, quote, developing a reunification plan for class members with children five years of age and over, closed quote. Another area appeared to be, quote, facilitating communication between class members and their children, closed quote?" Ex. 32, Guadian Dep. 40:3–24.  Guadian agreed that "as of July 6, 2018, the date of [his] declaration, these were steps in progress." *Id.* at 40:21–24.  Guadian was then asked, "These were not completed, these steps that you indicated, were not completed as of the date of your declaration, right?" *Id.* at 41:5–7.  Guadian answered, "Correct, they

were ongoing processes and we were building new processes, too, as we went." *Id.* at 41:8–9.

81.     On February 2, 2021, President Biden stated that he "condemn[ed] the human tragedy that occurred when our immigration laws were used to intentionally separate children from their parents or legal guardians." Ex. 51.

82.     On February 22, 2021, Attorney General Merrick Garland told the Senate Judiciary Committee that the prior administration's child separation immigration policy "was shameful.  I can't imagine anything worse than tearing parents from their children, and we will provide all of the cooperation that we possibility can." Ex. 52.

83.     On October 10, 2021, CBS News reported that DHS Secretary Alejandro Mayorkas "condemned the Trump administration for not maintaining adequate records of children separated from their parents during its zero-tolerance immigration policy." Ex. 53.  CBS News quoted Mayorkas as stating, "It's a marriage of cruelty and shambles of organizational work . . . .  I don't know how to put it more bluntly than that." *Id.*  CBS News further quoted Mayorkas as stating, "As a matter of fact, this is one where partisanship did not stand in the way of almost unanimous condemnation of the cruelty of the past." *Id.*

84.     On December 9, 2021, Secretary Mayorkas stated in a DHS press release, "It is unconscionable to separate children from their parents as a means to deter migration," and "I have met with separated families and heard firsthand of the immense trauma they have suffered.  We have an obligation to reunite separated families and ensure this cruel practice never happens again." Ex. 54.  The press release also stated that, on December 9, 2021, DHS "announced its request that the public provide recommendations on how to permanently protect against the prior administration's practice of intentionally separating families at the border to deter others from migrating to the United States." *Id.*

**VIII.  The Government Separated Plaintiff Families**

  **A.**  **José and Herlinda**

  85. On May 8, 2018, José and his five-year-old daughter Herlinda were apprehended by Border Patrol agents.  Ex. 55, at APF-US-HHS-0003859; Ex. 56, José Dep. 96:4–8.  José testified that the agents placed them into a "hielera"—a "cold room[]"—and refused to allow José to keep a sheet from his backpack to keep Herlinda warm.  Ex. 56, José Dep. 100:1–101:20, 110:16–112:10.

  86. An agent approached José and Herlinda "in an aggressive way," had José and Herlinda line up against a wall, and told them: "You guys don't read the news. You guys don't know what's going to happen with you." *Id.* at 114:17–116:5.  The agent said, "[Y]ou're all going to be locked up, and we're going to take your children away, and they're going to go to a place for minors." *Id.* at 116:8–12.

  87. José testified that he felt "very tormented" while he and Herlinda were detained together, because he "had seen families that were being separated, and I had that fear that they might separate me, as well, from my daughter." *Id.* at 122:6–22.  José testified to "seeing [government agents] separate children from their parents" in the *hieleras*, and that "[i]t was like a funeral there." *Id.*

  88. On May 9, 2018, José and Herlinda were called out of their *hielera* and José was told to bathe and dress Herlinda.  *Id.* at 125:10–23, 126:24–127:20.  José was told "to say goodbye" to Herlinda because she was "going to be transferred to New York." *Id.* at 126:9–12.  José was told by an ICE agent that he "was going to be in custody and that [Herlinda] was going to be going to a place for minors." *Id.* at 127:3–10.  Herlinda was "sad" and "inconsolable." *Id.* at 127:23–128:14.  José, Herlinda, and other families then formed a line, and José  was told "to say goodbye" to Herlinda because she was "going to be traveling." *Id.* at 128:15–22.

  89. When Herlinda heard she would be taken away, she grabbed José by the neck, and said, crying, "[P]api, don't let them take me." *Id.* at 129:10–14.  Herlinda "stuck herself" to José, "and she wouldn't let go," so agents "c[a]me and pull[ed] her off

[José] because she wouldn't let go." *Id.* at 129:10–130:4.  Herlinda was crying as she was walked away from José.  *Id.* at 130:10–13.

90.     José was not given a phone number or any other way to communicate with Herlinda.  *Id.* at 128:23–129:4.  José was never given information about a hotline he could call to locate Herlinda.  *Id.* at 138:14–16.

91.     On May 11, 2018, ORR placed Herlinda in the custody of Lutheran Social Services of New York ("LSS").  Ex. 55, at APF-US-HHS-0003859.

92.     On May 11, 2018, José was referred to the U.S. Attorney for the District of Arizona for prosecution.  Ex. 57, at APF-US-USAO-0000002.  The prosecutors' office declined to prosecute José's case the same day, "███████████████████████████ ████████████████████████████████████."  *Id.* at APF-US-USAO-0000001.

93.     José was not able to speak with Herlinda until May 31, 2018.  Ex. 58, at APF-040935.

94.     As of June 28, 2018, LSS did not know where José was located or how to contact him.  Ex. 59, at APF-US-HHS-0003784.

95.     On July 21, 2018, José and Herlinda were reunited at the ICE detention center in Port Isabel, Texas.  Ex. 60, at APF-050546; Ex. 56, José Dep. 154:18–24.

**B.     Heriberto and Alicia**

96.     On May 12, 2018, Heriberto and his six-year-old daughter Alicia were apprehended by USBP agents and transported to the Yuma Border Patrol Station.  Ex. 61, at APF-US-DHS-U-0001766; Ex. 62, at APF-US-DHS-U-0001752.

97.     The government separated Heriberto and Alicia on May 13, 2018.  Ex. 63, at APF-DHS-U-0001755.

98.     When agents physically separated Alicia from Heriberto, she "started running after [Heriberto], and she fell."  Ex. 64, Heriberto Dep. 89:2–5.  An officer "lifted [Alicia] up, put her on his shoulder," and carried her away.  *Id.* at 89:8–11.

99.     No officer told Heriberto "what was going to happen to [Alicia]."  *Id.* at 90:13–15.

100.    On or about May 15, 2018, ORR placed Alicia in the custody of Bethany Christian Services ("BCS") in Kalamazoo, Michigan.  Ex. 65, ████████████ Dep. 128:15–17.  When BCS tried to search for records of Heriberto after it assumed custody of Alicia, it obtained no results.  Ex. 66, at APF-030030.

101.    On May 15, 2018, the government declined to prosecute Heriberto.  Ex. 67, at  APF-US-CBP-0000752, APF-US-CBP-0000754;  Ex. 36, Lokey  (U.S.A.O.  A.Z. 30(b)(6)) Dep. 255:8–258:25.

102.    Heriberto and Alicia were unable to contact each other until May 29, 2018. Ex. 65, ████████████ Dep. 85:13–86:23.

103.    According to BCS's notes for Alicia, on June 5, 2018, Heriberto "████████ ████████████████████████████████████████████████████ ████████████████."  Ex. 66, at APF-030072.

104.    Heriberto was deported on June 6, 2018 without Alicia.  *Id.* at APF-030079.

105.    On August 13, 2018, Alicia received a psychological evaluation, which concluded that she was experiencing an "████████████████," and that the "████ ████████████████████████████████████████████████████ ████████████████."  Ex. 68, at APF-029859, APF-029861.

106.    On August 30, 2018, Alicia was deported to Guatemala and reunited with Heriberto.  Ex. 66, at APF-030241; Ex. 64, Heriberto Dep. 104:12–105:4.

**C.    Abel and Obet**

107.    USBP apprehended Abel and his seven-year-old son Obet on May 18, 2018. Ex. 69; Ex. 70.

108.    When Abel and Obet were detained together, Abel testified that he and Obet "saw this horrible thing where some children were screaming and yelling and they were being turned away from their parents. And there were children younger than [Obet], and they were being torn apart from their parents by these tall agents. And the children were younger than [Obet], and [Obet] and myself, we were seeing this, and the parents were shorter in height from the agents. We could see through a big glass, those children, and

[Obet] came to me full of fear and he asked me if we would undergo that same situation those children were going through."  Ex. 71, Abel Dep. 81:6–19.

109.   Abel testified that the scene of government agents separating children from their parents was "something we've never seen before.  It was like a horror movie."  *Id.* at 81:20–82:3.

110.   On May 19, 2018, the government separated Obet from Abel and placed Obet in ORR custody.  Ex. 70.

111.   On that day, "[a]bout five people . . . gather[ed] around" Abel and Obet's cell door.  Ex. 71, Abel Dep. 82:24–83:2.  The officers were armed with "weapons at their waist."  *Id.* at 83:5–10.  They opened the door and "took [Obet] by force without any notice of where he was being taken."  *Id.* at 83:4–5.  Abel "wanted to protect and defend [his] son," but he "didn't say anything because [he] didn't want them to take [Obet] by force."  *Id.* at 83:8–12.

112.   Abel was then taken "to a cell where there were about 70 parents and other people," and he was held there "approximately for seven days."  *Id.* at 84:12–15.

113.   On or about May 21, 2018, the government declined to prosecute Abel.  Ex. 72, at APF-US-USAO-0000017 (including Abel on a list of individuals "███████████ ████████████████████████████" on May 20, 2018); Ex. 73 (stating that Abel's prosecution was declined on May 21, 2018); Ex. 74, at APF-US-USAO-0000014 (including Abel on a May 22, 2018 list of prosecutions declined by the U.S. Attorney's Office for the District of Arizona).

114.   Abel did not receive any information about Obet until "50 days later," when he "received a piece of paper saying that [Obet] was at a place called Cayuga, and that I had a one-minute credit to call."  Ex. 71, Abel Dep. 86:4–8.  Abel called the number, but "there was no answer."  *Id.* at 86:8–9.

115.   Abel and Obet were reunified on July 25, 2018.  Ex. 75.

**D.    Joel and Mariela**

116.    On May 19, 2018, Joel and his eleven-year-old daughter Mariela were apprehended by CBP and transported to the Yuma Border Patrol Station.  Ex. 76, at APF-US-DHS-U-0001718–19; Ex. 77, at APF-US-DHS-U-0001857.

117.    On May 20, 2018, CBP referred Joel for prosecution and placed Joel and Mariela in separate cells in the Yuma Border Patrol Station.  Ex. 78, at APF-US-DHS-U-0001863; Ex. 77, at APF-US-DHS-U-0001858.

118.    Joel was told that Mariela was going to a place where "she could eat well and where she would be all right."  Ex. 79, Joel Dep. 105:17–20.  Joel was also told that he would be able to speak to Mariela.  *Id.* at 106:11–15.

119.    When government agents took Mariela away from Joel, Mariela "didn't go peacefully."  *Id.* at 101:15–19.

120.    After government agents separated Mariela from Joel, he "began to cry like a child, not having her near me."  *Id.* at 101:18–19.

121.    On May 22, 2018, the U.S. Attorney's Office for the District of Arizona notified Border Patrol that it would not accept Joel's case for prosecution for any violations of U.S. immigration laws.  Ex. 74, at APF-US-USAO-0000014.

122.    USBP Agent ▮▮▮▮ testified that Joel and Mariela were kept in separate cells at the Yuma Border Patrol Station "for approximately a day-and-a-half or more after the prosecution declination happened," "[e]ven though they were at the same facility within a few-minute walk of each other."  Ex. 31, ▮▮▮▮ Dep. 341:4–342:2.

123.    On or about May 24, 2018, Mariela was placed in ORR's custody and transferred to ORR's Southwest Key facility in Brownsville, Texas.  Ex. 80.

124.    Joel was not listed on the approved phone call list for Mariela at Southwest Key.  Ex. 81, ▮▮▮▮▮▮▮▮ Dep. 181:16–22.

125.    Joel was not told of Mariela's location despite multiple attempts to gather such information.  Ex. 79, Joel Dep. 102:1–5, 109:7–16, 124:9–125:5.

126.   The first call that [Mariela] had with her father since she arrived at Southwest Key occurred on June 25, 2018.  Ex. 81, ███████████ Dep. 176:25–177:12.

127.   On July 22, 2018, Joel and Mariela were reunited at the Port Isabel Detention Facility.  *Id.* at 84:22–85:5; Ex. 79, Joel Dep. 134:16–21.

**E.    Rolando and Bertha**

128.   On November 13, 2017, Rolando and his nine-year-old daughter Bertha sought asylum in the United States at the Nogales, Arizona port of entry.  Ex. 82.

129.   On November 15, 2017, ICE ERO Field Officer Juvenile Coordinator ("FOJC") officer ███████████ interviewed Rolando and Bertha and verified their parent-child relationship.  Ex. 83.

130.   Despite ██████ confirming Rolando and Bertha's familial relationship, at 10:46 a.m., ICE ERO officer ███████████ requested that Rolando and Bertha be separated based on Rolando's prior criminal history.  *Id.*  At 10:48 a.m., ███████ supervisor ███████████ replied, writing, "███████████████████████," and "███████████████████████████."  *Id.*

131.   Later that day, officers came with chains to Rolando and Bertha's room.  Ex. 84, Rolando Dep. 85:22–88:2.  The officers grabbed Rolando and took him outside the room.  *Id.* at 90:18–91:7.  The officers "shut the door quickly" and left Bertha crying inside.  *Id.* at 90:18–91:4.  Bertha later reported that an "officer hit her with a belt buckle," bruising her.  *Id.* at 100:4–101:16.  "The officer told her 'If you don't stop crying, I'm going to hit you more times with the belt.'"  *Id.* at 100:25–101:10.

132.   The officers did not let Rolando "say goodbye to [his] daughter."  *Id.* at 91:3–4.  Rolando "wanted to speak with her," but the officers "didn't let [him] speak with her."  *Id.* at 91:22–92:6.  After the separation, Rolando was not told "what was going to happen to [Bertha]."  *Id.* at 95:24–96:6.

133.   Bertha was transferred to Cayuga Centers, an ORR-contracted facility in New York.  Ex. 85.

134.    Rolando was not able to speak with Bertha for six days, when he was able to speak with Bertha for approximately five minutes.  Ex. 86, at CC000736.

135.    When Rolando spoke with Bertha, he did not know "where she was at that time."  Ex. 84, Rolando Dep. at 102:19–22.

136.    Rolando was deported to Guatemala without Bertha.  *Id.* at 107:17–108:1.

137.    Rolando and Bertha were reunited in Guatemala on July 26, 2018.  Ex. 86, at CC000736.

**F.    Mario and Antonio**

138.    On November 19, 2017, Mario and his seven-year-old son Antonio presented themselves at the DeConcini Port of Entry in Nogales, Arizona seeking asylum. Ex. 87, at 2.

139.    On November 20, 2017, at 9:24 a.m., FOJC officer ███████ asked ███████, "███████████████" Mario and Antonio "███████████ ███████"  Ex. 88, at APF-US-ICE-0064091A.  At 9:40 a.m., ███████ emailed ███ "███████ ███████ ███ ███████ ███ ███ ███ ███████ ███."  *Id.*  At 10:09 a.m., ███ responded, "███████████."  *Id.*

140.    ███████ instructed ███ to "███████████████ ███████████████."  *Id.* at APF-US-ICE-0064090A.

141.    That afternoon, ███████ instructed officers, "███████████ ███████████████████████████ ███."  Ex. 89.

142.    An officer informed Mario that he would be separated from his son "whether [Mario" want[ed] it or not."  Ex. 90, Mario Dep. 114:15-17.  The officer told Mario to "ask [his] son to behave well."  *Id.*

143.    Antonio "screamed" and "cr[ied]" when officers took him from Mario.  *Id.* at 117:22–23.  The officers were not able to take him away during the first attempt.  *Id.*

- 24 -

Two more officers came and grabbed Mario's hands, while a third officer took Antonio away from him. *Id.* at 117:25–118:3.

144.    Mario was not told where his son was going or how long he would be separated from his son. *Id.* at 115:19–25

145.    On November 22, 2017, Antonio was admitted to Cayuga Centers. Ex. 91; Ex. 92.

146.    Mario sent six written requests for information about Antonio's location and how to contact him. Ex. 93, at APF_004250–61. He was informed by ICE officers "that they didn't know anything" about Antonio's location. Ex. 90, Mario Dep. 124:5–125:1. After approximately his "third request," ICE told Mario that Antonio "was in New York." *Id.* at 124:21–125:1.

147.    The first time Mario was able to speak with Antonio was on December 8, 2017. Ex. 94, at APF-US-HHS-U-0001355.

148.    Mario was deported to Guatemala on January 17, 2018, without Antonio. Ex. 90, Mario Dep. 130:17–131:22; Ex. 95, at APF-US-DHS-U-0000954.

149.    Antonio was scheduled to return to Guatemala on July 9, 2018, but his flight was canceled and rescheduled for the end of July 2018. Ex. 96.

150.    Mario and Antonio were reunited in Guatemala on July 26, 2018. *Id.*

Respectfully submitted this 9th day of March, 2023.

By _s/ _Keith Beauchamp_
COPPERSMITH BROCKELMAN PLC
Keith Beauchamp
D. Andrew Gaona

COVINGTON & BURLING LLP
Matthew J. Schlesinger*
Jason A. Carey*
Jennifer L. Saulino*
Terra White Fulham*
Teresa S. Park*
Kathleen E. Paley*
Kavita R. Pillai*
Emily R. Woods*
Kristin M. Cobb*
Shadman Zaman*
Stephen Rees*†
Paulina Slagter*
Samuel Greeley*
Joshua Silver*
Patrick Lee*
One City Center, 850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: (202) 662-5581
mschlesinger@cov.com
jcarey@cov.com
jsaulino@cov.com
tfulham@cov.com
tpark@cov.com
kpaley@cov.com
kpillai@cov.com
rwoods@cov.com
kcobb@cov.com
szaman@cov.com
srees@cov.com
pslagter@cov.com
sgreeley@cov.com
jsilver@cov.com
plee@cov.com

SOUTHERN POVERTY LAW CENTER
Norma Ventura*
James Knoepp*
Sharada Jambulapati*
150 E. Ponce de Leon
Suite 340
Decatur, GA 30030
Telephone: (404) 521-6700
norma.ventura@splcenter.org
jim.knoepp@splcenter.org

sharada.jambulapati@splcenter.org

SOUTHERN POVERTY LAW CENTER
Paul R. Chavez*
2 S. Biscayne Boulevard
Suite 3750
Miami, FL 33137
Telephone: (786) 347-2056
paul.chavez@splcenter.org

*Attorneys for Plaintiffs A.P.F. et al.*
*\* Admitted pro hac vice*
*† Admitted only in Illinois, not admitted*
*in the District of Columbia, and*
*supervised by principals of the firm.*

*A.P.F., et al. v. United States of America*

**Index of Exhibits to Separate Statement of Facts in Support of
Plaintiffs' Motion for Partial Summary Judgment**

| Exhibit No. | Title | Citation |
|---|---|---|
| 1 | CBP, *National Standards on Transport, Escort, Detention, and Search* (Oct. 2015) | Available at https://www.cbp.gov/sites/default/files/assets/documents/2020-Feb/cbp-teds-policy-october2015.pdf |
| 2 | ICE, *Performance-Based National Detention Standards* (revised Dec. 2016) | Available at https://www.ice.gov/doclib/detention-standards/2011/5-6.pdf |
| 3 | Testimony of former ORR Deputy Director for Children's Programs Commander Jonathan White | White Dep. 46:25–48:9, 281:11–17, 304:23–308:6 |
| 4 | Testimony of former CBP Commissioner Kevin McAleenan | McAleenan Dep. 106:8–108:8 |
| 5 | 9/7/2022 Testimony of former ORR Associate Deputy Director Tricia Swartz | Swartz 9/7/2022 Dep. 11:15–12:7 |
| 6 | ███████████████ | CD-US-0219621 |
| 7 | Madeline Conway, POLITICO, *Kelly Confirms He's Considering Programs to Separate Migrant Children and Parents* (Mar. 6, 3017) | Available at https://www.politico.com/story/2017/03/kelly-migrant-chidren-travel-ban-235738 |
| 8 | Daniella Diaz, CNN, *Kelly: DHS Is Considering Separating Undocumented Children from Their Parents at the Border* (Mar. 7, 2017) | Available at https://www.cnn.com/2017/03/06/politics/john-kelly-separating-children-from-parents-immigration-border/index.html |
| 9 | Letter from Democratic Members of Congress to DHS Secretary Kelly (Mar. 8, 2017) | Dep. Ex. 160; CD-US-00016642 |
| 10 | Letter from Immigration Organizations to DHS Secretary Kelly (Mar. 22, 2017) | Dep. Ex. 660; CD-US-0047007 |
| 11 | DOJ OIG, *Review of the Department of Justice's Planning and Implementation of Its Zero Tolerance Policy and Its Coordination with the Department of Homeland Security and Health and Human Services* (revised Apr. 13, 2022) | Dep. Ex. 182 |
| 12 | Emails re "BP 1325 Prosecutions & I-213s" (Mar. 8, 2017) | Dep. Ex. 181; CD-US-0049531 |
| 13 | Emails re "Family Units" (Aug. 2, 2017) | Dep. Ex. 3; CD-US-00017118 |
| 14 | Email re "Timeline and backdrop on 1325 prosecutions and family units" (Dec. 21, 2017) | Dep. Ex. 180; CD-US-0049389 |

| Exhibit No. | Title | Citation |
|---|---|---|
| 15 | DHS OIG, *DHS Lacked Technology Needed to Successfully Account for Separated Migrant Families* (Nov. 25, 2019) | Dep. Ex. 666 |
| 16 | Emails re "DHS Separating Families" (Nov. 18, 2017) | Dep. Ex. 164; CD-US-0024332 |
| 17 | Emails re "ELP Initiative" (Dec. 13, 2017) | Dep. Ex. 161; CD-US-0054279 |
| 18 | Emails re "request re: complaint filed" (Dec. 19, 2017) | Dep. Ex. 600; CD-US-0094463 |
| 19 | ██████████████████ | Dep. Ex. 179; CD-US-0049398 |
| 20 | Email re "Policy Edits to UAC Options" (Dec. 16, 2017) | Dep. Ex. 324; CD-US-0097310A |
| 21 | Letter from AAP to DHS Secretary Nielsen (Jan. 11, 2018) | Dep. Ex. 373; CD-US-00016507A |
| 22 | Letter from Senators Durbin and Duckworth to DHS Secretary Nielsen (Mar. 2, 2018) | CD-US-0217933 |
| 23 | Testimony of former DHS Chief of Staff Chad Wolf | Wolf Dep. 196:3–16, 198:3–10 |
| 24 | Memorandum re "Zero-Tolerance for Offenses Under 8 U.S.C. § 1325(a)" (Apr. 6, 2018) | Dep. Ex. 187; APF-US-DOJ-0000001 |
| 25 | Memorandum re "Increasing Prosecutions of Immigration Violations" (decision memorandum dated Apr. 23, 2018; signed by Secretary Nielsen on May 4, 2018) | Dep. Ex. 191; CD-US-0024043 |
| 26 | Draft Memorandum re "Increasing Prosecutions of Immigration Violations" (Apr. 20, 2018) | CD-US-0102694TAA |
| 27 | Email re "Decision Memo: Increasing Referrals for Prosecution" (Apr. 24, 2018) | CD-US-0085000A |
| 28 | Memorandum re "Referral for Prosecution under 8 U.S.C. 1325(a), Improper Entry by Alien" (May 11, 2018) | CD-US-0050303 |
| 29 | 30(b)(6) Testimony of CBP OFO, by and through Bonnie Arellan | Arellano (CBP OFO 30(b)(6)) Dep. 2███████22 |
| 30 | ██████ny of USBP Agent ███████ | ████████ Dep. 34:6–17, 181:13–22 |
| 31 | ██████ny of USBP Agent ███████, Jr. | ████████ Dep. 221:14–18, 341:4–3 |
| 32 | Testimony of ICE ERO Acting Deputy Assistant Director Robert Guadian | Guadian Dep. 40:3–41:9, 61:2–11 |
| 33 | Testimony of former ICE Unit Chief of the Juvenile & Family Residential Management Unit Mellissa Harper | Harper Dep. 30:14–24, 110:4–9 |

| Exhibit No. | Title | Citation |
|---|---|---|
| 34 | 5/24/2022 Testimony of former ORR Associate Deputy Director Tricia Swartz | Swartz 5/24/2022 Dep. 194:21–24 |
| 35 | Email re "Family Separation" (May 31, 2018) | CD-US-0090515 |
| 36 | 30(b)(6) Testimony of U.S. Attorney's Office for the District of Arizona, by and through Sean Lokey | Lokey (USAO D. Ariz. 30(b)(6)) Dep. 110:15–111:9, 255:8–258:25 |
| 37 | Email re "USBP Chiefs VTC notes" (May 10, 2018) | Dep. Ex. 317; CD-US-0080521 |
| 38 | Email re "Phoenix Prosecution Paper" (May 10, 2018) | Dep. Ex. 380; CD-US-0167960 |
| 39 | NPR, *Transcript: Homeland Security Secretary Kirstjen Nielsen's Full Interview with NPR* (May 10, 2018) | Available at https://www.npr.org/2018/05/10/610113364/transcript-homeland-security-secretary-kirstjen-nielsens-full-interview-with-npr |
| 40 | Memorandum re "Family Separation Policy – Serious Constitutional, U.S. Law, and Treaty Concerns" (May 12, 2018) | Dep. Ex. 695; CD-US-0063242A |
| 41 | Emails re "CBP is Reuniting adults with kids" (May 25, 2018) | Dep. Ex. 158; CD-US-0030037 |
| 42 | Emails re "(Immediate Action) CBP is Reuniting adults with kids" (June 20, 2018) | Dep. Ex. 18; CD-US-0028320 |
| 43 | CRCL Memorandum re Complaints Concerning Family Separation (June 12, 2018) | CD-US-0045414 |
| 44 | Emails re "Connecting parents and kids" (June 16, 2018) | Dep. Ex. 674; CD-US-0190277 |
| 45 | HHS OIG, *Communication and Management Challenges Impeded HHS's Response to the Zero-Tolerance Policy* (March 2020) | Dep. Ex. 277; CM-US-OIG-0000087 |
| 46 | Exec. Order No. 13841, 83 Fed. Reg. 122 (June 20, 2018) | Available at https://www.govinfo.gov/content/pkg/FR-2018-06-25/pdf/2018-13696.pdf |
| 47 | Emails re "Border Security PCC, Summary of Conclusions June 21, 2018" (June 22, 2018) | CD-US-0194647 |
| 48 | Dan Diamond, POLITICO, *HHS Created Task Force to Reunify Migrant Families* (June 22, 2018) | Available at https://www.politico.com/story/2018/06/22/separated-families-migrants-reunite-667172 |
| 49 | Emails re "HHS" (June 23, 2018) | CD-US-0169162 |
| 50 | Memorandum re "Request Funding for Additional Resources to Support Effective Family Reunification in Response to the Zero Tolerance Initiative" (June 26, 2018) | CD-US-0068355 |

| Exhibit No. | Title | Citation |
|---|---|---|
| 51 | Exec. Order No. 14011, 86 Fed. Reg. 8273 (Feb. 2, 2021) | Available at https://www.govinfo.gov/content/pkg/FR-2021-02-05/pdf/2021-02562.pdf |
| 52 | Jeremy Herb, CNN, *Garland Vows at Confirmation Hearing to Keep Politics out of DOJ While Drawing Bipartisan Praise* (Feb. 22, 2021) | Available at https://www.cnn.com/2021/02/22/politics/merrick-garland-confirmation-hearing-day-1/index.html |
| 53 | Keith Zubrow, 60 Minutes Overtime, *DHS Sec. Mayorkas Calls for Legislation to Grant Separated Families Legal Status* (Oct. 10, 2021) | Available at https://www.cbsnews.com/news/mayorkas-immigration-family-separation-60-minutes-2021-10-10/ |
| 54 | DHS, *DHS to Request Public Input on How the U.S. Government Can Prevent Family Separations at the U.S. Border* (Dec. 9, 2021) | Available at https://www.dhs.gov/news/2021/12/09/dhs-request-public-input-how-us-government-can-prevent-family-separations-us-border |
| 55 | ███████████████ | Dep. Ex. 471; APF-US-HHS-0003859 |
| 56 | Testimony of Plaintiff "José" | José Dep. 96:4–8, 100:1–101:20, 110:16–112:10, 114:17–116:5, 116:8–12, 122:6–22, 125:10–23, 126:9–12, 126:24–127:10, 127:23–130:13, 138:14–16, 154:18–24 |
| 57 | ███████████████ | Dep. Ex. 550; APF-US-USAO-0000001 |
| 58 | ███████████████ | LSS Dep. Ex. 6; APF-040855 |
| 59 | ███████████████ | Dep. Ex. 476; APF-US-HHS-0003784 |
| 60 | ███████████████ | LSS Dep. Ex. 22; APF-050546 |
| 61 | ███████████████ | Dep. Ex. 551; APF-US-DHS-U-0001766 |
| 62 | ███████████████ | Dep. Ex. 54, APF-US-DHS-U-0001752 |
| 63 | ███████████████ | Dep. Ex. 53; APF-US-DHS-U-0001754 |
| 64 | Testimony of Plaintiff "Heriberto" | Heriberto Dep. 89:2–11, 90:13–15, 104:12–105:4 |
| 65 | ███████████████ Dep. 85:13–8 | |
| 66 | ███████████████ | Dep. Ex. 219; APF-030030 |
| 67 | ███████████████ | Dep. Ex. 552; APF-US-CBP-0000752 |
| 68 | ███████████████ | Dep. Ex. 222; APF-029841 |
| 69 | ███████████████ | Dep. Ex. 322; APF-US-DHS-U-0001732 |
| 70 | ███████████████ | Dep. Ex. 450; CC001941 |

| Exhibit No. | Title | Citation |
|---|---|---|
| 71 | Testimony of Plaintiff "Abel" | Abel Dep. 81:20–83:12, 84:12–15, 86:4–9 |
| 72 | ███████████████ | Dep. Ex. 553; APF-US-USAO-0000016 |
| 73 | ███████ | Dep. Ex. 49; APF-US-CBP-0000364 |
| 74 | ███████████████ | Dep. Ex. 555; APF-US-USAO-0000014 |
| 75 | ██████████ | CC001561 |
| 76 | ███████████████ | Dep. Ex. 556; APF-US-DHS-U-0001717 |
| 77 | ████████████ | Dep. Ex. 44; APF-US-DHS-U-0001857 |
| 78 | ████████████ | Dep. Ex. 43; APF-US-DHS-U-0001862 |
| 79 | Testimony of Plaintiff "Joel" | Joel Dep. 101:15–19, 102:1–5, 105:17–20, 106:11–15, 109:7–16, 124:9–125:5, 134:16–21 |
| 80 | ███████████████ | Dep. Ex. 47; APF-US-CBP-0000371 |
| 81 | ███████████████ | ████████████████████, D████████████████████, 181:16–22 |
| 82 | ███████████████ | Dep. Ex. 75; APF-US-CBP-R-0000337 |
| 83 | ███████████████ | Dep. Ex. 105; APF-US-ICE-0027727 |
| 84 | Testimony of Plaintiff "Rolando" | Rolando Dep. 85:22–88:2, 90:18–91:7, 91:22–92:6, 95:24–96:6 100:4–101:16, 102:19–22, 107:17–108:1 |
| 85 | ███████████████ | Cayuga Centers Dep. Ex. 11; CC001351 |
| 86 | ███████████████ | CC000733 |
| 87 | ███████████████ | Dep. Ex. 107; APF-US-ICE-0001920 |
| 88 | ███████████████ | Dep. Ex. 633; APF-US-ICE-0064090A |
| 89 | ███████████████ | Dep. Ex. 631 |
| 90 | Testimony of Plaintiff "Mario" | Mario Dep. 105:6–110:10, 114:15–17, 115:19–25, 117:22–118:3, 124:5–125:1, 130:17–131:22 |
| 91 | ███████████ | Cayuga Centers Dep. Ex. 10; CC000612 |
| 92 | ███████████████ | Cayuga Centers Dep. Ex. 24; APF-US-ICE-0002240 |
| 93 | ███████████████ | APF_004250 |

| Exhibit No. | Title | Citation |
|---|---|---|
| 94 | █████████████████ | APF-US-HHS-U-0000995, at APF-US-HHS-U-0001353–65 |
| 95 | ███████████████ | APF-US-DHS-U-0000836, at APF-US-DHS-U-0000954 |
| 96 | ███████████ | APF-US-DHS-R-0001692 |