BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division
JAMES G. TOUHEY, JR.
Director, Torts Branch
PHILIP D. MACWILLIAMS
Trial Attorney
D.C. Bar No. 482883
E-mail: phil.macwilliams@usdoj.gov
U.S. Department of Justice
Civil Division, Torts Branch
Benjamin Franklin Station, P.O. Box 888
Washington, DC 20044
Telephone: (202) 616-4285
Attorneys for the United States of America

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| A.P.F. on his own behalf and on behalf of his minor child, O.B.; J.V.S., on his own behalf and on behalf of his minor child H.Y.; J.D.G. on his own behalf and on behalf of his minor child, M.G.; H.P.M. on his own behalf and on behalf of his minor child, A.D.; M.C.L. on his own behalf and on behalf of his minor child, A.J.; and R.Z.G. on his own half and on behalf of his minor child, B.P., <br><br> Plaintiffs, <br><br> v. <br><br> United States of America, <br><br> Defendant. | Case no. 2:20-CV-00065-PHX-SRB <br><br> **STATEMENT OF FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

## STATEMENT OF FACTS

1.    In 1996, the federal government entered into a settlement agreement referred to as the "*Flores* Settlement Agreement."  *See Flores v. Sessions*, No. 85-cv-4544 (C.D. Cal. Feb. 2, 2015) (ECF No. 101).

2.    The U.S. District Court for the Central District of California issued orders enforcing the *Flores* Settlement Agreement ("the *Flores* court orders"),[1] whose operational impact limited the ability of U.S. Immigration and Customs Enforcement ("ICE") to house children in a family residential center (FRC) for longer than 20 days. Ex. A Att. 1 (McAleenan 177, 345-348); Ex. A Att. 2 (Homan 71, 81-83, 180-182).

3.    Because immigration proceedings typically lasted for longer than 20 days, the operational impact of ICE's implementation of the *Flores* court order was that family units that were apprehended along the U.S.-Mexico border had to be released directly into the United States either immediately following their entry or following a brief stay at a family residential center.  Ex. A Att. 1 (McAleenan 95-96;128-130, 345-348, 365); Ex. A Att. 2 (Homan 71, 180-182); Ex. B Att. 1 at 9-11, 17.

4.    On April 11, 2017, then-Attorney General Jefferson Sessions issued a memorandum titled "Renewed Commitment to Criminal Immigration Enforcement."  Ex. C Att. 1.

5.    On April 6, 2018, Attorney General Sessions issued a Memorandum For Federal Prosecutors Along the Southwest Border, titled "Zero-Tolerance for Offenses Under 8 U.S.C. § 1325(a)."  Ex. C Att. 2.

6.    In a memorandum dated April 23, 2018, titled "Increasing Prosecutions of Immigration Violations," the Commissioner of U.S. Customs and Border Protection ("CBP"), the Director of ICE, and the Director of U.S. Citizenship and Immigration Services ("USCIS") proposed three prosecution referral policy options to the Secretary of Homeland Security (the "DHS Referral Memorandum").  Ex. C Att. 3.

---

[1] *Flores v. Sessions*, 394 F.Supp.3d 1041 (C.D. Cal. 2017); *Flores v. Sessions*, 212 F.Supp.3d 907 (C.D. Cal. 2015).

7.     The drafting of the DHS Referral Memorandum was coordinated by CBP at the request of DHS Secretary Kirstjen Nielsen, and the DHS Referral Memorandum was transmitted to Secretary Nielsen through the Office of the Executive Secretary.  Ex. C Att. 3; Ex. A Att. 1 (McAleenan 48-52, 296).

8.     In the DHS Referral Memorandum, the option recommended by the Commissioner of CBP, the Director of ICE, and the Director of USCIS was Option 3, which stated:

**Option 3- Refer all Amenable Adults, including those presenting as part of a FMUA [family unit]:** Work with DOJ, the Department of Health and Human Services, and other interagency partners to develop a quickly scalable approach to achieve 100% immigration violation prosecution referral for all amenable adults, including those initially arriving or apprehended with minors.

Ex. C Att. 3.

9.     The term "amenable to prosecution" as used in the DHS Referral Memorandum referred to adults who violated 8 U.S.C. § 1325 and were eligible to be prosecuted.  Ex. C Att. 3; Ex. A Att. 1 (McAleenan 61).

10.     Prior to a decision on the DHS Referral Memorandum, CBP Commissioner Kevin McAleenan and others participated in several meetings with Secretary Nielsen to discuss readiness and operational aspects of the implementation of the proposed options. Ex. A Att. 1 (McAleenan 188-190, 263-265, 272-275, 368-372); Ex. B Att. 2 at 31.

11.     The agency heads who proposed the policy options in the DHS Referral Memorandum determined that criminal prosecutions were enforcement actions that were effective in reducing illegal border crossings.  Ex. C Att. 3; Ex. A Att. 1 (McAleenan 138, 263-265); Ex. A Att. 2 (Homan 68, 160); Ex. A Att. 3 (Hastings 294-295); Ex. A Att. 4 (Vitiello 220-221).

12.     The agency heads who proposed the policy options in the DHS Referral Memorandum determined that the prompt removal of inadmissible non-citizens who had been ordered removed were enforcement actions that were effective in reducing illegal border crossings.  Ex. A Att. 1 (McAleenan 118, 201-202); Ex. A Att. 2 (Homan 47-48, 69-71, 160).

13.     The agency heads who proposed the policy options in the DHS Referral Memorandum determined that the detention of adult non-citizens pending removal proceedings was an effective tool to ensure that the removal proceedings for the non-citizen were completed promptly and removal if ordered could be effectuated. Ex. A Att. B (Homan 79 178-180); Ex. A Att. 1 (McAleenan 102-104, 335-337, 348).

14.     The agency heads who proposed the policy options in the DHS Referral Memorandum determined that unlawful entries across the Southwest Border, including by family units, had increased from March to April 2018 as part of a trend of increasing border crossings by family units beginning in 2017.  Ex. A Att. 1 (McAleenan 96, 365-367); Ex. C Att. 3.

15.     On May 4, 2018, Secretary Nielsen approved Option 3 in the DHS Referral Memorandum: to refer all amenable adults who unlawfully cross the Southwest border for criminal prosecution, including those who arrive as part of a family unit ("Option 3" or the "DHS Referral Policy").  Ex. C Att. 3; Ex. C Att. 4 ("May 11, 2018 Secretary Memorandum").

16.     The DHS Referral Policy did not constrain or otherwise change ICE's statutory authority or processes relating to the detention of non-citizens pending removal proceedings, including as applied to adult non-citizens who were transferred to ICE custody following separation from their children.  Ex. C Att. 3.

17.     There was no prescribed specific course of action for reunification applicable to all adult non-citizens and their children who were separated as a result of enforcement actions taken in furtherance of the DHS Referral Policy.  Ex. C Att. 3; Ex. A Att. 1 (McAleenan 87-90); Ex. A Att. 2 (Homan 202).

18.      It was not Secretary Nielsen's purpose in adopting the DHS Referral Policy to use separations of parents and children to inflict harm as a deterrent to non-citizens seeking entry into the United States. Ex. B Att. 1 at 46-47; Ex. B Att. 2 at 18-19; Ex. A Att. 1 (McAleenan 367-376).

19.     The policy objectives of the DHS Referral Policy articulated by DHS officials were to deter and provide criminal consequences for illegal Southwest Border crossings;

to prevent harm inflicted on non-citizens through the dangerous journey to the Southwest border of the United States which is coordinated by and enriches criminal networks; to reduce the operational strain on U.S. Border Patrol resources created by unlawful entries by family units, which diverts limited law enforcement resources from border security operations; and to ensure that immigration proceedings were promptly completed, and final orders of removal could be effectuated following completion of immigration proceedings.  Ex. C Att. 3; Ex. A Att. 1 (McAleenan 87, 95-99, 199-202, 242-246, 263-265, 281-282, 344-361); Ex. A. Att. 2 (Homan 43-48, 68, 160); Ex. A Att. 3 (Hastings 294-295, 297-301); Ex. B Att. 1 at 46; Ex. B. Att. 2 at 18-19.

20.     Separations of family units as a result of law enforcement actions taken pursuant to the DHS Referral Policy were expected to be temporary, lasting for the duration of the parent's immigration proceedings if the parent was not granted release sooner.  Ex. A Att. 1 (McAleenan 87-89, 142-144); Ex. A Att. 2 (Homan 178-79).

21.     Prior to submitting the DHS Referral Memorandum to Secretary Nielsen, multiple other policy options to address illegal border crossings, including by family units, were discussed and considered – including safe third country agreements and proposed legislation to address the *Flores* Agreement and allow DHS to maintain custody of family units through the pendency of their immigration proceedings – but it was determined that they would not come to fruition in time to address the illegal border crossings anticipated during the Spring and Summer of 2018.  Ex. A Att. 1 (McAleenan 97-98, 361-364).

22.     Prior to implementation of the DHS Referral Policy in May 2018, CBP (including U.S. Border Patrol), HHS, DOJ, and ICE engaged in planning meetings to discuss agency resources and readiness.  Ex A Att. 1 (McAleenan 222-224, 231-233, 366-367); Ex. A Att. 3 (Hastings 60-62, 75-76).

23.     On May 4, 2018, U.S. Border Patrol Headquarters sent to the U.S. Border Patrol Sector Chiefs and Deputy Chiefs of the Southwest Border Sectors a Concept of Operations ("ConOp") regarding the implementation of the DHS Referral Policy and notified the Southwest Border Sectors that they were "authorized to implement increased

Southwest Border Prosecutions, as outlined in the [ConOp], **effective May 5, 2018.**" Ex. C Att. 5 (emphasis in original).

24.     CBP Commissioner McAleenan directed that parents traveling with children under the age of five (5) were exempt from the DHS Referral Policy for first time violations of 8 U.S.C. § 1325(a).  Ex. A Att. 1 (McAleenan 87).

25.    CBP's National Standards on Transport, Escort, Detention, and Search ("TEDS") sets forth the "nationwide standards which govern CBP's interaction with detained individuals" and was in place while the DHS Referral Policy was in effect.  Ex. C Att. 6; Ex. A Att. 3 (Hastings 303-304).

26.    Prior to and while the DHS Referral Policy was in effect, there had been no directives issued to the U.S. Border Patrol Sectors prescribing precisely (1) when a non-citizen child—whose non-citizen parent was to be referred for criminal prosecution—should be designated an unaccompanied alien child ("UAC") under the Trafficking Victims Protection Reauthorization Act of 2008, or (2) when a placement request with the Department of Health and Human Services' Office of Refugee Resettlement ("ORR") should be made.  Ex A Att. 1 (McAleenan 65-66, 71, 91-94, 217-222); Ex. A Att. 5 (DHS 30(b)(6) 140); Ex. Att. 3 (Hastings 306-307).

27.    Prior to and while the DHS Referral Policy was in effect, as a matter of operational practice, U.S. Border Patrol agents would make a placement request with ORR as expeditiously as possible to obtain placement of the child as soon as possible following the apprehension of the child designated as a UAC.  Ex. A Att. 1 (McAleenan 65-68, 71, 291-293); Ex. A Att. 3 (Hastings 44-45, 303-307); Ex. A Att. 4 (Vitiello 170).

28.     When a parent and child were separated while in Border Patrol custody and the adult non-citizen was transferred to the custody of ICE, ICE Enforcement and Removal Operations ("ICE-ERO") would proceed with custody decisions pursuant to its existing processes relating to the detention of adult non-citizens.  Ex. A Att. 2 (Homan 21-22); Ex. A Att. 6 (Albence 64-65, 68-69).

29.     When a parent and child were transferred by Border Patrol to ICE as a family unit, ICE-ERO would proceed with custody decisions pursuant to its existing processes relating to family units.  Exhibit A Att. 6 (Albence at 68-69).

30.     As a matter of pre-existing operational practice, and while the DHS Referral Policy was in effect, when a non-citizen child was transferred to the custody of ORR and the parent was transferred to ICE custody: (1) the separated parent and child could be reunified at the parent's request to be repatriated together upon removal of the parent, through coordination between ICE and HHS; (2) or, if the parent was released from ICE custody, the parent could seek release of the child from ORR.  Ex. A Att. 1 (McAleenan 87-91, 287-290, 300- 301); Ex. A Att. 2 (Homan 151-152).

31.     Implementation of the DHS Referral Policy utilized pre-existing processes and practices related to: processing non-citizen parents and children upon apprehension by Border Patrol; referring an adult for prosecution by Border Patrol to the U.S. Attorney's Office; requesting placement of a UAC with ORR and transferring custody of a child from Border Patrol to ORR; transferring adults to ICE custody from Border Patrol; detaining adults in ICE custody pending immigration proceedings; locating an appropriate placement for a child by ORR; establishing communications between a separated parent and child; and coordinating between ICE and ORR regarding reunification of a parent and child.  Ex. A Att. 1 (McAleenan 214-217, 307 -310); Ex. A Att. 2 (Homan 151-152); Ex. A Att. 6 (Albence 281-283); Ex. A Att. 4 (Vitiello 179-182).

32.     On May 7, 2018, the U.S. Border Patrol Yuma Sector (1) notified its Patrol Agents-In-Charge ("PAICs") to "immediately begin identifying and processing all eligible adult aliens for prosecution, regardless of accompanying family members or nationality"; (2) advised PAICs that: "For the purposes of identifying adults eligible for prosecution, those accompanied by tender age children, age 4 and younger, will not be processed for prosecution"; and (3) provided guidance to document in the Form I-213, Record of Deportable/Inadmissible Alien, that a parent and child separation occurred and the names and Alien Registration Numbers of the parent and child.  Ex. C Att. 7.

33.     The electronic system through which U.S. Border Patrol agents would make a request to ORR for placement of a UAC contained a feature in which Border Patrol agents could include information about the child's relatives, including the name and Alien Registration Number of the parent from whom the child had been separated.  Ex. A Att. 7 (Comella 228-229, 238, 244-245, 408-411).

34.     In May 2018, the U.S. Border Patrol Yuma Station had a unit of Border Patrol agents referred to as the Processing, Screening and Transportation Unit ("PST Unit"), which handled, among other things, record checks of non-citizens encountered by Border Patrol agents, determinations of whether an adult non-citizen would be processed for a referral for criminal prosecution, placement requests for UACs with ORR, and processing of non-citizens.  Ex. D; Ex. Att. 7 (Comella 171-175, 250).

35.     During implementation of the DHS Referral Policy, when a Yuma Sector Border Patrol agent in the PST Unit identified an adult non-citizen in a family unit as amenable to prosecution and designated to be processed for prosecution, a request to ORR for placement of the child was made as soon as possible, consistent with practices in place prior to the DHS Referral Policy.  Ex. D.

36.     Following the completion of the processing of the adult non-citizen identified as amenable to prosecution and to be processed for a referral for prosecution, the adult non-citizen's case file would be transferred to the Yuma Sector Prosecutions Unit.  Ex. A Att. 7 (Comella 171-175); Ex. A Att. 8 (Ramirez 58-59).

37.     The Prosecutions Unit in Border Patrol's Yuma Sector was responsible for making prosecution referrals to the U.S. Attorney's Office for the District of Arizona for a decision by the U.S. Attorney's Office to accept or decline the prosecution.  Ex. A Att. 8 (Ramirez 58-59, 125, 333); Ex. A Att. 9 (USAO 30(b)(6) 78-79).

38.     Following notification from the U.S. Attorney's Office that a prosecution referral had been accepted or declined, the Prosecutions Unit would record the disposition and the case file would be returned to the PST Unit.  Ex. A Att. 8 (Ramirez 273-275).

39.     On June 20, 2018, pursuant to Executive Order 13841, U.S. Border Patrol Headquarters issued instructions to the U.S. Border Patrol Southwest Border Sectors,

which was further updated on June 21, 2018, to suspend Section 1325 prosecution referrals for adult members of family units.  Ex. C Att. 8.

40.     On June 26, 2018, the U.S. District Court for the Southern District of California issued a preliminary injunction enjoining the separation of non-citizen parents and children following their entry into the United States, absent certain circumstances set forth by the court, and ordering the reunification of class members with their children by certain dates.  *Ms. L. v. ICE*, 310 F. Supp. 3d 1133 (S.D. Cal. 2018).

41.     During implementation of the DHS Referral Policy from May 5, 2018 until the Executive Order on June 20, 2018, the majority of family units who unlawfully crossed the U.S.-Mexico border were not separated.  Ex. A Att. 1 (McAleenan 279-282).

42.     Prior to and during the time period the DHS Referral Policy was in effect, CBP and ICE encountered situations where they made the discretionary determination on a case-by-case basis to separate a non-citizen adult from a non-citizen minor child following their entry into the United States together by transferring the non-citizen child to the custody of ORR and the non-citizen adult to ICE custody, on such grounds as: criminal prosecution of the adult; criminal history of the adult; threats to the safety of the public or child welfare concerns; an outstanding warrant for the adult; illness or other medical issues impacting the adult's ability to care for the child; and concerns relating to parentage.  Ex. A Att. 2 (Homan 221- 226); Ex. A Att. 1 (McAleenan 216); Ex. A Att. 6 (Albence 66); Ex. Att. 4 (Vitiello 59-60, 216-219); Ex. A Att. 3 (Hastings 44-45).

***J.V.S. and H.Y.***

43.     On May 8, 2018, at approximately 2:40 pm, U.S. Border Patrol agents apprehended J.V.S. and H.Y following their unlawful entry into the United States between ports of entry.  Ex. D Att. 1 (1769-1772, 1773-1775).

44.     Following their apprehension, J.V.S. and H.Y. were transported to and booked into the Yuma Border Patrol Station for processing.  Ex. D. Att. 1 (1769-1772,1773-1775, 1781-1786, 1787-1789).

45.      J.V.S. was identified as an adult amenable to prosecution and to be processed for prosecution, and a placement request for H.Y. was made with ORR.  Ex. D Att. 1 (1769-1772, 1773-1775, 1781-1786, 1787-1789).

46.      On May 9, 2018, at 11:35 am, the confirmation email for H.Y.'s ORR placement at Lutheran Social Services in New York ("LSSNY") was sent by an Intakes Specialist with General Dynamics Information Technology ("GDIT"), a contractor with ORR, and received by ICE Phoenix Field Office personnel, U.S. Border Patrol Yuma Station personnel, and staff members of LSSNY.  The email confirmation contained the full name and Alien number for H.Y. and the full name of J.V.S. and noted the relationship between J.V.S. and H.Y.  Ex. D Att. 6 (11983A-11984A); Ex. E Att. 1 (11983A-11984A).

47.      The separation, family relationship, and names and Alien numbers of J.V.S. and H.Y. were documented in both J.V.S. and H.Y.'s I-213s.  Ex. D Att. 1 (1769-1772, 1773-1775).

48.      The separation, family relationship, and names and Alien numbers of J.V.S. and H.Y. also were also documented in the Encounter Summary in ICE's EARM database, which contained the information about the separation from the I-213 narratives.  Ex. E Att. 1 (63975-63976, 63970-63971).

49.      On May 10, 2018, at approximately 7:08 am, H.Y. was booked out of the Yuma Station and transferred to ORR custody with placement at LSSNY in Bronx, New York.  Ex. D Att. 1 (1787-1789, 0376).

50.      On May 10, 2018, at approximately 4:08 pm, the processing of J.V.S. was complete.  Ex. D Att. 1 (01781-1786).

51.      J.V.S. was served with a Notice to Appear, and criminal charges for violation of 8 U.S.C. § 1325 were included the I-213.  Ex. D Att. 1 (1769-1772).

52.      On May 11, 2018 H.Y. arrived at LSSNY.  Ex. F Att. 1 (2021).

53.      LSSNY staff generated a report dated May 12, 2018 noting that H.Y. had been separated from her father while in DHS custody.  The report contained J.V.S.'s full name

and noted that the separation was also listed by DHS "in the intake tab of the UAC Portal." Ex. F Att. 1 (2370-2371).

54.     J.V.S. was referred to the U.S. Attorney's Office for criminal prosecution and, on May 11, 2018 at approximately 8:53 am, was booked out of Yuma Station and transferred to the custody of the U.S. Marshal's Service.  On May 11, 2018 the U.S. Attorney's Office declined to prosecute and J.V.S. was booked back in to the Yuma Station.  Ex. D Att. 1 (1781-1786, 0776-778, 0380); Ex. A Att. 9 (USAO 30(b)(6) 20, 152-153).

55.     On May 16, 2018, at approximately 4:06 pm, J.V.S. was booked out of the Yuma Border Patrol Station, transferred from U.S. Border Patrol custody to ICE custody, and transported to ICE's Florence Service Processing Center in Arizona.  Ex. D Att. 1 (1781-1786, 0379); Ex. E Att. 1 (63953).

56.     From May 16, 2018, until July 21, 2018, J.V.S. was detained in adult detention facilities until transferred to the ICE Port Isabel Detention Center in Texas where he was reunited with H.Y.  Ex. E Att.1 (63953).

57.     On June 18, 2018, an immigration judge ordered J.V.S. removed to Guatemala. Ex. G Att. 1 (0785).

58.     H.Y. remained in care through LSSNY until July 21, 2018, when she transferred to the ICE Port Isabel Detention Center in Texas and reunited with J.V.S.  Ex. E Att. 1 (1705, 63950).

59.     While in custody separately (from May 10 to July 21), J.V.S. and H.Y. had communications on at least the following occasions: phone calls on May 31, June 18, June 28, July 6, 2018, and a video call on July 10.   Ex. F Att. 1 (2245, 2250, 2253, 2257-2258, 2274-2275); Ex. E Att. 1 (1703-1704, 1705).  J.V.S. also had communications with H.Y.'s case manager at LSSNY on at least two occasions, on May 26 and June 12. Ex. F Att. 1 (2239, 2248) (Case Manager Progress Notes)].  H.Y. was provided telephone calls with her mother in Guatemala from May 31, 2018, until H.Y.'s discharge.  Ex. F Att. 1 (2274-2275).  H.Y.'s case manager also spoke with H.Y's mother on at least one occasion.  Ex. F Att. 1 (2252).

### *H.P.M. and A.D.*

60.     On May 12, 2018, at approximately 8:50 pm, U.S. Border Patrol agents apprehended H.P.M. and A.D. following their unlawful entry into the United States between ports of entry.  Ex. D Att. 2 (1766-1768, 1763-1765).

61.     H.P.M. was apprehended by U.S. Border Patrol agents at least once before in 2015 after illegally crossing the United States-Mexico border between ports of entry.  Ex. D Att. 2 (1766-1768).

62.     Following this illegal entry in 2015, H.P.M. was removed to Guatemala with an order prohibiting him from entering, attempting to enter, or being in the United States for a period of five years.  Ex. D Att. 2 (0507-509, 0001766-1768); Ex. E Att. 2 (63949); Ex. G Att. 2 (0434).

63.     Following their apprehension on May 12, 2018, H.P.M. and A.D. were transported to and booked into the Yuma Border Patrol Station for processing.  Ex. D Att. 2 (1766-1768, 1763-1765, 1754-1759, 1752-1753).

64.     H.P.M. was identified as an adult amenable to prosecution and to be processed for prosecution, and a placement request for A.D. was made with ORR.  Ex. D Att. 2 (1754-1759, 1766-1768, 1763-1765).

65.     On May 13, 2018, at 10:05 am, the confirmation email for A.D.'s placement at Bethany Christian Services ("Bethany") was sent by an Intakes Specialist with GDIT, a contractor with ORR, and received by ICE Phoenix Field Office personnel, U.S. Border Patrol Yuma Station personnel, and staff members of Bethany.  The email confirmation contained the names and Alien numbers for H.P.M. and A.D. and noted the relationship between H.P.M. and A.D.   Ex. D Att. 6 (11818A-11819A); Ex. E Att. 2 (11818A-11819A).

66.     The separation, family relationship, and names and Alien numbers of H.P.M. and A.D. were documented in both H.P.M. and A.D.'s I-213s.  Ex. D Att. 2 (1766-1768, 1763-1765).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

67.     The separation, family relationship, and names and Alien numbers of H.P.M. and A.D. also were documented in the Encounter Summary in ICE's EARM database, which contained the information about the separation from the I-213 narratives. Ex. E Att. 2 (63960-63961, 63968-63969).

68.     The Case Comments in the ICE EARM database also noted that A.D. was in care at Bethany and that H.P.M. was being detained at Eloy pending removal.  Ex. E Att. 2 (1948, 1701).

69.     On May 13, 2018 at approximately 11:53 pm, A.D. was booked out of the Yuma Station and transferred to ORR custody with placement at Bethany.  Ex. D Att. 2 (1752-1753, 1760).

70.     On May 15, 2018, A.D. arrived at Bethany.  Ex. F Att. 2 (130-134).

71.     Bethany staff generated a report on May 15, 2018 noting that A.D. had been separated from her father by DHS.  The report contained H.P.M.'s full name, date of birth, and Alien number.  Ex. F Att. 2 (0241-242).

72.     On May 14, 2018, at approximately 12:01 pm, the processing for H.P.M. was complete.  Ex. D Att. 2 (1754-1759).

73.     H.P.M. was served with an order reinstating a prior removal and a warrant of removal, and criminal charges for violation of 8 U.S.C. §1325 and §1326 were included in the I-213.  Ex. D Att. 2 (1766-1768).

74.     H.P.M. was referred to the U.S. Attorney's Office for criminal prosecution, and on May 15, 2018 the United States Attorney's Office declined to prosecute H.P.M.  Ex. D Att. 2 (0369); Ex. A Att. 9 (USAO 30(b)(6) 20, 152-153).

75.     On May 20, 2018, at approximately 2:22 am, H.P.M. was booked out of the Yuma Border Patrol Station, transferred from Border Patrol custody to ICE custody, and transported to the Eloy Detention Center in Eloy, Arizona.  Ex. D Att. 2 (1754-1759,1761).

76.     On June 4, 2018, H.P.M. signed a form stating that he was voluntarily returning to Guatemala and authorizing A.D. to remain in the United States until the termination of

her immigration proceedings.  He also advised the Guatemalan Consulate of the same. Ex. G Att. 2 (0419); Ex. J; Ex. E Att. 2 (1948).

77.     On June 7, 2018, H.P.M. was deported to Guatemala.  Ex. E Att. 2 (63949).

78.     On August 7, 2018, an immigration judge granted A.D. voluntary departure.  Ex. G Att. 2 (0054, 0056); Ex. E Att. 2 (63944).

79.     A.D. remained in care through Bethany until August 30, 2018, when she was removed to Guatemala.  Ex. E Att. 2 (63944, 1701).

80.     While in custody separately (from May 13 to August 30), H.P.M. and A.D. had communications on at least the following occasions: two phone calls on May 29 and, after that, phone calls twice a week while H.P.M. was detained at Eloy.  Ex. F Att. 2 (0564-565, 568, 571); Ex. E Att. 2 (1948).  A.D. was provided with video calls with her mother.  Ex. F Att. 2 (0560-561, 0564).  H.P.M. also communicated with A.D.'s case manager on June 5, 2018.  Ex. F Att. 2 (0570).

### *A.P.F. and O.B.*

81.     On May 18, 2018, at approximately 2:30 am, U.S. Border Patrol agents apprehended A.P.F. and O.B. following their unlawful entry into the United States between ports of entry. Ex. D Att. 3 (1732-1735, 1729-1731).

82.     A.P.F. was apprehended by Border Patrol agents at least once before in November 2012 after having illegally crossed the United States-Mexico border between ports of entry.  Ex. D Att. 3 (0178-181, 1732-1735).

83.     Following this illegal entry in November 2012, A.P.F. was removed to Guatemala with an order prohibiting him from entering, attempting to enter, or being in the United States for a period of five years.  Ex. D Att. 3 (0178-181); Ex. G Att. 3 (0203).

84.     Following their apprehension on May 18, 2018, A.P.F. and O.B. were transported to and booked into the Yuma Border Patrol Station for processing.  Ex. D Att. 3 (1732-1735, 1729-1731,1736-1738, 1739-1743).

13

85.     A.P.F was identified as an adult amenable to prosecution and to be processed for prosecution, and a placement request for O.B. was made with ORR.  Ex. D Att. 3 (1732-1735,1729-1731,1736-1738, 1739-1743).

86.     On May 19, 2018 at 11:28 am, the confirmation email for O.B.'s placement at Cayuga Centers was sent by an Intakes Specialist with GDIT, a contractor with ORR, and received by ICE Phoenix field Office personnel, U.S. Border Patrol Yuma Station personnel, and staff members of Cayuga Centers.  The email confirmation contained the names and Alien numbers for A.P.F. and O.B., and noted the relationship between A.P.F. and O.B.  Ex. D Att. 6 (6367A-6371A); Ex. E Att. 3 (6367A-6371A).

87.     The separation, family relationship, and names and Alien numbers of A.P.F. and O.B. were documented in both A.P.F. and O.B.'s I-213s.  Ex. D Att. 3 (1732-1735,1729-1731).

88.     The separation, family relationship, and names and Alien numbers of A.P.F. and O.B. also were documented in the Encounter Summary in ICE's EARM database, which contained the information about the separation from the I-213 narratives.  Ex. E Att. 3 (63964-63965, 63981-63982).

89.     On May 19, 2018, at approximately 6:44 pm, the processing for A.P.F was complete.  Ex. D Att. 3 (1739-1743).

90.      A.P.F. was served with an order reinstating the prior order of removal and a warrant of removal was issued, and criminal charges for violation of 8 U.S.C. §§ 1325 and 1326 were included in the I-213.  Ex. D Att. 3 (1732-1735).

91.     On May 20, 2018, at approximately 12:45 am, O.B. was booked out of the Yuma Station and transferred to ORR custody with placement at Cayuga Centers in Bronx, New York.  Ex. D Att. 3 (1736-1738, 0365).

92.     On the morning of May 21, 2018, O.B. arrived at Cayuga Centers.  Ex. F Att. 3 (2777-2779).

93.     Cayuga staff generated a report noting the separation of O.B. and his father.  Ex. F Att. 3 (2986-2987).

94.     A.P.F. was referred to the U.S. Attorney's Office for criminal prosecution, and on May 21, 2018, the U.S. Attorney's Office declined to prosecute.  Ex. D Att. 3 (0364); Ex. A Att. 9 (USAO 30(b)(6) 20, 152-153).

95.     On May 25, 2018, at approximately 2:52 am, A.P.F. was booked out of the Yuma Border Patrol Station, transferred from U.S. Border Patrol custody to ICE custody, and transported to an ICE detention facility in Florence, Arizona.  Ex. D Att. 3 (1739-1743, 0362); Ex. E Att.3 (63946).

96.     From May 25, 2018 until July 16, 2018, A.P.F. was detained in adult detention, until transferred to the ICE Port Isabel Service Processing Center in Texas where he was reunified with O.B. Ex. E Att. 3 (63946, 1693).

97.     On June 8, 2018, A.P.F. signed a form requesting to be reunited with O.B. for the purposes of their repatriation together to Guatemala.  Ex. G Att. 3 (0247).

98.     O.B. remained in care through Cayuga Centers until July 26, 2018 when he was transferred to the ICE Port Isabel Service Processing Center in Texas and reunified with A.P.F.   Ex. E Att. 3 (63957).

99.     While in custody separately (from May 20 to July 26), A.P.F. and O.B. had communications on at least the following occasions: a phone call on June 5,2018, and calls on three other occasions until their reunification.   Ex. F Att. 3 (02954).   O.B. had calls with his mother in Guatemala from May 30 until O.B.'s discharge and reunification. *Id.*

### *J.D.G. and M.G.*

100.    On May 19, 2018, at approximately 8:25 pm, U.S. Border Patrol agents apprehended J.D.G. and M.G. following their unlawful entry into the United States between ports of entry.  Ex. D Att. 4 (1717-1720,1726-1728).

101.    Following their apprehension on May 18, 2018, J.D.G. and M.G. were transported to and booked into the Yuma Border Patrol Station for processing.  Ex. D Att. 4 (1717-1720, 1726-1728, 1862-1866, 1857-1861).

15

102.    J.D.G. was identified as an adult amenable to prosecution and to be processed for prosecution, and a placement request for M.G. was made with ORR.  Ex. D Att. 4 (1857-1861, 1862-1866, 1717-1720, 1726-1728).

103.    On May 21, 2018, at 9:40 pm, the confirmation email for M.G.'s placement at Southwest Key Nueva Esperanza in Texas ("Southwest Key") was sent by an Intakes Specialist with GDIT, a contractor with ORR, and received by ICE Phoenix Field Office personnel, U.S. Border Patrol Yuma Station personnel, and staff members of Southwest Key.  The email confirmation contained the name and Alien numbers for both J.D.G. and M.G., and noted the relationship between J.D.G. and M.G.  Ex. D Att. 6 (5868A-5869A); Ex. E Att. 6 (5868A-5869A).

104.    The separation, family relationship, and names and Alien numbers of J.D.G. and M.G. were documented in both J.D.G. and M.G.'s I-213s. Ex. D Att. 4 (1717-1720,1726-1728).

105.    The separation, family relationship, and names and Alien numbers of J.D.G. and M.G. were also documented in the Encounter Summary in ICE's EARM database, which contained the information about the separation from the I-213 narratives.  Ex. E Att. 4 (63972-63974, 63979-63980).

106.    On May 21, 2018, at approximately 3:05 pm, the processing of J.D.G. was complete. Ex. D Att. 4 (1862-1866).

107.    J.D.G. was served with an order of Expedited Removal, and criminal charges for violation of 8 U.S.C. §1325 were included in the I-213.  Ex. D Att. 4 (1862-1866, 1717-1720).

108.    J.D.G. was referred to the U.S. Attorney's Office for criminal prosecution, and on May 22, 2018, the United States Attorney's Office declined to prosecute J.D.G.  Ex. 4 Att. 4 (0370); Ex. A Att. 9 (USAO 30(b)(6) 20, 152-153).

109.    On May 24, 2018, at approximately 12:14 am, M.G. was booked out of the Yuma Border Patrol Station and transferred to ORR custody with placement at Southwest Key in Brownsville, Texas.  Ex. D Att. 4 (1857-1861, 0371).

110.    On May 25, 2018, M.G. arrived at Southwest Key in the early morning.  Ex. F Att. 4 (2397-2399).

111.    Southwest Key staff generated a report stating that M.G. had been separated from her father while in DHS custody, and stating J.D.G.'s full name and last three digits of his Alien number.   Ex. F Att. 4 (2641-2642).

112.    On May 25, 2018, at approximately 2:52 am, J.D.G. was booked out of the Yuma Border Patrol Station, transferred from U.S. Border Patrol custody to ICE custody, and transported to an ICE detention facility in Florence, Arizona.  Ex. D Att. 4 (1862-1866, 0372-375); Ex. E Att. 4 (63951).

113.    From May 25, 2018 to July 22, 2018, J.D.G. was detained in adult detention facilities until transferred the ICE Port Isabel Detention Center in Texas and reunified with M.G.   Ex. E Att. 4 (63951, 1697-1698).

114.    M.G. remained in care through Southwest Key until July 22, 2018 when she was transferred to the ICE Port Isabel Detention Center in Texas and reunited with J.D.G.  Ex. E Att. 4 (63956, 1697-1698).

115.    While in custody separately (from May 24 to July 22), J.D.G. and M.G. had communications on at least the following occasions: a phone call on June 25, 2018, and at least once or twice more until their reunification.  Ex. F Att. 4 (2493, 2496, 2502-2505); Ex. E Att. 4 (1697-1698).  M.G. had phone calls with her mother in Guatemala from May 25 until M.G.'s discharge and reunification.  Ex. F Att. 4 (2487-2488, 2490-2498, 2502-2505), and with her aunt.  *Id*.

### *R.Z.G. and B.P.*

116.    Between 2001 and 2007, R.Z.G. lived in the United States in Michigan, having crossed the United States-Mexico border between ports of entry without documents authorizing his entry into the United States.  Ex. I Att. 1 (R.Z.G. Dep. 17-18).

117.    Prior to November 2017, R.Z.G. was apprehended by U.S. Border Patrol agents at least twice, in July 2013 and September 2013, in or near Eagle Pass, Texas, after

unlawfully crossing the United States-Mexico border between ports of entry on both occasions.  Ex. H Att. 1 (1814-1816); Ex. D Att. 6 (1545-1548).

118.    Following his unlawful entry in July 2013, R.Z.G. was convicted of illegal entry in violation of 8 U.S.C. § 1325 and sentenced to seven days in jail, and was removed to Guatemala with an order prohibiting him from entering, attempting to enter, or being in the United States for a period of five years.  Ex. H Att. 1 (1814-1816); Ex. E Att. 5 (63958-63959); Ex. G Att. 4 (1489).

119.    Following his unlawful re-entry in September 2013, R.Z.G. was convicted of illegal reentry, sentenced to 180 days in jail, and removed to Guatemala with an order prohibiting him from entering, attempting to enter, or being in the United States for a period of 20 years.  Ex. H Att. 1 (1814-1816); Ex. E Att. 6 (63958-63959); Ex. G Att. 4 (1468-1469, 1470).

120.    On November 13, 2017, at approximately 8:15 am, R.Z.G. and B.P. presented themselves to CBP officers at the DeConcini Port of Entry in Nogales, Arizona (the "Port of Entry").  Ex. H Att. 1 (1814-1816, 1795-1796).

121.    On November 14, 2017, at approximately 11:02 am, R.Z.G. and B.P. were booked out of the Port of Entry, transferred to ICE custody, and transported to ICE's Phoenix Field Office for placement determinations pending R.Z.G.'s and B.P.'s immigration proceedings.  Ex. H Att. 1 (1814-1816, 1795-1796); Ex. E Att. 6 (63958-63959, 63948).

122.    On November 15, 2017, the decision was made to separate R.Z.G. and B.P. based on R.Z.G.'s prior criminal and immigration history and a placement of B.P. with ORR was requested.  Ex. I Att. 2; Ex. A Att. 10 (Lee 16-17, 43); Ex. A Att. 11 (Lucero 28-31, 107, 113, 125-129, 146-147, 174-175, 193, 201-202, 313-322).

123.    On November 15, 2017 at 1:23 pm, the confirmation email for B.P.'s placement at Cayuga Centers was sent from the ORR Intakes email account and received by ICE Phoenix Field Office personnel, CBP personnel, and staff members of Cayuga.  The confirmation email contained the full name and Alien numbers for B.P. and R.Z.G., noted the relationship between R.Z.G. and B.P., and noted that R.Z.G. would be detained in ICE custody in Arizona. Ex. E Att. 6 (01741).

124.    The separation, family relationship, and names and Alien numbers of R.Z.G. and B.P. were documented in both R.Z.G.'s and B.P.'s I-213s.  Ex. H Att. 1 (1814-1816, 1795-1796).

125.    The family relationship, names, and Alien numbers of R.Z.G. and B.P. were also documented in the Encounter Summary in ICE's EARM database, which contained the information about the separation from the I-213 narratives.  Ex. E Att. 6 (63983-63984 63966-63967).

126.    On November 15, 2017, at approximately 6:25 pm, R.Z.G. was booked out of the Phoenix Field Office and transported to and booked into the Florence Staging Facility in Arizona at approximately 9:20 pm that same day.  Ex. E Att. 6 (63958-63959).

127.    On November 16, 2017, at approximately 9:05 am, B.P. was booked out of the Phoenix Field Office and transferred to ORR custody with placement at Cayuga Centers in Bronx, New York.  Ex. E Att. 6 (63948); Ex. F Att. 5 (1473-1475, 1835-1836).

128.    On November 17, 2017, B.P. arrived at Cayuga Centers.  Ex. F Att. 5 (1473-1475).

129.    Cayuga staff generated a report dated November 17, 2017, noting that B.P. had been separated from her father at the border, and that the "[s]eparation was also confirmed by ORR", and identifying his aunt as a potential sponsor  Ex. F Att. 5 (1835-1836, 1555-1561).

130.     On December 4, 2017, an immigration judge ordered that R.Z.G. be removed to Guatemala, and on December 13, 2017 R.Z.G. was removed to Guatemala.  Ex. G Att. 4 (1487-1489, 1478-1479).

131.     R.Z.G. and his wife wanted B.P. to remain in the United States and live with B.P.'s aunt, Ex. I Att. 1 (R.Z.G. Dep. 111), who was pursuing sponsorship of B.P. but was denied.  Ex. F Att. 5 (001697-1706).

132.    On May 31, 2018, an immigration judge granted B.P.'s withdrawal of her application for admission to the United States.  Ex. G Att. 4 (0350-0351); Ex. F Att. 6 (1707).

133.    B.P. remained in care through Cayuga Centers until July 26, 2018, when she was returned to Guatemala.  Ex. F Att. 6 (63948).

134.    While in separate custody (November 15 to December 13, 2017), R.Z.G. had communications with B.P. by phone on at least the following occasions: November 21, 2017, and at least two more times while R.Z.G. was detained at Eloy.  Ex. F Att. 5 (1697-1706, 1707-1713).  Additionally, B.P. was provided with phone calls with her mother in Guatemala on at least four occasions: November 28, 2017, December 6, 2017, January 5, 2018, and January 12, 2018.  Ex. F Att. 5 (1697-1706, 1707-1713). B.P. also had phone calls with her aunt on at least ten occasions between December 1, 2017 and March 22, 2018.  *Id.*

135.    Once R.Z.G. was back in Guatemala, B.P. spoke with R.Z.G. and/or B.P.'s mother twice a week for at least 10 minutes each time.  *Id.*  R.Z.G. also communicated with B.P.'s case manager at Cayuga when R.Z.G. was back in Guatemala on at least two occasions: April 2, 2018 and April 5, 2018.  Ex. F Att. 5 (1697-1706).

### *M.C.L. and A.J.*

136.    M.C.L. has used an alias and carried an identification bearing that name.  Ex. I Att. 3 (M.C.L. Dep. 15-17); Ex. G Att. 5 (1002-1008).

137.    Between 2005 and 2008, M.C.L. lived in the United States in Delaware, having crossed the United States-Mexico border between ports of entry without documents authorizing his entry into the United States.  Ex. I Att. 3 (M.C.L. Dep. 23-24).

138.    M.C.L. was arrested three times by police in Delaware, and was found guilty of driving under the influence, resisting arrest, and criminal impersonation.  Ex. G Att. 5 (1002-1008).

139.    Following his 2008 arrest in Delaware, M.C.L. was transferred to ICE custody in Pennsylvania and detained.  Ex. G Att. 5 (1002-1008); Ex. G Att. 5 (0950-952); Ex. E Att. 5 (63954-63955).

140.    An immigration judge issued a final order of removal on August 5, 2008, and M.C.L. was removed to Guatemala with an order prohibiting M.C.L. from entering,

attempting to enter, or being in the United States for a period of 10 years.  Ex. E Att. 5 (63954-63955); Ex. G Att. 5 (930-931).

141.    Between 2005 and 2016, M.C.L. was apprehended by Border Patrol agents on at least five separate occasions after having unlawfully crossed the United States-Mexico border between ports of entry each time: February 2005, March 2011, December 2011, May 2012, and September 2016.  Ex. H Att. 2 (1711-1713); Ex. G Att. 5 (1002-1008).

142.    Following his unlawful entry in February 2005, R.Z.G. was granted a Voluntary Return and removed from the United States.  Ex. H Att. 2 (1711-1713).

143.    Following his illegal re-entry in March 2011, a final order of removal was reinstated and M.C.L was removed to Guatemala with an order prohibiting him from entering, attempting to enter, or being in the United States for a period of 20 years.  Ex. H Att. 2 (1711-1713); Ex. E Att. 5 (63954-63955); Ex. G Att. 5 (0000916).

144.    Following his unlawful re-entry in December 2011, a final order of removal was reinstated, M.C.L. was convicted of illegal reentry and sentenced to 75 days of imprisonment, and M.C.L. was removed to Guatemala with an order prohibiting him from entering, attempting to enter, or being in the United States for a period of 20 years.  Ex. H Att. 2 (1711-1713); Ex. E Att. 5 (63954-63955); Ex. G Att. 5 (1002-1008, 0899).

145.    Following his unlawful re-entry in May 2012, a final order of removal was reinstated, M.C.L. was convicted of illegal reentry and sentenced to 180 days of imprisonment, and M.C.L. was removed to Guatemala with an order prohibiting him from entering, attempting to enter, or being in the United States for a period of 20 years  Ex. H Att. 2 (1711-1713); Ex. E Att. 5 (63954-63955); Ex. G Att. 5 (1002-1008, 0882).

146.    Following his illegal re-entry in September 2016, M.C.L. was issued an Expedited Removal order and removed to Guatemala with an order prohibiting him from entering, attempting to enter, or being in the United States for a period of five years.  Ex. H Att. 2 (1711-1713); Ex. E_ Att.5 (63954-63955); Ex. G Att. 5 (0860).

147.    On November 19, 2017, at approximately 9:22 am, M.C.L. and A.J. presented themselves to CBP officers at the DeConcini Port of Entry in Nogales, Arizona (the "Port of Entry").  Ex. H Att. 2 (1711-1713, 1709-1710).

148.    On November 20, 2017, the decision was made to separate M.C.L and A.J., based on M.C.L.'s prior criminal and immigration history and a placement of A.J. with ORR was requested.  Ex. H Att. 2; Ex. A Att. 10 (Lee 16-17, 43); Ex. A Att. 11 (Lucero 28-31, 107, 113, 125-129, 146-147, 174-175, 193, 201-202, 313-322); Ex. H. Att. 4.

149.    On November 20, 2017, at 8:27 pm, a confirmation email was sent by a Travel Analyst with MVM, Inc., a transportation services contractor, and received by ICE Phoenix Field Office personnel and CBP personnel.  The confirmation email contained the names and Alien numbers for both M.C.L. and A.J., and noted the relationship between M.C.L. and A.J.   Ex. H Att. 3 (0507); Ex. E Att. 5 (0507).

150.    The separation of M.C.L. and A.J. was documented in both of their I-213s.  Ex. H Att. 2 (1711-1713, 1709-1710).

151.    The separation was also documented in the Encounter Summary in ICE's EARM database, which contained the information about the separation from the I-213 narratives. Ex. E Att. 5 (63977-63978, 63962-63963).

152.    On November 20, 2017, at approximately 9:30 pm, A.J. was booked out of the Port of Entry and transferred to ORR custody with placement at Cayuga Centers in Bronx, New York.  Ex. E Att. 5 (63945); Ex. F Att. 6 (0685-687, 1330-1331).

153.    On November 21, 2017, at approximately 7:44 am, M.C.L. was booked out of the Port of Entry, transferred from CBP custody to ICE custody, and transported to ICE's Eloy Detention Center in Arizona.  Ex. E Att. 5 (63954-63955); Ex. H Att. 2 (0387).

154.    On November 22, 2017, at approximately 12:30 am, A.J. arrived at Cayuga Centers.  Ex. F Att. 6 (0685-687).

155.    Cayuga staff generated a report dated November 22, 2017, noting that A.J. had been separated from his father at the border.  Ex. F Att. 6 (1330-1331).

156.    On December 6, 2017, an immigration judge denied M.C.L.'s application for voluntary departure and ordered M.C.L. removed to Guatemala.  Ex. G Att. 5 (0845-846).

157.    M.C.L. was removed to Guatemala on January 17, 2018.  Ex. G  Att. 5 (0838-839).

158.    While in ORR custody, Cayuga staff coordinated with A.J.'s mother in Guatemala on the removal of A.J.  Ex. E Att. 5 (1691).

159.    On May 8, 2018, an immigration judge granted A.J.'s withdrawal of his application for admission to the United States.  Ex. G Att. 5 (0103); Ex. E Att. 5 (1692).

160.    A.J. remained in care through Cayuga Centers until July 26, 2018, when he was removed to Guatemala.  Ex. E Att. 5 (63945, 1692).

161.    While they were in in separate custody (from November 21, 2017 to January 17, 2018), M.C.L. communicated with A.J. by phone on at least one occasion, on December 8, 2017.  Ex. F Att. 6 (0892-895).  Additionally, A.J. was provided with phone calls with his mother in Guatemala beginning on December 8, 2017 through at least April 20, 2018.  Ex. F Att. 6 (0892-895).

Dated: March 9, 2023                    Respectfully Submitted,


                                        BRIAN M. BOYNTON
                                        Principal Deputy Assistant Attorney General

                                        JAMES G. TOUHEY, JR.
                                        Director, Torts Branch

                                        *s/ Phil MacWilliams*
                                        PHILIP D. MACWILLIAMS
                                        Trial Attorney
                                        D.C. Bar No. 482883
                                        E-mail: phil.macwilliams@usdoj.gov
                                        U.S. Department of Justice
                                        Civil Division, Torts Branch
                                        Benjamin Franklin Station, P.O. Box 888
                                        Washington, DC 20044
                                        Telephone: (202) 616-4285
                                        Attorneys for the United States of America

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on March 9, 2023, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants.

*s/ Phil MacWilliams*
PHILIP D. MACWILLIAMS
Attorney for United States of America