1  Keith Beauchamp (012434)
   D. Andrew Gaona (028414)
2  COPPERSMITH BROCKELMAN PLC
   2800 N. Central Avenue, Suite 1900
3  Phoenix, AZ 85004
   Telephone: (602) 381-5490
4  kbeauchamp@cblawyers.com
   agaona@cblawyers.com
5  *Counsel for A.P.F. Plaintiffs*

6  *(Additional Counsel for Plaintiffs Listed on the Signature Page)*

7

8              **UNITED STATES DISTRICT COURT**

9                   **DISTRICT OF ARIZONA**

10 | A.P.F., on his own behalf and on behalf of his | No. 2:20-cv-00065-SRB
11 | minor child, O.B.; et al., |
12 |                Plaintiffs, | **OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
13 |        v. |
14 | United States of America, | **ORAL ARGUMENT REQUESTED**
15 |                Defendant. |

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT ................................................................. 1

II.     STATEMENT OF FACTS ..................................................................... 2

        A.      Government Officials Separated Families to Deter Immigration
                Through the Southwest Border. ............................................. 2

        B.      Government Officials Separated Plaintiff Families. .......................... 5

                1.      Using Prosecution as a Pretext, Border Patrol Agents
                        Separated the 2018 Plaintiffs. ................................... 5

                2.      ICE Officers Separated 2017 Plaintiffs. .......................... 7

        C.      Government Officials Failed to Track Plaintiff Families, Allow Them
                to Speak with One Another, or Plan for Reunification. ..................... 9

III.    LEGAL STANDARD ......................................................................... 9

IV.     ARGUMENT ................................................................................ 10

        A.      Plaintiffs Seek Damages for the Specific Conduct of Government
                Officials, Not "Institutional" or "Systemic" Torts. ...................... 10

        B.      The Discretionary Function Exception Does Not Apply. ..................... 13

                1.      Separating Plaintiffs Was Not Discretionary Because it
                        Violated the Constitution. ...................................... 13

                2.      The Separation of Plaintiffs Was Not Subject To Discretion. ...... 21

                3.      Separating Plaintiffs Had No Legitimate Policy Rationale. ........ 26

        C.      The Separations of Plaintiffs Were Extreme and Outrageous. .............. 28

V.      CONCLUSION .............................................................................. 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.F.P. v. United States*,
2022 WL 2704570 (E.D. Cal. July 12, 2022)................................. 10, 11, 13, 14

*A.P.F. v. United States*,
492 F. Supp. 3d 989 (D. Ariz. 2020)........................................ *passim*

*Aguilar v. ICE*,
510 F.3d 1 (1st Cir. 2007) .............................................. 18, 19, 25

*B.A.D.J. v. United States*,
2022 WL 11631016 (D. Ariz. Sept. 30, 2022) ............................. 10, 11

*Blanco Ayala v. United States*
982 F.3d 209 (4th Cir. 2020) ................................................. 24

*C.M. v. United States*,
2020 WL 1698191 (D. Ariz. Mar. 30, 2020) ...................... 1, 3, 23, 28

*Caban v. United States*,
728 F.2d 68 (2d Cir. 1984) ................................................... 30

*City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*,
538 U.S. 188 (2003) .......................................................... 16

*Cloes v. City of Mesquite*,
582 F. App'x 721 (9th Cir. 2014)............................................. 13

*Cnty. of Sacramento v. Lewis*,
523 U.S. 833 (1998) ..................................................... 15, 29

*Coreas–Giron v. Holder*,
422 F. App'x 602 (9th Cir. 2011)............................................. 22

*Coulthurst v. United States*,
214 F.3d 106 (2d Cir. 2000) ................................................. 27

*D.A. v. United States*,
2023 WL 2619167 (W.D. Tex. Mar. 23, 2023)................................ 19

*D.B. v. Cardall*,
826 F.3d 721 (4th Cir. 2016) ........................................... 22, 23

*D.B. v. Poston*,
   119 F. Supp. 3d 472 (E.D. Va. 2015) ............................................................................. 23

*D.J.C.V. v. United States*,
   605 F. Supp. 3d 571 (S.D.N.Y. 2022) ........................................... 14, 15, 17, 20

*de Nolasco v. ICE*,
   319 F. Supp. 3d 491 (D.D.C. 2018) ................................................. 15, 17, 18

*Delgado v. INS*,
   637 F.2d 762 (10th Cir. 1980) ........................................................................ 14

*Dep't of Com. v. New York*,
   139 S. Ct. 2551 (2019) ................................................................................... 16

*DHS v. Regents of the Univ. of Cal.*,
   140 S. Ct. 1891 (2020) ................................................................................... 16

*Dillard Dep't Stores v. Silva*,
   106 S.W.3d 89 (Tex. App. 2003) .................................................................... 30

*Dominguez v. City of Scottsdale*,
   587 F. Supp. 3d 914 (D. Ariz. 2022) ........................................................... 9, 10

*K.O. ex rel. E.O. v. United States*,
   2023 WL 131411 (D. Mass. Jan. 9, 2023) ....................................................... 27

*E.R. v. United States*,
   2014 WL 4662241 (E.D.N.Y. Sept. 18, 2014) ................................................. 28

*E.S.M. v. United States*,
   2022 WL 11729644 (D. Ariz. Oct. 20, 2022) ............................................... 10, 11

*Est. of Saunders v. Comm'r*,
   745 F.3d 953 (9th Cir. 2014) ........................................................................... 19

*F.R. v. United States*,
   2022 WL 2905040 (D. Ariz. July 22, 2022) ................................................. 10, 11

*Franklin Sav. Corp. v. United States*,
   180 F.3d 1124 (10th Cir. 1999) ....................................................................... 18

*Fuentes-Ortega v. United States*,
   2022 WL 16924223 (D. Ariz. Nov. 14, 2022) ............................................... 10, 11

*Galicia v. United States*,
   2015 WL 12696086 (D.N.M. Feb. 24, 2015) .................................................... 30

*Galvin v. Hay*,
   374 F.3d 739 (9th Cir. 2004) ................................................................. 13, 21

*Gasho v. United States*
   39 F.3d 1420 (9th Cir. 1994) ....................................................................... 24

*Learner v. John Hancock Life Ins.*,
   2011 WL 13185713 (D. Ariz. Mar. 21, 2011) ............................................. 30

*Lee v. United States*,
   2020 WL 6573258 (D. Ariz. Sept. 18, 2020) ............................................... 11

*Lewis v. Dirt Sports LLC*,
   259 F. Supp. 3d 1039 (D. Ariz. 2017) ......................................................... 29

*Loumiet v. United States*,
   828 F.3d 935 (D.C. Cir. 2016) ..................................................................... 14

*Maldonado v. Lloyd*,
   2018 WL 2089348 (S.D.N.Y. May 4, 2018) ................................................ 22

*Marin-Garcia v. Holder*,
   647 F.3d 666 (7th Cir. 2011) ....................................................................... 15

*Marlys Bear Med. v. U.S. ex rel. Sec'y of Dep't of Interior*,
   241 F.3d 1208 (9th Cir. 2001) ......................................................... 26, 27, 28

*Meier v. United States*,
   2006 WL 3798160 (N.D. Cal. Dec, 22, 2006) ............................................. 11

*Mejia Rodriguez v. DHS*,
   562 F.3d 1137 (11th Cir. 2009) ................................................................... 24

*Mendez Ramirez v. Decker*,
   612 F. Supp. 3d 200 (S.D.N.Y. 2020) ......................................................... 22

*Milan-Rodriguez v. Sessions*,
   2018 WL 400317 (E.D. Cal. Jan. 12, 2018) ................................................ 18

*Mintz v. Bell Atl. Sys. Leasing Int'l, Inc.*,
   905 P.2d 559 (Ariz. Ct. App. 1995) ....................................................... 29, 30

*Ms. L. v. ICE*,
   302 F. Supp. 3d 1149 (S.D. Cal. 2018) ................................................. *passim*

*Ms. L. v. ICE*,
   310 F. Supp. 3d 1133 (S.D. Cal. 2018) ....................................................... 15

*Myers v. United States*,
   652 F.3d 1021 (9th Cir. 2011) ........................................................................... 28

*Myles v. United States*,
   47 F.4th 1005 (9th Cir. 2022) ........................................................................... 26

*Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*,
   210 F.3d 1099 (9th Cir. 2000) ............................................................................. 9

*O'Toole v. United States*,
   295 F.3d 1029 (9th Cir. 2002) .................................................................... 21, 26

*Payne-Barahana v. Gonzales*,
   474 F.3d 1 (1st Cir. 2007) ................................................................................. 15

*Prescott v. United States*,
   973 F.2d 696 (9th Cir. 1992) ............................................................................. 13

*Provenz v. Miller*,
   102 F.3d 1478 (9th Cir. 1996) ........................................................................... 12

*Reyna ex rel. J.F.G. v. Hott*
   921 F.3d 204 (4th Cir. 2019) ............................................................................. 14

*RIL-R v. Johnson*,
   80 F. Supp. 3d 164 (D.D.C. 2015) .................................................................... 27

*Rosales-Mireles v. United States*,
   138 S. Ct. 1897 (2018) ................................................................................ 15, 18

*Rosenbaum v. City & Cnty. of San Francisco*,
   484 F.3d 1142 (9th Cir. 2007) ........................................................................... 19

*Rosenbaum v. Washoe Cty.*,
   663 F.3d 1071 (9th Cir. 2011) ........................................................................... 15

*S.E.B.M. v. United States*,
   --- F. Supp. 3d ---, 2023 WL 2383784 (D.N.M. Mar. 6, 2023) ................... 17, 19, 23

*Savage v. Boies*,
   272 P.2d 349 (Ariz. 1954) ................................................................................. 29

*United States v. Dominguez-Portillo*,
   2018 WL 315759 (W.D. Tex. Jan. 5, 2018) ...................................................... 15

*United States v. Gaubert*,
   499 U.S. 315 (1991) .......................................................................................... 18

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977) ........................................................................................... 16

*Whisnant v. United States*,
  400 F.3d 117 (9th Cir. 2005) ............................................................................ 12

**Statutes**

6 U.S.C. § 279(g)(2) ..................................................................................... *passim*

8 U.S.C. § 1231 ..................................................................................................... 25

8 U.S.C. § 1232 ............................................................................................... 21, 22

8 U.S.C. § 1325 ................................................................................................... 3, 6

# I.     PRELIMINARY STATEMENT

Government officials and agents intentionally and cruelly separated Plaintiff families, often by force, and kept them apart for months, in violation of Plaintiffs' Due Process Rights and the TVPRA.  They did so on the pretext that the 2018 Adult Plaintiffs were "amenable to prosecution," despite none of them being charged or prosecuted, and on the unfounded assertion that the 2017 Adult Plaintiffs posed a safety risk—not because any father was not "available," absent the separations, to provide care for his child.  The separations, including the manner in which they were conducted, were unconstitutional, contrary to law, and outrageous.  Government employees compounded the harm of their tortious conduct by undertaking the separations with no plan to reunify families and with shocking disregard for when, or whether, parents would be able to locate, speak with, or reunite with their children. These extreme and outrageous actions by specific government employees were not only "deeply regrettable," as the government concedes, Br. at 9, but also, as President Biden has said, a "human tragedy."  These actions, which the facts show violated the Constitution, violated mandatory directives, and lacked a legitimate policy rationale, are the very type of conduct for which the Federal Torts Claims Act holds the government accountable.

The government argues that it is not liable for the actions of its employees because (i) Plaintiffs assert non-actionable "institutional or systemic tort" claims, (ii) Plaintiffs' separations were the result of actions protected by the FTCA's discretionary function exception, and (iii) the government employees' conduct was not extreme or outrageous.  This Court has already rejected these arguments in their earlier forms, *see A.P.F. v. United States*, 492 F. Supp. 3d 989 (D. Ariz. 2020); *C.M. v. United States*, 2020 WL 1698191, at *1 (D. Ariz. Mar. 30, 2020), and should do so again now.

*First*, Plaintiffs' claims and causes of action all arise from the specific and actionable conduct of government employees in separating the six Plaintiff families.  Plaintiffs do not challenge the issuance or adoption of the DHS Referral Policy *writ large*:  facts about it are relevant only to support elements of Plaintiffs' individual state law claims.  Plaintiffs seek damages based on the conduct of specific government officials and agents that caused

Plaintiffs' separations, and not, per the government's mischaracterization, the policymaking conduct of the government as a whole.

*Second*, the FTCA's discretionary function exception does not apply.  As the facts show, the specific individuals who separated Plaintiffs did so in violation of Plaintiffs' well-established due process right to family integrity and the TVPRA, and had no legitimate policy rationale other than to inflict an *in terrorem* effect on prospective migrants.  The discretionary function exception does not shield such conduct from liability.

*Third*, government officials and agents forcefully separated Plaintiffs for months in an attempt to deter prospective migrants.  Officials did so without a plan for tracking separated families, facilitating communication among separated parents and children, or reunifying families promptly.  This conduct was extreme and outrageous.  Arizona law does not immunize such conduct, whether or not it follows an arrest or detention.

Accordingly, there is no basis to enter summary judgment for the government on any of Plaintiffs' claims.  Plaintiffs respectfully request that the Court deny the government's motion.

## II.    STATEMENT OF FACTS

In addition to the following facts, Plaintiffs incorporate by reference the facts from their Motion for Partial Summary Judgment, ECF No. 362, and related Statement of Facts in support of their motion, ECF No. 368.

### A.    Government Officials Separated Families to Deter Immigration Through the Southwest Border.

In early 2017, government officials discussed separating families arriving at the Southwest Border—families primarily arriving from Latin America—to deter prospective migrants from those areas.  A.P.F. SOF ¶¶ 8–10.  On February 14, 2017, DHS, CBP, ICE, and ORR officials discussed "████████████████████," including "████ ████." A.P.F. SOF ¶¶ 6–7.  Family separation was presented as a "████████ ████████████████████." SSOF ¶ 6.  Officials believed they could "████ ████████████" by sending a message to Latin American migrants that "████ ████████" if you came "████████████████████." *Id.* ¶¶ 7, 9–10.

Attendees at the February 14, 2017 meeting understood that the purpose of separating families was "████████████████████." *Id.* ¶ 8.  Indeed, Associate Deputy Director of ORR Tricia Swartz worried that "████████████████████" for ██████████████ . *Id.* ¶ 12.  ORR Deputy Director for Children's Programs Jonathan White testified that he "████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████." *Id.* ¶ 13.

Officials continued pressing for widespread family separation as a method for deterring migration.  On August 8, 2017, ICE Acting Director Thomas Homan emailed CBP Commissioner Kevin McAleenan, DHS Chief of Staff Chad Wolf, DHS immigration counselor Gene Hamilton, and DHS Head of Public Affairs Jonathan Hoffman regarding monthly border apprehension statistics.  *Id.* ¶ 14.  Homan wrote:  "Very concerning. Gene, we need to discuss my proposal for separation." *Id.*  Homan's message was later forwarded to other ICE officers by ICE Chief of Staff Thomas Blank, who wrote: "Tom has been advocating that we need to separate family units and send the adults to adult detention and the children to HHS."  *Id.* ¶ 15.  High-level DHS officers discussed ████████ ████████████████████ with DHS Acting Secretary Elaine Duke, including on August 14, 2017, *id.* ¶ 16, and with newly appointed DHS Secretary Kirstjen Nielsen on December 11, 2017—less than a week after she assumed office, *id.* ¶ 19.  Officials, including Secretary Nielsen, viewed family separations as an option to "████████████████ ████████████████." *Id.*; *see also id.* ¶¶ 6–7, 20; A.P.F. SOF ¶ 28.

On April 6, 2018, Attorney General Jeff Sessions announced the Zero Tolerance Policy, which directed "each United States Attorney's Office along the Southwest Border— to the extent practicable, and in consultation with DHS—to adopt immediately a zero-tolerance policy for all offenses referred for prosecution under [8 U.S.C. §] 1325(a)" (the "Zero Tolerance Policy").  A.P.F. SOF ¶ 32.  Approximately two weeks later, McAleenan, Homan, and other senior DHS officials sent Nielsen the DHS Referral Memorandum, which proposed three options for implementing the Zero Tolerance Policy.  *Id.* ¶ 33.  For Option

3, the memorandum proposed: "Refer All Amenable Adults, including those presenting as part of a FMUA: Work with DOJ, [HHS], and other interagency partners to develop a quickly scalable approach to achieve 100% immigration violation prosecution referral for all amenable adults, including those initially arriving or apprehended with minors." *Id.* ¶ 36. The DHS Referral Memorandum was accompanied by a legal analysis of the proposal prepared by OGC attorney John Mitnick, SSOF ¶ 26, which reportedly explained that the government's "legal position" on "separating adults and children through the immigration process . . . is likely strongest [when] separation occurs in connection with a referral of an adult family member for criminal prosecution," *id.* ¶ 27. On April 24, 2018, Wolf transmitted the DHS Referral Memorandum to Nielsen, writing that Option 3 "███████ ████████████████████████████████████████." A.P.F. SOF ¶ 44. Nielsen approved Option 3 on May 4, 2018. *Id.* ¶ 45. On a call with the Southwest border U.S. Attorneys on May 12, 2018, DOJ immigration counselor Gene Hamilton reportedly stated that "prosecution makes separation a reality." SSOF ¶ 29.

But prosecution was a *pretext* for separation. Border Patrol agents were directed to separate any family where they believed the parent *might* be "amenable to prosecution," regardless of whether the parent was actually referred or if the referral was accepted. SSOF ¶¶ 34, 38, 42–43, 45. Indeed, families were separated even if the U.S. Attorneys' Office declined to prosecute a referral and even if Border Patrol officers knew that the prosecution referrals were flawed or would not be accepted. A.P.F. SOF ¶¶ 57–58; SSOF ¶¶ 36–37. Border Patrol agents therefore regularly separated families and referred children to ORR *before* parents' cases were referred for potential prosecution, *before* parents were sent to criminal custody, *before* the U.S. Attorneys' Office made a decision about whether to accept a parent's prosecution referral, and—in some cases—even when the agents had no expectation that the parent would *ever* be prosecuted. A.P.F. SOF ¶¶ 56, 59, 122; SSOF ¶ 34 (explaining that children were referred if Border Patrol simply "intended to refer [their parent] for prosecution").

**B.      Government Officials Separated Plaintiff Families.**

    **1.      Using Prosecution as a Pretext, Border Patrol Agents Separated the 2018 Plaintiffs.**

In May 2018, Border Patrol agents apprehended the 2018 Plaintiffs, booked them in to the Yuma Border Patrol Station, and identified José, Heriberto, Abel, and Joel as "amenable to prosecution" for alleged immigration violations.   SSOF ¶¶ 59, 71, 79, 88. Because the Border Patrol agents purportedly "intended to refer" José, Heriberto, Abel, and Joel for prosecution, they designated their children, Herlinda, Alicia, Obet, and Mariela, as "unaccompanied alien children" ("UACs") under the TVPRA and requested placements for them from ORR.   SSOF ¶¶ 34, 56–60, 70–72, 79–82, 88–89.

Border Patrol agents testified that after they determined the 2018 Adult Plaintiffs were "amenable to prosecution," the 2018 Child Plaintiffs were considered UACs and separation was "mandatory."   *Id.*  ¶ 41 (USBP agent testifying that, after May 2018, separations were "mandatory"); *id.* ¶¶ 37–38 (USBP agent testifying that "[a]t the time that we declare the child a UAC, we had every intention of . . . referring that individual for prosecution"); *id.* ¶ 43 (email from the Division Chief of Law Enforcement Operational Programs at USBP's Yuma Sector, directing border patrol agents "to immediately begin presenting for prosecution[] *all* eligible adult aliens" and "to immediately begin identifying and processing *all* eligible adults for prosecution, regardless of accompanying family members or nationality" (emphasis added)).   The UAC designations were not informed by whether the child was actually "unaccompanied" under the TVPRA.  *Id.* ¶ 40 (USBP agent testifying that it was not "practical" or "feasible" to wait for the U.S. Attorney's Office to decide whether to prosecute an adult migrant before designating the adult's child as a UAC).

Based on the UAC designations, Border Patrol agents forcibly separated the 2018 Child Plaintiffs from their fathers.  A.P.F. SOF ¶¶ 88–89, 97–98, 111, 117–19.  Agent ███ ██████ separated five-year-old Herlinda from José at 7:30 a.m. on May 9, 2018, as she grabbed her father by his neck, crying "[P]api, don't let them take me."  SSOF ¶ 58; A.P.F. SOF ¶ 89.  Agents "c[a]me and pull[ed] her off [José] because she wouldn't let go."  A.P.F. SOF ¶ 89.  Agent ████████████ separated six-year-old Alicia from Heriberto at 1:10

a.m. on May 13, 2018.  SSOF ¶ 71.  Alicia "started running after [Heriberto], and she fell."
A.P.F. SOF ¶ 98.  An agent then "lifted [Alicia] up, put her on his shoulder," and carried her
away.  *Id.*  On May 19, 2018, Border Patrol agents separated seven-year-old Obet from Abel,
although agents failed to record the family's separation in either Plaintiff's Subject Activity
Log.  *Id.* ¶ 110; SSOF ¶ 81.  Abel testified that "[a]bout five" armed officers opened the cell
door and "took [Obet] by force without any notice of where he was being taken."  A.P.F.
SOF ¶ 111.  Agent ███████████ separated eleven-year-old Mariela from Joel at 10:25 a.m.
on May 20, 2018.  A.P.F. SOF ¶ 117 & Ex. 77.  Mariela "didn't go peacefully," and Joel
"began to cry like a child, not having her near me."  *Id.* ¶¶ 119–20.

Border Patrol agents designated the 2018 Child Plaintiffs as UACs and separated
Plaintiff families *before* Border Patrol agents referred the 2018 Adult Plaintiffs to the U.S.
Attorney's Office for a decision regarding whether to prosecute.  SSOF ¶¶ 58, 63, 71, 80,
88; A.P.F. SOF ¶¶ 101 & Ex. 67, 113 & Exs. 72–74, 121 & Ex. 74.   None of the Plaintiff
fathers were ever charged or prosecuted.  SSOF ¶¶ 63, 67 (José's case was referred for
prosecution two days after the family was separated and declined the same day); A.P.F. SOF
¶ 101 & Ex. 67 (USBP agent ███████████ including Heriberto's case on a list of prosecution
"declines" two days after the family was separated);  A.P.F. SOF ¶ 113 & Ex. 72 (Agent
███████ informing the U.S. Attorney's office that Abel "did not meet the guidelines for
prosecution," and including him on a list of prosecution "Declines," the day after the family
was separated); A.P.F. SOF Ex. 73 (stating that Abel's prosecution was declined on May
21, 2018); A.P.F. SOF Ex. 74, at APF-US-USAO-0000014 (including Abel and Joel on a
May 22, 2018 list of prosecutions declined by the U.S. Attorney's Office).

After Border Patrol separated the 2018 Plaintiffs, agents continued to hold the fathers
and children in Yuma Station, just in different cells.  But despite being physically available
to care for his young child at the same Yuma Station, José and Herlinda were kept apart
while in custody at Yuma Station for 24 hours before Herlinda was transferred to an out-of-
state ORR facility.  SSOF ¶¶ 58–61.  Similarly, Heriberto and Alicia were separated at Yuma
Station for nearly 24 hours before Alicia was transferred to an out-of-state ORR facility.  *Id.*

¶¶ 71–73.  Abel and Obet also were in separate custody at Yuma Station for approximately a day before Obet was transferred to an out-of-state ORR facility.  *Id.* ¶¶ 80–84. Astonishingly, Joel and Mariela were kept apart at the same Yuma Station for *four days* before Mariela was transferred to an out-of-state ORR facility, even though Border Patrol agents expected Joel would not be prosecuted and even *after* the U.S. Attorney's Office had confirmed it would not accept Joel's case for prosecution.  A.P.F. SOF Ex. 77.  Two days after Agent ███ separated Joel and Mariela, Agent ████████ referred Joel's case for prosecution, noting to the U.S. Attorney's Office that he "believe[d]" Joel's case "may fall under your guidelines for declination."  A.P.F. SOF Ex. 74.  The U.S. Attorney's Office confirmed that Joel's case would not be accepted for prosecution three hours later that same day.  *Id.*  Yet Border Patrol continued to hold Joel and Mariela in separate cells at Yuma Station "for approximately a day-and-a-half or more after the prosecution declination happened," "[e]ven though they were at the same facility within a few-minute walk of each other."  A.P.F. SOF ¶ 122.  According to Border Patrol agent Shawn Jordan, officials were unable to reunite separated families even after federal prosecutors declined to prosecute a referred father because "[o]ur system wasn't set up to reunify at that time."  SSOF ¶ 38.

## 2. ICE Officers Separated 2017 Plaintiffs.

The 2017 Plaintiffs—Rolando and his nine-year-old daughter Bertha, and Mario and his seven-year-old son Antonio—sought asylum in the United States at the Nogales, Arizona port of entry in November 2017 and were transferred to the custody of the ICE Phoenix Office.  A.P.F. SOF ¶¶ 128–29, 138–39.

In a matter of minutes, ICE officers decided to separate the Plaintiff families.  On November 15, 2017, at 10:45 a.m., ICE FOJC officer ███████ reported to officer ████████████ that Rolando and Bertha's parent-child relationship had been verified, that Rolando had two prior immigration violation convictions, and that, more than a decade prior, Rolando had been convicted of operating a vehicle while impaired and paid a fine—a misdemeanor.  A.P.F. SOF Ex. 83.  One minute later, at 10:46 a.m., ███████ requested that Rolando and Bertha be separated.  *Id.*  Supervisor Michelle Lee approved the separation at

10:48 a.m.  *Id.*  On November 20, 2017, at 9:24 a.m., ICE FOJC officer ███████ reported to ███████ that Mario had prior immigration history and three non-violent misdemeanor convictions from 2008 and 2009 and asked, "are we able to split up the family?"  A.P.F. SOF Ex. 88.  At 9:40 a.m., ███████ requested that Mario and Antonio be separated.  *Id.*  Lee approved the separation at 10:09 a.m., and ███████ instructed ███ to separate Mario and Antonio and "not tell the father they are being separated."  *Id.*

ICE staff was not "required to explain why they concluded that someone's criminal history put the child's safety at risk."  SSOF ¶ 96.  And ICE Field Office Director Enrique Lucero testified that ICE officers likely did not record any explanation for why they concluded that Rolando and Mario's immigration history or non-violent misdemeanors put their child's safety at risk, such that the parent and child should be separated.  *Id.*  Lee testified that Rolando was a "mandatory detention case" and that she "didn't have other options" than separating Rolando and Bertha.  *Id.* ¶ 101.  Lee also testified that Mario and Antonio were separated because "an existing policy" made Mario "a mandatory detention case."  *Id.* ¶ 106.  But Lucero testified that different officers could reach different conclusions regarding whether Rolando's or Mario's prior immigration history and misdemeanors posed a risk to the safety of their children such that they should be separated from one another.  *Id.* ¶¶ 95, 105.  Neither Plaintiff father received a pre- or post-separation hearing regarding his separation from his child.  *Id.* ¶¶ 102, 110.

On November 15, 2017, ICE officers came with chains to Rolando and Bertha's room, grabbed Rolando and took him outside the room, and "shut the door quickly."  A.P.F. SOF ¶ 131.  Bertha was left crying inside and later reported that an "officer hit her with a belt buckle," bruising her.  *Id.*  "The officer told her 'If you don't stop crying, I'm going to hit you more times with the belt.'"  *Id.*  The officers did not let Rolando "say goodbye to [his] daughter" or "speak with her," and they did not tell him "what was going to happen to [Bertha]."  *Id.* ¶ 132.  The government did not reunite them for more than eight months.

An ICE officer told Mario that he would be separated from his son "whether [Mario] want[ed] it or not" and to "ask [his] son to behave well."  *Id.* ¶ 142.  Antonio "screamed"

and "cr[ied]" when officers took him from his father. *Id.* ¶ 143. The officers were not able to take him away during the first attempt. *Id.* Two more officers came and grabbed Mario's hands, while a third officer took Antonio away from him. *Id.* Mario was not told where his son was going or how long he would be separated from his son. *Id.* ¶ 144. Their separation lasted more than eight months.

### C. Government Officials Failed to Track Plaintiff Families, Allow Them to Speak with One Another, or Plan for Reunification.

Due to the government's failure to track separated families and provide for regular communication, *id.* ¶¶ 67–69, 72, 83; SSOF ¶¶ 47–53, Plaintiff fathers were not told where their children were taken and were unable to contact their children in the days and weeks following their separation, A.P.F. SOF ¶¶ 90, 93–94, 102, 114, 124–26, 134–35, 144, 146–47. The government did not have a plan to reunify Plaintiff families and did not do so until ordered by a federal court. *Id.* ¶ 78. José and Herlinda were separated for approximately 74 days, Heriberto and Alicia for approximately 110 days, Abel and Obet for approximately 67 days, Rolando and Bertha for approximately 253 days, and Mario and Antonio for approximately 248 days. *Id.* ¶¶ 95, 106, 115, 137, 150. The government deported Heriberto, Rolando, and Mario without their children. *Id.* ¶¶ 104, 136, 148.

Officials understood how outrageous and harmful these separations were. On June 15, 2018, ORR Associate Deputy Director Tricia Swartz emailed other HHS officers with the subject line "Why isn't HHS/DHS fixing this." SSOF ¶ 53. Swartz wrote: "This is becoming more and more outrageous. Another DHS $#@* show, and ORR is left holding the bag, while kids are harmed." *Id.*

## III.   LEGAL STANDARD

The party moving for summary judgment has the burden to identify "portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact." *Dominguez v. City of Scottsdale*, 587 F. Supp. 3d 914, 921 (D. Ariz. 2022) (Bolton, J.). If the movant does not carry its burden, "the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d 1099,

1102–03 (9th Cir. 2000).  "But if the movant meets its initial responsibility," the nonmoving party can defeat summary judgment by "demonstrat[ing] the existence of a factual dispute" that "is material."  *Dominguez*, 587 F. Supp. 3d at 921.  While the nonmoving party "must come forward with specific facts showing that there is a genuine issue for trial," it "need not establish a material issue of fact conclusively in its favor" to defeat summary judgment.  *Id.*  Thus, "[a]t summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial."  *Id.*

## IV.   ARGUMENT

### A.   Plaintiffs Seek Damages for the Specific Conduct of Government Officials, Not "Institutional" or "Systemic" Torts.

The government is wrong that Plaintiffs assert an "institutional or systemic" tort not cognizable under the FTCA.  In family separation cases, courts have routinely rejected the very same government argument where, as here, the plaintiffs' claims are predicated on the conduct of specific government officials and agents, not a general complaint about the adoption of the DHS Referral Policy.  *See, e.g.*, *Fuentes-Ortega v. United States*, 2022 WL 16924223, at *5 (D. Ariz. Nov. 14, 2022) ("specific allegations regarding individual federal employees and officers" are actionable under FTCA); *E.S.M. v. United States*, 2022 WL 11729644, at *2 (D. Ariz. Oct. 20, 2022) (denying dismissal because "Plaintiff's claims are plausibly based upon the actions of individual CBP employees"); *F.R. v. United States*, 2022 WL 2905040, at *4 (D. Ariz. July 22, 2022) ("claims against the United States for the alleged tortious misconduct of specific, individual employees working for those agencies" are actionable); *A.F.P. v. United States*, 2022 WL 2704570, at *18 (E.D. Cal. July 12, 2022) (claims that "attribute[] specific actions, including designing the family separation policy, subjecting plaintiffs to separation, and inflicting cruel conditions of confinement, to certain CBP and ICE employees, as well as other individual federal officials" are actionable); *B.A.D.J. v. United States*, 2022 WL 11631016, at *5 (D. Ariz. Sept. 30, 2022) (noting that "[i]ndividual officials craft the Government's policies, which are later implemented by the

Government's individual employees," and holding that subject matter jurisdiction extends to "tortious acts or omissions of individual federal employees").[1]

Like in those cases, Plaintiffs' claims here are based on the tortious misconduct of individual federal employees acting within the scope of their employment, namely the Border Patrol and ICE agents who separated Plaintiffs, as well as high-level officials such as DHS Secretary Nielsen, ICE Director Homan, ICE Executive Associate Director Matthew Albence, and CBP Commissioner McAleenan. At issue are the actions of these individuals in forcibly separating Plaintiffs for months as a means of deterrence, with no plan for tracking, facilitating communication, or reunifying separated families promptly. A.P.F. SOF ¶¶ 11–72, 85–150; SSOF ¶¶ 6–10, 19–20, 47–53; *see also* Am. Compl. ¶¶ 527–54.

The government cannot escape liability (and avoid these holdings and the facts) by misrepresenting the 2018 Plaintiffs' claims as challenging the DHS Referral Policy *writ large*.[2] The government incorrectly asserts—based on a single introductory paragraph in Plaintiffs' Amended Complaint—that the 2018 Plaintiffs' allegations are "quintessential claims based on 'policymaking or agency-wide misconduct'" and "indisputably arise out of separations resulting from enforcement action taken pursuant to the DHS Referral Policy." Br. at 6–8 (citing Am. Compl. ¶ 15). That background paragraph is not a cause of action and does not allege an institutional tort; it only recites the DHS Referral Policy and that Plaintiffs were subject to that policy. Am. Compl. ¶ 15. Focusing on this single paragraph, the government ignores the more than 500 paragraphs that follow, which detail how

---

[1] The government's citations to *Meier v. United States*, 2006 WL 3798160, at *3-4 (N.D. Cal. Dec. 22, 2006) and *Lee v. United States*, 2020 WL 6573258 (D. Ariz. Sept. 18, 2020) are unavailing. *Meier* held certain claims were not actionable under California law because there was no private person analog, 2006 WL 3798160, at *3–4, an issue that this Court has already resolved in this case and the government's motion does not raise, *see A.P.F. v. United States*, 492 F. Supp. 3d 989, 994 (D. Ariz. 2020). And courts consistently distinguish *Lee* as inapposite in rejecting the government's institutional tort defense in other family separation cases. *See Fuentes-Ortega*, 2022 WL 16924223, at *5 ("The government's reliance on [Lee] misses the mark."); *A.F.P.*, 2022 WL 2704570, at *18; *E.S.M.*, 2022 WL 11729644, at *2; *B.A.D.J.*, 2022 WL 11631016, at *8; *F.R.*, 2022 WL 2905040, at *4.

[2] The 2017 Plaintiffs' claims are not based on the DHS Referral Policy, and thus this argument cannot provide a basis for summary judgment as to their claims.

Plaintiffs' separations were the result of the actions of specific government officials and agents—allegations discovery has confirmed.  A.P.F. SOF ¶¶ 11–72, 85–150.[3]

Likewise, the government cannot escape liability by asserting that all of the actions of its employees following the adoption of the DHS Referral Policy are "policymaking" or "agency-wide misconduct" exempt from FTCA liability.  Br. at 7.  Plaintiffs' claims are no different than the actionable claim in *Whisnant v. United States*, where the plaintiff alleged that a government agency, required by its own regulations to ensure the safety of a commissary, caused tortious injury when it "ignore[d] indications of the dangerous condition . . . and intentionally or recklessly . . . permitted employees and customers to work and shop at the commissary in spite of health hazards about which the government knew or should have known."  400 F.3d 1177, 1180, 1185 (9th Cir. 2005).

That the facts regarding the DHS Referral Policy, including the undisputed facts related to its adoption and implementation, A.P.F. SOF ¶¶ 28–72; SSOF ¶¶ 5–53, are highly relevant to Plaintiffs' state law IIED and negligence claims does not make Plaintiffs' claims institutional or systemic torts.  As argued in Plaintiffs' summary judgment brief, A.P.F. Br. at 22–26, the information available to government officials responsible for adopting and implementing the policy, including DHS Secretary Nielsen, CBP Commissioner McAleenan, and ICE Director Homan, provide *evidence* of the requisite intent, including the government's reckless disregard of the harm separating families would cause, a necessary element of plaintiffs' IIED claim.  Likewise, the facts concerning the implementation of the DHS Referral Policy provide evidence of the extreme and outrageous nature of the separations, *id*. at 18–22; *see also A.P.F.*, 492 F. Supp. 3d at 996–97 (holding that facts related to implementation demonstrate "the harm resulting from the separations"), as well as a basis for finding the government breached its duty of care and was negligent, *see* A.P.F. Br. at 28–29.  The Court should, again, "reject[] the United States' re-

---

[3] The government should not be allowed to cure its failure of proof on this point on reply. *See Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996) ("Where new evidence is presented in a reply to a motion for summary judgment, the district court should not consider the new evidence without giving the [non-]movant an opportunity to respond.").

categorization of Plaintiffs' factual allegations as standalone claims," *A.P.F.*, 492 F. Supp. 3d at 996, and deny the government's motion for summary judgment.[4]

## B.   The Discretionary Function Exception Does Not Apply.

The FTCA's discretionary function exception is limited in scope.  "The discretionary function exception bars claims arising from governmental actions that (1) involv[e] an element of judgment or choice and (2) are based on considerations of public policy." *A.P.F.*, 492 F. Supp. 3d at 996 (quotation omitted).  "[T]he United States bears the ultimate burden of proving . . . the discretionary function exception" applies to the specific action challenged.  *Prescott v. United States*, 973 F.2d 696, 702 (9th Cir. 1992).  The government cannot demonstrate the exception applies here because the actions of the specific government employees at issue were (1) unconstitutional, and thus not discretionary; (2) unlawful, and thus not discretionary; and (3) without any legitimate policy rationale.[5]

## 1.   Separating Plaintiffs Was Not Discretionary Because it Violated the Constitution.

The Ninth Circuit has made clear that constitutional violations are not protected by the discretionary function exception because "[f]ederal officials do not possess discretion to violate constitutional rights." *Galvin v. Hay*, 374 F.3d 739, 758 (9th Cir. 2004) (quotation omitted); *Cloes v. City of Mesquite*, 582 F. App'x 721, 727 (9th Cir. 2014) ("[A]cts that violate the Constitution cannot be viewed as discretionary.").  "[T]he Supreme Court and the Ninth Circuit have" also repeatedly "held that non-citizens physically on U.S. soil have constitutional rights, including the right to due process of law." *Ms. L. v. ICE*, 302 F. Supp.

---

[4] That Plaintiffs' Amended Complaint and Motion for Partial Summary Judgment use "the government" as shorthand for the conduct of individual federal employees does not convert Plaintiffs' claims into institutional tort claims. *See A.F.P.*, 2022 WL 2704570, at *18 (noting that "[r]eferences to the 'United States Government' as a whole are not unexpected in an FTCA action, which may only be brought against 'the United States itself'").

[5] The separation of Plaintiffs involved the following conduct: (a) the cruel act of removing Plaintiffs from one another with force; (b) the failure to reunify separated families for months; and (c) the failure to allow Plaintiffs to communicate with one another.  A.P.F. Br. at 18–22.  This conduct was carried out with reckless disregard because the government knew or should have known that it had no ability to track separated families, facilitate communication, or reunite them promptly. *Id.* at 22–26.  Such conduct also breached the government's duty of care. *Id.* at 27–29.  This conduct underlies all of Plaintiffs' causes of action, including Loss of Consortium.  Am. Compl. ¶ 549–54.  If the Court denies the government's motion, all three of Plaintiffs' causes of action should proceed to trial.

3d 1149, 1161 (S.D. Cal. 2018) (quotation omitted).  This includes the long-established "right to family integrity or familial association."  *Id.*  Separating Plaintiffs was a violation of their right to family integrity, both as a matter of substantive and procedural due process.

As an initial matter, the government asserts that the Court need not consider Plaintiffs' substantive due process argument because, in its view, (a) Plaintiffs' right to family integrity was not "clearly established and specifically prescribed at the time of the alleged violation," and (b) there is no right to family integrity in the immigration detention context.  Br. at 23–28.  The government is wrong.

The "clearly established and specifically prescribed" standard applies only in the *Bivens* and qualified immunity context where plaintiffs bring constitutional causes of action against specific government employees—not where, as here, Plaintiffs allege state law tort claims against the United States itself for the conduct of specific government employees under the FTCA.[6]  Multiple courts have rejected the government's attempt to import qualified immunity standards into the FTCA context.  *See, e.g.*, *A.F.P.*, 2022 WL 2704570, at *13 ("The government appears to invite the court to expand the discretionary function exception test to incorporate the doctrine of qualified immunity and limit FTCA jurisdiction to only those claims that are based upon alleged violations of a 'specific, clearly established directive[.]' The government has cited no caselaw that supports their argument."); *D.J.C.V.*, 605 F. Supp. 3d at 597 (same); *Loumiet v. United States*, 828 F.3d 935, 946 (D.C. Cir. 2016) (same).

Nor do the government's out-of-circuit opinions support the proposition that there is no right to family integrity in the immigration detention context, and in any case, these opinions are inapposite.  In *Reyna ex rel. J.F.G. v. Hott*, the plaintiffs challenged DHS and ICE's decision to transfer them further away from their children, not the act of separation itself.  921 F.3d 204 (4th Cir. 2019).  In *Delgado v. INS*, 637 F.2d 762 (10th Cir. 1980),

---

[6] As FTCA suits are against the government, it "is not entitled to defend on the basis of any official immunity that its executive employees individually might possess."  *D.J.C.V.*, 605 F. Supp. 3d 571, 597 (S.D.N.Y. 2022).  Moreover, the constitutional analysis in this case arises only because the government asserts that its tortious conduct was discretionary and immune from liability—not because Plaintiffs are bringing constitutional claims.

*Marin-Garcia v. Holder*, 647 F.3d 666 (7th Cir. 2011), and *Payne-Barahana v. Gonzales*, 474 F.3d 1 (1st Cir. 2007), the separation occurred only after either a prosecution or deportation decision was made—not, like here, where Plaintiffs were separated before any prosecution or deportation decision, A.P.F. SOF ¶¶ 86–92, 97–101, 110–13, 117–22, 130–32, 139–43. *United States v. Dominguez-Portillo* is similarly inapplicable because it pertains to post-charging separations. 2018 WL 315759 (W.D. Tex. Jan. 5, 2018).[7]

### a. Separating Plaintiffs Violated Substantive Due Process.

The "substantive due process right to family integrity . . . is well established." *Rosenbaum v. Washoe Cty.*, 663 F.3d 1071, 1079 (9th Cir. 2011). "In a due process challenge to executive action, the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998). So long as the challenged "conduct was intended to injure in some way unjustifiable by any government interest, or . . . if it resulted from deliberate indifference," *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1906 (2018) (quotation omitted), a plaintiff's substantive due process rights were violated. Plaintiffs easily meet this standard here.

*First*, as government officials have freely admitted and multiple courts have found, separating Plaintiffs "shock[s] the contemporary conscience." *Lewis*, 523 U.S. at 847 n.8 (1998); *see* A.P.F. SOF ¶¶ 81–84; *Ms. L. v. ICE*, 310 F. Supp. 3d 1133, 1142, 1145 (S.D. Cal. 2018); *D.J.C.V.*, 605 F. Supp. 3d at 594; *de Nolasco v. ICE*, 319 F. Supp. 3d 491, 501 n.4 (D.D.C. 2018). And the 2018 Plaintiffs have presented substantial evidence that the actions of government officials here were "intended to injure" and were "unjustifiable by any government interest." *Rosales-Mireles*, 138 S. Ct. at 1906; SSOF ¶ 8 (ORR Deputy Director White testifying that "███████████████████████

---

[7] The government neglects to note that the *Dominguez-Portillo* court stated that "[i]f [migrants] are in fact separated from their children at the time of their arrest, prohibited from communicating with their children, not given any substantive information about the location and well-being of their children, and effectively barred from participating in their children's immigration proceedings up until the time of their (or their children's) deportation, then [their] constitutional rights to familial association may be implicated," 2018 WL 315759, at *6—an almost identical fact pattern to the government employees' actions at issue here.

- 15 -

██████"); *id.* ¶¶ 6–10, 14–15; A.P.F. SOF ¶¶ 8–12, 26, 28–31, 59, 61–62, 64–65, 81–84. Officials who were involved in February 2017 discussions about separating families were worried "███████████████████████" for "████████████████████████ ████████████████" involving "████████████████." SSOF ¶¶ 12–13. As ORR Associate Deputy Director Tricia Swartz recognized in June 2018, the "harm" to children resulting from the "DHS $#@* show" was "outrageous." *Id.* ¶ 53.

Incredibly, the government now argues that only Nielsen's intent matters and that her intent cannot be discerned through the testimony of others. Br. at 27. But when Plaintiffs sought to depose Nielsen, the government argued, "Plaintiffs already have the deposition testimony of former CBP Commissioner McAleenan, former ICE Director Homan, and the other 13 policy-level government witnesses, [and] the United States' voluminous document productions." Opp. to Mot. to Depose Nielsen at 8, ECF No. 309. The government cannot have it both ways. In any event, none of the government's cases are in the context of the FTCA or support that only an apex decisionmaker's intent is relevant.[8] Nor do the government's cases support its assertion that the statements of "other officials . . . [are] immaterial to determining Secretary Nielsen's intent." Br. at 27.[9]

*Second*, all Plaintiffs have shown that, at a minimum, their separations were with reckless disregard for the harm separation would cause. As explained in Plaintiffs' summary judgment brief, A.P.F. Br. at 22–26, the undisputed facts are that the government separated Plaintiffs despite knowing (a) that separating families would inflict harm particularly on the children, A.P.F. SOF ¶¶ 11–13, 31; SSOF ¶ 8, and (b) that the government was not prepared

---

[8] *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977) (equal protection case noting that a "decisionmaker's purposes" may be shown by "the specific sequence of events up to the challenged decision"); *City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 196 (2003) (equal protection case noting that "statements made by private individuals" could be "relevant to [an] equal protection analysis").

[9] *See Dep't of Com. v. New York*, 139 S. Ct. 2551, 2575 (2019) (APA case noting that, when "viewing the evidence as a whole" revealed a "significant mismatch between the decision the Secretary made and the rationale he provided," remand was warranted); *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1916 (2020) (equal protection case holding only that President Trump's statements were not evidence of intent of an agency decision because they were not sufficiently contemporaneous). The government's position is also in bad faith. If the discretionary function analysis turned solely on Nielsen's intent, the government would not have taken the position that Plaintiffs need not depose her.

to handle an influx of separated children and track separated families, allow them to communicate, or reunify separated families, A.P.F. SOF ¶¶ 11–13, 20, 23, 25–27, 43, 47–54, 67–70, 72, 80; SSOF ¶¶ 8, 22.

All these facts as to government officials' intent and recklessness are sufficient to conclude that Plaintiffs' separation "shock[s] the conscience." *de Nolasco*, 319 F. Supp. 3d at 501 n.4; *see D.J.C.V.*, 605 F. Supp. 3d at 594 ("five month[]" family separation that "was imposed despite U.S. authorities' awareness that the parent and child were seeking protection from persecution" was "shocking"); *A.P.F.*, 492 F. Supp. 3d at 996 ("Plaintiffs have plausibly alleged that the government's separation of their families violated their constitutional rights."). Indeed, the court in *Ms. L.* held that a due process violation is "*assured*" where, like here, the government separated parents "from their minor children, and fail[ed] to reunify" them, while "lack[ing] any effective procedures or protocols for notifying the parents about their childrens' whereabouts or ensuring communication between the parents and children, and [using] the children as tools in the parents' criminal and immigration proceedings." 310 F. Supp. 3d at 1145 (emphasis added). The government has not shown otherwise; instead, it has admitted that separating families was "unconscionable." A.P.F. SOF ¶ 84.

Under these circumstances, the remainder of the government's arguments are readily dismissed. *First*, contrary to the government's assertion, Br. at 26, contemporaneous binding authority prohibiting family separations in circumstances like the DHS Referral Policy is not necessary for Plaintiffs to overcome the discretionary function exception, as explained above. *S.E.B.M. v. United States* does not hold otherwise and is inapposite, as it concerned a separation that took place *after* a parent was *charged and prosecuted*—facts not present here. --- F. Supp. 3d ---, 2023 WL 2383784, at *14–15 (D.N.M. Mar. 6, 2023).

*Second*, the government incorrectly argues that the discretionary function exception negates any consideration of government officials' intent. Br. at 26–27. But the "shocks the conscience" test for determining if there has been a substantive due process violation is satisfied if the government's conduct was intentional *or* reckless, and intent *is* relevant to

this determination.  *See Rosales-Mireles*, 138 S. Ct. at 1906.  Neither *United States v. Gaubert*, 499 U.S. 315 (1991), nor *Franklin Sav. Corp. v. United States*, 180 F.3d 1124 (10th Cir. 1999), suggest differently.  They hold only that *after* a court determines the government had discretion with respect to the challenged action (*i.e.*, that the conduct did not violate the Constitution or was not subject to a mandatory directive), it need not consider intent when assessing whether the challenged conduct had a legitimate policy rationale at the last step of the discretionary function analysis.  *See Gaubert*, 499 U.S. at 325; *Franklin Sav. Corp.*, 180 F.3d at 1133–34.

*Third*, the government argues that, because the DHS Referral Policy applied to all adults, it was somehow "evenhanded" and thus cannot have violated substantive due process.  Br. at 28 (quoting *Aguilar v. ICE*, 510 F.3d 1, 22 (1st Cir. 2007)).  As the court in *Ms. L.* explained, *Aguilar* is "factually distinguishable" because "unlike Plaintiffs in this case, none of the plaintiffs in *Aguilar* were detained *with their children*," meaning that *Aguilar's* "analysis of the plaintiffs' substantive due process rights has limited application." *Ms. L.*, 302 F. Supp. 3d at 1163.  Regardless, *Aguilar* does not interpret "evenhanded" to mean applied equally, and it holds only that parents being separated from their children incidentally to their parents' detention did not violate due process.  Likewise, *Milan-Rodriguez v. Sessions*, 2018 WL 400317 (E.D. Cal. Jan. 12, 2018) is distinguishable because "the practice [of separations] is not a necessary incident of detention; it is the result of an *unnecessary* governmental action intended to separate family units who were arrested *together*," *Ms. L.*, 302 F. Supp. 3d at 1162–63 (quotation omitted) (emphasis in original).

*Fourth*, the government wrongly asserts that its failure to facilitate communication or to track and reunify families was not a substantive due process violation.  Br. at 28.  Courts have found that a parent's right to family integrity may be violated if they were detained "in separate facilities for many weeks with only periodic phone calls" and could not be involved in any aspect of their child's life or express love or comfort to their children.  *de Nolasco*, 319 F. Supp. 3d at 501.  The issue is not whether Plaintiff families were *ever* able to "communicate[] during their separations," Br. at 28, but rather when and how often—

especially since federal directives mandate prompt communication among family members,

SSOF ¶ 1; A.P.F. SOF ¶ 4.  Further, the government's assertion that "Plaintiffs' family

relationships were well-documented and available to the federal agencies . . . and that the

adult and minor Plaintiffs communicated during their separations," Br. at 28, is contradicted

by record evidence, A.P.F. SOF ¶¶ 90, 93–94, 102, 114, 124–26, 134–35, 144, 146–47,

including the undisputed facts that it took weeks for federal officers and contractors to

identify the name, much less the location, of separated parents and allow them to speak with

their children, A.P.F. ¶¶ 67–69, 72, 83, 94; SSOF ¶¶ 47–53.

Neither *Aguilar* nor *S.E.B.M.* support the government's contention. Br. at 28.  In

*Aguilar*, the government took "measures to alleviate any resultant harm" from detaining

parents far from their children, including coordinating with social services and releasing

detainees who were "the sole caregiver of one or more minor children."  510 F.3d at 22 &

n.5.  No such measures were taken here.  *S.E.B.M.* is also inapplicable.  It only held that in

the circumstances of that case, providing short calls between the family was protected by

the due care exception, which is not at issue here.[10]  *See S.E.B.M.*, 2023 WL 2383784, at

\*16.  As separating Plaintiffs violated their substantive due process rights, the discretionary

function exception does not apply.[11]

---

[10] In a footnote, the government asserts that the due care exception applies because after Border Patrol determined the 2018 Child Plaintiffs were UACs, the TVPRA required them to be transferred to ORR.  Br. at 17 n.16.  This assumes that the initial designation was correct, but it was not. *See supra* § IV.B.2.a.  Further, "[a]rguments raised only in footnotes" in an opening brief "are generally deemed waived." *Est. of Saunders v. Comm'r*, 745 F.3d 953, 962 n.8 (9th Cir. 2014).  The government is not entitled to summary judgment on its under-developed due care argument.

[11] There is also a dispute of fact whether the government violated the 2018 Plaintiffs' equal protection rights.  To prevail on an equal protection claim, a plaintiff must demonstrate that government action had a discriminatory effect and a discriminatory purpose. *See Rosenbaum v. City & Cnty. of San Francisco*, 484 F.3d 1142, 1152 (9th Cir. 2007).  The government's conduct had a discriminatory effect: it separated thousands of migrant families from Latin and South America at the Southwest border, but it did not separate similarly situated migrant families from other regions.  SSOF ¶ 30; A.P.F. SOF ¶¶ 32–33.  Officials' conduct was also motivated by a discriminatory animus toward immigrants in general and migrants from Latin America in particular.  SSOF ¶¶ 21, 23–24.  On such facts, summary judgment must be denied. *See D.A. v. United States*, 2023 WL 2619167, at \*8 (W.D. Tex. Mar. 23, 2023) ("Defendant's Zero Tolerance Policy plausibly amounted to selective prosecution motivated by discriminatory animus against Latino immigrants.").

**b.** **The 2017 Plaintiffs Were Denied Procedural Due Process.**

When assessing procedural due process, a court "first asks whether there exists a liberty or property interest which has been interfered with by the State; [and] second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *D.J.C.V*, 605 F. Supp. 3d at 591 (quotation omitted).  In *D.J.C.V.*, the court held that the plaintiff adequately alleged a procedural due process violation where the plaintiff and his child were "separated entirely for months, and not . . . afforded any opportunity whatsoever to be heard to challenge the separation, let alone a meaningful one." *Id.* at 592.

Here, the government has not, because it cannot, point to any record evidence that the 2017 Plaintiffs, who presented at a port of entry seeking asylum, A.P.F. SOF ¶¶ 128, 138, were provided an opportunity to be heard to challenge their separation.  The facts show that the 2017 Plaintiffs were separated in a matter of minutes, *id.* ¶¶ 130, 139; did not receive a pre- or post-separation hearing regarding their separation, SSOF ¶¶ 102, 110; and the government did not identify any "emergency warranting plaintiffs' immediate separation from one another," *D.J.C.V.*, 605 F. Supp. 3d at 593, especially where the 2017 Plaintiffs' family relationship was verified and the 2017 Adults Plaintiffs' criminal history involved non-violent misdemeanors, A.P.F. SOF ¶¶ 129, 139; SSOF ¶¶ 93, 104.  Indeed, there is no evidence that the government meaningfully considered all the factors it alleges in its brief before deciding to separate the families, Br. at 22–23, 28 n.27, and the government's own witness testified that different officers could reach different conclusions regarding whether the 2017 Plaintiffs should be separated, SSOF ¶¶ 95, 101, 105–06.  That the 2017 Plaintiffs were not reunited until the June 2018 *Ms. L.* order further underscores the lack of opportunity the 2017 Plaintiffs had to be heard.  A.P.F. SOF ¶ 137, 150.  As the government's separation of 2017 Plaintiffs violated their procedural due process rights, the government cannot avail itself of the discretionary function exception.  At minimum there is a factual dispute here, and thus summary judgment must be denied.

1

2. **The Separation of Plaintiffs Was Not Subject To Discretion.**

2

3

4

5

6

7

8

9

Even if the Court concludes that the government's conduct did not violate Plaintiffs' due process rights, it must still deny summary judgment because the discretionary function exception does not apply where, as here, the government "violate[d] a legal mandate." *Galvin*, 374 F.3d at 758; *O'Toole v. United States*, 295 F.3d 1029, 1033 (9th Cir. 2002) (because "a federal statute, regulation, or policy specifically prescribes a course of action," an "agency has no rightful option but to adhere to [a] directive" (quotation omitted)).  The relevant question for the purposes of the government's motion is whether the government agents who *separated* Plaintiffs were subject to a mandatory directive.

10

11

a.   **Designating the 2018 Child Plaintiffs as UACs Violated the TVPRA and Thus Was Not Discretionary.**

12

13

14

15

16

17

The government agents who separated the 2018 Plaintiffs were subject to the TVPRA, which establishes when a child can be deemed "unaccompanied."  *See* 8 U.S.C. § 1232(b)(1) (incorporating the definition of a UAC from 6 U.S.C. § 279(g)(2)); 6 U.S.C. § 279(g)(2) (defining a UAC to mean a child who "(A) has no lawful immigration status in the United States; (B) has not attained 18 years of age; and (C) with respect to whom-- (i) there is no parent or legal guardian in the United States; or (ii) no parent or legal guardian in the United States is available to provide care and physical custody.").

18

19

20

21

22

23

24

25

26

27

The facts show that Border Patrol separated the 2018 Plaintiffs because once agents "intended to refer" the 2018 Adult Plaintiffs for prosecution, they determined that the 2018 Child Plaintiffs were UACs.  SSOF ¶¶ 34, 59, 71, 79, 88.  This determination triggered the TVPRA requirement to transfer the 2018 Child Plaintiffs to ORR custody within 72 hours. 8 U.S.C. § 1232(b)(3); Br. at 17 n.15; SSOF ¶ 39.  The government wrongly argues the discretionary function exception applies to these facts because (1) "whether and when to deem a child traveling with an amenable adult as 'unaccompanied'" is discretionary, Br. at 14, 16; and (2) "[d]esignating a child a UAC" was an exercise of prosecutorial discretion because "the decision to pursue prosecution of the parent, whom the child cannot accompany

28

during the criminal proceedings, is integrally related to the decision to initiate prosecution itself," *id.* at 15.[12]

*First*, whether or when to designate a child as "unaccompanied" is not subject to discretion.  A child is considered "unaccompanied" *only* if they meet the specific definition set forth in 6 U.S.C. § 279(g)(2), which the TVPRA incorporates by reference.  *See* 8 U.S.C. § 1232(b)(1).  Courts construing 6 U.S.C. § 279(g)(2) have made clear that "[a]n individual who satisfies the definition is a UAC and must be treated as such; if the individual does not satisfy the definition, the government has no nebulous discretionary authority to treat the individual as a UAC."  *D.B. v. Cardall*, 826 F.3d 721, 749 n.4 (4th Cir. 2016) (Floyd, J., dissenting); *see Mendez Ramirez v. Decker*, 612 F. Supp. 3d 200, 216 (S.D.N.Y. 2020) ("[A] UAC ceases to be a UAC when she no longer meets the statutory definition"); *Maldonado v. Lloyd*, 2018 WL 2089348, at *5 (S.D.N.Y. May 4, 2018) ("[A] child is not 'unaccompanied'-and, therefore, neither a UAC nor properly within ORR's regulatory ambit-if a parent is physically present in the United States and . . . is available to provide care and physical custody."); *Coreas–Giron v. Holder*, 422 F. App'x 602, 603 (9th Cir. 2011) ("Since he lives with his mother in the United States, Coreas–Giron fails to meet the requirement for an unaccompanied alien child . . . .").

Here, the government determined that the 2018 Child Plaintiffs were UACs using a standard nowhere found in the TVPRA:  that once Border Patrol had "every intention of . . . referring that individual for prosecution," it "reasonably expect[ed] that the parent would not be there to care for the child."  SSOF ¶¶ 36–37.  The TVPRA and 6 U.S.C. § 279(g)(2) do not establish Border Patrol's "reasonable expectation" as the standard for whether or not a parent is "available" and, in fact, leave no discretion as to who is or is not a UAC.  Accordingly, under the TVPRA, the government did not have the discretion to separate the 2018 Plaintiffs.

---

[12] It is undisputed that the 2017 Child Plaintiffs were not designated as UACs, and Border Patrol never intended to (and could not have) refer the 2017 Adult Plaintiffs for prosecution. The government's argument for the application of the discretionary function exception to these facts cannot provide a basis for summary judgment on the 2017 Plaintiffs' claims.

The government's citation to the out-of-circuit and largely vacated district court opinion in *D.B. v. Poston*, 119 F. Supp. 3d 472, 482–83 (E.D. Va. 2015), *aff'd in part, vacated in part, remanded sub nom*. *D.B. v. Cardall*, 826 F.3d 721 (4th Cir. 2016), cannot save its motion. *See* Br. at 15. While the district court rejected the plaintiffs' habeas petition on the basis that a UAC determination was discretionary, 119 F. Supp. 3d at 476, the Fourth Circuit did not affirm this reasoning, *see D.B.*, 826 F.3d at 730–31. The Fourth Circuit did not reach whether Border Patrol's determination was erroneous (or discretionary) because the court concluded that ORR's subsequent determination that the plaintiff child was a UAC was appropriate and did not violate 6 U.S.C. § 279(g)(2). *See id.* at 734 & n.10. As explained in the dissent, this holding "implicitly reject[ed]" the government's argument that it has "discretion to classify individuals as UACs." *Id.* at 749 n.4 (Floyd, J., dissenting).

*Second*, the determination that the 2018 Child Plaintiffs were UACs, and the Adults were not "available," was not, contrary to the government's assertion, intertwined with any exercise of prosecutorial discretion. *See* Br. 14–18 (noting that a child cannot accompany a parent during criminal proceedings). This Court has already rejected this exact argument in *C.M.* because "[a]ny argument that the government was simply exercising prosecutorial discretion" when separating families "ignores the crucial fact that the government never charged any Plaintiff with a crime." 2020 WL 1698191, at *4. The facts are the same here: not a single 2018 Adult Plaintiff was charged with a crime. A.P.F. SOF ¶¶ 92, 101, 113, 121. They were determined only to be "amenable for prosecution" by Border Patrol when it designated the 2018 Child Plaintiffs as UACs.[13]

That the U.S. Attorney's Office could *eventually* exercise discretion with respect to the 2018 Adult Plaintiffs does not mean that the determination of whether the 2018 Child Plaintiffs were UACs was subject to discretion. *See S.E.B.M.*, 2023 WL 2383784, at *14 ("The act of charging, prosecuting, and jailing S.E.B.M.'s father made S.E.B.M. a UAC

---

[13] Border Patrol never referred Heriberto for prosecution. A.P.F. SOF ¶ 101; A.P.F. SOF Ex. 36. When referring Abel and Joel for prosecution, Border Patrol agents acknowledged that their cases might not meet the U.S. Attorney's guidelines for prosecution. A.P.F. SOF ¶ 113 & Exs. 72, 74.

which in turn required her to be cared for elsewhere . . .  The *only* discretionary action in that chain of events *was the decision to prosecute*." (emphases added)); *Mejia Rodriguez v. DHS*, 562 F.3d 1137, 1143 (11th Cir. 2009) ("[S]imply because the Secretary has the ultimate discretionary authority to grant an immigration benefit does not mean that every determination made by USCIS . . . is discretionary, and hence not subject to review. . . . [S]everal preliminary statutory eligibility decisions are not ones that involve discretion. . . . USCIS must simply apply the facts of the applicant's situation to the relevant law.").

The government's attempt to find some relevant discretion in the notion that Border Patrol initiated a prosecution by using discretion to determine that the 2018 Adult Plaintiffs were "amenable," which in turn required separation, is undermined by the very cases it cites. In *Gasho v. United States*, the Ninth Circuit concluded that while "prosecutorial decisions" fall "under FTCA exceptions," the government's "conduct during the arrest is not entitled to FTCA immunity." 39 F.3d 1420, 1436 (9th Cir. 1994).  In other words, law enforcement's actions *prior* to the decision to prosecute are not immune to challenge under the FTCA.  And in *Blanco Ayala v. United States*, which is not controlling, the plaintiff was detained by DHS *after* DHS completed their investigation and charged him with an immigration offense.  982 F.3d 209, 213 (4th Cir. 2020).  Further, unlike in *Blanco Ayala*, DOJ, not DHS or Border Patrol, was responsible for charging and prosecuting the 2018 Adult Plaintiffs.  A.P.F. SOF ¶¶ 92, 101, 113, 121.

Accordingly, the government was subject to a mandatory directive governing whether or not a child was a UAC at the time it separated plaintiffs, meaning that its determination was not subject to discretion and the discretionary function exception does not apply.  Government agents violated the TVPRA when they concluded the 2018 Child Plaintiffs were UACs, even though their parents remained in the same location as them, often only a few rooms apart, and before any prosecutorial charging decision had been made. A.P.F. SOF ¶¶ 86–92, 97–101, 110–13, 117–22, 130–32, 139–43.  That the 2018 Adult Plaintiffs were never charged and prosecuted underscores why the government's "reasonable expectation" excuse has never been the standard for whether or not a parent is

available for the purposes of 6 U.S.C. § 279(g)(2), and why the separations here were not an exercise of prosecutorial discretion.

### b. ICE's Statutory Detention Authority Does Not Immunize the Government from Liability.

The government also wrongly asserts that because ICE has the authority to arrange for the appropriate place of detention pursuant to 8 U.S.C. § 1231(g)(1), it had the discretion to separate Plaintiffs.  Plaintiffs are not challenging ICE's authority to arrange places for detention, but rather their separation, which the statute does not permit.  Courts have made clear that 8 U.S.C. § 1231(g)(1) does not give ICE "unfettered discretion," *Aguilar*, 510 F.3d at 20, and have held that it does not give the government the authority or discretion to separate families, *see Ms. L.*, 302 F. Supp. 3d at 1159–62; *Aguilar*, 510 F.3d at 20 (noting that if "a statute does not explicitly specify a particular authority as discretionary, it "does not bar judicial review").  As ICE's detention authority does not give it discretion to separate families, including Plaintiffs, it does not immunize the government from liability.

Regardless, ICE's discretionary authority is irrelevant as to the 2018 Plaintiffs because they were separated long before the fathers were transferred into ICE custody.  SSOF ¶¶ 58, 67, 71, 74, 80, 85, 88, 90.  With respect to the 2017 Plaintiffs, the government argues that ICE made the "discretionary determination[] . . . to detain, rather than release" the 2017 Adult Plaintiffs because of their criminal and immigration history, necessitating the family separation.  Br. at 22.  But there is a material factual dispute whether the separations were discretionary.  While the Field Office Director in the ICE Phoenix Office testified that different officers could reach different conclusions regarding whether Rolando's or Mario's criminal history meant they should be separated from their children, SSOF ¶¶ 95, 105, the supervising ICE officer who actually authorized the separations testified that they were "mandatory detention case[s]" and that she "didn't have other options" to separating the families, *id.* ¶¶ 101, 106 (testifying that she believed Mario was a "mandatory detention case" under "an existing policy" that "applied to all of the ICE field offices").  On such facts, summary judgment for the government must be denied.

### 3. Separating Plaintiffs Had No Legitimate Policy Rationale.

Even if the Court concludes that the challenged conduct did not violate the Constitution and was subject to discretion, the government must still show that its actions in separating Plaintiffs "involved a policy judgment." *Marlys Bear Med. v. U.S. ex rel. Sec'y of Dep't of Interior*, 241 F.3d 1208, 1214 (9th Cir. 2001). This "inquiry . . . is not meant to open the door to ex post rationalizations by the Government in an attempt to invoke the discretionary function shield." *Id.* at 1216. "There must be reasonable support in the record for a court to find, without imposing its own conjecture, that a decision was . . . susceptible to policy analysis." *Id.* Accordingly, if the Plaintiffs' separation, including the manner in which it was carried out, had "no legitimate policy rationale," it "has no role to play in the legitimate functioning of government" and "is not protected by the discretionary function exception." *Myles v. United States*, 47 F.4th 1005, 1012 (9th Cir. 2022).

There was no legitimate policy rationale for the decisions to separate the 2018 Plaintiffs. The government asserts that after a parent was deemed "amenable," Border Patrol's UAC determination was made in the face of "constraints and exigencies associated with noncitizens, particularly minors," and that such decisions are susceptible to policy analysis. Br. at 16–17. In other words, Border Patrol designated the 2018 Child Plaintiffs as UACs based on logistical considerations,[14] SSOF ¶ 40, and not based on whether the 2018 Adult Plaintiffs were actually "available," *see* 6 U.S.C § 279(g)(2). But failure to adhere to an affirmative obligation because it is difficult or resources are constrained is not a legitimate policy concern. *See Marlys Bear Med.*, 241 F.3d at 1216–17 ("[S]afety measures, once undertaken, cannot be shortchanged in the name of policy"); *O'Toole*, 295 F.3d at 1037 ("Were we to view inadequate funding alone as sufficient to garner the protection of the discretionary function exception, we would read the rule too narrowly and the exception too

---

[14] The government's claim is factually wrong. This is not, as the government argues, a situation in which federal officers were acting based on incomplete information. Br. at 17. The government *knew* when separating the 2018 Plaintiffs that the 2018 Adults were available, A.P.F. SOF ¶¶ 85–89, 92, 96–98, 101, 107–11, 113, 116–22, 128–32, 138–43, but it chose to designate the 2018 Children as UACs because it was logistically easier than awaiting a final prosecution decision by the U.S. Attorney's Office, SSOF ¶ 40.

broadly . . . . [T]he FTCA, as a remedial statute, should be construed liberally, and its exceptions should be read narrowly.").

The government also asserts that the designation of the 2018 Child Plaintiffs as UACs is "susceptible to the same policy considerations" that underlie the DHS Referral Policy. Br. at 14. This post-hoc rationalization is not supported by the facts. Instead, the facts show that the intent of the DHS Referral Policy was to inflict an *in terrorem* effect on prospective migrants, a policy rationale that the discretionary function exception does not shield. SSOF ¶¶ 6–10, 19–20; A.P.F. SOF ¶¶ 8–10, 18, 28–29, 34, 81–84; *see K.O. ex rel. E.O. v. United States*, 2023 WL 131411, at *8 (D. Mass. Jan. 9, 2023) (finding that "the only conceivable reason for separating these families was 'the *in terrorem* effect it may have on others,'" and concluding that the "conduct was not susceptible to policy analysis and the DFE does not apply"); *RIL-R v. Johnson*, 80 F. Supp. 3d 164, 188–89 (D.D.C. 2015) (using civil detention "for the sake of sending a message of deterrence to other Central American individuals who may be considering immigration" does not serve a legitimate government interest).

The decision to separate the 2017 Plaintiffs similarly lacks a legitimate policy rationale. The government cites the policy objectives underlying ICE's detention authority and claims that the 2017 decisions "reflected considerations of public safety and child welfare." Br. at 22. But the record does not reflect any meaningful determination by ICE that the public's safety or the 2017 Child Plaintiffs' welfare was at risk. Rather, the undisputed facts show that the decisions were made within minutes, A.P.F. SOF ¶¶ 130, 139, and no rationale for the safety risk purportedly necessitating these separations was meaningfully recorded, SSOF ¶ 96. Such conduct is not susceptible to policy analysis. *Coulthurst v. United States*, 214 F.3d 106, 110 (2d Cir. 2000) (laziness and carelessness are not shielded by the DFE). The government cannot backfill a rationale now. *See Marlys Bear Med.*, 241 F.3d at 1216.

Further, the "safety assessments" were purportedly made based on ICE's officers' subjective experience, meaning different officers could reach different conclusions with respect to separating families. SSOF ¶¶ 95, 105. Government agents should not be able to

separate families based on their whims.  Such conduct is not susceptible to policy analysis, especially where several policies mandate that the government maintain family unity. A.P.F. SOF ¶¶ 2–3; SSOF ¶ 1; *see also Marlys Bear Med.*, 241 F.3d at 1217 ("[A] failure to adhere to accepted professional standards is not "susceptible to a policy analysis.").  Regardless, considerations of public safety and child welfare are matters of professional judgment that are not susceptible to competing considerations of social, economic, or political policy.  *See Myers v. United States*, 652 F.3d 1021, 1031 (9th Cir. 2011).

Last, the government's failures to track separated families, allow separated families to communicate, and reunify families was not susceptible to policy analysis.  In *E.R. v. United States*, the court held that waiting "fourteen hours before contacting" the parents of a child Border Patrol separated from her caretaker could not "constitute a considered judgment grounded in social, economic, or political policies."  2014 WL 4662241, at *8 (E.D.N.Y. Sept. 18, 2014).  The facts here are far worse:  Rolando and Bertha were not able to communicate for six days, Heriberto and Alicia for sixteen days, Mario and Antonio for eighteen days, José and Herlinda for twenty-two days, Joel and Mariela for thirty-six days, and Abel and Obet for more than fifty days.  A.P.F. SOF ¶¶ 134, 147, 93, 102, 114, 126. The 2017 Plaintiffs were not reunified for more than eight months, and the 2018 Plaintiffs were not reunified for more than two months.  *Id.* ¶¶ 95, 106, 115, 127, 137, 150.

Separating Plaintiffs violated the Constitution and the TVPRA.  It also was not susceptible to policy analysis.  Thus, the discretionary function exception does not apply.

### C.    The Separations of Plaintiffs Were Extreme and Outrageous.

The Court has "recognized the viability of an IIED claim brought under the FTCA simply where [federal] agents' actions were motivated by malice."  *C.M.*, 2020 WL 1698191, at *2 (quotation omitted).  Here, the record is replete with such evidence: policymakers knew separating families would cause trauma, SSOF ¶ 8; A.P.F. SOF ¶¶ 11–13–26, 28–31, and adopted the DHS Referral Policy anyway for the purpose of deterring immigration through family separations, SSOF ¶¶ 6–10, 19–20; A.P.F. SOF ¶¶ 8–10, 18, 28–29, 34, 81–84; Plaintiff fathers begged officers not to take their children from them, but

1   Border Patrol agents did so anyway, in some cases forcefully, injuring Plaintiffs, A.P.F. SOF

2   ¶¶ 86–89, 97–98, 108–11, 119–20, 131–32, 142–43; Plaintiffs were not told anything about

3   each other's whereabouts or well-being, and were not able to speak to each other for weeks

4   after their separations, *id.* ¶¶ 90, 93–94, 99, 102, 114, 124–26, 132, 134–35, 144, 145–47;

5   and Plaintiffs were not reunited for months, and then only after a court order required the

6   government to do so, *id.* ¶¶ 78, 95, 106, 115, 127, 137, 150. Such conduct satisfies Arizona's

7   standard for extreme and outrageous conduct, as it goes "beyond all possible bounds of

8   decency" and is "utterly intolerable in a civilized community." *Mintz v. Bell Atl. Sys.*

9   *Leasing Int'l, Inc.*, 905 P.2d 559, 563 (Ariz. Ct. App. 1995); A.P.F. Br. at 18–22.

10      The government's brief does not engage these facts; it merely asserts that Arizona

11   law forecloses IIED claims that result from lawful arrest or privileged conduct. Br. at 30.

12   Moreover, the government misstates the law.[15] *First*, Arizona law does not foreclose IIED

13   claims where a plaintiff is arrested or detained. The government's citation to *Savage v.*

14   *Boies*, 272 P.2d 349, 352 (Ariz. 1954), proves the point. Br. at 30. In *Savage*, the court held

15   that the plaintiff's IIED claim should have gone to the jury because the officer effectuated a

16   lawful arrest by falsely representing to the arrestee that her child was in the hospital with

17   critical injuries, and hence a "a jury would be justified in finding that emotional distress . . .

18   is substantially certain to be produced by such conduct." 272 P.2d at 351. In other words,

19   conduct connected to a lawful arrest can give rise to an IIED claim. *See id.* at 352. Adopting

20   the government's position would mean that no plaintiff would ever be able to allege IIED

21   for conduct that took place after an arrest, no matter how egregious. *Savage* does not compel

22   such a conclusion. Regardless, Plaintiffs' claims arise out of their separations, not from the

23   mere fact of their detention. Such conduct was extreme and outrageous as explained above.

24

25   [15] The government argues that "[i]nsofar as Plaintiffs claim that they were intentionally harmed, they cannot also maintain claims for negligence based on the same challenged acts

26   or omissions." Br. at 29 n.28 (citing *Lewis v. Dirt Sports LLC*, 259 F. Supp. 3d 1039, 1046 (D. Ariz. 2017)). The government misapplies *Lewis*. In *Lewis*, the defendant admitted their

27   conduct was intentional, and thus their conduct could not be negligent. 259 F. Supp. 3d at 1046. The government's brief does not admit it intended to cause harm. As the *Lewis* court

28   noted, "[w]here a defendant's intent is genuinely disputed, intentional tort and negligence theories both may be considered by a jury." *Id.* at 1046 n.5.

*Second*, separating Plaintiffs was not "privileged." Br. at 30. Plaintiffs challenge their separations—they do not, as the government suggests, challenge "law enforcement actions to enforce" the law. *Id.* No authority the government cites holds that family separation is "privileged." Nor do any of the government's cases hold that such conduct, even if privileged, defeats an IIED claim under *Arizona* law. *See Caban v. United States*, 728 F.2d 68, 74 (2d Cir. 1984); *Galicia v. United States*, 2015 WL 12696086, at *2 (D.N.M. Feb. 24, 2015); *Dillard Dep't Stores v. Silva*, 106 S.W.3d 89, 797 (Tex. App. 2003).

The government's citation to *Mintz v. Bell Atlantic Systems*, 905 P.2d 559, is inapposite. That case involved IIED claims against a private employer, not the government. And the court in *Mintz* held only that the defendant employer's "legitimate business purpose in seeing that [plaintiff's] work was done" was simply *one* "relevant factor" in assessing the plaintiffs' IIED claim. *Id.* at 563. It did not hold that the existence of a legitimate purpose defeats an IIED claim.[16] In any event, there is a factual dispute whether the separation of families had a legitimate purpose other than its *in terrorem* effect. *See supra* § IV.B.3. The Court should therefore deny the government's motion for summary judgment as to whether its officials' conduct was extreme and outrageous conduct.

## V.   CONCLUSION

The Court should deny the government's Motion for Summary Judgment.

---

[16] *Learner v. John Hancock Life Ins.*, 2011 WL 13185713, at *3 (D. Ariz. Mar. 21, 2011) is also inapposite. The issue in that case was whether plaintiff could amend her complaint to add an IIED claim against her employer for sexual harassment, which the court granted.

Respectfully submitted this 24th day of April, 2023.

By */Keith Beauchamp/*
COPPERSMITH BROCKELMAN PLC
Keith Beauchamp
D. Andrew Gaona

COVINGTON & BURLING LLP
Matthew J. Schlesinger*
Jason A. Carey*
Jennifer L. Saulino*
Terra White Fulham*
Teresa S. Park*
Kathleen E. Paley*
Kavita R. Pillai*
Emily R. Woods*
Kristin M. Cobb*
Shadman Zaman*
Stephen Rees*†
Paulina Slagter*
Samuel Greeley*
Joshua Silver*
Patrick Lee*
One City Center, 850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: (202) 662-5581
mschlesinger@cov.com
jcarey@cov.com
jsaulino@cov.com
tfulham@cov.com
tpark@cov.com
kpaley@cov.com
kpillai@cov.com
rwoods@cov.com
kcobb@cov.com
szaman@cov.com
srees@cov.com
pslagter@cov.com
sgreeley@cov.com
jsilver@cov.com
plee@cov.com

SOUTHERN POVERTY LAW CENTER
Norma Ventura*
James Knoepp*
Sharada Jambulapati*
150 E. Ponce de Leon, Suite 340
Decatur, GA 30030
Telephone: (404) 521-6700
norma.ventura@splcenter.org

jim.knoepp@splcenter.org
sharada.jambulapati@splcenter.org

SOUTHERN POVERTY LAW CENTER
Paul R. Chavez*
2 S. Biscayne Boulevard, Suite 3750
Miami, FL 33137
Telephone: (786) 347-2056
paul.chavez@splcenter.org

*Attorneys for Plaintiffs A.P.F. et al.*
*\* Admitted pro hac vice*
*† Admitted only in Illinois, not admitted*
*in the District of Columbia, and*
*supervised by principals of the firm.*