Keith Beauchamp (012434)
D. Andrew Gaona (028414)
COPPERSMITH BROCKELMAN PLC
2800 N. Central Avenue, Suite 1900
Telephone: (602) 381-5490
Phoenix, AZ 85004
kbeauchamp@cblawyers.com
agaona@cblawyers.com
*Counsel for A.P.F. Plaintiffs*
(*Additional Counsel Listed on Signature Page*)

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| A.P.F., on his own behalf and on behalf of his minor child, O.B.; et al., | No. 2:20-cv-00065-SRB |
| Plaintiffs, | **SEPARATE STATEMENT OF FACTS IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| United States of America, | |
| Defendant. | |

Pursuant to LRCiv 56.1(a), Plaintiffs submit the following separate statement of facts ("SSOF") in support of their Opposition to Defendant's Motion for Summary Judgment:

## I.     Directives Regarding Family Unity and Communication

1.     The parties' settlement in *Flores v. Reno*, Case No. 85-4544 (C.D. Cal. Jan. 17, 1997), requires the government to provide minors in its custody with "contact with family members who were arrested with the minor."  Ex. 1, *Flores* Settlement ¶ 12(A).

2.     The TVPRA states that "[c]onsistent with [6 U.S.C. § 279], and except as otherwise provided under subsection (a), the care and custody of all unaccompanied alien children, including responsibility for their detention, where appropriate, shall be the responsibility of the Secretary of Health and Human Services."  8 U.S.C. § 1232(b)(1).

3.     6 U.S.C. § 279(g)(2) defines "unaccompanied alien child" to mean a child who "(A) has no lawful immigration status in the United States; (B) has not attained 18 years of age; and (C) with respect to whom-- (i) there is no parent or legal guardian in the United States; or (ii) no parent or legal guardian in the United States is available to provide care and physical custody."

4.     8 U.S.C. § 1232(b)(3) states that "[e]xcept in the case of exceptional circumstances, any department or agency of the Federal Government that has an unaccompanied alien child in custody shall transfer the custody of such child to the Secretary of Health and Human Services not later than 72 hours after determining that such child is an unaccompanied alien child."

## II.     Impact and Intent of the Zero Tolerance and DHS Referral Policies

5.     On August 16, 2016, DHS Deputy Executive Director J. Ryan Hutton wrote to several Border Patrol officers regarding "Separation of Family Units."  Ex. 2.  Hutton wrote that "[s]eparation of child from parent or legal guardian should be a rare occurrence, e.g. safety and well-being of child, active warrant or similar circumstance."  *Id.* at CD-US-0042208.

1    6.    At his deposition, Former ORR Deputy Director for Children's Programs

2 Jonathan White testified that the "████████████████" on February 14, 2017 between

3 DHS, CBP, ICE, and ORR officials "████████████████████████████████████████

4 ████████████████████" Ex. 3, White Dep. 80:23–81:6.  White testified that: "███████

5 ████████████████████████████████████████████████████████████████████████

6 ████████████████████████████████████████████████████████████████████████

7 ████████████████████████████████████████████████████████████████████████

8 ████████████████████████████████████████████████████████████████████████

9 ████████████████████████████████████████████████████████████████████████

10 ██████████████████████████████████████████████████" *Id.* at 81:9–20.  White

11 further testified that ███████████████████████████████████████████████████

12 ██████████████████████" *Id.* at 82:10–12.

13    7.    At his deposition, White was asked: "██████████████████████████████

14 ████████████████████████████████████████████████████████████████████████

15 ████████████████████" Ex. 3, White Dep. 82:18–21.  White answered: "██████████

16 ████████████████████████████████████████████████████████████████████████

17 ████████████████████████████████████████████████████████████████████████

18 ████████████████████" *Id.* at 82:24–83:3.

19    8.    At his deposition, White was asked: "██████████████████████████████

20 ████████████████████████████████████████████████████████████████████████

21 ████████████████" Ex. 3, White Dep. 105:21–23.  White answered: "█████" *Id.* at 106:1.

22    9.    Former Associate Deputy Director of ORR Tricia Swartz, when asked to

23 recall what was said at the February 14, 2017 meeting, testified that ██████████████

24 ████████████████████████████████████████████████████████████████████████

25 ████████████████████████████████████████████████████████████████████████

26 ████████████████████████████████████████████████████████████████████████

27 ████████████████████████████████████████████████████████████████████████

28 ████████████████████████████████████████████████████████████████████████

1    ███████████████████████████████████████████████████████ Ex. 4,

2    Swartz 9/7/2022 Dep. 12:8–13:2.

3         10.    At her deposition, Swartz was asked: "██████████████████

4    ████████████████████████████████████████████████████████████

5    ████████████████████████████████████?" Ex. 4, Swartz 9/7/2022

6    Dep. 15:1–5.  Swartz answered: "████████████████████████████████

7    ████████████████████████████████████████████████████████████

8    ████████████████████████████████████████████████████████████

9    ███████████████████████████████████████████████████." *Id.* at

10   15:6–13.

11        11.    Swartz stated she was "██████████████████████████████" and

12   was "███████████" by the discussion at the February 14, 2017 meeting.  Ex. 4, Swartz

13   9/7/2022 Dep. 13:4–14:25.

14        12.    White testified that, following the February 14, 2017 meeting, Swartz told

15   White "████████████████████████████." Ex. 3, White Dep. 106:23–24.  White

16   understood Swartz to mean ████████████████████████████████████████████

17   █████████████" *Id.* at 106:25–107:3.

18        13.    White further testified that he "████████████████████████████

19   ████████████████████████████████████████████████████████████

20   ████████████████████████████████████████████████████████████

21   ███████████████████." *Id.* at 107:4–13.

22        14.    On August 8, 2017, ICE Acting Director Thomas Homan emailed CBP

23   Commissioner Kevin McAleenan, DHS Chief of Staff Chad Wolf, Gene Hamilton (then

24   the immigration counselor for the DHS Secretary), and DHS Head of Public Affairs

25   Jonathan Hoffman regarding "Monthly border apprehension release" statistics from the

26   Southwest border.  Ex. 5, at CD-US-0190919.  Homan wrote:  "Very concerning. Gene,

27   we need to discuss my proposal for separation." *Id.*

28

15.     Homan's message was forwarded to other ICE officers by ICE Chief of Staff Thomas Blank, who wrote: "Tom has been advocating that we need to separate family units and send the adults to adult detention and the children to HHS." *Id.* at CD-US-0190917.

16.     On August 14, 2017, DHS Acting Secretary Elaine Duke, DHS Chief of Staff Chad Wolf, DHS Senior Counselor Gene Hamilton, CBP Acting Commissioner Kevin McAleenan, ICE Acting Director Thomas Homan, USCIS Acting Director James McCament, DHS Office of General Counsel Acting General Counsel Joseph Maher, and DHS Policy Assistant Secretary for Border, Immigration and Trade Michael Dougherty attended an "█████████████████████████." Ex. 6. One of the "████████ █████" for the meeting was to █████████████████████████." *Id.* at CD-US-0046677.     Another "████████ ████" was "████████ █ █ ██████████████████████████████████████████████ ██████████████████████████████████████████████ *Id.*

17.     On October 19, 2017, ICE ERO Detention and Deportation Officer ██ ████████ wrote to ICE officials that █████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ ██████████████████████████████████████████████ █████████████████████" Ex. 7, at CD-US-0108519A–20A.

1     18.   A November 22, 2017 CBP memorandum regarding "█████████

2 ██████████████████████████████████████████████████" that

3 ████████████████████████████████████████████████████████████

4 ████████████████████████████████████████████████████████████

5 ████████████████████████████████████████████████████████████

6 ████████████████████████████████████████████████████████████

7 ████████████████████████████████████████████████████████████

8 ████████████████████████████████████████████████████████████

9 ████████████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████████████

11 ██████████████████████████████████████████ Ex. 8, at

12 CD-US-0056971AT–72AT.

13     19.   On December 11, 2017, DHS, ICE, and CBP officers briefed newly

14 appointed DHS Secretary Kirstjen Nielsen regarding "██████████████████

15 █████" Ex. 9.  One bullet point in the ████████ for Nielsen regarding "██

16 █████" stated: "██████████████████████████████

17 ████████████████████████████████████████████████████████████

18 ████████████████████████████████████████████████████████████

19 ████████████████████████████████████████████████████████."

20 *Id.* at CD-US-0035405.

21     20.   On December 29, 2017, ████████████████████████

22 ███████ emailed other DHS officers regarding "████████████████████,"

23 writing, "███████████████████████████████████████████

24 ████████████████████████████████████████████████████████████

25 ████████████████████████████████████████████████████████████

26 ████████████████████████████████████████████████████████████

27 █████████████████████████████████████." Ex. 10, at CD-US-

28 0099463.  One of the talking points stated:  "██████████████████████

1 ███████████████████████████████████████████████████████████

2 ███████████████████████████████████████████████████████████

3 ██████████████████████████████████████████." *Id.*

4      21.    On January 12, 2018, *The Washington Post* reported that then-President

5 Donald Trump "grew frustrated with lawmakers Thursday in the Oval Office when they

6 discussed protecting immigrants from Haiti, El Salvador and African countries as part of

7 a bipartisan immigration deal," and that President Trump said:  "Why are we having all

8 these people from shithole countries come here?"  Ex. 11, at 1.

9      22.    On March 28, 2018, ICE Juvenile & Family Residential Management Unit

10 Chief ████████████ wrote to other ICE officials regarding "█████████████████

11 ███████████████████" Ex. 12. ████ wrote: "████████████████████

12 ███████████████████████████████████████████████████████████

13 ███████████████████████████████████████████████████████████

14 ███████████████████████████████████████████████████████████

15 ███████████████████████████████████████████████████████████

16 ███████████████████████████████████████████████████████████

17 ███████████████████████████████████████████████████████████

18 ███████████████████████████████████████████████████████████

19 ██████████████████████████████████████████████████." *Id.*

20      23.    The DOJ OIG Report states that then-Attorney General Jeff Sessions's

21 "concerns about increases in border apprehensions, as well as a migrant caravan then

22 moving toward the United States, contributed to his decision to issue the zero tolerance

23 policy in April 2018."  A.P.F. SOF Ex. 11 at 9, ECF No. 364-2.

24      24.    The DOJ OIG Report states that former Counselor to the Attorney General

25 Gene Hamilton informed the DOJ OIG that "a number of events and ongoing concerns

26 about increases in border apprehensions contributed to Sessions's decision to issue the

27 zero tolerance policy on April 6, 2018," and that "one of the events generating concerns

28 within DOJ, DHS, and the White House was a migrant caravan of 1,540 Central

Americans that was moving toward the United States through Mexico on 16 buses." *Id.* at 20.  The DOJ OIG Report states that Hamilton informed the DOJ OIG "that Sessions directed him to draft a policy directive for the Southwest border USAOs to work with DHS to increase the number of referrals from DHS and to accept as close to all of these referrals for prosecution as possible." *Id.* at 21.

25.     On April 3, 2018, in an email to various DOJ attorneys regarding "█████████ ███████," Hamilton wrote: "████████████████████████████████ ████████████████████████████████████████████████ ████████████████████  ██████████████████████████ ██████████████████████████████████████████████ ████████████████████████████████████." Ex. 13.

26.     On April 24, 2018, DHS General Counsel John Mitnick sent DHS Chief of Staff Chad Wolf a "Memorandum for the Secretary intended to accompany the Decision Memorandum relating to increased referrals of aliens for prosecution under 8 U.S.C. § 1325(a)," titled "Criminal Prosecution of Aliens Who Entered Unlawfully: Legal Guidance on Potential Separation of Family Members."  Ex. 14.

27.     On October 25, 2018, Scott Shuchart, a former senior adviser in the DHS Office of Civil Rights and Civil Liberties, published an article in the Washington Post titled "Careless Cruelty: Civil servants said separating families was illegal. The administration ignored us." Ex. 15.  The article states that Mitnick's April 24, 2018 memo "argu[ed] that the government's 'legal position' on 'separating adults and children through the immigration process . . . is likely strongest [when] separation occurs in connection with a referral of an adult family member for criminal prosecution.'" *Id.* at 5.

28.     The DOJ OIG Report states that on May 11, 2018, Sessions held a conference call with five Southwest border U.S. Attorneys.  A.P.F. SOF Ex. 11 at 39, ECF No. 364-2.  According to handwritten notes from the call, Sessions told the U.S. Attorneys "we need to take away children; if care about kids, don't bring them in."  *Id.*;

*see also* Ex. 16 (handwritten notes from May 11, 2018 call ███████████).  The notes also state "████████████████████" and "███████████." Ex. 16.

29.    The DOJ OIG Report states that on May 12, 2018, "the five Southwest border U.S. Attorneys participated in a call with [then-DOJ immigration counselor Gene] Hamilton" and other DOJ officials.  A.P.F. SOF Ex. 11 at 40, ECF No. 364-2.  The DOJ OIG Report states that, "[a]ccording to notes of the call," Hamilton said that "prosecution makes separation a reality." *Id.*; Ex. 17, at CD-US-0049595 (handwritten notes regarding the May 12, 2018 call, noting, "██████████████████████").

30.    The DHS OIG Report states that "[o]f the 3,014 children Border Patrol identified as separated [during the Zero Tolerance period], 99.7 percent were from Latin American countries."  A.P.F. SOF Ex. 15 at 28 n.34, ECF No. 364-5.

**III.    The DHS Referral Memorandum's Citation to the El Paso Initiative**

31.    The DHS Referral Memorandum states that, "[a]mong the results of [the El Paso Initiative], the number of illegal crossings between ports of entry of FMUAs dropped by 64 percent."  A.P.F. SOF Ex. 25 at CD-US-0024046, ECF No. 364-6.

32.    On May 7, 2018, Border Patrol officer Katie Waldman emailed other Border Patrol officers about the DHS Referral Memorandum's citation to the El Paso Initiative, writing: "What months is this? I can't seem to calculate this."  Ex. 18, at CD-US-0077187–88.  Waldman then wrote:  "Can I please get an answer to this ASAP because based on this math it's the exact opposite as laid out in the memo? In July 2017, 231 FMUAs were apprehended between ports of entry in the El Paso sector (link). In November 2017, 379 FMUAs were apprehended between ports of entry in the El Paso sector (link). That is a 64 percent change, but it's a 64 percent *increase*." *Id.* at CD-US-0077187 (emphasis in original).

33.    When James McCament, the DHS 30(b)(6) witness, was asked: "What was the basis" for the DHS Referral Memorandum's statement that "among the results of this initiative, the number of illegal crossings between ports of entry of FMUAs dropped by

64[%]," he answered: "I don't, I don't know."  Ex. 19, McCament (DHS 30(b)(6)) Dep. 165:1–9.

**IV.    2018 UAC Determinations**

34.    At his deposition, former Special Operations Supervisor for the Yuma Border Patrol Station's Processing, Screening & Transportation Unit Shawn Jordan, whom the government has disclosed as a Rule 26(a)(2)(C) expert, Ex. 20, provided the following testimony:

> Q.    When in the process would the determination be made that a child was a UAC?
>
> A.    So when the agents and supervisors assigned to the PST determined that the adult in that family was going to be prosecuted, the child would be determined to be a UAC, and they would be referred to the Office of Refugee Resettlement for placement.
>
> Q.    When you say, sir, going to be prosecuted, do you mean going to be referred for prosecution?
>
> A.    So yes.  So once we determine that we intended to refer that adult for prosecution, there would be no one to care for that child, and we would refer that child to the Office of Refugee Resettlement as soon as practical.

Ex. 21, Jordan Dep. 111:15–112:6.

35.    At his deposition, Jordan testified that the *Flores* Settlement "requires the Border Patrol to transfer all children out of our facilities as soon as possible."  Ex. 21, Jordan Dep. 125:12–16.  Jordan testified that his "understanding as to the definition of 'as soon as possible'" was "[o]nce we can effect the transfer of that child to an appropriate facility."  *Id.* at 125:17–20.

36.    At his deposition, Jordan was asked:  "So if the parent was never prosecuted, would the justification for declaring the child a UAC still be a valid justification?"  Ex. 21, Jordan Dep. 130:6–9.  Jordan answered:  "At the time that we declare the child a UAC, we had every intention of prosecuting -- or referring that individual for prosecution."  *Id.* at 130:10–12.

37.    At his deposition, Jordan provided the following testimony:

- 9 -

1    Q.   So what you're saying, and let's confirm this, it was that the intention to prosecute an adult meant that the child

2    became a UAC.  Is that correct?

    A.   We can reasonably expect that the parent would not be

3    there to care for the child, yes.

4

    Q.   And if the adult was never prosecuted, that wouldn't

5    change anything.  Is that correct?

6    A.   No.  What -- if the child was -- if the child was referred to ORR, they would be picked up.  Whether or not the parent

7    was there, we often didn't know whether the parent was -- what was going to come of the parent's case.

8

    Q.   So and I think we're saying the same thing, sir. So once

9    the child is sent off to ORR, if the parent is not prosecuted, it's -- did you ever rescind the ORR designation or UAC

10    designation?

11    A.   Sir, not that I'm aware of.

12  Ex. 21, Jordan Dep. 130:20–131:17.

13       38.   At his deposition, Jordan provided the following testimony:

14    Q.   I wanted to ask about what in May of 2018 was the process for when you were notified that an adult was not

15    going to be prosecuted and their child was still at the Border Patrol station at the time that you became aware that the

16    prosecution was not going to go forward.

17    A.   So I don't recall being notified that there were children still there.  I have since learned that it has happened, that

18    potential defendants did return or were declined and came back just in some of the -- some of the preparation for this

19    case or other cases and -- but I was not at the time contemporaneously aware that children were there with their

20    parents.

21    Q.   Was there a process in place to deal with that type of scenario at the time?

22

    A.   That was a -- such a rare occurrence that it did not -- we

23    did not have a process in place to deal with that.

24    Q.   So what happened in that situation when a child was still at the Border Patrol station and Border Patrol was notified

25    that the parent wasn't going to be prosecuted, that the prosecution had been declined?  What did Border Patrol do?

26

    A.   I don't know which situation you're describing.

27

28

Q.    Well, do you intend to offer any opinions on whether family members could have been reunited in that type of scenario?

A.   So I believe that that would have been incredibly difficult for us to reunite the families just based on the logistical challenges that we had with getting them out of the facility in a timely manner within the time frames that were predicated by the TVPRA and our policies and moving them to an appropriate ORR facility.

Q.   I'm sorry, I don't quite understand what would have been incredibly difficult from a logistics standpoint to be able to do that?

. . .

A.     So the -- once the child had been designated as an unaccompanied child, there was no longer any link to the parent other than what would have to be manually searched through all of the A-files to try and link them up via A-number.  At that time, we did not have any -- anything that joined them in our systems of record that the users at the Border Patrol stations could see.  So that would have required a manual hand search of all of the A-files coming back and all of the juvenile detainees that were in custody to try and marry up those A-numbers and any annotations that were made in the files.  Our system wasn't set up to reunify at that time.

Q.   Why wasn't the system set up in that way to allow for a rapid reunification if a prosecution had been declined and the child was still there?

A.    That is a question that I would most likely need to defer to our systems experts, but this initiative to prosecute people that violated the -- violated these laws was something that developed rather quickly and was implemented, and the systems were -- often took time to adapt to new and changing operational needs and goals.

Ex. 21, Jordan Dep. 174:7–177:17.

39.    At his deposition, Jordan was asked:  "And would you agree that [the TVPRA] states that a UAC should be in ORR custody within 72 hours?"  Ex. 21, Jordan Dep. 188:14–16.  Jordan answered:  "Yes, I agree."  *Id.* at 188:20.

40.    At his deposition, Jordan provided the following testimony:

Q.   So my question is, why not just wait until after -- to make an ORR placement until after a decision has been reached by the US Attorneys Office?

1    A.    That would not have been practical for us to do.  Based
2    on the rolling time frame on when any of those decisions from
     the US Attorneys Office would be made, typically the
3    prosecuting attorney or the duty US attorney who would
     make that decision to accept or decline is not working on
4    Saturdays, Sundays, so that would give us at least three days
     where none of these decisions are being made, and we'd need
5    to hold any children that we encounter from Thursday
     through Sunday, for three to four days, before we get a
6    decision on whether or not that case is going to be accepted.
     So that would exacerbate the strained capacity issues that we
7    already had, would cause us to have to pull additional
     manpower and resources in away from frontline enforcement
8    duties to come in and deal with custody and care of these
     juveniles, which are being held longer than they needed to,
9    just to facilitate that. So that's why that wasn't a tenable
     solution to us in the Yuma Sector.

10   Q.    And if you're called to testify at trial, would you be
     prepared to offer an opinion on the feasibility of waiting in
11   such a fashion to make an ORR placement request?

12                          . . . .

13   A.    Yes, I would.

14   Q.    And what is your opinion on that matter?

15   A.    I believe that that was not a tenable solution for us to
     attempt to do that based on all of the requirements for us to
16   move juveniles out, the finite amount of detention capacity,
     officer agents that are competing with processing and
17   enforcement duties, all of that would have created extra
     strains negatively impacting our enforcement posture and the
18   -- and depreciated border security within our ORR if we were
     to have taken that tack and held these minors longer than what
19   we did.

20   Q.    I'm going to ask a related question: Assuming that the
     US Attorneys Office accepted a case for prosecution, why not
21   just wait to make an ORR placement request until after the
     disposition of the -- the court's disposition of the case was
22   handed down; in other words, the sentence or potential
     sentence?
23
     A.    So, again, for all our similar reasons, the -- holding these
24   minors for the pendency of that criminal proceeding was not
     a tenable solution either. The involvement of the criminal
25   proceeding would only exacerbate those extended time in
     custody issues, further complicating the amount of agents that
26   needed to be pulled out to deal with custody and care of all
     these minors, straining our already -- our already strained
27   capacity issues. So that coupled with all of the unknown
     factors that would go into that initial appearance and whether
28   or not -- whether or not that parent was going to plead guilty

                          - 12 -

1
2
3
4
5

or plead not guilty, whether they would have a communication issue in the court, whether there would be a translator there to assist them with the reading of the complaint, that and all those other factors, and the fact that the court was only open for five days a week and we were trying to run a 24/7 operation just made that unfeasible for us to try and do something as you've described with holding the minors for the pendency of their parents' criminal proceeding.

Ex. 21, Jordan Dep. 190:16–193:22.

6
7
8
9
10
11

41. At his deposition, USBP Agent Joseph Comella, Jr. was asked: "Was there . . . a change in May of 2018 where you received instructions to separate families to the maximum possible extent; is that correct?" Ex. 22, Comella Dep. 25:7–10. Comella answered: "I don't recall specifics but I believe that's correct." *Id.* at 25:11–12. Comella was then asked: "And to your understanding, that was mandatory; you were required to do it?" *Id.* at 25:13–15. Comella answered: "Correct." *Id.* at 25:19.

12
13
14
15

42. At his deposition, Comella was asked: "[A]s of May of 2018, is it accurate to say that, regardless of what happened with the prosecution, your directive was to separate parents and children?" Ex. 22, Comella Dep. 180:16–20. Comella answered: "Those amenable, yeah." *Id.* at 180:23.

16
17
18
19
20
21

43. On May 7, 2018, the Division Chief – Law Enforcement Operational Programs at the U.S. Border Patrol's Yuma Sector instructed agents "to immediately begin presenting for prosecution[] all eligible adult aliens." Ex. 23. He further wrote: "You are to direct your station's personnel to immediately begin identifying and processing all eligible adults for prosecution, regardless of accompanying family members or nationality." *Id.*

22
23
24
25
26

44. On May 11, 2018, U.S. Attorney ▮▮▮▮▮▮▮ emailed U.S. Attorney ▮▮▮▮▮▮ regarding ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 24. ▮▮▮▮ wrote: "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮" *Id.*

27
28

45. On May 22, 2018, ▮▮▮▮▮▮▮, the Unit Chief of ICE's Juvenile & Family Residential Management Unit, Custody Management Division, emailed other ICE

1  officers a draft memorandum from ICE Assistant Director Tae Johnson to ICE ERO

2  Executive Associate Director Matthew Albence, titled "███████████████████

3  ████████████████████." Ex. 25, at CD-US-0059226, CD-US-0059233.  The

4  memo stated that DOJ and DHS "██████████████████████████████████

5  ████████████████████████████████████████████████████████

6  ██████████████████████." *Id.* at CD-US-0059233.

7      46.    Handwritten notes regarding a May 22, 2018 call with Deputy Attorney

8  General Rod Rosenstein and several government attorneys, including U.S. Attorney for

9  the Western District of Texas John Bash, reflect Rosenstein's statements regarding ████

10  ████████████████████████████████████████████████████. Ex.

11  26.  The notes reflect that Rosenstein said: "█████████████████████," "████

12  ████████████████████████████" and "████████████████████

13  ████████████████████████" *Id.*  Rosenstein is further noted as directing

14  prosecutors to "████████████████████████████████████," but "█

15  ████████████████████." *Id.*

16  **V.    Failure to Track Separated Families and Allow Them to Communicate**

17      47.    At his deposition, former Counselor to the Attorney General Gene Hamilton

18  testified that, between "April 2018 through June 2018," "[t]here was a point in time that

19  I became aware that DHS did not have a way, or it was not maintaining linkages between

20  the parent and the child."  Ex. 27, Hamilton Dep. 304:24–305:14.

21      48.    At his deposition, Hamilton was asked:  "When did you recall learning that

22  there was a problem with DHS not maintaining linkages between the parent and child?"

23  Ex. 27, Hamilton Dep. 306:1–3.  Hamilton answered:  "It's probably in June [2018]." *Id.*

24  at 306:6–8.

25      49.    The Rule 30(b)(6) deponent for DHS testified that "DRIL line, which "has

26  to do with the detention referral information line," is "a phone line and access line in each

27  of the ICE detention centers. And so if . . . the child wishes to speak to the parent or the

28  parent wishes to speak with the child, that DRIL line would be one line of access where

you could place contact, ask to speak. If it's the child receiving a request from the parent, ORR would check to see if the child wishes to speak with the parent. If the parent -- the child wishes to speak with the parent, it would be the same point just to confirm, and then the local detention center would allow for that communication."  Ex. 19, McCament (DHS 30(b)(6)) Dep. 255:10–256:6.

50.    On June 12, 2018, ICE ERO Assistant Director Tae Johnson wrote to ICE Executive Associate Director Matthew Albence and ICE official Nathalie Asher:  "We can't be plastering the DRIL number all over the place and only field 30% of the calls. We've also turned off the voicemail feature because of the staffing issues. Will keep you posted on this. For now, we are going to see if overtime can be used to increase call acceptance rates. We're currently getting over 700 calls per day with ten operators……." Ex. 28, at CD-US-0061131–32.

51.    On June 12, 2018, Criminal Chief for the Southern District of Texas ███████████ emailed Hamilton and other government attorneys regarding a call earlier that day with Hamilton and Associate Deputy Attorney General Iris Lan.  Ex. 29, at CD-US-0049708.  ███████ wrote: "████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████████████████" *Id.* at CD-US-0049709.

52.    On June 13, 2018, CBP Commissioner Kevin McAleenan emailed ORR Director Scott Lloyd regarding "Connecting parents and kids."  A.P.F. SOF Ex. 44 at CD-US-0190279, ECF No. 364-12.  McAleenan wrote:  "We are being told by ICE delays are happening once we find the parent and connect to child in ORR - the ORR case manager tells us it could take days to get child to the phone to connect to parent.  Do you have any info on this?"  *Id.*  An HHS officer wrote to Lloyd regarding McAleenan's email that: "I

guess it would depend on who they are contacting. If it's the hotline, then it will take time to connect parent and child since the hotline will not provide PII and will forward info to the shelter. They should provide ORR direct a list of parents, their location and contact with the UAC name and A# to facilitate quick contact. We should mention that we've had situations where we have been unable to get parent locations from them and cases where parents are deported without notification or coordination with us." *Id.*

53.    On June 15, 2018, Tricia Swartz ORR Associate Deputy Director Tricia Swartz emailed other HHS officers with the subject line "Why isn't HHS/DHS fixing this." Ex. 30.  Swartz wrote:  "This is becoming more and more outrageous. Another DHS $#@* show, and ORR is left holding the bag, while kids are harmed…. Congressman, attorneys, parents are allegedly calling the hotline and still not able to connect with their kids for days and days.  Can HHS appoint and empower one person whose job it is to do nothing else but to force a fix for this? This person should be provided unlimited resources and power to accomplish this fix, until family separation ends and every child is connected with his/her parent. Objective one should be to force DHS to provide ORR the parent's location and A# at referral. Objective two should be to force fixes to retroactively match up parents and all 3,000 kids already separated. Objective three should be to mark all parents cases so that DHS knows that a parent was accompanied by a kid at entry, and force them to check that and take relevant action before any person is removed. Thanks for listening. Feel free to forward to anyone that you think might be interested in fixing the problem." *Id.*

## VI.    Plaintiffs' Separations

### A.    José and Herlinda

54.    Border Patrol agents apprehended José and his five-year-old daughter Herlinda on May 8, 2018.  Ex. 31, at APF-US-DHS-U-0001771–72; A.P.F. SOF ¶ 85.

55.    José and Herlinda were booked in to the Yuma Border Patrol Station at approximately 5:30 p.m. that day.  Ex. 31, at APF-US-DHS-U-0001782, 1788.

56. DHS records from May 8, 2018 state that Herlinda "is a 5 year old juvenile who is unaccompanied." *Id.* at APF-US-DHS-U-0001774.

57. At approximately 7:07 p.m. on May 8, 2018, Agent ███████████ notified ORR about Herlinda. *Id.* at APF-US-DHS-U-0001788.

58. At approximately 7:30 a.m. on May 9, 2018, Agent ███████████ separated José from Herlinda. *Id.* at APF-US-DHS-U-0001782, 1788.

59. DHS records state that José "was separated from [Herlinda] due to father being amenable to prosecution." *Id.* at APF-US-DHS-U-0001771; *id.* at APF-US-DHS-U-0001774 ("Child was separated from parent [José] due to his violation of 8 USC 1325.").

60. The ORR placement request to move Herlinda to LSS was received at approximately 10:10 a.m. on May 9, 2018. *Id.* at APF-US-DHS-U-0001787–88.

61. Herlinda remained at the Yuma Station until approximately 7:08 a.m. on May 10, 2018, when she was booked out and transferred to LSS. *Id.* at APF-US-DHS-U-0001789.

62. DHS records state that, when Herlinda was removed from Yuma Station, "Contact With Family Not Made" because it was "Operationally infeasible." *Id.*

63. At approximately 8:15 a.m. on May 11, 2018, José's case was referred to the U.S. Attorney for the District of Arizona for prosecution. A.P.F. SOF Ex. 57, at APF-US-USAO-0000002, ECF No. 364-13.

64. At approximately 8:53 a.m. on May 11, 2018, José was booked out of the Yuma Station for transportation to court. Ex. 31, at APF-US-DHS-U-0001783; Ex. 32, at APF-US-CBP-0000776.

65. At approximately 12:17 p.m. on May 11, 2018, José was booked back in at Yuma Station. Ex. 31, at APF-US-DHS-U-0001783.

66. At approximately 12:44 p.m. on May 11, 2018, the U.S. Attorney's office informed Border Patrol agents that it was "declining prosecution for the following attempted 1325's," including José's, "because there is insufficient evidence to establish a

reasonable likelihood of conviction."  A.P.F. SOF Ex. 57, at APF-US-USAO-0000001, ECF No. 364-13.

67.     José remained at Yuma Station until May 16, 2018, when he was transferred to ICE custody at the Florence Service Processing Center.  Ex. 31, at APF-US-DHS-U-0001782–86; Ex. 33, at APF-US-CBP-0000378.

**B.     Heriberto and Alicia**

68.     Border Patrol agents apprehended Heriberto and his six-year-old daughter Alicia on May 12, 2018.  A.P.F. SOF ¶ 96.

69.     Heriberto and Alicia were booked in to the Border Patrol's Yuma Station at approximately 11:00 p.m. on May 12, 2018.  Ex. 34, at APF-US-DHS-U-0001753; Ex. 35, at APF-US-DHS-U-0001755.

70.     At approximately 1:09 a.m. on May 13, 2018, Agent ███████ notified ORR about Alicia.  Ex. 34, at APF-US-DHS-U-0001753.

71.     At approximately 1:10 a.m. on May 13, 2018, Agent █████ "separated [Heriberto] from child [Alicia] due to the father being amenable to prosecution for 8 USC 1326."  Ex. 35, at APF-US-DHS-U-0001755.

72.     The ORR placement request to move Alicia to BCS was received at approximately 1:44 p.m. on May 13, 2018.  Ex. 34, at APF-US-DHS-U-0001753.

73.     Alicia was booked out of custody at Yuma Station at approximately 11:53 p.m. on May 13, 2018.  *Id.*

74.     Heriberto remained in Border Patrol custody at Yuma Station from May 12 through May 20, 2018.  Ex. 35, at APF-US-DHS-U-0001755–59.

75.     At his deposition, Heriberto testified that he "sign[ed] a document requesting to be deported" because he "was told that if I didn't sign, they would not give me [Alicia] back."  Ex. 36, Heriberto Dep. 101:19–25.  Heriberto further testified that his understanding about the "purpose of the document" he signed was that "if I was deported, and my daughter would leave with me, and then if I signed it, she would leave with me.

1  Then I signed that document because all I wanted at that time was to be deported with my

2  daughter." *Id.* at 102:20–103:2.

3      76.    Heriberto testified that the document he signed "was in English, but I don't

4  know how to read, and if it had been in Spanish, the same. I don't know how to read

5  Spanish." Ex. 36, Heriberto Dep. 102:14–19.

6      **C.  Abel and Obet**

7      77.    Border Patrol agents apprehended Abel and his seven-year-old son Obet at

8  approximately 2:30 a.m. on May 18, 2018.  A.P.F. SOF ¶ 107.

9      78.    Abel and Obet were booked in to the Border Patrol's Yuma Station at

10  approximately 8:45 a.m. on May 18, 2018.  Ex. 37, at APF-US-DHS-U-0001737; Ex. 38,

11  at APF-US-DHS-U-0001740.

12      79.    DHS records state that "[Abel] will be separated from his son [Obet] due to

13  being amenable for prosecution."  Ex. 39, at APF-US-DHS-U-0001734.

14      80.    Abel and Obet were separated by government agents on May 19, 2018.

15  A.P.F. SOF ¶ 110.

16      81.    Border Patrol agents did not record the separation of Abel and Obet in either

17  Plaintiff's Subject Activity Log.  Ex. 37, at APF-US-DHS-U-0001737–38; Ex. 38, at

18  APF-US-DHS-U-0001740–41.

19      82.    At approximately 6:48 p.m. on May 18, 2018, Agent ███████ notified

20  ORR about Obet.  Ex. 37, at APF-US-DHS-U-0001737.

21      83.    The ORR placement request to move Obet to Cayuga Centers was received

22  at approximately 2:50 p.m. on May 19, 2018.  *Id.* at APF-US-DHS-U-0001738.

23      84.    Obet was booked out of custody at Yuma Station at approximately 12:25

24  a.m. on May 20, 2018.  *Id.*

25      85.    Abel remained in Border Patrol custody at Yuma Station from May 18

26  through May 25, 2018.  Ex. 38, at APF-US-DHS-U-0001740–43.

27

28

**D.**     **Joel and Mariela**

86.     At approximately 8:25 p.m. on May 19, 2018, Border Patrol agents apprehended Joel and Mariela.  A.P.F. SOF Ex. 77, at APF-US-DHS-U-0001858, ECF No. 364-14; A.P.F. SOF Ex. 78, at APF-US-DHS-U-0001863, ECF No. 364-14.

87.     Joel and Mariela were booked in to the Border Patrol's Yuma Station at approximately 12:20 a.m. on May 20, 2018.  A.P.F. SOF Ex. 77, at APF-US-DHS-U-0001858, ECF No. 364-14; A.P.F. SOF Ex. 78, at APF-US-DHS-U-0001863, ECF No. 364-14.

88.     At approximately 10:25 a.m. on May 20, 2018, Agent ████████ reported that Mariela was separated from Joel because "Father is amenable for prosecution due to immigration law violation."  A.P.F. SOF Ex. 77, at APF-US-DHS-U-0001858, ECF No. 364-14; A.P.F. SOF Ex. 78, at APF-US-DHS-U-0001863, ECF No. 364-14.

89.     Mariela remained in custody at the Yuma Station until approximately 12:14 a.m. on May 24, 2018, A.P.F. SOF Ex. 77, at APF-US-DHS-U-0001861, ECF No. 364-14, when she was transferred to ORR's Southwest Key facility in Brownsville, Texas, A.P.F. SOF ¶ 123; A.P.F. SOF Ex. 80, ECF No. 364-14.

90.     Joel remained in custody at the Yuma Station until approximately 2:52 a.m. on May 25, 2018.  A.P.F. SOF Ex. 78, at APF-US-DHS-U-0001866, ECF No. 364-14.

91.     On May 25, 2018, Southwest Key generated an Initial Intakes Assessment for Mariela.  Ex. 40.  The assessment did not state that Mariela had been separated from her father Joel or provide Joel's name, Alien number, or location.  *Id.*

92.     ████████, the Southwest Key 30(b)(6) witness, provided the following testimony:

> Q:  Am I correct that that table doesn't list [Mariela's] father? Is that correct?
>
> A:  Yes.
>
> Q:  Why does that section not include information about [Mariela's] father?

1

A:  I don't know.

2

Q:   Would you expect the case manager to ask if the minor had -- the whereabouts of the minor's father?

3

4

A:  Yes.

5

Q:   And if the minor had given that information, would -- about her father, would that information be reflected in this table?

6

7

A:  Yes.

8

Q:   Am I correct that in this page, there is nothing that indicates that [Mariela] had crossed into the United States with her father? Is that correct?

9

10

A:  Yes.

11

Q:   And there is also nothing that indicates that she had been separated from her father. Is that correct?

12

A:  Yes.

13

Ex. 41, ▇▇▇ (Southwest Key 30(b)(6)) Dep. 103:17–104:17.

14

**E.    Rolando and Bertha**

15

93.    On September 16, 2013, Rolando was convicted of illegal entry under 8

16

U.S.C. § 1325.  Ex. 42.

17

94.    On November 20, 2017, Cayuga Centers staff reported: "Have made

18

contact with detention center to contact father of minor. Officer ▇▇▇ mentioned

19

interviewing detainee and him mentioning an aunt in US who may be potential sponsor

20

for minor. Awaiting phone call from father."  Ex. 43, at APF-US-HHS-U-0001703.

21

95.    At his deposition, former ICE Field Office Director in the ICE Phoenix

22

Office Enrique Lucero, Jr. provided the following testimony regarding Plaintiff

23

Rolando's prior DUI conviction:

24

Q:   Would his DUI criminal conviction alone have been sufficient to justify a separation from his child?

25

26

A:  It could have been. Again, the officers are making their determination. So I can't say on every single case they're going to come to the same conclusion.

27

28

Q:   Okay. And would a deportation immigration history alone be sufficient to separate a parent from their child?

A:  It could be. Again, it's possible.

Q:   Do you think that this immigration and criminal history is sufficient for separating [Rolando] and [Bertha]?

A:  In my opinion, I do.

Q:   You said that other officers could come to different conclusions based on this information?

A:  I'm saying it's possible.

Ex. 44, Lucero Dep. 198:8–199:2.

96.    At his deposition, Lucero provided the following testimony:

Q:   Were -- was your staff required to explain why they concluded that someone's criminal history put the child's safety at risk?

A:  No, not that I'm aware of.

Q:   So this would not be recorded in writing somewhere if they made a decision that someone's criminal history put a child's safety at risk?

A:  It would probably be recorded in the fact that they would show the criminal history and immigration history, not necessarily going into a narrative form talking about why that's -- why that's a particular dangerous situation for a child.

Ex. 44, Lucero Dep. 129:1–15.

97.    At her deposition, former ICE ERO officer Michelle Lee was asked about her email on November 15, 2017 in which she instructed ICE officers to separate Rolando and Bertha.  A.P.F. SOF ¶ 130; A.P.F. SOF Ex. 83, ECF No. 364-14; Ex. 45, Lee Dep. 99:20–105:11.

98.    Lee was asked:  "And you respond at 10:48 a.m., which is two minutes later: 'Please do make a request to place the kid locally, thanks.' Is this a decision by you to separate the family?" Ex. 45, Lee Dep. 102:18–22.  She answered:  "The father -- the father is a final order with a criminal record, so, yes. . . . He will be in a mandatory category that would not [be] able to get placed at [a Family Residential Center] or get released out of custody."  *Id.* at 102:23–103:3.

99.     Lee confirmed that she sent her email approving Rolando and Bertha's separations from her Blackberry device.  Ex. 45, Lee Dep. 103:4–7.

100.     Lee testified that she did not remember "having a discussion with Ms. Hoopes," the ICE ERO officer who asked Lee for permission to separate Rolando and Bertha, "about this particular family."  Ex. 45, Lee Dep. 104:4–7.

101.     Lee also provided the following testimony:

> Q:  If you -- if you hadn't talked to [Ms. Hoopes], do you feel as though two minutes is a sufficient amount of time to make a decision such as separating a family?
>
> A:   I didn't have other options. It was mandatory detention case, so it's not -- it's not -- it's not something that I would have spent extensive amount of time, no.
>
> Q:   Did you feel like you didn't have any other option in this case, other than to separate the family?
>
> A:  If he's a mandatory detention case, then he would go into adult detention facility, so the child would be placed with ORR.
>
> Q:    My question was: Did you feel like you had any other option but to separate this family?
>
> A:  No.

Ex. 45, Lee Dep. 104:19–105:11.

102.     Rolando never received a pre- or post-separation hearing regarding his separation from Bertha.

**F.     Mario and Antonio**

103.     At his deposition, Plaintiff Mario testified that he borrowed an identification card from ██████████ "[i]n about 2007 or 2008."  Ex. 46, Mario Dep. 18:7–15.

104.     On December 30, 2011, Mario (under the alias ██████████) was convicted of illegal entry under 8 U.S.C. § 1325(a)(1).  Ex. 47.

105.     At his deposition, former ICE Field Office Director Lucero was asked:  "Is it the case that officers reviewing [Plaintiff Mario's] criminal history could reach different

conclusions about whether it posed a risk to the safety of a child?"  Ex. 44, Lucero Dep. 178:13–16.  Lucero answered:  "It's possible."  *Id.* at 178:17.

106.    At her deposition, former ICE ERO officer Lee was asked about her instruction that ICE officers separate Mario and Antonio.  Ex. 45, Lee Dep. 86:23–87:12; A.P.F. SOF ¶ 139; A.P.F. SOF Ex. 88, ECF No. 364-14.  Lee provided the following testimony:

> Q:  What were all of the circumstances that led to the decision to separate this adult from his seven-year-old child?
>
> A:    The father is a mandatory detention case who has a criminal -- criminal history and prior immigration final order, so he would be a mandatory detention case.
>
> Q:    What made -- what, in your view, made the father a mandatory detention case?
>
> A:  At the time, he -- there was an existing policy. If you're asking me to cite the number, I won't be able to tell you, but he had final order and immigration history when our officers did a case review, which makes him not releasable.
>
> Q:  This is based on what policy, I'm sorry, you say you don't know what the policy was?
>
> A:  No, I do not. I do not recall.
>
> Q:  Do you believe there was a written policy?
>
> A:  Yes.
>
> Q:  Do you believe it was a written policy that applied to all of the ICE field offices?
>
> A:  Yes, the mandatory detention cases.

Ex. 45, Lee Dep. 86:23–87:25.

107.    Mario and Antonio were separated on November 20, 2017, A.P.F. SOF ¶¶ 139–43, and Antonio was placed in ORR custody at Cayuga Centers on November 22, 2017, *id.* ¶ 145.

108.    On December 8, 2017, Cayuga Centers reported that Mario "was able to give worker mother's [contact] information . . . so minor is able to keep in contact with one parent if not both."  Ex. 48, at APF-US-HHS-U-0001026.

1   109.   On December 11, 2017, Cayuga staff reported that Antonio's mother "was

2   extremely upset that she hadn't spoken to anyone since her husband left [country of

3   origin] and that she didn't and couldn't get in touch with her son."  Ex. 48, at APF-US-

4   HHS-U-0001026.  Cayuga staff informed Antonio's mother "there was no way to tell

5   [when] minor would get his voluntary departure and she would have to be patient with

6   the process and be ready to receive UC on the other side."  *Id.*

7   110.   Mario never received a pre- or post-separation hearing regarding his

8   separation from Antonio.

9

10      Respectfully submitted this 24th day of April, 2023.

By *s/ Keith Beauchamp*
COPPERSMITH BROCKELMAN PLC
Keith Beauchamp
D. Andrew Gaona

COVINGTON & BURLING LLP
Matthew J. Schlesinger*
Jason A. Carey*
Jennifer L. Saulino*
Terra White Fulham*
Teresa S. Park*
Kathleen E. Paley*
Kavita R. Pillai*
Emily R. Woods*
Kristin M. Cobb*
Shadman Zaman*
Stephen Rees*†
Paulina Slagter*
Samuel Greeley*
Joshua Silver*
Patrick Lee*
One City Center, 850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: (202) 662-5581
mschlesinger@cov.com
jcarey@cov.com
jsaulino@cov.com
tfulham@cov.com
tpark@cov.com
kpaley@cov.com
kpillai@cov.com
rwoods@cov.com
kcobb@cov.com
szaman@cov.com
srees@cov.com
pslagter@cov.com
sgreeley@cov.com
jsilver@cov.com
plee@cov.com

SOUTHERN POVERTY LAW CENTER
Norma Ventura*
James Knoepp*
Sharada Jambulapati*
150 E. Ponce de Leon
Suite 340
Decatur, GA 30030
Telephone: (404) 521-6700
norma.ventura@splcenter.org
jim.knoepp@splcenter.org

sharada.jambulapati@splcenter.org

SOUTHERN POVERTY LAW CENTER
Paul R. Chavez*
2 S. Biscayne Boulevard
Suite 3750
Miami, FL 33137
Telephone: (786) 347-2056
paul.chavez@splcenter.org

*Attorneys for Plaintiffs A.P.F. et al.*
*\* Admitted pro hac vice*
*† Admitted only in Illinois, not admitted*
*in the District of Columbia, and*
*supervised by principals of the firm.*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### *A.P.F., et al. v. United States of America*

### Index of Exhibits to Separate Statement of Facts in Support of Plaintiffs' Opposition to Defendant's Motion for Summary Judgment

| Exhibit No. | Title | Citation |
|---|---|---|
| 1 | *Flores v. Reno*, Stipulated Settlement Agreement, No. 85-4544 (C.D. Cal. Jan. 17, 1997) | |
| 2 | Email re "Separation of Family Units" (Aug. 16, 2016) | Dep. Ex. 647; CD-US-0042208 |
| 3 | Testimony of ORR Deputy Director for Children's Programs Commander Jonathan White | White Dep. 80:23–81:20, 82:10–83:3, 105:21–107:13 |
| 4 | 9/7/2022 Testimony of ORR Associate Deputy Director Tricia Swartz | Swartz 9/7/2022 Dep. 12:8–15:13 |
| 5 | Emails re "Monthly border apprehensions release" (Aug. 8, 2017) | Dep. Ex. 292; CD-US-0190917 |
| 6 | Discussion points regarding ███████ (Aug. 14, 2017) | Dep. Ex. 387; CD-US-0046677 |
| 7 | Emails re "█████████" (Oct. 19, 2017) | CD-US-0108517A |
| 8 | Memorandum re "████████" | CD-US-0056970AT |
| 9 | Emails re "████████ (Dec. 11, 2017), attaching ████████ (Dec. 11, 2017) | Dep. Ex. 398; CD-US-0035380 |
| 10 | Emails re "████████" (Dec. 30, 2017) | CD-US-0099460 |
| 11 | Josh Dawsey, *Trump Derides Protections for Immigrants from 'Shithole' Countries*, WASH. POST (Jan. 12, 2018) | Available at https://perma.cc/2HP4-PFYK |
| 12 | Email re "████████ (Mar. 28, 2018) | Dep. Ex. 125; CD-US-0146859 |
| 13 | Emails re "████████" (Apr. 3, 2018) | CD-US-0049410 |
| 14 | Emails re "Legal Analysis Relating to Decision Memorandum" (Apr. 24, 2018), attaching Memorandum re "Criminal Prosecution of Aliens Who Entered Unlawfully: Legal Guidance on Potential Separation of Family Members" (Apr. 24, 2018) | CD-US-0097341 |

| Exhibit No. | Title | Citation |
|---|---|---|
| 15 | Scott Shuchart, *Careless Cruelty: Civil Servants Said Separating Families Was Illegal. The Administration Ignored Us*, WASH. POST (Oct. 25, 2018) | Available at https://perma.cc/UF3C-7D74 |
| 16 | Handwritten notes re May 11, 2018 call between Attorney General Jeff Sessions and Southwest border U.S. Attorneys | CD-US-0049581 |
| 17 | Handwritten Notes (May 12, 2018) | Dep. Ex. 199; CD-US-0049593 |
| 18 | Emails re "quick q" (May 7, 2018) | Dep. Ex. 692; CD-US-0077185 |
| 19 | 30(b)(6) Testimony of DHS, by and through James McCament | McCament (DHS 30(b)(6)) Dep. 165:1–9, 255:10–256:6 |
| 20 | Defendant United States of America's Expert Disclosure for U.S. Border Patrol Agent Shawn Jordan | |
| 21 | Testimony of U.S. Border Patrol Agent Shawn Jordan | Jordan Dep. 111:15–112:20, 130:6–131:17, 174:4–177:17, 188:14–20, 190:16–193:22 |
| 22 | Testimony of U.S. Border Patrol Agent Joseph Comella, Jr. | Comella Dep. 25:7–19, 180:16–23 |
| 23 | Emails re "Southwest Border Prosecutions" (May 7, 2018) | Comella Dep. Ex. 15; CD-US-0028029 |
| 24 | Emails re " ███████ (May 11, 2018) | CD-US-0049218 |
| 25 | Emails re " ███████" (May 22, 2018), attaching Memorandum re " ███ ██████████ " | Dep. Ex. 113; CD-US-0059226 |
| 26 | Handwritten notes re call between Rod Rosenstein, John Bash, and other DOJ attorneys (May 22, 2018) | Dep. Ex. 203; CD-US-0049600 |
| 27 | Testimony of DHS and DOJ Immigration Counselor Gene Hamilton | Hamilton Dep. 304:24–305:14, 306:1–8 |
| 28 | Emails re "Separation Procedures" (June 12, 2018) | CD-US-0061131 |
| 29 | Emails re " ██████" (June 12, 2018) | CD-US-0049708 |
| 30 | Email re "Why isn't HHS/DHS fixing this" (June 15, 2018) | CD-US-0191792 |
| 31 | Plaintiff "José" – Record of Deportable/Inadmissible Alien | APF-US-DHS-U-0001769 |
| 32 | Manifest of Persons and Property Transferred (May 11, 2018) | APF-US-CBP-0000776 |
| 33 | Manifest of Persons and Property Transferred (May 16, 2018) | APF-US-CBP-0000377 |
| 34 | Plaintiff "Alicia" – Subject Activity Log | APF-US-DHS-U-0001752 |

| Exhibit No. | Title | Citation |
|---|---|---|
| 35 | Plaintiff "Heriberto" – Subject Activity Log | APF-US-DHS-U-0001754 |
| 36 | Testimony of Plaintiff "Heriberto" | Heriberto Dep. 101:19–25, 102:14–103:2 |
| 37 | Plaintiff "Obet" – Subject Activity Log | APF-US-DHS-U-0001736 |
| 38 | Plaintiff "Abel" – Subject Activity Log | APF-US-DHS-U-0001739 |
| 39 | Plaintiff "Abel" – Record of Deportable/Inadmissible Alien | APF-US-DHS-U-0001732 |
| 40 | Plaintiff "Mariela" – Initial Intakes Assessment | APF-038182 |
| 41 | 30(b)(6) Testimony of Southwest Key, by and through ▮▮▮▮▮▮ | ▮▮▮▮▮▮ (Southwest Key 30(b)(6)) Dep. 103:17–104:17 |
| 42 | *United States v.* ▮▮▮▮▮▮, No. ▮▮▮▮▮▮▮▮▮▮, ECF No. 1 (W.D. Tex. ▮▮▮▮▮▮▮▮) | |
| 43 | Cayuga Centers UC Progress Report re "Bertha" | APF-US-HHS-U-0001696 |
| 44 | Testimony of ICE Field Office Director Enrique Lucero, Jr. | Lucero Dep. 129:1–15, 178:13–17, 198:8–199:2 |
| 45 | Testimony of ICE ERO Officer Michelle Lee | Lee Dep. 86:23–87:12, 99:20–105:11 |
| 46 | Testimony of Plaintiff "Mario" | Mario Dep. 18:7–15 |
| 47 | *United States v. Rivera-Ortiz*, No. ▮▮▮▮▮▮▮▮▮▮, ECF No. 1 (D. Ariz. ▮▮▮) | |
| 48 | Plaintiff "Antonio" – Case Review | APF-US-HHS-U-0001022 |