1
2
3
4
5
6                IN THE UNITED STATES DISTRICT COURT
7                   FOR THE DISTRICT OF ARIZONA
8
9    C.M., et al.,                        No. CV-19-05217-PHX-SRB
10                  Plaintiffs,            No. CV-20-00065-PHX-SRB
11   v.                                    **ORDER**
12   United States of America,
13                  Defendant.
14   ───────────────────────────
15   A.P.F., et al.,
16                  Plaintiffs,
17   v.
18   United States of America,
19                  Defendant.
20
21          Pending before the Court are Defendant United States of America's Motion for
22   Summary Judgment on C.M. Plaintiffs'[1] claims and C.M. Plaintiffs' Motion for Partial
23   Summary Judgment. (Doc. 371, 19-cv-5217, US-CM Mot.; Doc. 378, 19-cv-5217, CM
24   Mot.) The Court will also consider the United States' Motion for Summary Judgment on
25   A.P.F. Plaintiffs'[2] claims and A.P.F. Plaintiffs' Motion for Partial Summary Judgment.
26   (Doc. 363, 20-cv-65, US-APF Mot.; Doc. 362, 20-cv-65, APF Mot.)
27
     ───────────────
28   [1] Referring collectively to C.M., B.M., L.G., B.G., M.R., J.R., O.A., L.A., V.C., and G.A.
     [2] Referring collectively to A.P.F., O.B., J.V.S., H.Y., J.D.G., M.G., H.P.M., A.D., M.C.L.,
     A.J., R.Z.G., and B.P.

# I.     BACKGROUND[3]

## A.     Factual Background

This case arises out of the United States' forced separation of noncitizen parent Plaintiffs from their children along the United States-Mexico border.

### 1.     Immigration Background

A noncitizen "who arrives in the United States (whether or not at a designated port of arrival . . .)" is considered an "applicant for admission" and must "be inspected by immigration officers." 8 U.S.C. § 1225(a)(1), (3). It is unlawful for a noncitizen to, *inter alia*, "enter[] or attempt[] to enter the United States at any time or place other than as designated by immigration officers or . . . elude[] examination of inspection by immigration officers." *Id.* § 1325(a). A noncitizen's first violation of § 1325(a) is a misdemeanor punishable by fine, six months imprisonment, or both. *Id.* A noncitizen present in the United States in violation of the law may also be removed from the United States. *See id.* § 1227. "Removal is a civil, not criminal, matter." *Arizona v. United States*, 567 U.S. 387, 396 (2012).

In 1997, the federal government entered into a settlement agreement known as the Flores Settlement Agreement ("Flores Agreement"), which "sets out nationwide policy for the detention, release, and treatment of minors in [the United States'] custody." (Doc. 372, 19-cv-5217, US-CM SOF ¶ 1; Doc. 379-20, 19-cv-5217, Ex. 85, ("Flores Agreement") ¶ 9.) Among other things, the Flores Agreement requires the government to house children in facilities that meet certain standards, which includes providing "contact with family members who were arrested with the minor." (Flores Agreement ¶ 12.A.) It also favors releasing children from custody to a parent or legal guardian when possible and requires the government and facilities licensed to house minors to make "prompt and continuous efforts . . . toward family reunification." (*Id.* ¶¶ 14, 18–19.)

An "unaccompanied alien child" ("UAC") is a child under 18 years of age who "has no lawful immigration status in the United States" and either has "no parent or legal

---

[3] All exhibit page numbers in this Order refer to the document's ECF page number or bates number unless otherwise indicated.

guardian in the United States" or "no parent or legal guardian in the United States . . . available to provide care and physical custody." 6 U.S.C. § 279(g); 8 U.S.C. § 1232(g) (incorporating the definition of UAC by reference). The Office of Refugee Resettlement ("ORR"), an office within the Department of Health and Human Services ("HHS"), is responsible for "the care and placement of [UACs] who are in Federal custody by reason of their immigration status." 6 U.S.C. § 279(b)(1)(A). The Trafficking Victims Protection and Reauthorization Act ("TVPRA") also imposes responsibility on the Secretary of HHS for the detention, care, and custody of UACs. 8 U.S.C. § 1232(b)(1). Except for "exceptional circumstances," any United States department or agency must transfer a child to HHS "not later than 72 hours after determining that such child is" a UAC. *Id.* § 1232(b)(3).

### 2.    The DHS Referral Policy

In early 2017, government officials, including Customs and Border Protection ("CBP") Commissioner Kevin McAleenan and then-acting Department of Homeland Security ("DHS") Secretary John Kelly, considered separating parents and children as a method to deter illegal immigration into the United States. (Doc. 379, 19-cv-5217, ("CM SOF") ¶¶ 1–2.) Immigration advocates, the American Academy of Pediatrics, and members of Congress issued warnings to Secretary Kelly and Immigration and Customs Enforcement ("ICE") Director Thomas Homan that separating children from their parents would inflict trauma on these families. (*Id.* ¶¶ 3–5; Doc. 364, 20-cv-65, ("APF SOF") ¶¶ 11–12; *see* Doc. 379-2, 19-cv-5217, Ex. 4; Doc. 379-3, 19-cv-5217, Ex. 6.) In July 2017, CBP agents in El Paso, Texas, began referring all adults who unlawfully entered the United States for prosecution under 8 U.S.C. § 1325, including adults traveling with children ("El Paso Pilot"). (CM SOF ¶ 6.) Under the El Paso Pilot, CBP agents would typically refer a parent for prosecution, designate the child as a UAC, separate the child from her parent, and transfer the child to ORR custody. (*Id.* ¶ 7.) The Pilot was terminated in November 2017 to allow CBP leadership "to review all aspects of [the] program and brief up the chain at the appropriate level." (*Id.* ¶ 9; Doc. 364-6, 20-cv-65, Ex. 16.) The DHS Office of

Inspector General ("DHS OIG") determined that CBP headquarters was aware of "system deficiencies related to tracking family separations" but that CBP did not modify its systems to address these challenges. (Docs. 379-4 to 379-11, 19-cv-5217, Ex. 13, ("DHS OIG Audit") at CD-US-0213932–33.)

In January 2018, the American Academy of Pediatrics issued a letter to DHS Secretary Kirstjen Nielsen warning that a policy of separating families would inflict trauma and potentially lead to "toxic stress" in children. (CM SOF ¶ 14; *but see* Doc. 398, 19-cv-5217, ("US-CM CSOF") ¶ 14 (disputing that Secretary Nielsen received the letter).) Members of the United States Senate reiterated these warnings in March 2018. (*See* Doc. 379-13, 19-cv-5217, Ex. 17 (addressing letter to Secretary Nielsen).) ICE and CBP officials also informed Secretary Nielsen of concerns from non-governmental organizations that separating families could "be detrimental to the health, safety and well-being of children." (CM SOF ¶ 16; APF SOF ¶ 31.)

On April 6, 2018, Attorney General Jeff Sessions "direct[ed] each United States Attorney's Office along the Southwest Border—to the extent practicable, and in consultation with DHS—to adopt immediately a zero-tolerance policy for all offenses referred for prosecution under [8 U.S.C. §] 1325(a)" ("Zero Tolerance Policy"). (CM SOF ¶ 17; Doc. 364-6, 20-cv-65, Ex. 24, at 58.) On April 23, 2018, Commissioner McAleenan, Director Homan, and U.S. Citizenship and Immigration Services Director Francis Cissna issued a memorandum titled "Increasing Prosecutions of Immigration Violations," to Secretary Nielsen, proposing three prosecution referral policy options for unlawful entries into the United States along the United States-Mexico border ("Referral Memorandum"). (US-CM SOF ¶ 6; Doc. 372-3, 19-cv-5217, Ex. C Att. 3, ("Referral Memorandum") at 12.) The Referral Memorandum evaluated each option's feasibility, potential "legal risk," and anticipated "deterrent impact." (Referral Memorandum at 12.) McAleenan, Homan, and Cissna recommended option three of the Referral Memorandum:

> **Option 3- Refer all Amenable Adults, including those presenting as part of a [family unit]:** Work with DOJ, the Department of Health and Human Services, and other interagency partners to develop a quickly scalable approach to achieve 100% immigration violation prosecution referral for all amenable adults, including those initially arriving or apprehended with

1    minors.

2    (*Id.* at 12, 14.)[4] An "amenable adult" was any adult suspected of being "eligible to be

3    prosecuted" under § 1325(a). (US-CM SOF ¶ 9 (citing Doc. 372-1, Ex. A Att. 1,

4    ("McAleenan Dep.") at 61:8–15); *see, e.g.*, Doc. 404, 19-cv-5217, ("CM CSOF") ¶ 9.) The

5    "effectiveness" of the El Paso Pilot was a factor in recommending option three, but the

6    Referral Memorandum did not discuss system deficiencies experienced during the El Paso

7    Pilot. (APF SOF ¶¶ 39–41; *see* Referral Memorandum at 13.) McAleenan, Homan, and

8    Cissna noted that option three would "requir[e] significant resources and present[]

9    increased legal risk." (Referral Memorandum at 12.)

10        On May 4, 2018, Secretary Nielsen approved option three of the Referral

11   Memorandum as the policy of DHS to refer all amenable adults for prosecution ("Referral

12   Policy"). (*See, e.g.*, Doc. 379-13, 19-cv-5217, Ex. 19, ("Referral Policy").) Secretary

13   Nielsen "direct[ed] all DHS law enforcement officers at the border to refer all illegal border

14   crossers to the Department of Justice for criminal prosecution to the extent practicable."

15   (Doc. 364-6, 20-cv-65, Ex. 28, ("Policy Memorandum") at 74–75.) The Referral Policy

16   did not address processes for tracking separated families, coordinating communication

17   between family members, or reuniting family members, but Secretary Nielsen stated that

18   "[i]f adopting [the] policy requires additional resources, each office shall identify and

19   request such additional resources." (Policy Memorandum at 74–75.)

20                      **2.    Referral Policy Implementation**

21        Prior to and during the effective period of the Referral Policy, CBP would separate

22   families for reasons including "criminal prosecution of the adult; criminal history of the

23   adult; threats to the safety of the public or child welfare concerns; an outstanding warrant

24   for the adult; illness or other medical issues impacting the adult's ability to care for the

25   child; and concerns relating to parentage." (Doc. 365, 20-cv-65, ("US-APF SOF") ¶ 42.)

26   Officers would conduct "case-by-case review[s]" of these factors to determine whether to

27   ─────────────
     [4] Option one proposed that DHS "develop a quickly scalable approach to increase
28   prosecution in accordance with USAO capacity." (Referral Memorandum at 12.) Option
     two proposed that DHS "develop a quickly scalable approach to achieve 100% immigration
     violation prosecution referral for all amenable single adults." (*Id.*)

separate a family unit. (Doc. 365, 20-cv-65, Ex. A Att. 2, ("Homan Dep.") at 222:3–224:19.) During the Referral Policy however, CBP agents separated parents and children and transferred children to ORR regardless of whether their parents were in fact prosecuted or ever placed into criminal custody. (CM SOF ¶¶ 40–41.) If CBP officers identified issues with potential prosecution referrals, they were instructed to "highlight the areas of concern" for the U.S. Attorney's Office. (APF SOF ¶ 57 (quoting Doc. 364-7, 20-cv-65, Ex. 30, ("Agent R. Dep.") at 181:13–22).)

According to the United States, "[p]rior to and while the DHS Referral Policy was in effect," CBP did not have any "directives" "prescribing precisely" when to designate a child as a UAC or when to transfer a child to HHS. (US-APF SOF ¶ 26.) But CBP agents would "as a matter of operational practice" request a transfer of a child to ORR custody "as expeditiously as possible" after designating their parent as amenable to prosecution. (*Id.* ¶¶ 27, 35.) Moreover, CBP agents would not reunite parents and children even if the U.S. Attorney's Office declined to prosecute the parent or if the parent returned from criminal custody to the same station as her child. (CM SOF ¶¶ 43–44; APF SOF ¶ 58.) On May 10, 2018, ICE Executive Associate Director Matthew Albence expressed to Homan that parents who were prosecuted, had pled guilty, and were sentenced to time-served would return to CBP custody before their children had been transferred to ORR and asked CBP agents to adjust their detention procedures to avoid "a situation in which the parents are back in the exact same facility as their children." (Doc. 379, 19-cv-5217, Ex. 44, at 85.) Albence was concerned that reunification would "undermine[] the entire effort and the [department] [would] look completely ridiculous [going] through the effort of prosecuting only to send them to a FRC and out the door." (Doc. 364-9, 20-cv-65, Ex. 41, at 11.)

On June 20, 2018, then-President Trump issued Executive Order 13841 announcing a policy "to maintain family unity, including by detaining alien families together where appropriate and consistent with law and available resources." (Doc. 364-12, 20-cv-65, Ex. 46.) Southwest CBP sectors were directed to "suspend Section 1325 prosecution referrals for adult members of family units." (US-CM SOF ¶ 39.) On June 23, 2018, Albence

instructed that families would only be reunited for removal and would not be placed in an "[FRC] for the sole purpose of releasing 20 days later." (Doc. 364-12, 20-cv-65, Ex. 49, at 98–99.) But on June 26, 2018, the United States District Court for the Southern District of California issued a preliminary injunction enjoining the separation of parents and children and ordering the government to reunite all parents and children within 30 days of the court's order. *See Ms. L. v. ICE*, 310 F. Supp. 3d 1133, 1149–50 (S.D. Cal. 2018). Even after *Ms. L*, the government was still developing systems to facilitate communication and reunification of parents and children. (APF SOF ¶ 80 (citing Doc. 364-7, 20-cv-65, Ex. 32, ("Robert Guadian Dep.")).)

In 2019, the DHS OIG conducted an audit of the Referral Policy and concluded that DHS lacked the information technology necessary to effectively track separated families while the Referral Policy was in effect, despite knowing of these deficiencies following the El Paso Pilot.[5] (DHS OIG Audit at CD-US-0213915, 0213932–39.) The DHS OIG also found that "Border Patrol and ICE headquarters did not provide adequate guidance to field personnel to ensure successful implementation of the [Referral Policy]," and DHS lacked any standard procedures to reunify separated families. (*Id.* at CD-US-0213939–42.) According to the United States, it utilized "pre-existing processes and practices" to facilitate communication between separated families and coordinate family reunification because the Referral Policy did not "prescribe[] [a] specific course of action." (*E.g.*, US-CM SOF ¶¶ 17, 31.)

The parties disagree on the purpose of the Referral Policy. According to the United States, the "policy objectives" of the Referral Policy were to, *inter alia*, "deter and provide criminal consequences for illegal Southwest Border crossings," and ease the operational challenges of unlawful entries by family units. (*E.g.*, *id.* ¶ 19.) Secretary Nielsen maintained that DHS did not have a child separation policy, but instead a policy "to increase consequences for those who choose to break the law," which caused parents to be

---

[5] The OIG Audit refers to the Referral Policy as the "Zero Tolerance Policy." (*See* DHS OIG Audit at CD-US-0213915 ("From May 5, 2018, to June 20, 2018, DHS adopted a *Zero Tolerance Policy* to refer for prosecution all adults illegally entering the United States." (emphasis in original)).)

"separated from their child." (CM SOF ¶ 39; Doc. 372-2, 19-cv-5217, Ex. B Att. 1, at 10; Doc. 364-8, 20-cv-65, Ex. 39 (Secretary Nielsen stating that separating families at the border is "no different than what we do every day in every part of the United States when an adult of a family commits a crime. If you as a parent break into a house, you will be incarcerated by police and thereby separated from your family. We're doing the same thing at the border").) According to Plaintiffs, Nielsen, McAleenan, and Homan (collectively, the "Policymakers") adopted and implemented the Referral Policy as a front for what was in fact a child separation policy designed to deter immigration into the United States. (CM CSOF ¶ 19; Doc. 432, 20-cv-65, ("APF CSOF") ¶ 19.) Plaintiffs point out that the government separated Plaintiffs and transferred the children to ORR custody despite never prosecuting parent Plaintiffs. (*E.g.*, CM SOF ¶¶ 40–43.)

### 3.     C.M. Plaintiffs' Family Separations

C.M. Plaintiffs are five mothers and their respective children who were separated by federal officers after unlawfully entering the United States near Yuma, Arizona, between ports of entry in May 2018. (*See generally id.* ¶¶ 55–120.)

On May 8, 2018, V.C. and her six-year-old son G.A. were apprehended and transported to Yuma Station after entering the United States near Yuma, Arizona, between ports of entry. (*Id.* ¶ 55; US-CM SOF ¶¶ 114–15.) CBP agents "identified [V.C.] as an adult amendable to prosecution" but never referred V.C. for prosecution or placed her into criminal custody. (CM SOF ¶¶ 68–69; US-CM SOF ¶ 116.) But on May 10, 2018, V.C. and G.A. were informed they would be separated. (CM SOF ¶ 58.) According to V.C., as children waited in line crying, a CBP agent laughed and taunted the families by saying, "Don't cry, today is a happy day. It's Mother's Day." (Doc. 379-18, 19-cv-5217, Ex. 52, ¶¶ 6–8.) CBP agents then "directed parents and children to line up on opposite walls" and "physically" separated children from their parents. (CM SOF ¶¶ 60–61.) G.A. was separated from V.C. on May 10 and did not speak to his mother for almost two months. (*Id.* ¶¶ 63–66; US-CM SOF ¶¶ 120, 131.) V.C. and G.A. were reunited on July 26, 2018. (US-CM SOF ¶ 130.)

On May 8, 2018, M.R. and her twelve-year-old son J.R. were apprehended and transported to Yuma Station after entering the United States near Yuma, Arizona, between ports of entry. (*Id.* ¶¶ 78–79; CM SOF ¶ 70.) CBP agents told M.R. and other mothers that the United States "want[ed] to take away [their] children." (CM SOF ¶ 71.) M.R. was told that she would be deported without J.R., and they were separated on May 10, 2018. (*Id.* ¶ 76; US-CM SOF ¶ 84.) M.R. was referred for prosecution on May 11, 2018, but the U.S. Attorney's Office declined to prosecute M.R. that same day. (US-CM SOF ¶¶ 86–87.) M.R. and J.R. spoke on the phone following their separation, during which "[i]mmigration officers nearby laughed and shook their heads listening to M.R. and J.R. cry." (CM SOF ¶ 80.) M.R. and J.R. were reunited on July 26, 2018. (US-CM SOF ¶ 92.)

On May 9, 2018, C.M. and her five-year-old son B.M. were apprehended and transported to Yuma Station after entering the United States near Yuma, Arizona, between ports of entry. (*Id.* ¶¶ 43–44; CM SOF ¶ 84.) At Yuma Station an immigration officer told C.M. that she would be removed from the United States without B.M., laughed, and said "Happy Mother's Day." (CM SOF ¶ 85.) CBP agents designated C.M. as amenable to prosecution and made a placement request for B.M. with ORR. (US-CM SOF ¶ 45.) As C.M. pleaded with a CBP officer not to take B.M. because he would be unable to understand anyone, the officer laughed "and made fun of her indigenous accent." (CM SOF ¶ 87.) CBP agents separated C.M. and B.M. on May 11, 2018, and "pulled" B.M. from C.M. "by force." (*Id.* ¶ 89; US-CM SOF ¶¶ 49–50.) The U.S. Attorney's Office declined to prosecute C.M. on May 14, 2018, and C.M. was never placed in criminal custody. (US-CM SOF ¶ 54; CM SOF ¶ 98.) C.M. and B.M. were reunited on July 26, 2018. (US-CM SOF ¶ 59.)

On May 11, 2018, O.A. and her five-year-old daughter L.A. were apprehended and transported to Yuma Station after entering the United States between ports of entry near Yuma, Arizona. (*Id.* ¶¶ 96–97; CM SOF ¶ 99.) CBP agents separated L.A. from her mother on May 13, 2018, and the U.S. Attorney's Office declined to prosecute O.A. on May 14, 2018. (US-CM SOF ¶¶ 104–05.) O.A. was never placed in criminal custody. (CM SOF ¶¶

110–11.) O.A. and L.A. were reunited on September 13, 2018. (US-CM SOF ¶ 112.)

On May 16, 2018, L.G. and her six-year-old daughter B.G. were apprehended and transported to Yuma Station after entering the United States between ports of entry near Yuma, Arizona. (*Id.* ¶¶ 61–62; CM SOF ¶ 112.) CBP agents designated L.G. as amenable to prosecution and made a placement request for B.G. with ORR. (US-CM SOF ¶¶ 63–66.) CBP agents separated B.G. from L.G. on May 17, 2018, L.G. was referred for prosecution, and the U.S. Attorney's Office declined to prosecute L.G. on May 18, 2018. (*Id.* ¶¶ 69, 72.) L.G. was never placed in criminal custody. (CM SOF ¶¶ 118–19.) L.G. and B.G. spoke for the first time approximately forty days after being separated and were reunited on July 24, 2018. (*Id.* ¶ 116; US-CM SOF ¶¶ 76–77.)

### 4.    A.P.F. Plaintiffs' Separations

A.P.F. Plaintiffs are six fathers and their respective children who were separated by federal officers after entering the United States between ports of entry near Yuma, Arizona, or presenting at ports of entry. (*See generally* APF SOF ¶¶ 85–150.)

On May 8, 2018, J.V.S. and his five-year-old daughter H.Y. were apprehended and transported to Yuma Station after entering the United States between ports of entry. (US-APF SOF ¶¶ 43–44.) On May 9, 2018, CBP agents informed J.V.S. that H.Y. was "going to be transferred to New York," and agents physically pulled H.Y. from J.V.S. (APF SOF ¶¶ 88–89.) H.Y. was transferred to ORR custody on May 10, 2018. (US-APF SOF ¶ 49.) J.V.S. was referred for prosecution on May 11, 2018, which the U.S. Attorney's Office declined that same day. (APF SOF ¶ 92.) J.V.S. and H.Y. were reunited on July 21, 2018. (*Id.* ¶ 95.)

On May 12, 2018, H.P.M. and his six-year-old daughter A.D. were apprehended and transported to Yuma Station after entering the United States between ports of entry. (*Id.* ¶ 96; US-APF SOF ¶¶ 60, 63.) CBP agents designated H.P.M. as amenable to prosecution and on May 13, 2018, separated A.D. and transferred her to ORR custody. (US-APF SOF ¶¶ 64, 69.) An agent carried A.D. away "on his shoulder" but no agent informed H.P.M. "what was going to happen to" her. (APF SOF ¶¶ 97–99.) H.P.M. was

1    referred for prosecution but the U.S. Attorney's Office declined to prosecute H.P.M. on

2    May 15, 2018. (US-APF SOF ¶ 74.) H.P.M. was removed to Guatemala on June 7, 2018,

3    and A.D. was removed on August 30, 2018 to be reunited with H.P.M. (*Id.* ¶¶ 77–79.)

4        On May 18, 2018, A.P.F. and his son O.B. were apprehended and transported to

5    Yuma Station after entering the United States between ports of entry. (*Id.* ¶¶ 81, 84; APF

6    SOF ¶ 107.) CBP designated A.P.F. as amenable to prosecution and separated A.P.F. and

7    O.B. on May 19, 2018. (US-APF SOF ¶¶ 85–88, APF SOF ¶ 110.) A.P.F. was referred for

8    prosecution but the U.S. Attorney's Office declined to prosecute A.P.F. on May 21, 2018.

9    (US-APF SOF ¶ 94; APF SOF ¶ 113.) A.P.F. and O.B. were reunited on July 25, 2018.

10   (APF SOF ¶ 115.)

11       On May 19, 2018, J.D.G. and his eleven-year-old daughter M.G. were apprehended

12   and transported to Yuma Station after entering the United States between ports of entry.

13   (US-APF SOF ¶¶ 100–01.) CBP designated J.D.G. as amenable to prosecution, referred

14   him for prosecution on May 20, 2018, and placed M.G. in a separate cell at Yuma Station.

15   (APF SOF ¶ 117.) The U.S. Attorney's Office declined to prosecute J.D.G. on May 22,

16   2018, but CBP still transferred M.G. to ORR custody on May 24, 2018. (*Id.* ¶¶ 121–23;

17   US-APF SOF ¶¶ 108–09.) J.D.G. and M.G. were reunited at a detention facility on July 22,

18   2018. (APF SOF ¶ 127.)

19       On November 13, 2017, R.Z.G. and his nine-year-old daughter B.P. sought entry

20   into the United States at the DeConcini port of entry in Nogales, Arizona. (*Id.* ¶ 128; US-

21   APF SOF ¶ 120.) R.Z.G. and B.P. were transferred to ICE custody, and on November 15,

22   2017, ICE agents separated the two based on R.Z.G.'s criminal and immigration history.

23   (US-APF SOF ¶¶ 117–119 (describing R.Z.G.'s prior unlawful entries into the United

24   States), 122; APF SOF ¶ 130.) B.P. cried when officers separated her from R.Z.G., after

25   which an "officer hit her with a belt buckle" and threatened to hit her again if she continued

26   crying. (APF SOF ¶ 131; *but see* Doc. 393, 20-cv-65, ("US-APF CSOF") ¶ 131.) R.Z.G.

27   was transferred to a separate facility on November 15, 2017, and B.P. was transferred to

28   ORR custody on November 16, 2017. (US-APF SOF ¶¶ 126–27.) R.Z.G. was removed to

1    Guatemala on December 13, 2017, and B.P. was removed on July 26, 2018 to be reunited

2    with R.Z.G. (*Id.* ¶ 133.)

3           On November 19, 2017, M.C.L. and his seven-year-old son A.J. sought entry into

4    the United States at the DeConcini Port of Entry in Nogales, Arizona. (*Id.* ¶ 147.) On

5    November 20, 2017, CBP agents decided to separate M.C.L. and A.J. based on M.C.L.'s

6    immigration and criminal history. (*Id.* ¶¶ 137–146 (describing M.C.L.'s immigration and

7    criminal history), 148; APF SOF ¶ 139.) A.J. was transferred to ORR custody on November

8    20, 2017, and M.C.L. was transferred to ICE custody on November 21, 2017. (US-APF

9    SOF ¶¶ 152–53.) M.C.L. was removed to Guatemala on January 17, 2018, and A.J. was

10   removed on July 26, 2018 to be reunited with M.C.L. (*Id.* ¶¶ 156–60.)

11          **B.      Procedural Background**

12          C.M. Plaintiffs filed suit on September 19, 2019, alleging two causes of action under

13   the Federal Tort Claims Act ("FTCA"): (1) intentional infliction of emotional distress

14   ("IIED"); and (2) negligence. *See* 28 U.S.C. §§ 1346(b), 2671–80; (Doc. 1, 19-cv-5217,

15   CM Compl. ¶¶ 387–93.) A.P.F. Plaintiffs filed suit on January 10, 2020, alleging three

16   causes of action under the FTCA: (1) IIED; (2) negligence; and (3) loss of child's

17   consortium. (Doc. 1, 20-cv-65, APF Compl. ¶¶ 303–30.) On April 14, 2020, the Court

18   granted A.P.F. Plaintiffs' Motion to Transfer to promote judicial economy given the cases'

19   substantial overlap. (*See* Doc. 35, 19-cv-5217, 04/14/2020 Order; *see* Doc. 10, 20-cv-65.)

20   A.P.F. Plaintiffs filed their Amended Complaint on July 16, 2020, adding four additional

21   fathers and their children to this suit. (*See* Doc. 34, 20-cv-65, APF Am. Compl.)

22          Except for A.P.F. Plaintiffs' claims specific to M.C.L., A.J., R.Z.G., and B.P. ("Port

23   of Entry Plaintiffs"), the parties' arguments in their respective Motions are, for all intents

24   and purposes, the same. (*Compare* US-CM Mot., *and* CM Mot., *with* US-APF Mot., *and*

25   APF Mot.) On March 9, 2023, the United States filed its Motions, arguing that Plaintiffs'

26   FTCA claims fail because (1) Plaintiffs cannot bring institutional tort claims under the

27   FTCA, (2) Plaintiffs' claims are barred by the FTCA's discretionary function exception,

28   and (3) Plaintiffs have failed to establish their IIED claims. (*See generally* US-CM Mot.;

1    US-APF Mot.) C.M. Plaintiffs and A.P.F. Plaintiffs also filed their respective Motions on

2    March 9, 2023, each seeking partial summary judgment as to the liability elements of their

3    IIED and negligence claims. (*See* CM Mot. at 1–2; APF Mot. at 1–2.) The parties timely

4    filed their responses and replies. (Doc. 403, 19-cv-5217, ("CM Resp."); Doc. 424, 19-cv-

5    5217, ("US-CM Reply"); Doc. 397, 19-cv-5217, ("US-CM Resp."); Doc. 421, 19-cv-5217,

6    ("CM Reply"); Doc. 421, 20-cv-65, ("APF Resp."); Doc. 428, 20-cv-65, ("US-APF

7    Reply"); Doc. 392, 20-cv-65, ("US-APF Resp."); Doc. 429, 20-cv-65, ("APF Reply").)

8    The Court heard oral argument on June 13, 2023. (*See* Doc. 427, Min. Entry.)

9    **II.     LEGAL STANDARD & ANALYSIS**

10            Under Fed. R. Civ. P. 56, summary judgment is properly granted when: (1) there is

11   no genuine dispute as to any material fact; and (2) after viewing the evidence most

12   favorably to the non-moving party, the movant is clearly entitled to prevail as a matter of

13   law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Eisenberg v. Ins. Co. of N.*

14   *Am.*, 815 F.2d 1285, 1288–89 (9th Cir. 1987). A fact is "material" when, under the

15   governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty*

16   *Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute of material fact exists if "the

17   evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

18   In considering a motion for summary judgment, the court must regard as true the non-

19   moving party's evidence if it is supported by affidavits or other evidentiary material.

20   *Eisenberg*, 815 F.2d at 1289; *see also Celotex*, 477 U.S. at 324. However, the non-moving

21   party may not merely rest on its pleadings; it must produce some significant probative

22   evidence tending to contradict the moving party's allegations, thereby creating a material

23   question of fact. *Anderson*, 477 U.S. at 256–57; *First Nat'l Bank of Ariz. v. Cities Serv.*

24   *Co.*, 391 U.S. 253, 289 (1968).

25       **A.     FTCA Jurisdiction**

26            The United States is generally immune from suits for damages. A court has

27   jurisdiction to entertain a suit against the United States only "to the extent that it has waived

28   its sovereign immunity." *Reed ex rel. Allen v. U.S. Dep't of the Interior*, 231 F.3d 501, 504

1   (9th Cir. 2000) (citing *Blackburn v. United States*, 100 F.3d 1426, 1429 (9th Cir. 1996)).

2   The FTCA waives the United States' immunity for:

> [C]ivil actions on claims against the United States, for money damages . . .
> for injury or loss of property, or personal injury or death caused by the
> negligent or wrongful act or omission of any employee of the Government
> while acting within the scope of his office or employment, under
> circumstances where the United States, if a private person, would be liable
> to the claimant in accordance with the law of the place where the act or
> omission occurred.

7   28 U.S.C. § 1346(b)(1). The FTCA's waiver of immunity allows the United States to be

8   held liable under a theory of respondeat superior for "the intentionally wrongful or careless

9   conduct" of its employees. *Laird v. Nelms*, 406 U.S. 797, 799 (1972); *see Lee v. United*

10  *States*, No. CV 19-08051-PCT-DLR (DMF), 2020 WL 6573258, at *6 (D. Ariz. Sept. 18,

11  2020) ("The FTCA applies only to 'the negligent or wrongful act or omission of *any*

12  *employee of the United States* while acting within the scope of his office or employment,'

13  not to generalized theories of negligence asserted against the staff and employees of federal

14  institutions as a whole." (emphasis in original)).

15       There are, however, several exceptions to the United States' waiver of immunity.

16  Relevant to the United States' Motions is the "discretionary function exception" ("DFE"),

17  under which the United States is immune from suit for any claim "based upon the exercise

18  or performance or the failure to exercise or perform a discretionary function or duty on the

19  part of a federal agency or an employee of the Government, whether or not the discretion

20  involved be abused." 28 U.S.C. § 2680(a). Plaintiffs must show that the Court has subject

21  matter jurisdiction under the FTCA's waiver of immunity, while the United States must

22  prove that the DFE applies. *Prescott v. United States*, 973 F.2d 696, 701–03 (9th Cir. 1992).

23       **1.    Plaintiffs Do Not Assert "Institutional" Claims**

24       The United States first argues that the Court lacks jurisdiction because Plaintiffs are

25  asserting "institutional" or "systemic" claims that challenge "official agency

26  policymaking." (*E.g.*, US-CM Mot. at 5–7.) Citing a single paragraph in each of Plaintiffs'

27  Complaints, the United States contends that Plaintiffs challenge the Referral Policy, which

28  was the result of "policymaking or agency-wide misconduct" rather than the tortious

misconduct of any individual employees. (*Id.* at 6 (citing CM Compl. ¶ 1); US-APF Mot. at 7 (citing APF Compl. ¶ 15).) Plaintiffs' claims also "arise out of" law enforcement activities "taken pursuant to the DHS Referral Policy." (*E.g.*, US-CM Mot. at 8.) Plaintiffs counter that the United States "overlooks substantial evidence" supporting Plaintiffs' allegations of tortious conduct by individual federal employees.[6] (*E.g.*, C.M. Resp. at 14–15.) The Court agrees with Plaintiffs.

Plaintiffs in this case provide instances of individual conduct by Nielsen, McAleenan, Homan, and Albence to support their argument that the government "negligently and intentionally established" a policy designed to separate noncitizen families as a means of deterrence at the southern border. Plaintiffs assert, *inter alia*, that the Policymakers and CBP agents "forcibly separat[ed] Plaintiffs for months as a means of deterrence, with no plan for tracking, facilitating communication, or reunifying separated families promptly." (APF Resp. at 11; *see also* CM Resp. at 14.) Plaintiffs further contend that Secretary Nielsen adopted the Referral Policy despite knowing of the "severe emotional trauma" it would cause parents and children. (*E.g.*, CM Mot. at 21–22.) These are not "institutional" tort claims.

The United States argues that Plaintiffs' claims "indisputably arise out of separations resulting from enforcement action taken pursuant to the DHS Referral Policy." (*E.g.*, US-APF Mot. at 8.) This argument ignores Plaintiffs' evidence specific to federal officials and employees at Yuma Station who separated Plaintiffs. (US-CM Mot. at 6; *see* CM SOF ¶¶ 55–120; APF SOF ¶¶ 85–150.) Though the "[t]ortious acts or omissions of government agencies or the federal government as a whole cannot form the basis for FTCA claims," the United States cannot shield itself from liability by characterizing each employee's actions as that of an agency or policy action generally. (*See* US-CM Mot. at 6); *Fuentes-Ortega v. United States*, 640 F. Supp. 3d 878, 885 (D. Ariz. 2022) (finding the

---

[6] Plaintiffs' failure to name the specific agents who designated parent Plaintiffs as amenable to prosecution or children Plaintiffs as UACs and effectuated the separations is not fatal to Plaintiffs' claims. *See Wilbur P.G. v. United States*, No. 4:21-CV-04457, 2022 WL 302319, at *6 (N.D. Cal. May 10, 2022). The Court's use of the term "government" refers to unspecified United States employees responsible for the challenged conduct.

court had subject matter jurisdiction over FTCA claim where the plaintiffs made "specific allegations regarding individual federal employees and officers"); *F.R. v. United States*, No. CV-21-00339-PHX-DLR, 2022 WL 2905040, at *3–4 (D. Ariz. Jul. 22, 2022) (finding subject matter jurisdiction "to the extent the complaint alleges tortious misconduct by individual government employees" but not "[t]o the extent Plaintiffs intend to sue the United States for the alleged tortious misconduct of the relevant agencies writ large").

### 2. The Discretionary Function Exception Does Not Apply

The United States contends that it is immune from suit because the DFE applies to both the Policymakers' and CBP agents' conduct. (US-CM Mot. at 8; US-APF Mot. at 9.)

"Whether a challenged action falls within the [DFE] requires a particularized analysis of the specific agency action challenged." *Myles v. United States*, 47 F.4th 1005, 1011 (9th Cir. 2022) (quoting *GATX/Airlog Co. v. United States*, 286 F.3d 1168, 1174 (9th Cir. 2002)). The Court must identify Plaintiffs' "specific allegations of agency wrongdoing" and then apply a two-part test to determine whether the DFE applies to that challenged conduct. *Id.* (quoting *Young v. United States*, 769 F.3d 1047, 1053–54 (9th Cir. 2014)); *Terbush v. United States*, 516 F.3d 1125, 1129 (9th Cir. 2008) (citing *Berkovitz v. United States*, 486 U.S. 531, 536–37 (1988)). First, the employee's conduct must "involve[] an element of judgment or choice." *Berkovitz*, 486 U.S. at 536. The DFE does not apply when the Constitution, "a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow" because "the employee has no rightful option but to adhere to the directive." *Id.*; *see also Nurse v. United States*, 226 F.3d 996, 1002 (9th Cir. 2000) ("[G]overnmental conduct cannot be discretionary if it violates a legal mandate."); *Broidy Cap. Mgmt., LLC v. State of Qatar*, 982 F.3d 582, 591 (9th Cir. 2020) ("The discretion of the U.S. Government is, of course, cabined by the applicable limitations in the U.S. Constitution, federal statutes and regulations, and any other relevant binding source of law."); *Nieves Martinez v. United States*, 997 F.3d 867, 877 (9th Cir. 2021) ("Even if the agents' actions involved elements of discretion, agents do not have

discretion to violate the Constitution.")[7]

Second, if the challenged conduct involved an element of judgment or choice, that judgment must be "of the kind that the discretionary function exception was designed to shield, namely, . . . governmental actions and decisions based on considerations of public policy." *Terbush*, 516 F.3d at 1129 (citation and internal quotations omitted); *see United States v. Varig Airlines*, 467 U.S. 797, 814 (1984) (explaining that the DFE was designed to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort"). The challenged action "'need not *actually* be grounded in policy considerations' so long as it is, 'by its nature, susceptible to a policy analysis.'" *GATX/Airlog*, 286 F.3d at 1174 (emphasis in original) (quoting *Nurse*, 226 F.3d at 1001). "The focus of this second step is 'not on the agent's subjective intent in exercising the discretion conferred by statute or regulation,' but rather 'on the nature of the actions taken and on whether they are susceptible to policy analysis.'" *Gonzales v. United States*, 814 F.3d 1022, 1027–28 (9th Cir. 2016) (quoting *United States v. Gaubert*, 499 U.S. 315, 325 (1991)).

---

[7] The Court agrees with Plaintiffs that the qualified immunity analysis is inapplicable to the DFE. (*See* CM Resp. at 21–22; APF Resp. at 13–15; *see, e.g.*, US-CM Mot. at 21–26.) In *Galvin v. Hay*, the Ninth Circuit cited *Nurse* and held that the DFE did not bar the plaintiffs FTCA claim for false arrest because the federal officers had violated the plaintiffs' constitutional rights. 374 F.3d 739, 758 (9th Cir. 2004). The *Galvin* Court nevertheless affirmed the district court's dismissal of the FTCA claim by applying California law to find that the federal officers had "reasonable cause to believe" that the arrest was lawful because their conduct did not violate clearly established law. *Id.* (citation omitted). It did not apply the qualified immunity analysis to shield the officers' conduct under the DFE in the first instance. *See also Loumiet v. United States*, 828 F.3d 935, 944–45 (D.C. Cir. 2016) (explaining that a carve-out for unconstitutional conduct "would authorize [FTCA] claims . . . for conduct that violates the mandates of a statute, rule, or policy, while insulating the government from claims alleging on-duty conduct so egregious that it violates the more fundamental requirements of the Constitution"). The United States' citation to *Bryan v. United States*, 913 F.3d 356 (3d Cir. 2019) misses the mark. In *Xi v. Haugen*, the Third Circuit made clear that "unconstitutional government conduct is per se outside the [DFE]" and rejected the argument that *Bryan* adopted the qualified immunity analysis for the DFE. 68 F.4th 824, 839 & n.11 (3d Cir. 2023). Moreover, "[a] plaintiff who identifies constitutional defects in the conduct underlying her FTCA tort claim . . . may affect the availability of the discretionary-function defense, but she does not thereby convert an FTCA claim into a constitutional damages claim against the government; state law is necessarily still the source of the substantive standard of FTCA liability." *Loumiet*, 828 F.3d at 945–46; (*see* US-CM Mot. at 22 (arguing that a "carveout" in the DFE for constitutional violations "would effectively create a back door for constitutional claims under the FTCA").)

"[A]s a remedial statute, [the FTCA] should be construed liberally, and its exceptions should be read narrowly." *Terbush*, 516 F.3d at 1135 (citations and internal quotations omitted). The Court should "identify 'those circumstances which are within the words and reason of the exception'—no less and no more." *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 491–92 (2006) (citation omitted).

### i.      The Policymakers' Conduct

"Typically, the promulgation of policies and rules is protected by the FTCA's discretionary function exception." *Nurse*, 226 F.3d at 1002. The United States argues that the DFE shields Secretary Nielsen's issuance of the Referral Policy, specifically, her "approval of referring for prosecution all adults amenable to prosecution for violation of 8 U.S.C. § 1325(a)." (US-CM Mot. at 10.) But Plaintiffs do not challenge Secretary Nielsen's decision to refer all amenable adults for prosecution. (*See, e.g.*, CM Resp. at 16–17.) Instead, Plaintiffs claim that Secretary Nielsen, McAleenan, Homan, Cissna, and Albence, among others, developed and implemented a policy designed to deter Central American individuals from unlawfully immigrating to the United States by separating families without justification and knowing that it would inflict trauma upon children and parents. (*See* CM Resp. at 17–21; APF Resp. at 17–18, 28–29.) Plaintiffs argue that the DFE does not apply because this conduct violated Plaintiffs' constitutional right to family integrity. (*E.g.*, CM Resp. at 17–21.)

The United States argues that the Court should avoid inquiring into the Policymakers' subjective intent to determine whether the DFE applies. (*E.g.*, US-CM Mot. at 24 (citing *Gaubert* for the proposition that the proper inquiry is whether the conduct is susceptible to policy analysis and not the employee's subjective intent).) Plaintiffs counter that the subjective intent of the Policymakers is relevant to whether their conduct shocks the conscience for a due process violation. (CM Resp. at 20–21; APF Resp. at 18.) The Court agrees with Plaintiffs. Because the government lacks discretion to violate a person's due process rights, the Court finds it must consider the Policymakers' subjective intent

behind the adoption of the Referral Policy.[8] (*See generally* US-CM Mot.)

All persons in the United States are guaranteed the due process rights of the Fifth Amendment. *Matthews v. Diaz*, 426 U.S. 67, 77 (1976); *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("[T]he Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent."). The substantive component of the Due Process Clause protects "against government interference with certain fundamental rights and liberty interests," regardless of the process provided, "unless the infringement is narrowly tailored to serve a compelling [government] interest." *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997); *Lopez-Valenzuela v. Arpaio*, 770 F.3d 772, 780 (9th Cir. 2014). "[T]he interest of parents in the care, custody, and control of their children . . . is perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (collecting cases); *see also Rosenbaum v. Washoe County*, 663 F.3d 1071, 1079 (9th Cir. 2011) ("The substantive due process right to family integrity or to familial association is well established. A parent has a 'fundamental liberty interest' in companionship with his or her child." (citation omitted)).

The United States' separation of Plaintiffs for weeks or months unquestionably interfered with Plaintiffs' right to family integrity. *See Jacinto-Castanon de Nolasco v. U.S. Immigr. and Customs Enf't*, 319 F. Supp. 3d 491, 501 (D.C. 2018) (finding separation of parent and sons in separate facilities with "periodic phone calls" interfered with the mother's care, custody, and control, particularly while her sons "endure[d] the bewildering

---

[8] The United States contends that, in any event, only Secretary Nielsen's intent would be relevant to assessing the purpose of the Referral Policy. (US-CM Mot. at 24–25.) None of the cases the United States cites foreclose considering the motives of other officials involved in developing the Referral Policy, but instead illustrate that the decisionmaking *process* may often reveal evidence of intent. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 (1977) (explaining that "legislative or administrative history may be highly relevant" to determining whether a discriminating purpose was a motivating factor); *City of Cuyahoga Falls, Ohio v. Buckeye Comm. Hope Found.*, 538 U.S. 188, 196–97 (evidence of discriminatory intent may include "statements made by decisionmakers *or referendum sponsors* during deliberation" (emphasis added)); *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2575 (2019) (in an APA case, "presented . . . with an explanation for agency action that is incongruent with what the record reveals about the agency's priorities and *decisionmaking process*" (emphasis added)).

experience of detention"). And Plaintiffs' evidence suggests an inconsistency between the pronounced purpose of the Referral Policy—to refer all amenable adults for prosecution—and the Policymakers' underlying intent. The United States asserts that "the evenhanded enforcement of the immigration laws" cannot form the basis of a due process violation and that the Referral Policy applied to all adults unlawfully entering the United States regardless of familial status. (US-CM Mot. at 25–26 (citation omitted); US-APF Mot. at 28.) But Plaintiffs have offered evidence that the Policymakers intended to separate families irrespective of whether the parents were ever prosecuted to deter other potential migrants from entering the United States. (CM CSOF ¶ 19; APF CSOF ¶ 19.) And in V.C.'s case, the government separated her and G.A. despite never referring V.C. for prosecution. (*See* CM SOF ¶¶ 68–69; US-CM SOF ¶ 116.) This could serve no compelling or legitimate government interest.[9] *C.f. R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 188–90 (D.D.C. 2015) (finding that general civil detention "for the sake of sending a message of deterrence to other Central American individuals who may be considering immigration" is not justified by any legitimate government interest); *Jacinto-Castanon*, 319 F. Supp. 3d at 502 (finding no support in federal law for the proposition that separating families in immigration custody serves a legitimate government objective).

There is also a genuine dispute of material fact as to whether the government's intrusion upon Plaintiffs' right to family integrity was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998); *see Rosenbaum*, 663 F.3d at 1079. Conduct "shock[s] the conscience" when it is "intended to injure in some way unjustifiable by any government interest" or results from "deliberate indifference." *Lewis*, 523 U.S. at 849–50, 855. Where, as here, "actual deliberation is practical, then an [official's] 'deliberate indifference' may

---

[9] The cases that the United States cites in support of its argument that there was no constitutional directive prohibiting the separation of Plaintiffs are inapposite. *See, e.g., Delgado v. I.N.S.*, 637 F.2d 762, 762–63 (10th Cir. 1980) (removing noncitizen father of citizen children did not violate due process); *Marin-Garcia Holder v. Holder*, 647 F.3d 666, 674 (7th Cir. 2011) (same); *United States v. Dominguez-Portillo*, No: EP-17-MJ-4409-MAT, 2018 WL 315759, at *6 (W.D. Tex. Jan 5, 2018) (separating families after parents were criminally charged did not violate due process).

suffice to shock the conscience," while the intent to harm standard generally applies when an employee must make "snap judgment[s]." *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010) (citation omitted). Plaintiffs persuasively argue that the Policymakers designed the Referral Policy to separate families as a means of deterrence and despite knowing that it would cause severe trauma to children and parents. Plaintiffs remained separated even while parent Plaintiffs were in civil immigration detention pending removal proceedings. (*E.g.*, US-CM SOF ¶¶ 54, 59; CM SOF ¶¶ 98, 110–11 (stating Plaintiffs never transferred to criminal custody); APF SOF ¶¶ 121–23 (stating the government transferred M.G. to ORR custody after the U.S. Attorney's Office declined to prosecute J.D.G., who was being held in the same facility).) And evidence indicates that the Policymakers knew the government was ill-equipped to inform parent Plaintiffs of their children's whereabouts or establish communication between family units. (*See, e.g.*, DHS OIG Audit at CD-US-0213915, 0213932–42.) This raises genuine issues of fact whether the Policymakers implemented the Referral Policy with deliberate indifference to the harm it would cause Plaintiffs.

### ii.    Border Patrol's Conduct

The United States argues that the DFE applies to CBP's implementation of the Referral Policy. (*E.g.*, US-CM Mot. at 13.) Specifically, the United States asserts that CBP agents at Yuma Station exercised discretion to refer an amenable adult for prosecution, "and, relatedly, whether and when to deem a child traveling with an amenable adult as 'unaccompanied' within the meaning of the TVPRA." (*Id.* at 13.) Because a child cannot accompany her parent to criminal custody, designating the child as a UAC "is integrally related to the decision to initiate prosecution itself." (*Id.* at 14–15.)

The United States' attempt to bootstrap CBP agents' UAC determinations to the exercise of prosecutorial discretion is unpersuasive. The United States cites *Blanco Ayala v. United States*, where the Fourth Circuit held that "the decisions to detain and remove [a non-citizen] are discretionary because they are bound up in the decisions surrounding the investigatory step." 982 F.3d 209, 215 (4th Cir. 2020); (*see* US-CM Mot. at 14–15.) The

United States also points to *S.E.B.M. by & through Felipe v. United States*, a case in which the government had in fact prosecuted the father. No. 1:21-cv-00095-JHR-LF, 2023 WL 2383784, at *14 (D. N.M. Mar. 6, 2023); (*see* US-CM Mot. at 10.) The court in *S.E.B.M.* explained that the child became a UAC upon the government's decision to prosecute her father, which was "indivisible" from and caused their separation. 2023 WL 2383784 at *14–15; *see also Peña Arita v. United States*, 470 F. Supp. 3d 663, 686–87 (S.D. Tex. 2020) (agreeing with the United States that "once the discretionary *decision to prosecute* is made [by the U.S. Attorney's Office], the separation of prisoners from their families is plainly legal" (emphasis added)). But the CBP agents' UAC determinations in this case are not similarly "bound up" in or "indivisible" from the decision to refer the parent Plaintiffs for prosecution because the *possibility* of facing prosecution did not make parent Plaintiffs unavailable to provide care and custody. Plaintiffs were never prosecuted or held in criminal custody.[10]

The United States contends that whether and when to designate a child as a UAC was nevertheless "a discretionary determination susceptible to policy analysis" because an agency's interpretation of a statute is a discretionary act. (*E.g.*, US-CM Mot. at 15; US-CM Reply at 10–11 (citing *Villanueva v. United States*, 708 F. Supp. 2d 960, 975 (D. Ariz. 2009)).) Plaintiffs counter that CBP agents lacked discretion to designate children Plaintiffs as UACs because parent Plaintiffs were still available to provide care and custody while their prosecution referrals were pending. (CM Resp. at 22–23; APF Resp. at 22–23.)

The TVPRA directs all United States departments and agencies to transfer a child to HHS "after determining that such child is an unaccompanied alien child." 8 U.S.C. § 1232(b)(3). And a child is a UAC only if "no parent or legal guardian *is available* to provide care and physical custody"; the TVPRA does not grant CBP agents discretion to

---

[10] The United States also contends that parent Plaintiffs' detention in ICE custody was a discretionary act. (US-APF Mot. 18–22.) A.P.F. Plaintiffs counter that ICE's authority to arrange for the place of detention is irrelevant because Plaintiffs challenge their separations that occurred well before parent Plaintiffs were transferred to ICE custody. (APF Resp. at 25.) And C.M. Plaintiffs note that a parent's detention does not categorically render that parent unavailable. (C.M. Resp. at 23 n.13.) The Court agrees with Plaintiffs.

make pre-emptive determinations that a parent *might become* unavailable.[11] 6 U.S.C. § 279(g) (emphasis added); *c.f. K.O. by & through E.O. v. United States*, No. 4:20-12015-TSH, 2023 WL 131411, at *7 (D. Mass. 2023) (ORR lacks authority to detain non-UACs); (*see* Doc. 404-2, 19-cv-5217, Ex. 10, ("Jordan Dep.") at 129:4–131:17 (explaining that CBP made UAC determinations based on the expectation that children would become UACs if their parents were prosecuted).) And though CBP agents may encounter circumstances where they must exercise "some professional judgment" in determining whether a child meets the definition of a UAC, "that professional judgment is not the same as 'discretion.'" *Myers v. United States*, 652 F.3d 1021, 1029 (9th Cir. 2011) (finding the DFE inapplicable where a policy requiring review of a health and safety plan by an industrial hygienist or someone of "equivalent" training and experience was "not so uncertain in its definition of the requisite training . . . that it [was] 'discretionary'"). This "interpretation comports with the significant procedural safeguards that traditionally accompany attempts by the Government to intervene in the relationship between a parent and child." *Maldonado v. Lloyd*, No. 18 Civ. 3089 (JFK), 2018 WL 2089348, at *6 (S.D. N.Y. May 4, 2018) ("Analyzing the ordinary meaning" of "available to provide care and physical custody" to find that a child was not a UAC).[12]

Citing *Fisher Bros. Sales, Inc. v. United States*, 46 F.3d 279, 287 (3d Cir. 1995), the United States argues that the DFE protects CBP agents' decisions to designate the children Plaintiffs as UACs based on "currently available information" instead of waiting for the U.S. Attorney's Office to confirm that it would prosecute parent Plaintiffs. (*E.g.*, US-CM

---

[11] The United States asserts that "for operational reasons," it calculates the 72-hour time limit to transfer a child to ORR "as running from the time the child determined to be a UAC is apprehended." (US-CM Mot. at 16 n.14.) But the TVPRA expressly requires a child to be transferred within 72 hours after they are determined to be a UAC, while the Flores Agreement only requires transfer "as expeditiously as possible." 8 U.S.C. § 1232(b)(3); (Flores Agreement ¶ 12A.) Neither requires transfer to ORR custody within 72 hours after a child is first apprehended.

[12] The *Maldonado* court noted that "[a] parent might be physically present in the United States and yet not 'available to provide care and physical custody' when, for example, the parent 'refuses to make herself available to take custody of a child' or is 'incarcerated or otherwise in custodial detention.'" 2018 WL 2089348, at *5 n.6 (quoting *D.B. v. Cardall*, 826 F.3d 721, 747 (4th Cir. 2016) (Floyd, J., dissenting)). None of these circumstances existed when CBP agents separated Plaintiffs and designated the children as UACs.

Mot. at 16–17; US-CM Reply at 11.) *Fisher* is inapposite, as it concerned the Commissioner of the Food and Drug Administration's decision to refuse entry of imported produce based on data indicating the produce was possibly adulterated, which was "clearly [a] 'matter of choice' for a person occupying his position" and "not in conflict with any applicable statute or regulation." 46 F.3d at 283, 285. The Commissioner's choice to refuse entry of the produce based on then-available information was also susceptible to policy analysis. *Id.* at 286–87. But here, CBP agents pre-emptively designated children Plaintiffs as UACs by suspecting that their parents would be prosecuted. Whether a child meets the definition of a UAC does not implicate the same "matter of choice" for CBP agents and the Court need not consider whether it may have been susceptible to policy analysis.

Because CBP officers did not have discretion to pre-emptively designate children Plaintiffs as UACs before parent Plaintiffs were in fact unavailable to provide care and custody, the DFE does not apply. The Court finds that it has subject matter jurisdiction over Plaintiffs' claims and denies the United States' Motions.[13]

### iii.    Separation of the Port of Entry Pls.

The United States contends that ICE agents' decisions to separate and detain the Port of Entry Plaintiffs are shielded by the DFE. (US-APF Mot. at 22.) Specifically, the United States argues that both M.C.L. and R.Z.G. were detained due to their criminal histories and prior removals from the United States, which ICE considers when making detention decisions. (*Id.*) The port of entry Plaintiffs assert that they were denied procedural due process because they were not provided any opportunity to be heard before the government separated them. (APF Resp. at 20–21.)

Procedural due process guarantees "fair procedure in connection with any deprivation of life, liberty, or property by" the government. *Collins v. City of Harker*

---

[13] The United States does not argue that the CBP agents' specific conduct when separating Plaintiffs is shielded by the DFE. The CBP agents' statements to and treatment of Plaintiffs is not the type of judgment or choice susceptible to policy analysis. (*See, e.g.*, CM SOF ¶¶ 59, 71–72, 85, 87; APF SOF ¶¶ 86, 89, 111, 131, 143); *c.f. Myles*, 47 F.4th at 1012 (explaining that the DFE does not apply to law enforcement investigative tactics that have "no legitimate policy rationale"); *Gaubert*, 499 U.S. at 325 n.7 ("Although driving requires the constant exercise of discretion, the official's decisions in exercising that discretion can hardly be said to be grounded in regulatory policy.").

*Heights*, 503 U.S. 115, 125 (1992). "To satisfy procedural due process, a deprivation of life, liberty, or property must be 'preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Lone Star Sec. & Video, Inc. v. City of Los Angeles*, 584 F.3d 1232, 1236 (9th Cir. 2009) (quoting *In re Yochum*, 89 F.3d 661, 672 (9th Cir. 1996)). "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Matthews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). The requirements of due process require a balancing of factors set out in *Matthews*:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335.

The United States does not seriously dispute that the Port of Entry Plaintiffs were not given any opportunity to be heard before the government separated children Plaintiffs and transferred them to ORR. (*See* US-APF Reply at 11–12.) Instead, the United States contends that Port of Entry Plaintiffs provide no support for a procedural due process violation in the context of the government's unique concerns at the border. (*Id.* at 12.) But the right to family integrity is "fundamental," and the United States points to no caselaw that suggests the government could separate Plaintiffs, purportedly based on M.C.L. and R.Z.G.'s criminal and immigration history, without *any* opportunity for them to be heard. *Troxel*, 530 U.S. at 65; *Rosenbaum*, 663 F.3d at 1079; (*e.g.*, US-APF SOF ¶¶ 122, 148.) Plaintiffs' evidence suggests that the government separated the Port of Entry Plaintiffs within minutes and, in the case of M.C.L., avoided informing him that the government was going to do so. (APF SOF ¶¶ 130, 139–40.)

The United States has failed to establish that the DFE applies to the government's separation of the Port of Entry Plaintiffs.

### B.   Intentional Infliction of Emotional Distress

Plaintiffs seek partial summary judgment on their IIED and negligence claims. (*See*

*generally* CM Mot.; APF Mot.) The Court considers the Motions together because Plaintiffs' requested rulings are nearly identical. To prevail on a claim for IIED, a plaintiff must prove (1) "the conduct by the defendant must be 'extreme' and 'outrageous'"; (2) "the defendant must either intend to cause emotional distress or recklessly disregard the near certainty that such distress will result from his conduct"; and (3) "severe emotional distress must indeed occur as a result of defendant's conduct." *Ford v. Revlon, Inc.*, 734 P.2d 580, 585 (Ariz. 1987). Plaintiffs contend that the government's separation of Plaintiffs was extreme and outrageous and conducted with a reckless disregard of causing Plaintiffs emotional distress. (*See* CM Mot. at 16–23; APF Mot. at 18–26.)

### 1.    Extreme and Outrageous Conduct

Arizona defines "extreme and outrageous" as going "beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (quoting Restatement (Second) of Torts § 46 cmt. d). Plaintiffs argue that the government's separation of families was extreme and outrageous. (CM Mot. at 16–17; APF Mot. at 18–22.) Specifically, the Policymakers' conduct was extreme and outrageous because they implemented the Referral Policy despite knowing that the government was ill-equipped to track or reunite separated families and facilitate communication between parents and children. (*E.g.*, CM Mot. at 17–19.) Plaintiffs also assert that CBP agents' conduct in separating Plaintiffs was extreme and outrageous because agents, *inter alia*, mocked mothers when separating their children, separated children from their parents by physical force, failed to provide parent Plaintiffs with information on their children's location or wellbeing or on how to communicate, and failed to promptly reunite families.[14]

---

[14] H.P.M. signed a form that stated he was voluntarily returning to Guatemala and authorizing A.D. to remain in the United States for her immigration proceedings. (US-APF SOF ¶ 76.) A.D. was not removed to Guatemala until August 30, 2018. (*Id.* ¶¶ 78–79.) H.P.M. argues that he was removed under "false pretenses" because A.D. remained in ORR custody after H.P.M. was deported. (APF Mot. at 21.) The United States disputes this assertion and argues that in any event H.P.M.'s claim is barred by the FTCA's misrepresentation exception. (US-APF Resp. at 18–19.) The misrepresentation exception bars claims of negligent or fraudulent misrepresentation under the FTCA. *Pauly v. U.S. Dep't of Agric.*, 348 F.3d 1143, 1151 (9th Cir. 2003). Though H.P.M.'s deportation without A.D. is "the result of allegedly inaccurate information . . . either by design (fraud) or by inadvertence (negligent misrepresentation)," H.P.M. may still maintain an IIED claim for the government's other challenged conduct related to his separation. *Id.*; (*see* APF Reply

1   (*Id.* at 20–21; APF Mot. at 19–20.)

2        The United States disputes Plaintiffs characterization of CBP officers' treatment of

3   families in CBP custody. (*See* US-APF Resp. at 13 n.16, 22 n.24 (citing Doc. 393-1, 20-

4   cv-65, Ex. A Att. 6, Joseph Comella Dep. 203–08, 229–33).) And whether the

5   government's method of separating Plaintiffs, facilitating contact between Plaintiffs, and

6   arranging for their reunification went "beyond all possible bounds of decency" raises issues

7   of material fact. (*See* US-APF Resp. at 22; *see, e.g.*, US-APF SOF ¶¶ 46–48, 65–68, 134–

8   35 (documenting Plaintiffs' respective family relationships and separations).) The Court

9   denies Plaintiffs' Motions as to whether the government's separation of Plaintiffs was

10  extreme and outrageous.

11        **2.     Whether the Government Showed Reckless Disregard**

12        Plaintiffs contend that the government also recklessly disregarded the near certainty

13  that emotional distress would result from the family separations. (CM Mot. at 21–23; APF

14  Mot. at 22–26.) Plaintiffs argue that the Policymakers were repeatedly warned of the

15  possibility that family separations would cause trauma and "toxic stress" in children and

16  knew that the government did not adequately prepare for an influx of separated families.

17  (CM Mot. at 22; *see* APF Mot. at 24–25.) The United States disputes that Secretary Nielsen

18  ever actually received these warnings, and that in any event, a host of factors were weighed

19  before Secretary Nielsen chose the Referral Policy. (*E.g.*, US-APF Resp. at 23–24.) The

20  information considered by the Policymakers when deciding to implement the Referral

21  Policy raises issues of material fact. *See Lucchesi v. Stimmell*, 716 P.2d 1013, 1017 (Ariz.

22  1986) (en banc) ("[I]f the state of mind or intent of one of the parties is a material issue,

23  summary judgment is improper." (citation omitted)). Plaintiffs assert that their IIED claims

24  center on the government's act of separating Plaintiffs in the face of information that it

25  would impose trauma, and not on the Policymakers' implementation of the Referral Policy

26  generally. (*E.g.*, APF Reply at 14–15.) But whether the Policymakers recklessly

27  disregarded the emotional harm that separating families could cause based on the

28  _____

    at 9–10, 9 n.10.)

information available to them—from warnings from the public to the Policymakers' understanding of the systems in place to manage the separations—is precisely the type of factual inquiry ill-suited for summary judgment.[15]

The Court denies Plaintiffs' Motions as to whether the government recklessly disregarded the near certainty that the Referral Policy would cause Plaintiffs emotional distress.[16]

### C.   Negligence

To prevail on a negligence claim, a plaintiff must prove by a preponderance of the evidence "(1) a duty requiring the defendant to conform to a certain standard of care; (2) a breach by the defendant of that standard; (3) a causal connection between the defendant's conduct and the resulting injury; and (4) actual damages." *Gipson v. Kasey*, 150 P.3d 228, 230 (Ariz. 2007) (en banc) (citation omitted). Whether a duty exists is an issue of law, while breach, causation, and damages all involve factual issues. *Id.*; *Lips v. Scottsdale Healthcare Corp.*, 229 P.3d 1008, 1010 (Ariz. 2010) (en banc). Plaintiffs seek partial summary judgment on their negligence claims and argue that the government owed Plaintiffs a duty and breached the applicable standard of care.[17] (*See* CM Mot. at 23–25;

---

[15] C.M. Plaintiffs assert in passing that the CBP agents who separated C.M. Plaintiffs recklessly disregarded that their "unnecessarily cruel" separations would cause severe emotional distress. (CM Mot. at 22.) The Court denies C.M. Plaintiffs Motion because this raises similar issues of fact to that of the Policymakers' conduct. Port of Entry Plaintiffs contend that the government acted with reckless disregard by separating the Port of Entry Plaintiffs because "the government knew" by March 2017 that a separation policy would cause trauma to families. (APF Mot. at 23–24.) But Port of Entry Plaintiffs present no evidence that the CBP agents responsible for their separations had knowledge of this information, which was generally expressed to the Policymakers as well as high-level agency officials following the El Paso Pilot. (*See id.* at 23 (citing warnings by immigration organizations and Congress to the Policymakers and knowledge of "CBP headquarters personnel").) The Court denies A.P.F. Plaintiffs' Motion on this point.

[16] The Court denies the United States' Motions on Plaintiffs' IIED claims. The United States contends that Plaintiffs' separations were "authorized by federal law" and therefore privileged. (*E.g.*, US-CM Mot. at 27–28.) This argument is undermined by the Court's findings above that the DFE does not shield the government's conduct that violated a legal mandate. (*See supra* Part II.A.2.) Though referring parent Plaintiffs for prosecution may have been authorized by federal law, this says nothing of CBP agents' decisions to separate Plaintiffs and transfer children Plaintiffs to ORR custody.

[17] The United States contends that Plaintiffs cannot recover under both their IIED claims and negligence claims for the same conduct. (*E.g.*, US-CM Resp. at 23.) But Plaintiffs may pursue both causes of action when the government's intent is in dispute or different acts support each cause of action. *See Lewis v. Dirt Sports LLC*, 259 F. Supp. 3d 1039, 1046 n.5 (D. Ariz. 2017) (explaining that a plaintiff may pursue both intentional tort and

APF Mot. at 26–29.)

### 1.    Whether the United States Owed Plaintiffs a Duty

A duty is an "obligation, recognized by law, which requires the defendant to conform to a particular standard of conduct in order to protect others against unreasonable risks of harm." *Gipson*, 150 P.3d at 230. "'Duties of care may arise from special relationships based on contract, family relations, or conduct undertaken by the defendant,' and from public policy considerations." *Lips*, 229 P.3d at 1010 (quoting *Gipson*, 150 P.3d at 232). Plaintiffs argue that the United States owed Plaintiffs a duty because a special relationship existed between the parties while Plaintiffs were in the United States' custody. (CM Mot. at 23–24; APF Mot. at 27–28.) The Court agrees.

A duty of care exists if "the relationship of the parties was such that the defendant was under an obligation to use some care to avoid or prevent injury to the plaintiff." *Markowitz v. Ariz. Parks Bd.*, 706 P.2d 364, 368 (Ariz. 1985) (in banc). Arizona law recognizes a duty arising from "special relationships such as guardian-ward and jailer-prisoner." *Gilbert v. La Paz County*, No. CV 18-01792-PHC-DGC (DMF), 2020 WL 2064099, at *13 (D. Ariz. Apr. 29, 2020); *c.f. Fleming v. State Dep't of Pub. Safety*, 352 P.3d 446, 448 (Ariz. 2015) (en banc) ("[U]nder our common law, when DPS takes custody of someone in a manner that deprives the person of the opportunity for self-protection, it assumes a duty to protect that person against unreasonable risk of physical harm." (citing Restatement (Second) of Torts § 314A(1)(a), (4))). Like a jailor-prisoner relationship, federal immigration officials owe a duty of care to noncitizens that they detain and hold in custody.[18]

### 2.    Whether the United States Breached its Standard of Care

"In negligence cases, the duty if it exists is always the same—to conform to the legal

---

negligence theories "[w]here a defendant's intent is genuinely disputed").

[18] The United States mischaracterizes the inquiry as whether Arizona law imposes a duty for the government to keep parents and children together pending criminal or immigration proceedings. (*E.g.*, US-CM Resp. at 23.) The issue of whether there is a duty is distinct from "the specific details of the required standard of conduct." (*E.g.*, CM Reply at 14 (quoting *Anthony v. United States*, CV-20-08002-PCT-DJH, 2022 WL 4781938, at *3 (D. Ariz. Sept. 30, 2022)).)

standard of reasonable conduct in light of the apparent risk." *Avitia v. Crisis Preparation and Recovery Inc.*, 521 P.3d 373, 377 (Ariz. Ct. App. 2022) (quoting *Coburn v. City of Tucson*, 691 P.2d 1078, 1080 (Ariz. 1984)) (cleaned up). "The standard of care is defined as [w]hat the defendant must do, or must not do . . . to satisfy the duty." *Gipson*, 150 P.3d at 230 (citation and internal quotations omitted); *Coburn*, 691 P.2d at 1080 ("[T]he details of conduct necessary to meet [a duty] will vary from case to case, depending upon the foreseeability of harm if the person under the obligation pursues or fails to pursue a particular course of conduct.").

Plaintiffs assert the government did not provide "reasonable care under the circumstances," because it *inter alia*, (1) failed to inform parent Plaintiffs about their children's location and wellbeing, (2) failed to enable regular communication between Plaintiffs, and (3) did not promptly reunite Plaintiffs. (CM Mot. at 24–25; APF Mot. at 28–29 (both quoting *Markowitz*, 706 P.2d at 368).) The United States contends that Plaintiffs have not demonstrated a breach of the appropriate standard of care. (US-CM Resp. at 24–25; US-APF Resp. at 27.)

Assuming Plaintiffs correctly defined the applicable standard of care, the Court finds that genuine issues of material fact preclude summary judgment. The parties dispute the government's facilitation of communication between parent Plaintiffs and their children. (*See, e.g.*, CM SOF ¶¶ 81, 92, 116–17; US-CM SOF ¶¶ 60, 77, 95; US-APF SOF ¶¶ 80, 134; APF CSOF ¶¶ 80, 134.) And the United States asserts that its systems adequately tracked Plaintiffs' family units for the duration of their separations. (*E.g.*, US-CM SOF ¶¶ 46–48, 51, 66–68, 71; US-APF SOF ¶¶ 46–48, 53, 65–68.) In addition, all children Plaintiffs except for L.A. and A.D. were reunited their parents within the 30 days required by the court's order in *Ms. L. See Ms. L.*, 310 F. Supp. 3d at 1149–50; (US-CM SOF ¶¶ 59, 76, 92, 112, 130; US-APF SOF ¶¶ 58, 79, 98, 114, 133, 160.)

Plaintiffs contend that the government's violation of "its own standards for the treatment of detained migrants" and those standards in the Flores Agreement is evidence that the government breached its duty of care. (CM Mot. at 25 n.10; CM Reply at 15 n.18;

APF Reply at 17.) Specifically, Plaintiffs assert that pursuant to the Flores Agreement, the government must provide "contact with family members who were arrested with the minor." (Flores Agreement ¶ 12.A.) The CBP's National Standards on Transport, Escort, Detention, and Search ("TEDS") state that "[g]enerally, family units with juveniles should not be separated." (Doc. 379-19, 19-cv-5217, Ex. 83, ("TEDS Manual") at 22, 29.) And ICE's Performance-Based National Detention Standards ("ICE Standards") permit indigent detainees to "request a call to immediate family or others in personal or family emergencies or on an as-needed basis." (Doc. 379-19, 19-cv-5217, Ex. 84, ("ICE Standards") at 407–408.) But none of these standards establish that the government failed to provide reasonable care *under the circumstances*, that is, when CBP was experiencing an influx of illegal immigration into the United States and coordinating communication and reunification of thousands of families during the Referral Policy. (*See* DHS OIG Audit at CD-US-0213915, 0213915 (explaining that DHS apprehended approximately 107,000 families and 50,000 children at the United States-Mexico border in fiscal year 2018 and separated an estimated 3,014 children under the Referral Policy).) For instance, the ICE Standards also state that communication access can be restricted "[w]hen required by the volume of detainee telephone demand." (ICE Standards at 406.) Whether the government's breached its duty of care is a factually intense inquiry inappropriate for summary judgment.

## III.    CONCLUSION

The Court denies the United States' Motions for Summary Judgment because the United States has not shown that the discretionary function exception bars Plaintiffs' claims. The Court grants C.M. Plaintiffs' and A.P.F. Plaintiffs' Motions for Partial Summary Judgment on whether the United States owed Plaintiffs a duty of care. But there remain issues of material fact whether the United States breached its duty. The Court denies the parties' Motions as to C.M. Plaintiffs' and A.P.F. Plaintiffs' IIED claims.

**IT IS ORDERED** denying the United States' Motion for Summary Judgment on C.M. Plaintiffs' claims (Doc. 371, 19-cv-5217).

**IT IS FURTHER ORDERED** denying the United States' Motion for Summary

Judgment on A.P.F. Plaintiffs' claims (Doc. 363, 20-cv-65).

**IT IS FURTHER ORDERED** granting in part and denying in part C.M. Plaintiffs' Motion for Partial Summary Judgment (Doc. 378, 19-cv-5217).

**IT IS FURTHER ORDERED** granting in part and denying in part A.P.F. Plaintiffs' Motion for Partial Summary Judgment (Doc. 362, 20-cv-65).

Dated this 24th day of October, 2023.

Susan R. Bolton
United States District Judge