BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General
Civil Division
JAMES G. TOUHEY, JR.
Director, Torts Branch
PHILIP D. MACWILLIAMS
Trial Attorney
D.C. Bar No. 482883
E-mail: phil.macwilliams@usdoj.gov
U.S. Department of Justice
Civil Division, Torts Branch
Benjamin Franklin Station, P.O. Box 888
Washington, DC 20044
Telephone: (202) 616-4285
Attorneys for the United States of America

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| A.P.F. on his own behalf and on behalf of his minor child, O.B.; J.V.S., on his own behalf and on behalf of his minor child H.Y.; J.D.G. on his own behalf and on behalf of his minor child, M.G.; H.P.M. on his own behalf and on behalf of his minor child, A.D.; M.C.L. on his own behalf and on behalf of his minor child, A.J.; and R.Z.G. on his own half and on behalf of his minor child, B.P., <br><br> Plaintiffs, <br><br> v. <br><br> United States of America, <br><br> Defendant. | No. 2:20-cv-00065-SRB <br><br> **UNITED STATES' TRIAL MEMORANDUM** |

Pursuant to the Court's orders dated December 14, 2023 (ECF No. 447) and April 16, 2024 (ECF No. 474), Defendant United States submits this Trial Memorandum.

In light of the conditional settlements reached with four of the six family unit Plaintiffs in this action, the issues to be presented at trial have significantly narrowed.[1]

---

[1] *See* ECF Nos. 468, 470. Specifically, conditional settlements have been reached with A.P.F., on his own behalf and on behalf of his minor child, O.B.; J.V.S., on his own behalf and on behalf of his minor child H.Y.; J.D.G. on his own behalf and on behalf of his minor child, M.G.; and H.P.M., on his own behalf and on behalf of his minor child, A.D. They are referred to herein as the "2018 Plaintiffs."

Accordingly, the United States sets forth below an overview of the proper scope of the trial and issues to be presented.[2]

This Trial Memorandum also raises the following issues: (1) the United States' position regarding the inadmissibility of many of Plaintiffs' proposed exhibits and much of their witness testimony; (2) the exclusion of deposition testimony from actions other than the instant action, including *P.G. v. United States*, Case No. 4:21-cv-04457 (N.D. Cal.); and (3) the exclusion of testimony by Plaintiffs' expert witness Dr. Kristin Samuelson or, in the alternative, the grounds for disregarding her testimony if presented.

**I. Scope of Trial**

This case, which was brought under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b)(1), 2671-2680 ("FTCA"), now consists of two sets of Plaintiffs – M.C.L., on his own behalf and on behalf of his minor child A.J., and R.Z.G., on his own behalf and on behalf of his minor child B.P.  Throughout this litigation they have been referred to as the "port-of entry Plaintiffs" to distinguish them from the 2018 Plaintiffs who initially filed this action.

This action initially was brought by the 2018 Plaintiffs, four fathers and their respective minor children who were apprehended by U.S. Border Patrol in Border Patrol's Yuma Sector after unlawfully entering the United States between ports of entry in May 2018.[3]  The 2018 Plaintiffs unlawfully entered the United States when the DHS Referral Policy was in effect (that is, after May 4, 2018).  Accordingly, they were processed for

---

[2] In light of the United States' Motion for Summary Judgment and Statement of Facts In Support (ECF Nos. 363, 365) and its Opposition to Plaintiffs' Motion for Partial Summary Judgment and Controverting and Supplemental Statement of Facts (ECF Nos. 392, 393), as well as the parties' Joint Proposed Pre-trial Order, this section of the United States' Trial Memorandum is kept brief because of the Court's familiarity with the background facts, claims, defenses, and various issues that have been before the Court throughout this litigation.

[3] Border Patrol is a component within U.S. Customs and Border Protection ("CBP"). CBP is an agency within the U.S. Department of Homeland Security ("DHS"), a federal agency established in 2002 pursuant to the Homeland Security Act, 6 U.S.C. §§ 101 et seq. Among other things, Border Patrol has responsibility for detecting and apprehending individuals who enter the United States illegally between ports of entry. Those law enforcement activities are performed by Border Patrol Agents. Border Patrol's geographic areas of responsibility are divided into several sectors, including the Yuma Sector, which encompasses parts of Arizona and California.

criminal prosecution referrals and their children were transferred to the custody of the Office of Refugee Resettlement ("ORR"), an office with the U.S. Department of Health and Human Services ("HHS"). As the Court is aware, the 2018 Plaintiffs have reached conditional settlements with the United States and thus are no longer part of the upcoming trial.

The claims of the remaining Plaintiffs – the port-of-entry Plaintiffs – were brought into this action through an Amended Complaint in 2020. *See* ECF No. 33. Their claims arise out of decisions to place the adult Plaintiffs and the minor Plaintiffs in separate custody pending removal of the adult Plaintiffs from the United States, following Plaintiffs' attempts to enter the United States at the DeConcini Port of Entry in Nogales, Arizona in November 2017.[4] The decisions to place the adults Plaintiffs and minor Plaintiffs in separate custody were made by local operators in Arizona based on the adult Plaintiffs' criminal and immigration histories.

Specifically, Plaintiff R.Z.G. and his daughter B.P. were encountered by CBP officers at the DeConcini Port of Entry in November 2017. After they were processed by CBP officers, R.Z.P. and B.P. were transferred together to Immigration and Customs Enforcement's ("ICE") Phoenix Field Office.[5] ICE officers and their supervisors at the

---

[4] The DeConcini Port of Entry falls within the responsibility of the CBP Office of Field Operations ("OFO"). OFO also is a component within CBP but is separate and distinct from Border Patrol. OFO consists of twenty (20) field offices and 328 ports of entry. Among other things, OFO has responsibility for conducting inspections of individuals and conveyances and facilitating the flow of legitimate trade and travel at ports of entry. Those law enforcement activities are performed by CBP officers.

[5] ICE also is an agency within DHS. Among other things, ICE possesses responsibility for enforcing federal immigration laws, including the detention and removal of noncitizens. ICE consists of many divisions, one of which is the Enforcement and Removal Operations ("ERO") Division. The official in charge of ICE ERO is the Executive Associate Director. Among other things, ICE ERO possesses responsibility for the immigration enforcement process, including the identification, arrest, detention, and removal of noncitizens who are subject to removal or are unlawfully present in the United States. ERO itself consists of several divisions, including, among others, the Custody Management Division, the Enforcement Division, the Removal Division, and the Field Operations Division which coordinates with ICE's field offices throughout the nation. The ICE Phoenix Field Office is one of the many ICE field offices. The law enforcement functions by ICE described above are performed by ICE Detention and Removal officers.

Phoenix Field Office made the decision to place R.Z.G. and B.P. in separate custody, with R.Z.G. transferred to secure adult ICE detention and B.P. transferred to ORR custody.[6]

Plaintiff M.C.L. and his daughter A.J. also were encountered by CBP officers at the DeConcini Port of Entry in November 2017. After processing by CBP officers, and following discussions with ICE officers in the Phoenix Field Office, the decision was made to place M.C.L. and A.J. in separate custody, with M.C.L. transferred to secure adult ICE detention and A.J. transferred to ORR custody.

Because the 2018 Plaintiffs are no longer part of this case, many issues are no longer relevant to the upcoming trial, including the development and adoption of the DHS Referral Policy and the Attorney General's Zero Tolerance Policy; efforts to prepare for the implementation of the DHS Referral Policy by various federal agencies and their contractors; implementation of the DHS Referral Policy by Border Patrol in the Yuma Sector; and efforts made while the DHS Referral Policy was in effect to modify and adapt processes and procedures relating to the tracking of and communications between parents

---

[6] In 2003, pursuant to the Homeland Security Act, 6 U.S.C. § 279(a) & (b), responsibility for "coordinating and implementing the care and placement of unaccompanied alien children [defined at 6 U.S.C. § 279(g)] who are in Federal custody by reason of their immigration status" was transferred to the Director of the ORR. When an agency takes custody of a noncitizen child for whom "there is no parent or legal guardian in the United States [or] no parent or legal guardian in the United States is available to provide care and physical custody," 6 U.S.C. § 279(g)(2), the agency must designate that child as an "unaccompanied alien child" ("UAC") pursuant to the Trafficking Victims Protection Reauthorization Act of 2008 ("TVPRA"), and transfer custody of the child to ORR. *Id.*

ORR has responsibility for "the care and placement of unaccompanied alien children who are in federal custody by reason of their immigration status." 6 U.S.C. §§ 279(a), (b)(1)(A), (b)(1)(C); see also 8 U.S.C. § 1232(b)(1). The term "UAC" is defined as a child who: (1) "has no lawful immigration status in the United States"; (2) "has not attained 18 years of age"; and (3) "with respect to whom…there is no parent or legal guardian in the United States [or] no parent or legal guardian in the United States is available to provide care and physical custody." 6 U.S.C. § 279(g)(2).

Under the TVPRA, any federal agency shall "transfer the custody of such child to [ORR] not later than 72 hours after determining that such child is" a UAC except in the case of exceptional circumstances. 8 U.S.C. § 1232(b)(3). ORR seeks to place UACs "in the least restrictive setting that is in the best interest of the child." *Id.* § 1232(c)(2)(A). ORR "shall not release such children upon their own recognizance." 6 U.S.C. § 279(b)(2). Once a minor is in ORR custody, statutory and regulatory provisions govern release of the minor to an approved sponsor. *See* 8 U.S.C. § 1232(c)(3).

and children in separate custody and their reunification. Accordingly, the upcoming trial is significantly narrowed to only the claims brought by the port-of-entry Plaintiffs.[7]

The criminal and immigration histories of the adult port-of-entry Plaintiffs is indisputable. R.Z.G. and M.C.L. each had criminal histories for illegal conduct (including driving while intoxicated) while previously unlawfully present in the United States. Prior to 2017, each had been apprehended multiple times by Border Patrol for unlawfully entering the United States, had been convicted and incarcerated for their unlawful entries, and were subsequently detained and removed from the United States. Further, at the time R.Z.G. and M.C.L. each sought entry again into the United States in November 2017, they were subject to prior orders of removal and were barred from seeking entry into the United States. It was R.Z.G.'s and M.C.L.'s criminal and immigration histories that were the basis for the government's decisions to place each in secure adult ICE detention pending their removals from the United States. Those placement decisions necessitated the transfer of their children to ORR custody. The evidence will show that those decisions cannot be the basis for liability under the FTCA, as they are protected by the exceptions to the FTCA set forth at 28 U.S.C. 2680(a) and are privileged under state law.[8] Nor can Plaintiffs establish that those decisions, the processes by which they were made, or the manners in which the separations were effectuated satisfy the elements of their claims for intentional infliction of emotional distress ("IIED") or the elements of their claims for negligence, including that a duty of care under state law was breached.

To the extent Plaintiffs seek to hold the United States liable for R.Z.G.'s and M.C.L.'s removals from the United States without their children, the Court lacks subject

---

[7] Despite the significantly narrowed case in light of the conditional settlements by the 2018 Plaintiffs, Plaintiffs nevertheless seek to introduce several hundred exhibits and hours of deposition testimony relating to issues that have no relevancy to the port-of-entry Plaintiffs' claims. This is addressed further in Section II below.

[8] Noncitizens arriving in or present in the United States who, following inspection, are deemed inadmissible are subject to removal from the United States and subject to detention during the pendency of their removal proceedings. *See* 8 U.S.C. §§ 1225(b), 1226; 1357. Further, noncitizens with final orders of removal are subject to detention pursuant to 8 U.S.C. § 1231(a). DHS possesses statutory authority to "arrange for appropriate places of detention for aliens detained pending removal or a decision on removal." 8 U.S.C. § 1231(g)(1).

matter jurisdiction over such claims under the misrepresentation exception to the FTCA, 28 U.S.C. 2680(h), as this Court has already held, insofar as R.Z.G. and M.C.L. contest their voluntarily consent to removal from the United States without their children. *See* Order dated October 23, 2023 (ECF No. 443) at 26 n.14. Moreover, the Court lacks subject matter jurisdiction over claims arising out of the removal of non-citizens. *See* 8 U.S.C. § 1252(g). And, decisions regarding whether, when, and with whom to remove a non-citizen from the United States are protected by the discretionary function exception to the FTCA and are privileged under state law. Finally, Plaintiffs will not carry their burden of establishing the elements of IIED or negligence based on such removals.

Furthermore, to the extent Plaintiffs seek to hold the United States liable for alleged inadequacies with respect to communications with and about their children – either while they were in separate custody or between the time the adult Plaintiffs were removed and the minor Plaintiffs were released from ORR custody and repatriated – such claims also fail, as the evidence will show that the frequency of such communications are protected by the discretionary function exception. Moreover, Plaintiffs will not carry their burden of establishing the elements of IIED or negligence, in light of the evidence that will be presented regarding how their separations were documented and tracked, and the evidence that communications occurred between the adult Plaintiffs and the minor Plaintiffs, between the minor Plaintiffs and other family members, and between the adult Plaintiffs and the minor Plaintiffs' case managers. Additionally, Plaintiffs will not establish that any allegedly tortious acts or omissions with respect to communications between the adult Plaintiffs and the minor Plaintiffs were by employees of the government, as required under the FTCA.

## II. Evidentiary Issues

### A. Exclusion of Evidence Relating to the DHS Referral Policy and Zero Tolerance Policy

As discussed above, the only claims remaining in this suit are those of the port-of-entry Plaintiffs who were separated in November 2017. Nevertheless, Plaintiffs seek to put into evidence hundreds of documents, and hours of deposition testimony, relating to

the DHS Referral Policy and the Zero Tolerance Policy, which post-dated Plaintiffs' separations by many months and are no longer relevant to this case. In particular, Plaintiffs seek to introduce documents and testimony related to the creation and adoption of the DHS Referral Policy and the Zero Tolerance Policy, and the implementation of those policies in the field by U.S. Border Patrol, ICE, and the U.S. Attorney's Offices. Plaintiffs also have identified potential exhibits and testimony relating to efforts to prepare for the implementation of the DHS Referral Policy by the various federal agencies and their contractors, and efforts made while the DHS Referral Policy was in effect regarding processes and procedures related to the tracking of and communications between parents and children in separate custody. But such proposed evidence is of no relevance, given the DHS Referral Policy and Zero Tolerance Policy post-dated the separations at issue and have no relation to the separations of the port-of-entry Plaintiffs.

Plaintiffs also intend to put on evidence that in 2017 certain government officials considered immigration enforcement policy options, including options that involved prosecutions of adults traveling in family units and detention of such adults. However, those policy discussions occurred at agency headquarters levels in Washington, D.C. and lack any connection or relevance to the decisions by local operators in the field in Phoenix, Arizona and Nogales, Arizona to place the port-of-entry Plaintiffs and their children in separate custody.

Further, Plaintiffs intend to put on evidence related to the so-called El Paso Initiative, which was a prosecution initiative in the El Paso Border Patrol Sector that occurred from approximately July 2017 to November 2017. However, that initiative had no connection to the decisions made in Phoenix, Arizona and Nogales, Arizona to place the adult Plaintiffs and their children in separate custody. Indeed, the El Paso Initiative involved a completely different CBP component (Border Patrol) than the CBP component (OFO) and agency (ICE) that encountered Plaintiffs in a completely different region of the country.

Accordingly, the United States has lodged its objections to Plaintiffs' exhibits and designated testimony on these topics as not relevant (pursuant to Federal Rule of Evidence

401) and as wasteful of the Court's time and resources (pursuant to Federal Rule of Evidence 403). [9]  Accordingly, it is the United States' position – as it will address at the final pre-trial conference, if permitted, and raise at trial at the appropriate time if and when Plaintiffs' seek to move such documents and testimony into evidence – that the Court should preclude the introduction of all exhibits and testimony (either via deposition or live witness) that does not relate directly and specifically to the separations of these particular port-of-entry Plaintiffs, or does not relate directly to any relevant policies and procedures specifically applicable to and in effect at the time and location of the encounters with these port-of-entry Plaintiffs in November 2017.[10]

It is also notable that at the April 16 hearing, Plaintiffs acknowledged that the evidence described above relating to the DHS Referral Policy and Zero Tolerance Policy – that would otherwise have been part of the trial had the 2018 Plaintiffs not reached conditional settlements – is no longer part of their case. Tr. dated 4/16/24 at 6. The only caveat provided by Plaintiffs was that they would intend to put on evidence of issues relating to alleged problems with the tracking of and communications between separated family members and their reunifications that emerged in the lead up to and during the DHS Referral Policy. *Id*. Plaintiffs have not, however, limited their proposed exhibits and proposed testimony to that caveat.

Moreover, Plaintiffs' proposed evidence relating generally to the identification of any such alleged problems with tracking, communications, and reunifications lacks

---

[9] The volume of exhibits and deposition testimony to be put into evidence does not comport with Plaintiffs' representation that their entire case can be presented in five days. Tr. dated 4/16/24 at 7.

[10] More specifically, with respect to testimony (either by deposition designation or live witness), the United States will object to the testimony of the following individuals on Plaintiffs' witness list: Robert Guadian; Tricia Swartz; Jonathan White; Melissa Harper; Matthew Albence; John Bash; Thomas Blank; Michael Dougherty; Gene Hamilton; Brian Hastings; Thomas Homan; Benjamine Huffman; Shawn Jordan; Scott Lloyd; Kevin McAleenan; James McCament; Cameron Quinn; Tracy Short; Ronald Vitiello; and Chad Wolf. Although Mr. Albence, Mr. Homan, and Mr. Vitiello appear on the United States' witness list (as "may call" witnesses), their designated deposition testimony pertains to the discrete point that criminal history is a long-standing basis for placement of an adult and child in separate custody. The deposition testimony of these individuals designated by Plaintiffs is not so limited, nor is it limited to information relevant to the separations of these specific Plaintiffs. Rather, such testimony pertains to the issues described above that are outside the scope of Plaintiffs' claims.

relevance to the port-of-entry Plaintiffs' claims because it is unrelated to any specific issues with to *these* port-of-entry Plaintiffs. The proposed evidence putatively relating to the identification of alleged problems with the tracking of and communications between separated family members and their reunifications in the lead up to the DHS Referral Policy, as well as evidence relating to efforts to adapt and modify processes and procedures relating to tracking and communications and reunifications while the DHS Referral Policy was in effect and after, all post-date the separations of Plaintiffs. Accordingly, it is evidence of subsequent remedial measures that cannot be offered into evidence per Federal Rule of Evidence 407. *See, e.g., Jones v. DeVaney*, 107 Fed. Appx. 709, *1 (9th Cir. 2004) (evidence on change in practices and training of employees on such practices not admissible under FRE 407); *Mezaki v. Eurocopter*, No. CV–06–1218, 2008 WL 8765257, *3 (D. Ariz. May 6, 2018) (documents identifying issues that post-dated the conduct at issue not admissible under FRE 407).

**B. Other Evidentiary Issues Relating to Admissibility and Authenticity**

Plaintiffs stated in the Joint Proposed Pre-trial Order their intention to raise with the Court, and seek a ruling on, the United States' anticipated objections to some portion of Plaintiffs' exhibits based on authenticity and admissibility. Because Plaintiffs do not identify the specific exhibits they intend to raise with the Court – instead referring generally to "email exchanges" and "government reports or position/policy statements" – the United States cannot specifically address them herein. Given the numerous exhibits at issue and the various evidentiary issues with respect to those exhibits (or portions therein), the United States' position is the evidentiary issues should be addressed if and when Plaintiffs seek to offer them into evidence. However, for purposes of facilitating any discussions at the final pre-trial conference or at trial, the United States provides herein the general bases for its authenticity and admissibility objections.

As to documents produced by the United States this action, the United States' anticipated objections for authenticity generally relate to handwritten notes and correspondence not drafted by employees of federal agencies. Regarding the former, in many instances the identity of the author (or even his or her title or position) was not

established during discovery.  Thus, to the extent the relevance and admissibility of the notes turns on the author of said notes being known (which presumably it does), they are subject to objection by the United States unless their authenticity and admissibility is established at trial (or has not already been established by Court order).  *See, e.g., Nordin v. Standard Fire Insurance Co.*, Case No. 3:22-cv-00775, 2023 WL 6462616, * 2 (D. Or. Oct. 3, 2023) (handwritten notes not allowed into evidence without testimony by witness with personal knowledge to authenticate them).

   Regarding the latter, although there is not a dispute that such correspondence is a true and accurate copy of what was produced by the United States, the accuracy of the authorship and source of such documents was not established during discovery.  Thus, depending on the purpose for which Plaintiffs intend to introduce such documents, they are subject to objections based on authenticity (as well as, of course, to hearsay and other objections).

   As to "email exchanges," whether Plaintiffs have sufficiently laid the foundation for the admission of certain such documents as business records, as they assert, is a document-specific inquiry.  *See Monotype Corp. v. Int'l Typeface Corp.*, 43 F.3d 443, 450 (9th Cir. 1994) (holding that emails are not automatically admissible under the business records exception); *see also Rogers v. Oregon Trail Elec. Consumers Co-op., Inc.*, Case No. 3:10-CV-1337, 2012 WL 1635127, *8-9 (D. Or. May 8, 2012) (holding that "Emails do not fit neatly into the business records exception" and noting that several district courts in the Ninth Circuit apply a five-part test) (citing *In re Oil Spill by the Oil Rig Deepwater Horizon in the Gulf of Mex.*, MDL No. 2179, 2012 WL 85447, at *3 (E.D. La. Jan. 11, 2012)).  Many of the documents are lengthy, with numerous topics and statements therein.  There is uncertainty as to the source of many putative statements therein, as well to the authorship of attachments thereto, and there exists a lack of clarity as to which portion(s) of the documents Plaintiffs intend to use as evidence at trial and for what purpose.  All these factors give rise to potential hearsay and other objections.  The United States lodged potential objections only in instances where there are legitimate questions regarding the

admissibility of certain specific documents and where the foundation for admissibility was not established during discovery.

As to the documents Plaintiffs characterize as "government reports or position/policy statements", it is unclear precisely which documents they are referring to or what their basis is for contending that such documents are admissible (other than the two examples they noted in the Joint Proposed Pre-trial Order). To the extent Plaintiffs refer to various reports (and interim reports) issued by Offices of Inspector Generals and a DHS task force, Plaintiffs do not identify which portions of the documents they intend to cite as evidence of their claims. Even if such reports are self-authenticating there remain several evidentiary issues to address with respect to portions of those documents including, but not limited to, relevance, hearsay within hearsay, prejudice, and subsequent remedial measures. *See, e.g., Sussel v. Wynne*, Case No. 05–00444, 2006 WL 2860664, *2 (D. HI Oct. 4, 2006) (each statement within report must fall within hearsay exception); *see also United States v. Taylor*, 462 F.3d 1023, 2006 WL 2506038 at *2 (8th Cir. Aug. 31, 2006) (report's recitation of witness statement does not fall under the exception contained in Rule 803(8)(C)); *United States v. Mackey*, 117 F.3d 24, 28–29 (1st Cir.1997) (hearsay statements by third persons contained in report are not admissible under Rule 803(8)(C) merely because they appear within the public report; such statements raise the problem of "hearsay within hearsay"); *Smith v. Isuzu Motors Ltd.*, 137 F.3d 859, 862 (5th Cir. 1998) (draft opinions not admissible as public record); *City of New York v. Pullman Inc.,* 662 F.2d 910, 915 (2d Cir.1981) ("interim" report not admissible because it "did not embody the findings of an agency, but the tentative results of an incomplete staff investigation").

The complexity of the potential evidentiary issues with these documents is compounded by the length of such documents and the lack of clarity as to which portions Plaintiffs are citing as evidence in support of their claims. *See Sussel*, 2006 WL 2860664 at *2 ("only factual *findings* resulting from an investigation are excluded from the hearsay rule pursuant to the public records exception") (emphasis in original; internal quotation marks omitted).

Finally, many of the United States' lodged objections pertain to various purported media articles and social media posts. Such materials are quintessential hearsay statements routinely excluded from evidence. *See, Larez v. City of Los Angeles,* 946 F.2d 630, 642 (9th Cir. 1991); *Harvey v. Navajo County*, Case No. 3:10–cv–08025, 2012 WL 1605854, *1 (D. Ariz. May 8, 2012) ("Newspaper articles are hearsay and may not be admitted to establish the truth of what is said in the articles."). Even if circumstances existed where such an article could theoretically be admitted for some limited purpose, it would require the author of the article to be called as a witness and subjected to cross-examination. *Id.*

### III. Exclusion of Deposition Testimony from *P.G. v. United States*

Plaintiffs state in the Joint Proposed Pre-trial Order that they intend to submit by designation the deposition testimony of six (6) witnesses in *P.G. v. United States*, Case No. 4:21-cv-04457 (N.D. Cal.). Defendant United States objects to the introduction of deposition testimony from *P.G.*

To obtain deposition transcripts from that case, Plaintiffs filed a motion with the Court seeking to compel the United States to produce the transcripts, which the United States opposed. *See* ECF Nos. 451, 455,459. Plaintiffs' motion to compel explained that Plaintiffs sought the transcripts for potential impeachment purposes at trial. *Id.*; *see also* Pls. Memorandum in Reply (ECF No. 459) at 4 ("Ensuring that all parties have access to trial witnesses' prior statements in a related matter furthers that purpose."). The Court granted Plaintiffs' motion, stating that "[t]he Court agrees . . . that Plaintiffs should be provided with these transcripts because of their potential for impeachment at trial." *See* Order dated March 12, 2024 (ECF No.465) at 3.

Notably, only one of the six deponents is on the United States' witness list (Albence, as a "may call"), and that is for the very limited purpose noted above at fn.10. And this witness also was deposed by Plaintiffs in the instant case. However, Plaintiffs included in the Joint Proposed Pre-trial Order designations of those witness' deposition testimony from *P.G.*, to be admitted into the record as trial testimony. Thus, it is clear Plaintiffs'

intended use of the *P.G.* deposition transcripts is not limited to potential impeachment material.

The remaining four deponents (Lloyd, Quinn, McCament, and Huffman) are on Plaintiffs' witness list, but not the United States' witness list. Plaintiffs do not anticipate these witnesses testifying at trial and have instead designated portions of their deposition testimony from *P.G.* to be admitted into the record as trial testimony. Again, it is clear Plaintiffs' intended use of these deposition transcripts is not limited to potential impeachment material.

Plaintiffs' attempted use of this deposition testimony from *P.G.* not only contravenes the Court's order, it has no basis under Federal Rule of Civil Procedure 32(a)(8) as the instant action is not a "later action" as required by that rule. *See Oracle America, Inc. v. Hewlett Packard Ent. Co.*, Case No. Case No. 16-cv-01393, 2017 WL 1436080, *2 ("Rule 32 requires that the *earlier* depositions involve the same subject matter and same parties.") (emphasis added). This proposed deposition testimony also relates to the creation and implementation of the DHS Referral Policy and Zero Tolerance Policy and therefore should be precluded for the same reasons set forth above in Section II.

**IV.   Dr. Kristin Samuelson's Testimony Should Be Precluded Or, In the Alternative, Disregarded**

The United States requests that the Court exclude Plaintiffs' expert Dr. Kristin Samuelson from testifying at trial, because her testimony would run afoul of the Court's Amended Case Management Order, which states at Paragraph 5(g) that "[e]ach side shall be limited to one retained or specifically employed expert witness per issue." *See* ECF No. 144.

Plaintiffs include Dr. Samuelson on their witness list as an expert witness who will testify about issues pertaining to general causation, and that Plaintiffs were injured by their separations. Further, Plaintiffs intend for Dr. Samuelson to rebut the testimony of the United States' expert witnesses to the extent they address issues of causation. Dr. Samuelson did not conduct any clinical assessments of Plaintiffs.

Plaintiffs also state their intention to call another expert witness, Dr. Braebeck, albeit through an offer of proof, as limited by this Court's order. *See* ECF No. 474. Dr. Braebeck performed clinical assessments of Plaintiffs and the offer of proof presumably will relate to those assessments and Dr. Braebeck's opinions as to whether Plaintiffs suffered injuries that were caused by their separations. And, as with Dr. Samuelson, Plaintiffs intend for Dr. Braebeck to rebut the testimony of the United States' expert witnesses to the extent they address issues of causation.

It is Dr. Braebeck who performed clinical assessments of Plaintiffs and thus will offer her opinions on whether their separations were the cause of their alleged injuries. Dr. Samuelson's opinions regarding the impact of family separations generally are not germane to any disputed issue in this case. Therefore, such testimony would lack relevance and not be of assistance to the Court. At best, the testimony of Dr. Samuelson could serve no purpose other than a general bolstering of Dr. Braebeck's testimony regarding actual harm and causation. The Case Management Order, however, prohibits such duplication of experts. Accordingly, Dr. Samuelson's testimony should be excluded.

Furthermore, in the Joint Proposed Pretrial Order, Plaintiffs state that Dr. Samuelson will rebut the testimony of the United States' experts, Drs. Winkel and Wenger, regarding causation. Dr. Samuelson's opinions in this regard, however, were not disclosed to the United States pursuant to Rule 26. Indeed, Dr. Samuelson's report was issued *before* Drs. Winkel's and Wenger's reports were disclosed. Thus, Dr. Samuelson's testimony must be excluded on this basis as well.

Alternatively, even if the Court permits Dr. Samuelson to offer testimony, the Court nevertheless should give it no weight because Dr. Samuelson's proffered testimony confuses the issues, will not assist the Court in determining any fact in issue, and fails to apply reliable principles and methods to the facts of this case.

In particular, Dr. Samuelson's "general causation" testimony will not aid the Court as the trier of fact of Plaintiffs' IIED and negligence claims, *see* FRE 702(a), and is

needlessly cumulative and confuses the issues. *See* FRE 403.[11]  Unlike, for example, a products liability or toxic tort case where both general causation and specific causation must be established to prove that a substance is capable of causing the specific injury, *see, e.g., In re: Zicam Cold Remedy Mktg., Sales Pracs., & Prod. Liab. Litig.*, 797 F. Supp. 2d 940, 942 (D. Ariz. 2011) (in products liability case, it was necessary for plaintiffs to prove general and specific causation), for their claims of IIED and negligence Plaintiffs must prove that the challenged conduct at issue did in fact cause these particular Plaintiffs the specific injuries they allege.  In fact, as this Court has already observed, Plaintiffs' claims turn not on the impact that family separations may have on the mental and emotional health of separated parents and children in general, but on how the separations affected these particular Plaintiffs.  *See* Order dated Nov. 16, 2022 (ECF No. 312) at 2 (noting that "public statements of acknowledgement of harm to separated families says little about the particular injuries suffered by the individual adult Plaintiffs in these cases and whether such injuries are ongoing and permanent."); *see also E.E.O.C. v. GLC Restaurants, Inc.*, 2006 WL 3052224, at *9 (D. Ariz. Oct. 26, 2006) ("To determine whether any of the Plaintiffs raise a viable claim of intentional infliction of emotional distress, it is necessary to examine their *individual symptoms*.") (emphasis added).

Simply put, at issue in this case is not whether, as a general matter, separations of families can cause mental and emotional injuries in adults and children (as Dr. Samuelson opines), but whether these particular Plaintiffs suffered mental and emotional injuries as a proximate result of their separations, and the nature and extent of their injuries.  Dr. Samuelson cannot opine on those issues.

Moreover, Dr. Samuelson's opinions are not a reliable application of expert principles and methods to the facts of this case.  *See* FRE 702(d).  Dr. Samuelson did not evaluate any of the Plaintiffs, nor does her report reflect a review of any Plaintiff-specific records.  Indeed, her report does not even mention any Plaintiff by name.  To the extent Dr. Samuelson opines generally on potential neurobiological harm that could potentially

---

[11] Notably, effective December 1, 2023, FRE 702 was amended to require an expert to satisfy the admissibility standards set forth under the rule pursuant to a "more likely than not" standard.

- 15 -

result from family separations, she does not (and cannot) opine that these Plaintiffs suffered such harms or that separations did in fact cause such harm to these Plaintiffs.

Dated: April 23, 2024			Respectfully Submitted,

			BRIAN M. BOYNTON
			Principal Deputy Assistant Attorney General

			JAMES G. TOUHEY, JR.
			Director, Torts Branch

			*s/ Phil MacWilliams*
			PHILIP D. MACWILLIAMS
			Trial Attorney
			D.C. Bar No. 482883
			E-mail: phil.macwilliams@usdoj.gov
			U.S. Department of Justice
			Civil Division, Torts Branch
			Benjamin Franklin Station, P.O. Box 888
			Washington, DC 20044
			Telephone: (202) 616-4285
			Attorneys for the United States of America

**CERTIFICATE OF SERVICE**

I hereby certify that on April 23, 2024, I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants.

*s/ Phil MacWilliams*
PHILIP D. MACWILLIAMS
Attorney for United States of America